IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

RONNIE COLE,

                    Plaintiff,                  Civil Action No.
                                                  9:14-CV-0539 (BKS/DEP)

    v.

NEW YORK STATE DEPARTMENT
OF CORRECTIONS AND
COMMUNITY SUPERVISION, *et al.*,

                    Defendants.

_____

APPEARANCES:                            OF COUNSEL:

FOR PLAINTIFF:

RONNIE COLE, *Pro Se*
91-A-9212
Five Points Correctional Facility
Caller Box 119
Romulus, NY 14541

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN          KEVIN M. HAYDEN, ESQ.
New York State Attorney General       Ass't Attorney General
615 Erie Boulevard West
Suite 102
Syracuse, NY 13204-2465

DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

*Pro se* plaintiff Ronnie Cole has commenced this action asserting civil rights claims arising out of his confinement in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") pursuant to 42 U.S.C. § 1983. Plaintiff's claims, which are multi-faceted, arise out of events occurring at two separate DOCCS facilities.

Currently pending before the court is a motion filed by defendants requesting the entry of summary judgment dismissing plaintiff's claims on a variety of grounds. For the reasons set forth below, I recommend that defendants' motion for summary judgment be granted in part, but otherwise denied.

I.    <u>BACKGROUND</u>[1]

Plaintiff is a prison inmate currently being held in the custody of the DOCCS at the Five Points Correctional Facility ("Five Points"). <u>Dkt. No.</u>

---

[1] The record herein contains few undisputed facts. Plaintiff and defendants disagree on many of the events that transpired and provide conflicting accounts of the circumstances surrounding the relevant incidents. In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in the plaintiff's party's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003). To the extent that plaintiff's deposition testimony is at odds with his memorandum of law or submissions in his statement of facts, the court will follow the rule that "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Raskin v. Wyatt Co.*, 125 F.3d 55, 63 (2d Cir. 1997).

[54-1 at 1](#).[2] Plaintiff is serving a sentence for robbery, possession of stolen property, criminal possession of a weapon, and promoting prison contraband. Dkt. No. 45-15 at 1. Plaintiff's claims, however, arise out of his previous confinement at the Walsh Regional Medical Unit ("Walsh") and the Upstate Correctional Facility ("Upstate").[3] *Id.* at 2.

### A.    Use of Force Incidents at Walsh

On October 29, 2013, defendant Corrections Officer Anthony M. Durante entered plaintiff's room to conduct a strip frisk of plaintiff and a search of his area. Dkt. No. 29-1 at 15.[4] At the time, plaintiff was in his pajamas and seated in his wheelchair. Dkt. No. 45-3 at 27. Plaintiff maintains that defendant Sergeant John A. Wagner followed Durante into plaintiff's room in the E-Wing and blocked the door.[5] *Id.* Plaintiff asserts that

---

[2] Citations to page numbers refer to the pagination generated by CM/ECF, not the page numbers generated by the parties.

[3] Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined for twenty-three hours each day, primarily for disciplinary reasons. *Samuels v. Selsky*, No. 01-CV-8235, 2002 WL 31040370, at *4 n.11 (S.D.N.Y. Sept. 12, 2002).

[4] The record does not contain an affidavit authenticating or supporting the admissibility of the records annexed to plaintiff's amended complaint. Regardless, the court considers these records because defendants rely upon the records in support of their motion for summary judgment. *See Goris v. Breslin*, 2010 WL 376626, at *10, n.1 (E.D.N.Y. Jan. 26, 2010) (collecting cases).

[5] Wagner claims that he was supervising the "suspicion search" that was ordered based upon information obtained by defendant Lieutenant Raymond Judway from a confidential informant. Dkt. No. 29-1 at 16.

he attempted to comply with Durante's orders and began to unbutton his shirt. *Id.* at 29. Plaintiff claims that Durante said "Happy Anniversary," and struck plaintiff on the right side of his face. *Id.* at 30, 32. Plaintiff maintains that defendant Stephen M. LoRusso entered the room and joined defendants Durante and Wagner as they repeatedly hit, kicked, and punched plaintiff in the head, face, and neck. Dkt. No. 45-3 at 38-56. Defendants Durante and LoRusso then pulled plaintiff out of his wheelchair, lifted him overhead, and "slammed" him into the floor causing plaintiff to land on his abdomen. *Id.* at 52-56. As a result, plaintiff's urine bag broke. *Id.* at 53. Plaintiff asserts that restraints were applied and the assault terminated when the medical staff and other officers entered the room. Dkt. No. 45-3 at 57-59.

Defendant Durante, by contrast, has executed a sworn affidavit in which he denies having assaulted the plaintiff.[6] *See* Durante Aff. (Dkt. No. 45-14) ¶3. Durante claims that plaintiff became agitated during the search and began swinging his closed fists at Durante. *Id.* Plaintiff struck Durante on the right side of his head and Durante responded by pushing the plaintiff. *Id.* ¶1, 3. As a result, plaintiff fell backwards into a locker. *Id.* Durante avers

---

[6] That affidavit, which is included with defendants' motion, was given by defendant Durante in connection with a matter brought by the plaintiff in the New York Court of Claims.

that a violent struggle ensued during which plaintiff bit him and grabbed his testicles. *Id.* ¶4. Plaintiff was ultimately subdued, and defendants Wagner and LoRusso placed him in mechanical restraints. Dkt. No. 45-14 ¶4; Dkt. No. 29-1 at 16.

Plaintiff also alleges that on or around December 16, 2013, he was assaulted in a room in the A-Wing at Walsh. Dkt. No. 45-3 at 125-26. Plaintiff claims that three officers "waterboarded" him while defendant Lieutenant Timothy Michaels was present.[7] *Id.* at 126.

### B.  Facts Related to Plaintiff's Medical Treatment at Walsh[8]

On October 29, 2013, shortly after the use of force incident, plaintiff attempted to hang himself. Dkt. No. 45-15 at 3; Dkt. No. 54-1 at 4. He was examined by defendant Nurse Priscilla Peterson, who noted observing a swollen and reddened area over plaintiff's left eyebrow, neck, and left ankle. Dkt. No. 46 at 3. Plaintiff was thereafter placed on suicide watch. Dkt. No. 45-3 at 71; Dkt. No. 46 at 5; Dkt. No. 54-1 at 5. While plaintiff was on a

---

[7]  Plaintiff's amended complaint neither names the three officers nor asserts a claim against them.

[8]  In their motion, defendants offer a sworn affidavit from Nurse Administrator Kelly Rabideau, as well as certified copies of medical records submitted under seal. Dkt. No. 45-10; Dkt. No. 46. Defendants also offer a video recording that allegedly contains relevant facts. Dkt. No. 48. The video is certified, and plaintiff does not challenge its object to the authenticity. Dkt. No. 45-6.

"one-on-one" suicide watch, his behavior was documented every ten minutes. Dkt. No. 46 at 5-11.

On November 1, 2013, defendant Deputy Superintendent Amy A. Tousignant issued a property deprivation order depriving plaintiff of "all property." Dkt. No. 45-9 at 30-34. Tousignant noted that plaintiff refused to follow directions, and thus posed a threat to the safety and security of staff. Dkt. No. 45-9 at 30. The order remained in effect until November 14, 2013. Id. at 34.

It is at this point that the parties' versions of the relevant events again diverge. Defendants maintain that while on watch, plaintiff received a mattress, a clean urine bag, and was able to shower. Dkt. No. 54-1 at 5. Defendants claim that plaintiff refused to accept meals, medication, blood work, and lab tests. Id. at 5-11. Conversely, plaintiff maintains that when he returned to his room, it was equipped with only a mat, and the toilet was padlocked. Dkt. No. 45-3 at 74, 85. Plaintiff alleges that defendants refused to provide him with meals, a urine bag, or medication. Id. at 74-85. Plaintiff maintains that he was not informed that any blood work or lab tests were necessary. Dkt. No. 54-1 at 7.

On October 31, 2013, plaintiff was examined by defendant Dr. Raja Mara for complaints of pain in his left eye. Dkt. No. 46 at 1. Dr. Mara's

6

findings were benign for a left eye injury. *Id.* Plaintiff took his prescribed medications on that date and the following day, spoke with personnel from the Office of Mental Health, and was removed from the watch.[9] Dkt. No. 46 at 10; Dkt. No. 54-1 at 8-9.

The parties offer conflicting accounts of plaintiff's subsequent medical treatment. Defendants claim that Dr. Mara examined plaintiff on November 5, 2013, and that Cole reported that his left eye was "good." Dkt. No. 46 at 1. Defendants allege that a physical therapist attempted to examine plaintiff on November 18, 2013, but plaintiff refused to comply and demanded a wheelchair. Dkt. No. 46 at 107. Defendants further contend that plaintiff refused to attend an audiology consultative appointment and refused to allow defendant Nurse Rebecca Dutch to conduct an annual physical examination. Dkt. No. 46 at 26, 104.

Plaintiff counters by claiming that Dr. Mara did not examine him on November 5, 2013, and that he was not informed that he had an appointment with an audiologist or Nurse Dutch. Dkt. No. 54-1 at 9. Plaintiff also claims that he did not attend any examination by a physical therapist on November 18, 2013. Dkt. No. 54-1 at 9-10.

---

[9] The record does not indicate what prescribed medications were administered.

On December 17, 2013, plaintiff was examined by an audiologist based upon a referral from Dr. Mara and defendant Facility Health Service Director Yogendra Sharma. Dkt. No. 45-15 at 11; Dkt. No. 46 at 106; Dkt. No. 54-1 at 22. The audiologist reported that plaintiff had bi-lateral hearing aids and that plaintiff's left hearing aid was cracked and needed to be sent for repair. Dkt. No. 46 at 106. The estimated cost for the repair was $189.00. *Id.* Plaintiff was told that he was responsible for the cost of the repair, but refused to pay. *Id.* The left hearing aid was relinquished to the medical staff at Walsh. *Id.*

C.     Facts Related to Medical Treatment at Upstate

Plaintiff was transferred, with a wheelchair, to Upstate on December 19, 2013. Dkt. No. 54-1 at 11. Upon arrival, plaintiff was evaluated by a nurse who noted that he presented with a history that included urethral stricture, a MRSA infection, anti-social behavior, neuropathy, and "TB." Dkt. No. 46 at 99. Defendants contend that plaintiff told staff to "get the [expletive] away from me" while "swinging his urine bag around, picking at his wounds, and pulling at his catheter and dressings." Dkt. No. 46 at 90. Plaintiff was placed on a "watch" to be monitored for self-harm. Dkt. No. 46 at 90; Dkt. No. 54-1 at 12. Defendants assert that while plaintiff was on a

"one on one" watch, he refused to accept meals or medication, show his wounds to staff, or have his dressings changed. Dkt. No. 46 at 90, 91.

Plaintiff maintains that he was physically unable to pull at his catheter because he was in full restraints with waist chains and leg irons. Dkt. No. 54-1 at 12. Plaintiff claims that he did not threaten self-harm and disputes the assertions that he refused to comply with medical staff directives. Dkt. No. 54-1 at 12-13. Plaintiff asserts that defendants confiscated his wheelchair and provided an inadequate replacement. Dkt. No. 45-3 at 136-141. Plaintiff also claims that he was denied showers and meals from December 20, 2013 through December 24, 2013. Dkt. No. 45-3 at 146; Dkt. No. 54-1 at 14.

On December 24, 2013, plaintiff was transferred from the Upstate infirmary to a cell, via wheelchair. Dkt. No. 46 at 97. A sick call response was prepared, directing that: (1) medications would be issued three times daily; (2) Ensure would be issued four time each day; (3) the catheter would be changed monthly; and (4) dressing supplies would be provided on a daily basis. *Id.* at 98. A medical permit was also issued for the plaintiff providing for (1) a single cell, bottom bunk; (2) braces for plaintiff's right and left leg; (3) bilateral hearing aids; (4) gauze; (5) a catheter and drainage bag, (6) jock strap; and (7) dentures. *Id.* at 14.

1.   Medications and Supplies

From December 30, 2013 through April 4, 2014, plaintiff received replacement batteries for his hearing aid. Dkt. No. 46 at 32, 37, 95; Dkt. No. 54-1 at 22. Plaintiff also received urine bags (with straps),[10] knee sleeves, a jock strap, dressing supplies, gauze, tubular dressings for his arms, Bacitracin, Clobetasol ointment, and a back brace. Dkt. No. 46 at 13, 28, 33, 34, 38, 39, 40, 42, 43, 53, 62, 67, 71. A medical permit was issued allowing plaintiff to use his wheelchair and occupy a handicapped cell. Dkt. No. 46 at 13, 67. Plaintiff was additionally prescribed various medications, including Zantac (used to treat ulcers), Oxybutynin (used to treat overactive bladder), vitamin-C, a multi-vitamin, Celexa (an anti-depressant), Ativan (used to treat anxiety), Prilosec, Omeprazole, Ranitidine (used to treat ulcers), Flunisolide spray, Hydroxyzine (used to treat anxiety), Diphenhydramine (an antihistamine), and Ensure formula. Dkt. No. 46 at 35, 42, 51, 59, 64, 94-95. Plaintiff also received 25 mg of Atarax, prescribed to treat his skin disorder. *Id.* at 64, 69.

From January 1, 2014 through April 4, 2014, plaintiff repeatedly refused to accept his dressing supplies, meals, and medications. Dkt. No.

---

[10]  On February 25, 2014, plaintiff refused to accept a new urine bag and dressing and demanded an "extender" for the bag. Dkt. No. 46 at 37. The technician advised the plaintiff that "no such thing" exists. *Id.*

46 at 35, 41, 47, 49, 55-56, 67, 71, 123-130, 132, 133, 134, 136, 139, 140, 142-147, 153-156, 158, 159, 161; Dkt. No. 54-1 at 23. Plaintiff's prescriptions for medications and Ensure formula were discontinued due to non-compliance. Dkt. No. 46 at 34, 43, 45, 46.

    2.    Examinations and Consultations

On January 2, 2014, plaintiff was examined by Defendant Dr. G. Schroyer, and was diagnosed with neurodermatitis. Dkt. No. 46 at 68, 70. Dr. Schroyer prescribed two rolls of cling wrap for each extremity and a tubular retainer. *Id.* Dr. Schroyer also examined plaintiff's scrotum and noted that it was "intact with [a] thin layer of skin." *Id.* at 68. Plaintiff was directed to apply ointment daily and use a jock strap, "to be changed as needed." *Id.* Dr. Schroyer also ordered plaintiff's catheter to be changed monthly. Dkt. No. 46 at 68. Defendants contend that plaintiff refused all medications and dressings. Dkt. No. 45-15 at 12. Plaintiff claims that he did not receive the supplies or medications. Dkt. No. 54-1 at 23-24.

On January 6, 2014, plaintiff was transported to the nurses' office for a catheter change. Dkt. No. 46 at 62. When plaintiff saw the catheter that the nurse intended to use, he stated, "I can't use that kind, it'll give me an infection." *Id.* The nurse called the pharmacy technician to request a clear catheter, and was advised that one would need to be located. *Id.* Plaintiff

refused the catheter change and said he would wait for a new one to arrive. *Id.* The nurse told plaintiff to apply ointment to the area under his scrotum. Dkt. No. 46 at 62. The notations in plaintiff's records indicate that two packets of ointment were issued, although plaintiff claims that he never received the ointment. Dkt. No. 46 at 62; Dkt. No. 54-1 at 27.

Plaintiff was scheduled for physical therapy consultations on January 8, 2014 and February 10, 2014. Dkt. No. 46 at 103, 108. The therapist noted, however, that plaintiff refused to attend on those dates. *Id.* Plaintiff claims that security issues prevented his attendance. Dkt. No. 54-1 at 29. On March 24, 2014 and April 43, 2014, plaintiff refused to attend physical therapy sessions. Dkt. No. 46 at 31, 73.

On January 14, 2014, plaintiff submitted a request for a reasonable accommodation. Dkt. No. 46 at 12. In it he asked for a wheelchair that "fits" with a cushioned seat and a shower chair. *Id.* On January 23, 2014, Dr. Schroyer denied plaintiff's request for a new wheelchair, noting that "current wheelchair meets pts needs." *Id.* at 12.

On January 17, 2014, plaintiff was treated by a nurse for complaints of swelling in his left leg. Dkt. No. 46 at 53. The nurse did not detect any swelling, but observed very dry skin with open areas and "scant bloody

drainage." *Id.* Plaintiff received cream for use on his arm and legs and was advised to treat the open areas with Bacitracin. *Id.*

Defendant Nurse Practitioner Mary Kowalachuk ("Kowalachuk") diagnosed plaintiff on February 4, 2014, with atopic dermatitis. Dkt. No. 46 at 42. On March 4, 2014, Kowalachuk attempted to change plaintiff's catheter. *Id.* at 34. While plaintiff was advised that he must be on the examination table for the nurse to perform the procedure, he refused to stand from his wheelchair. *Id.*

Defendant Facility Health Service Director V. Mandalaywala sent plaintiff to Alice Hyde Medical Center on March 22, 2014, after plaintiff accidentally pulled out his catheter while attempting to transfer from his wheelchair to the shower. Dkt. No. 46 at 76-84. Plaintiff was transported to the hospital for a procedure to reinsert his catheter. *Id.* at 32, 76-84. The procedure was successful and plaintiff returned to Upstate. *Id.*

On April 7, 2014, plaintiff was transferred to Five Points. Dkt. No. 46 at 30.

D.    Disciplinary Hearings

On November 1, 2013, plaintiff was issued a misbehavior report charging him with assault on staff, engaging in violent conduct, refusing a direct order, and failure to comply with a frisk search. Dkt. No. 29 at 14. A

Tier III hearing was commenced on November 4, 2013 with defendant

Captain Joseph Corey presiding, to address these charges.[11] Dkt. No. 45-9

at 40. On November 15, 2013, plaintiff was removed from the hearing

allegedly due to disruptive conduct. Dkt. No. 29-1 at 31. Plaintiff was

ultimately found guilty of all charges.[12] *Id.* at 41-42. Cole was sentenced on

November 20, 2013, to serve eighteen months of disciplinary confinement

in the facility's special housing unit ("SHU"), with a loss of privileges, and a

recommended loss of good time credits. *Id.* at 40.

Plaintiff appealed the disciplinary determination on November 20,

2013. *Id.* at 27-32. Defendant Director of Special Housing Albert Prack

modified plaintiff's sentence on January 14, 2014. Dkt. No. 29-1 at 44. On

February 11, 2014, Prisoners' Legal Services of New York forwarded

correspondence to defendant Prack, on plaintiff's behalf, requesting

reconsideration of the modification. Dkt. No. 29-1 at 46. Defendant Prack

later reviewed and administratively reversed defendant Corey's decision on

---

[11] The DOCCS conducts three types of inmate disciplinary hearings. *See* 7 N.Y.C.R.R. § 270.3; *see also Hynes v. Squillace*, 143 F.3d 653, 655 n.1 (2d Cir. 1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. *Hynes*, 143 F.3d at 655 n.1. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. *Id.* Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *Id.*

[12] Plaintiff disputes the assertion that he was disruptive or that he pled guilty to the violent conduct charge, as defendants maintain.

March 4, 2014. *Id.* at 59. Plaintiff was advised that a complete rehearing would commence "within 14 days of receipt of [that] notice." Dkt. No. 29-1 at 59.

On March 20, 2014, defendant Hearing Officer Steven Bullis conducted a rehearing with respect to plaintiff's misbehavior report. Dkt. No. 29 ¶78. At the conclusion of that hearing plaintiff was found guilty of all charges. *Id.* Prack reversed Bullis' findings on June 2, 2014, noting that, "[t]he circumstances surrounding the incident required the hearing officer to get a mental health assessment." Dkt. No. 45-13 at 10.

As a result of the misbehavior report and two hearings, plaintiff remained in disciplinary SHU confinement for a total of 170 days. Dkt. No. 29 ¶28.

## II.   PROCEDURAL HISTORY

Plaintiff commenced this action with the filing of a complaint, accompanied by an application for leave to proceed in forma pauperis ("IFP"), on May 8, 2014. Dkt. Nos. 1, 2. Following an initial review of the complaint pursuant to 28 U.S.C. §§ 1915(e)(2)(B), 1915A, District Judge Mae A. D'Agostino issued an order granting plaintiff's IFP application and approving the filing of his complaint subject to dismissal of claims that arose under the Americans With Disabilities Act, as amended ("ADA"), 42 U.S.C.

§ 12,101 *et seq.*, and claims for money damages pursuant to 42 U.S.C. § 1983 against the DOCCS and the defendants in their official capacities. *See generally* Dkt. No. 5. On June 16, 2015, the court granted plaintiff's subsequent motion to amend his complaint to assert section 1983 claims against the defendants in their individual capacities and an ADA claim against the DOCCS. *See generally* Dkt. No. 28.

On November 13, 2015, following the close of discovery, defendants moved for the entry of summary judgment seeking dismissal of the complaint on multiple grounds, including (1) failure to exhaust administrative remedies with respect to Eighth Amendment claims against defendants LoRusso and Michaels; (2) the absence of any evidence from which a reasonable factfinder could conclude that plaintiff sustained anything other than *de minimis* injuries as a result of the October 29, 2013 incident; (3) the lack of record evidence to give rise to a genuine dispute of material fact regarding whether defendants were deliberately indifferent to plaintiff's serious medical needs; (4) plaintiff's failure to demonstrate either the deprivation of a protected liberty interest or procedural due process associated with any such deprivation; (5) the lack of record evidence to give rise to a genuine dispute of material fact regarding whether defendants retaliated against plaintiff in violation of his First Amendment constitutional

rights; (6) the lack of personal involvement of the supervisory defendants; (7) the failure to state a cause of action under the ADA; and (8) qualified immunity. Dkt. No. 45. Plaintiff filed his response in opposition to the motion on December 28, 2015. Dkt. No. 54. Defendants' motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3( c). *See* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

   A.   Legal Standard Governing Motions for Summary Judgment

   Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson*, 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

B.     Exhaustion of Administrative Remedies

As a procedural matter, defendants contend that plaintiff is precluded from judicial pursuit of his Eighth Amendment claims against defendants LoRusso and Michaels based upon his failure to comply with the exhaustion requirements of 42 U.S.C. § 1997e(a). Dkt. No. 45-16 at 16-18.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted. 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo*, 548 U.S. 81, 84 (2006) ("Exhaustion is ... mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley*, No. 04–CV–4587, 2007 WL 389003, at *5–6 (E.D.N.Y. Jan.31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983.").[13] This limitation is intended to serve the dual purpose of affording

---

[13]  All unreported cases cited to in this decision have been appended to this report for the convenience of the *pro se* plaintiff.

"prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into courtl[,]" and to improve the quality of inmate suits filed through the production of a "useful administrative record." *Jones v. Bock*, 549 U.S. 199, 204 (2007) (citations omitted); *see Woodford*, 548 U.S. at 91-92; *see also Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

The failure of a prisoner to satisfy the PLRA's exhaustion requirement gives rise to an affirmative defense that must be affirmatively raised by a defendant in response to an inmate suit.[14] *Jones*, 549 U.S. at 212. In the event the defendant establishes that the inmate plaintiff failed "to fully complete[ ] the administrative review process" prior to commencing the action, the plaintiff's complaint is subject to dismissal. *Pettus v. McCoy*, No. 04–CV–0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion"

---

[14] Defendants have interposed an exhaustion defense in their answer. Dkt. No. 34 ¶18.

requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95; *see also Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007).

New York prison inmates are subject to an Inmate Grievance Program ("IGP") established by the DOCCS, which is recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson*, No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb.20, 2004) (citing *Mojias v. Johnson*, 351 F.3d 606 (2d Cir. 2003) and *Snider v. Melindez*, 199 F.3d 108, 112–13 (2d Cir. 1999)). The IGP consists of a three-step review process. First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within twenty-one days of the incident. 7 N.Y.C.R.R. § 701.5(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. *Id.* §§ 701.4(b), 701.5(b). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. *Id.* § 701.5(c). The third level of the process affords the inmate the right to appeal the superintendent's ruling to the CORC, which makes the final administrative decision.§§ 701.4(b), 701.5(b), 701.5(d). Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief

pursuant to section 1983 in a federal court. *Reyes v. Punzal*, 206 F.Supp.2d 431, 432 (W.D.N.Y. 2002) (citing, *inter alia, Sulton v. Greiner*, No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec.11, 2000)).

Despite the PLRA's mandate concerning exhaustion, there are circumstances under which the requirement can be excused. In its recent decision in *Ross v. Blake*, 136 S. Ct. 1850 (2016), the Supreme Court noted that the requirement hinges upon internal remedies being actually available to a plaintiff inmate. *Ross*, 136 S. Ct. 1859. When internal administrative remedies are unavailable to an inmate, the PLRA's exhaustion requirement does not preclude commencement of an action. *Id.*

In *Ross*, the Supreme Court identified three circumstances in which a court could find that internal administrative remedies are not available. Under the first, "an administrative procedure is unavailable when (despite what regulations are guidance materials may promise) it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Ross*, 136 S. Ct. at 1859. In addition, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id*. The Court explained that "[i]n this situation, some mechanism exists to provide relief, that no ordinary prisoner can discern or navigate it. *Id.* The Court went on to identify a third situation under

which "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

Since the Supreme Court's decision in *Ross*, the Second Circuit has weighed in on the issue in a case involving a district court's determination that a plaintiff's complaint should be dismissed for failure to exhaust remedies where the inmate claimed to have submitted a grievance concerning misconduct by corrections officers but received no response to the grievance, and took no further action with respect to it. *Williams v. Priatno*, __ F.3d __, No. 14-1477, 2016 WL 3729383 (2d Cir. July 12, 2016). In *Williams*, plaintiff alleged that on December 31, 2012, while confined in the Downstate Correctional Facility ("Downstate"), his personal items were searched, his legal papers were confiscated, and he was assaulted by corrections officers. *Id.* at *2. Plaintiff claimed that on January 15, 2013, while still at Downstate and confined in an SHU cell, he drafted a grievance detailing the misconduct and gave it to a corrections officer to forward to the grievance office. *Id.* One week later, not having received a response to the grievance, the plaintiff inquired of the facility superintendent, who was making rounds in the SHU, concerning the grievance, and was told that the superintendent had no knowledge of the grievance but would look into it. *Id.*

Shortly after that conversation, plaintiff was transferred into another facility. Plaintiff never received a response to the grievance, nor did he ever appeal to the superintendent and/or the CORC.

After discussing the Supreme Court's decision in *Ross*, the Second Circuit in *Williams* reversed the dismissal of plaintiff's complaint, concluding that the pertinent provisions of the IGP, providing recourse in situations such as those presented, were opaque, therefore making the grievance process unavailable to the plaintiff. *Williams*, 2016 WL 3729383, at *5-6. Although not the centerpiece of its decision in *Williams*, the Second Circuit went on to note that the ambiguity associated with the prescribed mechanism for appealing a grievance that was never officially filed and answered was compounded by plaintiff's transfer and concluded that the procedures available to the plaintiff were so opaque and confusing as the incapable of use, thereby making the administrative remedies unavailable to the plaintiff. *Id.* at *7.

The initial burden of demonstrating non-exhaustion rests with the defendants. Once the defendants meet this burden, however, "it then becomes incumbent upon the plaintiff to counter with a showing of unavailability…". *See, e.g., Murray v. Palmer*, No. 03–CV–1010, 2010 WL 1235591, at *4 & n. 17 (N.D.N.Y. Mar. 31, 2010) (Suddaby, J.); *see also*

*Calloway v. Grimshaw*, No. 09–CV–1354, 2011 WL 4345299, at *5 & n. 5 (N.D.N.Y. Aug.10, 2011) (Lowe, M.J.) (citing cases), *report and recommendation adopted by* 2011 WL 4345296 (N.D.N.Y. Sept. 15, 2011) (McAvoy, J.); *Cohn v. KeySpan Corp.*, 713 F.Supp.2d 143, 155 (E.D.N.Y. 2010) (finding that, in the employment discrimination context, the defendants bear the burden of establishing the affirmative defense of failure to timely exhaust his administrative remedies, but once defendants have done so, the plaintiff must plead and prove facts supporting equitable avoidance of the defense).

   1. <u>Claims Against Defendant LoRusso</u>

 While acknowledging that plaintiff did file grievances generally addressing the October 2013 incident, defendant LoRusso maintains that the grievances fail to include or reference his claim that the officer used excessive force. Rather, defendant LoRusso contends that plaintiff's grievances against him related only to the destruction of property and, as such, do not suffice to meet the applicable exhaustion requirements. Dkt. No. 45-16 at 17.

 Undeniably, there is no specific requirement within the IGP or otherwise that an inmate identify all persons alleged to be responsible for the acts giving rise to his or her constitutional claims. *Espinal v. Goord*, 558

F.3d 119, 126 (2d Cir. 2009). A grievance, however, must be sufficiently precise and illuminating in order to place defendants on notice of what, substantively, is claimed in order to permit a proper investigation. *Johnson*, 380 F.3d at 697 (quoting *Strong v. David*, 297 F.3d 646, 650 (2d Cir. 2002)).

In this instance, defendant LoRusso's argument lacks merit, as it overlooks both the fact that defendant LoRusso is named in plaintiff's grievances, and case law which firmly establishes that this alone does not necessarily provide a basis to conclude that a claim is unexhausted. *See Brownell v. Krom*, 446 F.3d 305, 311 n .1 (2d Cir. 2006). The undisputed record reveals that plaintiff filed several grievances related to the events that transpired at Walsh on October 29, 2013.[15] Dkt. No. 29-1 at 33; Dkt. No. 45-9 at 5, 7, 9, 10, 11, 12. Plaintiff claimed that he was assaulted on October 29, 2013 and complained that various DOCCS employees, including defendant LoRusso, failed to adhere to DOCCS policies related to searches and property. *Id.* While the use of excessive force by defendant LoRusso was not directly raised in plaintiff's grievances, defendant LoRusso does not dispute that he was present in plaintiff's cell on the day of the incident. As part of the investigation into the incident, LoRusso

---

[15]  The grievances were consolidated and referenced as Grievance No. MHK 12505-13.

submitted a statement and reported that he responded to plaintiff's room and "immediately grabbed Cole's left arm with both hands and forced it to the small of his back despite much resistance from Cole. I then placed mechanical restraints on his left wrist and then assisted in rolling Cole on his left side." Dkt. No. 29-1 at 17. According to the November 14, 2013 use of force report prepared in connection with the incident, LoRusso applied force against the plaintiff, including in the form of a body hold and mechanical restraints. Dkt. No. 45-9 at 46, 50, 51. LoRusso "maintained his hold on Cole's left hand and then forced it backward to Cole's lower back and assisted Sgt. Wagner in putting it in mechanical restraints." *Id.* at 15 46, 51. LoRusso then "rolled Cole onto his left side." *Id.*

Having carefully examined the exhaustion issue in light of defendants' arguments, I cannot find as a matter of law that plaintiff has failed to fully exhaust available administrative remedies related to defendant LoRusso prior to filing this action. At best, drawing all inferences in plaintiff's favor, there is a triable issue as to whether plaintiff's grievance provided the requisite notice of the conduct at issue with respect to his claims against defendant LoRusso. *See Brownell*, 446 F.3d at 310–11. Accordingly, I recommend against dismissal of plaintiff's complaint on this basis.

### 2.    Claim Against Defendant Michaels

Defendants contend that plaintiff is barred from pursuing a claim based upon a "failure to protect" theory against defendant Michaels based upon Cole's failure to file a grievance relating to that claim. Dkt. No. 45-16 at 18. Plaintiff asks the court to excuse his failure to exhaust the available administrative remedies prior to commencing this action and including a failure to protect claim against defendant Michaels because (1) he forwarded a grievance to Upstate regarding the waterboarding incident but the grievance was returned with the explanation that plaintiff "needed to send the grievance to the facility responsible for the waterboard action," and (2) plaintiff sent a grievance to Walsh/Mohawk C.F. regarding the incident but did not receive a response. Dkt. No. 54-2 at 16-17.

As was previously noted, despite an inmate's entitlement in most instances to file and pursue a grievance in accordance with the IGP, there are circumstances under which the grievance procedure nonetheless is deemed not to have been available to an inmate plaintiff. *See Ross*, 136 S. Ct. at 1859-60. Thus, for example, exhaustion may be considered unavailable where the "plaintiff filed his initial grievance with the wrong facility, and he did not explicitly ask for additional time to file it properly," but

the IGP Supervisor failed "to advise plaintiff of his ability to ask for an extension". *Brooks v. Rock*, No. 11-CV-1171 (GLS/ATB), 2014 WL 1292232, at *11 (N.D.N.Y. March 28, 2014).

When, as in this case, an inmate asserts that his or her resort to the grievance process was deterred, the question of whether a sufficient basis to negate a finding of "availability" has been established entails an objective inquiry, focusing upon whether "'a similarly situated individual of ordinary firmness' [would] have deemed them available." *Hemphill*, 380 F.3d at 688 (citing *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003)). In opposition to defendants' motion, plaintiff asserts that he attempted, twice, to file a grievance against defendant Michaels, but his grievances were rejected. The record contains a January 6, 2014 letter from plaintiff to Mr. J. Lovelace, Senior Investigator at the Office of the Inspector General. Dkt. No. 29-1 at 101. In that correspondence, plaintiff advises that he forwarded a letter on December 24, 2013 regarding "crimes committed against my person" on December 19, 2013 "before . . . administrative draft out." *Id.* at 101. In it, plaintiff refers to being "beat" and "drowning." *Id.* Plaintiff enclosed a grievance based upon the December 19, 2013 assault. *Id.* The record also contains a memorandum dated January 6, 2014 from the IGP Office informing plaintiff that Grievance No. UST 53210-14 related to

harassment/misconduct was being investigated. Dkt. No. 29-1 at 100. The record, however, does not contain a copy of that grievance.

Based upon the record, this court cannot conclude that plaintiff did not properly submit a timely initial grievance regarding defendant Michaels' alleged violation of plaintiff's rights at Walsh, and that the IGP was available to him. Mindful that a court should not resolve credibility issues when deciding a motion for summary judgment, and that the defendants bear the ultimate burden of proving that plaintiff did not exhaust his administrative remedies, I conclude that there appears to be a material issue of fact as to whether plaintiff filed a timely initial grievance regarding his claim against defendant Michaels or whether his failure to do so should be excused under *Ross*.

C.    Excessive Force Claims

Plaintiff claims that defendants Durante, Wagner, and LoRusso violated his Eighth Amendment rights through their use of excessive force against him. Dkt. No. 29 ¶100. Defendants argue that there is no medical evidence by which plaintiff can substantiate this claim, and that any injury he suffered was *de minimis*. Dkt. No. 45-16 at 15-16.

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley v.*

*Albers*, 475 U.S. 312, 319 (quotation marks omitted); *Griffin v. Crippen*, 193 F.3d 89, 91 (2d Cir.1999). "A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components-one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir.2009) (citing *Hudson v. McMillian*, 503 U.S. 1, 7–8 (1992); *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir.1999)). To satisfy the subjective requirement in an excessive force case, the plaintiff must demonstrate that "the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Wright*, 554 F.3d at 268 (quotation marks omitted). This inquiry turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson*, 503 U.S. at 6 (quotation marks omitted); *accord, Blyden*, 186 F.3d at 262. The Supreme Court has emphasized that the nature of the force applied is the "core judicial inquiry" in excessive force cases, rather than "whether a certain quantum of injury was sustained." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test, a court must be mindful that the absence of serious

31

injury, though relevant, does not necessarily negate a finding of wantonness.[16] *Wilkins*, 559 U.S. at 37; *Hudson*, 503 U.S. at 9.

"The objective component [of the excessive force analysis] ... focuses on the harm done, in light of 'contemporary standards of decency.' " *Wright*, 554 F.3d at 268 (quoting *Hudson*, 503 U.S. at 8); *see also Blyden*, 186 F.3d at 263 (finding the objective component "context specific, turning upon 'contemporary standards of decency' "). In assessing this element, a court must ask whether the alleged wrongdoing is objectively harmful enough to establish a constitutional violation. *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *accord Hudson*, 503 U.S. at 8; *see also Wright*, 554 F.3d at 268. "But when prison officials use force to cause harm maliciously and sadistically, ''contemporary standards of decency always are violated. This is true whether or not significant injury is evident.' " *Wright*, 554 F.3d at 268–69 (quoting *Hudson*, 503 U.S. at 9) (alterations omitted)). The extent of an inmate's injury is but one of the factors to be considered in determining whether a prison official's use of force was "unnecessary and wanton"

---

[16] This notwithstanding, "[n]ot every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir.1993) (quotation marks omitted); *see also Griffin*, 193 F.3d at 91. "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9–10 (quotation marks omitted).

because "injury and force ... are imperfectly correlated[.]" *Wilkins*, 559 U.S. at 38. In addition, courts consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Hudson*, 503 U.S. at 7; *Whitley*, 475 U.S. at 321; *Romano*, 998 F.2d at 105.

In support of defendants' motion, they have included an affidavit from defendant Durante, in which he denies plaintiff's allegations and explains the necessity of applying force in order to maintain discipline. Dkt. No. 45-14. Durante avers that he entered plaintiff's room at approximately 9:40 a.m. to conduct a search. Dkt. No. 45-14 at 1. Plaintiff became agitated, jumped out of his chair, and swung his closed fists at Durante, striking the officer in the head. *Id.* Durante pushed plaintiff away, causing him to fall into a locker. *Id.* Durante recounts that during a violent struggle, plaintiff grabbed his testicles and bit Durante's left hand. Dkt. No. 45-15 at 2. Durante forced plaintiff onto the floor, chest first, and maintained pressure on plaintiff's shoulders. *Id.* Defendants Wagner and LoRusso then applied mechanical restraints. *Id.*

As was discussed earlier, an investigation was conducted regarding the incident, during which defendants LoRusso and Wagner provided statements. According to defendant LoRusso, he responded to plaintiff's

room and "immediately grabbed Coles left arm with both hands and forced it to the small of his back despite much resistance from Cole. I then placed mechanical restraints on his left wrist and then assisted in rolling Cole on his left side." Dkt. No. 29-1 at 17. Additionally, defendant Wagner reported plaintiff did not comply with Durante's directives and that, "[f]orce had to be used to gain control of Inmate Cole." Dkt. No. 45-9 at 47.

While defendants explain that the use of force was necessary because plaintiff refused to comply with their efforts to conduct a search and attacked him, plaintiff disputed their version of the events when he testified during his deposition that defendants used forced against him for reasons unrelated to restoring or maintaining discipline. Plaintiff testified that during an illegal cell search and strip search, defendants choked, kicked and punched him in the head, neck, face, legs, back and abdomen. Dkt. No. 45-3 at 32, 38, 40-43. He claims that the defendants pulled him out of his wheelchair, picked him up by his arms and "slammed" him to the ground on two occasions causing plaintiff's urine bag to break when he landed on his abdomen. *Id.* at 52-54. Plaintiff contends that the attack was in retaliation for filing grievances and lawsuits. Dkt. No. 45-3 at 25, 30, 50.

In further support of their motion, defendants also rely upon a surveillance video recording from Walsh.[17] [Dkt. No. 48](#) (traditionally filed, not electronically filed). The video recording does not depict the use of force incident or any of the events surrounding the excessive force claim. Instead, it simply begins with plaintiff being escorted from his cell to another cell following the incident. [Dkt. No. 48](#). As such, the court is unable to resolve any factual issues surrounding the use of force or determine which version of events to credit. *See Comeaux v. Sutton*, 496 F. App'x 368, 372 (5th Cir. 2012) (holding that while the video depicted the plaintiff's injuries, the videotape did not offer any proof as to the need for or circumstances of force and thus, the court could not hold that the plaintiff's version of events was inconsistent with his injuries).

Plaintiff claims that as a result of the incident he sustained two black eyes and suffered bruising, swelling, and pain in his face, back, abdomen and wrist. Dkt. No. 45-3 at 66, 68. Defendants argue that plaintiff's injuries were *de minimis* because the medical records associated with the treatment administered by Walsh personnel and the video recording do not support plaintiff's allegations concerning the extent of his injuries. *See generally* Dkt.

---

[17] The video is not date or time stamped. The date on which it was recorded, however, is referenced in the audio portion of the video.

No. 45-2. Defendants ignore the fact, however, that plaintiff's injuries are but one factor to consider in the excessive force analysis. *See Wilkins*, 559 U.S. at 38 (finding that the extent of an inmate's injuries is but one factor to consider in determining whether a defendant's use of force was "unnecessary and wanton" because "injury and force . . . are imperfectly correlated"). Although none of plaintiff's medical records reveal that he suffered anything but minimal injuries as a result of the alleged uses of force by the defendants, the dispositive inquiry is whether defendants used force in a malicious and sadistic manner, rather than in a good-faith effort to maintain or restore order. On a motion for summary judgment, where the record evidence could reasonably permit a rational factfinder to find that corrections officers used force maliciously and sadistically, dismissal of an excessive force claim is inappropriate. *See Wright*, 554 F.3d at 269 (reversing summary dismissal the plaintiff's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the "medical records after the . . . incident with [that officer] indicated only a slight injury") (citing *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003)).

Based on the record now before the court, there exists a dispute of fact as to the basis for defendants' use of force. From the conflicting accounts given by the parties, this case would appear to squarely present an issue of credibility not appropriately resolved on motion for summary judgment. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) (citing, *inter alia, Anderson*, 477 U.S. at 255, 106 S. Ct. 2513). Accordingly, I recommend that defendants' motion be denied to the extent that it seeks dismissal of this claim.

D.    Failure to Protect Claim Against Defendant Michaels

In their motion defendants argue that plaintiff's claim against defendant Michaels for failing to protect him from harm at the hands of three unidentified corrections officers is subject to dismissal on the merits. A plaintiff asserting a failure to protect claim must prove that the defendant against whom the claim is asserted actually knew of and disregarded an excessive risk of harm to his health and safety. *Hayes v. New York City Dep't of Corrs.,* 84 F.3d 614, 620 (2d Cir. 1996). This "reckless disregard" to a plaintiff's health and safety can be proven by evidence establishing "a pervasive risk of harm to inmates . . . and a failure by prison officials to reasonably respond to that risk." *Knowles v. N.Y. City Dep't of Corrs.*, 904 F. Supp. 217, 222 (S.D.N.Y. 1995) (quotation marks omitted). To establish

liability on the part of a defendant under this theory, "the plaintiff must adduce evidence establishing that the officer had (1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene." *Henry v. Dinelle*, No. 10–CV–0456, 2011 WL 5975027, at *4 (N.D.N.Y. Nov. 29, 2011) (Suddaby, J.) (citing *Jean–Laurent v. Wilkinson*, 540 F.Supp.2d 501, 512 (S.D.N.Y. 2008)).

Plaintiff claims that three officers, who are not named as defendants in this action, "held" him in the "A-Wing holding closet" at Walsh and "play[ed] there [sic] game of water boarding." Dkt. No. 29 at 16; *see also* Dkt. No. 45-3 at 126, 129. Plaintiff maintains that those unnamed individuals restrained him and placed a towel over his face while they poured water on him in an attempt to choke him. Dkt. No. 45-3 at 128-130. According to the plaintiff, defendant Michaels was present during the assault. *Id.* at 126. Defendants argue that this claim is "wild and unsupported," but do not offer any affidavit from defendant Michaels or any substantive argument in support of their request for dismissal of this claim. Dkt. No. 45-16 at 18. I therefore recommend against the entry of summary judgment dismissing

plaintiff's claim against defendant Michaels for failure to protect him from harm.

E.     Deliberate Medical Indifference Claim

In his complaint, plaintiff asserts claims addressed to the sufficiency of the medical care and treatment received by him at the relevant times. In their motion defendants also seek dismissal of this claim as a matter of law.

1.     Legal Standard Governing Deliberate Medical Indifference Claims

While the Eighth Amendment " 'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 102–03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Failure to provide inmates with medical care, "[i]n the worst cases, . . . may actually produce physical torture or lingering death, [and] . . . [i]n less serious cases, . . . may result in pain and suffering no one suggests would serve any penological purpose." *Id.*

A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by neglecting to provide adequate medical care must

satisfy both objective and subjective requirements. *Wright v. Goord*, 554

F.3d 255, 268 (2d Cir.2009); *Price v. Reilly*, 697 F.Supp.2d 344, 356

(E.D.N.Y.2010). The Second Circuit has noted the following with respect to

the objective requirement:

> [d]etermining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable medical care . . . . Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner.

*Salahuddin v. Goord*, 467 F.3d 263, 279–80 (2d Cir. 2006) (citations omitted).

The second inquiry of the objective test requires a court to examine the

seriousness of the inmate's medical condition if the plaintiff alleges a complete failure

to provide treatment. *Smith v. Carpenter*, 316 F.3d 178, 185–86 (2d Cir. 2003).

"Factors relevant to the seriousness of a medical condition include   whether a

reasonable doctor or patient would find it important and worthy of comment, whether

the condition significantly affects an individual's daily   activities, and whether it

causes chronic and substantial pain." *Salahuddin*,   467 F.3d at 280 (quotation marks

and alterations omitted).

If, on the other hand, a plaintiff's complaint alleges that treatment was provided but was inadequate, the second inquiry of the objective test is narrowly confined to that specific alleged inadequacy, rather than focusing upon the seriousness of the inmate's medical condition. *Salahuddin*, 467 F.3d at 280. "For example, if the prisoner is receiving ongoing treatment and the offending conduct is an unreasonable delay or interruption in that treatment, [the focus of the] inquiry [is] on the challenged delay or interruption in treatment, rather than the prisoner's underlying medical condition alone." *Id.* (quotations marks omitted).

To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.' " *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). "In medical-treatment cases ..., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin*, 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* (citing *Farmer*, 511 U.S. at 837); *see also Leach v. Dufrain*, 103 F.Supp.2d 542, 546 (N.D.N.Y. 2000) (Kahn, J .); *Waldo v. Goord*, No. 97–CV–1385,

1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J., adopting report and recommendation by Homer, M.J.). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin*, 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 839–40).

It should be noted that the Eighth Amendment does not afford prisoners a right to medical treatment of their choosing; the question of what diagnostic techniques and treatments should be administered to address an inmate's medical condition is a "classic example of a matter for medical judgment" and, accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle*, 429 U.S. at 107, 97 S.Ct. at 293; *Chance*, 143 F.3d at 703 (citation omitted); *Rosales v. Coughlin*, 10 F.Supp.2d 261, 264 (W.D.N.Y.1998) (citation omitted). Accordingly, mere disagreement with prison officials regarding a course of treatment does not implicate a constitutional right or support a deliberate indifference claim under section 1983. *United States ex rel. Hyde v. McGinnis*, 429 F.2d 864, 867 (2d Cir.1970) (citation omitted).

2. <u>Analysis</u>

Addressing the first objective element of the governing test, defendants argue that plaintiff has failed to establish that he suffered from

any serious injury and contend that there is no evidence that plaintiff suffered from a MRSA infection while confined at Walsh or Upstate. Dkt. No. 45-16 at 15. Plaintiff's medical records, submitted in support of defendants' summary judgment motion, however, belie defendants' argument. Those records indicate that plaintiff attempted suicide, was positive for a MRSA infection suffered from asthma, urethral stricture, hearing loss, and neuropathy, and displayed an anti-social personality. Dkt. No. 46 at 99. Accordingly, a reasonable factfinder could conclude that plaintiff suffered from a serious medical need. *See McCluskey v. Vincent*, 505 F. App'x 199, 202 (3d Cir. 2012) (holding that MRSA is a serious medical need); *Miller v. Ramineni*, No. 14-CV-1351(DNH/CFH), 2016 WL 1253684, at *4 (N.D.N.Y. Feb. 29, 2016), *report and recommendation adopted,* 2016 WL 1261125 (N.D.N.Y. Mar. 30, 2016) ("Several courts have concluded that MRSA constitutes a sufficiently serious medical condition.") (collecting cases); *see also Zimmerman v. Burge*, No. 06 CV 0176 (GLS/GHL), 2009 WL 9054936, at *6 (N.D.N.Y. April 20, 2009) (finding that objective element was satisfied because plaintiff attempted suicide and was diagnosed with depression).

### a.    Claims Against Walsh Defendants

Plaintiff claims that defendants Mara, Regional Medical Director Marshall Trabout, Dutch, Peterson, Health Care Assistant Joseph

Henderson, and Nurse Administrator D. Williamson ignored his medical needs. In his deposition, plaintiff provided greater detail concerning this claim, testifying that defendants (1) refused to assess and treat his injuries after the excessive force incident; (2) failed to provide medication and medical supplies including Depends and urine bags; and (3) failed to repair his hearing aids.[18] See Dkt. No. 45-3 at 77, 97-105. Defendants assert that plaintiff refused to allow medical staff to administer blood tests and declined to attend scheduled appointments.

The evidence before the court establishes that defendant Peterson examined plaintiff following the alleged assault, and documented her findings. Dkt. No. 29-1 at 12. From October 29, 2013 through November 1, 2013, plaintiff was monitored every ten minutes while on a "suicide watch." Dkt. No. 46 at 5-11. After plaintiff was discharged from the watch, he was examined by defendant Mara, received medications and medical supplies, and attended a consultation with an audiologist. Dkt. No. 45-3 at 79-82.

While there is a dispute regarding whether defendants failed to advise plaintiff of scheduled appointments, even viewing the evidence in a light

---

[18]  Defendants incorrectly summarize plaintiff's deliberate medical indifference claims against the Walsh defendants. Dkt. No. 45-10 at 2. They contend that as a result of the use of force incident, plaintiff sustained only minor injuries that were not sufficiently serious medical conditions requiring constitutional protections. Dkt. No. 45-16 at 12. However, plaintiff's Eighth Amendment claims are not limited to a failure to treat the injuries allegedly sustained by the plaintiff as a result of the October 29, 2013 incident.

most favorable to plaintiff, the failure to advise plaintiff of scheduled appointments does not constitute deliberate indifference. *See Johnson v. Woods*, No. 07-CV-1018 (DNH/DRH), 2010 WL 2039164, at *13 (N.D.N.Y. March 2, 2010). There is no evidence from which a rational factfinder could conclude that defendants knew that plaintiff would suffer serious harm if they failed to advise him of blood tests, an appointment with an audiologist, a consultative appointment with a physical therapist, or the need for an annual physical examination. At best, plaintiff's allegations state claims of negligence and medical malpractice which are not cognizable under 42 U.S.C. § 1983. *See, e.g., Farmer*, 511 U.S. at 835 ("[D]eliberate indifference describes a state of mind more blameworthy than negligence."); *Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) ("A showing of medical malpractice is . . . insufficient to support an Eighth Amendment claim unless the malpractice involves culpable recklessness."); *Morris v. Hoke*, No. 87–CV–7812, 1992 WL 310792, at *2 (S.D.N.Y. Oct.21, 1992) ("[T]he [plaintiff's allegations] would underlie, at best, a state claim of negligence or medical malpractice, not cognizable under 42 U.S.C.1983.").

With regard to plaintiff's allegations related to his hearing aids, the record reveals that on December 17, 2013, he attended a consultative appointment with an audiologist and was advised that his left hearing aid

was cracked and needed repair. Dkt. No. 46 at 106. Plaintiff refused to pay the cast of the needed repair. *Id.* The record does not contain any evidence related to plaintiff's right hearing aid, and specifically whether it was functional at that time. On December 30, 2013, plaintiff received new batteries for his hearing aids. *Id.* at 95. Even assuming that plaintiff was deprived of his hearing aids for any period of time, his claim is deficient based upon his failure to provide any evidence establishing that he was unable to function due to the deprivation. *See Alster v. Goord*, 745 F.Supp.2d 317, 334 (S.D.N.Y. 2010) (finding that the plaintiff's allegations related to uncomfortable or inadequate hearing aids failed to rise to the level of a constitutional violation) (citations omitted); *see also Fate v. Goord*, 2012 WL 3104884, at *7 (S.D.N.Y. July 31, 2012) (holding that the "short waiting period" before receiving hearing aids cannot be considered deliberate indifference).

In further support of his inadequate medical care claim, plaintiff recites facts related to the conditions of his cell. Plaintiff claims that the cell did not have a bed, his toilet was padlocked, he was denied meals, and he was forced to sleep on the floor. Dkt. No. 45-3 at 73-76. Even assuming these conditions existed, the evidence does not establish that plaintiff's medical conditions deteriorated due to those conditions. Moreover, this portion of his

claim is also subject to dismissal since the record before the court does not establish that any named defendant was personally responsible for the conditions of plaintiff's cell, or that any named defendant possessed the authority to remedy those conditions. *See Savage v. Brue*, No. 05-CV-0857 (GLS/GHL), 2007 WL 3047110, at *12 (N.D.N.Y. Oct.18, 2007) (holding that cell conditions were immaterial to Eighth Amendment medical claim because the complaint lacked allegations establishing that defendants were involved in decisions related to supplies or suggesting that the conditions contributed to plaintiff's serious medical condition).

The evidence now before the court also fails to disclose the precise involvement on the part of defendant D. Williamson in the alleged deprivation of treatment, and lacks factual assertions plausibly establishing that this defendant both knew of and disregarded an excessive risk to plaintiff's health or safety. Plaintiff vaguely testified that D. Williamson "failed to provide adequate medical care." Dkt. No. 45-3 at 183-84. This conclusory allegation is insufficient to establish defendant D. Williamson's role in the medical indifference alleged. *See Schwartz v. Dennison*, 518 F.Supp.2d 560, 573 n. 11 (S.D.N.Y. 2007) ("Plaintiff's complaint contained no allegations from which it can be inferred that defendants created, or allowed to continue, an unconstitutional policy."); *Graham v. Poole*, 476 F.Supp.2d

257, 261 (W.D.N.Y. 2007) ("Plaintiff's conclusory allegation that Poole failed to provide him with adequate medical care is also insufficient to state a claim.").

In sum, plaintiff alleges deliberate indifference against Walsh defendants in only a skeletal and conclusory fashion and, for the most part, fails to point to specific deprivations that could rise to a level of constitutional significance. Aside from plaintiff's vague and unsupported deposition testimony, there is no evidence that defendants were deliberately indifferent to plaintiff's medical needs. Accordingly, I recommend that this portion of defendants' motion be granted, and that plaintiff's medical indifference claims against defendants Mara, Trabout, Dutch, Peterson, Henderson and D. Williamson be dismissed.

> b.    Claims Against Upstate Defendants

Plaintiff alleges that defendants Mandalaywala, Dr. Schroyer, Kowalachuk, Smith, Michaels, and Nurse M. Williamson were also deliberately indifferent to his serious medical needs, in violation of the Eighth Amendment. Specifically, plaintiff claims that those defendants (1) failed to treat his MRSA infection and wounds; (2) improperly discontinued medications; (3) confiscated plaintiff's wheelchair and denied his request for a suitable replacement; (4) attempted to provide a catheter that would have

caused infection; and (5) failed to provide examinations or consultations with specialists. Dkt. No. 29 ¶65, 104, 105; Dkt. No. 45-3 at 159-167; Dkt. No. 54-2 at 10-11. Defendants contend that plaintiff's care at Upstate was appropriate, and that he was non-compliant with his treatment. Dkt. No. 45-16 at 11-15.

Having carefully reviewed the record, I conclude that no reasonable factfinder could find that the Upstate medical defendants were deliberately indifferent to plaintiff's medical needs. Between December 2013 and April 2014, plaintiff was treated by prison medical staff on virtually a daily basis for a variety of ailments. Plaintiff received vitamins, dietary supplements, and various medications to treat his skin disorder, ulcer, overactive bladder, depression, and anxiety. Dkt. No. 46 at 35, 42, 51, 59, 64, 94-95. Plaintiff also received dressing supplies including gauze, sleeves, tubular dressing, Bacitracin and Clobetasol ointment. *See generally* Dkt. No. 46. Plaintiff was examined by Dr. Schroyer, as well as members of the nursing staff, and was referred to a hospital to have his catheter reinserted. Dkt. No. 29-1 at 62-69. Plaintiff received a permit for a wheelchair, braces, and knee sleeves. Plaintiff's dissatisfaction with his treatment, type of wheelchair, and defendants' choice of a latex catheter rather than a silicone catheter falls

short of establishing that defendants acted with a sufficiently culpable state of mind.

Addressing the discontinuance of medications, defendants explain that the decision to halt plaintiff's medications was based upon his non-compliance with staff directives and his continued refusal to accept medication. Plaintiff's deliberate indifference claims are undermined by his admission that he was not denied meals or medication, but rather, refused for fear it "would cause him more harm." Dkt. No. 54-2 at 10; *see Mortimer Excell v. Fischer*, No. 08-CV-0945 (DNH/RFT), 2009 WL 3111711, at *5 (N.D.N.Y. Sept. 24, 2009) (dismissing the plaintiff's Eighth Amendment claim because the plaintiff was provided with food but refused to eat it for fear that it was drugged). Even assuming that defendants acted improperly in discontinuing plaintiff's medication, at most the error constitutes negligence, which is not actionable under 1983. *Johnson v. Connolly,* No. 07-CV-0158 (LEK/GHL), 2008 WL 724167, at *5 (N.D.N.Y. March 17, 2008) (holding that allegations that medications were improperly discontinued amounts to negligence, not deliberate indifference).

As to plaintiff's claim that he should have been referred to a urologist, a plaintiff's disagreement over the decision of whether an evaluation by a specialist is warranted in any particular case is the very kind of treatment

decision which, courts have recognized, does not alone support a cognizable claim under the Eighth Amendment. *Estelle*, 429 U.S. at 107, 97 S.Ct. at 293; *Chance*, 143 F.3d at 703. There is no evidence in the record to suggest that an examination by a urologist was medically necessary, or that any different treatment would have eventuated as a result of such a visit. Simply stated, plaintiff's disagreement regarding the need for referral to a urologist does not state a claim against the defendants for deliberate indifference to his serious medical needs.

In sum, the record lacks any facts demonstrating that defendants' conduct exposed plaintiff to an excessive risk of harm, or that his condition deteriorated because of the defendants' actions. Accordingly, no reasonable factfinder could conclude that the Upstate defendants were deliberately indifferent to plaintiff's medical needs. Plaintiff's medical indifference claim against the Upstate defendants is therefore also subject to dismissal as a matter of law.

F.     Due Process Claims Against Defendants Tousignant and Michaels

Plaintiff claims that defendant Tousignant issued a deprivation order confiscating Cole's property, bed, braces and "anything in his cell" in

violation of his Fourteenth Amendment rights.[19] Dkt. No. 45-3 at 119.

Plaintiff also alleges that defendant Michaels issued an order depriving

plaintiff of the use of his wheelchair without affording plaintiff his due

process rights. Dkt. No. 29 ¶ 58; Dkt. No. 45-3 at 125.

In the prison context, it is will established that the alleged destruction

or loss of a plaintiff's personal property will not support a claim redressable

under § 1983, provided that adequate post-deprivation remedies are

available. *Hudson v. Palmer*, 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d

393 (1984). The deprivation of property does not constitute a Fourteenth

Amendment violation because New York provides an adequate

post-deprivation remedy in the Court of Claims with respect to property

claims by prisoners. *Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir. 1996).

Here, plaintiff does not allege a destruction or loss of any personal

property. Instead, he claims that he was temporarily deprived of access to

his personal property and wheelchair. Even assuming the record supported

plaintiff's allegations, there was an adequate post-deprivation remedy

available to the plaintiff before the New York State Court of Claims. *See

Davis v. New York*, 311 F. App'x 397, 400 (2d Cir. 2009). Accordingly, I

---

[19] Defendants have not submitted any argument in response to this claim.

recommend dismissal of plaintiff's due process claims related to his deprivation of property.

G.   Due Process Claims Associated With the October 29, 2013 Misbehavior Report

Plaintiff claims that defendants Corey and Bullis deprived him of due process when presiding over his disciplinary hearings.[20] Dkt. No. 29 at ¶103. Defendants argue that plaintiff's due process claim is deficient as a matter of law. Dkt. No. 45-16 at 23-26.

To successfully state a claim under 42 U.S.C. § 1983 for a denial of procedural due process, a plaintiff must show that he 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields*, 280 F.3d 69, 79–80 (2d Cir. 2000) (citations omitted); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir.1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351–52 (2d Cir. 1996).

1.   Liberty Interest

As to the first element, in *Sandin v. Conner*, 515 U.S. 472 (1995), the Supreme Court determined that, to establish a liberty interest in the context of a prison disciplinary proceeding resulting in removal of an inmate from the general prison population, a plaintiff must demonstrate that (1) the state

_____

[20]  Plaintiff also asserts supervisory claims against Prack related to his disciplinary hearings. Those claims are discussed below. *See* pp. __ - __, *post.*

actually created a protected liberty interest in being free from segregation and (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483–84; *Tellier*, 280 F.3d at 79–80; *Hynes*, 143 F.3d at 658. The prevailing view in this circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor. *See, e.g., LaBounty v. Coombe*, No. 95–CV–2617, 2001 WL 1658245, at *6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin*, No. 94–CV–0985, 2001 WL 118598, at *6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.). Accordingly, I must next examine whether the allegations related to the conditions of plaintiff's SHU confinement rise to the level of an atypical and significant hardship under *Sandin*.

Atypicality in a *Sandin* inquiry is normally a question of law.[21] *Colon v. Howard*, 215 F.3d 227, 230–31 (2d Cir. 2000); *Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir. 1999). "[W]hether the conditions of a segregation amount to an 'atypical and significant hardship' turns on the duration of the segregation and a comparison with the conditions in the general population

---

[21] In cases where there is a factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those to a jury for resolution. *Colon v. Howard*, 215 F.3d 227, 230–31 (2d Cir. 2000); *Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir. 1999).

and in other categories of segregation." *Arce v. Walker*, 139 F.3d 329, 336 (2d Cir. 1998) (citing *Brooks v. DiFasi*, 112 F.3d 46, 48–49 (2d Cir. 1997)). In cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions of that confinement, however, a court may not be required to undergo a detailed analysis of these considerations. *Arce*, 139 F.3d at 336; *Hynes*, 143 F.3d at 658.

As to the duration of the disciplinary segregation, restrictive confinement of less than 101 days, on its own, does not generally rise to the level of an atypical and significant hardship. *Davis*, 576 F.3d at 133. Accordingly, when the duration of restrictive confinement is less than 101 days, proof of "conditions more onerous than usual" is required. *Davis*, 576 F.3d at 133 (citing *Colon*, 215 F.3d at 232–33 n.5). In those circumstances the court must examine "the [actual] conditions of [the plaintiff's] confinement 'in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration.' " *Davis*, 576 F.3d at 134 (quoting *Welch v. Bartlett*, 196 F.3d 389, 392–93 (2d Cir. 1999)). On the other hand, the Second Circuit has found that disciplinary segregation under ordinary conditions of more than 305 days rises to the level of atypicality. *See Colon*,

215 F.3d at 231 ("Confinement in normal SHU conditions for 305 days is in our judgment a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*.").

Defendants concede that as a result of the two disciplinary hearings and determinations, plaintiff served 170 days of SHU disciplinary confinement, but allege that he was not deprived of a liberty interest because during that time, "he was offered daily medical attention and meals, which he claims to have refused to eat because he did not 'trust it.' " Dkt. No. 45-16 at 24. The record confirms that plaintiff spent 170 days in an SHU setting. Dkt. No. 29. Because this period of disciplinary confinement falls between 101 and 305 days, in order to determine whether plaintiff suffered an atypical hardship, and therefore has been deprived a constitutional significant liberty interest, the court is required "to articulate specific findings of the conditions of the imposed confinement relative to the ordinary prison conditions[.]" *Reynoso v. Selsky*, 292 F. App'x 120, 123 (2d Cir. 2008). While plaintiff's testimony from his deposition suggests that the conditions of his SHU confinement were extraordinary,[22] defendants have not adduced any evidence with respect to the conditions of ordinary prison

---

[22] Plaintiff testified that, while confined in the SHU, he was denied showers, food, and water. Dkt. No. 45-3 at 145-150. Plaintiff also claimed that he remained on the "floor the whole time." *Id.* at 147.

life in support of their motion. Because this evidence is lacking, the court cannot undertake the type of specific fact-finding required to determine, on a motion for summary judgment, whether plaintiff suffered an atypical and significant hardship during his disciplinary confinement. *See Reynoso*, 292 F. App'x at 123 (reversing the district court where it had neglected "to articulate findings as to why the 150–day total sentence was not 'atypical and significant' " and commenting that "[s]uch a determination is anything but simple, and cannot be resolved summarily"). For this reason, I have assumed, for purposes of this report, that plaintiff was deprived of a liberty interest during the course of his 170 day SHU confinement, and will proceed to analyze whether defendants provided plaintiff with constitutionally adequate safeguards in connection with his disciplinary hearings.

2. <u>Sufficiency of Process Associated with the October 29, 2013 Misbehavior Report and Ensuing Disciplinary Hearing</u>

The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally significant liberty interest are well-established, the contours of the requisite protections having been articulated by the Supreme Court in *Wolff v. McDonnell*, 418 U.S. 539, 564–67, 94 S.Ct. 2963, 2978–80, 41 L.Ed.2d 935 (1974). Under *Wolff,* the constitutionally-mandated due process requirements include (1) written

notice of the charges; (2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff*, 418 U.S. at 564–67, 94 S.Ct. at 2978–80; *see also Eng v. Coughlin*, 858 F.2d 889, 897–98 (2d Cir.1988). In order to pass muster under the Fourteenth Amendment, a hearing officer's disciplinary determination also must garner the support of at least "some evidence." *Superintendent v. Hill*, 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985).

### a. False Misbehavior Reports

Plaintiff alleges that defendants Corey and Bullis violated his due process rights when they conducted hearings based upon a false misbehavior report. Dkt. No. 54-2 at 25. The mere allegation of the issuance of a false misbehavior report to an inmate is not cognizable under section 1983. *See Boddie v. Schneider*, 105 F.3d 857, 862 (2d Cir. 1997) ("[A] prison inmate has no general right to be free from being falsely accused in a misbehavior report."). Similarly, an inmate does not possess a due process right to be free from having a hearing officer rely upon an alleged false

misbehavior report at a disciplinary hearing. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *cert. denied*, 485 U.S. 982, 108 S.Ct. 1273 (1988) ("It is well established that in the absence of other aggravating factors, an inmate enjoys no constitutional right against the issuance of a false misbehavior report."). This general rule recognizes that an inmate's procedural due process rights are adequately safeguarded by the opportunity to challenge and present evidence to rebut the false accusations at a disciplinary hearing. *Freeman*, 808 F.2d at 953.

      b. <u>November 2013 Hearing</u>

          i) <u>Whether Plaintiff's Claims Relating To His First Disciplinary Hearing Are Negated By The Reversal And Subsequent Second Hearing</u>

Defendants claim that the issue of whether plaintiff's due process rights were violated during the first hearing is a nullity due to the subsequent reversal of the resulting determination and commencement of a second hearing. Dkt. No. 45-16 at 25. In support of that position, they rely upon the Second Circuit's decisions in *Horne v. Coughlin*, 155 F.3d 26 (2d Cir. 1998). The underlying facts in *Horne* are strikingly similar to those in the case at bar. In that case, a first disciplinary hearing was conducted on December 19, 1984, resulting in a finding of guilt and a sentence of one year of SHU disciplinary confinement. *Horne*, 155 F. 3d at 28. That determination was

ultimately reversed in May 1985. *Id.* A second hearing was conducted on May 9, 1985. *Id.* At the conclusion of that hearing, plaintiff was again found guilty and sentenced to serve three hundred days in SHU confinement, although that penalty was administratively modified to six months of SHU confinement. *Id.* Plaintiff in that case was credited with all of the time served as a result of the first hearing, and was released thirteen days after the modification on May 28, 1985, after having served six months of SHU confinement, including the time spent as a result of the first hearing.[23] *Id.* Under these circumstances, the Second Circuit concluded that it was

---

[23] That time spent in disciplinary confinement as a result of the first hearing was credited to the penalty ultimately dispensed after the second hearing is made clear in a footnote of the court's decision in *Horne*, in which it stated:

> It should be clear from the discussion in the dissenting opinion that *Horne* did not spend five months of administrative confinement waiting for his second hearing. The 5 – month period he spent in SHU pursuant to his first disciplinary sentence (before it was voided), and the few days spent thereafter awaiting the second hearing, were all credited to the service of his eventually six – month sentence. As a result his 6 months were completed and he was released from SHU thirteen days after the six – month sentence was imposed on May 28, 1985 [sic]. Thus, the six months to which *Horne* was ultimately sentenced was the only time he spent in the SHU.

*Horne*, 155 F. 3d at 31, n. 4.

unnecessary to address plaintiff's procedural due process claims arising out of the first hearing since "it became a nullity." *Id.* at 31.

In this matter, as in *Horne*, the record establishes that plaintiff was confined in the SHU as a result of penalties imposed following the November 2013 hearing, and remained in SHU confinement until and after the second hearing commenced on March 20, 2014, at which he was again found guilty. Accordingly, based upon the Second Circuit's decision in *Horne*, it is unnecessary to determine whether plaintiff was afforded due process in connection with his first hearing, and his claims against defendant Corey are subject to dismissal on this basis.

        ii)      <u>Plaintiff's Arguments Regarding The First Hearing</u>

Even assuming *arguendo* that the plaintiff's first hearing was not rendered a nullity, for purposes of the plaintiff's procedural due process claims, I will address his substantive arguments. In connection with the first hearing, plaintiff claims that defendant Corey precluded him from questioning witnesses and improperly removed him from the first hearing. Dkt. No. 29 ¶103; Dkt. No. 54-2 at 26-27. Plaintiff argues that Hearing Officer Corey's failure to call an inmate, nurses, and Imam Muhammad violated his Fourteenth Amendment rights. *Id.* Plaintiff claims that

Muhammad was present in his room after the assault, and would have offered testimony concerning his injuries. Dkt. No. 45-3 at 109-110.

### aa. Right to Call Witnesses

Among the due process violations cited by plaintiff in support of his procedural due process claim with regard to the first hearing is a deprivation of his right to call witnesses. While the Fourteenth Amendment guarantees an inmate's right to call witnesses and present evidence in his defense before being deprived of a cognizable liberty interest, that right is not without bounds; the law requires only that an inmate be permitted to present witness testimony only where "permitting him [or her] to do so will not be unduly hazardous to institutional safety or correctional goals." *Hill v. Selsky*, 487 F.Supp.2d 340, 342 (W.D.N.Y.2007) (citing *Wolff*, 418 U.S. at 566, 94 S.Ct. at 2979). "[A] prisoner's request for a witness can be denied on the basis of irrelevance or lack of necessity." *Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 (2d Cir. 1991). "Prison officials may be required to explain, in a limited manner, the reason why witnesses were not allowed to testify." *Ponte v. Real*, 471 U.S. 491, 497 (1985). "The burden is not upon the inmate to prove the official's conduct was arbitrary and capricious, but upon the official to prove the rationality of his position." *Fox v. Coughlin*, 893 F.2d 475, 478 (2d Cir. 1990).

During the first hearing, defendant Corey permitted plaintiff to call defendants Peterson and Judway as witnesses. Dkt. No. 45-9 at 42. On November 20, 2013, defendant Corey completed the required Form 2176 with an explanation of his decision not to call RN Hart, RN Schram, and Imam Muhammad as witnesses. Dkt. No. 29-1 at 22. Corey noted that Hart, Schram, and Muhammad did not witness the alleged assault, and were not involved in the incident that precipitated the hearing. *Id.* The fact that plaintiff was not present to execute the witness interview form reflecting the hearing officer's denial of plaintiff's request to call those three witnesses does not give rise to a due process violation.[24] "[A]s long as a hearing officer articulates a reason for not calling a witness that is logically related to correctional goals, due process does not require that he do so during the hearing." *Brooks v. Rock*, No. 11-CV-1171 (GLS/ATB), 2014 WL 1292232, at *29 (N.D.N.Y. Mar. 28, 2014) (citation omitted).

Defendant Corey's decision not to call the requested witnesses was reasonable. It is clear from plaintiff's testimony that those witnesses were not present during the alleged assault, and the record of plaintiff's injuries and treatment adequately addressed their scope and extent. *See Wolff*, 418

---

[24] Plaintiff does not dispute that he received the form. While the record does not clearly establish when plaintiff received the form, he was provided with the form at some point, as is evidenced by the fact that it was annexed as an exhibit to his amended complaint. Dkt. No. 29-1 at 22.

U.S. at 466 (citing "lack of necessity" as a proper ground for refusing to call a potential witness at a disciplinary hearing). Finally, a careful review of the record does not suggest that the result of plaintiff's hearing would have been any different had defendant Corey permitted these witnesses to testify. *See Lewis v. Murphy*, No. 12-CV-0268 (NAM/CFH), 2014 WL 3729362, at *13 (N.D.N.Y. July 25, 2014) (holding that the plaintiff alleged that his counselor failed to interview witnesses but did not show how this shortcoming prejudiced the results).

### bb. Removal from Hearing

Plaintiff claims that defendant Corey improperly ordered his removal from the hearing. Dkt. No. 54-2 at 26. Defendants contend that even if the court determines plaintiff's Fourteenth Amendment rights were violated when excluded from the hearing, defendant Corey is entitled to qualified immunity. Dkt. No. 45-16 at 27.

The Second Circuit has not conclusively resolved whether an inmate has a due process right to be present at disciplinary proceedings, and district courts within the circuit have issued varying opinions regarding the issue. *See Vogelfang v. Capra*, 889 F. Supp. 2d 489, 514 (S.D.N.Y. 2012) ("[T]his Court finds it to be an open question in the Second Circuit whether there is an independent right of a prisoner to be present at all times during a

disciplinary hearing, or whether such a right to be present exists only insofar as it is required to enable the prisoner to exercise his or her rights to call witnesses or present documentary evidence."); *Clark v. Dannheim*, No. 02-CV-6525L, 2011 WL 2973687, at *1 (W.D.N.Y. July 21, 2011) (collecting cases) ("[W]here an inmate disrupts a hearing, a hearing officer has discretion to order the inmate removed, particularly if the prisoner has been warned that continued unruly behavior may result in his expulsion."); *Mims v. Ufland*, No. 07 CIV. 1926, 2008 WL 2986497, at *5 (S.D.N.Y. Aug. 1, 2008) (citations omitted) (holding that the limited right to be present at the hearing is not absolute, and can be waived if the inmate engages in disruptive conduct). In this district, courts have reasoned that the Supreme Court's decision in *Wolff* affords an inmate the limited right to be physically present at disciplinary hearings in order to exercise basic due process rights. *Johnson v. Doling*, No. 05 CV 376 (TJM/RFT), 2007 WL 3046701, at *8-9 (N.D.N.Y. Oct. 17, 2007) (citations omitted). That right is "necessarily be limited by penological interests;" however, the "per se denial of such right would undermine the requirement that disciplinary hearings be held 'at a meaningful time and in a meaningful manner.' " *Id.* (citing, *inter alia Wolff*, 418 U.S. at 566 (stating "we must balance the inmate's interest . . . against

the needs of the prison, and some amount of flexibility and accommodation is required").

Defendants contend that plaintiff was removed from the hearing due to his "beligerent [sic] and disruptive" behavior. Dkt. No. 45-9 at 42-44. Plaintiff maintains that he was improperly removed from the hearing because defendant Corey "didn't like the questions I was asking." Dkt. No. 45-3 at 111. Plaintiff avers that he did not yell, or struggle but "conduct[ed] [himself] as they were conducting themselves." *Id.* at 112. While a hearing officer retains the right to remove a disruptive inmate based on safety concerns, *see Ponte*, 471 U.S. at 495, the evidence before the court does not conclusively establish that plaintiff was disruptive during the hearing. The transcript of that disciplinary hearing is not part of the record before this court. Accordingly, there are genuine issues of fact as to whether plaintiff's due process rights were violated when defendant Corey removed him from the disciplinary hearing. Having made that determination, I must turn to the issue of whether Corey is entitled to qualified immunity with respect to this claim.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v.*

*Howards*, 132 S.Ct. 2088, 2093 (2012); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Sudler v. City of N.Y.*, 689 F.3d 159, 174 (2d Cir. 2012). The law of qualified immunity seeks to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson,* 555 U.S. at 231. Government officials are shielded from liability by qualified immunity when making "reasonable mistakes" concerning the lawfulness of their conduct. *Sudler*, 689 F.3d at 174 (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001), abrogated on other grounds by (*Pearson*, 555 U.S. 223)). Because qualified immunity is "an immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), the Supreme Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Pearson*, 555 U.S. at 231 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)).

The determination of whether a government official is immune from suit is informed by two factors. *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011). Specifically, the inquiry is informed by whether the facts alleged, taken in a light most favorable to the plaintiff, show that the conduct at issue violated a statutory or constitutional right, and if so, whether that right "was

clearly established at the time of the challenged conduct." *Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014) (citing *Reichle*, 132 S.Ct. at 2093). The Supreme Court has said that an officer's "conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2083 (2011) (quotation marks and alterations omitted). "To this end, a plaintiff need not show a case 'directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.' " *Terebesi,* 764 F.3d at 230 (quoting *al-Kidd*, 131 S.Ct. at 2083). However, "[e]ven where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton*, 505 F.3d 161, 169–70 (2d Cir. 2007) (citations omitted). This "objective reasonableness" part of the test is satisfied if "officers of reasonable competence could disagree on [the legality of the defendant's actions]." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

In this instance, even assuming plaintiff is able to establish a constitutional violation, I recommend a finding that defendant Corey is

entitled to qualified immunity based upon my conclusion that it was objectively reasonable for him to believe that his conduct did not violate plaintiff's constitutional rights. As a threshold matter, at the time of the disciplinary hearing, "the contours" of the right, or limited right, of an inmate to be present at his disciplinary hearing were not clearly established. *Webb v. Selsky*, No. 01-CV-149S, 2008 WL 796179, at *7-8 (W.D.N.Y. Mar. 24, 2008). In any event, a person in defendant Corey's position could have reasonably concluded that excluding plaintiff from the hearing would not violate any clearly established constitutional right. Accordingly, I recommend a finding that defendant Corey is entitled to qualified immunity.

c. March 20, 2014 Hearing

Plaintiff contends that the second disciplinary hearing, which was conducted on March 20, 2014 by defendant Steven Bullis, was untimely as it did not commence within the fourteen days prescribed by the decision on appeal and 7 N.Y.C.R.R. § 251–5.1. Dkt. No. 54-2 at 25, 30. It is well-established that the violation of a state regulation is not cognizable under 42 U.S.C. § 1983. *Cusamano v. Sobek*, 604 F.Supp.2d 416, 482 (N.D.N.Y. 2009) (Suddaby, J.) (collecting cases). Plaintiff's claim of undue delay is instead subject only to overarching constitutional considerations, which require only that the hearing be held within a "reasonable time" and

not within any prescribed number of days. *Russell v. Coughlin*, 910 F.2d 75, 78 n. 1 (2d Cir. 1990) ("Federal constitutional standards rather than state law define the requirements of procedural due process."); *Donato v. Phillips*, No. 04–CV–1160, 2007 WL 168238, at *6 (N.D.N.Y. Jan. 18, 2007) (McAvoy, J.) (hearing that started nine days after plaintiff's confinement in the SHU was reasonable). Here, the undisputed record establishes that second hearing was commenced one day beyond the allotted time. Plaintiff has failed to produce any evidence suggesting that his procedural due process rights were violated by this brief delay.

During his deposition, plaintiff claimed that defendant Bullis refused to allow him to question witnesses and denied him due process when the hearing officer called witnesses before plaintiff was brought into the room. Dkt. No. 45-3 at 114. Plaintiff does not identify the witnesses in question or provide any argument related to the substance of the testimony. "It is not a violation of due process at a disciplinary hearing to take the testimony of a witness outside the presence of an inmate." *Kalwaskinski v. Morse*, 201 F.3d 103, 109 (2d Cir. 1999) (citations omitted). "Nor does an inmate have a constitutional right of confrontation." *Id.* (citations omitted). Accordingly, I recommend that plaintiff's due process claims related to the second disciplinary hearing be dismissed.

H.    Retaliation

In their motion, defendants also seek dismissal of retaliation claims asserted by the plaintiff. When prison officials take adverse action against an inmate, motivated by the inmate's exercise of a constitutional right, including the free speech provisions of the First Amendment, a section 1983 retaliation claim may be sustained. *See Friedl v. City of N .Y.*, 210 F.3d 79, 85 (2d Cir.2000) ("In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws."). The Second Circuit has cautioned, however, that, because of "the ease with which claims of retaliation may be fabricated, courts should examine prisoners' claims of retaliation with skepticism and particular care." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir.1995); *accord, Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2013).

To establish a claim under section 1983 for unlawful retaliation, a plaintiff must prove that (1) he engaged in protected conduct, (2) the defendants took adverse action against him, and (3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount*

*Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir. 2007). "[P]rison officials' conduct constitutes an 'adverse action' when it would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Alicea v. Howell*, 387 F.Supp.2d 227, 237 (W.D.N.Y.2005) (quoting *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001)).

As to the first element of the plaintiff's retaliation claim, it is well settled that the filing of grievances and lawsuits constitutes protected activity for purposes of a First Amendment retaliation analysis. *See Johnson v. Eggersdorf*, 8 F. App'x 140, 144 (2d Cir. 2001) ("It is undisputed that retaliation by prison officials against an inmate for the filing of a grievance can act as a deprivation of a constitutionally protected right."). Turning to the second element of the retaliation claim, plaintiff must establish that he suffered an adverse action. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 398 (6th Cir.1999). To establish the requisite connection between protected speech and adverse action, in order to satisfy the third element, the plaintiff must prove that the protected conduct was a "substantial and motivating factor to the adverse action taken by prison officials." *Bennett v. Goord*, 343 F.3d at 133, 137 (2d Cir.2003).

With respect to the third, causation element of a retaliation claim, several factors may be considered in determining whether the requisite nexus exists between the plaintiff's protected activity and a prison official's actions, including "(1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his . . . motivation." *Jean-Laurent v. Lane*, No. 11-CV-0186, 2013 WL 600213, at *8 (N.D.N.Y. Jan. 24, 2013). While the chronology of events may favor the finding of a causal connection, a plaintiff may not rely upon temporal proximity alone to defeat summary judgment. *Faulk v. Fisher*, 545 F. App'x 56, 58 (2d Cir. 2013) (finding that temporal proximity between protected conduct and an adverse action constitutes circumstantial evidence of retaliation). The evidence relating to the causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action. *Baskerville v. Blot*, 224 F.Supp.2d 723, 732 (S.D.N.Y. 2002).

Plaintiff has asserted retaliation claims against defendants Durante, Wagner, LoRusso, Sharma, Trabout, Mara, J. Henderson, P. Henderson, Tousignant, M. Williamson, Smith, Kumar, Schroyer, Kowalachuk, and Corey. Defendants argue that plaintiff cannot support retaliation claims with

the "speculative" assertion that those defendants were motivated, in general, by plaintiff's litigious behavior. Defendants contend that plaintiff's failure to cite to any specific grievances or complaints as the basis for his retaliation claim warrants an award of summary judgment. Dkt. No. 45-16 at 22-23.

### 1. Defendant Durante

Plaintiff alleges that defendant Durante used excessive force in retaliation for plaintiff filing grievances and a lawsuit. Dkt. No. 54-2 at 14. The record before the court contains evidence that plaintiff filed complaints in September 2010 and October 2010 related to threats, harassment, and assaults involving Durante. Dkt. No. 29-1 at 1. In September 2010, plaintiff filed a complaint in this district against "DOCS" and various employees related to his confinement at Mohawk C.F.[25] *See Cole v. New York State Dep't of Corr. Servs.*, No. 10-CV-1098 (NAM/TWD) ([Dkt. No. 1](#)) ("*Cole I*"). On March 23, 2011, plaintiff's amended complaint in that case was accepted for filing. *Id.* ([Dkt. No. 16](#)). In his amended complaint, plaintiff claimed, *inter alia*, that defendant Durante retaliated against him and violated his Eighth Amendment rights with harassment, threats, and excessive force claims arising from assaults that occurred in September

---

[25] The DOCCS was formerly known as the Department of Correctional Services, or "DOCS."

2010 and October 2010. *Id.* ([Dkt. No. 16](#) ¶70, 74). On April 21, 2011, Durante acknowledged service of the amended complaint in that action. *Id.* ([Dkt. No. 28](#)). Plaintiff subsequently forwarded a letter to defendant Superintendent Paul M. Gonyea on July 16, 2012, accusing defendants LoRusso and Durante of harassment. Dkt. No. 29-1 at 7-10. Based upon these circumstances, I find that plaintiff engaged in protected conduct with the filing of complaints, grievances, and a lawsuit involving defendant Durante.

As to the second element of the plaintiff's retaliation claim, it is clear that "an assault by corrections officers is sufficient to 'chill a person of ordinary firmness from continuing to engage in his First Amendment activity.' "[26] *Rivera v. Goord*, 119 F.Supp.2d 327, 339-40 (S.D.N.Y. 2000). While defendants do not present any further arguments in support of dismissing plaintiff's retaliation claims, implicit in their motion is the suggestion that the record lacks evidence to establish the requisite nexus between the protected conduct and adverse action that is, that the protected conduct was a "substantial" or "motivating factor" in defendant Durante's decision to use force against plaintiff.

---

[26] In their motion, defendants do not dispute that plaintiff suffered adverse actions.

Plaintiff asserts that immediately before being assaulted by defendant Durante, the officer stated, "Happy Anniversary" in reference to prior assaults and a lawsuit that resulted from those assaults. Dkt. No. 45-3 at 30. Plaintiff also testified that defendant Durante told him that the assault was "payback" for grievances. Dkt. No. 45-3 at 54. While plaintiff has offered proof of his complaints and the filing of a lawsuit against Durante, the gap between the protected conduct asserted and the defendant's alleged retaliatory act is tenuous. *See Butler v. Raytel Med. Corp.*, 150 F. App'x 44, 47 (2d Cir. 2005) (holding that a one year gap between complaint and adverse employment action is insufficient to support an inference of a causal relationship). However, when coupled with the statements attributed to Durante, which, if true, strongly suggest that he was motivated to assault plaintiff for filing the lawsuit, these circumstances present genuine issues of material fact concerning the nexus element of the retaliation test, thereby precluding the entry of summary judgment in connection with plaintiff's retaliation claim. *See Roland v. McMonagle*, No. 12-CV-6331, 2015 WL 5918179, at *6 (S.D.N.Y. Oct. 9, 2015) (finding an issue of fact as to retaliation despite the gap in time between the protected conduct and alleged attack as the plaintiff presented evidence that the defendants were aware of the complaints and mocked him for filing grievances during the

attack). For this reason, I recommend against the entry of summary judgment dismissing plaintiff's retaliation claim against defendant Durante.

### 2.    Defendant LoRusso

As it relates to defendant LoRusso, the record before the court does not contain any evidence that plaintiff filed a grievance against defendant LoRusso prior to the October 2013 incident, and LoRusso was not a named defendant in *Cole I*. For this report, I assume that plaintiff engaged in protected conduct, as it relates to defendant LoRusso, based upon the July 2012 letter to defendant Gonyea. What is lacking, however, are any allegations of fact that connect the letter and the October 2013 incident. Plaintiff cannot rely solely upon the temporal proximity of the complaint and the alleged acts of misconduct by defendant LoRusso to survive summary judgment. Temporal proximity alone is insufficient to carry plaintiff's burden of proof beyond the pleading stage. *Ethier v. City of Cohoes*, No. 02-CV-1584, 2006 WL 1007780, at *7 (N.D.N.Y. Apr.18, 2006) (McAvoy, S.J.) (citing cases); *Freeman v. Goord*, No. 02 Civ. 9033, 2005 WL 3333465, at *7 (S.D.N.Y. Dec.7, 2005). Moreover, the thirteen months that elapsed between the alleged protected conduct, in July 2012, and the October 2013 incident, without more is insufficient to support a finding of the requisite nexus. *See, e.g., Nicastro v. N.Y. City Dep't of Design & Constr.*,

125 F. App'x 357, 358 (2d Cir. 2005) (concluding that the plaintiff could not, at the summary judgment stage, establish even a *prima facie* case of retaliation where the adverse employment action occurred "almost ten months after" the plaintiff engaged in protected conduct and there was no other evidence of causation); *Figueroa v. Johnson*, 109 F. Supp. 3d 532, 552 (E.D.N.Y. 2015). Accordingly, I recommend that plaintiff's retaliation claim against defendant LoRusso be dismissed

        3.    <u>Defendants Sharma, Trabout, Mara, J. Henderson, P. Henderson, Tousignant, M. Williamson, Smith, Kumar, Schroyer, and Kowalachuk</u>

Plaintiff also claims that defendants Sharma, Trabout, Mara, J. Henderson, P. Henderson, Tousignant, M. Williamson, Smith, Kumar, Schroyer, and Kowalachuk retaliated against him when they confiscated his wheelchair and hearing aids, refused to provide Depends, pajamas, or soap, failed to treat his MRSA infection, and were deliberately indifferent to his medical needs. Dkt. No. 29 at ¶105; Dkt. No. 45-3 at 174. Plaintiff asserts that their retaliatory conduct was motivated by plaintiff's prior grievances and lawsuit.

Based upon the record before the court, no reasonable factfinder could conclude that plaintiff suffered any significant adverse action. While, plaintiff was dissatisfied the medical treatment received from prison officials,

the record establishes a willingness on defendants' part to respond to plaintiff's medical needs. Moreover, as was discussed in depth above, plaintiff was not denied adequate or timely medical attention. Under these circumstances plaintiff did not suffer any adverse action as a result of defendants' medical treatment and thus, as a matter of law, cannot sustain a retaliation claim based upon that treatment.

I note, moreover, that even assuming plaintiff suffered any negative consequences from defendants' medical treatment, he has not cited to any evidence which would support the requisite nexus between his protected conduct and the adverse action. On July 26, 2012, plaintiff filed a grievance (MHK-12773-12) complaining of inadequate medical treatment, harassment, food tampering, and conspiracy.[27] *Id.* at 11. The record also establishes that plaintiff filed grievances in July 2012 and November 2013 related to his medical care at Walsh. Dkt. No. 29-1 at 11; Dkt. No. 45-9 at 9, 11. Plaintiff also filed numerous grievances related to his medical care at Upstate. *Id.* at 50, 51, 57, 96. However, the record does not contain any proof from which a reasonable factfinder could conclude that any action by these defendants was motivated by plaintiff's filing of grievances or the

---

[27]  The record contains a copy of a CORC decision dated February 20, 2013, resolving a grievance filed on July 26, 2012. Dkt. No. 29-1 at 11. The names of the Walsh medical staff and corrections officers identified in the grievance were redacted, however, and the record does not contain a copy of the original grievance.

commencement of *Cole I*. These defendants were not named as defendants in *Cole I*, and are not referenced anywhere in plaintiff's amended complaint in that action. *See Cole I* ([Dkt. No. 16](#)). There is no evidence of any connection between these defendants and defendant Durante or the prior grievances nor, indeed, is there any record evidence that these defendants were even aware that plaintiff filed grievances or a lawsuit. The evidence now before the court fails to establish a connection between these defendants and plaintiff's grievance and lawsuit. Simply stated, the record is devoid of any evidence from which a reasonable factfinder could conclude that these defendants retaliated against plaintiff for the filing of grievances and a lawsuit.

### 4. Defendants Wagner and Corey

With regard to defendants Wagner and Corey, plaintiff has failed to adduce any facts indicating that he engaged in protected conduct as it relates to these two defendants. The grievances at issue did not involve these defendants, and plaintiff has failed to offer any facts indicating these defendants knew that he had engaged in protected conduct. Indeed, plaintiff testified that he never saw defendant Wagner before the day of the alleged assault, and never filed any grievance against defendants Corey or Wagner. Dkt. No. 45-3 at 48-49; 120-121.

Plaintiff claims that defendant Corey was aware of his prior grievances and complaints regarding harassment based upon his position as Deputy Superintendent of Security. This contention, however, is unsupported by the record or any competent evidence, and instead appears to be the product of sheer surmise on plaintiff's part. Because the record contains no evidence from which a reasonable factfinder could conclude that there exists a causal connection between plaintiff's grievances, complaints and lawsuit and adverse action by defendant Wagner or defendant Corey, I recommend that the court grant this portion of defendants' motion and dismiss plaintiff's retaliation cause of action as against these two defendants.

I.    Personal Involvement/Supervisory Liability

Plaintiff asserts claims against defendants Judway, Upstate Deputy Superintendent of Administration Sandra Danforth, Sharma, Gonyea, Prack, and DOCCS Acting Commissioner Anthony Annucci. Those claims appear to be based solely upon their supervisory positions and plaintiff's contention that those defendants were aware of ongoing constitutional violations and failed to prevent them from continuing. *See, e.g.* Dkt. No. 29 at ¶102; Dkt. No. 54-2 at 18-19; Dkt. No. 45-3 at 122, 159, 168, 170. Plaintiff also maintains that defendant Annucci failed to transfer him out of Walsh

after plaintiff settled his prior lawsuit. Dkt. No. 54-2 at 12. Defendants argue that the record before the court fails to establish their involvement in any constitutional violations.

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [42 U.S.C.] 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir.1991)); *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir.1977). As the Supreme Court has noted, a defendant may only be held accountable for his own actions under section 1983. *See Ashcroft v. Iqbal*, 556 U.S. 662, 683 (2009) ("[P]etitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic."). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir.1986). "To be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law." *Hendrickson v. U.S. Attorney Gen.*, No. 91–CV–8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994).

It is well-established that individuals who are sued in their capacities as supervisors, cannot be liable for damages under section 1983 solely by

virtue of being a supervisor. *See Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) ("[L]iability . . . cannot rest on respondeat superior."); *Wright*, 21 F.3d at 501. To establish responsibility on the part of a supervisory official for a civil rights violation, a plaintiff must demonstrate that the individual (1) directly participated in the challenged conduct; (2) after learning of the violation through a report or appeal, failed to remedy the wrong; (3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in managing the subordinates who caused the unlawful event; or (5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty*, 490 F.3d 143, 152–53 (2d Cir.2007), *see also Richardson*, 347 F.3d at 435; *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.1995); *Wright*, 21 F.3d at 501.

In the face of defendants' summary judgment motion, in which they assert the insufficiency of plaintiff's allegations against the aforementioned supervisory defendants, plaintiff must offer evidence which would implicate their personal involvement in the constitutional violations.

1. <u>Defendant Judway</u>

Plaintiff claims that defendant Judway was personally involved in the use of force incident, and cites to Judway's testimony during the November

2013 disciplinary hearing as support for that allegation. Plaintiff maintains that Judway testified that he authorized defendants Durante and Wagner to "get Cole by any means necessary." Dkt. No. 45-3 at 66. Unfortunately, the record now before the court does not contain either a transcript from that hearing or an affidavit from defendant Judway. Though admittedly tenuous, assuming there was a constitutional violation related to the use of force incident, it is conceivable that a reasonable factfinder could credit plaintiff's claim and conclude that defendant Judway was personally involved. This could suffice to potentially support a finding of the requisite personal involvement on the part of defendant Judway to support a finding of liability against him. For this reason, I have recommended a finding that plaintiff has raised genuine questions of material fact regarding defendant Judway's personal involvement, sufficient to avoid summary judgment on this basis.

2.     Defendant Gonyea

Plaintiff alleges that defendant Gonyea received notice that defendants Durante and LoRusso were threatening and harassing plaintiff in July 2012. Defendants' motion does not contain any declaration or affidavit from defendant Gonyea. Rather, defendants summarily state, without reference to the July 2012 letter, that Gonyea is being sued solely due to his position in the prison hierarchy. The court finds that defendants

have failed to sustain their initial burden of proving that there are no material issues of fact with respect to Gonyea's personal involvement. Accordingly, I recommend defendants' motion with respect to defendant Gonyea be denied.

### 3. Defendant Prack

Plaintiff's claims against defendant Prack arise from the two disciplinary hearings conducted to address the November 1, 2013 misbehavior report, and his role in reviewing the resulting determinations. Plaintiff appealed the disciplinary determinations by defendants Corey and Bullis, and defendant Prack responded to those internal appeals. Dkt. No. 29-1 at 44, 59; Dkt. No. 45-13 at 10; Dkt. No. 54-2 at 18. With respect to the first disciplinary hearing, for the same reasons cited in support of my recommendation that plaintiff's claims against defendant Corey be dismissed, I also recommend dismissal of all claims against defendant rack arising out of that first disciplinary hearing. Turning to the second hearing, I have found no basis to conclude that the second hearing was conducted in a manner that failed to comport with due process. Accordingly, I recommend the court also grant defendants' motion with respect to plaintiff's due process claim asserted against Prack arising from the second hearing. *See, e.g., Lopez v. Whitmore*, No. 13–CV–0952 (BKS/ATB), 2015

WL 4394604, at *11 (July 16, 2015) (dismissing due process claim against defendant Prack "[b]ecause his only involvement in plaintiff's claims was to affirm the results of a disciplinary hearing that th[e] court ... found comported with due process").

### 4. Defendants Danforth and Sharma

Plaintiff asserts supervisory liability claims against defendant Sharma based upon his position as the Health Service Director at Walsh. Dkt. No. 45-3 at 170. Plaintiff also claims that defendant Danforth was responsible for investigating plaintiff's complaints against the medical staff. *Id.* at 159. As was discussed above, I have recommended a finding that plaintiff failed to raise an issue of material fact with respect to his Eighth Amendment medical indifference claims, and that they are subject to dismissal. Accordingly, for the reasons set forth in Part III(I)(3) above, I recommend that the portion of defendants' motion for summary judgment seeking dismissal of plaintiff's supervisory claims against defendants Danforth and Sharma be granted.

### 5. Defendant Annucci

At his deposition, plaintiff testified that he is suing Acting Commissioner Annucci in this action for four reasons, alleging that Annucci (1) is at the top of the chain of command as Deputy Commissioner of

DOCCS; (2) failed to investigate the alleged assault on plaintiff; (3) failed to respond to letters from plaintiff; and (4) failed to transfer plaintiff out of Walsh after becoming aware of the prior lawsuit. Dkt. No. 45-3 at 121-122; Dkt. No. 54-23 at 12.

With regard to the failure to transfer plaintiff, "[a] supervisor's failure to transfer a prisoner out of a facility may constitute deliberate indifference where the supervisor 1) knows that the conditions of confinement expose the prisoner to serious risk of harm, and 2) the supervisor has the authority to transfer the prisoner to another facility." *Kane v. Pierce*, No. 106-CV-01564, 2009 WL 189955, at *3 (E.D. Cal. Jan. 26, 2009), *report and recommendation adopted*, 2009 WL 674127 (E.D. Cal. Mar. 16, 2009) (citations omitted).

Plaintiff's claims against Annucci are based upon plaintiff's unsupported assumption that Annucci received plaintiff's letters. Dkt. No. 45-3 at 123 ("I wrote him several times. He would refer back to the facility. He did nothing."). Indeed, there is no record evidence, including any testimony from plaintiff, regarding where, when, or by what means plaintiff forwarded a letter or complaint directly to Annucci. In any event, even assuming that Annucci received plaintiff's letters, Annucci's failure to respond to them is not sufficient to give rise to personal involvement under

section 1983. *Parks v. Smith*, No. 08-CV-0586 (TJM/GHL), 2011 WL 4055415, at *14 (N.D.N.Y. March 29, 2011) ("A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that official's personal involvement.").

For these reasons, I find that no reasonable factfinder could conclude, based on the record evidence, that defendant Annucci was personally involved in any of the allegations giving rise to this action.

###### J.    Defendant Judway

Plaintiff claims that defendant Judway failed to adhere to DOCCS policy when he authorized a strip search of the plaintiff without preparing the appropriate paperwork. Dkt. No. 29 at 49-51; Dkt. No. 45-3 at 66. The allegations in plaintiff's amended complaint related to defendant's failure to adhere to DOCCS's regulations or policies do not give rise to a cognizable claim under section 1983. *See Bolden v. Alston*, 810 F.2d 353, 358 (2d Cir.1987) ("State procedural requirements do not establish federal constitutional rights."); *Barnes v. Henderson*, 628 F.Supp.2d 407, 411 (W.D.N.Y. 2009) ("[A] violation of New York State regulations concerning disciplinary hearings does not in itself establish a due process violation."). I therefore recommend the dismissal of plaintiff's claims against defendant

Judway based upon his alleged failure to comply with DOCCS policies and procedures.

K.    ADA Claims[28]

Title II of the ADA prohibits discrimination on the basis of disability by public entities, providing that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown,* 294 F.3d 35, 45 (2d Cir. 2002). The protections offered under Title II extends to inmates in state correctional facilities like Upstate. *See Pa. Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 213 (1998) ("[T]he plain text of Title II of the ADA unambiguously extends to state prison inmates[.]").

To establish a violation under the ADA, a plaintiff must demonstrate that (1) he is a qualified individual with a disability; (2) the defendant is subject to the ADA; and (3) he was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of a disability. *Henrietta D.*,

---

[28] Plaintiff does not specify what portions of the ADA are triggered by defendants' actions. Reading his amended complaint liberally, it appears that he brings this complaint under Title II of the Act.

331 F.3d at 272. The ADA defines a "disability" in part as a "physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(A). A "qualified individual with a disability" is one "who, with or without reasonable modifications to rules, policies or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

Plaintiff claims that his hearing impairment was diagnosed by prison officials and known to all defendants, and constitutes a disability. Dkt. No. 54-2 at 20; Dkt. No. 29-1 at 79-81. Defendants argue that the issue of whether plaintiff's hearing loss is a disability for the purposes of the ADA has already been resolved by the United States District Court for the Southern District. Dkt. No. 45-16 at 20. In *Cole v. Goord, et. al.*, No. 05 Civ 2902 (S.D.N.Y. filed August 29, 2009) ("*Cole II*"), the court dismissed ADA claims brought by the plaintiff, finding that he did not have a hearing disability. *See Cole v. Goord*, 2009 WL 2601369, at *8 (S.D.N.Y. Aug. 25, 2009). In doing so the court reasoned:

> Defendants acknowledge that Cole has some
> difficulty hearing and has been diagnosed with

non-significant bilateral hearing loss by the audiologists who have examined him. (*See* Def. Rule 56.1 Statement, ¶ 8.) But Cole has not demonstrated that this hearing loss "substantially limits" a major life activity as required by the ADA. With the hearing aids which defendants provided for him and which he wears daily, Cole can hear "clear[ly and] pick[ ] up everything." Because measures taken to correct or mitigate a physical impairment are relevant to whether an impairment substantially limits a major life activity, *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482–83, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999); *see also Fall v. New York State United Teachers*, 289 Fed. Appx. 419, 421 (2d Cir. 2008) (finding that plaintiff did not assert, or support with credible evidence, the proposition that her hearing loss was substantial when the corrective measures were employed), Cole has no hearing disability for purposes of the ADA.

*Id.* (internal citations omitted).

Issue preclusion, often referred to as collateral estoppel, bars a party that has had a full and fair opportunity to litigate an issue of fact or law from relitigating the same issue once it has been decided against that party. *Proctor v. LeClaire*, 715 F.3d 402, 414 (2d Cir.2013); *McKithen v. Brown*, 481 F.3d 89, 105 (2d Cir.2007), *cert denied*, 552 U.S. 1179, 128 S.Ct. 1218, 170 L.Ed.2d 59 (2008). Issue preclusion applies when

(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue;

and (4) the resolution of the issue was necessary to
support a valid and final judgment on the merits.

*Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006) (quotation marks

omitted); *accord, Proctor*, 715 F.3d at 414; *see also McKithen*, 481 F.3d at

105.

The burdens applicable to the factors informing the issue of collateral

estoppel are variously allocated. The party seeking to invoke issue

preclusion bears the burden of demonstrating that the nature of the issues

are identical, and "they were necessarily decided in the prior action." *Kulak*

*v. City of N.Y.*, 88 F.3d 63, 72 (2d Cir.1996). The burden of demonstrating

that the prior action did not afford a full and fair opportunity to litigate the

issue, however, rests with the party opposing application of the doctrine.

*Kulak*, 88 F.3d at 72. The determination of whether the previous action

provided a full and fair opportunity to litigate requires consideration of

several factors, including

the nature of the forum and the importance of the
claim in the prior litigation, the incentive and initiative
to litigate and the actual extent of litigation, the
competence and expertise of counsel, the availability
of new evidence, the differences in the applicable law
and the foreseeability of future litigation.

*Shell v. Brun*, 362 F.Supp.2d 398, 400 (W.D.N.Y.2005) (quoting *Ryan v.*

*N.Y. Tel. Co.*, 62 N.Y.2d 500, 501 (1984)).

From the record now before the court, it is clear that plaintiff raised the claim now being asserted in *Cole II*, and that the precise issue now presented - that is, whether his hearing loss constitutes a disability under the ADA - was decided against him. There is nothing to suggest that plaintiff was not afforded a full and fair opportunity to litigate that claim in the prior proceeding. Even though *Cole II* was brought against different defendants, because the Southern District concluded that plaintiff did not suffer from a hearing disability for the purposes of the ADA, that determination is entitled to full faith and precludes plaintiff from mounting a challenge in this court. *See Garrett v. Angelone*, 940 F.Supp. 933, 940-41 (W.D. Va. 1996) ("Because the factual issue of discrimination on the basis of handicap at Deep Meadow was litigated and decided by the Eastern District in the previous action, [the plaintiff] is estopped from rearguing this factual issue in any later litigation."). Moreover, there is nothing in the record to suggest that plaintiff's hearing loss has materially deteriorated. Indeed, in opposition to defendants' motion, plaintiff relies solely upon medical evidence from 2004 and 2009. Dkt. No. 29-1 at 79-81. Accordingly, I find no basis to disagree with the Southern District's determination, and on this basis I recommend granting defendants' motion for summary judgment dismissing plaintiff's ADA claims under the doctrine of collateral estoppel.

L.    Negligence Claims

Plaintiff claims that defendants Mandalaywala, Kowalachuk, Smith, Schroyer, and Danforth were negligent when they failed to order "follow-up examinations" and provide plaintiff with treatment by a urologist. Dkt. No. 29 ¶ 106.

By statute, New York vests state employees, including correctional employees, with immunity from suits for damages arising from conduct performed within the scope of their employment. N.Y. Corr. Law § 24. The relevant statute provides as follows:

> 1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, which for purposes of this section shall include members of the state board of parole, in his or her personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.
>
> 2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

N.Y. Correct. Law § 24; *see also Ierardi v. Sysco*, 119 F.3d 183, 186–87 (2d Cir.1997). Section 24 thus precludes claims against corrections personnel brought against them in any court in their personal capacities arising out of

94

the discharge of their duties. *Baker v. Couglin*, 77 F.3d 12, 14–15 (2d Cir. 1996). Because "a federal court applying pendent jurisdiction is forced to apply state substantive law to a state claim, this would result in inmates being prohibited from advancing such pendent claims along with their federal claims in federal court." *O'Diah v. Fischer*, No. 08–CV–0941, 2012 WL 987726, at *21 (N.D.N.Y. Feb. 28, 2012) (Homer, M.J.), *report and recommendation adopted by* 2012 WL 976033 (N.D.N.Y. Mar. 22, 2012) (McAvoy, J.). Additionally, because the New York State Court of Claims is one of "limited jurisdiction," hearing only claims against New York State, "[section] 24 amounts to a grant of immunity for corrections officers sued in their personal capacities for claims arising out of the discharge of their duties." *Rucano v. Koenigsmann*, No. 12–CV-0035, 2014 WL 1292281, at *15 (N.D.N.Y. Mar. 31, 2014) (D'Agostino, J.).[29]

In 2009, the Supreme Court held that section 24 violates the Supremacy Clause to the extent it delegates to the New York State Court of Claims jurisdiction to adjudicate civil rights cases arising under section

---

[29] To be sure, the immunity afforded under section 24 is by no means absolute. Actions taken by corrections employees occurring during the course of their employment but wholly outside of their scope of employment, for example, lack the protection of that provision. The circumstances presented in *Ierardi*, for example, involving a claim of sexual harassment by a special education teacher employed by the DOCCS against a corrections officer assigned to the same facility, serve to aptly illustrate the type of situation in which section 24 would not afford protection. *Ierardi*, 119 F.3d at 188–89.

1983. *Haywood v. Drown*, 556 U.S. 729, 734–36 (2009). While the Supreme Court concluded that section 24 violates the Supremacy Clause as it applies to claims brought under section 1983, it did not find the statute unconstitutional when applied to claims arising under New York State law. Accordingly, "courts in this District have held that the *Haywood* decision does not affect the question of the district court's jurisdiction to hear pendent state law claims against DOCCS employees and have continued to dismiss those claims under Corrections Law § 24." *Rounds v. Thompson*, No. 12–CV–0953, 2013 WL 3187074, at *4 (N.D.N.Y. June 20, 2013) (Sharpe, J.); *see also May v. Donneli*, No. 06–CV–0437, 2009 WL 3049613, at *5 (N.D.N.Y. Sept. 18, 2009) (Sharpe, J., adopting report and recommendation by Treece, M.J.) ("A claim brought pursuant to state law does not implicate the Supremacy Clause, and therefore, the Haywood decision does not affect the question of whether this Court has proper jurisdiction to hear [a] pendent state law claim.").

To determine whether section 24 is applicable to a corrections officer's alleged misconduct, "courts generally look at the factors associated with New York's scope of employment analysis." *Ierardi*, 119 F.3d at 187 n. 3 (citing *Johnson v. N.Y. State Dep't of Corr. Servs. & Cmty. Supervision*,

No. 11–CV–0079, 2013 WL 5347468, at *3 (W.D.N.Y. Sept. 23, 2013)).

Those factors include:

> the connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly done by such an employee; the extent of departure from normal methods of performance; and whether the specific act was one that the employer could reasonably have anticipated.

*Johnson*, 2013 WL 5347468, at *3 (citing *Riviello v. Waldron*, 391 N.E.2d 1278, 128 (N.Y.1979)). Ultimately, "an employee will be considered within the scope of his employment so long as he is discharging his duties, no matter how irregularly, or with what disregard of instructions." *Cepeda v. Coughlin*, 513 N.Y.S.2d 528, 530 (N.Y. 1987) (quotation marks omitted).

In this case, all of plaintiff's allegations against the defendants now under consideration stem from events that occurred at Upstate while all defendants were on duty. Because each defendant in this case was "discharging his [or her] duties" relating to plaintiff's medical treatment, I find that the allegations in the amended complaint plausibly suggest that defendants were acting within the scope of their employment as DOCCS employees while undertaking the conduct alleged by plaintiff. *Cepeda*, 513 N.Y.S.2d at 530. For this reason, I recommend that plaintiff's negligence claims arising under New York law be dismissed.

## IV.  SUMMARY AND RECOMMENDATION

Plaintiff's amended complaint in this action contains an amalgamation of claims against various defendants ranging from the Acting Commissioner of the DOCCS down to corrections officers and medical personnel employed at the facilities in which he was confined at the relevant times. All of plaintiff's claims relate to or stem from the alleged use of excessive force at Walsh and plaintiff's medical treatment at Walsh and Upstate. Having thoroughly reviewed the record now before the court, I find that the record discloses the existence of fact issues regarding whether plaintiff failed to exhaust his administrative remedies with respect to his claims against defendants LoRusso and Michaels. Turning to the merits of plaintiff's claims, I find the existence of genuine issues of material fact precluding the entry of summary judgment dismissing plaintiff's excessive force cause of action against defendants Durante, LoRusso, and Wagner; failure to protect claim against defendant Michaels; and retaliation claims asserted against defendant Durante.[30]

---

[30] As the foregoing indicates, I have found that if the November 2013 were not viewed as a nullity, summary judgment dismissing that claim as against defendant Corey would be precluded based upon the finding of material issues of fact surrounding plaintiff's removal from that proceeding. I nonetheless recommended a finding, however, under the circumstances of this case, that defendant Corey is entitled to qualified immunity since no reasonable person in his circumstances would conclude that removing plaintiff from the disciplinary hearing would clearly violate established constitutional principles.

Turning to plaintiff's claims against defendants Gonyea and Judway, I find that plaintiff has demonstrated a sufficiently plausible basis for finding the requisite degree of personal involvement in the actions taken by these two defendants to avoid summary judgment. I also find, however, that neither plaintiff's amended complaint nor the record before the court discloses any basis for finding personal involvement on the part of defendants Annucci and Prack in the constitutional deprivations alleged.

I further find that plaintiff's claims of deliberate indifference against Walsh and Upstate employees are deficient because, even when accepted as true and interpreted in his favor, the evidence fails to reflect deliberate indifference to his condition, instead merely reflecting a disagreement and plaintiff's dissatisfaction with the course of his treatment. Additionally, I conclude that plaintiff's due process claims against Tousignant, Michaels, and Bullis; retaliation claims against LoRusso, Wagner, Sharma, Trabout, Mara, J. Henderson, P. Henderson, Tousignant, M. Williamson, Smith, Kumar, Schroyer, Kowalachuk, and Corey; ADA claims; and claims that defendant Judway violated DOCCS rules and policy are deficient as a matter of law, and thus I recommend that summary judgment be entered dismissing those claims. I also recommend a finding that plaintiff's state law

negligence claims are subject to dismissal based on N.Y. Correction Law § 24.

It is therefore hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 45) be GRANTED, in part, and that plaintiff's claims against defendants DOCCS, Annucci, Prack, Bullis, Corey, Tousignant, Sharma, Trabout, Mara, Dutch, Peterson, P. Henderson, D. Williamson, J. Henderson, Danforth, Mandalaywala, Schroyer, Kowalachuk, Smith, and M. Williamson be DISMISSED and that plaintiff's retaliation claims against LoRusso and Wagner be DISMISSED, but that the motion otherwise be DENIED in all respects, and that the matter proceed with regard to plaintiff's excessive force claims against defendants Durante, Wagner, and LoRusso; retaliation claims against defendant Durante; supervisory claims against defendants Judway and Gonyea; and failure to protect claim against defendant Michaels based upon events occurring at Walsh.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72;

*Roldan v. Racette*, 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this

report and recommendation upon the parties in accordance with this court's

local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:     August 25, 2016
           Syracuse, NY


Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Wayne HARGROVE, Plaintiff,
v.
Sheriff Edward RILEY; Nassau County Correctional
Facility, et al; Nassau County University Medical Staff
and Nassau County Correctional Facility, Defendants.
**Civil Action No. CV-04-4587 (DGT).**

Jan. 31, 2007.

Wayne Hargrove, Ossining, NY, pro se.

Alexander V. Sansone, Troy & Troy, Lake Ronkonkoma,
NY, Joseph Carney, Mineola, NY, for Defendants.

*MEMORANDUM AND ORDER*

TRAGER, J.

**\*1** Inmate Wayne Hargrove ("Hargrove" or "plaintiff")
brings this *pro se* action pursuant to 42 U.S.C. § 1983
against the Nassau County Sheriff, Nassau County
Correctional Facility ("NCCF") and NCCF's medical staff,
(collectively, "defendants"), seeking damages for injuries
allegedly caused by defendants while he was incarcerated
at NCCF. Defendants now move for summary judgment
pursuant to Fed.R.Civ.P. 56 arguing, *inter alia,* that
Hargrove's claims should be dismissed because he failed
to exhaust administrative remedies, as required by the
Prison Litigation Reform Act of 1995 ("PLRA"), 42
U.S.C. § 1997e. For the following reasons, defendants'
motions for summary judgment are granted.

**Background**

On August 27, 2004,[FN1] Hargrove filed a complaint,
alleging that defendants violated his civil rights when they
forcibly administered purified protein derivative skin tests
("PPD test") to test for latent tuberculosis ("TB") in April
2002, 2003 and 2004 while he was incarcerated at NCCF.
Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A. Hargrove
named Nassau County Sheriff Edward Reilly ("Reilly"),
NCCF and Nassau County University Medical Staff [FN2] as
defendants.[FN3] On November 22, 2004, after discovery,
County Defendants and NHCC Defendants filed separate
motions for summary judgment pursuant to Fed.R.Civ.P.
56. Both defendants properly filed a Local Rule 56.1
Statement and served Hargrove a Notice to *Pro Se* Litigant
Opposing Motion for Summary Judgment, pursuant to
Local Civil Rule 56.2.

FN1. Hargrove signed the complaint August 27,
2004. The *pro se* clerk's office received and filed
the complaint on September 20, 2004. Under the
prison mail-box rule, a *pro se* prisoner's
complaint is deemed filed when it is delivered to
prison authorities. *See, e.g., Walker v.
Jastremski, 430 F.3d 560, 562 (2d
Cir.2005)*(deeming *pro* se prisoner's § 1983
action filed on date complaint was handed to
prison officials). There is no evidence in the
record as to when Hargrove handed the
complaint to prison officials. However, it is clear
the operative date is between August 27, 2004
and September 20, 2004. As discussed, *infra,*
both of these dates occur before Hargrove
properly exhausted the administrative remedies
available to him at NCCF.

FN2. The Nassau County University Medical
Staff are employed by the Nassau Health Care
Corporation ("NHCC"). Pursuant to the
Correctional Center Health Services Agreement
between the County of Nassau and NHCC, dated
September 24, 1999, NHCC provides medical
services for inmates at NCCF. County Defs.'s

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Not. of Motion, Decl., at 1.

FN3. Reilly and NCCF are represented separately from NHCC. Accordingly, when a distinction is necessary, Reilly and NCCF will be referred to as "County Defendants" and Nassau County University Medical Staff and NHCC will be referred to as "NHCC Defendants."

**(1)**

**Tuberculosis Testing at NCCF**

Upon entering NCCF, new prisoners must first go through medical intake. Aff. of Kim Edwards, ("Edwards Aff.") ¶ 3. This standard process usually takes seventy-two hours. Edwards Aff. ¶ 4. During medical intake, NCCF tests inmates for TB. Aff. of Getachew Feleke ("Feleke Aff.") ¶ 3. NCCF generally uses a PPD test to detect latent TB. Feleke Aff. ¶ 3. However, if an inmate has previously tested positive for TB, it is NCCF's policy to test for TB using an x-ray instead.[FN4] Feleke Aff. ¶ 3. As part of its Infectious Disease Program, NCCF re-tests inmates for TB each year, beginning after they have been housed in that facility for one year. Edwards Aff. ¶ 5.

FN4. According to WebMD, "[a] tuberculin skin test should not be done for people who have a(1) Known TB infection [or a] (2) Positive tuberculin skin test in the past. A second test may cause a more severe reaction to the TB antigens." Jan Nissl, RN, BS, *Tuberculin Skin Tests,* W E B M D , h t t p : / / www.webmd.com/hw/lab_tests/hw203560.asp (last visited Jan. 31, 2007).

**(2)**

**Hargrove's Tuberculosis Testing at NCCF**

On March 15, 2002, Hargrove was incarcerated at NCCF.

NHCC Defs.' 56.1 Statement ¶ 1. Before entering the general population, Hargrove was processed through medical intake. NHCC Defs.' 56.1 Statement ¶ 2. The NCCF Medical Intake Chart for Hargrove, dated March 15, 2002 ("3/15/02 Chart"), shows that Hargrove informed medical staff that he had previously been exposed to tuberculosis. NHCC Defs.' Notice of Mot., Ex. C, at 1; NHCC Defs.' 56.1 Statement ¶ 2. The 3/15/02 Chart also shows that Hargrove reported testing positive to a prior PPD test and that he had been treated for TB in 2000. NHCC Defs.' Notice of Mot., Ex. C, at 1. Hargrove alleges that he was exposed to and treated for TB in 1997. Hargrove's Aff. in Opp. to Mot. for Summary Judgment, ("Aff. in Opp."), Ex. A at 1-2. Defendants contend that Hargrove was given an x-ray during the medical intake process because of his reported positive PPD test, and that the x-ray was negative, showing no active TB infection. NHCC Defs.' 56.1 Statement ¶ 2; Edwards Aff. ¶ 3. Without specifying a date, Hargrove generally states that his "request to be x-rayed was denied." Aff. in Opp. at 3.

**\*2** Pursuant to NCCF's Infectious Disease Program, after being incarcerated in NCCF for a year, Hargrove was scheduled to be re-tested for TB. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. On May 24, 2003, Hargrove was given a PPD skin test. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. This test was negative. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. According to Hargrove, he requested an x-ray instead of a PPD test because of his previous exposure to TB, but was forced to submit to the PPD test. He also alleges that defendants threatened to put him in "keep lock" or "lock up" unless he submitted to the PPD test.[FN5] Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A.

FN5. Hargrove has made contradictory statements about being placed in "keep lock" or "lock up". It is unclear whether he is alleging that defendants threatened to place him in "lock up" unless he submitted to the PPD test or whether he was actually placed in "lock up" until such time that he agreed to submit to the PPD tests. For example, in his complaint, Hargrove states that when he "refused to submit to another [PPD] test, the Correctional Authorities were brought in and placed [him] in lock up." Complaint ¶ 4. In a hearing before Magistrate Judge Bloom on

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

January 31, 2005, Hargrove stated that he took the PPD tests because he was told that he would be placed in "lock up" until he submitted to the test. Hr'g Tr. 6:1-18; 9:5-10:10. In Exhibit B to his complaint, Hargrove alleges both that he was given an unwarranted TB shot and that when he refused the same shot he was placed in "keep lock." Complaint, Ex. B. There is no evidence in the record that Hargrove was ever segregated from the general population while housed at NCCF, outside of the seventy-two hour initial medical intake period. Aff. of Sgt. Neumann ("Neumann Aff.") at 1-2 (referring to prison records showing Hargrove's holding locations which demonstrate that he was never placed in "lock up"); NCCF 56.1 Statement ¶ E. Whether or not Hargrove was actually placed in "lock up" is not a material fact for purposes of this motion; as explained in detail, *infra,* Hargrove's failure to exhaust administrative remedies under the PLRA precludes a consideration of the merits of his Section 1983 claim.

The following year, in June of 2004, Hargrove was scheduled to be retested. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Because of the contradiction between the negative May 2003 PPD test and his reported positive history, NCCF contacted the Infectious Disease Department of the Nassau County Medical Center. Edwards Aff. ¶ 6. It was suggested that Hargrove be given a two-step PPD test, administered fifteen days apart. Feleke Aff. ¶ 4; Edwards Aff. ¶ 6. Hargrove was given these two PPD skin tests in June 2004. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Again, Hargrove alleges that these tests were administered against his will and under threat of being placed in quarantine. Complaint, Exs. A, B; Aff. in Opp., Ex. A.

On December 3, 2004, Hargrove was seen by a physician's assistant. NHCC Defs.' 56.1 Statement ¶ 6. During this meeting, Hargrove complained of a dry cough and that the site on his forearm where the June 2004 PPD tests had been administered was red and swollen. NHCC Defs.' 56.1 Statement ¶ 6; 11/28/04 Sick Call Request.

Hargrove's December 18, 2004 chart notes a positive PPD

test and an order was placed in the chart that Hargrove not be submitted for future PPD tests. Edwards Aff. ¶ 7; NHCC Defs.' 56.1 Statement ¶ 8. *See also* 11/19/2004 Grievance.

Hargrove alleges that the following physical ailments were caused by the PPD tests: chronic coughing, high blood pressure, chronic back pain, lung infection, dizzy spells, blurred vision and a permanent scar on both his forearms. Complaint, Ex. C; Aff. in Opp. at 3-4.

**(3)**

**NCCF's Inmate Grievance Procedure**

NCCF has had an inmate grievance program ("IGP") in place since 2001. Aff. of Kenneth Williams, ("Williams Aff."), at 2. NCCF's IGP is carried out in conformance with the New York State Commission of Corrections Minimum Standards and Regulations for Management of County Jails and Penitentiaries ("Minimum Standards"). *Id.*

The IGP is designed to resolve complaints and grievances that an inmate may have regarding the inmate's care and treatment while incarcerated at NCCF. Williams Aff. at 2. Upon entering NCCF, all inmates receive a copy of the NCCF inmate handbook, which outlines the IGP. *Id.*

**\*3** The record does not include an actual copy of NCCF's IGP, but the NCCF's IGP is detailed in the affidavit of NCCF Investigator Kenneth Williams. [FN6] The IGP encourages inmates to resolve their grievances informally with the staff member assigned to the inmate housing unit first. *Id.* If an acceptable resolution cannot be reached, inmates must then proceed through the formal three-step process set out in the IGP. *Id.* at 3.

FN6. Hargrove does dispute any statements made by Investigator Williams regarding the inmate grievance procedure, time limits or its availability to him. Furthermore, Hargrove does

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

not dispute that he received a handbook outlining the IGP.

The first step requires an inmate to submit his grievance form [FN7] to the Inmate Grievance Unit by placing it in a locked box located in each housing area, "within five days of the date of the act or occurrence giving rise to the grievance." [FN8] *Id.* at 2-3. NCCF indexes all grievance forms filed by inmates in a log book and in a computer system. *Id.* at 1, 3. Once a grievance form is received by the Inmate Grievance Unit, the grievance is investigated and the inmate will receive a written determination of the outcome from the Inmate Grievance Coordinator in Section II of the grievance form. [FN9] *Id.* at 3. The inmate is then given a choice to accept or appeal the decision by checking the desired selection and signing his name in Section III of the grievance form. *See, e.g.,* 11/19/2004 Grievance form. If the inmate is not satisfied with the decision of the Inmate Grievance Coordinator, the inmate may appeal the determination to the Chief Administrative Officer. Williams Aff. at 3. Finally, if the inmate is not satisfied with the Chief Administrative Officer's determination, the inmate may appeal to the New York State Commission of Correction Citizen's Policy and Complaint Review Council ("Council"). *Id.* at 3. The Council will then render a final determination. *Id.* at 3.

FN7. The grievance forms contain four sections to be utilized throughout all three steps of the IGP. Section I provides space for the inmate to explain his complaint and the actions he requests as relief. Section II is for the decision of the Inmate Grievance Coordinator. Section III is titled "Acceptance/Appeal of Grievance Coordinator's decision" and contains two mutually exclusive options in which the inmate must choose one or the other: "I have read and accept the Grievance Coordinator's decision," or "I have read and appeal the Grievance Coordinator's decision." Section IV provides space for the decision of the Chief Administrative Officer.

FN8. Hargrove has not argued that he was unaware of this five-day deadline.

FN9. There is no evidence in the record specifying the how long an inmate has to appeal inaction by the Inmate Grievance Unit.

**(4)**

**Authenticity of the Grievance Forms and Other Documents Submitted by Hargrove**

In support of his allegations that he continuously informed defendants that he had been exposed to TB and, therefore, should not have been given PPD tests, Hargrove submitted three letters with his complaint, two of which were addressed to the Inmate Grievance Committee and one of which was addressed to "To whom this may concern." Complaint, Exs. A-C. He also submitted five complaint letters written to Sheriff Reilly, seventeen sick call requests and nine grievance forms during discovery and with his Affidavit in Opposition to Defendants' Motion for Summary Judgment, explaining that some of the medical records and notarized letters were "missing." Aff. in Opp, Ex. A at 2. Defendants call the authenticity of most of these documents into question, contending that Hargrove never submitted any grievance form or complaint letter before he filed his complaint. County Defs.' Mem. of Law at 16-21; County Defs.' 56.1 Statement at ¶¶ B2, C3, D3.

Kenneth Williams, an investigator at NCCF in the Inmate Grievance Unit, testified that he reviewed all of the grievance forms, complaint letters and sick call requests annexed to Hargrove's Complaint and to Hargrove's Affidavit in Opposition to Defendants' Motion for Summary Judgment. Williams Aff. at 2. Williams testified that he examined the grievance records at NCCF and searched "for any grievances by plaintiff/inmate Hargrove" and found "only two." [FN10] Williams Aff. at 1. The first grievance, dated November 19, 2004, complained that the medical staff continued "forcing [Hargrove] to take a T.B. shot while [he] keep[s] telling them that [he] has been exposed to T.B." 11/19/2004 Grievance; Williams Aff. at 1. In response to this grievance, Hargrove's "positive" TB status was noted in his medical records and an order was placed in Hargrove's medical chart, stating that Hargrove not be subjected to future PPD tests. 11/19/2004 Grievance, Section II;

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Williams Aff. at 1; NHCC Defs.' 56.1 Statement ¶ 8; Edwards Aff. ¶ 7. In Section III of the 11/19/2004 Grievance, Hargrove acknowledged that he had read the Grievance Coordinator's decision, and that he chose to accept the decision instead of appealing it. 11/19/2004 Grievance. The other grievance received by the Grievance Unit, dated May 11, 2005, complained of an unrelated matter. 5/11/2005 Grievance (complaining of back problems and requesting the return of his medical shoes); Williams Aff. at 1. Thus, Williams concluded that, beside the 11/19/2004 and 5/11/2005 Grievance Forms, none of the other documents were "received by the grievance unit, and, given the locked box system, the grievance-forms were never submitted by plaintiff/inmate." Williams Aff. at 2.

> FN10. It is NCCF's procedure to forward to the attention of the Grievance Unit all official grievance forms and complaint letters-even ones not specifically addressed to the Grievance Unit. Williams Aff. at 3.

**\*4** A visual examination of the grievance forms Hargrove submitted in support of his claims suggests forgery. Five of the nine grievance forms were requests to stop PPD testing. *See* April 19, 2002 grievance; April 28, 2002 grievance; April 20, 2003 grievance; April 28, 2003 grievance; November 19, 2004 grievance. The remaining grievance forms concerned Hargrove's requests for medical shoes. *See* March 18, 2002 grievance; July 6, 2002 grievance; February 20, 2003 grievance; May 11, 2005 grievance. Of the grievance forms complaining of unwanted PPD tests, the April 28, 2002 grievance form is a patent photocopy of the April 19, 2002 grievance form, and the April 28, 2003 grievance form is a patent photocopy of the April 20, 2003 grievance form, with only the handwritten dates changed. The only potentially authentic grievance forms relating to Hargrove's complaint about the PPD testing are dated April 19, 2002, April 20, 2003, and November 19, 2004. Of these grievance forms, only the November 19, 2004 has been authenticated by NCCF personnel. *See generally* Williams Aff. at 1-4.

Turning to the complaint letters addressed to Reilly, many contain notary stamps cut from the bottom of unrelated

documents and photocopied onto the bottom of the complaint letters. *See* County Defs.' Mem. of Law at 18-21. C.O. Thomas McDevitt and C.O. Paul Klein, both of whom perform notary services for prisoners at NCCF, have submitted sworn affidavits, stating that they kept individual Notary Log Books covering all dates relevant to this litigation. Aff. of C.O. Klein, ("Klein Aff."), at 1; Aff. of C.O. McDevitt, ("McDevitt Aff."), at 1. McDevitt's Notary Log Book shows that he notarized only one document for Hargrove. This document, dated May 13, 2002, was a motion related to Hargrove's criminal trial. McDevitt Aff. at 1-2. Hargrove signed the Notary Log Book acknowledging receipt of that notarized motion. McDevitt Aff. at 2. McDevitt states that he never notarized any other documents for Hargrove. McDevitt Aff. at 2. However, McDevitt's stamp and signature dated May 13, 2002 (the date of the legitimate notarization) appear on Hargrove's letter to Sheriff Reilly dated May 10, 2002. County Defs.' Not. of Motion, Ex. A.

These facts repeat themselves in regard to the documents bearing the notary stamp and signature of Klein. Klein had performed several legitimate notarizations for Hargrove in connection to Hargrove's criminal trial. Klein Aff. at 1-2. Hargrove signed Klein's Notary Log Book acknowledging receipt of those notarized documents. Klein Aff. at 2. However, Klein states that he never notarized any of Hargrove's letters addressed to Sheriff Reilly that bear Klein's stamp and signature. Klein Aff. at 2. On all of the documents that Hargrove submitted bearing Klein's stamp and signature, the dates and signatures of Klein match identically to the dates on which he had performed legitimate notarizations for Hargrove in connection with his criminal trial. Defendants argue it is clear that the documents bearing the stamps and signatures of McDevitt and Klein were not actually notarized by these notaries. County Defs.' Mem. of Law at 17-22.

**\*5** Hargrove does not deny these allegations. Instead, he resubmits the documents that McDevitt and Klein testify they did not notarize with his Affidavit in Opposition and insists that the documents "refute[ ] the assertions put forth by the defendants." Aff. in Opp. at 2.

**Discussion**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

### (1)

#### Summary Judgment Standard

A motion for summary judgment is granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A court ruling on a summary judgment motion must construe the facts in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Williams v. Metropolitan Detention Center,* 418 F.Supp.2d 96, 100 (E.D.N.Y.2005). Defendants, the moving party in this action, bear the burden of demonstrating the absence of a genuine issue of material fact. *Baisch v. Gallina,* 346 F.3d 366, 371 (2d Cir.2003).

As Hargrove is proceeding *pro se,* his complaint must be reviewed carefully and liberally, and be interpreted to "raise the strongest argument it suggests," *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001), particularly when civil rights violations are alleged, *see, e.g., McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004). Plaintiff's complaint does not specify the legal theories upon which it relies, but, in construing his complaint to raise its strongest argument, it will be interpreted to raise claims under 42 U.S.C. § 1983. *See, e.g., Dufort v. Burgos,* No. 04-CV-4940, 2005 WL 2660384, at *2 (E.D.N.Y. Oct. 18, 2005) (liberally construing plaintiff's complaint, which failed to specify the legal theory or theories upon which it rested, as, *inter alia,* a claim under 42 U.S.C. § 1983); *Williams,* 418 F.Supp.2d at 100 (same).

### (2)

#### Prison Litigation Reform Act

#### a. Purpose of the Prison Litigation Reform Act

The PLRA was intended to "reduce the quantity and improve the quality of prisoner suits." *Woodford v. Ngo,* --- U.S. ----, 126 S.Ct. 2378, 2387 (2006) (quoting *Porter v. Nussle,* 534 U.S. 516, 524 (2002)). It seeks to eliminate unwarranted interference with the administration of prisons by federal courts, and thus " 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Woodford,* 126 S.Ct. at 2387 (quoting *Porter,* 534 U.S. at 525).*See also Booth v. Churner,* 532 U.S. 731, 739 (2001). Formal grievance procedures allow prison officials to reconsider their policies, implement the necessary corrections and discipline prison officials who fail to follow existing policy. *See Ruggiero v. County of Orange,* 467 F.3d 170, 177-78 (2d Cir.2006).

#### b. The Exhaustion Requirement

The PLRA's "invigorated" exhaustion provision, 42 U.S.C. § 1997e(a), provides the mechanism to reduce the quantity and improve the quality of prisoners' suits by requiring that prison officials have the opportunity to address prisoner complaints through internal processes before allowing a case to proceed in federal court. *Woodford,* 126 S.Ct. at 2382 (citing *Porter,* 534 U.S. at 524).Section 1997e(a) provides that:

**\*6** [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983. *Woodford,* 126 S.Ct. at 2383;*Ruggiero,* 467 F.3d at 174;*Williams,* 418 F.Supp.2d at 100-01. The exhaustion provision is applicable to suits seeking relief, such as money damages, that may not be available in prison administrative proceedings, as long as other forms of relief are obtainable through administrative channels. *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004); *see also Woodford,* 126 S.Ct. at 2382-83 ("[A] prisoner must now exhaust

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process.") (citing *Booth,* 532 U.S. at 734).

In June 2006, the Supreme Court held that the PLRA requires "proper exhaustion" before a case may proceed in federal court. *Woodford,* 126 S.Ct. at 2387. "Proper exhaustion" requires a prisoner to use " 'all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2385 (emphasis in original)). Although the level of detail necessary to properly exhaust a prison's grievance process will vary from system to system, *Jones v. Bock,* 127 S.Ct. 910, 2007 WL 135890, at *12 (Jan. 22, 2007), "proper exhaustion" under the PLRA " 'demands compliance with [that] agency's deadlines and other critical procedural rules.' " *Ruggiero,* 467 F.3d at 176 (quoting *Woodford,* 126 S.Ct. at 2386). Thus, the PLRA's exhaustion requirement is not satisfied by "untimely or otherwise procedurally defective attempts to secure administrative remedies." *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2382).

**(3)**

**Exhaustion Analysis: Hargrove did not Exhaust the Administrative Remedies Made Available by NCCF prior to Bringing Suit**

Section 1997e(a) of the PLRA applies to Hargrove's complaint; Hargrove was and continues to be confined in a correctional facility, *see Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004), and Hargrove's claim is about a "prison condition" within the meaning of the PLRA, *see Williams,* 418 F.Supp.2d at 101. *See also Sloane v. W. Mazzuca,* No. 04-CV-8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct.31, 2006) (recognizing PLRA's application to complaint alleging retaliation by prison officials for plaintiff's refusal to consent to a PPD test). Accordingly, the merits of Hargrove's Section 1983 claims can only be addressed if it is first determined that Hargrove properly exhausted each claim under Section 1997e(a) of the PLRA before filing his complaint in federal court.

**\*7** Hargrove has submitted both forged [FN11] and authentic grievance forms in opposing defendants' motions for summary judgment. Excluding, for the moment, the forged documents, NCCF's records reflect that Hargrove did not submit his first grievance until after he filed the instant complaint. Williams Aff. at 1. Hargrove's first grievance complaining of unwanted PPD testing is dated November 19, 2004, Williams Aff. at 1, two to three months after Hargrove filed his complaint. Additionally, this first grievance, dated November 19, 2004, was submitted five months after the last PPD test was administered to him in June 2004. NHCC Defs.' 56.1 Statement ¶¶ 5,6. This five-month period far exceeds the five-day window provided by NCCF's IGP. Since Hargrove failed to comply with the IGP's deadlines, he did not properly exhaust the available administrative remedies. *Ruggiero,* 467 F.3d at 176 (" 'untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement.' ") (quoting *Woodford,* 126 S.Ct. at 2382).

FN11. Based on an examination of the documents themselves, as well as the uncontradicted testimony of the notaries performing services for prisoners at NCCF, *see generally* Klein Aff.; McDevitt Aff., and of the investigator in the Inmate Grievance Unit, *see generally* Williams Aff., it appears that many of the documents submitted by Hargrove are forgeries. However, in order to view the facts in the light most favorable to Hargrove, and so as to avoid making findings of fact in a summary judgment motion, for the purposes of the exhaustion analysis, all of the documents will be considered to be authentic. However, for purposes of the sanctions analysis, the documents will be explored and the consequences of Hargrove's misrepresentations will be addressed.

Furthermore, even if the falsified grievance forms Hargrove submitted in support of his claim are considered authentic, they are still untimely. The diagnostic TB tests (whether x-ray or PPD tests) were given to Hargrove on March 15, 2002, May 24, 2003 and in June of 2004, but the grievance forms Hargrove submitted complaining of unwanted PPD tests are dated April 19, 2002, April 28, 2002, April 20, 2003, April 28, 2003 and November 19,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2004. None of these grievances were filed "within five days of the of the date of the act or occurrence giving rise to the grievance." Williams Aff. at 3. There is no evidence in the record suggesting that NCCF's IGP allows for a tolling of the five-day time limit in which to file a grievance.[FN12]

> FN12. Even if the submitted grievances had been filed within the proscribed time period, they only show that Hargrove's grievances reached an Inmate Grievance Coordinator, the first formal step of NCCF's three-step administrative grievance process; Hargrove never appealed to the Chief Administrative Officer. By failing to take the next available step in NCCF's IGP, Hargrove failed to satisfy the mandatory exhaustion requirement. *See, e.g., Williams, 418 F.Supp.2d at 101, 102* (dismissing *pro se* complaint where plaintiff could only show he exhausted two of the four-step process mandated by prison's administrative process).

While the letters to Reilly and sick call requests show that Hargrove attempted to bring his complaints about the PPD testing to the attention of the prison staff, *see, e.g.,* Aff. in Opp., Exs. A-D, NCCF's IGP requires use of formal grievance forms. Thus, writing complaint letters and submitting sick call requests did not properly exhaust NCCF's available administrative remedies. *See, e .g., Hernandez v. Coffey,* No. 99-CV-11615, 2006 WL 2109465, at *4 (S.D.N.Y. July 26, 2006) (holding letters did not satisfy plaintiff's exhaustion obligation); *Williams, 418 F.Supp.2d at 101* (holding that because plaintiff's efforts to convey his medical condition through letters and conversations with the warden and medical staff did "not include the required steps of the PLRA's administrative remedy process," plaintiff failed to exhaust); *Mills v. Garvin,* No. 99-CV-6032, 2001 U.S. Dist. LEXIS 3333, at *8 (S.D.N.Y. Mar. 2, 2001) ("letter writing is not the equivalent of an exhaustion of administrative remedies under the PLRA").

As Hargrove failed to properly exhaust his administrative remedies, this action is precluded by *42 U.S.C. § 1997e(a)* unless Hargrove can establish excuse for his failure to exhaust.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(4)**

**No Grounds to Excuse Plaintiff's Failure to Exhaust**

**\*8** Exhaustion is an affirmative defense that defendants have the duty to raise. *Jones,* 2007 WL 135890, at \* 8-11;*Sloane,* 2006 WL 3096031, at \*4;*Williams,* 418 F.Supp.2d at 101. Once argued by the defendants, a plaintiff has an opportunity to show why the exhaustion requirement should be excused or why his failure to exhaust is justified. *See Ruggiero,* 467 F.3d at 175;*Collins v. Goord,* 438 F.Supp.2d 399, 411 (S.D.N.Y.2006) ("[T]he Second Circuit has cautioned that 'while the PLRA's exhaustion requirement is 'mandatory,' certain caveats apply.' ")(internal citations omitted). Thus, before concluding that a prisoner failed to exhaust available administrative remedies as required by *Section 1997e(a)* of the PLRA, the following three factors must be considered: (1) whether administrative remedies were actually available to the prisoner; (2) whether defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; and (3) whether special circumstances, such as a reasonable misunderstanding of the grievance procedures, exist justifying the prisoner's failure to comply with the exhaustion requirement. *Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).[FN13]

> FN13. Courts in the Second Circuit have questioned what effect, if any, the Supreme Court's recent decision in *Woodford* requiring "proper exhaustion" may have on the three-step *Hemphill* inquiry. The Second Circuit has yet to address this issue. *See Ruggiero,* 467 F.3d at 175-76 (declining to "determine what effect *Woodford* has on our case law in this area ... because [plaintiff] could not have prevailed even under our pre-*Woodford* case law"). To date, district courts have acknowledged the tension, but resolved to apply *Hemphill* to exhaustion claims until instructed otherwise by the Second Circuit. *See, e.g., Larkins v. Selsky,* 04-CV-5900, 2006 WL 3548959, at \*9, n. 4 (S.D.N.Y. Dec. 6,

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2006) (applying the current law of the Second Circuit to exhaustion claims); *Sloane,* 2006 WL 3096031, at *5 ("Until such time as the Court of Appeals considers the impact of *Woodford,* if any, on its prior rulings, this Court must follow the law of the Second Circuit. The Court will therefore apply the current law of this circuit to the exhaustion claims."); *Collins v. Goord,* 438 F.Supp.2d at 411 n. 13 (acknowledging that *Woodford* and *Hemphill* may be in tension, but deciding exhaustion claims under *Hemphill* inquiry); *Hernandez v. Coffey,* No.99-CV11615, 2006 WL 2109465, at *3 (S.D.N.Y. July 26, 2006) (same). Here, Hargrove does not prevail under *Hemphill;* therefore, there is no occasion to address the potential effect *Woodford* may have had in his case.

**a. Whether administrative remedies were "available" to Hargrove**

The first step in the *Hemphill* inquiry requires a court to determine whether administrative remedies were available to the prisoner. *Hemphill,* 380 F.3d at 686. The test for assessing availability is an "objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Id.* at 688 (internal quotation marks omitted). In making this determination, "courts should be careful to look at the applicable set of grievance procedures." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). Exhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, *Ruggiero,* 467 F.3d at 179, or where defendants' behavior prevents plaintiff from seeking administrative remedies,[FN14]*Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004).

FN14. Case law does not clearly distinguish between situations in which defendants' behavior renders administrative remedies "unavailable" to the plaintiff and cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense because of their behavior. As such, there will be some overlap in the analyses.

Here, Hargrove has not claimed that NCCF's administrative grievance procedure was unavailable to him. In fact, Hargrove demonstrated his access to and knowledge of NCCF's IGP by filing proper grievances on November 19, 2004 and on May 10, 2005. Hargrove did not dispute any part of Investigator Williams's affidavit detailing the IGP and its availability to inmates since 2001. Specifically, Hargrove did not dispute, upon entering the facility, that he received a copy of the inmate handbook outlining the IGP. He has not claimed that he is unfamiliar with or unaware of NCCF's IGP. Hargrove has not alleged that prison officials failed to advance his grievances [FN15] or that they threatened him or took any other action which effectively rendered the administrative process unavailable.

FN15. Although not specifically alleged, interpreting the evidence to "raise the strongest argument," Hargrove may be arguing that NCCF's IGP was not available to him because the Grievance Coordinator failed to respond to his grievances. In the single grievance regarding PPD tests that defendants concede is authentic, Hargrove writes, "[n]ow for the third time your office refused to answer my grievances so please look into this matter because the T.B. shot is [sic] effecting my health." 11/19/04 Grievance. This language implies that Hargrove filed grievances in the past and received no response from the Inmate Grievance Coordinator. Furthermore, Hargrove wrote on one of the submitted copies of the November 19, 2004 grievance that "[t]his is the only accepte[sic] that Plaintiff got back from all grievances and letters that the Plaintiff sent to Sheriff Riley and his medical staffs about his staff making [sic] take T.B. test for 3 year[s]." County Defs'. Not. of Motion, Ex. A, 11/19/2004 grievance.

First, it must be reiterated that filing of the initial grievances was untimely. However, even assuming *arguendo* that the original grievances had been timely filed, district courts in the Second Circuit have held that the "lack of a response from the [Inmate Grievance Review Committee] does not excuse an inmate's obligation to exhaust his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

remedies through available appeals." *Hernandez v. Coffey,* 2006 WL 2109465, at *3-5. *See also Hemphill,* 380 F.3d at 686 ("Threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system"); *Acosta v. Corr. Officer Dawkins,* No. 04-CV-6678, 2005 WL 1668627, at *3 (S.D.N.Y. July 14, 2005) (inmate required to appeal lack of response to exhaust administrative remedies); *Mendoza v. Goord,* No. 00-CV-0146, 2002 U.S. Dist. LEXIS 22573, at *6 (S.D.N.Y. Nov. 21, 2002) ("If, as a result of a negligent error by prison officials-or even their deliberate attempt to sabotage a prisoner's grievance-the prisoner [does not receive a response] on his complaint, he is not thereby forestalled from appealing"). Hargrove did not assert or offer evidence suggesting that he appealed the unresponsiveness or that those appeals were not advanced.

**\*9** Additionally, Hargrove's transfer from NCCF to Sing Sing Correctional Facility ("Sing Sing") in July 2005 did not excuse his previous failure to properly exhaust. *See, e.g., Sims v. Blot,* No. 00-CV-2524, 2003 WL 21738766, at *4 (S.D.N.Y. July 25, 2003) (determining that failure to exhaust administrative remedies is not excused by transfer to another facility); *Santiago v. Meinsen,* 89 F.Supp.2d 435, 440-41 (S.D.N.Y.2000) (determining that plaintiff should not be "rewarded" for failing to participate in grievance procedure before being transferred). Hargrove had ample opportunity to properly file his grievances and to appeal their results as required by NCCF's procedures while he was imprisoned at NCCF. The last PPD test Hargrove complains of was given in 2004; therefore, Hargrove had until June or July of 2004 to timely file his grievance in accordance with NCCF's IGP. Hargrove was not transferred to Sing Sing until July 2005. County Defs.' Mem. of Law at 2. Thus, Hargrove's transfer cannot excuse his previous failure to properly exhaust.

**b. Estoppel**

The second step of the inquiry asks whether defendants are estopped from raising exhaustion as a defense. Specifically, "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (internal citations omitted).

Here, Hargrove has not made any statements that would permit a finding that defendants should be estopped from raising the affirmative defense of exhaustion or that defendants waived the right to raise the defense. Defendants first raised the PLRA's exhaustion requirement as an affirmative defense in their respective answers. *See* County Defs.' Am. Answer at 3; NHCC Defs.' Answer at 1. County Defendants raised it again in their motion for summary judgment. *See* County Defs.' Mem of Law at 15-23. Thus, defendants are not estopped from raising the affirmative defense now. *See, e.g., Sloane,* 2006 WL 3096031, at *8 (exhaustion defense not waived where defendants first raised it in their motion to dismiss).

Additionally, defendants have not threatened Hargrove or engaged in other conduct preventing him from exhausting the available administrative remedies. *Cf. Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004) (holding defendants were estopped from asserting non-exhaustion because of prison officials' beatings, threats and other conduct inhibiting the inmate from filing proper grievances); *Feliciano v. Goord,* No. 97-CV-263, 1998 WL 436358, at *2 (S.D.N.Y. July 27, 1998) (holding defendants were estopped from asserting non-exhaustion where prison officials refused to provide inmate with grievance forms, assured him that the incidents would be investigated by staff as a prerequisite to filing a grievance, and provided prisoner with no information about results of investigation). Hargrove has not argued otherwise. *See Ruggiero,* 467 F.3d at 178 (holding defendants were not estopped from asserting a failure to exhaust defense where plaintiff pointed to no affirmative act by prison officials that would have prevented him from pursing administrative remedies); *Sloane,* 2006 WL 3096031, at *8 (finding no estoppel where plaintiff did not argue that defendants prevented him from pursuing the available administrative remedies); *Hernandez,* 2006 WL 2109465,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

at *4 (finding no estoppel where plaintiff did not argue that any threats or intimidation prevented him from pursuing his appeals). Thus, for the same reasons that administrative remedies were not deemed unavailable to Hargrove, defendants are not estopped from raising a failure to exhaust defense.

### c. Special circumstances

**\*10** Even where administrative remedies are available and the defendants are not estopped from arguing exhaustion, the court must "consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " *Hemphill,* 380 F.3d at 688 (quoting *Giano,* 380 F.3d at 676). For example, plaintiff's reasonable interpretation of regulations differing from prison official's interpretation has been held to constitute a "special circumstance." *Giano,* 380 F.3d at 676-77. No special circumstances have been alleged that would excuse Hargrove from availing himself of administrative remedies. *See Sloane,* 2006 WL 3096031, at *8; *Freeman v. Goord,* No. 02-CV-9033, 2004 U .S. Dist. LEXIS 23873, at * 9-10 (S.D.N.Y.2004) (granting motion to dismiss where "there is no evidence in the record ••• of any 'special circumstances' in this action.")

### (5)

### Hargrove's Failure to Exhaust, in Addition to his Fraud on the Court, Warrants Dismissal with Prejudice

Hargrove has not sufficiently rebutted the defendants' assertion of failure to exhaust, and a liberal reading of his submissions does not reveal any grounds to excuse that failure.

Because Hargrove filed a complaint in federal court before filing a grievance, permitting his unexhausted and unexcused claim to proceed would undercut one of the goals of the exhaustion doctrine by allowing NCCF to be haled into federal court without the "opportunity to correct

its own mistakes with respect to the programs it administers." *Woodford,* 126 S.Ct. at 2385. *See also Ruggiero,* 467 F.3d at 178 (citing *Porter,* 534 U.S. at 525). Thus, his complaint must be dismissed.

In general, dismissal without prejudice is appropriate where plaintiff has failed to exhaust but the time permitted for pursuing administrative remedies has not expired. *Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004). Dismissal with prejudice is appropriate where "administrative remedies have become unavailable after the prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust." *Berry,* 366 F.3d at 88. Here, Hargrove's administrative remedies were available to him during his entire period of confinement at NCCF. He remained incarcerated in NCCF throughout the time period in which he alleges the PPD tests were given. He could have exhausted remedies for his grievances at any time. Therefore, Hargrove had ample opportunity to seek administrative remedies but failed to do so. Because there is no evidence in the record that administrative remedies are still available to Hargrove, as the five-day time period had run, and because Hargrove has alleged no special circumstances justifying his failure to exhaust, his complaint is accordingly dismissed with prejudice. *Berry,* 366 F.3d at 88 (upholding dismissal with prejudice where plaintiff had no justification for his failure to pursue administrative remedies while they were available.)

**\*11** Additionally, defendants' have moved for sanctions based on Hargrove's alleged submission of falsified evidence. If a party commits a fraud on the court, the court has the inherent power to do whatever is reasonably necessary to deter abuse of the judicial process. *Shangold v. The Walt Disney Co.,* No. 03-CV-9522, 2006 WL 71672, at *4 (S.D.N.Y. January 12, 2006) (citing *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44 (1991)). Fraud upon the court has been defined as "fraud which seriously affects the integrity of the normal process of adjudication." *Gleason v. Jandrucko,* 860 F.2d 556, 559 (2d Cir.1988); *McMunn v. Mem'l Sloan-Kettering Cancer Center,* 191 F.Supp.2d 440, 445 (S.D.N.Y.2002). In order for a court to grant sanctions based upon fraud, it must be established by clear and convincing evidence that a party has "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by ... unfairly hampering

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

the presentation of the opposing party's claim or defense." *McMunn*, 191 F.Supp.2d at 455 (quoting *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1119 (1st Cir.1989).

After carefully reviewing the allegedly fraudulent documents, it must be concluded that Hargrove consciously falsified these documents. *See, e.g., Shangold*, 2006 WL 71672, at *1, *3 (finding clear and convincing evidence of fraud where plaintiffs fabricated a timeline and plot outlines to advance their claims); *McMunn*, 191 F.Supp.2d at 446 (finding clear and convincing evidence of fraud where plaintiff edited audio tapes and represented that they were unedited during discovery). The notaries performing services for prisoners at NCCF testify that they never notarized many of the documents supplied by Hargrove. *See* Klein Aff.; McDevitt Aff. Furthermore, a visual examination of the documents themselves makes it clear that many of the documents submitted by Hargrove are forgeries.

In considering what sanction to impose, courts consider the following five factors: (i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the plaintiffs; (iii) whether there was a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future. *Scholastic, Inc. v. Stouffer*, 221 F.Supp.2d 425, 444 (S.D.N.Y.2002) (citing *McMunn*, 191 F.Supp.2d at 461).

Here, Hargrove's deception was not an isolated instance; he fabricated the dates on many grievance forms, in addition to improperly duplicating notary stamps on complaint letters to make them look authentic. Klein Aff. at 2; McDevitt Aff. at 2; County Defs.' 56.1 Statement ¶¶ C3, D3. He submitted these forgeries to defendants during discovery and again as exhibits to his Affidavit in Opposition to Defendant's Motion for Summary Judgment. A severe sanction is warranted as Hargrove's forgeries were intentional, he never corrected them once their authenticity was challenged and he continues to insist on their veracity. Aff. in Opp. at 1-4. Given that there is clear and convincing evidence that Hargrove has continuously and consciously perpetrated a fraud on the court through his submission of fraudulent documents and sworn

affirmations of those documents' authenticity, dismissal with prejudice is especially appropriate. *See, e.g., Shangold*, 2006 WL 71672, at *5 (dismissing with prejudice where plaintiffs fabricated evidence to advance their claims); *Scholastic*, 221 F.Supp.2d at 439-444 (dismissing with prejudice where plaintiff produced seven pieces of falsified evidence); *McMunn*, 191 F.Supp.2d at 445 (dismissing with prejudice where plaintiff "lie[d] to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process").

## Conclusion

**\*12** Because Hargrove did not satisfy the exhaustion requirement under the PLRA, defendants' motions for summary judgment are granted. Further, considering the fraud Hargrove perpetrated on the court, the claims are dismissed against all defendants with prejudice. The Clerk of the Court is directed to close the case.

SO ORDERED:

E.D.N.Y.,2007.
Hargrove v. Riley
Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))



**C**
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
James PETTUS, Plaintiff,
v.
Jospeh McCOY, Superintendent, Deputy Ryan,
Defendants.
**No. 9:04-CV-0471.**

Sept. 13, 2006.

James Pettus, Comstock, NY, pro se.

Charles J. Quackenbush, New York State Attorney
General, The Capitol Albany, NY, for Defendants.

**DECISION and ORDER**

THOMAS J. McAVOY, Senior District Judge.

**\*1** Plaintiff commenced the instant action asserting
various violations of his constitutional rights arising out of
his placement at the Southport Correctional Facility. In his
Complaint, Plaintiff alleges that he was improperly sent to
the Special Housing Unit ("SHU") at a maximum security
facility and that being in SHU has put his life in jeopardy.
Currently before the Court is Defendants' motion for
summary judgment pursuant to Fed.R.Civ.P. 56 seeking
dismissal of the Complaint in its entirety for failure to
exhaust administrative remedies.

**I. FACTS**[FN1]

> FN1. The following facts are taken from
> Defendants' statement of material facts submitted

pursuant to N.D.N.Y.L.R. 7.1(a)(3). These facts
are deemed admitted because they are supported
by the record evidence and Plaintiff failed to
submit an opposing statement of material facts as
required by Rule 7.1(a)(3). Plaintiff was
specifically advised by Defendants of his
obligation to file an opposing statement of
material facts and to otherwise properly respond
to the motion for summary judgment.

Plaintiff is an inmate in the custody of the New York State
Department of Correctional Services. Plaintiff signed the
instant Complaint on April 7, 2004. On his Complaint
form, Plaintiff indicated that there is a grievance
procedure available to him and that he availed himself of
the grievance procedure by filing a complaint with the
IGRC [FN2], followed by an appeal to the superintendent of
the facility, and then to the Central Office Review
Committee in Albany. The Complaint indicates that
Plaintiff is "waiting for response from Albany." The
Complaint was filed on April 27, 2004.

> FN2. Inmate Grievance Review Committee.

On April 12, 2004, prior to the filing of the instant
Complaint, Plaintiff filed a grievance relating to the issues
presented in this case. On April 19, 2004, the IGRC
recommended that Plaintiff's grievance be denied. Plaintiff
then appealed that decision to the facility Superintendent.
In the meantime, on April 27, Plaintiff commenced the
instant litigation. On May 3, 2004, after Plaintiff filed the
Complaint in this case, the Superintendent denied
Plaintiff's grievance. On May 5, 2004, Plaintiff appealed
the decision to the Central Office Review Committee in
Albany. On June 23, 2004, the Central Office Review
Committee denied Plaintiff's appeal. Plaintiff did not file
any other grievances in connection with the matters raised
in this lawsuit.

Defendants now move to dismiss on the ground that
Plaintiff commenced the instant action before fully
exhausting his available administrative remedies.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

## II. DISCUSSION

The sole issue presented is whether Plaintiff was required to complete the administrative process before commencing this litigation. This issue has already been addressed by the Second Circuit in *Neal v. Goord,* 267 F.3d 116 (2d Cir.2001). The issue in that case was "whether plaintiff's complaint should have been dismissed despite his having exhausted at least some claims during the pendency of his lawsuit." *Id.* at 121. The Second Circuit held that "exhausting administrative remedies after a complaint is filed will not save a case from dismissal." *Id.*

In this case, Defendants have established from a legally sufficient source that an administrative remedy is available and applicable. *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003); *see also* 7. N.Y.C.R.R. § 701.1, *et seq.* Plaintiff's Complaint concerns his placement in SHU at a maximum security facility. These are matters that fall within the grievance procedure available to NYSDOCS inmates and are required to be exhausted under the Prison Litigation Reform Act, 42 U.S.C. § 1997e. Plaintiff has failed to demonstrate any applicable exception to the exhaustion requirement. Because Plaintiff commenced the instant litigation prior to fully completing the administrative review process, the instant Complaint must be dismissed without prejudice. *Neal,* 267 F.3d 116.

## III. CONCLUSION

**\*2** For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and the Complaint is DISMISSED WITHOUT PREJUDICE. The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

N.D.N.Y.,2006.
Pettus v. McCoy
Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))



H

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
William MINGUES, Plaintiff,
v.
C.O NELSON and C.O. Berlingame, Defendants.
**No. 96 CV 5396(GBD).**

Feb. 20, 2004.

**Background:** Inmate brought a § 1983 action asserting, inter alia, claims of excessive force during his wife's visit with him at the correctional facility.

**Holding:** On a defense motion to dismiss, the District Court, Daniels, J., held that the record established that the action was filed after the effective date of the Prison Litigation Reform Act (PLRA).
Motion granted.

West Headnotes

Civil Rights 78 ☞ 1395(7)

78 Civil Rights
    78III Federal Remedies in General
        78k1392 Pleading
            78k1395 Particular Causes of Action
                78k1395(7) k. Prisons and Jails; Probation and Parole. Most Cited Cases
Record established that inmate's § 1983 action was filed after the effective date of the Prison Litigation Reform Act of 1996 (PLRA), such that the inmate's failure to exhaust his administrative remedies precluded relief; examination of the initial complaint itself, on its face, unequivocally demonstrated that the inmate's subsequent allegation in his amended complaint that he filed the complaint in April of 1996 was patently false; there was no explanation offered that could reasonably support and account for the existence of May dates on the complaint. 42 U.S.C.A. § 1983; Civil Rights of Institutionalized Persons Act, § 7(a), 42 U.S.C.A. § 1997e(a).

*MEMORANDUM DECISION AND ORDER*

DANIELS, J.

**\*1** This § 1983 action was originally commenced by the plaintiff,[FN1] a prisoner in New York State custody, and his wife claiming their civil rights were violated during the wife's visit with plaintiff at the correctional facility. Discovery in this matter has concluded. Previously, all claims asserted by plaintiff's wife were dismissed for failure to prosecute. Additionally, defendants' summary judgment motion was denied with respect to plaintiff's claims of excessive force,[FN2] and summary judgment was granted dismissing all of plaintiff's other claims. Defendants now seek to dismiss the remaining excessive force claims on the grounds they are barred by the Prisoner Litigation Reform Act of 1996 ("PLRA"), 42 U.S.C. § 1997e(a), as plaintiff failed to exhaust his administrative remedies.

FN1. Plaintiff and his wife were proceeding *pro se* when they filed the complaint and amended complaint. Thereafter, plaintiff obtained legal representation.

FN2. In the amended complaint, plaintiff alleges he was beaten, kicked and punched. (Am.Compl. § 6). In his original complaint, he had also claimed that he was whipped." (Compl. at 7, 8). Plaintiff testified at his deposition that he was slapped once in the face, punched about four or five times in the lower back, and a correctional officer then laid on top of him. (Mingues Dep. at 78-81). The incident, which took approximately thirty to forty seconds, caused plaintiff to suffer from back pain for an unspecified period of time. (*Id.* at 81, 86).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

Subdivision (a) of § 1997e provides, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This provision became effective on April 26, 1996. *Blisset v. Casey,* 147 F.3d 218, 219 (2d Cir.1998). The PLRA's exhaustion requirement does not apply retroactively to actions pending when the Act was signed into law. *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003).

There is no dispute that plaintiff did not avail himself of the existing and available prison grievance procedure. Plaintiff, however, argues he was not required to exhaust his administrative remedies because, as alleged in his amended complaint, "petitioners (sic) had already filed in April 10-12 of 1996," prior to the PLRA's April 26, 1996 enactment date.[FN3] (Am.Compl. § 2). In order to determine the date that the instant action was commenced, the date of the filing of the amended complaint relates back to the filing date of the original complaint. Fed.R.Civ.P. 15(c). The original complaint was signed and dated by plaintiff's wife on May 8, 1996; it was stamped received by the Pro Se Office on May 10, 1996; and plaintiff's signature is dated May 13, 1996.[FN4]

FN3. The amended complaint reads as follows:

That the original complaint filed under and pursuant to Title 42 section 1983 and 1985 was made and submitted before this court in April of 1996, before the application of the Prisoner Litigation Reform Act of 1996 was signed into law. The Act was signed into law April 26, 1996 and petitioners had already filed in April 10-12 of 1996. (Am.Compl. § 2).

FN4. Plaintiff's wife application for *in forma pauperis* relief was signed and dated May 8, 1996, and it is stamped as received by the Pro Se Office on May 10, 1996. Plaintiff's signature, on his initial application for appointment of counsel, is dated May 13, 1996, and it is stamped as

received by the Pro Se Office on May 10, 1996. Attached to plaintiff's application, is his signed Affirmation of Service, also dated May 13, 1996, wherein plaintiff declared under penalty of perjury that he served his application upon the Pro Se Office. Plaintiff alleges that "between April 17, 1996 until October 7, 1996," all visitation was suspended between him and his wife and that their "only form of communications was correspondence ." (Am.Compl. § 7).

The matter was referred to Magistrate Judge Pitman for a Report and Recommendation ("Report"). Although the magistrate judge found that the three earliest possible dates that the evidence demonstrates the complaint could have been filed, *i.e.,* May 8th, 10th, and 13th of 1996, were all beyond the PLRA enactment date, he nevertheless recommended that the motion to dismiss be denied based on plaintiff's allegation in the amended complaint that he filed the original complaint April 10-12 of 1996, prior to the April 26, 1996 enactment date. The magistrate judge found that, "[i]n light of the express allegation in the Amended Complaint that plaintiff commenced the action before April 26, 1996 and the absence of a clear record to the contrary, the requirement that disputed factual issues be resolved in plaintiff's favor for purposes of this motion requires that the motion be denied." (Report at 12-13).

**\*2** Defendants object to the Report's conclusion that there is a material issue of fact regarding the date the action was filed. Plaintiff's attorney did not file any objections.[FN5] The Court must make a *de novo* determination as to those portions of the Report to which there are objections. Fed.R.Civ.P. 72(b); 28 U.S.C. § 636(b)(1)(C). It is not required that the Court conduct a *de novo* hearing on the matter. *United States v. Raddatz,* 447 U.S. 667, 676, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). Rather, it is sufficient that the Court "arrive at its own, independent conclusion" regarding those portions to which the objections were made. *Nelson v. Smith,* 618 F.Supp. 1186, 1189-90 (S.D.N.Y.1985) (quoting *Hernandez v. Estelle,* 711 F.2d 619, 620 (5th Cir.1983)). Accordingly, the Court, in the exercise of sound judicial discretion, must determine the extent, if any, it should rely upon the magistrate judge's proposed findings and recommendations. *Raddatz,* 447 U.S. at 676. The Court may accept, reject or modify, in whole or in part, the findings and recommendations set forth within the Report. Fed.R.Civ.P. 72(b); 28 U.S.C. §

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

636(b)(1)(C). Where there are no objections, the Court may accept the Report provided there is no clear error on the face of the record. *Nelson v. Smith*, 618 F.Supp. at 1189; *see also Heisler v. Kralik*, 981 F.Supp. 830, 840 (S.D.N.Y.1997), *aff'd sub nom. Heisler v. Rockland County*, 164 F.3d 618 (2d Cir.1998).

FN5. Plaintiff himself filed objections which was not adopted by his counsel. Plaintiff objects to the magistrate judge's finding that an issue exists as to when plaintiff filed the complaint because plaintiff asserts he gave it to prison officials to be mailed in April. Additionally, plaintiff objects to the magistrate judge's suggestion that the defendants convert their motion to one for summary judgment asserting the same theory as set forth in the present motion. Since this Court finds that the instant motion is meritorious, the propriety of plaintiff personally submitting his own objections need not be address as those objections are moot.

Upon a *de novo* review, the Report's recommendation that the motion be denied is rejected by the Court. Section 1997e (a) requires that inmates exhaust all available administrative remedies prior to the commencement of a § 1983 action concerning prison conditions, and failure to do so warrants dismissal of the action. *Porter v. Nussel*, 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Scott*, 344 F.3d at 290. The exhaustion of one's administrative remedies, however, is not a jurisdictional requirement under the PLRA. *Richardson v. Goord*, 347 F.3d 431 (2d Cir.2003). A defendant may assert a non-exhaustion claim as an affirmative defense. *Jenkins v. Haubert*, 179 F.3d 19, 28-29 (2d Cir.1999). Since it is an affirmative defense, defendants bear the burden of proof in this regard. *See*, *McCoy v. Goord*, 255 F.Supp.2d 233, 248 (S.D.N.Y.2003); *Arnold v. Goetz*, 245 F.Supp.2d 527, 534-35 (S.D.N.Y.2003); *Reyes v. Punzal*, 206 F.Supp.2d 431, 433 (W.D.N.Y.2002). A motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), is an appropriate vehicle to be used by a defendant where the failure to exhaust is clear from the face of the complaint as well as any written instrument attached as an exhibit and any statements or documents incorporated by reference into the complaint. *See*, *Scott v. Gardner*, 287 F.Supp.2d 477, 485 (S.D.N.Y.2003) (citation omitted); *McCoy*, 255 F.Supp.2d at 249.

In the amended complaint, plaintiff alleges, in a conclusory manner, that he filed the original complaint before the effective date of the PLRA, sometime between April 10th and April 12th of 1996.[FN6] On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inference in plaintiff's favor. *Resnick v. Swartz*, 303 F.3d 147, 150-51 (2d Cir.2002) (citation omitted); *Bolt Elec., Inc. v. City of New York*, 53 F.3d 465, 469 (2d Cir.1995). Dismissal is only warranted where it appears without doubt that plaintiff can prove no set of facts supporting his claims that would entitle him to relief. *Harris v. City of New York*, 186 F.3d 243, 247 (2d Cir.1999). The court's consideration is not limiting solely to the factual allegations set forth in the amended complaint. Rather, the court may also consider documents attached to the complaint as exhibits or incorporated in it by reference, matters of which judicial notice may be taken, or to documents either in plaintiff's possession or of which he has knowledge of and relied on in bringing the action. *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir.1993) (citation omitted). The court is not bound to accept as true a conclusory allegation where the pleadings are devoid of any specific facts or circumstances supporting such an assertion. *DeJesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65, 70 (2d Cir.1996). Nor must the court "ignore any facts alleged in the complaint that undermine the plaintiff's claim." *Roots Partnership v. Lands' End, Inc.*, 965 F.2d 1411, 1416 (7th Cir.1992) (citation omitted).

FN6. In response to then Chief Judge Thomas P. Griesa's 1996 order dismissing this action, plaintiff filed an Application for Reconsideration, dated October 28, 1996, wherein he claims that "on April 12, 1996 this petitioner filed a 1983 civil suit ..." (Pl.'s Mot. for Recons. at 1).

*3 Plaintiff fails to allege any factual basis in support of his claim that he filed the initial complaint between April 10-12, 1996. The Court is not required to accept this statement as a well-pleaded factual allegation in light of the existing record which clearly demonstrates that such an allegation is not only factually unsupported by the clear evidence, but is factually impossible. Generally, an

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

amended complaint supersedes the original complaint, and renders it of no legal effect. *In re. Crysen/Montenay Energy Co.,* 226 F.3d 160, 162 (2d Cir.2000). In plaintiff's amended complaint, he states that he is submitting the amended complaint in support of his original complaint. Hence, the original complaint is incorporated by reference in the amended complaint, and may be considered by the Court. Even if the initial complaint was not so incorporated, given the circumstances of this case, the Court would nevertheless consider it as it relates to the original date of filing. An examination of the initial complaint itself, on its face, unequivocally demonstrates that plaintiff's subsequent allegation in his amended complaint that he filed the complaint between April 10th and 12th of 1996 is patently false.

The original complaint refers to plaintiff's prison disciplinary hearing arising out of the same incident forming the basis of the present lawsuit. Generally, the disciplinary charges against plaintiff were in connection with an alleged conspiracy by him and his wife to commit grand larceny against inmate Robert Cornell. That hearing began on April 16, 1996, and concluded on April 19, 1996. (Defs.' Notice of Mot. for Summ. J. Ex. N, Transcript of Disciplinary Hr'g, conducted on April 16, 18-19, 1996). Specifically, in the original complaint, plaintiff refers to the testimony given by this fellow inmate.[FN7] (Compl. at 8). That inmate testified on April 19th. (Hr'g. Tr. at 53-54, 57). Thus, plaintiff's claim that he filed the complaint between April 10-12, 1996, is absolutely impossible as the initial complaint refers to events occurring after that time period. Merely because plaintiff boldly alleges in his amended complaint that he filed the original complaint between April 10th and 12th does not require this Court to turn a blind eye to plaintiff's prior pleadings demonstrating the absurdity of his claim.[FN8] *See, Silva Run Worlwide Ltd. v. Gaming Lottery Corp.,* 2001 WL 396521, *1 (S.D.N.Y. April 19, 2001) (citations omitted) (A court should not "accept allegations that are contradicted or undermined by other more specific allegations in the complaint or by written materials properly before the court.").

FN7. In the complaint, plaintiff alleges "that at his S.H.U. hearing petitioner called as a witness Robert Cornell who stated that this petitioner Mingues nor his wife (co-petitioner) Narvaez ever took any money from him. (Compl. at 8).

FN8. At his deposition, plaintiff testified that he filed the initial complaint "[a]pproximately around June of 1996." (Mingues Dep. at 37-38).

Lawsuits by inmates represented by counsel are commenced when the complaint is filed with the court. *See,* Fed.R.Civ.P. 3, 5(e). For *pro se* litigants, who are not imprisoned and have been granted *in forum pauperis* relief, their complaints are deemed filed when received by the Pro Se Office. *See,* Toliver v. County of Sullivan, 841 F.2d 41 (2d Cir.1998). The complaint of a *pro se* prisoner, however, is deemed filed when he or she gives the complaint to prisoner officials to be mailed. *Houston v. Lack,* 487 U.S. 266, 270, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988); *Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir.1993), *modified on other grounds,* 25 F.3d 81 (2d Cir.1994). The "prison mailbox" rule is designed to combat inmate litigants' dependence on the prison facility's mail system and their lack of counsel so as to assure the timely filing of their legal papers with the court. *Noble v. Kelly,* 246 F.3d 93, 97 (2d Cir.2001) (citations omitted). Given the difficulty in determining when a prisoner relinquishes control of the complaint to prison personnel, the date the plaintiff signed the original complaint is presumed to be the date plaintiff gave the complaint to prison officials to be mailed. *See e.g.,* Forster v. Bigger, 2003 WL 22299326, *2 (S.D.N.Y. Oct.7, 2003); *Hosendove v. Myers,* 2003 WL 22216809, *2 (D.Conn. Sept.19, 2003); *Hayes v. N .Y.S. D.O.C. Officers,* 1998 WL 901730, *3 (S.D.N.Y. Dec.28, 1998); *Torres v. Irvin,* 33 F.Supp.2d 257, 270 (S.D.N.Y.1998) (cases cited therein).

**\*4** In response to the Report and Recommendation, plaintiff asserts that, in April, the original complaint "was placed in the facility mail box." (Pl.'s Objection to Report at 1). However, it is uncontested that plaintiff's wife signed the complaint on May 8th; it was received by the Pro Se Office on May 10th; and plaintiff's signature is dated May 13th. There is no explanation offered that could reasonably support and account for the existence of these May dates on a complaint which plaintiff falsely claims to have deposited to be mailed during the period of April 10th and April 12th. Had plaintiff mailed the complaint directly to the court prior to April 26th, it would have been impossible for the plaintiff's wife to have signed the document two

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

days prior to the date that the Pro Se Office stamped it received on May 10th.[FN9] Moreover, absent evidence to the contrary, applying the mailbox rule would presume that plaintiff gave his complaint to prison officials on May 13, 1996, the date he signed it. *See, Johnson v. Coombe,* 156 F.Supp.2d 273, 277 (S.D.N.Y.2001) (quoting *Torres,* 33 F.Supp.2d at 270). Even if the Court gave plaintiff the benefit of the date plaintiff's wife signed the complaint, *i.e.,* the earliest date reflected on the filed complaint, it was still after the effective date of the PLRA. Hence, plaintiff is legally obligated to have pursued his prison grievance procedures prior to filing the instant action. The plaintiff has offered no explanation for the initial complaint's reference to events that occurred after the date he claims he filed it, the two May dates on which he and his former co-plaintiff wife signed the complaint, or the May date stamped received by the Pro Se Office. As the magistrate Judge observed:

> FN9. The benefit of the mailbox rule does not apply where the plaintiff delivers the complaint to someone outside the prison system to forward to the court. *Knickerbocker v. Artuz,* 271 F.3d 35, 37 (2d Cir.2001).

Apart from the allegation that certain events giving rise to the claims occurred on April 9, 1996, the Original Complaint contains no mention of dates in April, 1996. Mingues no where explains the contradiction between the signature dates on the Original Complaint and the allegations contained in Amended Complaint. (Report at 12).

New York state law provides a three tier grievance procedure applicable to plaintiff's claims of excessive force. *See,* N.Y. Correct. Law § 139 (McKinnney's 2003); N.Y. Comp.Codes R. & Regs. tit. 7, § 701.7 (2003); *Mendoz v. Goord,* 2002 WL 31654855 (S.D.N.Y. Nov.21, 2002); *Rodriguez v. Hahn,* 209 F.Supp.2d 344 (S.D.N.Y.2002). Plaintiff has not denied knowledge of the grievance procedure at his institution, nor claimed that anything or anyone caused him not to file a grievance and completely pursue it through the administrative process.[FN10] The magistrate judge's determination that the defendants' Rule 12(b) motion should be denied because of an "absence of a clear record" contrary to plaintiff's express allegation in the amended complaint that he

commenced the action before April 26, 1996 is erroneous. The Court could have *sua sponte* dismiss this action as the record is unmistakably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA. *See, Mojias v. Johnson,* 351 F.3d 606 (2003); *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999). In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear.

> FN10. In the original complaint, plaintiff stated he did not file a grievance, pursuant to the state's prisoner grievance procedure, "because this matter can not be dealt with by interdepartmental grievances." (Compl. at 2-3). In plaintiff's attorney's memorandum in opposition to the motion to dismiss, counsel contends that plaintiff is not required to file a grievance because the state's prison system provides extremely limited administrative remedies and money damages, which plaintiff seeks, are not available.

**\*5** Accordingly, it is hereby

ORDERED that the Report and Recommendation is not adopted; and it is further

ORDERED that the defendants' motion to dismiss the complaint is granted.

S.D.N.Y.,2004.
Mingues v. Nelson
Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Roger SULTON, Plaintiff,
v.
Charles GREINER, Superintendent of Sing Sing Corr.
Fac., Doctor Halko & P.A. Williams of Sing Sing Corr.
Fac. Medical Department, Doctor Lofton, Defendants.
**No. 00 Civ. 0727(RWS).**

Dec. 11, 2000.

Roger Sulton, Wende Correctional Facility, Alden, NY,
Plaintiff, pro se.

Honorable Eliot Spitzer, Attorney General of the State of
New York, New York, NY, By: S. Kenneth Jones,
Assistant Attorney General, for Defendants, of counsel.

OPINION

SWEET, J.

**\*1** Defendants Charles Greiner ("Greiner"), past
Superintendent of Sing Sing Correctional Facility ("Sing
Sing") and Dr. Nikulas Halko, ("Halko"), P.A. Williams
("Williams"), and Dr. Lofton ("Lofton"), all of the Sing
Sing Medical Department, (collectively, the
"Defendants"), have moved to dismiss the amended
complaint of *pro se* inmate Roger Sulton ("Sulton"),
pursuant to Fed.R.Civ.P. 12(b)(6) and 12(h)(2) for failure
to exhaust administrative remedies. For the reasons set
forth below, the motion will be granted.

*Prior Proceedings*

Sulton filed the complaint in this action on February 2,
2000, asserting a claim against the Defendants under
Section 1983 for alleged violation of his constitutional
rights under the Eighth Amendment for acting with
deliberate indifference to his serious medical needs.
Sulton filed an amended complaint on May 3, 2000, to
identify additional defendants to his suit. Additionally,
Sulton alleges negligent malpractice by the Sing Sing
medical staff. Sulton seeks monetary damages. The instant
motion was filed on August 9, 2000, and was marked fully
submitted on September 6, 2000.

*Facts*

The Defendants' motion comes in the posture of a motion
to dismiss for failure to state a claim, pursuant to Federal
Rule of Civil Procedure 12(b)(6). However, both the
Defendants and Sulton have submitted materials outside
the pleadings. Where a District Court is provided with
materials outside the pleadings in the context of a 12(b)(6)
motion to dismiss, it has two options: the court may
exclude the additional materials and decide the motion on
the complaint alone or convert the motion to one for
summary judgment. *See* Fed.R.Civ.P. 12(b); *Kopec v.
Coughlin, 922 F.2d 152, 154 (2d Cir.1991)*; *Fonte v.
Board of Managers of Continental Towers Condominium,
848 F.2d 24, 25 (2d Cir.1988)*. The Court has determined
to treat the instant motion as a motion for summary
judgment. Therefore, the following facts are gleaned from
the parties' submissions, with all inferences drawn in favor
of the non-movant as required on a motion for summary
judgment. They are not findings of fact by the Court.

Sulton is a prison inmate who was incarcerated in Sing
Sing at the time of the incidents in question. Greiner was
Superintendent of Sing Sing at that time. Halko was and is
a doctor on medical staff at Sing Sing. Williams and
Lofton are alleged to be affiliated with the Sing Sing
Medical Department.

According to Sulton, on October 8, 1998, he slipped on a
flight of wet stairs, where there was no "wet floor" sign
posted, and injured his left knee. The next day his knee
was swollen and the pain "was real bad." That same day

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

Sulton went to sick call and saw P.A. Williams. Williams ordered x-rays and also ordered "no-work, feed-in cell, pain killers and a cane" for Sulton. The swelling went down, but the pain got stronger.

For four months Sulton complained to the Sing Sing medical staff about his pain. During this time his left knee would give out "at any time." Yet, "nothing was done." However, the Sing Sing Medical Department did send Sulton to the Green Haven Correctional Facility for an M.R.I. and, subsequently, knee surgery was recommended by an attending physician on April 23, 1999. A hinged knee brace was recommended for post-surgery recovery.

**\*2** At some point thereafter, Sulton wrote to Greiner concerning his medical problem and he was placed on "a call-out" to see Halko. Halko then informed Sulton that he would not be going for surgery because Correctional Physician Services [FN1] ("CPS") would not allow it. CPS wanted the inmate to undergo physical therapy before they would approve surgery. Sulton continued to be in pain and requested outside medical care from Williams. However, Williams could not do anything about Sulton's surgery until it was approved by CPS.

> FN1. CPS is the health maintenance organization which must pre-approve any outside medical service to be provided to inmates outside of the correctional facility.

In September 1999, Sulton was transferred to Wende Correctional Facility ("Wende"). The medical department there provided him with physical therapy for his left knee, which was "still in constant pain" and was prone to giving out beneath his body weight.

Sulton filed grievance # 14106-99 on November 3, 1999, and on November 24, 1999, he received a response from the Inmate Grievance Resolution Committee (the "IGRC"). Sulton contends that on that same date he indicated his desire to appeal their decision to the Superintendent. Sulton did not appeal his grievance to the highest level of administrative review, the Central Office Review Committee (the "CORC"). In a letter to Wende Superintendent Donnelly ("Donnelly") dated December

17, 2000, Sulton complained that he never received a response to his appeal of the IGRC decision. However, the Defendants have submitted a response from Donnelly dated December 6, 2000, in which Donnelly stated that he concurred with the IGRC's decision.

In January 2000, "plaintiff['s] legs gave out and the right leg took the weight of the body ... causing the plaintiff to suffer ... torn joints in the ankle area." Surgery was performed on the ankle and he was placed on "medical confinement status."

*Discussion*

I. *This Action Will Be Dismissed For Plaintiff's Failure To Comply With The Prison Litigation Reform Act Of 1996*

In his amended complaint, Sulton alleges that he filed a grievance and, although initially the Defendants were unable to identify the grievance, by his opposition to the instant motion Sulton has identified the process he undertook to pursue his grievance.

Section 1997e(a) of the Prison Litigation Reform Act (the "PLRA") provides that:

No action shall be brought with respect to prison conditions under ... 42 U.S.C. § 1983 ... or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

In enacting Section 1997e(a), Congress made exhaustion mandatory. *Salahuddin v. Mead,* 174 F.3d 271, 274-75 (2d Cir.1999). As a result, where an inmate fails to satisfy the PLRA's exhaustion requirement, the complaint must be dismissed. *See, e.g., Santiago v. Meinsen,* 89 F.Supp.2d 435, 439-40 (S.D.N.Y.2000) (citations omitted).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

In New York, the relevant administrative vehicle is the Inmate Grievance Program ("IGP"). *See* N.Y. Correct. Law § 139 (directing Commissioner of the Department of Correctional Services to establish a grievance mechanism in each correctional facility under the jurisdiction of the Department); N.Y. Comp.Codes R. & Regs., tit. 7, § 701.1 (instituting IGP). New York inmates can file internal grievances with the inmate grievance committee on practically any issue affecting their confinement. *See In re Patterson,* 53 N.Y.2d 98, 440 N.Y.S.2d 600 (N.Y.1981) (interpreting N.Y. Correct. Law § 139 broadly); N.Y. Comp.Codes R. & Regs., tit. 7, §§ 701.2(a) (inmates may file grievances about the "substance or application of any written or unwritten policy, regulation, procedure or rule of the Department of Correctional Services ...") and 701.7 (procedures for filing, time limits, hearings and appeals).

**\*3** The New York State Department of Correctional Services ("DOCS") has established a grievance program with specific procedures which must be followed in order for a prisoner to exhaust his administrative remedies. *See Petit v. Bender,* No. 99 Civ. 0969. 2000 WL 303280, at \*2- \*3 (S.D.N.Y. March 22, 2000) (holding that prisoner failed to exhaust his administrative remedies where prisoner only partially complied with the grievance procedures established by Section 701 *et seq.*). These procedures include a requirement that an inmate appeal a Superintendent's decision to the CORC by filing an appeal with the Grievance Clerk. *See* N.Y. Comp.Codes R. & Regs., tit. 7, § 701.7(c)(1).

There is, however, an additional issue to be addressed in this case, which is that the administrative remedies available to Sulton do not afford monetary relief. The Second Circuit has not yet ruled on whether the PLRA's exhaustion requirement applies where the available administrative remedies available do not provide the type of relief the prisoner seeks. *Snider v. Dylag,* 188 F.3d 51, 55 (2d Cir.1999) ("We note that it is far from certain that the exhaustion requirement of 42 U.S.C. § 1997e(a) applies to deliberate indifference claims ... under Section 1983, where the relief requested is monetary and where the administrative appeal, even if decided for the complainant, could not result in a monetary award.").

There is disagreement among the district courts within this circuit as to this issue, although there is "clear trend ... to

find exhaustion applicable even where the requested relief, money damages, cannot be awarded by the administrative body hearing the complaint." *Santiago v. Meinsen,* 89 F.Supp.2d at 440; *see Snider v. Melindez,* 199 F.3d 108, 114 n. 2 (2d Cir.1999) (noting disagreement among courts as to applicability of exhaustion requirement where administrative remedies are unable to provide the relief that a prisoner seeks in his federal action); *but cf. Nussle v. Willette,* 224 F.3d 95, (2d Cir.2000) (holding that exhaustion not required for excessive force claim because such claim is not "prison conditions" suit and overruling district court decisions applying exhaustion requirement to excessive force claims seeking monetary relief).

Moreover, this Court has previously held that a prisoner must exhaust his administrative remedies before seeking relief in federal court in connection with a prison conditions claim even where a prisoner seeks damages not recoverable under an established grievance procedure. *Coronado v. Goord,* No. 99 Civ. 1674, 2000 WL 52488, at \*2 (S.D.N.Y. Jan. 24, 2000); *Edney v. Karrigan,* No. 99 Civ. 1675, 1999 WL 958921, at \*4 (S.D.N.Y. Oct. 14, 1999). This is the rule that will be applied here.

In his response to the motion to dismiss, Sulton indicates that he filed grievance # 14106-99 on November 3, 1999 and on November 24, 1999 he received a response IGRC and that on the same date Sulton indicated his desire to appeal their decision to the Superintendent. Sulton does not contend that he appealed his grievance to the highest level of administrative review, namely, the CORC. Instead, Sulton has asserted that Superintendent Donnelly never replied to the appeal of the IGRC decision and submits a letter dated December 17, 2000 in which Sulton complains that he never received a response from Donnelly. However, the Defendants have submitted a response from Donnelly dated December 6, 2000, in which Donnelly concurred with the decision of the IGRC denying Sulton relief. There is no evidence in the record that Sulton appealed the grievance to CORC.

**\*4** Accordingly, because Sulton failed to exhaust his administrative remedies by appealing the grievance to the CORC, his claims of medical indifference will be dismissed pursuant to 42 U.S.C. § 1997e. *See Petit,* 2000 WL 303280, at \*3.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

*Conclusion*

Therefore, for the reasons set forth above, the Defendants'
motion will be granted and the amended complaint will be
dismissed without prejudice to the action being renewed
once Sulton has exhausted all administrative remedies.

It is so ordered.

S.D.N.Y.,2000.
Sulton v. Greiner
Not Reported in F.Supp.2d, 2000 WL 1809284
(S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by   Mena v. City of New York,   S.D.N.Y.,   July 19, 2016

2016 WL 3729383
Only the Westlaw citation is currently available.
United States Court of Appeals,
Second Circuit.

Mark Williams, Plaintiff–Appellant,

v.

Correction Officer Priatno, Correction
Officer Gammone, Defendants–Appellees,
Correction Officer John DOE, State of New
York, New York State Department of Corrections
and Community Service, Defendants. *

Docket No. 14-4777
|
August Term, 2015
|
Argued: February 29, 2016
|
Decided: July 12, 2016

**Synopsis**

**Background:** Former state inmate brought § 1983 action against two corrections officers, alleging that they violated his Eighth Amendment rights by beating him for talking back to another officer when he was incarcerated at state corrections facility. The United States District Court for the Southern District of New York, Seibel, J., dismissed the action. Inmate appealed.

**[Holding:]** The Court of Appeals, Katzmann, Chief Judge, held that prisoner satisfied Prison Litigation Reform Act's (PLRA) exhaustion requirement.

Reversed and remanded.

West Headnotes (7)

**[1]**      **Federal Courts**

    Dismissal or nonsuit in general

Court of Appeals reviews a grant of a motion to dismiss de novo.

Cases that cite this headnote

**[2]**      **Federal Courts**

    Imprisonment and incidents thereof

Issue of whether a plaintiff has exhausted administrative remedies under Prison Litigation Reform Act (PLRA) is a question reviewed de novo. Civil Rights of Institutionalized Persons Act § 7, 42 U.S.C.A. § 1997e(a).

Cases that cite this headnote

**[3]**      **Federal Courts**

    Pleadings; Dismissal

In reviewing district court's grant of motion to dismiss, the Court of Appeals accepts all factual allegations in the complaint as true.

Cases that cite this headnote

**[4]**      **Federal Civil Procedure**

    Pro Se or Lay Pleadings

On a motion to dismiss for failure to state a claim, where the complaint was filed pro se, it must be construed liberally with special solicitude and interpreted to raise the strongest claims that it suggests. Fed. R. Civ. P. 12(b)(6).

1 Cases that cite this headnote

**[5]**      **Prisons**

    Pleading

Failure to exhaust administrative remedies is an affirmative defense under the Prison Litigation Reform Act (PLRA), not a pleading requirement. Civil Rights of Institutionalized Persons Act § 7, 42 U.S.C.A. § 1997e(a).

2 Cases that cite this headnote

**[6]** **Prisons**

⤷ Exhaustion of Other Remedies

Although inmates are not required to specially plead or demonstrate exhaustion in their complaints, a district court still may dismiss a complaint for failure to exhaust administrative remedies if it is clear on the face of the complaint that the plaintiff did not satisfy the Prison Litigation Reform Act (PLRA) exhaustion requirement. Civil Rights of Institutionalized Persons Act § 7, 42 U.S.C.A. § 1997e(a).

1 Cases that cite this headnote

**[7]** **Prisons**

⤷ Particular cases

Prison grievance procedures that were technically available to state inmate who claimed he was beaten by correction officers were so opaque and confusing that they were incapable of use, and therefore, inmate exhausted all administrative remedies that were available to him, as required before filing suit under Prison Litigation Reform Act (PLRA), by giving his complaint to a correction officer to forward to the grievance clerk; confusing grievance process that provided an appeal "to the next step" did not contemplate inmate's situation in which correction officer did not file the grievance, which made it practically impossible for him to ascertain whether and how he could pursue his grievance. Civil Rights of Institutionalized Persons Act § 7, 42 U.S.C.A. § 1997e(a); N.Y. Comp. Codes R. & Regs. tit. 7, § 701.7.

3 Cases that cite this headnote

Plaintiff–Appellant Mark Williams appeals from an order of the District Court for the Southern District of New York that dismissed his claim under 42 U.S.C. § 1983 and the Eighth Amendment for failure to exhaust all available administrative remedies as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a). We conclude that administrative remedies beyond the

submission of his initial complaint were unavailable to Williams because the applicable grievance procedures are "so opaque" and confusing that they were, "practically speaking, incapable of use." *Ross v. Blake*, ––– U.S. ––––, 136 S.Ct. 1850, 1859, ––– L.Ed.2d –––– (2016). Accordingly, we reverse the decision of the district court and remand for further proceedings consistent with this opinion.

**Attorneys and Law Firms**

BRIAN M. FELDMAN (Michael J. Rooney, on the brief), Harter Secrest & Emery LLP, Rochester, NY, for Plaintiff–Appellant.

HOLLY A. THOMAS (Barbara D. Underwood and Anisha S. Dasgupta, on the brief), for Eric T. Schneiderman, Attorney General of the State of New York, New York, NY, for Defendants–Appellees.

Before: Katzmann, Chief Judge, Sack and Lohier, Circuit Judges.

**Opinion**

Katzmann, Chief Judge:

**\*1** Plaintiff–Appellant Mark Williams alleges in this 42 U.S.C. § 1983 case that Defendants–Appellees Correction Officer Priatno and Correction Officer Gammone violated his Eighth Amendment rights when they brutally beat him for talking back to another officer when he was an inmate at Downstate Correctional Facility ("Downstate") in New York. We are presented with the threshold question of whether Williams exhausted all available administrative remedies prior to filing this lawsuit in the United States District Court for the Southern District of New York, as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a). More specifically, we must decide whether the prison's grievance process was actually "available" to Williams in light of the extraordinary circumstances of his case. We conclude that that process was not available to Williams because the applicable grievance procedures are "so opaque" and confusing that they were, "practically speaking, incapable of use." *Ross v. Blake*, ––– U.S. ––––, 136 S.Ct. 1850, 1859, ––– L.Ed.2d –––– (2016). We reverse the decision of the district court that granted defendants' motion to dismiss and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

*A. Department of Corrections and Community Supervision Grievance Procedures*

The New York State Department of Corrections and Community Supervision ("DOCCS") regulations outline the procedures that apply to the Inmate Grievance Program ("IGP") at Downstate. The grievance process begins with the filing of a complaint within 21 days of an alleged incident. N.Y. Comp. Codes R. & Regs. ("NYCRR") tit. 7, § 701.5(a)(1). Typically, inmates file grievances with the grievance clerk. *Id.* However, if an inmate is housed in the special housing unit ("SHU"), and therefore segregated from the regular prison population, he may give the grievance complaint to a correction officer to file for him. *See id.* § 701.7. Upon filing, the grievance clerk numbers and logs the grievances. *Id.* § 701.5(a)(2).

Ordinarily, there are three levels of review of a grievance. The first is by the inmate grievance resolution committee ("IGRC"); the second is by the facility superintendent; and the third is by the central office review committee ("CORC"). *Id.* §§ 701.1(c), 701.5. However, "harassment grievances"—those that involve "employee misconduct meant to annoy, intimidate or harm an inmate," *id.* § 701.2(e)—are subject to expedited first-level review by the facility superintendent, *id.* § 701.8. When the grievance clerk identifies a harassment grievance, the clerk must forward the grievance to the superintendent on the same day that the grievance was filed. *Id.* § 701.8(b). If the grievance presents a bona fide harassment issue, then the superintendent must initiate an investigation, render a decision on the grievance, and inform the inmate of the decision within 25 days of receipt of the grievance. *Id.* § 701.8(d), (f). "If the superintendent fails to respond within the required 25 calendar day time limit the grievant may appeal his/her grievance to CORC." *Id.* § 701.8(g); *see also id.* § 701.6(g)(2) (stating generally that matters not decided within designated time limits "may be appealed to the next step").

**\*2** If an inmate is transferred to another facility while a grievance is pending, a response to the grievance shall be mailed to the inmate at the new facility. *Id.* § 701.6(h)(1). "If the grievant wishes to appeal, he or she must mail the signed appeal form back to the IGP supervisor at the facility where the grievance was originally filed within seven calendar days after receipt." *Id.* § 701.6(h)(2). If an inmate wishes to file a new grievance about an incident that occurred prior to a transfer, he must file the grievance in the facility where he is currently housed, "even if it pertains to another facility." *Id.* § 701.5(a)(1).

*B. Facts and Procedural History*

Williams was formerly incarcerated at Downstate. He alleges that, on December 31, 2012, he was in a search room (also known as a "drafting" room) while his personal items were being searched. A correction officer was "thoroughly probing [his] legal work" and he asked her to stop. Joint App. at 32. Williams explains that the legal papers were related to a separate action seeking damages for an assault he experienced while an inmate at Rikers Island. The officer instructed Williams to sit down, which he did while "admonishing" her. *Id.* At that point, defendant correction officers Priatno and Gammone approached Williams. They grabbed Williams and dragged him to another room that had no cameras, where they were out of eyesight of the other 15 to 20 inmates who were seated in the drafting room. Williams alleges that the officers proceeded to assault him—thrusting his forehead against the wall, causing him to fall to the ground, and then kicking and stomping on any uncovered part of his body. Defendant Gammone allegedly picked him up and said, "this is what running your mouth gets you," and punched him on his right eye. *Id.* at 37. Williams fell to the floor again, and defendant Priatno allegedly kicked his face and head. Following the assault, the officers sent him to the infirmary. He suffered injuries to his head, knee, eye, elbow, lower back, jaw, and nose, and he now takes medication for anxiety and panic attacks.

Williams alleges that on January 15, 2013, while he was housed in the SHU at Downstate, he drafted a grievance detailing the officers' misconduct. [1] He gave the grievance to a correction officer to forward to the grievance office on his behalf, in accordance with DOCCS grievance procedures that apply to inmates in the SHU. *See* NYCRR tit. 7, § 701.7. One week later, Downstate superintendent Ada Perez was making rounds in the SHU. Williams told her about the incident and said he had not yet received a response to his grievance. Perez told him she had no knowledge of the grievance and that she would look into it. About a week after that conversation, Williams was transferred to another facility. He never received a response to the grievance and alleges that the

correction officer in the SHU never filed it for him. There is no dispute that Williams never appealed the grievance.

Proceeding pro se, Williams filed a complaint in the United States District Court for the Southern District of New York on January 13, 2014, asserting a claim under 42 U.S.C. § 1983 and the Eighth Amendment. The initial complaint named as defendants Correction Officer Priatno, Correction Officer John Doe, the State of New York, and DOCCS. Pursuant to screening procedures that apply to pro se complaints under 28 U.S.C. § 1915A, the district court dismissed the claims against the State and DOCCS and directed the Attorney General's Office to ascertain the identity of defendant John Doe and provide that information to Williams. Williams filed an amended complaint on February 19, 2014, naming correction officers Priatno and Gammone as defendants.

**\*3** Defendants moved to dismiss the complaint on the basis that Williams failed to exhaust administrative remedies as required by the PLRA, citing records that show Williams never filed an appeal. In a decision dated December 10, 2014, the district court (Seibel, *J.*) granted defendants' motion. The court reasoned that, even if Williams's grievance had never been filed, he still could have appealed the grievance to the next level because the regulations allow an appeal in the absence of a response. The district court also *sua sponte* denied Williams leave to file a second amended complaint, concluding that "better pleading would not lead to a different result." Joint App. at 66.

Williams filed a timely notice of appeal and subsequently moved for appointment of pro bono counsel. In granting his motion, we directed pro bono counsel to brief, among other issues, the following questions:

> (1) whether the framework in *Hemphill v. New York*, 380 F.3d 680 (2d Cir.2004) for excusing non-compliance with exhaustion of administrative remedies is still good law in light of *Woodford v. Ngo*, 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006); and (2) if so, whether a prison's failure to respond to a grievance renders an administrative remedy "unavailable" so as to excuse

the prisoner's non-compliance with administrative exhaustion.

Motion Order, filed Mar. 18, 2015, Docket No. 33. While this case was pending, the Supreme Court decided *Ross v. Blake*, ––– U.S. ––––, 136 S.Ct. 1850, ––– L.Ed.2d –––– (2016), which clarified the framework under which courts should assess whether a prisoner has complied with the PLRA exhaustion requirement. Because that framework can be easily applied to the parties' arguments and the record on appeal, we review the district court's decision under *Ross* and conclude that the court erred in granting defendants' motion to dismiss. Accordingly, we reverse and remand for further proceedings.

## II. DISCUSSION

**[1]** **[2]** **[3]** **[4]** We review a grant of a motion to dismiss *de novo*. *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir.2011). Specifically, the issue of "[w]hether a plaintiff has exhausted administrative remedies under the [PLRA] is also a question reviewed *de novo*." *Amador v. Andrews*, 655 F.3d 89, 94–95 (2d Cir.2011). For purposes of this review, we accept all of the factual allegations in the complaint as true, *see Erickson v. Pardus*, 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007), and, because Williams appeared pro se before the district court, we are "constrained to conduct our examination with 'special solicitude,' interpreting the complaint to raise the 'strongest claims that it suggests,' " *Hill*, 657 F.3d at 122 (alterations omitted) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474–75 (2d Cir.2006) (per curiam)).

**[5]** **[6]** The PLRA instructs that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983] ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Failure to exhaust administrative remedies is an affirmative defense under the PLRA, not a pleading requirement. *Jones v. Bock*, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *Grullon v. City of New Haven*, 720 F.3d 133, 141 (2d Cir.2013). Accordingly, "inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Jones*, 549 U.S. at 216, 127 S.Ct. 910. However, a district court still may dismiss a complaint for failure to exhaust administrative remedies if it is clear on the face of the complaint that the plaintiff

did not satisfy the PLRA exhaustion requirement. *See id.* at 215, 127 S.Ct. 910.

In *Hemphill v. New York*, 380 F.3d 680 (2d Cir.2004), we set forth a three-part inquiry to guide our analysis of whether a plaintiff has satisfied the PLRA. *See id.* at 686–91. The first part involves an assessment whether administrative remedies were in fact available to the plaintiff; the second part instructs courts to consider whether defendants forfeited the affirmative defense of exhaustion by failing to preserve it or should be estopped from raising it because their own actions inhibited the plaintiff's ability to exhaust administrative remedies; and the third part directs courts to determine whether special circumstances existed that justified a plaintiff's failure to exhaust remedies that were available and not subject to estoppel. *See Amador*, 655 F.3d at 102 (summarizing *Hemphill* inquiry).

**\*4** Two years later, in *Woodford v. Ngo*, 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), the Supreme Court weighed in on the importance of the PLRA exhaustion requirement without directly opining on the validity of the exceptions we outlined in *Hemphill*. In *Woodford*, a prisoner's grievance was denied because it was not timely filed. *Id.* at 86–87, 126 S.Ct. 2378. He then filed a lawsuit in federal court and argued he should be relieved from the PLRA exhaustion requirement on the basis that, as a result of his untimely filing, the grievance process was no longer available to him. *Id.* The Court rejected this position, emphasizing that the PLRA "requires proper exhaustion," *id.* at 93, 126 S.Ct. 2378, "which 'means using all steps that the [prison grievance system] holds out, and doing so *properly* (so that the [prison grievance system] addresses the issues on the merits),' " *id.* at 90, 126 S.Ct. 2378 (emphasis in original) (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)). "Proper exhaustion demands compliance with [a prison grievance system's] deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id.* at 90–91, 126 S.Ct. 2378.

In the aftermath of *Woodford*, we were left to determine the extent to which our *Hemphill* framework remained intact. The text of the statute convinced the court that the first part of our inquiry—the determination of whether an administrative remedy was in fact "available" to the inmate—was still valid. *See, e.g., Macias v.* *Zenk*, 495 F.3d 37, 44–45 (2d Cir.2007) (discussing *Woodford* and analyzing whether the grievance process was actually available to the plaintiff); *Johnston v. Maha*, 460 Fed.Appx. 11, 15 n. 6 (2d Cir. 2012) (summary order) ("Although [*Woodford*] requires that prisoners 'properly' exhaust the available remedies under the PLRA, it certainly does not abrogate the unavailability defense to nonexhaustion."); *see also Woodford*, 548 U.S. at 85, 126 S.Ct. 2378 (focusing its analysis on "all 'available' remedies"). However, the continued viability of *Hemphill*'s inquiries regarding estoppel and special circumstances was less clear. *See, e.g., Amador*, 655 F.3d at 102; *Macias*, 495 F.3d at 43 n. 1; *Ruggiero v. Cty. of Orange*, 467 F.3d 170, 176 (2d Cir.2006).

The Supreme Court's recent decision in *Ross v. Blake*, ––– U.S. ––––, 136 S.Ct. 1850, ––– L.Ed.2d –––– (2016), squarely addresses that ambiguity and guides our decision here. In *Ross*, the Court held that, aside from the "significant" textual qualifier that "the remedies must indeed be 'available' to the prisoner," there are "no limits on an inmate's obligation to exhaust—irrespective of any 'special circumstances.' " *Id.* at 1856. The Court stressed "the mandatory nature of [the PLRA's] exhaustion regime," *id.* at 1857, noting that the text of the PLRA and its legislative history refute the existence of a special circumstances exception to the statute's exhaustion requirement, *id.* at 1857–58. Therefore, to the extent that our special circumstances exception established in *Giano v. Goord*, 380 F.3d 670, 675–76 (2d Cir.2004), and *Hemphill*, 380 F.3d at 689–91, permits plaintiffs to file a lawsuit in federal court without first exhausting administrative remedies that were, *in fact*, available to them, those aspects of *Giano* and *Hemphill* are abrogated by *Ross*. Indeed, *Ross* largely supplants our *Hemphill* inquiry by framing the exception issue entirely within the context of whether administrative remedies were actually available to the aggrieved inmate. *See Ross*, 136 S.Ct. at 1858–59.

Accordingly, we will shift our focus to an analysis of whether the PLRA's textual "unavailability" exception applies here. Our decision in *Hemphill* touches on that question, noting that "the behavior of the defendants may render administrative remedies unavailable." 380 F.3d at 686. But we are significantly aided by *Ross* in interpreting the meaning of the word "available" as used in the PLRA. In *Ross*, the Court highlights "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable

of use to obtain relief." *Ross*, 136 S.Ct. at 1859. [2] First, an administrative remedy may be unavailable when "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* In other words, "some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* Third, an administrative remedy may be unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

**\*5** **[7]** Turning to the facts of this case, we assume for purposes of our analysis that an administrative remedy was "officially on the books." *Id.* at 1859. Prison regulations provide that inmates in the SHU may file grievances by giving the complaint to a correction officer to forward to the grievance clerk. *See* NYCRR tit. 7, § 701.7. The regulations also provide that an inmate may appeal a grievance "to the next step" if he does not receive a timely response. *Id.* § 701.6(g)(2); *see also id.* § 701.8(g). Defendants assert that, even if Williams's grievance had not been filed and despite the fact that he had been transferred to a new facility prior to receiving a response, he still could have attempted to appeal the grievance in accordance with sections 701.6(g)(2) and 701.8(g).

However, even if Williams technically could have appealed his grievance, we conclude that the regulatory scheme providing for that appeal is "so opaque" and "so confusing that ... no reasonable prisoner can use [it]." *Ross*, 136 S.Ct. at 1859 (quoting Tr. of Oral Arg. 23). The regulations simply do not contemplate the situation in which Williams found himself, making it practically impossible for him to ascertain whether and how he could pursue his grievance.

We accept as true Williams's allegation that the correction officer never filed his grievance. [3] *See Erickson*, 551 U.S. at 94, 127 S.Ct. 2197. Under that circumstance, the regulations do not adequately outline the process to appeal or otherwise exhaust administrative remedies. On their face, the regulations only contemplate appeals of grievances that were actually filed. For example, if the grievance had never been filed, the superintendent would never have received it and the timeline for her to provide a response within 25 days "of receipt of the grievance"

would never have been triggered. NYCRR tit. 7, § 701.8(f). In turn, the textual provision allowing a grievant to appeal to the CORC would never have come into effect. *See id.* § 701.8(g) ( "If the superintendent fails to respond within the required 25 calendar day time limit the grievant may appeal his/her grievance to CORC."). Accordingly, the regulations give no guidance whatsoever to an inmate whose grievance was never filed.

Defendants assure us, however, that if Williams had attempted to appeal his grievance, it would have "allow[ed] the facility to alert the inmate that his original complaint ha[d] not been received, and to inform him about how to proceed with his complaint." Post–Argument Letter from Holly A. Thomas, Special Counsel to the Solicitor Gen., State of N.Y. Office of the Attorney Gen. ("Defendants' Post–Argument Letter") (Mar. 16, 2016), Docket No. 97, at 1. At oral argument, counsel for defendants stated that there is no time limit to appeal to the next step if an inmate does not receive a response to a grievance. *See* Oral Arg. Recording at 1:59:13–38. In their post-argument letter, defendants explain how this would work in practice by outlining three options that would be presented to an inmate following his appeal of an unfiled grievance: (1) if it is still within 21 days of the incident, the inmate can re-file the complaint; (2) if it is beyond 21 days but within 45 days of the incident, the inmate can request an exception to the 21–day time limit if he can show mitigating circumstances; or (3) if it is more than 45 days since the incident, the inmate may file a separate complaint grieving the denial of an extension to the time limit. Defendants' Post–Argument Letter, at 2–3; *see also id.*, App. 1b, 2c. [4]

**\*6** These options are pieced together from various provisions in the regulations that do not involve appeals of grievances but provide instructions on the timelines that apply to the filing of new complaints. *See* NYCRR tit. 7, § 701.5(a)(1); *id.* § 701.6(g)(1)(i)(a); *id.* § 701.6(g)(1) (ii). A close review of the regulations shows, contrary to defendants' assertions at oral argument, that an "appeal" in Williams's circumstance is, indeed, subject to time limitations and procedural hurdles that in all but the rarest of circumstances would preclude him from pursuing his unfiled and unanswered grievance, and that are, in any event, "so confusing that ... no reasonable prisoner can use them." *Ross*, 136 S.Ct. at 1859 (quoting Tr. of Oral Arg. 23).

Looking at the first option, an inmate does not even have the right to appeal a grievance to the next step until the time for the superintendent to respond has already passed —a date which, in the case of a harassment grievance, is already well beyond 21 days of the incident. *See id.* §§ 701.5(a)(1), 701.8(g). Regarding the second option, for similar reasons, the window to request an extension between 21 and 45 days of the incident will occur only where the inmate took less than the allowed 21 days to submit his original complaint. If the inmate took full advantage of the time the regulations give him to act and then had to wait 25 days for a response, 46 days will have passed before he learns with certainty that the superintendent failed to respond. [5] Finally, where options one and two are unavailable, the third option is wholly inapplicable as a mechanism to appeal an unfiled grievance, because the regulations state unequivocally that "[a]n exception to the time limit may not be granted if the request was made more than 45 days after an alleged occurrence." *Id.* § 701.6(g)(1)(i)(a). Therefore, even though option three suggests that an inmate could file a separate complaint grieving the denial of an exception to the filing deadline, such a grievance would be futile given that the regulations do not give the IGP supervisor authority to grant an exception beyond 45 days of the initial incident.

In sum, the regulations plainly do not describe a mechanism for appealing a grievance that was never filed. Moreover, the purported options for relief provided by defendants, to the extent they are even available to an inmate in Williams's situation, only increase confusion regarding the avenues available to pursue an appeal. For these reasons, the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it. [6]

**\*7** Furthermore, if the regulations outlined above, as applied to a prisoner in Williams's situation, were not already "so confusing" that "no ordinary prisoner can discern or navigate [them]," *Ross,* 136 S.Ct. at 1859, their obscurity was compounded by the fact that Williams was transferred to another facility approximately two weeks after giving his grievance to the correction officer. Defendants contend that a transfer does not affect an inmate's ability to appeal his grievance to the next step, pointing to a provision in the regulation that provides: "If the [transferred] grievant wishes to appeal, he or she must mail the signed appeal form back to the IGP supervisor at the facility where the grievance was originally filed within seven calendar days after receipt." *NYCRR tit. 7, § 701.6(h)(2).* However, this provision presumes not only that the grievance was actually filed, but also that the inmate received an appeal form that he can sign and mail back. The regulations plainly do not provide guidance on how a transferred inmate can appeal his grievance with the original facility without having received a response.

For the foregoing reasons, we conclude that the grievance procedures that were technically available to Williams are so opaque and confusing that they were, "practically speaking, incapable of use." *Ross,* 136 S.Ct. at 1859. Accordingly, in giving his grievance to the correction officer, Williams exhausted all administrative remedies that were available to him. 42 U.S.C. § 1997e(a). [7] To avoid confusion going forward, we recommend that DOCCS revise its grievance procedures to instruct inmates how to appeal grievances that were not properly filed by prison staff, and how to appeal a grievance, to which the inmate never received a response, after being transferred.

### III. CONCLUSION

Having concluded that Williams satisfied the PLRA's exhaustion requirement, we **REVERSE** the judgment of the district court and **REMAND** for further proceedings in accordance with this opinion.

### All Citations

--- F.3d ----, 2016 WL 3729383

Footnotes

\*      The Clerk of Court is directed to amend the caption to conform to the listing above.

1      Some allegations concerning the circumstances of Williams's attempted filing of his grievance are taken from his pro se opposition to the motion to dismiss, which we may consider in resolving this appeal. *See Wright v. Comm'r of Internal Revenue,* 381 F.3d 41, 44 (2d Cir.2004) (construing pro se submissions "liberally"); *Ortiz v. McBride,* 323 F.3d 191, 194 (2d Cir.2003) ("The rule favoring liberal construction of *pro se* submissions is especially applicable to civil rights claims.").

2  We note that the three circumstances discussed in *Ross* do not appear to be exhaustive, given the Court's focus on three kinds of circumstances that were "relevant" to the facts of that case. *Ross,* 136 S.Ct. at 1859. Because those circumstances are also relevant to the facts of this case, we do not opine on what other circumstances might render an otherwise available administrative remedy actually incapable of use.

3  We consider this claim to be plausible given Williams's allegations that he asked superintendent Perez about his grievance one week after giving it to the correction officer and Perez said that she had no knowledge of it. There is no question that Williams's grievance was a harassment grievance. *See* NYCRR tit. 7, § 701.2(e) (defining harassment grievances). Had the correction officer filed it, it should have been forwarded to Perez the same day in accordance with procedures that govern the processing of harassment grievances. *See* NYCRR tit. 7, § 701.8(b). At the motion to dismiss stage, the allegation that she had no knowledge of the grievance supports Williams's allegation that it was not filed.

4  Defendants offer a fourth option for an inmate to address an unfiled grievance: submitting "a new complaint grieving the alleged willful mishandling of his original complaint by DOCCS's personnel." Defendants' Post–Argument Letter at 3. However, because such a grievance would not itself address the substantive allegations in the original unfiled grievance —and it is unclear how prevailing on the former would affect the ability to pursue the latter—under the circumstances of this case, it is at a minimum a roundabout, if not ineffectual, means for an inmate to attain relief.

5  Even when an inmate submits his initial grievance before the 21–day deadline specified in section 701.5(a)(1), and, therefore, it is possible that he could have filed a request for an extension under the second option, he would still not learn of that option until the prison responds to his "appeal" of the unanswered grievance and informs him of these options. In the examples provided by defendants, the amount of time the prison takes to provide a response to these types of inquiries varies. *See, e.g.,* Defendants' Post–Argument Letter, App. 1 (1 day); App. 2 (7 days); App. 3 (3 days); App. 4 (1 day); App. 5 (17 days).

6  Defendants argue that an inmate's claim that he submitted a grievance that was unfiled and unanswered (which the district court would accept as true at the motion to dismiss stage), and that was not appealed, cannot excuse compliance with the PLRA's exhaustion requirement. If the inmate's allegation to that effect alone sufficed for purposes of the PLRA, he could thereby "avoid the prison grievance process altogether ... without the administrative process ever having been initiated." Defendants' Br. at 22–23. Indeed, many district courts have concluded that a "nonresponse" to a grievance "must be appealed" in order to exhaust administrative remedies under the PLRA. *See, e.g.,* *Smith v. Kelly,* 985 F.Supp.2d 275, 281 (N.D.N.Y.2013); *see also id.* at 281 n. 8 (collecting cases). Nonetheless, defendants bear the initial burden of establishing the affirmative defense of non-exhaustion "by pointing to 'legally sufficient sources' such as statutes, regulations, or grievance procedures" which demonstrate that "a grievance process exists and applies to the underlying dispute." *Hubbs v. Suffolk Cty. Sheriff's Dep't,* 788 F.3d 54, 59 (2d Cir.2015) (alteration omitted) (quoting *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003)). Because, as we explained above, the process of appealing an unfiled grievance is practically unavailable to inmates under current DOCCS regulations, defendants have not met their initial burden here.

7  In light of this conclusion, we need not decide whether administrative remedies also may have been unavailable to Williams for other reasons, such as officer misconduct. *See Ross,* 136 S.Ct. at 1860.

---

**End of Document**                                        © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
James MURRAY, Plaintiff,
v.
R. PALMER, Corrections Officer, Great Meadow
Correctional Facility; S. Griffin, Corrections Officer,
Great Meadow Correctional Facility; M. Terry,
Corrections Officer, Great Meadow Correctional
Facility; F. Englese, Corrections Officer, Great Meadow
Correctional Facility; Sergeant Edwards, Great Meadow
Correctional Facility; K. Bump, Sergeant, Great
Meadow Correctional Facility; K.H. Smith, Sergeant,
Great Meadow Correctional Facility; A. Paolano,
Facility Health Director: and Ted Nesmith, Physicians
Assistant, Defendants.
No. 9:03-CV-1010 (DNH/GLS).

June 20, 2008.
James Murray, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, James Seaman, Esq., Asst. Attorney General,
of Counsel, Albany, NY, for Defendants.

### *ORDER*

DAVID N. HURD, District Judge.

**\*1** Plaintiff, James Murray, brought this civil rights
action pursuant to 42 U.S.C. § 1983. In a 51 page Report
Recommendation dated February 11, 2008, the Honorable
George H. Lowe, United States Magistrate Judge,
recommended that defendants' motion for summary
judgment be granted in part (i.e., to the extent that it
requests the dismissal with prejudice of plaintiff's claims
against defendant Paolano and Nesmith); and denied in
part (i.e., to the extent that it requests dismissal of
plaintiff's claims against the remaining defendants on the
grounds of plaintiff's failure to exhaust available
administrative remedies) for the reasons stated in the

Report Recommendation. Lengthy objections to the
Report Recommendation have been filed by the plaintiff.

Based upon a de novo review of the portions of the
Report-Recommendation to which the plaintiff has
objected, the Report-Recommendation is accepted and
adopted. *See* 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendants' motion for summary judgment is
GRANTED in part and DENIED in part;

2. Plaintiff's complaint against defendants Paolano
and Nesmith is DISMISSED with prejudice;

3. Defendants' motion for summary judgment is
DENIED, to the extent that their request for dismissal of
plaintiff's assault claims under the Eighth Amendment
against the remaining defendants on the grounds of
plaintiff's failure to exhaust available administrative
remedies as stated in the Report-Recommendation.

IT IS SO ORDERED.

JAMES MURRAY, Plaintiff,

-v.-

R. PALMER, Corrections Officer, Great Meadow
C.F.; S. GRIFFIN, Corrections Officer, Great Meadow
C.F.; M. TERRY, Corrections Officer, Great Meadow
C.F.; F. ENGLESE, Corrections Officer, Great Meadow
C.F.; P. EDWARDS, Sergeant, Great Meadow C.F.; K.
BUMP, Sergeant, Great Meadow C.F.; K.H. SMITH,
Sergeant, Great Meadow C.F.; A. PAOLANO, Health
Director, Great Meadows C.F.; TED NESMITH,
Physicians Assistant, Great Meadows C.F., Defendants.

R. PALMER, Corrections Officer, Great Meadow
C.F.; S. GRIFFIN, Corrections Officer, Great Meadow
C.F.; M. TERRY, Corrections Officer, Great Meadow

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

C.F.; Counter Claimants,

-v.-

JAMES MURRAY, Counter Defendant.

***ORDER and REPORT-RECOMMENDATION***

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Currently pending before the Court is Defendants' motion for summary judgment. (Dkt. No. 78.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

I. BACKGROUND

A. Plaintiff's Second Amended Complaint

In his Second Amended Complaint, James Murray ("Plaintiff") alleges that nine correctional officials and health care providers employed by the New York State Department of Correctional Services ("DOCS") at Great Meadow Correctional Facility ("Great Meadow C.F .") violated his rights under the Eighth Amendment on August 17, 2000, when (1) Defendants Palmers, Griffin, Terry, and Englese assaulted him without provocation while he was incapacitated by mechanical restraints, (2) Defendants Edwards, Bump, and Smith witnessed, but did not stop, the assault, and (3) Defendants Paolano and Nesmith failed to examine and treat him following the assault despite his complaints of having a broken wrist. (Dkt. No. 10, ¶¶ 6-7 [Plf.'s Second Am. Compl.].)

B. Defendants' Counterclaim

**\*2** In their Answer to Plaintiff's Second Amended Complaint, three of the nine Defendants (Palmer, Griffin and Terry) assert a counterclaim against Defendant for personal injuries they sustained as a result of Plaintiff's assault and battery upon them during the physical struggle that ensued between them and Plaintiff due to his threatening and violent behavior on August 17, 2000, at Great Meadow C.F. (Dkt. No. 35, Part 1, ¶¶ 23-30 [Defs.' Answer & Counterclaim].)

I note that the docket in this action inaccurately indicates that this Counterclaim is asserted also on behalf of Defendants Englese, Edwards, Bump, Smith, Paolano, and "Nejwith" (later identified as "Nesmith"). (*See* Caption of Docket Sheet.) As a result, at the end of this Report-Recommendation, *I direct the Clerk's Office to correct the docket sheet to remove the names of those individuals as "counter claimants" on the docket.*

I note also that, while such counterclaims are unusual in prisoner civil rights cases (due to the fact that prisoners are often "judgment proof" since they are without funds), Plaintiff paid the $150 filing fee in this action (Dkt. No. 1), and, in his Second Amended Complaint, he alleges that he received a settlement payment in another prisoner civil rights actions in 2002. (Dkt. No. 10, ¶ 10 [Plf.'s Second Am. Compl.].) Further investigation reveals that the settlement resulted in a payment of $20,000 to Plaintiff. *See Murray v. Westchester County Jail,* 98-CV-0959 (S .D.N.Y.) (settled for $20,000 in 2002).

II. DEFENDANTS' MOTION AND PLAINTIFF'S RESPONSE

A. Defendants' Motion

In their motion for summary judgment, Defendants argue that Plaintiff's Second Amended Complaint should be dismissed for four reasons: (1) Plaintiff has failed to adduce any evidence establishing that Defendant Paolano, a supervisor, was personally involved in any of the constitutional violations alleged; (2) Plaintiff has failed to adduce any evidence establishing that Defendant Nesmith was deliberately indifferent to any of Plaintiff's serious medical needs; (3) at the very least, Defendant Nesmith is protected from liability by the doctrine of qualified immunity, as a matter of law; and (4) Plaintiff has failed to adduce any evidence establishing that he exhausted his available administrative remedies with respect to his assault claim, before filing that claim in federal court. (Dkt. No. 78, Part 13, at 2, 4-13 [Defs.' Mem. of Law].)

In addition, Defendants argue that, during his deposition in this action, Plaintiff asserted, for the first time, a claim that the medical staff at Great Meadow C.F. violated his rights under the Eighth Amendment by failing

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

to honor non-life-sustaining medical prescriptions written at a former facility. (*Id.* at 3.) As a threshold matter, Defendants argue, this claim should be dismissed since Plaintiff never included the claim in his Second Amended Complaint, nor did Plaintiff ever file a motion for leave to file a Third Amended Complaint. (*Id.*) In any event, Defendants argue, even if the Court were to reach the merits of this claim, the Court should dismiss the claim because Plaintiff has failed to allege facts plausibly suggesting, or adduce evidence establishing, that Defendants were personally involved in the creation or implementation of DOCS' prescription-review policy, nor has Plaintiff provided such allegations or evidence indicating the policy is even unconstitutional. (*Id.*)

**\*3** Defendants' motion is accompanied by a Statement of Material Facts, submitted in accordance with Local Rule 7.1(a)(3) ("Rule 7.1 Statement"). (Dkt. No. 78, Part 12.) Each of the 40 paragraphs contained in Defendants' Rule 7.1 Statement is supported by an accurate citation to the record evidence. (*Id.*) It is worth mentioning that the record evidence consists of (1) the affirmations of Defendants Nesmith and Paolano, and exhibits thereto, (2) the affirmation of the Inmate Grievance Program Director for DOCS, and exhibits thereto, (3) affirmation of the Legal Liaison between Great Meadow C.F. and the New York State Attorney General's Office during the time in question, and exhibits thereto, and (4) a 155-page excerpt from Plaintiff's deposition transcript. (Dkt. No. 78.)

**B. Plaintiff's Response**

After being specifically notified of the consequences of failing to properly respond to Defendants' motion (*see* Dkt. No. 78, Part 1), and after being granted *three* extensions of the deadline by which to do so (*see* Dkt. Nos. 79, 80, 83), Plaintiff submitted a barrage of documents: (1) 49 pages of exhibits, which are attached to neither an affidavit nor a memorandum of law (Dkt. No. 84); (2) 113 pages of exhibits, attached to a 25-page affidavit (Dkt. No. 85); (3) 21 pages of exhibits, attached to a 12-page supplemental affidavit (Dkt. No. 86); and (4) a 29-page memorandum of law (Dkt. No. 86); and a 13-page supplemental memorandum of law (Dkt. No. 88).

Generally in his Memorandum of Law and Supplemental Memorandum of Law, Plaintiff responds to

the legal arguments advanced by Defendants. (*See* Dkt. No. 86, Plf.'s Memo. of Law [responding to Defs.' exhaustion argument]; Dkt. No. 88, at 7-13 [Plf.'s Supp. Memo. of Law, responding to Defs.' arguments regarding the personal involvement of Defendant Paolano, the lack of evidence supporting a deliberate indifference claim against Defendant Nesmith, the applicability of the qualified immunity defense with regard to Plaintiff's claim against Defendant Nesmith, and the sufficiency and timing of Plaintiff's prescription-review claim against Defendant Paolano].) Those responses are described below in Part IV of this Report-Recommendation.

However, unfortunately, not among the numerous documents that Plaintiff has provided is a *proper* response to Defendants' Rule 7.1 Statement. (*See* Dkt. No. 85, Part 2, at 45-52 [Ex. N to Plf.'s Affid.].) Specifically, Plaintiff's Rule 7.1 Response (which is buried in a pile of exhibits) fails, with very few exceptions, to "set forth ... specific citation[s] to the record," as required by Local Rule 7.1(a)(3). (*Id.*) I note that the notary's "sworn to" stamp at the end of the Rule 7.1. Statement does not transform Plaintiff's Rule 7.1 Response into record evidence so as to render that Response compliant with Local Rule 7.1. First, Local Rule 7.1 expressly states, "The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits." N.D.N.Y. L.R. 7.1(a)(3). In this way, the District's Local Rule, like similar local rules of other districts, contemplates citations to a record that is independent of a Rule 7.1 Response. *See, e.g., Vaden v. GAP, Inc.,* 06-CV-0142, 2007 U.S. Dist. LEXIS 22736, at \*3-5, 2007 WL 954256 (M.D.Tenn. March 26, 2007) (finding non-movant's verified response to movant's statement of material facts to be deficient because it did cite to affidavit or declaration, nor did it establish that non-movant had actual knowledge of matters to which he attested); *Waterhouse v. District of Columbia,* 124 F.Supp.2d 1, 4-5 (D.D.C.2000) (criticizing party's "Verified Statement of Material Facts," as being deficient in citations to independent record evidence, lacking "firsthand knowledge," and being purely "self-serving" in nature). Moreover, many of Plaintiff's statements in his Rule 7.1 Response are either argumentative in nature or lacking in specificity and personal knowledge, so as to disqualify those statements from having the effect of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

sworn testimony for purposes of a summary judgment motion. *See, infra,* notes 10-12 of this Report-Recommendation.

## III. GOVERNING LEGAL STANDARD

*\*4* Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material fact exists,[FN1] the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.[FN2]

> FN1. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> FN2. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." [FN3] The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [FN4] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [FN5]

> FN3. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary

judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

> FN4. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ...."); *Matsushita,* 475 U.S. at 585-86; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> FN5. *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at *8 (W.D.N.Y. Mar.29, 2004) [internal quotations omitted] [emphasis added].

What this burden-shifting standard means when a plaintiff has failed to *properly* respond to a defendant's Rule 7.1 Statement of Material Facts is that the facts as set forth in that Rule 7.1 Statement will be accepted as true [FN6] to the extent that (1) those facts are supported by the evidence in the record,[FN7] and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment.[FN8]

> FN6. See N.D.N.Y. L.R. 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."*) [emphasis in original].

> FN7. See *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243 (2d Cir.2004) ("[I]n determining whether the moving party has met [its] burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [internal quotation marks and citations omitted].

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

FN8. *See* *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996); *cf.* N.D.N.Y. L.R. 56.2 (imposing on movant duty to provide such notice to *pro se* opponent).

Implied in the above-stated standard is the fact that a district court has no duty to perform an *independent* review of the record to find proof of a factual dispute, even if the non-movant is proceeding *pro se.*[FN9] In the event the district court chooses to conduct such an independent review of the record, any affidavit submitted by the non-movant, in order to be sufficient to create a factual issue for purposes of a summary judgment motion, must, among other things, not be conclusory.[FN10] (An affidavit is conclusory if, for example, its assertions lack any supporting evidence or are too general.)[FN11] Finally, even where an affidavit is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint."[FN12]

FN9. *See* *Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432, 2004 WL 2309715 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4, 2006 WL 395269 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct.29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

FN10. *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate v. Top Assoc.,* 425 F.2d 92, 97 (2d Cir.1970) (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

FN11. *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

FN12. *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-55 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb.15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd,* 136 F. App'x 383 (2d Cir.2005) (unreported decision, cited not as precedential authority but merely to show the case's subsequent history, in accordance with Second Circuit Local Rule § 0.23).

## IV. ANALYSIS

## A. Whether Plaintiff Has Adduced Evidence Establishing that Defendant Paolano Was Personally Involved in the Constitutional Violations Alleged

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 [2d Cir.1991] ).[FN13] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant.[FN14] If the defendant is a supervisory official, such as a correctional facility superintendent or a facility health services director, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct.[FN15] In other words, supervisory officials may not be held liable merely because they held a position of authority.[FN16] Rather, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.[FN17]

FN13. *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

FN14. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

FN15. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

FN16. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

FN17. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

781 F.2d 319, 323-324 (2d Cir.1986) (setting forth four prongs).

**\*5** Defendants argue that Plaintiff has not adduced evidence establishing that Defendant Paolano, the Great Meadow C.F. Health Services Director during the time in question, was personally involved in the constitutional violations alleged. (Dkt. No. 78, Part 13, at 2 [Defs.' Memo. of Law].) In support of this argument, Defendants point to the record evidence establishing that, during the time in which Plaintiff was incarcerated at Great Meadow C.F. (i . e., from early August of 2000 to late November of 2000), Defendant Paolano never treated Plaintiff for any medical condition, much less a broken wrist on August 17, 2000. (*Id.; see also* Dkt. No. 78, Part 4, ¶¶ 7-8 [Paolano Affid.]; Dkt. No. 78, Part 5 [Ex. A to Paolano Affid.]; Dkt. No. 78, Part 11, at 32-33 [Plf.'s Depo.].)

Plaintiff responds that (1) Defendant Paolano was personally involved since he "treated" Plaintiff on August 17, 2000, by virtue of his supervisory position as the Great Meadow C.F.'s Health Services Director, and (2) Defendant Paolano has the "final say" regarding what medications inmates shall be permitted to retain when they transfer into Great Meadow C.F. (Dkt. No. 88, at 7-8 [Plf.'s Supp. Memo. of Law].) In support of this argument, Plaintiff cites a paragraph of his Supplemental Affidavit, and an administrative decision, for the proposition that Defendant Paolano, as the Great Meadow C.F. Health Services Director, had the "sole responsibility for providing treatment to the inmates under [the Facility's] care." (*Id.; see also* Dkt. No. 86, Suppl. Affid., ¶ 5 & Ex. 14.)

**1. Whether Defendant Paolano Was Personally Involved in Plaintiff's Treatment on August 17, 2000**

With respect to Plaintiff's first point (regarding Defendant Paolano's asserted "treatment" of Plaintiff on August 17, 2000), the problem with Plaintiff's argument is that the uncontrovered record evidence establishes that, as Defendants' assert, Defendant Paolano did not, in fact, treat Plaintiff on August 17, 2000 (or at any time when Plaintiff was incarcerated at Great Meadow C.F.). This was the fact asserted by Defendants in Paragraphs 38 of their Rule 7.1 Statement. (*See* Dkt. No. 78, Part 12, ¶ 38 [Defs.' Rule 7.1 Statement].) Defendants supported this factual assertion with record evidence. (*Id.* [providing accurate record citations]; *see also* Dkt. No. 78, Part 12, ¶¶ 37-38 [Defs.' Rule 7.1 Statement, indicating that it was Defendant Nesmith, not Defendant Paolano, who treated Plaintiff on 8/17/00].) Plaintiff has failed to specifically controvert this factual assertion, despite having been given an adequate opportunity to conduct discovery, and having been specifically notified of the consequences of failing to properly respond to Defendants' motion (*see* Dkt. No. 78, Part 1), and having been granted *three* extensions of the deadline by which to do so (*see* Dkt. Nos. 79, 80, 83). Specifically, Plaintiff fails to cite any record evidence in support of his denial of Defendants' referenced factual assertion. (*See* Dkt. No. 85, Part 2, at 50 [Ex. N to Plf.'s Affid.].) As a result, under the Local Rules of Practice for this Court, Plaintiff has effectively "admitted" Defendants' referenced factual assertions. N.D.N.Y. L.R. 7.1(a)(3).

**\*6** The Court has no duty to perform an independent review of the record to find proof disputing this established fact. *See, supra,* Part III and note 9 of this Report-Recommendation. Moreover, I decline to exercise my discretion, and I recommend that the Court decline to exercise its discretion, to perform an independent review of the record to find such proof for several reasons, any one of which is sufficient reason to make such a decision: (1) as an exercise of discretion, in order to preserve judicial resources in light of the Court's heavy caseload; (2) the fact that Plaintiff has already been afforded considerable leniency in this action, including numerous deadline extensions and liberal constructions; and (3) the fact that Plaintiff is fully knowledgeable about the requirements of a non-movant on a summary judgment motion, due to Defendants' notification of those requirements, and due to Plaintiff's extraordinary litigation experience.

With regard to this last reason, I note that federal courts normally treat the papers filed by *pro se* civil rights litigants with special solicitude. This is because, generally, *pro se* litigants are unfamiliar with legal terminology and the litigation process, and because the civil rights claims they assert are of a very serious nature. However, "[t]here are circumstances where an overly litigious inmate, who is quite familiar with the legal system and with pleading requirements, may not be afforded [the] special solicitude" that is normally afforded *pro se* litigants.[FN18] Generally, the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

rationale for diminishing special solicitude (at least in the Second Circuit) is that the *pro se* litigant's extreme litigiousness demonstrates his *experience,* the lack of which is the reason for extending special solicitude to a *pro se* litigant in the first place.[FN19] The Second Circuit has diminished this special solicitude, and/or indicated the acceptability of such a diminishment, on several occasions.[FN20] Similarly, I decide to do so, here, and I recommend the Court do the same.

> FN18. *Koehl v. Greene,* 06-CV-0478, 2007 WL 2846905, at *3 & n. 17 (N.D.N.Y. Sept.26, 2007)* (Kahn, J., adopting Report-Recommendation) [citations omitted].

> FN19. *Koehl,* 2007 WL 2846905, at *3 & n. 18 [citations omitted].

> FN20. *See, e.g., Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001) (unpublished opinion), *aff'g,* 97-CV-0938, Decision and Order (N.D.N.Y. filed May 28, 1999) (Kahn, J.), *adopting,* Report-Recommendation, at 1, n. 1 (N.D.N.Y. filed Apr. 28, 1999) (Smith, M.J.); *Johnson v. C. Gummerson,* 201 F.3d 431, at *2 (2d Cir.1999) (unpublished opinion), *aff'g,* 97-CV-1727, Decision and Order (N.D.N.Y. filed June 11, 1999) (McAvoy, J.), *adopting,* Report-Recommendation (N.D.N.Y. filed April 28, 1999) (Smith, M.J.); *Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994); *see also Raitport v. Chem. Bank,* 74 F.R.D. 128, 133 (S.D.N.Y.1977)[citing *Ackert v. Bryan,* No. 27240 (2d Cir. June 21, 1963) (Kaufman, J., concurring).

Plaintiff is no stranger to the court system. A review of the Federal Judiciary's Public Access to Court Electronic Records ("PACER") System reveals that Plaintiff has filed at least 15 other federal district court actions, [FN21] and at least three federal court appeals.[FN22] Furthermore, a review of the New York State Unified Court System's website reveals that he has filed at least 20 state court actions,[FN23] and at least two state court appeals.[FN24] Among these many actions he has had at least one victory, resulting in the payment of $20,000 to him in settlement proceeds.[FN25]

> FN21. *See Murray v. New York,* 96-CV-3413 (S.D.N.Y.); *Murray v. Westchester County Jail,* 98-CV-0959 (S.D.N.Y.); *Murray v. McGinnis,* 99-CV-1908 (W.D.N.Y.); *Murray v. McGinnis,* 99-CV-2945 (S.D.N.Y.); *Murray v. McGinnis,* 00-CV-3510 (S.D.N.Y.); *Murray v. Jacobs,* 04-CV-6231 (W.D.N.Y.); *Murray v. Bushey,* 04-CV-0805 (W.D.N.Y.); *Murray v. Goord,* 05-CV-1113 (N.D.N.Y.); *Murray v. Wissman,* 05-CV-1186 (N.D.N.Y.); *Murray v. Goord,* 05-CV-1579 (N.D.N.Y.); *Murray v. Doe,* 06-CV-0205 (S.D.N.Y.); *Murray v. O'Herron,* 06-CV-0793 (W.D.N.Y.); *Murray v. Goord,* 06-CV-1445 (N.D.N.Y.); *Murray v. Fisher,* 07-CV-0306 (W.D.N.Y.); *Murray v. Escrow,* 07-CV-0353 (W.D.N.Y.).

> FN22. *See Murray v. McGinnis,* No. 01-2533 (2d Cir.); *Murray v. McGinnis,* No. 01-2536 (2d Cir.); *Murray v. McGinnis,* No. 01-2632 (2d Cir.).

> FN23. *See Murray v. Goord,* Index No. 011568/1996 (N.Y. Sup.Ct., Westchester County); *Murray v. Goord,* Index No. 002383/1997 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002131/1998 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002307/1998 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002879/1998 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002683/2004 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002044/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. McGinnis,* Index No. 002099/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Sullivan,* Index No. 002217/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002421/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002495/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002496/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002888/2006 (N.Y. Sup.Ct., Chemung

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

County); *Murray v. LeClaire,* Index No. 002008/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. LeClaire,* Index No. 002009/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. LeClaire,* Index No. 002010/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. LeClaire,* Index No. 002011/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. Fisher,* Index No. 002762/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. New York,* Claim No. 108304, Motion No. 67679 (N.Y.Ct.Cl.); *Murray v. New York,* Motion No. M-67997 (N.Y.Ct.Cl.).

FN24. *See Murray v. Goord,* No. 84875, 709 N.Y. S.2d 662 (N.Y.S.App.Div., 3d Dept.2000); *Murray v. Goord,* No. 83252, 694 N.Y.S .2d 797 (N.Y.S.App.Div., 3d Dept.1999).

FN25. *See Murray v. Westchester County Jail,* 98-CV-0959 (S.D.N.Y .) (settled for $20,000 in 2002).

I will add only that, even if I were inclined to conduct such an independent review of the record, the record evidence that Plaintiff cites regarding this issue in his Supplemental Memorandum of Law does not create such a question of fact. (*See* Dkt. No. 88, at 7-8 [Plf.'s Supp. Memo. of Law, citing Dkt. No. 86, Suppl. Affid., ¶ 5 & Ex. 14].) It appears entirely likely that Defendant Paolano had the ultimate responsibility for providing medical treatment to the inmates at Great Meadow C.F.[FN26] However, this duty arose solely because of his supervisory position, i.e., as the Facility Health Services Director. It is precisely this sort of supervisory duty that does *not* result in liability under 42 U.S.C. § 1983, as explained above.

FN26. To the extent that Plaintiff relies on this evidence to support the proposition that Defendant Paolano had the "sole" responsibility for such health care, that reliance is misplaced. Setting aside the loose nature of the administrative decision's use of the word "sole," and the different context in which that word was used (regarding the review of Plaintiff's grievance about having had his prescription

discontinued), the administrative decision's rationale for its decision holds no preclusive effect in this Court. I note that this argument by Plaintiff, which is creative and which implicitly relies on principles of estoppel, demonstrates his facility with the law due to his extraordinary litigation experience.

**\*7** As for the other ways through which a supervisory official may be deemed "personally involved" in a constitutional violation under 42 U.S.C. § 1983, Plaintiff does not even argue (or allege facts plausibly suggesting)[FN27] that Defendant Paolano *failed to remedy* the alleged deliberate indifference to Plaintiff's serious medical needs on August 17, 2000, after learning of that deliberate indifference through a report or appeal. Nor does Plaintiff argue (or allege facts plausibly suggesting) that Defendant Paolano created, or allowed to continue, *a policy or custom* under which the alleged deliberate indifference on August 17, 2000, occurred. Nor does Plaintiff argue (or allege facts plausibly suggesting) that Defendant Paolano had been *grossly negligent* in managing subordinates (such as Defendant Nesmith) who caused the alleged deliberate indifference. Nor does Plaintiff argue (or allege facts plausibly suggesting) that Defendant Paolano exhibited *deliberate indifference* to the rights of Plaintiff by failing to act on information indicating that Defendant Nesmith was violating Plaintiff's constitutional rights.

FN27. *See Bell Atl. Corp. v. Twombly,* --- U.S. ----, ----, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007) (holding that, for a plaintiff's complaint to state a claim upon which relief might be granted under Fed.R.Civ.P. 8 and 12, his "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," or, in other words, there must be "plausible grounds to infer [actionable conduct]"), *accord, Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) ("[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly* ] is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible."* ) [emphasis in

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

original].

In the alternative, I reach the same conclusion (that Plaintiff's claim against Defendant Paolano arising from the events of August 17, 2000, lacks merit) on the ground that there was no constitutional violation committed by Defendant Nesmith on August 17, 2000, in which Defendant Paolano could have been personally involved, for the reasons discussed below in Part IV.B. of this Report-Recommendation.

## 2. Whether Defendant Paolano Was Personally Involved in the Review of Plaintiff's Prescriptions in Early August of 2000

With respect to Plaintiff's second point (regarding Defendant Paolano's asserted "final say" regarding what medications inmates shall be permitted to retain when they transfer into Great Meadow C.F.), there are three problems with this argument.

First, the argument regards a claim that is not properly before this Court for the reasons explained below in Part IV.E. of this Report-Recommendation.

Second, as Defendants argue, even if the Court were to reach the merits of this claim, it should rule that Plaintiff has failed to adduce evidence establishing that Defendant Paolano was personally involved in the creation or implementation of DOCS' prescription-review policy. It is an uncontroverted fact, for purposes of Defendants' motion, that (1) the decision to temporarily deprive Plaintiff of his previously prescribed pain medication (i.e., pending the review of that medication by a physician at Great Meadow C.F.) upon his arrival at Great Meadow C.F. was made by an "intake nurse," not by Defendant Paolano, (2) the nurse's decision was made pursuant to a policy instituted by DOCS, not by Defendant Paolano, and (3) Defendant Paolano did not have the authority to alter that policy. These were the facts asserted by Defendants in Paragraphs 6 through 9 of their Rule 7.1 Statement. (*See* Dkt. No. 78, Part 12, ¶¶ 6-9 [Defs.' Rule 7.1 Statement].) Defendants supported these factual assertions with record evidence. (*Id.* [providing accurate record citations].) Plaintiff expressly admits two of these factual assertions, and fails to support his denial of the remaining factual assertions with citations to record evidence that actually controverts the facts asserted. (Dkt. No. 85, Part 2, at 46-47 [Ex. N to Plf.'s Affid.].)

**\*8** For example, in support of his denial of Defendants' factual assertion that "[t]his policy is not unique to Great Meadow, but applies to DOCS facilities generally," Plaintiff says that, at an unidentified point in time, "Downstate CF honored doctors proscribed [sic] treatment and filled by prescriptions from Southport Correctional Facility .... Also I've been transferred to other prisons such as Auburn [C.F.] in which they honored doctors prescribe[d] orders." (*Id.*) I will set aside the fact that Defendants' factual assertion is not that the policy applies to every single DOCS facility but that it applies to them as a general matter. I will also set aside the fact that Plaintiff's assertion is not supported by a citation to independent record evidence. The main problem with this assertion is that it is not specific as to what year or years he had these experiences, nor does it even say that his prescriptions were immediately honored without a review by a physician at the new facility.

The other piece of "evidence" Plaintiff cites in support of this denial is "Superintendent George B. Duncan's 9/22/00 decision of Appeal to him regarding [Plaintiff's Grievance No.] GM-30651-00." (*Id.*) The problem is that the referenced determination states merely that Defendant Paolano, as the Great Meadow C.F. Health Services Director, had the "sole responsibility for providing treatment to the inmates under [the Facility's] care, and has the final say regarding all medical prescriptions." (Dkt. No. 86, at 14 [Ex. 14 to Plf.'s Suppl. Affid.].) For the sake of much-needed brevity, I will set aside the issue of whether an IGP Program Director's broadly stated *rationale* for an appellate determination with respect to a prisoner's grievance can ever constitute evidence sufficient to create proof of a genuine issue of fact for purposes of a summary judgment motion. The main problem with this "evidence" is that there is absolutely nothing inconsistent between (1) a DOCS policy to temporarily deprive prisoners of non-life-sustaining prescription medications upon their arrival at a correctional facility, pending the review of those medical prescriptions by a physician at the facility, and (2) a DOCS policy to give Facility Health Service Directors the "final say" regarding the review of those medical prescriptions.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

Because Plaintiff has failed to support his denial of these factual assertions with citations to record evidence that actually controverts the facts asserted, I will consider the facts asserted by Defendants as true. N.D.N.Y. L.R. 7.1(a)(3). Under the circumstances, I decline, and I recommend the Court decline, to perform an independent review of the record to find proof disputing this established fact for the several reasons described above in Part IV.A.1. of this Report-Recommendation.

Third, Plaintiff has failed to adduce evidence establishing that the policy in question is even unconstitutional. I note that, in his Supplemental Memorandum of Law, Plaintiff argues that "deliberate indifference to serious medical needs is ... shown by the fact that prisoners are denied access to a doctor and physical examination upon arrival at [Great Meadow] C.F. to determine the need for pain medications which aren't life sustaining ...." (Dkt. No. 88, at 10 [Plf.'s Supp. Memo. of Law].) As a threshold matter, Plaintiff's argument is misplaced to the extent he is arguing about the medical care other prisoners may not have received upon their arrival at Great Meadow C.F. since this is not a class-action. More importantly, to the extent he is arguing about any medical care that he (allegedly) did not receive upon his arrival at Great Meadow C.F., he cites no record evidence in support of such an assertion. (*Id.*) Indeed, he does not even cite any record evidence establishing that, upon his arrival at Great Meadow C.F. in early 2000, either (1) he asked a Defendant in this action for such medical care, or (2) he was suffering from a serious medical need for purposes of the Eighth Amendment. (*Id.*)

**\*9** If Plaintiff is complaining that Defendant Paolano is liable for recklessly causing a physician at Great Meadow C.F. to excessively delay a review Plaintiff's pain medication upon his arrival at Great Meadow C.F., then Plaintiff should have asserted that allegation (and some basic facts supporting it) in a pleading in this action so that Defendants could have taken adequate discovery on it, and so that the Court could squarely review the merits of it. (Dkt. No. 78, Part 11, at 53 [Plf.'s Depo.].)

For all of these reasons, I recommend that Plaintiff's claims against Defendant Paolano be dismissed with

prejudice.

**B. Whether Plaintiff Has Adduced Evidence Establishing that Defendant Nesmith Was Deliberately Indifferent to Plaintiff's Serious Medical Needs**

Generally, to state a claim for inadequate medical care, a plaintiff must allege facts plausibly suggesting two things: (1) that he had a sufficiently serious medical need; and (2) that the defendants were deliberately indifferent to that serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

Defendants argue that, even assuming that Plaintiff's broken wrist constituted a sufficiently serious medical condition for purposes of the Eighth Amendment, Plaintiff has not adduced evidence establishing that, on August 17, 2000, Defendant Nesmith acted with deliberate indifference to that medical condition. (Dkt. No. 78, Part 13, at 4-9 [Defs.' Memo. of Law].) In support of this argument, Defendants point to the record evidence establishing that Defendant Nesmith sutured lacerations in Plaintiff's forehead, ordered an x-ray examination of Plaintiff's wrist, and placed that wrist in a splint (with an intention to replace that splint with a cast once the swelling in Plaintiff's wrist subsided) within 24 hours of the onset of Plaintiff's injuries. (*Id.* at 7-9 [providing accurate record citations].) Moreover, argue Defendants, Plaintiff's medical records indicate that he did not first complain of an injury to his wrist until hours after he experienced that injury. (*Id.* at 8 [providing accurate record citation].)

Plaintiff responds that "[he] informed P.A. Nesmith that his wrist felt broken and P.A. Nesmith ignored plaintiff, which isn't reasonable. P.A. Nesmith didn't even care to do a physical examination to begin with[,] which would've revealed [the broken wrist] and is fundamental medical care after physical trauma." (Dkt. No. 88, at 11 [Plf.'s Supp. Memo. of Law].) In support of this argument, Plaintiff cites *no* record evidence. (*Id.* at 11-12.)

The main problem with Plaintiff's argument is that the uncontroverted record evidence establishes that, as Defendants have argued, Defendant Nesmith (1) sutured lacerations in Plaintiff's forehead within hours if not minutes of Plaintiff's injury and (2) ordered an x-ray

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

examination of Plaintiff's wrist, and placed that wrist in a splint (with an intention to replace that splint with a cast once the swelling in Plaintiff's wrist subsided) within 24 hours of the onset of Plaintiff's injuries. These facts were asserted by Defendants in Paragraphs 27 through 32 of their Rule 7.1 Statement. (*See* Dkt. No. 78, Part 12, ¶¶ 27-32 [Defs.' Rule 7.1 Statement].) Defendants supported these factual assertions with record evidence. (*Id.* [providing accurate record citations].) Plaintiff expressly admits most of these factual assertions, and fails to support his denial of the remaining factual assertions with citations to record evidence that actually controverts the facts asserted. (Dkt. No. 85, Part 2, at 48-50 [Ex. N to Plf.'s Affid.].)

**\*10** The only denial he supports with a record citation is with regard to when, within the referenced 24-hour period, Defendant Nesmith ordered his wrist x-ray. This issue is not material, since I have assumed, for purposes of Defendants' motion, merely that Defendant Nesmith ordered Plaintiff's wrist x-ray within 24 hours of the onset of Plaintiff's injury.[FN28] (Indeed, whether the wrist x-ray was ordered in the late evening of August 17, 2000, or the early morning of August 18, 2000, would appear to be immaterial for the additional reason that it would appear unlikely that any x-rays could be conducted in the middle of the night in Great Meadow C.F.)

FN28. Furthermore, I note that the record evidence he references (in support of his argument that the x-ray was on the morning of August 18, 2000, not the evening of August 17, 2000) is "Defendants exhibit 20," which he says "contains [an] 11/20/00 Great Meadow Correctional Facility Investigation Sheet by P. Bundrick, RN, NA, and Interdepartmental Communication from defendant Ted Nesmith P.A. that state [that the] X ray was ordered on 8/18/00 in the morning." (*Id.*) I cannot find, in the record, any "exhibit 20" having been submitted by Defendants, who designated their exhibits by letter, not number. (*See generally* Dkt. No. 78.) However, at Exhibit G of Defendant Nesmith's affidavit, there is the "Investigation Sheet" to which Plaintiff refers. (Dkt. No. 78, Part 3, at 28 [Ex. G to Nesmith

Affid.].) The problem is that document does not say what Plaintiff says. Rather, it says, "Later that evening [on August 17, 2000] ... [a]n x-ray was ordered for the following morning ...." (*Id.*) In short, the document says that the x-ray was not ordered *on* the morning of August 18, 2007, but *for* that morning. Granted, the second document to which Plaintiff refers, the "Interdepartmental Communication" from Defendant Nesmith, does say that "I saw him the next morning and ordered an xray ...." (*Id.* at 29.) I believe that this is a misstatement, given the overwhelming record evidence to the contrary.

Moreover, in confirming the accuracy of Defendants' record citations contained in their Rule 7.1 Statement, I discovered several facts further supporting a finding that Defendant Nesmith's medical care to Plaintiff was both prompt and responsive. In particular, the record evidence cited by Defendants reveals the following specific facts:

(1) at approximately 10:17 a.m. on August 17, 2000, Plaintiff was first seen by someone in the medical unit at Great Meadow C.F. (Nurse Hillary Cooper);

(2) at approximately 10:40 a.m. on August 17, 2000, Defendant Nesmith examined Plaintiff; during that examination, the main focus of Defendant Nesmith's attention was Plaintiff's complaint of the lack of feeling in his lower extremities; Defendant Nesmith responded to this complaint by confirming that Plaintiff could still move his lower extremities, causing Plaintiff to receive an x-ray examination of his spine (which films did not indicate any pathology), and admitting Plaintiff to the prison infirmary for observation;

(3) at approximately 11:00 a.m. on August 17, 2000, Defendant Nesmith placed four sutures in each of two 1/4" lacerations on Plaintiff's left and right forehead;

(4) by 11:20 a.m. Plaintiff was given, or at least prescribed, Tylenol by a medical care provider;

(5) Plaintiff's medical records reflect no complaint by Plaintiff of any injury to his wrist at any point in time other than between 4:00 p.m. and midnight on August 17,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

2000;

(6) at some point after 9:00 p.m. on August 17, 2000, and 9:00 a.m. on the morning of August 18, 2000, Defendant Nesmith ordered that Plaintiff's wrist be examined by x-ray, in response to Plaintiff's complaint of an injured wrist; that x-ray examination occurred at Great Meadow C.F. at some point between 9:00 a.m. on August 17, 2000, and 11:00 a.m. on August 18, 2000, when Defendant Nesmith personally performed a "wet read" of the x-rays before sending them to Albany Medical Center for a formal reading by a radiologist;

(7) at approximately 11:00 a.m. on August 18, 2000, Defendant Nesmith placed a splint on Plaintiff's wrist and forearm with the intent of replacing it with a cast in a couple of days; the reason that Defendant Nesmith did not use a cast at that time was that Plaintiff's wrist and forearm were swollen, and Defendant Nesmith believed, based on 30 years experience treating hundreds of fractures, that it was generally not good medical practice to put a cast on a fresh fracture, because the cast will not fit tightly once the swelling subsides;

*11 (8) on August 22, 2000, Defendant Nesmith replaced the splint with a cast;

(9) on August 23, 2000, Plaintiff was discharged from the infirmary at Great Meadow C.F.; and

(10) on August 30, 2000, Defendant Nesmith removed the sutures from Plaintiff's forehead. (*See generally* Dkt. No. 78, Part 2, ¶¶ 3-15 [Aff. of Nesmith]; Dkt. No. 78, Part 3, Exs. A-E [Exs. to Aff. of Nesmith].)

"[D]eliberate indifference describes a state of mind more blameworthy than negligence," [FN29] one that is "equivalent to criminal recklessness." [FN30] There is no evidence of such criminal recklessness on the part of Defendant Nesmith, based on the uncontroverted facts before the Court, which show a rather prompt and responsive level of medical care given by Defendant Nesmith to Plaintiff, during the hours and days following the onset of his injuries.

FN29. *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[D]eliberate indifference [for purposes of an Eighth Amendment claim] describes a state of mind more blameworthy than negligence."); *Estelle,* 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Murphy v. Grabo,* 94-CV-1684, 1998 WL 166840, at *4 (N.D.N.Y. Apr.9, 1998) (Pooler, J.) ("Deliberate indifference, whether evidenced by [prison] medical staff or by [prison] officials who allegedly disregard the instructions of [prison] medical staff, requires more than negligence.... Disagreement with prescribed treatment does not rise to the level of a constitutional claim.... Additionally, negligence by physicians, even amounting to malpractice, does not become a constitutional violation merely because the plaintiff is an inmate.... Thus, claims of malpractice or disagreement with treatment are not actionable under section 1983.") [citations omitted].").

FN30. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) ("The required state of mind [for a deliberate indifference claim under the Eighth Amendment], equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and he must also draw the inference.") [internal quotation marks and citations omitted]; *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) ("The subjective element requires a state of mind that is the equivalent of criminal recklessness ....") [citation omitted]; *cf. Farmer,* 511 U.S. at 827 ("[S]ubjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

interpreted in our cases, and we adopt it as the test for 'deliberate indifference' under the Eighth Amendment.").

In his argument that his treatment in question constituted deliberate indifference to a serious medical need, Plaintiff focuses on the approximate 24-hour period that appears to have elapsed between the onset of his injury and his receipt of an x-ray examination of his wrist. He argues that this 24-hour period of time constituted a delay that was unreasonable and reckless. In support of his argument, he cites two cases. *See Brown v. Hughes,* 894 F.2d 1533, 1538-39 (11th Cir.), *cert. denied,* 496 U.S. 928, 110 S.Ct. 2624, 110 L.Ed.2d 645 (1990); *Loe v. Armistead,* 582 F.2d 1291, 1296 (4th Cir.1978), *cert. denied,* 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980). However, the facts of both cases are clearly distinguishable from the facts of the case at hand.

In *Brown v. Hughes,* the Eleventh Circuit found a genuine issue of material fact was created as to whether a correctional officer knew of a prisoner's four injury during the four hours in which no medical care was provided to the prisoner, so as to preclude summary judgment for that officer. *Brown,* 894 F.2d at 1538-39. However, the Eleventh Circuit expressly stated that the question of fact was created because the prisoner had "submitted affidavits stating that [the officer] was called to his cell because there had been a fight, that while [the officer] was present [the prisoner] began to limp and then hop on one leg, that his foot began to swell severely, that he told [the officer] his foot felt as though it were broken, and that [the officer] promised to send someone to look at it but never did." *Id.* Those are *not* the facts of this case.

In *Loe v. Armistead,* the Fourth Circuit found merely that, in light of the extraordinary leniency with which *pro se* complaints are construed, the court was unable to conclude that a prisoner had failed to state a claim upon which relief might be granted for purposes of a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) because the prisoner had alleged that the defendants-*despite being (at some point) "notified" of the prisoner's injured arm*-had inexplicably delayed for 22 hours in giving him medical treatment for the injury. *Loe,* 582 F.2d at 1296. More specifically, the court expressly construed the prisoner's

complaint as alleging that, following the onset of the plaintiff's injury at 10:00 a.m. on the day in question, the plaintiff was immediately taken to the prison's infirmary where a nurse, while examining the prisoner's arm, heard him complain to her about pain. *Id.* at 1292. Furthermore, the court construed the prisoner's complaint as alleging that, "[t]hroughout the day, until approximately 6:00 p.m., [the prisoner] repeatedly requested that he be taken to the hospital. He was repeatedly told that only the marshals could take him to a hospital and that they had been notified of his injury." *Id.* at 1292-93. Again, those are *not* the facts of this case.

**\*12** Specifically, there is no evidence in the record of which I am aware that at any time before 4:00 p.m. on August 17, 2000, Defendant Nesmith either (1) heard Plaintiff utter a complaint about a wrist injury sufficient to warrant an x-ray examination or (2) observed physical symptoms in Plaintiff's wrist (such as an obvious deformity) that would place him on notice of such an injury. As previously stated, I decline, and I urge the Court to decline, to tediously sift through the 262 pages of documents that Plaintiff has submitted in the hope of finding a shred of evidence sufficient to create a triable issue of fact as to whether Plaintiff made, and Defendant Nesmith heard, such a complaint before 4:00 p.m. on August 17, 2000.

I note that, in reviewing Plaintiff's legal arguments, I have read his testimony on this issue. That testimony is contained at Paragraphs 8 through 12, and Paragraph 18, of his Supplemental Affidavit. (*See* Dkt. No. 86, at ¶¶ 8-10, 18 [Plf.'s Supp. Affid., containing two sets of Paragraphs numbed "5" through "11"].) In those Paragraphs, Plaintiff swears, in pertinent part, that "[w]hile I was on the x-ray table I told defendant Ted Nesmith, P.A. and/or Bill Redmond RN ... that my wrist felt broken, and was ignored." (*Id.* at ¶ 9.) Plaintiff also swears that "I was [then] put into a room in the facility clinic[,] and I asked defendant Ted Nesmith, PA[,] shortly thereafter for [an] x-ray of [my] wrist[,] pain medication and [an] ice pack but wasn't given it [sic]." (*Id.* at ¶ 10.) Finally, Plaintiff swears as follows: "At one point on 8/17/00 defendant Nesmith told me that he didn't give a damn when I kept complaining that my wrist felt broken and how I'm going to sue him cause I'm not stupid

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

[enough] to not know he's supposed to do [a] physical examination [of me], [and not] to ignore my complaints about [my] wrist feeling broke and feeling extreem [sic] pain. He told me [to] stop complaining [and that] he's done with me for the day." (*Id.* at ¶ 18.)

This last factual assertion is important since a response of "message received" from the defendant appears to have been critical in the two cases cited by Plaintiff. It should be emphasized that, according to the undisputed facts, when Plaintiff made his asserted wrist complaint to Defendant Nesmith during the morning of August 17, 2000, Defendant Nesmith was either suturing up Plaintiff's forehead or focusing on Plaintiff's complaint of a lack of feeling in his lower extremities. (This complaint of lack of feeling, by the way, was found to be inconsistent with Defendant Nesmith's physical examination of Plaintiff.)

In any event, Defendant Nesmith can hardly be said to have, in fact, "ignored" Plaintiff since he placed him under *observation* in the prison's infirmary (and apparently was responsible for the prescription of Tylenol for Plaintiff).[FN31] Indeed, it was in the infirmary that Plaintiff was observed by a medical staff member to be complaining about his wrist, which resulted in an x-ray examination of Plaintiff's wrist.

> FN31. In support of my conclusion that this fact alone is a sufficient reason to dismiss Plaintiff's claims against Defendant Nesmith, I rely on a case cited by Plaintiff himself. *See Brown,* 894 F.2d at 1539 ("Although no nurses were present [in the hospital] at the jail that day, the procedure of sending [the plaintiff] to the hospital, once employed, was sufficient to ensure that [the plaintiff's broken] foot was treated promptly. Thus, [the plaintiff] has failed to raise an issue of deliberate indifference on the part of these defendants, and the order of summary judgment in their favor must be affirmed.").

**\*13** Even if it were true that Plaintiff made a wrist complaint directly to Defendant Nesmith (during Defendant Nesmith's examination and treatment of Plaintiff between 10:40 a.m. and 11:00 a.m. on August 17,

2000), and Defendant Nesmith heard that complaint, and that complaint were specific and credible enough to warrant an immediate x-ray examination, there would be, at most, only some *negligence* by Defendant Nesmith in not ordering an x-ray examination until 9:00 p.m. that night.

As the Supreme Court has observed, "[T]he question of whether an X-ray-or additional diagnostic techniques or forms of treatment-is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice....." *Estelle,* 429 U.S. at 107.[FN32] For this reason, this Court has actually held that a *17-day* delay between the onset of the prisoner's apparent wrist fracture and the provision of an x-ray examination and cast did not constitute deliberate indifference, as a matter of law. *Miles v. County of Broome,* 04-CV-1147, 2006 U.S. Dist. LEXIS 15482, at \*27-28, 2006 WL 561247 (N.D.N.Y. Mar. 6, 2006) (McAvoy, J.) (granting defendants' motion for summary judgment with regard to prisoner's deliberate indifference claim).

> FN32. *See also Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001) (prisoner's "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention [with regard to the treatment of his broken finger], are not adequate grounds for a section 1983 claim. These issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment.") [citation omitted]; *cf. O'Bryan v. Federal Bureau of Prisons,* 07-CV-0076, 2007 U.S. Dist. LEXIS 65287, at \*24-28 (E.D.Ky. Sept. 4, 2007) (holding no deliberate indifference where prisoner wore wrist brace/bandage on his broken wrist for two months even though he had asked for a cast; finding that "the type of wrap would only go the difference of opinion between a patient and doctor about what should be done, and the Supreme Court has stated that a difference of opinion regarding the plaintiff's

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

diagnosis and treatment does not state a constitutional claim.").

As I read Plaintiff's complaints about the medical care provided to him by Defendant Nesmith in this action, I am reminded of what the Second Circuit once observed:

It must be remembered that the State is not constitutionally obligated, much as it may be desired by inmates, to construct a perfect plan for [medical] care that exceeds what the average reasonable person would expect or avail herself of in life outside the prison walls. [A] correctional facility is not a health spa, but a prison in which convicted felons are incarcerated. Common experience indicates that the great majority of prisoners would not in freedom or on parole enjoy the excellence in [medical] care which plaintiff[ ] understandably seeks .... We are governed by the principle that the objective is not to impose upon a state prison a model system of [medical] care beyond average needs but to provide the minimum level of [medical] care required by the Constitution.... The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves ....

*Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986) [internal quotations and citations omitted].

For all of these reasons, I recommend that Plaintiff's claims against Defendant Nesmith be dismissed with prejudice.

### C. Whether Defendant Nesmith Is Protected from Liability by the Doctrine of Qualified Immunity, As a Matter of Law

"Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " [FN33] In determining whether a particular right was *clearly established,* courts in this Circuit consider three factors:

FN33. *Williams,* 781 F.2d at 322 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ).

*14 (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful. [FN34]

FN34. *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted).

Regarding the issue of whether *a reasonable person would have known* he was violating a clearly established right, this "objective reasonableness" [FN35] test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." [FN36] As the Supreme Court explained,

FN35. See *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") (quoting *Harlow,* 457 U.S. at 819); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

FN36. *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *see also Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) (citing cases); *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996).

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law .... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

should be recognized.[FN37]

> FN37. *Malley,* 475 U.S. at 341.

Furthermore, courts in the Second Circuit recognize that "the use of an 'objective reasonableness' standard permits qualified immunity claims to be decided as a matter of law."[FN38]

> FN38. *Malsh,* 901 F.Supp. at 764 (citing *Cartier v. Lussier,* 955 F.2d 841, 844 [2d Cir.1992] [citing Supreme Court cases].)

Here, I agree with Defendants that, based on the current record, it was not clearly established that, between August 17, 2000, and August 22, 2000, Plaintiff possessed an Eighth Amendment right to receive an x-ray examination and casting of his wrist any sooner than he did. (Dkt. No. 78, Part 13, at 9-11 [Defs.' Memo. of Law].) I note that neither of the two decisions cited by Plaintiff (discussed earlier in this Report-Recommendation) were controlling in the Second Circuit. *See Brown v. Hughes,* 894 F.2d 1533, 1538-39 (11th Cir.), *cert. denied,* 496 U.S. 928, 110 S.Ct. 2624, 110 L.Ed.2d 645 (1990); *Loe v. Armistead,* 582 F.2d 1291, 1296 (4th Cir.1978), *cert. denied,* 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980). I also note that what was controlling was the Supreme Court's decision in *Estelle v. Gamble,* holding that "the question of whether an X-ray-or additional diagnostic techniques or forms of treatment-is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice....." *Estelle,* 429 U.S. at 107.

Furthermore, I agree with Defendants that, at the very least, officers of reasonable competence could have believed that Defendant Nesmith's actions in conducting the x-ray examination and casting when he did were legal.[FN39] In his memorandum of law, Plaintiff argues that Defendant Nesmith *intentionally* delayed giving Plaintiff an x-ray for 12 hours, and that the four-day delay of placing a hard cast on Plaintiff's wrist caused Plaintiff *permanent injury to his wrist.* (Dkt. No. 88, at 12-13 [Plf.'s Supp. Memo. of Law].) He cites no portion of the

record for either assertion. (*Id.*) Nor would the fact of permanent injury even be enough to propel Plaintiff's Eighth Amendment claim to a jury.[FN40] I emphasize that it is an undisputed fact, for purposes of Defendants' motion, that the reason that Defendant Nesmith placed a splint and not a cast on Plaintiff's wrist and arm on the morning of August 18, 2000, was that Plaintiff's wrist and forearm were swollen, and Defendant Nesmith's medical judgment (based on his experience) was that it was not good medical practice to put a cast on a fresh fracture, because the cast will not fit tightly once the swelling subsides.[FN41] Officers of reasonable competence could have believed that decision was legal.

> FN39. (*Id.*)

> FN40. This particular point of law was recognized in one of the cases Plaintiff himself cites. *Loe,* 582 F.2d at 1296, n. 3 ("[Plaintiff's] assertion that he suffered pain two and one-half weeks after the injury and that the fracture had not healed do not establish deliberate indifference or lack of due process. Similarly, his allegation that he has not achieved a satisfactory recovery suggests nothing more than possible medical malpractice. It does not assert a constitutional tort.").

> FN41. (Dkt. No. 78, Part 12, ¶¶ 31-33 [Defs.' Rule 7.1 Statement]; *see also* Dkt. No. 78, Part 2, ¶¶ 11-13 [Affid. of Nesmith]; Dkt. No. 78, Part 3, Ex. C [Exs. to Affid. of Nesmith] )

**\*15** As a result, I recommend that, in the alternative, the Court dismiss Plaintiff's claims against Defendant Nesmith based on the doctrine of qualified immunity.

**D. Whether Plaintiff Has Adduced Evidence Establishing that He Exhausted His Available Administrative Remedies with Respect to His Assault Claim**

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

or other correctional facility until such administrative remedies as are available are exhausted." [FN42] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." [FN43] The Department of Correctional Services ("DOCS") has available a well-established three-step inmate grievance program.[FN44]

FN42. 42 U.S.C. § 1997e.

FN43. *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

FN44. 7 N.Y.C.R.R. § 701.7.

Generally, the DOCS Inmate Grievance Program ("IGP") involves the following procedure.[FN45] *First,* an inmate must file a complaint with the facility's IGP clerk within fourteen (14) calendar days of the alleged occurrence. A representative of the facility's inmate grievance resolution committee ("IGRC") has seven working days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within seven (7) working days of receipt of the grievance, and issues a written decision within two (2) working days of the conclusion of the hearing. *Second,* a grievant may appeal the IGRC decision to the facility's superintendent within four (4) working days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within ten (10) working days of receipt of the grievant's appeal. *Third,* a grievant may appeal to the central office review committee ("CORC") within four (4) working days of receipt of the superintendent's written decision. CORC is to render a written decision within twenty (20) working days of receipt of the appeal. It is important to emphasize that *any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process.* [FN46]

FN45. 7 N.Y.C.R.R. § 701.7; *see also White v. The State of New York,* 00-CV-3434, 2002 U.S. Dist. LEXIS 18791, at *6 (S.D.N.Y. Oct 3, 2002).

FN46. 7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g ., Croswell v. McCoy,* 01-CV-0547, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him."); *Nimmons v. Silver,* 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17, 2006) (Hurd, J.).

Generally, if a prisoner has failed to follow each of these steps prior to commencing litigation, he has failed to exhaust his administrative remedies. [FN47] However, the Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA.[FN48] *First,* "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." [FN49] *Second,* if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." [FN50] *Third,* if the remedies were available and some of the defendants did not forfeit, and

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." [FN51]

> FN47. *Rodriguez v. Hahn,* 209 F.Supp.2d 344, 347-48 (S.D.N.Y.2002); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002).

> FN48. *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004).

> FN49. *Hemphill,* 380 F.3d at 686 (citation omitted).

> FN50. *Id.* [citations omitted].

> FN51. *Id.* [citations and internal quotations omitted].

**\*16** Defendants argue that Plaintiff never exhausted his available administrative remedies with regard to his claim arising out of the assault that allegedly occurred on August 17, 2000. (Dkt. No. 78, Part 13, at 9-11 [Defs.' Memo. of Law].)

Plaintiff responds with four different legal arguments. First, he appears to argue that he handed a written grievance to an unidentified corrections officer but never got a response from the IGRC, and that filing an appeal under such a circumstance is merely optional, under the PLRA (Dkt. No. 86, at 23-25, 44 [Plf.'s Memo. of Law].) Second, he argues that Defendants "can't realistically show" that Plaintiff never sent any grievances or appeals to the Great Meadow C.F. Inmate Grievance Clerk since that facility did not (during the time in question) have a grievance "receipt system." (*Id.* at 25-29.) In support of this argument, he cites unspecified record evidence that, although he sent a letter to one "Sally Reams" at some point and received a letter back from her on May 5, 2003, she later claimed that she had never received a letter from Plaintiff. (*Id.* at 29.) Third, he argues that the determination he received from CORC (at some point) satisfied the PLRA's exhaustion requirement. (*Id.* at 30-38.) Fourth, he argues that Defendants rendered any

administrative remedies "unavailable" to Plaintiff, for purposes of the Second Circuit's above-described three-part exhaustion inquiry, by (1) failing to cause DOCS to provide proper "instructional provisions" in its directives, (2) failing to cause Great Meadow C.F. to have a grievance "receipt system," and (3) "trash [ing]" Plaintiff's grievances and appeals. (*Id.* at 39-45.) [FN52]

> FN52. I note that the breadth of Plaintiff's creative, thoughtful and well-developed legal arguments further demonstrates his extraordinary experience as a litigant.

For the reasons set forth below, I reject each of these arguments. However, I am unable to conclude, for another reason, that Plaintiff has failed to exhaust his administrative remedies as a matter of law, based on the current record.

**1. Plaintiff's Apparent Argument that an Appeal from His Lost or Ignored Grievance Was "Optional" Under the PLRA**

Plaintiff apparently argues that filing an appeal to CORC when one has not received a response to one's grievance is merely optional under the PLRA. (Dkt. No. 86, at 23-25, 44 [Plf.'s Memo. of Law].) If this is Plaintiff's argument, it misses the point.

It may be true that the decision of whether or not to file an appeal in an action is always "optional"-from a metaphysical standpoint. However, it is also true that, in order to satisfy the PLRA's exhaustion requirement, one *must* file an appeal when one has not received a response to one's grievance (unless one of the exceptions contained in the Second Circuit's three-party inquiry exists). *See, supra,* note 46 of this Report-Recommendation.

**2. Plaintiff's Argument that Defendants "Can't Realistically Show" that Plaintiff Never Sent any Grievances or Appeals to the Great Meadow C.F. Inmate Grievance Clerk**

Plaintiff also argues that Defendants "can't realistically show" that Plaintiff never sent any grievances or appeals to the Great Meadow C.F. Inmate Grievance Clerk since that facility did not (during the time in question) have a grievance "receipt system." (Dkt. No. 86,

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

at 25-29 [Plf.'s Memo. of Law].) This argument also fails.

**\*17** Plaintiff appears to misunderstand the parties' respective burdens on Defendants' motion for summary judgment. Even though a failure to exhaust is an affirmative defense that a defendant must plead and prove, once a defendant has met his initial burden of establishing the absence of any genuine issue of material fact regarding exhaustion (which initial burden has been appropriately characterized as "modest"),[FN53] the burden then shifts to the nonmoving party to come forward with specific facts showing that there is a genuine issue for trial regarding exhaustion. *See, supra,* Part III of this Report-Recommendation.

> FN53. *See Ciaprazi v. Goord,* 02-CV-0915, 2005 WL 3531464, at \*8 (N.D.N.Y. Dec.22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest") [citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ]; *accord, Saunders v. Ricks,* 03-CV-0598, 2006 WL 3051792, at \*9 & n. 60 (N.D.N.Y. Oct.18, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.), *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at \*17 & n. 109 (N.D.N.Y. Apr.24, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.).

Here, it is an uncontroverted fact, for purposes of Defendants' motion, that (1) grievance records at Great Meadow C.F. indicate that Plaintiff never filed a timely grievance alleging that he had been assaulted by corrections officers at Great Meadow C.F. in 2000, and (2) records maintained by CORC indicate that Plaintiff never filed an appeal (to CORC) regarding any grievance alleging that he had been so assaulted. (*See* Dkt. No. 78, Part 12, ¶¶ 39-40 [Defs.' Rule 7.1 Statement, providing accurate record citations].) Plaintiff has failed to properly controvert these factual assertions with specific citations to record evidence that actually creates a genuine issue of fact. (*See* Dkt. No. 85, Part 2, at 50-51 [Ex. N to Plf.'s Affid.].) As a result, under the Local Rules of Practice for this Court, Plaintiff has effectively "admitted" Defendants' referenced factual assertions. N.D.N.Y. L.R. 7.1(a)(3).

With respect to Plaintiff's argument that the referenced factual assertions are basically meaningless because Great Meadow C.F. did not (during the time in question) have a grievance "receipt system," that argument also fails. In support of this argument, Plaintiff cites unspecified record evidence that, although he sent a letter to Sally Reams (the IGP Supervisor at Great Meadow C.F. in May 2003) at some point and received a letter back from her on May 5, 2003, she later claimed that she had never received a letter from Plaintiff. (*Id.* at 29.) (*See* Dkt. No. 86, at 29 [Plf.'s Memo. of Law].) After examining Plaintiff's original Affidavit and exhibits, I located and carefully read the documents in question. (Dkt. No. 85, Part 1, ¶ 23 [Plf.'s Affid.]; Dkt. No. 85, Part 2 [Exs. F and G to Plf.'s Affid.].)

These documents do not constitute sufficient evidence to create a triable question of fact on the issue of whether, in August and/or September of 2000, Great Meadow C.F. did not have a grievance "receipt system." At most, they indicate that (1) at some point, nearly three years after the events at issue, Plaintiff (while incarcerated at Attica C.F.) wrote to Ms. Reams complaining about the alleged assault on August 17, 2000, (2) she responded to Plaintiff, on May 5, 2003, that he must grieve the issue at Attica C .F., where he must request permission to file an untimely grievance, and (3) at some point between April 7, 2003, and June 23, 2003, Ms. Reams informed Mr. Eagen that she did not "remember" receiving "correspondence" from Plaintiff. (*Id.*) The fact that Ms. Reams, after the passing of several weeks and perhaps months, did not retain an independent memory (not record) of receiving a piece of "correspondence" (not grievance) from Plaintiff (who was not an inmate currently incarcerated at her facility) bears little if any relevance on the issue of whether Great Meadow C.F. had, in April and/or May of 2003, a mechanism by which it recorded its receipt of *grievances.* Moreover, whether or not Great Meadow C.F. had a grievance "receipt system" in April and/or May of 2003 bears little if any relevance to whether it had a grievance "receipt system" in August and/or September of 2000.

**\*18** It should be emphasized that Defendants have adduced record evidence specifically establishing that, in August and September 2000, Great Meadow C.F. had a *functioning* grievance-recording process through which,

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

when a prisoner (and specifically Plaintiff) filed a grievance, it was "assign[ed] a number, title and code" and "log[ged] ... into facility records." (Dkt. No. 78, Part 6, ¶¶ 7-9 [Bellamy Decl.]; Dkt. No. 78, Part 7, at 2 [Ex. A to Bellamy Decl.] Dkt. No. 78, Part 8, ¶ 4 [Brooks Decl.]; Dkt. No. 78, Part 9, at 6 [Ex. B to Brooks Decl.].)

Finally, even if Great Meadow C.F. did not (during the time in question) have a functioning grievance-recording process (thus, resulting in Plaintiff's alleged grievance never being responded to), Plaintiff still had the duty to appeal that non-response to the next level. *See, supra,* note 46 of this Report-Recommendation.

### 3. Plaintiff's Argument that the Determination He Received from CORC Satisfied the PLRA's Exhaustion Requirement

Plaintiff argues that the determination he received from CORC (at some point) satisfied the PLRA's exhaustion requirement. (Dkt. No. 86, at 30-38 [Plf.'s Memo. of Law].) This argument also fails.

Plaintiff does not clearly articulate the specific portion of the record where this determination is located. (*See id.* at 30 [Plf .'s Affid., referencing merely "plaintiff's affidavit and exhibits"].) Again, the Court has no duty to *sua sponte* scour the 209 pages that comprise Plaintiff's "affidavit and exhibits" for proof of a dispute of material fact, and I decline to do so (and recommend the Court decline to do so) for the reasons stated above in Part IV.A.1. of this Report-Recommendation. I have, however, in analyzing the various issues presented by Defendants' motion, reviewed what I believe to be the material portions of the documents to which Plaintiff refers. I report that Plaintiff appears to be referring to a determination by the Upstate C.F. Inmate Grievance Program, dated June 20, 2003, stating, "After reviewing [your June 11, 2003, Upstate C.F.] grievance with CORC, it has been determined that the grievance is unacceptable. It does not present appropriate mitigating circumstances for an untimely filing." (Dkt. No. 85, Part 2, at 37 [Ex. J to Plf.'s Affid.]; *see also* Dkt. No. 85, Part 1, ¶¶ 22-34 [Plf.'s Affid.].)

There are two problems for Plaintiff with this document. First, this document does *not* constitute a written determination by *CORC* on a written appeal by Plaintiff to *CORC* from an Upstate C.F. written determination. (*See* Dkt. No. 85, Part 2, at 37 [Ex. J to Plf.'s Affid.].) This fact is confirmed by one of Plaintiff's own exhibits, wherein DOCS IGP Director Thomas Eagen advises Plaintiff, "Contrary to the IGP Supervisor's assertion in his memorandum dated June 20, 2003, the IGP Supervisor's denial of an extension of the time frames to file your grievance from Great Meadow in August 2000 has not been reviewed by the Central Office Review Committee (CORC). The IGP Supervisor did review the matter with Central Office staff who is [sic] not a member of CORC." (*See* Dkt. No. 85, Part 2, at 39 [Ex. K to Plf.'s Affid.].) At best, the document in question is an indication by Upstate C.F. that the success of an appeal by Plaintiff to CORC would be unlikely.

**\*19** Second, even if the document does somehow constitute a written determination by CORC on appeal by Plaintiff, the grievance to which the determination refers is a grievance filed by Plaintiff on June 11, 2003, at Upstate C.F., not a grievance filed by Plaintiff on August 30, 2000, at Great Meadow C.F. (Dkt. No. 85, Part 2, at 32-35 [Ex. I to Plf.'s Affid.].) Specifically, Plaintiff's June 11, 2003, grievance, filed at Upstate C.F., requested permission to file an admittedly *untimely* grievance regarding the injuries he sustained during the assault on August 17, 2000. (*Id.*)

A prisoner has not exhausted his administrative remedies with CORC when, years after failing to file a timely appeal with CORC, the prisoner requests *and is denied* permission to file an untimely (especially, a two-year-old) appeal with CORC due to an unpersuasive showing of "mitigating circumstances." *See Burns v. Zwillinger,* 02-CV-5802, 2005 U.S. Dist. LEXIS 1912, at *11 (S.D.N .Y. Feb. 8, 2005) ("Since [plaintiff] failed to present mitigating circumstances for his untimely appeal to the IGP Superintendent, the CORC, or this Court, [defendant's] motion to dismiss on the grounds that [plaintiff] failed to timely exhaust his administrative remedies is granted."); *Soto v. Belcher,* 339 F.Supp.2d 592, 595 (S.D.N.Y.2004) ("Without mitigating circumstances, courts consistently have found that CORC's dismissal of a grievance appeal as untimely constitutes failure to exhaust available administrative remedies.") [collecting cases]. If the rule were to the contrary, then, as

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

a practical matter, no prisoner could ever be said to have failed to exhaust his administrative remedies because, immediately before filing suit in federal court, he could perfunctorily write to CORC asking for permission to file an untimely appeal, and whatever the answer, he could claim to have completed the exhaustion requirement. The very reason for requiring that a prisoner obtain permission before filing an untimely appeal presumes that the permitted appeal would be required to complete the exhaustion requirement. Viewed from another standpoint, a decision by CORC to refuse the filing of an untimely appeal does not involve a review of the merits of the appeal.

**4. Plaintiff's Argument that Defendants Rendered any Administrative Remedies "Unavailable" to Plaintiff**

Plaintiff also argues that Defendants rendered any administrative remedies "unavailable" to Plaintiff, for purposes of the Second Circuit's above-described three-part exhaustion inquiry, by (1) failing to cause DOCS to provide proper "instructional provisions" in its directives, (2) failing to cause Great Meadow C.F. to have a grievance "receipt system," and (3) "trash [ing]" Plaintiff's grievances and appeals. (Dkt. No. 86, at 39-45 [Plf.'s Memo. of Law].) This argument also fails.

In support of this argument, Plaintiff "incorporates by reference all the previously asserted points, Plaintiff's Affidavit in Opposition with supporting exhibits, as well as[ ] the entire transcripts of Defendants['] deposition on [sic] Plaintiff ...." (*Id.* at 40, 45.) Again, the Court has no duty to *sua sponte* scour the 265 pages that comprise Plaintiff's Affidavit, Supplemental Affidavit, exhibits, and deposition transcript for proof of a dispute of material fact, and I decline to do so (and recommend the Court decline to do so) for the reasons stated above in Part IV.A.1. of this Report-Recommendation. I have, however, in analyzing the various issues presented by Defendants' motion, reviewed the documents to which Plaintiff refers, and I report that I have found no evidence sufficient to create a genuine issue of triable fact on the issue of whether Defendants, *through their own actions,* have inhibited Plaintiff exhaustion of remedies so as to estop one or more Defendants from raising Plaintiff's failure to exhaust as a defense.

**\*20** For example, Plaintiff has adduced no evidence

that he possesses any *personal knowledge* (only speculation) of any Defendant in this action having "trashed" his alleged grievance(s) and appeal(s),[FN54] nor has he even adduced evidence that it was *one of the named Defendants in this action* to whom he handed his alleged grievance(s) and appeal(s) for delivery to the Great Meadow C.F. Inmate Grievance Program Clerk on August 30, 2000, September 13, 2000, and September 27, 2000.[FN55] Similarly, the legal case cited by Plaintiff appears to have nothing to do with any Defendant to this action, nor does it even have to do with Great Meadow C.F.[FN56]

FN54. (*See* Dkt. No. 85, Part 1, ¶¶ 13-14, 16-17 [Plf.'s Affid., asserting, "Prison officials trashed my grievances and appeals since they claim not to have them despite [the] fact I sent them in a timely manner. It's [the] only reason they wouldn't have them.... Prison officials have a history of trashing grievances and appeals.... I've been subjected to having my grievances and appeals trashed prior to and since this matter and have spoken to alot [sic] of other prisoners whom [sic] said that they were also subjected to having their grievances and appeals trashed before and after this incident, in alot [sic] of facilities.... Suspecting foul play with respect to my grievances and appeals, I wrote, and spoke to[,] prison officials and staff that did nothing to rectify the matter, which isn't surprising considering [the] fact that it's an old problem ...."].)

FN55. (*See* Dkt. No. 85, Part 1, ¶ 6 [Plf.'s Affid., asserting only that "[o]n August 30th, 2000 plaintiff handed the correction officer collecting the mail in F Block SHU in the Great Meadow Correctional Facility an envelope addressed to the inmate grievance clerk ... which contained the grievances relative to this action at hand ...."]; Dkt. No. 85, Part 1, ¶ 9 [Plf.'s Affid., asserting only that "[o]n September 13, 2000, I appealed said grievances to [the] Superintendent by putting them in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail, in F-Block

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

SHU [at] Great Meadow CF ...."]; Dkt. No. 85, Part 1, ¶ 11 [Plf.'s Affid., asserting only that "[o]n September 27th, 2000, I appealed said grievance ... to C.O.R.C. by putting them [sic] in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail in F-Block SHU [at] Great Meadow CF ...."].)

FN56. (*See* Dkt. No. 85, Part 1, ¶ 15 [Plf.'s Affid., referencing case]; Dkt. No. 85, Part 2, at 16-17 [Ex. B to Plf.'s Affid., attaching a hand-written copy of case, which mentioned a prisoner's grievances that had been discarded in *1996* by an *unidentified* corrections officer at *Sing Sing Correctional Facility* ].)

**5. Record Evidence Creating Genuine Issue of Fact**

Although I decline to *sua sponte* scour the lengthy record for proof of a triable issue of fact regarding exhaustion, I have, while deciding the many issues presented by Defendants' motion, had occasion to review in detail many portions of the record. In so doing, I have discovered evidence that I believe is sufficient to create a triable issue of fact on exhaustion.

Specifically, the record contains Plaintiff's testimony that (1) on August 30, 2000, he gave a corrections officer a grievance regarding the alleged assault on August 17, 2000, but he never received a response to that grievance, (2) on September 13, 2000, he gave a corrections officer an appeal (to the Superintendent) from that non-response, but again did not receive a response, and (3) on September 27, 2000, he gave a corrections officer an appeal (to CORC) from that non-response, but again did not receive a response.[FN57]

FN57. (*See* Dkt. No. 85, Part 1, ¶ 6 [Plf.'s Affid., asserting only that "[o]n August 30th, 2000 plaintiff handed the correction officer collecting the mail in F Block SHU in the Great Meadow Correctional Facility an envelope addressed to the inmate grievance clerk in which contained [sic] the grievances relative to this action at hand ...."]; Dkt. No. 85, Part 1, ¶ 9 [Plf.'s Affid., asserting only that "[o]n September 13, 2000, I appealed said grievances to [the] Superintendent

by putting them in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail; in F-Block SHU [at] Great Meadow CF...."]; Dkt. No. 85, Part 1, ¶ 11 [Plf.'s Affid ., asserting only that "[o]n September 27h, 2000, I appealed said grievance ... to C.O.R.C. by putting them [sic] in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail in F-Block SHU [at] Great Meadow CF ...."].)

The remaining issue then, as it appears to me, is whether or not this affidavit testimony is so self-serving and unsubstantiated by other direct evidence that "no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint."[FN58] Granted, this testimony appears self-serving. However, based on the present record, I am unable to find that the testimony is so wholly unsubstantiated by other direct evidence as to be incredible. Rather, this testimony appears corroborated by two pieces of evidence. First, the record contains what Plaintiff asserts is the grievance that he handed to a corrections officer on August 30, 2000, regarding the alleged assault on August 17, 2000. (Dkt. No. 85, Part 2, at 65-75 [Ex. Q to Plf.'s Affid.].) Second, the record contains two pieces of correspondence between Plaintiff and legal professionals *during or immediately following the time period in question* containing language suggesting that Plaintiff had received no response to his grievance. (Dkt. No. 85, Part 2, at 19-21 [Exs. C-D to Plf.'s Affid .].)

FN58. *See, supra,* note 12 of this Report-Recommendation (collecting cases).

Stated simply, I find that sufficient record evidence exists to create a genuine issue of fact as to (1) whether Plaintiff's administrative remedies were, with respect to his assault grievance during the time in question, "available" to him, for purposes of the first part of the Second Circuit's three-part exhaustion inquiry, and/or (2) whether Plaintiff has shown "special circumstances" justifying his failure to comply with the administrative procedural requirements, for purposes of the third part of the Second Circuit's three-part exhaustion inquiry.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

**\*21** As a result, I recommend that the Court deny this portion of Defendants' motion for summary judgment.

**E. Whether Plaintiff Has Sufficiently Alleged, or Established, that Defendants Were Liable for the Policy to Review the Non-Life-Sustaining Medical Prescriptions of Prisoners Upon Arrival at Great Meadow C.F.**

As explained above in Part II.A. of this Report-Recommendation, Defendants argue that, during his deposition in this action, Plaintiff asserted, for the first time, a claim that the medical staff at Great Meadow C.F. violated his rights under the Eighth Amendment by failing to honor non-life-sustaining medical prescriptions written at a former facility. (Dkt. No. 78, Part 13, at 3 [Defs.' Mem. of Law].) As a threshold matter, Defendants argue, this claim should be dismissed since Plaintiff never included the claim in his Second Amended Complaint, nor did Plaintiff ever file a motion for leave to file a Third Amended Complaint. (*Id.*) In any event, Defendants argue, even if the Court were to reach the merits of this claim, the Court should dismiss the claim because Plaintiff has failed to allege facts plausibly suggesting, or adduce evidence establishing, that Defendants were personally involved in the creation or implementation of DOCS' prescription-review policy, nor has Plaintiff provided such allegations or evidence indicating the policy is even unconstitutional. (*Id.*)

Plaintiff responds that "[he] didn't have to get in particular [sic] about the policy [of] discontinuing all incoming prisoners['] non[-]life[-]sustaining medications without examination and indiscriminetly [sic] upon arrival at [Great Meadow] C.F. in [his Second] Amended Complaint. Pleading[s] are just supposed to inform [a] party about [a] claim[,] and plaintiff informed defendant [of] the nature of [his] claims including [the claim of] inadequate medical care. And discovery revealed [the] detail[s] [of that claim] as [Plaintiff had] intended." (Dkt. No. 88, at 10 [Plf.'s Supp. Memo. of Law].) In addition, Plaintiff responds that Defendant Paolano must have been personally involved in the creation and/or implementation of the policy in question since he was the Great Meadow Health Services Director. (*Id.* at 10.)

I agree with Defendants that this claim is not properly

before this Court. Plaintiff's characterization of the notice-pleading standard, and of the contents of his Amended Complaint, are patently without support (both legally and factually). It has long been recognized that a "claim," under Fed.R.Civ.P. 8, denotes "the aggregate of operative facts which give rise to a right enforceable in the courts." [FN59] Clearly, Plaintiff's Second Amended Complaint alleges no facts whatsoever giving rise to an asserted right to be free from the application of the prescription-review policy at Great Meadow C.F. Indeed, his Second Amended Complaint-which asserts Eighth Amendment claims arising *solely* out of events that (allegedly) transpired on August 17, 2000-says nothing at all of the events that transpired immediately upon his arrival at Great Meadow C.F. in early August of 2000, nor does the Second Amended Complaint even casually mention the words "prescription," "medication" or "policy." (*See generally* Dkt. No. 10 [Second Am. Compl.].)

FN59. *Original Ballet Russe, Ltd. v. Ballet Theatre, Inc.,* 133 F.2d 187, 189 (2d Cir.1943); *United States v. Iroquois Apartments, Inc.,* 21 F.R.D. 151, 153 (E.D.N.Y.1957); *Birnbaum v. Birrell,* 9 F.R.D. 72, 74 (S.D.N.Y.1948).

**\*22** Furthermore, under the notice-pleading standard set forth by Fed.R.Civ.P. 8(a)(2), to which Plaintiff refers in his Supplemental Memorandum of Law, Defendants are entitled to *fair notice* of Plaintiff's claims.[FN60] The obvious purpose of this rule is to protect defendants from undefined charges and to facilitate a proper decision on the merits. [FN61] A complaint that fails to provide such fair notice "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [FN62] This fair notice does not occur where, as here, news of the claim first springs up in a deposition more than two years after the action was commenced, approximately seven months after the amended-pleading deadline expired, and approximately two weeks before discovery in the action was scheduled to close. (*Compare* Dkt. No. 1 [Plf.'s Compl., filed 8/14/03] *with* Dkt. No. 42, at 1-2 [Pretrial Scheduling Order setting amended-pleading deadline as 2/28/05] *and* Dkt. No. 78, Part 11, at 52-53 [Plf.'s Depo.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

Transcript, dated 9/30/05] *and* Dkt. No. 49 [Order setting discovery deadline as 10/14/05].)

FN60. *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (the statement required by Fed.R.Civ.P. 8 [a][2] must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests").

FN61. *Ruffolo v. Oppenheimer & Co., Inc.,* 90-CV-4593, 1991 WL 17857, at *2 (S.D.N.Y. Feb.5, 1991); *Howard v. Koch,* 575 F.Supp. 1299, 1304 (E.D.N.Y.1982); *Walter Reade's Theatres, Inc. v. Loew's Inc.,* 20 F.R.D. 579, 582 (S.D.N.Y.1957).

FN62. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Tech., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

Under the circumstances, the mechanism by which to assert such a late-blossoming claim was a motion to reopen the amended-pleading filing deadline (the success of which depended on a showing of cause), coupled with a motion for leave file a Third Amended Complaint (the success of which depended, in part, on a showing of lack of prejudice to Defendants, as well as a lack of futility). Plaintiff never made such motions, nor showed such cause.

I acknowledge that, generally, the liberal notice-pleading standard set forth by Fed.R.Civ.P. 8 is applied with even greater force where the plaintiff is proceeding *pro se.* In other words, while all pleadings are to be construed liberally, *pro se* civil rights pleadings are

generally construed with an *extra* degree of liberality. As an initial matter, I have already concluded, based on my review of Plaintiff's extensive litigation experience, that he need not be afforded such an extra degree of leniency since the rationale for such an extension is a *pro se* litigant's inexperience with the court system and legal terminology, and here Plaintiff has an abundance of such experience. *See, supra,* notes 21-25 of this Report-Recommendation. Moreover, even if he were afforded such an extra degree of leniency, his phantom prescription-review claim could not be read into his Second Amended Pleading, for the reasons discussed above. (I note that, even when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended.") [FN63]

FN63. *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980); *accord, Standley v. Dennison,* 05-CV-1033, 2007 WL 2406909, at *6, n. 27 (N.D.N.Y. Aug.21, 2007) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *2 (N.D.Y.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *DiProjetto v. Morris Protective Serv.,* 489 F.Supp.2d 305, 307 (W.D.N.Y.2007); *Cosby v. City of White Plains,* 04-CV-5829, 2007 WL 853203, at *3 (S.D.N.Y. Feb.9, 2007); *Lopez v. Wright,* 05-CV-1568, 2007 WL 388919, at *3, n. 11 (N.D.N.Y. Jan.31, 2007) (Mordue, C.J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins v. Fed. Bur. of Prisons,* 05-CV-0904, 2007 WL 37404, at *4 (N.D.N.Y. Jan.4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

Nor could Plaintiff's late-blossoming prescription-review claim properly be read into his papers in opposition to Defendants' motion for summary

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

judgment. Granted, a *pro se* plaintiff's papers in opposition to a *motion to dismiss* may sometimes be read as effectively amending a pleading (e.g., if the allegations in those papers are consistent with those in the pleading). However, a *pro se* plaintiff's papers in opposition to a *motion for summary judgment* may not be so read, in large part due to prejudice that would inure to the defendants through having the pleading changed after discovery has occurred and they have gone through the expense of filing a motion for summary judgment.[FN64]

> FN64. *See Auguste v. Dept. of Corr.,* 424 F.Supp.2d 363, 368 (D.Conn.2006) ("Auguste [a *pro se* civil rights plaintiff] cannot amend his complaint in his memorandum in response to defendants' motion for summary judgment.") [citations omitted].

**\*23** Finally, in the event the Court decides to construe Plaintiff's Second Amended Complaint as somehow asserting this claim, I agree with Defendants that the Court should dismiss that claim, also for the reasons discussed above in Part IV.A.2. of this Report-Recommendation. Specifically, Plaintiff has failed to adduce evidence establishing that Defendant Paolano (or any named Defendant in this action) was personally involved in the creation or implementation of DOCS' prescription-review policy, nor has Plaintiff provided evidence establishing that the policy is even unconstitutional. *See, supra,* Part IV.A.2. of this Report-Recommendation.

**ACCORDINGLY,** it is

**ORDERED** that the Clerk's Office shall, in accordance with note 1 of this Order and Report-Recommendation, correct the docket sheet to remove the names of Defendants Englese, Edwards, Bump, Smith, Paolano, and Nesmith as "counter claimants" in this action; and it is further

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 78) be ***GRANTED* in part** (i.e., to the extent that it requests the dismissal with prejudice of Plaintiff's claims against Defendants Paolano and Nesmith) and ***DENIED* in part** (i.e., to the extent that it requests dismissal of Plaintiff's claims against the remaining Defendants on the grounds of Plaintiff's failure to exhaust available administrative remedies) for the reasons stated above.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2008.

Murray v. Palmer
Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4345299 (N.D.N.Y.)
**(Cite as: 2011 WL 4345299 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Samuel CALLOWAY, Plaintiff,
v.
Sgt. Charles GRIMSHAW, a/k/a Grinnhan, Defendant.

No. 9:09–CV–1354 (TJM/GHL).
Aug. 10, 2011.

Samuel Calloway, Marcy, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Brian J. O'Donnell, Esq., C. Harris Dague, Esq., of counsel, Albany, NY, for Defendant.

### *REPORT–RECOMMENDATION AND ORDER*

GEORGE H. LOWE, United States Magistrate Judge.

**\*1** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Thomas J. McAvoy, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Generally, Plaintiff Samuel Calloway alleges that Defendant Sergeant Charles Grimshaw administered excessive force against Plaintiff and denied him medical assistance. Dkt. No. 1.

Currently pending before the Court is Defendant's motion for summary judgment pursuant to Fed.R.Civ.P. 56. Dkt. No. 30. After the motion was filed, Plaintiff submitted a one-page letter, which will be described below. Dkt. No. 31.

### I. BACKGROUND

### A. Summary of the Amended Complaint[FN1]

FN1. The Court granted Plaintiff leave to amend his complaint. Dkt. No. 17.

Plaintiff alleges the following: On July 4, 2008, at Clinton Correctional Facility, he experienced a "psychotic episode" after he was denied his medication. Dkt. No. 18 at ¶ 6. Defendant Grimshaw and three unknown correctional officers came to Plaintiff's cell. *Id.* at ¶ 7. Two officers pinned Plaintiff's arms to his side while Defendant Grimshaw punched him in the face and head and "rammed" Plaintiff's head into iron bars two or three times. *Id.* at ¶¶ 7–8. Plaintiff then was beaten by other unknown officers before he was taken to a holding cell in the Mental Health Satellite Unit. *Id.* at ¶ 7. He received medical attention. *Id.* He sustained, *inter alia,* a wound above his right eye, bruises, and scrapes. *Id.* He alleges that Defendant Grimshaw utilized excessive force, committed assault and battery, subjected Plaintiff to intentional infliction of emotional distress, and denied immediate emergency aid to Plaintiff. *Id.* at ¶¶ 8–13.

### B. Summary of Grounds in Support of Defendant Grimshaw's Motion

Defendant argues that summary judgment should be granted because Plaintiff failed to exhaust administrative remedies prior to commencing this action. Dkt. No. 30. Defendant asserts that (1) Plaintiff did not avail himself of available administrative remedies; (2) Defendant should not be estopped from raising the exhaustion defense; and (3) no special circumstances were alleged that would excuse Plaintiff's non-compliance with the exhaustion requirement. *Id.*

### C. Summary of Plaintiff's Letter

The only submission filed by Plaintiff following the filing of the motion was a one-page letter. Dkt. No. 31. In the letter, Plaintiff states, *inter alia,* that he is trying to find an attorney, that Defendant is a malicious man, that Defendant never "reached out" to the nurse who treated Plaintiff on the night of the incident, and that somehow the nurse is being

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4345299 (N.D.N.Y.)
**(Cite as: 2011 WL 4345299 (N.D.N.Y.))**

"set-up." *Id.* Plaintiff made no reference to the pending motion. *See id.*

## II. LEGAL STANDARD GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006).

**\*2** The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of material [FN2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008).

> FN2. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

When a plaintiff fails to respond to a defendant's motion for summary judgment, "[t]he fact that there has been no [such] response ... does not ... [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz,* 76 F.3d 483, 486

(2d Cir.1996). Rather, practically speaking, the Court must (1) determine what material facts, if any, are *disputed* in the record presented on the defendants' motion, and (2) assure itself that, based on those *undisputed* material facts, the law indeed warrants judgment for the defendants. *See Champion,* 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 232 (N.D.N.Y.2001); N.D.N.Y. L.R. 7.1(b)(3).

Where a plaintiff has failed to properly respond to a defendant's Statement of Material Facts (its "Rule 7.1 Statement"), the facts as set forth in that Rule 7.1 Statement will be accepted as true to the extent that (1) those facts are supported by the evidence in the record, and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment. *See* N.D.N.Y. L.R. 7.1(a)(3); *Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.,* 373 F.3d 241, 243 (2d Cir.2004); *Champion,* 76 F.3d at 486.

Similarly, where a plaintiff has failed to respond to a defendant's properly filed and facially meritorious memorandum of law, the plaintiff is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3) of the Local Rules of Practice for this Court. Implied in this standard is the fact that, where a non-movant fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute, even if that non-movant is proceeding *pro se. See Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002). This is because even *pro se* plaintiffs must obey the Court's procedural rules.[FN3] For example, this Court has consistently enforced Local Rule 7.1(a)(3) (and its predecessor, Local Rule 7.1[f] ), by deeming facts set forth in a moving party's statement to have been admitted where the opposing party has failed to properly respond to that statement-even where the opposing party was proceeding *pro se* in a civil rights case.[FN4] Here, however,

in an abundance of caution, I have independently reviewed the entire record.

> FN3. *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Edwards v. I.N.S.,* 59 F.3d 5, 8 (2d Cir.1995) ("[W]hile a *pro se* litigant's pleadings must be construed liberally, ... *pro se* litigants generally are required to inform themselves regarding procedural rules and to comply with them .") [citations omitted].

> FN4. *See, e.g., DeMar v. Car–Freshner Corp.,* 49 F.Supp.2d 84, 86 & n. 1 (N.D.N.Y.1999) (McAvoy, C.J.) (*pro se* civil rights case); *Costello v. Norton,* No. 96–CV–1634, 1998 WL 743710, at *1, n. 1 (N.D.N.Y. Oct.21, 1998) (McAvoy, C.J.) ( *pro se* civil rights case); *Squair v. O'Brien & Gere Eng'rs, Inc.,* No. 96–CV–1812, 1998 WL 566773, at *1, n. 2 (N.D.N.Y. Aug.21, 1998) (Scullin, J.) (*pro se* civil rights case); *see also Monahan v. N.Y. City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1[a][3], in *pro se* civil rights case).

## III. ANALYSIS

A. Exhaustion Requirement

**\*3** Under the Prison Litigation Reform Act,

("PLRA"), inmates must exhaust all available administrative remedies before bringing a federal action. 42 U.S.C. § 1997e(a). Exhaustion is a requirement that applies to all actions about prison life, whether they involve general circumstances or particular episodes and regardless of the claim's subject matter. *See, e.g., Giano v. Goord,* 380 F.3d 670, 675–76 (2d Cir.2004).

In *Jones v. Bock,* the Supreme Court held that in order to properly exhaust administrative remedies, an inmate must complete the administrative review process in accordance with the applicable state rules. 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) (citing *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)). In *Woodford,* the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules as a prerequisite to bringing a suit in federal court. 548 U.S. at 90–103.

The Department of Correctional Services ("DOCS") maintains a three-tiered administrative review and appeals system for prisoner grievances. *See* 7 N.Y. Comp.Codes R. & Regs. ("N.Y.C.R.R.") § 701.5. Prior to pursuing a § 1983 action in federal court, a prisoner in the DOCS system must exhaust all three levels. *See Porter,* 534 U.S. at 524. First, an inmate may file an inmate grievance complaint form or a written grievance, if forms are not available, with the Inmate Grievance Resolution Committee ("IGRC"). *See* 7 N.Y.C.R.R. § 701.5(a). Second, if the inmate is dissatisfied with the IGRC decision, he may appeal to the prison superintendent. *See id.* § 701.5(c). Finally, DOCS permits an inmate to appeal the superintendent's written decision to the Central Office Review Committee ("CORC"). *See id.* § 701.5(d).

The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the pris-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

oner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted); *see also Messa v. Goord,* No. 10–1019–pr, ––– F.3d –––, 2011 WL 3086827, *2 (2d Cir. July 25, 2011) (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).

**\*4** Here, in the amended complaint, Plaintiff indicated that he submitted a grievance. Dkt. No. 18 at ¶ 4(b). However, when asked to state the "final result" of that grievance, he stated that he was "surrounded by several Correctional Officer[s] and an [u]nknown [s]ergeant in D Block in the transitional Inmate Care Program" and was told that if he "didn't sign off on the grievance, they would set [him] up by placing a weapon in [his] cell and [ ] they could make it hard for [him] if [he] was transferred." *Id.*

**Regarding the first inquiry set forth in Hemphill,** I note that an administrative remedy was available to Plaintiff. Plaintiff expressly states that there was a prisoner grievance procedure at Clinton Correctional Facility. Dkt. No. 18 at ¶ 4. Thus, an administrative remedy was available to Plaintiff.

**Regarding the second inquiry set forth in Hemphill,** the court is required to determine if Defendant may have forfeited the affirmative defense by failing to raise or preserve it or if Defendant took some affirmative action to prevent Plaintiff from using the grievance procedure, such as beating, denying grievance forms and writing implements, or threatening retaliation. *Cisson v. Middaugh,* No. 9:09–CV–260, 2011 WL 2579800, at *3 (N.D.N.Y. Feb.2, 2011) (citing *Ruggiero v. County of Orange,* 467 F.3d 170, 178 (2d Cir.2004) (citations omitted)), *accepted,* 2011 WL 2559568 (N.D.N.Y. June 27, 2011) (Scullin, J.).

First, Defendant did not forfeit the administrative defense of non-exhaustion by failing to raise or preserve it. Defendant's Answer timely asserted this affirmative defense. Dkt. No. 16 at ¶ 11.

Second, regarding Plaintiff's vague assertion that several correctional officers and an unknown sergeant threatened him to "sign off" on his grievance, Plaintiff provides only the most conclusory allegation on this topic. He provides no information as to the identity of these non-defendants and when the alleged interaction took place.

"Notwithstanding the deference to which a *pro se* litigant is entitled, as well as the deference accorded to a non-movant on a summary judgment motion, [Plaintiff] must produce specific facts to rebut the movant's showing and to establish that there are material issues of fact requiring a trial." *See Bennett v. James,* No. 08 Civ. 9979, 737 F.Supp.2d 219, 226 (S.D.N.Y. Sept.16, 2010) (quotation marks omitted) (citing *Almanzar v. Newland,* No. 08 Civ. 8612, 2010 WL 1379739, at *6 (S.D.N.Y. Mar.26, 2010) (citation and internal quotations omitted) (finding plaintiff's "vague allegations" insufficient to demonstrate his efforts to exhaust); *Winston v. Woodward,* No. 05 Civ. 3385, 2008 WL 2263191, at *9 (S.D.N.Y. May 30, 2008) (allegations of threats and harassment that "stand alone and unsupported" insufficient to defeat summary judgment on question of exhaustion) (quoting *Veloz,* 339 F.Supp.2d at 516; *Veloz,* 339 F.Supp.2d at 516 (dismissing suit for failure to exhaust where plaintiff "offers no evidence that any particular officer thwarted his attempts to file")).

**\*5** Here, Plaintiff does not provide the Court

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

with *any* evidence to support a finding that *Defendant* acted to interfere with his ability to exhaust. *See Bennett,* 737 F.Supp.2d at 226 (citing *Bennett v. Bailey,* No. 07 Civ. 7002, 2010 WL 1459192, at *5 (S.D.N.Y. Apr.9, 2010) (plaintiff's contention that "unidentified medical officials told him that pursuing a grievance would be 'a waste of time' ... falls far short of conduct amounting to the denial [of] administrative remedies to a prisoner" (citation omitted)); *Murray v. Palmer,* No. 9:03–CV–1010, 2010 WL 1235591, at *5 (N.D.N.Y. Mar.31, 2010) (Suddaby, J.) (finding that Plaintiff "failed to offer any credible evidence ... that Defendants in any way interfered with Plaintiff's ability to file grievances during the time in question") (emphasis in original) (citing cases) (emphasis in original)).[FN5]

> FN5. (citing *inter alia, Ruggiero v. County of Orange,* 467 F.3d 170, 178 (2d Cir.2006) (holding that defendants were not estopped from asserting the affirmative defense of non-exhaustion where the conduct plaintiff alleged kept him from filing a grievance-that he was not given the manual on how to grieve-was not attributable to the defendants and plaintiff "point[ed] to no affirmative act by prison officials that would have prevented him from pursuing administrative remedies"); *Murray v. Palmer,* 03–CV–1010, 2008 WL 2522324, at *19 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting Report–Recommendation of Lowe, M.J.) ("I have found no evidence sufficient to create a genuine issue of triable fact on the issue of whether Defendants, *through their own actions,* have inhibited Plaintiff ['s] exhaustion of remedies so as to estop one or more Defendants from raising Plaintiff's failure to exhaust as a defense.") (emphasis in original); *Shaheen v. McIntyre,* 05–CV–0173, 2007 WL 3274835, at *16 (N.D.N.Y. Nov.5, 2007) (McAvoy, J. adopting Report–Recommendation of Lowe, M.J.) (finding defendants not estopped

from raising Plaintiff's non-exhaustion as a defense based on plaintiff's allegation "that [he] was inhibited (through non-responsiveness) by [ ] unnamed officials at Coxsackie C.F.'s Inmate Grievance Program (or perhaps the Grievance Review Committee), and Coxsackie C.F. Deputy Superintendent of Security Graham" because plaintiff's complaint and "opposition papers ... fail to contain any evidence placing blame on Defendants for the (alleged) failure to address his grievances and complaint letters"); *Smith v. Woods,* 03–CV–0480, 2006 WL 1133247, at *16 (N.D.N.Y. Apr.24, 2006) (Hurd, J. adopting Report–Recommendation of Lowe, M.J.) (finding that defendants are not estopped from relying on the defense of non-exhaustion because "no evidence (or even an argument) exists that any *Defendant* ... inhibit[ed] Plaintiff's exhaustion of remedies; Plaintiff merely argues that a nonparty to this action (the IGRC Supervisor) advised him that his allegedly defective bunk bed was not a grievable matter.") (emphasis in original)).

Moreover, as pointed out by Defendant, Plaintiff made no mention of being surrounded and threatened during his deposition. Dkt. No. 30–10 at 8–9 (citing Dep. Tr. (Dkt. No. 30–8 at 43–54)). Instead, Plaintiff stated that he filed a grievance related to the incident but never received a response.[FN6] *Id.* at 8–9 (citing Dep. Tr. (Dkt. No. 30–8 at 43–54)). Accordingly, I find that Defendant should not be estopped from asserting this defense.

> FN6. Once it became clear to Plaintiff that a response to his initial filing was not forthcoming, he was required to appeal his claim to the next level. *See Martinez v. Williams,* 186 F.Supp.2d 353, 357 (S.D.N.Y.2002) (inmate who allegedly received no response to grievance "could have and should have appealed grievance

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

in accordance with grievance procedure") (citing 7 N.Y. Comp.Codes R. & Regs. § 701.8).

**Regarding the third inquiry set forth in *Hemphill,*** when a prisoner plausibly alleges special circumstances that caused the prisoner's failure to comply with the grievance procedures, the court may waive the exhaustion requirement. *See, e.g., Brownell v. Krom,* 446 F.3d 305, 311–12 (2d Cir.2006). "The special circumstances inquiry 'must be determined by looking at the circumstances which might understandably lead usually uncounselled prisoners to fail to grieve in the normally required way.' " *Jones v. Fischer,* No. 07 Civ. 7589, 2008 WL 3174510, at *4 (S.D.N.Y.2008) (quoting *Giano v. Goord,* 380 F.3d 670, 678 (2d Cir.2004). "Findings of special circumstances have been primarily established where plaintiffs acted pursuant to reasonable interpretations of the regulations, thus preventing exhaustion." *Winston,* 2008 WL 2263191, at *10.

Here, Plaintiff has alleged no special circumstances that caused his failure to comply with the grievance procedures. "Indeed, 'absent an allegation by the inmate that his failure to exhaust was based on a reasonable, but erroneous interpretation of prison regulations, the special circumstances exception is generally inapplicable.' " *Almanzar,* 2010 WL 1379739, at *6 (quoting *McDowall v. Metropolitan Corr. Ctr.,* No. 08–Civ–8329, 2010 WL 64877, at *7 n. 4 (S.D.N.Y. Feb. 22, 2010).

Lastly, I note that Plaintiff stated in his amended complaint that he was suffering from a psychotic episode. However, Plaintiff does not allege that any mental condition constituted a special circumstance that prevented him from exhausting his administrative remedies. Even if Plaintiff made such an argument, "the special circumstances exception under *Hemphill* concerned an inmate's justifiable confusion regarding the proper DOCS procedure for filing an expedited grievance, not an inmate's mental or emotional condition." *Newman v. Duncan,* No. 04–CV–395, 2007 WL 2847304, at *4

(N.D.N.Y. Sept. 26, 2007) (citing *Hemphill,* 380 F.3d at 689–91). Thus, even if Plaintiff alleged that he suffered from a mental condition that constituted a special circumstance, such an argument would fail. *See Newman,* 2007 WL 2847304, at *4 (failure to exhaust remedies due to claimed but undocumented mental illness is not a special circumstance).

**\*6 ACCORDINGLY,** it is

**RECOMMENDED** that Defendant's motion for summary judgment (Dkt. No. 30) be **GRANTED;** and it is further

**ORDERED,** that the Clerk serve copies of the electronically-available-only decisions cited herein on Plaintiff.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court.

***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2011.
Calloway v. Grimshaw
Not Reported in F.Supp.2d, 2011 WL 4345299 (N.D.N.Y.)

END OF DOCUMENT


Not Reported in F.Supp.2d, 2011 WL 4345296 (N.D.N.Y.)
**(Cite as: 2011 WL 4345296 (N.D.N.Y.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Samuel CALLOWAY, Plaintiff,
v.
Sgt. Charles GRIMSHAW, a/k/a Grinnhan, Defendant.

No. 9:09–CV–1354 (TJM/GHL.).
Sept. 15, 2011.

Samuel Calloway, Marcy, NY, pro se.

Brian J. O'Donnell, C. Harris Dague, New York State Attorney General, Albany, NY, for Defendant.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

**I. INTRODUCTION**

**\*1** This *pro se* action brought pursuant to 42 U.S.C. § 1983 was referred to the Hon. George H. Lowe, United States Magistrate Judge, for a Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). No objections to the Report–Recommendation and Order dated August 10, 2011 have been filed, and the time to do so has expired. Furthermore, after examining the record, this Court has determined that the Report–Recommendation and Order is not subject to attack for plain error or manifest injustice.

**II. CONCLUSION**

Accordingly, the Court **ADOPTS** the Report–Recommendation and Order for the reasons stated therein. Therefore, it is hereby

**ORDERED** that Defendant's motion for summary judgment (Dkt.# 30) is **GRANTED** and the Complaint is **DISMISSED.**

**IT IS SO ORDERED.**

N.D.N.Y.,2011.
Calloway v. Grimshaw
Not Reported in F.Supp.2d, 2011 WL 4345296 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

2014 WL 1292232
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Emanuel M. BROOKS Jr., Plaintiff,

v.

P. ROCK et al., Defendants.

No. 9:11–cv–1171 (GLS/ATB).
|
Signed March 28, 2014.

**Attorneys and Law Firms**

Emanuel M. Brooks Jr., Marcy, NY, pro se.

Hon. Eric T. Schneiderman, Stephen M. Kerwin, Assistant Attorney General, of Counsel, Albany, NY, for the Defendants.

### *MEMORANDUM–DECISION AND ORDER*

GARY L. SHARPE, Chief Judge.

### I. *Introduction*

**\*1** Plaintiff *pro se* Emanuel M. Brooks Jr. commenced this action against defendants P. Rock, P. Chase,[1] T. LaValley, R. Paquette–Monthie,[2] and Eric Gutwein[3] alleging a host of civil rights violations pursuant to 42 U.S.C. § 1983. (*See generally* Compl., Dkt. No. 1.) Following the dismissal of some claims, (Dkt. No. 17), defendants moved for summary judgment dismissing the complaint in its entirety. (Dkt. No. 42). Brooks also moved for preliminary injunctions and the appointment of counsel. (Dkt.Nos.54, 58.) In a Report–Recommendation (R & R) dated January 17, 2014, Magistrate Judge Andrew T. Baxter recommended that defendants' motion be granted, and that Brooks' motions be denied. (Dkt. No. 60.) Pending is Brooks' "Motion of Appeal and Objection to [Decision]," which, as explained below, is liberally construed as both an objection to the R & R and request for leave to amend. (Dkt. No. 62.) For the reasons that follow, the R & R is adopted in its entirety, and leave to amend is denied.

### II. *Background*

Brooks, an inmate in the custody of the New York Department of Corrections and Community Supervision (DOCCS), was housed at Clinton Correctional Facility for the first time period relevant to his complaint. (Dkt. No. 42, Attach. 5 at 4; Compl. at 5.) While at Clinton, Brooks contends that Rock opened a door, which hit him extremely hard in the forehead, refused him speedy medical attention for his head injury, and falsely charged him with misbehavior. (Compl. at 5.) Chase, who found Brooks not guilty of the charges lodged by Rock, (Defs.' Statement of Material Facts (SMF) ¶ 39, Dkt. No. 42, Attach. 16), allegedly threatened Brooks that he was "going to get [him] at the next [correctional facility]," (Compl. at 5).

Thereafter, Brooks was transferred to Coxsackie Correctional Facility. (Dkt. No. 42, Attach. 5 at 4.) Brooks claims that LaValley arranged for his transfer to Coxsackie, despite his request to be transferred to Sing Sing Correctional Facility, in retaliation for filing a grievance regarding Rock. (Compl. at 6.) While at Coxsackie, Brooks was cited for misbehavior by Paquette–Monthie, (Dkt. No. 42, Attach. 13 at 8); Brooks claims that the misbehavior report was filed in retaliation for his complaint about Rock while at Clinton, (Compl. at 7). According to Brooks, Gutwein, who presided at Brooks' disciplinary hearing on the Coxsackie misbehavior report, (Dkt. No. 42, Attach. 14 ¶ 5), improperly denied Brooks' requests to produce certain witnesses and evidence, found him guilty of the charged conduct, and sentenced him to six months in the special housing unit along with six months loss of good time, (Compl. at 7–8).

This action was filed on September 30, 2011. (*See generally* Compl.) In October 2012, following several delays attributable to Brooks before service of process occurred, (Dkt No. 7 at 7–10; Dkt. Nos. 9, 12, 13, 15, 16, 17), defendants moved to dismiss pursuant to Rule 12(b)(6), (Dkt. No. 31). In response, Brooks sought leave to amend. (Dkt. No. 36.) The court converted defendants' motion to dismiss to a motion seeking summary judgment and denied Brooks' motion for leave to amend for failure to comply with the Local Rules of Practice, but explained that "[i]f, after resolution of the summary judgment motion, [he] still wish[ed] to amend his complaint, he

[could do so] in the proper form." (Dkt. No. 38 at 9–10.) In May 2013, defendants filed their motion for summary judgment consistent with the court's conversion of their earlier-filed motion to dismiss. (Dkt. No. 42.) Before that motion for summary judgment was considered by the court, Brooks filed the aforementioned motions for appointment of counsel and preliminary injunctions. (Dkt.Nos.54, 58.)

**\*2** In a January 17, 2014 R & R, Judge Baxter recommended that defendants' motion for summary judgment be granted. [4] (Dkt. No. 60 at 60.) As pertinent here, Judge Baxter determined that: (1) issues of fact precluded summary judgment regarding Brooks' exhaustion of administrative remedies with respect to his claims against Rock; (2) Brooks failed to exhaust his administrative remedies with respect to his claims against Chase and LaValley; and (3) despite his failure to exhaust with respect to Chase and LaValley, all claims, against all defendants, were subject to dismissal on the merits. (*Id.* at 7.)

### III. *Standard of Review*

Before entering final judgment, this court routinely reviews all report and recommendation orders in cases it has referred to a magistrate judge. If a party has objected to specific elements of the magistrate judge's findings and recommendations, this court reviews those findings and recommendations *de novo.* See *Almonte v. N.Y. State Div. of Parole,* No. 04–cv–484, 2006 WL 149049, at *6– 7 (N.D.N.Y. Jan. 18, 2006).* In those cases where no party has filed an objection, or only a vague or general objection has been filed, this court reviews the findings and recommendations of the magistrate judge for clear error. [5] *See id.*

### IV. *Discussion*

As an initial matter, the court must make sense of Brooks' submission, which he has titled "Motion of Appeal and Objection to [Decision]." (Dkt. No. 62.) The only references made to the R & R in that filing concern Brooks' contention that defendants "[l]ied in the summary [j]udg[ ]ment [when] they all testified and stated that ... plaintiff never file[d] a grievance or at[tempted] to

exhaus[t] his [administrative remedies]." (*Id.* at 1–2, 10.) The balance of Brooks' submission contains allegations, made for the first time, that defendants, DOCCS, and potentially other unnamed individuals, [6] failed and/or refused to protect him from a conspiracy-related to an incident that occurred on December 2, 2013 at Clinton-to murder him "in further [retaliation]." (*Id.* at 2–13.) In light of the new allegations, Brooks requests a "Motion of discover," "Motion for permanent order of restrain," "Motion for chain of custody," and a "Tellephone an commer emergency Confrence." (*Id.* at 8, 9.) Bearing in mind Brooks' *pro se* status, the court treats his assertion that defendants were dishonest regarding his exhaustion of administrative remedies as an objection to the R & R, and it considers the remainder of Brooks' submission as a motion seeking leave to amend his complaint. [7]

#### A. *Objection*

While it appears that Brooks' objection is specific, and, thus, is deserving of *de novo* review, *see Almonte,* 2006 WL 149049, at *6–7,* even if the court accepts as true his allegation that defendants "lied" in support of their argument that he failed to exhaust his administrative remedies, (Dkt. No. 62 at 1–2, 10), that fact would not impact Judge Baxter's ultimate recommendation of dismissal. Indeed, despite the finding that Brooks failed to exhaust with respect to some of his claims, the R & R recommends dismissal of all claims on the merits, (Dkt. No. 60 at 7, 60), a reality that Brooks overlooks entirely. Nonetheless, the court has carefully reviewed the R & R for clear error and finds none. As such, the R & R is adopted in its entirety.

#### B. *Leave to Amend*

**\*3** Defendants argue that leave to amend should be denied because: (1) the new allegations "have absolutely nothing to do with the incidents in [Brooks' c]omplaint, or the named defendants"; (2) Brooks failed to submit a proposed amended pleading in compliance with Local Rule 7.1(a)(4); and (3) a late amendment "would prejudice the right of the current defendants to a speedy conclusion of this action." (Dkt. No. 63 at 2.) The court agrees that Brooks should not be granted leave to amend.

At the outset, the court is cognizant of the fact that Brooks has had no prior opportunity to file an amended pleading. This is so despite the fact that this action has

been pending for well over two years. Indeed, the posture of this case is somewhat peculiar in that the summons and complaint were not served upon defendants until nearly one year after commencement. (Dkt.Nos.17–20, 23–25.) The wheels of justice have churned at an admirable pace since; nonetheless, given the natural progression of this litigation, a significant amount of time has elapsed. Before filing an answer, defendants moved to dismiss, and later, after the record's conversion of that motion, augmented the record and filed a summary judgment motion. (Dkt.Nos.31, 38, 42.) The court is also mindful that discovery has not commenced.

Brooks was previously informed that if, after resolution of the summary judgment motion, he still wished to amend his complaint, he had to do so by making "a motion to amend in the proper form." (Dkt. No. 38 at 10.) Despite the explicit nature of the court's prior order, Brooks' latest request, which is based on facts that did not occur until December 2013, (Dkt. No. 62 at 5, 6), is not in proper form. *See* N.D.N.Y. L.R. 7.1(a)(4) (requiring, among other things, that a party seeking leave to amend "must attach an unsigned copy of the proposed amended pleading to its motion papers").

More fundamentally, however, Brooks' latest allegations are not sufficiently related to his underlying claims to warrant amendment under Fed.R.Civ.P. 15. *See Jolley v. Meacham,* 210 F.3d 354, 2000 WL 427276, at *1 (2d Cir.2000) ( "As for the claims that were unknown to [the plaintiff] at the time he filed his original complaint, we agree with the district court's determination that these claims were not sufficiently related to [the plaintiff]'s original claim, and therefore they could not be added to his original claim."); *Smith v. Yonkers Police Dep't,* 152 F.3d 920, 1998 WL 433005, at *1 (2d Cir.1998) (holding that the district court did not abuse its discretion in denying a motion to amend made five years after commencement of the action that sought to allege "a claim wholly unrelated to [the original pleading]"); *Jones v. Fischer,* No. 9:11–cv–774, 2013 WL 4039377, at *2 n. 6 (N.D.N.Y. Aug. 7, 2013) (explaining that new factual allegations, raised for the first time along with objections, would be disregarded where those "allegations have nothing whatsoever to do with claims that were asserted in the [operative pleading]"). Indeed, the only link between the new allegations that DOCCS has failed to protect Brooks from a murder conspiracy and defendants is his wispy assertion that defendants are participating

in that failure or refusal to protect Brooks "in *further* [retaliation]." (Dkt. No. 62 at 3 (emphasis added).) Liberally read, this suggests that defendants' new alleged failure to protect Brooks is because of the same grievances that were at the center of his original retaliation claims. The highly tenuous relationship between the new and original allegations is insufficient to serve as a basis for leave to amend, particularly when coupled with the significant lapse of time between the facts alleged in the complaint, which occurred in 2011, (Compl. at 5, 12–20), and Brooks' claim about an incident that occurred in December 2013, (Dkt. No. 62 at 5–6). *See Robles v. Khahaifa,* No. 09CV718, 2012 WL 2401574, at *10 (W.D.N.Y. June 25, 2012). Accordingly, leave to amend is denied.

## V. *Conclusion*

**\*4 WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge Andrew T. Baxter's ReportRecommendation (Dkt. No. 60) is **ADOPTED** in its entirety; and it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 42) is **GRANTED;** and it is further

**ORDERED** that Brooks' complaint (Dkt. No. 1) is **DISMISSED;** and it is further

**ORDERED** that Brooks' motion for the appointment of counsel (Dkt. No. 58) is **DENIED;** and it is further

**ORDERED** that Brooks' motions for preliminary injunctions (Dkt.Nos.54, 58) are **DENIED** as moot; and it is further

**ORDERED** that Brooks' motion for leave to amend his complaint (Dkt. No. 62) is **DENIED;** and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this MemorandumDecision and Order to the parties.

**IT IS SO ORDERED.**

### REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

Presently before the court is the defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 42). This matter was referred for Report and Recommendation on May 22, 2013 by Chief U.S. District Judge Gary L. Sharpe, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

On October 31, 2012, defendants filed a motion to dismiss plaintiff's civil rights action for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No. 31). Plaintiff responded (Dkt. No. 36) and defendants filed a reply (Dkt. No. 37). By Decision and Order dated March 29, 2013, this court converted the Rule 12(b)(6) motion to one for summary judgment, and provided the parties with an opportunity to file supplemental papers. (Dkt. No 38). On May 20, 2013, defendants filed a complete motion for summary judgment (Dkt.Nos.42, 43), but also continued to rely on papers submitted in connection with the prior Rule 12(b)(6) motion. Plaintiff has opposed the motion for summary judgment (Dkt. No. 52); he has also filed two motions for preliminary injunctions, one of which included a motion for appointment of counsel (Dkt.Nos.54, 58), to which defendants have responded (Dkt.Nos.57, 59).

For the reasons set forth below, this court recommends that defendants' motion for summary judgment be granted on most of the grounds raised therein, and that plaintiff's complaint be dismissed in its entirety. In light of this recommendation, this court also recommends that plaintiff's motion for appointment of counsel be denied and his motions for preliminary injunctions be found moot.

### *BACKGROUND*

On and before June 15, 2011, plaintiff was confined by the New York Department of Corrections and Community Supervision ("DOCCS") at the Clinton Correctional Facility ("Clinton") in Danemora, in the northeastern corner of New York. Plaintiff alleges that, on that date, Correction Officer ("C.O.") P. Rock "bust open" the door to the bathroom that plaintiff was using, causing the door

to hit him extremely hard in the forehead. (Compl., Dkt. No. 1 at 5). [1] Although plaintiff was injured, defendant Rock refused to take plaintiff for immediate medical attention; and plaintiff did not receive any medical care until two days later. (*Id.*).

**\*5** C.O. Rock prepared a misbehavior report, charging plaintiff with smoking in the bathroom, a copy of which was served on plaintiff at 7:00 a.m. on June 16th. (*Id.;* Dkt. No. 36 at 67). Plaintiff attached to his complaint a letter, dated June 15th, addressed to Superintendent LaValley, complaining about C.O. Rock's conduct earlier that day. (Dkt. No. 1 at 12). Plaintiff claims that he also filed a formal grievance with respect to the incident involving defendant Rock and later submitted appeals when he received no response to his initial grievance. (Compl., Dkt. No. 1 at 3–4, 13–20).

Lt. Chase [2] conducted a disciplinary hearing and found plaintiff not guilty on the misbehavior report filed by C.O. Rock. Plaintiff alleges that defendant Chase stated that, although he could not "get me at this facility [,] ... he was going to get me at the next one." (Compl., Dkt. No. 1 at 5). Plaintiff further alleges that, although he had requested a transfer to the Sing Sing Correctional Facility ("Sing Sing"), Supt. LaValley had plaintiff promptly transferred to Coxsackie Correctional Facility (Coxsackie), in retaliation for the complaint against C.O. Rock, which plaintiff submitted to defendant LaValley. (Compl., Dkt. No. 1 at 6, 7; Dkt. No. 36 at 40).

On July 7, 2011, shortly after his arrival at Coxsackie, Counselor PaquetteMonthie issued plaintiff a misbehavior report for placing telephone calls to his wife from other facilities, in violation of an order of protection issued in connection with an earlier prosecution of plaintiff. (Compl., Dkt. No. 1 at 7; Dkt. No. 31–2 at 2). Plaintiff alleges that defendant Paquette– Monthie wrote the misbehavior report in retaliation for plaintiff's complaint about C.O. Rock at Clinton. (Compl., Dkt. No. 1 at 7). In exhibits attached to his response to the Rule 12(b)(6) motion, plaintiff claimed that Counselor Paquette–Monthie told him that she initiated the disciplinary charges against him at Coxsackie because he filed a complaint against a friend of hers at Clinton Annex. (Dkt. No. 36 at 31, 37, 40).

Defendant Eric Gutwein [3] presided over plaintiff's disciplinary hearing at Coxsackie. (Disc. Hrg. Tr. at 1, Dkt. No. 42–15). Plaintiff alleges that Hearing Officer Gutwein, participating in the retaliatory conspiracy against plaintiff because of his complaints at Clinton, denied plaintiff's many requests for witnesses and additional evidence, found plaintiff guilty of the charges, and sentenced him to six months in the Special Housing Unit ("SHU") and a six-month loss of good time. (Compl., Dkt. No. 1 at 7–8).

Liberally construed, plaintiff's complaint alleges that his constitutional rights under the First, Eighth, and Fourteenth Amendments were violated because (1) he was subjected to cruel and unusual punishment by defendant Rock when she allegedly hit him in the head with the bathroom door; (2) he was improperly denied prompt medical care by defendant Rock; (3) he was retaliated against for filing complaints and grievances by defendants Rock, Chase, LaValley, Paquette–Monthie, [4] and Gutwein in connection with the initiation and adjudication of disciplinary charges at Clinton, his transfer to Coxsackie, and the initiation and adjudication of disciplinary charges at Coxsackie; and (4) he was denied due process in connection with the adjudication of the disciplinary charges at Coxsackie. [5] Plaintiff demands damages, as well as injunctive relief, including the termination of the defendants by DOCCS, a formal apology from the defendants, a transfer to the prison of his choice, and protection from further retaliation at DOCCS. (Compl., Dkt. No. 1 at 10–11).

**\*6** Defendants have challenged each of plaintiff's claims and have filed numerous declarations contesting many of plaintiff's factual allegations. In moving for summary judgment with respect to the claims against defendants Rock, Chase, and LaValley, defendants contend that plaintiff failed to exhaust his administrative remedies because, *inter alia,* he never filed a formal grievance with respect to any of these defendants at Clinton. (Defs.' Mem. of Law at 14–16, Dkt. No. 42–17).

Defendant Rock denies that she hit the plaintiff with a bathroom door on June 15, 2011, and she alleges that plaintiff did not request medical attention on that date, nor did he appear to require medical attention. (Rock Decl. ¶¶ 8–12, Dkt. No. 42–2). Plaintiff was seen by the medical staff at Clinton on June 17th and complained of

a headache relating to being hit on the head by a mess hall door two days earlier. There was no evidence of a bump, swelling, or bruising, and plaintiff was treated with Ibuprofen and given a bag of ice. (Michalek Decl. ¶ 5, Dkt. No. 42–9). C.O. Rock was unaware of any complaint or grievance filed against her by plaintiff, and denies knowing defendant Paquette–Monthie or causing her to issue a misbehavior report against plaintiff at Coxsackie. (Rock Decl. ¶¶ 14–17).

Defendant Chase, who found plaintiff not guilty on the disciplinary charges filed by C.O. Rock, denies ever threatening plaintiff, and had no knowledge that he filed any complaint or grievance against defendant Rock. Lt. Chase asserts that he did nothing to cause defendant Paquette–Monthie–whom he does not know–or anyone else, to retaliate against plaintiff. (Chase Decl. ¶¶ 7–14, Dkt. No. 42–3). Clinton Supt. LaValley also denies knowing defendant Paquette–Monthie or doing anything to induce her to file a misbehavior report against plaintiff at Coxsackie. Defendant LaValley asserts that he had no involvement in plaintiff's transfer to Coxsackie; that transfer was handled by the DOCCS Deputy Superintendent for Programs pursuant to a prior request by plaintiff for an "area of preference" transfer. (LaValley Decl. ¶¶ 7–15, Dkt. No. 42–4).

DOCCS Counselor Paquette–Monthie filed a misbehavior report against plaintiff at Coxsackie after learning, through her intake interview of plaintiff and information in his file, that he had been contacting his wife by telephone. Such contact violated an order-of-protection issued against plaintiff and contravened prior direct orders from the staff at Sing Sing that plaintiff should stop calling his wife. Defendant Paquette–Monthie denies knowing defendants Rock, Chase, or LaValley at Clinton, and states that she did not file the misbehavior report for retaliatory purposes. (Paquette–Monthie Decl. ¶¶ 6–15, Dkt. No. 42–12).

Defendant Gutwein, who presided over the disciplinary hearing at Coxsackie also denied knowing defendant Rock, or knowing that she had been the target of a prior complaint by plaintiff. Defendant Gutwein claims that he made his documented decisions regarding the evidence allowed at the hearing, the ultimate determination of plaintiff's guilt, and the punishment imposed, based on the merits, and not because of any retaliatory motive. (Gutwein Decl. ¶¶ 5–34, Dkt. No. 42–14).

**\*7** The court concludes that there are material issues of fact as to whether plaintiff exhausted his administrative remedies relating to his claims against defendant Rock, but no issues of fact as to whether he failed to properly exhaust claims with respect to defendants Chase and LaValley. However, this court recommends dismissal of all of plaintiff's claims on the merits, because no rational fact finder could conclude that the defendants violated plaintiff's various constitutional rights, as he alleges.

## DISCUSSION

### I. Summary Judgment

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc .,* 369 U.S. 654, 655 (1962); *Salahuddin v. Goord,* 467 F.3d at 272.

### II. Exhaustion of Administrative Remedies

Defendants contend that, notwithstanding plaintiff's claims to the contrary, he failed to initiate the grievance process, in a timely and proper manner, with respect to his complaints against defendants Rock, Chase, and LaValley of Clinton Correctional Facility. Defense counsel argues that, even if plaintiff had filed a timely grievance with respect to these defendants, he failed to exhaust his administrative remedies by not pursuing an appeal to the Central Office Review Committee (CORC). (Defs.' Mem. of Law at 14–16).

The court concludes that there are issues of fact material to whether plaintiff has exhausted his administrative remedies with respect to the claims against defendant Rock, which may not be resolved on summary judgment. However, no reasonable fact finder could conclude that the plaintiff filed timely grievances relating to his claims against defendants Chase regarding the disciplinary charges initiated at Clinton, or against defendant LaValley with respect to plaintiff's transfer from Clinton to Coxsackie. Accordingly I will recommend that those claims be dismissed on summary judgment based, *inter alia,* on plaintiff's failure to exhaust administrative remedies.

### A. Applicable Law

**\*8** The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord,* 380 F.3d 670, 675–76 (2d Cir.2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock,* 549 U.S. 199, 216 (2007); *Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g, Key v. Toussaint,* 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) (citations omitted).

The Supreme Court held that, in order to properly exhaust an inmate's administrative remedies, he must complete

the administrative review process in accordance with the applicable state rules. *Jones v. Bock,* 549 U.S. at 218–19 (citing *Woodford v. Ngo,* 548 U.S. 81 (2006)). In *Woodford,* the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90–103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee (IGRC). N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee (CORC). *Id.* § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility).

At the same time that the Second Circuit decided *Giano,* it also decided four related cases, clarifying the law in the Second Circuit regarding the PLRA's exhaustion requirement, and specifying various instances in which the requirement could be waived or excused.[6] Based on these cases, the Second Circuit developed a "three part inquiry" to determine whether an inmate has fulfilled the PLRA exhaustion requirement. *See Brownell v. Krom,* 446 F.3d 305, 311–12 (2d Cir.2006) (citing *Hemphill,* 380 F.3d at 686). The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.* Whether the *Hemphill* test survives following the Supreme Court's decision in *Woodford,* has been a matter of some speculation.[7] Although the Second Circuit has not explicitly held that *Hemphill* remains good law, it has applied the three-part inquiry in post-*Woodford* cases. *See, e.g., Messa v. Goord,* 652 F.3d 305, 309 (2d Cir.2011); *Davis v. State of New York,* 311 F. App'x 397, 399 (2d Cir.2009).

**B. Analysis**

**\*9** Defense counsel attempts to rebut plaintiff's allegation that he filed a timely initial grievance with respect to his claims against defendants Rock, Chase, and LaValley, purported copies of which are attached to the complaint. (Defs.' Mem. of Law at 14–16). Clinton Superintendent LaValley declared that his office had no record of receiving any letter from plaintiff raising the allegations contained in the complaint in this action, and had no recollection of receiving any such letter, including those attached to the complaint. (LaValley Decl. ¶ 5–6). Tara Brousseau, the Inmate Grievance Program ("IGP") Supervisor at Clinton, found no documentation in her files indicating that plaintiff ever submitted a formal grievance at Clinton regarding plaintiff's allegations against defendants Rock, Chase, and LaValley. (Brousseau Decl. ¶¶ 8–11, Dkt. No. 42–6). Defense counsel contends that the documentation provided by plaintiff in his complaint contained no "acknowledg[ ]ment from any recipient that his document was received in a timely manner so as to comply with DOCCS grievance procedures." (Defs.' Mem. of Law at 14). Counsel also points out inconsistencies in plaintiff's claims regarding the submission of his initial grievance, including the fact that the "Affidavit of Service," attached to his complaint (Dkt. No. 1 at 18) swears that he placed a grievance regarding defendant Rock in a mailbox at Clinton on June 26, 2011–two days after plaintiff was transferred out of that facility, according to DOCCS transfer records. (Defs.' Mem. of Law at 16).[8]

In his response to defendants' summary judgment motion, plaintiff has filed additional documentation regarding some of his complaints to DOCCS about the alleged violations of his constitutional rights by defendant Rock at Clinton. (Dkt. No. 52–11 at 4, 7, 13, 21). The newly-disclosed records include a memorandum, purportedly signed by Supt. LaValley, acknowledging receipt of a communication from plaintiff on June 17, 2011–two days after plaintiff claims he submitted his original letter of complaint about defendant Rock to the Clinton Superintendent (Dkt. No. 52–11 at 4–5). In the absence of any reply from defendants questioning the authenticity of the memorandum, this would seem to confirm plaintiff's allegation that he sent the letter dated June 15th to defendant LaValley, even if that complaint about defendant Rock would not qualify as a formal grievance for exhaustion purposes.[9]

Plaintiff also filed a July 18, 2011 memorandum from N. Ratliff, then the IGP Supervisor at Clinton, acknowledging receipt, from plaintiff, of a "complaint dated 7/14/11/6/24/11," which would appear to refer, in part, to plaintiff's "Affidavit of Service," notarized July 14, 2011 and addressed, *inter alia*, to Ratliff, regarding a grievance about defendant Rock. (Dkt. No. 52–11 at 7, 14). [10] Plaintiff's papers in opposition to the summary judgment motions include two slightly different complaints directed to N. Ratliff and the Inmate Grievance Committee regarding defendant Rock, each dated June 26, 2011. (Dkt. No. 52–11 at 8–9, 15–16). Given that N. Ratliff's memorandum reference a "complaint" dated, *inter alia*, June 24–the day plaintiff was th moved out of Clinton-it is not entirely clear which version of plaintiff's "complaint" Ratliff received or how and when she received it. However, a rational fact finder could conclude that, contrary to the assertion by Tara Brousseau, a complaint against defendant Rock from plaintiff was received at Clinton, notwithstanding the uncertainty regarding the dates. The memorandum from N. Ratliff returned plaintiff's "complaint" because he was no longer housed at Clinton and because an inmate is supposed to file grievances in the facility where he is confined, even if it relates to conduct at another institution. Neither party has submitted any information as to whether plaintiff thereafter submitted a grievance regarding the earlier events at Clinton to officials at the DOCCS institutions to which he was transferred or that he sought an extension of the deadline for submitting an initial grievance.

**\*10** There are some discrepancies in plaintiff's various claims about his submission(s), to DOCCS, of a grievance about the alleged violations of his rights at Clinton. In some statements, including his recent response to the declaration of Tara Brousseau, plaintiff claims that he submitted a grievance about defendant Rock to the IGP supervisor at Clinton on June 15, 2011, and that the letter that he sent to Supt. LaValley on the same date was a copy of the grievance. (Dkt. No. 52–9 at 2). [11] In other statements, including his "Affidavit of Service," plaintiff asserts that he filed an initial grievance at Clinton on or about June 26, 2011, which is also the date on several versions of the complaints against defendant Rock that plaintiff filed with his complaint and his response to the summary judgment motion. (Dkt. No. 52–11 at 8–9, 14–18). However, there are also discrepancies between

the documents recently filed by plaintiff and some of the statements of DOCCS witnesses regarding plaintiff's submission of complaints-*i.e.*, Supt. LaValley's claim that his office never received any of the letters attached to plaintiff's complaint and Tara Brousseau's declaration that Clinton IGP never received a grievance from plaintiff about defendant Rock.

Under applicable regulations, [12] an inmate must file a formal grievance within 21 days of an alleged occurrence, although he may make a request for additional time within 45 days of the occurrence, which may be granted in the discretion of the IGP supervisor upon a showing of mitigating circumstances. If the plaintiff properly submitted an initial grievance on June 15, June 24, or June 26, 2011, it would have timely-*i.e.*, within 21 days of the alleged incident involving defendant Rock. If the first grievance was submitted around July 14, 2011, it would have been beyond the 21–day deadline, but within the 45–day period during which the plaintiff could have requested additional time to file, based upon mitigating circumstances. Even if, after his transfer from Clinton, plaintiff filed his initial grievance with the wrong facility, and he did not explicitly ask for additional time to file it properly, the failure of the IGP Supervisor to advise plaintiff of his ability to ask for an extension suggests the possibility that the grievance procedures were not made reasonably available to plaintiff. *See, e.g., Mandell v. Goord,* 9:06–CV–1478 (GTS/DEP), 2009 WL 3123029, at \*10–11 (N.D.N.Y. Sept. 29, 2009) (where DOCCS officials tersely rejected plaintiff's grievance as untimely, without advising the plaintiff that he should request an exception to the time limit from the IGP supervisor based on mitigating circumstances, or that additional information regarding his delay in filing the grievance was needed, it is arguable that material questions of fact exist as to whether administrative remedies were available to the plaintiff or whether the defendants should be estopped by their conduct from relying on the non-exhaustion defense).

**\*11** It is entirely possible that a finder of fact tasked with weighing the relative credibility of plaintiff and the DOCCS witnesses might conclude, in the face of the inconclusive documentary evidence, that plaintiff did not properly submit a timely initial grievance regarding defendant Rock's alleged violation of plaintiff's rights at Clinton. However, given that the court should not make credibility determinations in connection with a

summary judgment motion, and that the defendants have the ultimate burden of proving that plaintiff did not exhaust his administrative remedies, there appears to be a material issue of fact as to whether plaintiff filed a timely initial grievance about defendant Rock or whether his failure to do so should be excused under *Hemphill* standards.

Defendants contend that, even if plaintiff properly filed a timely initial grievance against defendant Rock that was ignored by DOCCS officials, he failed to exhaust his administrative remedies because he never filed an appeal with CORC. (Defs.' Mem. of Law at 15). The Assistant Director of the DOCCS IGP program states, in his declaration, that he found no evidence in the CORC files indicating that plaintiff ever filed a grievance appeal with CORC concerning the alleged events at Clinton Annex. (Hale Decl. ¶¶ 8–11, Dkt. No. 42–7).

Courts have consistently held that an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement. *See e.g. Veloz v. New York,* 339 F.Supp.2d 505, 516 (S.D.N.Y.2004) (plaintiff's allegations that his grievances were misplaced or destroyed by corrections officers ultimately does not relieve him of the requirement to appeal those claims to the next level once it became clear that no response was forthcoming) (citing *Martinez v. Williams,* 186 F.Supp.2d 353, 357 (S.D.N.Y.2002) (same). "If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA." *Croswell v. McCoy,* 01–CV–547, 2003 WL 962534, at *4 (N.D.N.Y. Mar. 11, 2003) (Sharpe, M.J.). [13]

Plaintiff, however, has submitted documentation indicating that, after receiving no response to the initial grievance he claimed to have filed, he submitted "appeals" to the Superintendent at Clinton and to the IGP Supervisor and the Director of the IGP in Albany. A copy of plaintiff's purported "appeal" to Supt. LaValley, dated July 26, 2011, was attached to his complaint (Dkt. No. 1 at 13), although he has filed no additional documents acknowledging receipt of this "appeal." Copies of a further "appeal" addressed to the Director of the IGP in Albany and an IGP supervisor, part of which is dated "6–26–11" and part of which was dated 8–26–11," were also appended to the complaint (Dkt. No. 1 at 14–17), along with the "Affidavit of Service" notarized on July

14, 2011 (Dkt. No. 1 at 18). Plaintiff submitted, with his response to the summary judgment motion, a letter dated September 6, 2011, from the offices of the Director of IGP in Albany (Karen Bellamy), acknowledging receipt of correspondence from plaintiff dated July 14, 2011. (Dkt. No. 52–11 at 13). As noted earlier, plaintiff's "Affidavit of Service" notarized on July 14th has receipt stamps indicating that DOCCS received a copy of it on September 1, 2011. The letter from Karen Bellamy's office returns plaintiff's correspondence, advising him that "you must submit your grievance or appeal directly to IGRC at the facility." (Dkt. No. 52–11 at 13).

**\*12** Plaintiff's response to the summary judgment motion also attaches a memorandum from the IGP Supervisor at Upstate dated September 14, 2011, acknowledging receipt of "complaints/letters of appeal ... with written dates of 6/26/2011 and 7/27/2011." (Dkt. No. 52–11 at 21). As noted above, one of plaintiff's alleged grievance appeals is dated June 26, 2011; there does not appear to be any submission from plaintiff dated July 27, 2011 in the record. The letter from Upstate, where plaintiff was confined at the time, returned plaintiff's documents as "untimely" because they related to alleged occurrences on "6/14/11 [and] 6/15/11"-the dates of the incident with defendant Rock at Clinton. (*Id.*). The Upstate IGP Supervisor relied on the regulations summarized in note 12 above, which require an initial complaint to be filed within 21 days of the alleged occurrence unless an extension request is made within 45 days of the occurrence and is granted by the IGP supervisor. (*Id.*).

While the documentation with respect to plaintiff's alleged "appeals" is far from conclusive, it supports his claim that, when he received no response to his purported initial grievance, he properly mailed an "appeal" to the Superintendent of the facility where the grievance was allegedly ignored. [14] When his appeal to the Superintendent was also allegedly ignored, plaintiff attempted to file an appeal with CORC by sending it to the Director of IGP in Albany. When the Director's Office advised plaintiff that his complaint or appeal needed to be filed with the IGRC at the facility where he was confined, plaintiff apparently did so. However, the IGP supervisor at Upstate treated his submission as an original complaint-not an appeal that should be forwarded to CORC-and found that it was untimely based on the deadlines applicable to initial complaints.

While the applicable regulations set time limits for filing appeals based on receipt of the written decision at an earlier stage, they do not set definitive deadlines for filing appeals when no response is ever received. See N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.5(c)(1) (an appeal to the Superintendent must be filed within seven calendar days **after the receipt of the IGRC's written response")** (emphasis added); 701.5(d)(1)(I) (an appeal to CORC must be submitted, through the grievance clerk, **"within seven calendar days after receipt of the superintendent's written response")** (emphasis added); 701.6(h)(2) (quoted in note 14 above). Plaintiff's "appeals" could not, as a matter of law, be deemed untimely; or at least, the uncertainty with respect to the deadlines might excuse a late appeal under the *Hemphill* standards. [15] The court concludes that there are issues of fact that are material to the question of whether plaintiff properly pursued the administrative appeals necessary to exhaust his claims with respect to defendant Rock.

The various documents filed by plaintiff do not reflect that he made any written complaints about retaliation in connection with the adjudication of his disciplinary charges at Clinton by defendant Chase, or his transfer to Coxsackie, for which plaintiff blames defendant LaValley, until his submission to IGP in Albany—part of which was dated "6–26–11" and part of which was dated "8–26–2011." (Dkt. No. 52–11 at 17–20). It is clear that the portion of the submission dated June 26th is backdated because it purports to be an appeal of the grievance plaintiff states that he filed on approximately the same date and it references events, including plaintiff's misconduct charge at Coxsackie on July 7, 2013 (Paquette–Monthie Decl. ¶¶ 6–7, 11–12), which occurred well after June 26th. As noted above, the documents submitted by plaintiff indicate that his submission was not received in the office of the IGP Director in Albany until early September 2011. The court concludes that no reasonable fact finder could conclude that plaintiff filed an initial grievance with respect to the conduct of defendants Chase and LaValley until August 26, 2011, which is considerably longer than 21 or 45 days after the relevant "occurrences"-the adjudication of the misbehavior report at Clinton on June 22, 2011 (Chase Decl. ¶ 5) or plaintiff's transfer out of Clinton, which occurred on or about June 24, 2011 (LaValley Decl. ¶ 7 & Ex. B). Accordingly, the court concludes that these claims against defendants Carr and LaValley may be dismissed, on summary judgment, because of plaintiff's failure to exhaust his administrative remedies by filing a timely initial grievance.

### III. Eighth Amendment Claims

**\*13** Plaintiff alleges that defendant Rock violated his Eighth Amendment rights in two ways on June 15, 2011, by inflicting cruel and unusual punishment when she hit him in the head with the bathroom door, and by refusing to allow him to get immediate medical treatment for his purported injuries. As discussed above, C.O. Rock denies that she opened the bathroom door or caused it to hit plaintiff in the head, and she alleges that plaintiff did not request medical care or appear to require it. Plaintiff was seen, at his request, two days later by the Clinton medical staff, who found no evidence of bruising or swelling on plaintiff's head and treated him with Ibuprofen and a bag of ice.

Notwithstanding these factual disputes, the court concludes that, even accepting plaintiff's version of the relevant events, no reasonable fact finder could conclude that his Eighth Amendment rights were violated by defendant Rock. Accordingly, for the following reasons, this court recommends dismissal of those claims.

#### A. Excessive Force

#### 1. Applicable Law

Inmates enjoy Eighth Amendment protection against the use of excessive force, and may recover damages under 42 U.S.C. § 1983 for a violation of those rights. *Hudson v. McMillian,* 503 U.S. 1, 9–10 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *Sims v.. Artuz,* 230 F.3d 14, 20 (2d Cir.2000). To sustain a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999).

In order to satisfy the objective element of the constitutional standard for excessive force, the defendants' conduct must be " 'inconsistent with the contemporary standards of decency.' " *Whitley v. Albers,* 475 U.S. 312, 327 (1986) (citation omitted); *Hudson,* 503 U.S. at 9. "[T]he malicious use of force to cause harm constitute[s] [an] Eighth Amendment violation per se [,]" regardless of

the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing *Hudson,* 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id.* at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: the extent of the injury and the mental state of the defendant; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003).

### 2. Analysis

**\*14** In connection with defendants' summary judgment motion, plaintiff and C.O. Rock present very different versions of the events of June 15th. Plaintiff alleges that, on the day before the incident, C.O. Rock threatened to "put her size 7 shoe up my Muslim ass." (Compl ., Dkt. No. 1 at 5; Pl.'s Reply to Rock Decl. ¶ 7, Dkt. No. 52–6). Defendant Rock denies ever threatening plaintiff. (Rock Decl. ¶ 13). Defendant Rock alleges that, on June 15th, plaintiff had been in the bathroom for approximately 15 minutes, and that other inmates needed to use the bathroom. (Rock Decl. ¶ 6). Plaintiff states that he obtained permission from C.O. Rock to use the bathroom and had been in the room for only five minutes. (Pl.'s Reply to Rock Decl. ¶ 9). Plaintiff claims that C.O. Rock "bust open" the door to the single male bathroom in the mess hall, hitting him extremely hard in the forehead. (Compl., Dkt. No. 1 at 5; Pl.'s Reply to Rock Decl. ¶ 7). C.O. Rock states that she knocked on the door and directed plaintiff to come out; she denies that she opened

the door or hit plaintiff with the door. (Rock Decl. ¶¶ 6, 8–9).

In support of defendants' initial Rule 12(b)(6) motion, counsel contended that plaintiff's allegations regarding the June 15, 2011 incident in the Clinton mess hall established, at worst, that defendant Rock was negligent in causing a bathroom door to strike plaintiff in the head. (Defs.' Mem. in Support of Rule 12(b)(6) Mot. at 13, Dkt. No. 31–4). A correction officer who negligently causes an unintended injury to an inmate has not engaged in the type of wanton or malicious conduct necessary to support an Eighth Amendment excessive force claim. (*Id.,* citing *Daniels v. Williams,* 474 U.S. 327 (1986) (a state official's negligent act causing unintended loss of or injury to life, liberty, or property does not support a Section 1983 claim)). *See also Epps v. City of Schenectady,* 1:10–CV–1101 (MAD/ CFH), 2013 WL 717915, at *6 (N.D.N.Y. Feb. 27, 2013) (negligence cannot be a basis for liability for constitutional torts); *Cicio v. Graham,* 9:08–CV–534 (NAM/DEP), 2010 WL 980272, at * 13 (N.D.N.Y. Mar. 15, 2010) (citing *Schultz v. Amick,* 955 F.Supp. 1087, 1096 (N.D.Iowa 1997) (liability in a § 1983 excessive force action cannot be founded on mere negligence) (collecting cases)).

The court concludes that, even under plaintiff's version of the relevant events, a reasonable fact finder could not conclude that defendant Rock used force against plaintiff maliciously and sadistically, to cause harm. Whether plaintiff was in the bathroom for five minutes or 15 minutes, C.O. Rock had a good-faith penological basis to investigate why plaintiff had stayed in the bathroom long enough to deny access to other inmates who needed to use the facilities. Because plaintiff was on the other side of the bathroom door, defendant Rock could not have known that he was positioned in such a way that the door would hurt plaintiff if she opened it forcefully. While "busting open" the door may have created some risk that the person inside might be hit by the door, this is, at most, negligence that clearly does not rise to the level of wanton or malicious conduct. *See, e.g., White v. Drake,* 9:10–CV–1034 (GTS/DRH), 2011 WL 4478921, at *1, 9 (N.D.N.Y. Sept. 26, 2011) (the allegation that defendant kicked plaintiff's cell door from the outside while plaintiff was inside his cell, causing injury to plaintiff nose and jaw, are insufficient to establish an intentional or malicious effort to injure plaintiff, as necessary to state an excessive force claim under the Eighth Amendment); *Bilan v. Davis,* 11 Civ. 5509, 2013 WL 3940562, at *6

(S.D.N.Y. July 31, 2013) (an officer struck plaintiff only after the conflict between the officers and a non-party inmate spilled over to where plaintiff was standing; in the absence of allegations that the force used against him was intentional and wanton, plaintiff's excessive force claim must fail) (Rept. & Recommendation), *adopted,* 2013 WL 4455408 (S.D.N.Y. Aug 20, 2013).

### B. Denial of Medical Care

#### 1. Applicable Law

**\*15** In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing, *inter alia, Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

The objective prong of the standard is satisfied "when (a) the prisoner was 'actually deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.' *Bellotto v. County of Orange,* 248 F. App'x 232, 236 (2d Cir.2007) (quoting *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006)). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). When a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," the court must focus on the seriousness of the particular risk of harm that resulted from the challenged delay or interruption, rather than the prisoner's underlying medical condition alone." *Id.* at 185. The standard for determining when a deprivation or delay in a prisoner's medical need is sufficiently serious contemplates a condition of urgency that may result in degeneration of the patient's condition or extreme pain. *Bellotto v. County of Orange,* 248 F. App'x at 236 (citing, *inter alia, Chance v. Armstrong,* 143 F.3d at 702).

The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan,* 511 U.S. 825, 847 (1994). A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Id.* at 835, 837. The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer v. Brennan,* 511 U.S. at 844. Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin v. Goord,* 467 F.3d at 281.

**\*16** A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference. *Chance v. Armstrong,* 143 F.3d at 703. Nor does the fact that an inmate feels that he did not get the level of medical attention he deserved, or that he might prefer an alternative treatment, support a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001) (citing *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986)). Even negligence in diagnosing or treating an inmate's medical condition does not constitute deliberate indifference. *Farmer v. Brennan,* 511 U.S. at 835. Thus, any claims of medical malpractice, or disagreement with treatment are not actionable under Section 1983. *Ross v. Kelly,* 784 F.Supp. 35, 44–45 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (table).

#### 2. Analysis

While plaintiff claims that defendant Rock violated his Eighth Amendment rights by failing to allow him to obtain immediate medical care after the incident on June 15th, he acknowledges that he was seen by the prison medical staff two days later. (Compl., Dkt. No. 1 at 5).[16] In connection with defendants' initial Rule 12(b)

(6) motion, counsel argued, *inter alia,* that plaintiff failed to allege that the brief delay in his treatment caused any significant harm to him, thus failing to satisfy the objective prong of the deliberate indifference standard. (Mem. in Support of Rule 12(b)(6) Mot. at 22–23). It is clear from the parties' submissions relating to defendants' summary judgment motion that C.O. Rock and plaintiff disagree as to whether he requested and/or required medical attention on June 15th. However, no reasonable fact finder could conclude, based on the irrefutable facts, that the brief delay in plaintiff's treatment significantly increased the risk of serious adverse health consequences to him, as required to establish a deliberate indifference claim.

*Evans v. Manos* cogently summarizes how a prison inmate's claim for a delay in medical treatment should be evaluated under the Eighth Amendment:

> "Although a delay in medical care can demonstrate deliberate indifference to a prisoner's medical needs, a prisoner's Eighth Amendment rights are violated only where 'the delay reflects deliberate indifference to a serious risk of health or safety, to a life-threatening or fast-degenerating condition or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment.' "

*Evans v. Manos,* 336 F.Supp.2d 255, 262 (W.D.N.Y.2004) (citations omitted). The Second Circuit has not resolved whether actual adverse medical effects are required, as a threshold matter, to state a viable Eighth Amendment claim relating to delayed medical care; but has indicated that a plaintiff must at least show that the delay significantly increased the risk for medical injury or similar serious adverse consequences. *Smith v. Carpenter,* 316 F.3d at 188–89, n. 14, n. 15. The Court in Smith also observed, in the post-trial context, that, "although demonstrable adverse medical effects may not be required under the Eighth Amendment, the absence of present physical injury will often be probative in assessing the risk of future harm." *Smith v. Carpenter,* 316 F.3d at 188.

**\*17** As noted, when plaintiff was examined by the Clinton medical staff on June 17th, they observed no visible bump, swelling, or bruising on his head, and he was treated with only Ibuprofen and a bag of ice. (Michalek Decl. ¶ 5; 6/17/11 Ambulatory Health Record ("AHR"), Dkt. No. 43 at 4). Plaintiff claims he did have a visible bruise and swelling, which is why the medical staff gave him ice. (Pl.'s Reply to Michalek Decl. ¶ 5). Subsequent

medical records document only a few complaints by plaintiff of the lingering headaches, dizziness, shaking, and smelling odors, which he attributed to the blow to the head he allegedly received at Clinton on June 15, 2011. (Michalek Decl. ¶¶ 6, 11; 7/18/11 AHR, Dkt. No. 43 at 6; 8/16/11 AHR, Dkt. No. 43 at 9). The medical staff found no follow-up treatment was necessary with respect to his complaints about a head injury, other than dispensing Tylenol to plaintiff on August 16, 2011. (*Id.*).

Plaintiff apparently contests the accuracy of subsequent medical records at several DOCCS facilities, which reflect no evidence of any significant long-term effects of the alleged incident on June 15th, claiming that "he has expressed to medical staff in each facility of all the ongoing pain and suffering he has been force [sic] to live with due to all of the injuries he sustained from past and present incident...." (Pl.'s Reply to Michalek Decl. ¶ 6) .[17] He also challenges the quality of his medical care after leaving Clinton.[18] As noted above, differences of opinion between a prisoner and prison officials regarding appropriate medical treatment do not, as a matter of law, constitute deliberate indifference. Moreover, Plaintiff's conclusory claims of serious ongoing health problems that he attributes to the June 15th incident at Clinton do not create an issue of fact in the face of the overwhelming documentary medical evidence to the contrary.[19]

In any event, plaintiff still has offered no evidence to rebut defendants' well—documented position that the two-day delay before plaintiff saw the medical staff at Clinton about his very subjective and relatively minor medical complaints did not involve a significant risk of degeneration of his medical condition or require him to endure extreme pain. *Bellotto v. County of Orange,* 248 F. App'x at 236. Thus, the court concludes that no reasonable fact finder could conclude that plaintiff can establish the objective element of a deliberate indifference claim. *See, e.g., Vansertima v. Department of Corrections,* 10 CV 3214, 2012 WL 4503412, at \*2, 6 (E.D.N.Y. Sept. 28, 2012) (plaintiff allegedly suffered a nose bleed and an injury to his head "causing sever[e] pain" as a result of hitting his face on the seat in front of him when the prison bus in which he was riding stopped suddenly; given that plaintiff was seen by the medical staff within one or two days after the incident and his subsequent complaints involved relatively infrequent nose bleeds and intermittent headaches, plaintiff cannot show any "adverse medical

effects or demonstrable physical injury" that resulted from what was in any case-at most—a two delay in treatment).[20]

### IV. Retaliation

**\*18** Plaintiff's theory is that, in response to plaintiff's complaint against defendant Rock for hitting plaintiff with a bathroom door and then denying him medical care, five DOCCS employees from two separate and geographically distant prisons conspired to retaliate against him in various ways. This court recommends the dismissal of plaintiff's retaliation/conspiracy claims against each defendant, based on the lack of a causal connection between plaintiff's protected conduct and any "adverse action" taken against him, the absence of "personal involvement," and/or, as previously discussed, plaintiff's failure to exhaust his administrative remedies.

### A. Applicable Law

#### 1. Retaliation

In order to establish a claim of retaliation for the exercise of a First Amendment right, plaintiff must show that he engaged in constitutionally protected speech or conduct, and that the protected activity was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *see also Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997). The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (citation omitted). This objective test applies whether or not the plaintiff was himself subjectively deterred from exercising his rights. *Id.*

To establish retaliation, the plaintiff must also establish a causal connection between the protected speech or conduct and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004). Although a " 'plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action[,]' "[s]uch circumstantial evidence of retaliation, ... without more, is insufficient to survive summary judgment." *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 370 (S.D.N.Y.2011) (citations omitted).

Even if plaintiff makes the appropriate showing of retaliation, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.* at 371. "Regardless of the presence of retaliatory motive, ... a defendant may be entitled to summary judgment if he can show ... that even without the improper motivation the alleged retaliatory action would have occurred." *Scott v. Coughlin,* 344 F.3d 282, 287–88 (2d Cir.2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977)).

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Accordingly, plaintiff must set forth non-conclusory allegations to sustain a retaliation claim.[21] *Bennett,* 343 F.3d at 137. Even where a complaint or affidavit contains specific assertions, the allegations "may still be deemed conclusory if [they are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.' " *Smith v. Woods,* 9:03–CV–480 (DNH/ GHL), 2006 WL 1133247, at \*3 & n. 11 (N.D.N.Y. Apr. 24, 2006) (quoting *Jeffreys v. City of New York,* 426 F.3d 549, 554–55 (2d Cir.2005)). To be sufficient to create a "factual issue," in the context of a summary judgment motion, an allegation in an affidavit or verified complaint "must, among other things, be based 'on personal knowledge.' " *Id.,* 2006 WL 1133247, at \*3 & n. 7 (collecting cases); Fed.R.Civ.P. 56(c)(4).

**\*19** A prison inmate has no constitutionally-guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest, as long as the prisoner is provided with procedural due process. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). However, if a defendant initiated disciplinary proceedings against plaintiff in retaliation for his exercise of a constitutionally protected right, substantive due process rights may be implicated even if the plaintiff did receive full procedural due process. *Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988). Any adverse action taken by defendant in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself, states a viable constitutional claim. *Id.*

## 2. Personal Involvement

For retaliation claims, as for other section 1983 claims, a plaintiff "must show some tangible connection between the constitutional violation alleged and [a] particular defendant." *Toole v. Connell,* 9:04–CV–724 (LEK/DEP), 2008 WL 4186334, at *6 (N.D.N.Y. Sept. 10, 2008). Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003).

In *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability. A supervisory official is personally involved if the supervisor directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she was grossly negligent in managing subordinates who caused the unlawful condition. *Id. See also Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007) (citing *Colon v. Coughlin,* 58 F.3d 865, 873) (2d Cir.1995)), *rev'd on other grounds,* 556 U.S. 662 (2009).

### B. Analysis

Defense counsel argues that the retaliation claims should be dismissed because there was no causal connection between plaintiff's protected conduct and the alleged adverse actions against him, and because some defendants were not personally involved in any adverse action against plaintiff. Those arguments require a close examination of the record regarding each defendant. *Toole v. Connell,* 2008 WL 4186334, at *6 (analysis of retaliation claims requires careful, case-specific, consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two).

### 1. Defendant Rock

**\*20** To the extent plaintiff alleges that defendant Rock retaliated against him by filing a false misbehavior report because he submitted a complaint to Supt. LaValley about the June 15, 2011 incident in the Clinton mess hall, plaintiff clearly cannot establish the required causal connection between his protected conduct and C.O. Rock's alleged adverse action. Plaintiff's initial complaint to Supt. LaValley (Dkt. No. 52–11 at 5), explicitly refers to the misbehavior report written by defendant Rock, and so was clearly written after the correction officer made clear to plaintiff that she intended to initiate disciplinary action against him. The letter which purportedly confirms that Supt. LaValley's office received plaintiff's letter of complaint states that the communication was not received until June 17, 2011 (Dkt. No. 52–11 at 4), after plaintiff was served with the misbehavior report, on June 16th at 7:00 a.m. (Dkt. No. 36 at 67). Clearly, plaintiff's complaint to the Superintendent about C.O. Rock could not have been "a substantial or motivating factor" that caused her to issue the misbehavior report, as would be necessary to support a retaliation claim. *Bennett v. Goord,* 343 F.3d at 137.

Plaintiff also alleges that, because of the complaint he wrote against defendant Rock, she caused others to retaliate against him-defendant Chase, in connection with the June 22, 2011 adjudication of the disciplinary charges she filed at Clinton; Supt. LaValley, in connection with plaintiff's transfer to Coxsackie on June 24th; defendant Paquette–Monthie, in connection with the misbehavior report she filed against plaintiff at Coxsackie on July 7, 2011; and defendant Gutwein, in connection with the adjudication of the disciplinary charges at Coxsackie later in July 2011. As discussed elsewhere herein, plaintiff's retaliation claims with respect to the adjudication of the misbehavior report at Clinton (on which plaintiff was acquitted), and his transfer from Clinton (which plaintiff initiated), clearly lack merit and should also be dismissed because plaintiff did not exhaust his administrative remedies.

Plaintiff's retaliation claim with respect to the misbehavior report at Coxsackie are also not viable. Although he did not make this allegation in his original complaint, plaintiff claimed, in response to the defendants' initial Rule 12(b)(6) motion and their later summary judgment motion, that C.O. Rock bragged to him, on June 14, 2011, that she would not suffer any consequences if plaintiff 'wr[o]te her up" because she had "family" in

Clinton and at DOCCS—presumably in the central office in Albany. (Dkt. No. 36 at 29; Dkt. No. 52 at 6). However, plaintiff does not otherwise counter defendant Rock's sworn declaration that she was not aware of any complaint plaintiff wrote about her conduct on June 15th, which plaintiff admits was never investigated by DOCCS (Dkt. No. 52–11 at 6, 19). (Rock Decl. ¶¶ 13–14). And, for the reasons set forth below, no reasonable fact finder could conclude that plaintiff can overcome C.O. Rock's sworn statements that she did not know, or communicate with, defendant Paquette–Monthie, or otherwise direct anyone at Coxsackie to pursue a false misbehavior report against plaintiff. (Rock Decl. ¶¶ 14–17).

### 2. Defendant Chase

**\*21** As noted above, plaintiff failed to exhaust his administrative remedies with respect to any retaliation claims relating to Lt. Chase's adjudication of the disciplinary charges at Clinton or plaintiff's transfer from Clinton. In any event, defendant Chase's acquittal of defendant on the misbehavior report clearly is not an "adverse action" which could support a retaliation charge.

The complaint alleges that, when he could not "get" plaintiff at Clinton, C.O. Chase threatened to "get," *i.e.,* retaliate against, plaintiff at the next facility. In response to the defendants' Rule 12(b)(6) motion and/or the instant summary judgment motion, plaintiff attributed further damaging admissions to Lt. Chase: first, that he talked about the order of protection against plaintiff, which was the impetus for the later disciplinary charges at Coxsackie (Dkt. No. 36 at 30; Pl.'s Reply to Chase Decl. ¶¶ 6–7, 9–10, Dkt. No. 52–7); and second, that he threatened to block plaintiff's transfer to Coxsackie (Pl.'s Reply to Defs.' Rule 7.1(a)(3) Stmt. ¶ 113, Dkt. No. 52 at 9; Pl.'s Reply to Chase Decl. ¶ 12).

Plaintiff's claims about Lt. Chase's admissions, which became more self serving from the time plaintiff filed the initial complaint to the times he was defending his complaint against substantive defense motions, are, in the court's view, inherently implausible. It seems unlikely that defendant Chase would retaliate against an inmate based on a complaint against another officer in which he was not implicated.[22] Lt. Chase acquitted plaintiff of disciplinary charges that he was smoking in the bathroom at Clinton because C.O. Rock did not actually see plaintiff smoking; she only smelled cigarette smoke on his person

and in the room as he was leaving. (Chase Decl. ¶ 7; Dkt. No. 52–11 at 1–3). Given that the circumstantial evidence presented by C.O. Rock probably constituted "some" "reliable evidence" sufficient to uphold a conviction on a prison disciplinary charge,[23] it seems highly likely that defendant Chase would have convicted plaintiff had he truly wanted to retaliate against him for his complaints against defendant Rock. Moreover, if, as plaintiff suggests in response to the Rule 12(b)(6) motion, Lt. Chase knew about plaintiff's violations of the order of protection and intended to extract revenge against plaintiff, he could have initiated additional disciplinary charges before plaintiff was transferred. If Lt. Chase had the power and the retaliatory motivation to block plaintiff's transfer from Clinton to Coxsackie, then why did that transfer actually take place?

In his sworn declaration, Lt. Chase states that he never threatened plaintiff; he had no knowledge of any complaints by plaintiff against C.O. Rock; and he had no knowledge as to why or when plaintiff was to be transferred out of Clinton (where Lt. Chase worked). Defendant Chase further alleges that he did not personally know, or have any contact with defendant Paquette–Monthie; he never gave any direction to anyone else regarding a misbehavior report issued to plaintiff at Coxsackie; and he did not otherwise take any action to retaliate against plaintiff. (Chase Decl. ¶¶ 8–14).

**\*22** The only support for plaintiff's allegation that Lt. Chase harbored a retaliatory motive because of plaintiff's complaints against C.O. Rock and played some role in the later filing of disciplinary charges against plaintiff in a different prison are the purported admissions which plaintiff attributes to defendant Chase. As noted, those supposed admissions are inherently implausible and have become increasingly elaborate and self serving as this case has progressed. Plaintiff's unsupported and highly improbable claims about Lt. Chase's admissions are not sufficient to overcome defendant Chase's sworn declaration, and no reasonable fact finder could conclude that he retaliated against the plaintiff. *See, e.g ., Allah v. Greiner,* 03 Civ. 3789, 2006 WL 357824, at \* 1, 3, 5–6, 7, 9 (S.D.N.Y. Feb. 15, 2006) (prisoner's allegations that virtually all of the defendants made specific admissions that they retaliated against him, were implausible and discredited by the defendants' sworn affidavits, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims)[24]; *Jeffreys v. City*

*of New York,* 426 F.3d at 554 ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably for the plaintiff,' ... and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account.") (citation omitted)).

### 3. Defendant LaValley

The complaint alleges that plaintiff sent Clinton Superintendent LaValley an initial complaint about defendant Rock; but that, rather than investigate, defendant LaValley worked with C.O. Rock and Lt. Chase to retaliate against plaintiff. Plaintiff also appears to allege that defendant LaValley caused him to be transferred to Coxsackie, where he would be subjected to further retaliation by Counselor PaquetteMonthie. (Dkt. No. 1 at 6). In response to the defendants' summary judgment motion, plaintiff filed a letter apparently acknowledging receipt, by Supt. LaValley's office, of plaintiff's initial complaint, which, according to the letter, was "referred to Captain D. Holdridge for review and appropriate action ." (Dkt. No. 52–11 at 4).

As discussed above, plaintiff failed to administratively exhaust any retaliation claim involving the adjudication of the disciplinary charges at Clinton or his transfer from Clinton. Furthermore, plaintiff's claims that defendants Rock and Chase retaliated against him in connection with the misbehavior report at Clinton are devoid of merit for the reasons set forth above. In any event, if defendant LaValley failed to follow up on plaintiff's complaint about C.O. Rock or he delegated responsibility for addressing the complaint to a subordinate, he would not have been "personally involved" in any violation of plaintiff's rights by defendant Rock. *See, e.g., Smart v. Goord,* 441 F.Supp.2d 631, 642–643 (S.D.N.Y .2006) (the failure of a supervisory official to respond to a letter of complaint is insufficient to create personal responsibility); *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (a supervisor's referral of a prisoner's letter of complaint to a subordinate for review, and a later response to the prisoners to advise him of the subordinate's decision did not demonstrate the requisite personal involvement on the part of the supervisory prison official).

**\*23** With respect to plaintiff's transfer out of Clinton, plaintiff admittedly initiated the process by requesting an "area of preference" transfer. (LaValley Decl. ¶ 7 & Ex. A, Dkt. No. 42–5 at 2; Pl.'s Reply to Defs.' Rule 7.1(a)(3) Stmt. ¶ 115). Plaintiff complains, however, that he should have been transferred from Clinton, in far Northern New York, to Sing Sing, near plaintiff's family in Westchester County, rather than to Coxsackie, which is south of Albany-much closer to Westchester County than Clinton, but not as close as Sing Sing. (Pl.'s Reply to Defs.' Rule 7.1(a)(3) Stmt. ¶¶ 115–16). While "prison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights[,]" "[a] prisoner has no liberty interest in remaining at a particular correctional facility...." *Davis v. Kelly,* 160 F.3d 917, 920 (2d Cir.1998). In any event, Supt. LaValley's declaration states, and plaintiff has not rebutted, that he had no personal involvement in plaintiff's transfer to Coxsackie, because transfers of prisoners from Clinton were overseen, in the normal course of business, by the Deputy Superintendent for Programs. (LaValley Decl. ¶¶ 8–13; Pl.'s Reply to LaValley Decl., Dkt. No. 52–8).

Finally, to the extent the complaint suggests that defendant LaValley conspired with others at Coxsackie to retaliate against him, plaintiff provides no evidence whatsoever to counter Supt. LaValley's declaration that he did not know Counselor Paquette–Monthie, and that he did nothing to retaliate against plaintiff in connection with the filing of disciplinary charges against him at that separate facility. (LaValley Decl. ¶¶ 13–15; Pl.'s Reply to LaValley Decl., Dkt. No. 52–8). Based on the authority cited above, it is clear that a claim of retaliation based on mere speculation by an inmate that a particular defendant was somehow involved in allegedly retaliatory action by others at a separate facility cannot survive summary judgment. In any event, as discussed below, plaintiff's claims of retaliation against the Coxsackie defendants are subject to dismissal on other grounds.

### 4. Defendants Paquette–Monthie and Gutwein

Defendants' initial Rule 12(b)(6) motion plaintiff's retaliation claims against Counselor Paquette–Monthie and Hearing Officer Gutwein argued that plaintiff did not plead any specific facts to support his bald speculation that the Clinton defendants enlisted the Coxsackie defendants to pursue retaliatory disciplinary charges against him. (Defs.' Mem. in Support of Rule 12(b)(6) Mot. at 12). Plaintiff responded to this motion with the

self-serving claim that defendant Paquette–Monthie told him that she issued the misbehavior report against him because he "filed a complaint against her friend at Clinton Annex." (Dkt. No. 36 at 31, 37, 40). [25] During the July 2011 disciplinary hearing, plaintiff tried to cross-examine defendant Paquette–Monthie about her allegedly biased and vengeful motivation for filing the misbehavior report against him, and asked questions about statements she supposedly made during prior interviews of plaintiff; but, he never made any reference to the counselor's alleged statement that she initiated the charges because plaintiff had filed a complaint against a friend of hers. (Disc. Hrg. Tr. at 15, 27, 28, 33–34, 38, 40, 42–43, Dkt. No. 42–15). Nor did plaintiff claim that Counselor Paquette–Monthie made this admission in the various complaints and grievance "appeals" he purportedly submitted in August 2011 (Dkt. No. 52–11 at 6, 17–20, 22–23, 27–28), or in his original complaint filed in this action in September 2011 (Dkt. No. 1). [26]

**\*24** In her sworn declaration, defendant Paquette–Monthie states that she did not personally know, and never had any contact with, defendants Rock and Chase at Clinton. She insists that she issued the misbehavior report against plaintiff, not to retaliate against him, but in good faith, based on the evidence. (Paquette–Monthie Decl. ¶¶ 11–15). Defendant Gutwein similarly denies any effort to retaliate against plaintiff, and swears that he was not directed by anyone to find plaintiff guilty of the disciplinary charges against him at Coxsackie. Hearing Officer Gutwein also states that he did not know C.O. Rock from Clinton, and was unaware of any complaint or grievance plaintiff may have filed against her. (Gutwein Decl. ¶¶ 24–33).

Based on the authority cited in note 22 above, it is unlikely that defendants Paquette–Monthie and Gutwein would be motivated to retaliate against plaintiff for a complaint or grievance in which they were not implicated, particularly when the target of the complaint worked at a separate and geographically distant correctional facility. The sworn declarations establishing that the Clinton and Coxsackie defendants did not know each other or have any contact, utterly refute plaintiff's speculation that they colluded to initiate false disciplinary charges against him. The only support plaintiff offers for the implausible conspiracy theory underlying the retaliation claim against the Coxsackie defendants is the alleged admission of Counselor Paquette–Monthie that she issued

the misbehavior report because plaintiff had complained about a friend of hers at Clinton Annex. Given that plaintiff did not offer this self-serving alleged admission while confronting Counselor Paquette–Monthie at the disciplinary hearing, or in his grievance appeals which referenced the Coxsackie defendants, or even in his initial complaint in this action, the court finds that the purported admission does not create an issue of fact that could lead any reasonable fact finder to conclude that defendants Paquette–Monthie and Gutwein conspired to retaliate against plaintiff. *See, e.g., Allah v. Greiner,* 2006 WL 357824, at \* 1, 3, 5–6, 7, 9; *Jeffreys v. City of New York,* 426 F.3d at 554.

In any event, the court concludes that plaintiff's retaliation claims against defendants Paquette–Monthie and Gutwein would be subject to dismissal because they would have taken the same actions with respect to the misbehavior report against plaintiff even if they had known of complaints or grievances filed by plaintiff against defendant Rock. See, e.g., *Lowrance v. Achtyl,* 20 F.3d 529, 534–35 (2d Cir.1994) (defendants met their burden of showing that they would have disciplined the plaintiff even in the absence of the protected conduct because the plaintiff had admitted to engaging in the misconduct that formed the basis of the misbehavior report; plaintiff's retaliation claim was properly dismissed under *Mt. Healthy* and its progeny); *Smith v. Woods,* 2006 WL 1133247, at \* 10 (the record evidence establishes that the hearing officer could, and indeed would, have reached the same disciplinary hearing decision (and imposed the same penalties) despite any such complaints or grievances by plaintiff–*i.e.,* based upon the evidence as presented to him at plaintiff's disciplinary hearing decision).

**\*25** The basis of the disciplinary charge against plaintiff was that he violated an order of protection that precluded him from, *inter alia,* all communications and contact, including by "telephone[,]" with his wife and daughters, "except for visits to state correctional facility and correspondence." (Gutwein Decl. ¶ 6 & Ex. A, Dkt. No. 14–15 at 3). Based on the order of protection, plaintiff had been directed to stop calling his wife by DOCCS staff at Sing Sing, and was not allowed to add his wife to his authorized call list (Dkt. No. 42–15 at 4–5); but plaintiff apparently circumvented that limitation by listing, under the name of an aunt, the telephone number at the home where his wife came to reside. (Disc. Hrg. Tr. at 2, 7, 9, 21–22, 56–58).

During his initial interview with Counselor Paquette–Monthie at Coxsackie, and during the disciplinary hearing, plaintiff acknowledged that he had telephonic contact with his wife from other DOCCS facilities before he was transferred to Coxsackie, at the number listed under his aunt's name on his emergency contact list.[27] (Disc. Hrg. Tr. at 7, 9, 12, 18, 19–20). He disputed the disciplinary charges because he believed that he should not be charged with misconduct by Coxsackie officials for calls he made to his wife from other institutions. (Disc. Hrg. Tr. at 14, 19–20, 26, 35, 44, 46, 52–53, 56). Plaintiff also asserted that the exception for "correspondence" in the order of protection should be interpreted to include telephonic contact, notwithstanding the explicit, prior prohibition in the order against communications by telephone. (Disc. Hrg. Tr. at 17, 18, 20, 23, 44–45, 49). Plaintiff claimed that his wife, who was willing to speak with him by phone, and the District Attorney and Judge who caused the order of protection to be entered, would agree that telephonic contact was permissible, notwithstanding the clear language of the order of protection.[28] (Disc. Hrg. Tr. at 6–7, 23, 39, 57–58, 61).

The court finds that, although plaintiff made several frivolous arguments that he should be found not guilty, "he admitted to engaging in the conduct that formed the basis of the misbehavior report." *Lowrance v. Achtyl,* 20 F.3d at 534–35. Accordingly, I would recommend that summary judgment be granted in favor of the Coxsackie defendants on plaintiff's retaliation claim, based, *inter alia,* on *Mt. Healthy* and its progeny.

### V. Due Process

#### A. Legal Standards

To begin a due process analysis, the court must determine whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges, and then determine whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001); *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). In *Sandin v. Conner,* 515 U.S. 472, 484 (1995), the Supreme Court held that although states may create liberty interests for inmates that are protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected

manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."

**\*26** The due process protections afforded inmates facing disciplinary hearings that affect a liberty interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citing, *inter alia, Wolff v. McDonnell,* 418 U.S. 539, 563–67 (1974)). The hearing officer's findings must be supported by "some" "reliable evidence." *Id.* (citing, *inter alia, Superintendent v. Hill,* 472 U.S. 445, 455 (1985)).

Violations of state regulations with respect to disciplinary hearings do not, by themselves, necessarily rise to the level of constitutional violations. *See, e.g., Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995) (state law violation does not necessarily rise to the level of a constitutional violation); *Young v. County of Fulton,* 160 F.3d 899, 902 (2d Cir.1998) (violation of state law is not the "benchmark" for determining whether a constitutional violation has occurred). To establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural deficiencies, in the sense that the errors affected the outcome of the hearing. *See, e.g., Clark v. Dannheim,* 590 F.Supp.2d 426, 429 (W.D.N.Y.2008) (citing, *inter alia, Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir.1991) ("it is entirely inappropriate to overturn the outcome of a prison disciplinary proceeding because of a procedural error without making the normal appellate assessment as to whether the error was harmless or prejudicial").

#### B. Analysis

The complaint alleges that, in conducting the disciplinary hearing at Coxsackie and finding plaintiff guilty, defendant Gutwein was motivated by a desire to retaliate against plaintiff for his complaint against defendant Rock at Clinton. Plaintiff also alleges that Hearing Officer Gutwein also improperly denied plaintiff's requests to call key witnesses or obtain documents that would have established his innocence. (Dkt. No. 1 at 7). In plaintiff's prior motion to amend his complaint, which this

court denied (Dkt. No. 38 at 7, 9–10), he attempted to supplement his due process claim by alleging that (1) the misbehavior report was deficient because it did not specify the institution from which plaintiff made the offending phone calls to his wife (Dkt. No. 36 at 34); (2) defendant Gutwein improperly disallowed certain questions plaintiff wanted hearing witnesses to answer (Dkt. No. 36 at 33); and (3) plaintiff's assistant was not allowed to contact certain witnesses on his behalf (Dkt. No. 36 at 36). Although not technically part of the complaint, the court will address these allegations.

Defendants, apparently conceding that the disciplinary sanctions imposed on plaintiff at Coxsackie implicated a liberty interest, argue that the plaintiff was afforded all of the process to which he was due at the hearing conducted by defendant Gutwein. (Defs.' Mem. in Support of Rule 12(b)(6) Mot. at 16–20). The court agrees that, based on the record of the disciplinary hearing, no reasonable fact finder could conclude that plaintiff's due process rights were violated or that the outcome of the proceeding would have been any different if he had been allowed to call and question the witnesses and present the documents that he requested.

### 1. Misbehavior Report

*27 The July 7, 2011 misbehavior report charged plaintiff with violating prison rules 107.20 (False Statements or Information); 106 .10 (Refusing Direct Order); and 121.12 (Phone Program Violation) for making telephone calls to his wife in violation of an order of protection and contrary to direct orders from an officer at Sing Sing, which he managed to do by misleadingly listing his aunt's name as an emergency contact, but at an address and phone number where his wife resided. (Dkt. No. 42–15 at 2). Plaintiff alleges that defendant Paquette–Monthie's misbehavior report provided inadequate notice of the charges because it did not specify the facility from which he made telephone calls to his wife.

The notice required by due process serves to "compel 'the charging officer to be [sufficiently] specific as to the misconduct with which the inmate is charged' to inform the inmate of what he is accused of doing so that he can prepare a defense to those charges and not be made to explain away vague charges set out in a misbehavior report." *Taylor v. Rodriguez,* 238 F.3d 188, 192–93 (2d Cir.2001) (citation omitted)). However, the Constitution does not demand notice that painstakingly details all facts

relevant to the date, place, and manner of charged inmate misconduct. *Sira v. Morton,* 380 F.3d at 72.

Counselor Paquette–Monthie's misbehavior report was based on plaintiff's admissions that he had previously been calling his wife, and the report noted the date in 2009 when plaintiff changed his emergency contact information so he could reach his wife by phone, despite prior orders that he not do so. (Dkt. No. 42–15 at 2). The misbehavior report includes considerable factual detail, and the charges contained therein could certainly not be considered impermissibly vague or conclusory. *Taylor v. Rodriguez,* 238 F.3d at 193 (due process requires more than a conclusory charge). The fact that the misbehavior report did not specify the institution(s) from which plaintiff impermissibly called his wife did not impede him from establishing that he made no such calls from Coxsackie and pursuing the defense, albeit a frivolous one, that he could not be charged at Coxsackie for conduct committed at prior facilities. (Disc. Hrg. Tr. at 14, 19–20, 26, 35, 44, 46, 53, 56).

### 2. Witnesses and Exhibits

During the hearing, plaintiff requested the following witnesses on his behalf: defendant Paquette–Monthie; her supervisor; plaintiff's wife; the District Attorney and the judge who were involved with the Order of Protection; plaintiff's wife's lawyer; plaintiff's criminal defense lawyer; and a staff member from the Office of Mental Health. (Gutwein Decl. ¶ 8; Disc. Hrg. Tr. at 4–8). The hearing officer called only Counselor Paquette–Monthie and Supervising Counselor Chenel to testify, and both were questioned extensively by plaintiff, although defendant Gutwein screened many of plaintiff's questions. (Gutwein Decl. ¶¶ 9–10; Disc. Hrg. at 8–43, 43–61).

*28 Plaintiff, in his motion to amend the complaint, alleged that Hearing Officer Gutwein "would not allow me to question witnesses with questions that proved I was being ret[a]liated for no reasons but for[ ] filing a complaint against the coun[s]elor['s] friend C.O. P. Rock." (Dkt. No. 36 at 33). Hearing Officer Gutwein allowed the witnesses to answer some, but not all questions by which plaintiff tried to establish that Counselor Paquette–Monthie filed the misbehavior report against him because of her "bias" and motive for "revenge." But, plaintiff never sought to ask any question as to whether the counselor initiated the charges because plaintiff had filed a prior complaint against C.O. Rock or

any other friend at Clinton. (Disc. Hrg. Tr. at 15, 27, 28, 33–34, 38, 40, 42–43, 54, 55). [29]

The mere fact that plaintiff's questions for witnesses had to be filtered through the hearing officer did not violate due process. *See Baxter v. Palmigiano,* 425 U.S. 308, 322–23 & n. 5 (1976) (inmates are not entitled to the right to confront and crossexamine witnesses at a disciplinary hearing). The plaintiff's tone during the entire disciplinary hearing was argumentative, and many of his proposed questions reflected a dogged, but unfocused effort to induce Counselor Paquette–Monthie to admit she was, for whatever reason, biased against the plaintiff. During the disciplinary hearing, defendant Paquette–Monthie clearly testified that she initiated the charges against plaintiff because of the perceived seriousness of his misconduct, and "was not playing any dirty politics ... behind the scenes." (Disc. Hrg. Tr. at 26, 28). The hearing officer reasonably denied many of the plaintiff's other questions about the counselor's alleged bias because they were repetitive and bordered on harassment. In any event, it is clear from defendant Paquette–Monthie's declaration (¶¶ 12–17, Dkt. No. 42–12), that if plaintiff had actually tried to ask her at the hearing whether she was retaliating against him at the behest of C.O. Rock or others from Clinton, she would have flatly denied it. Thus, plaintiff cannot establish prejudice, because even if defendant Gutwein had disallowed such questions (which, again, plaintiff never asked), allowing Counselor Paquette–Monthie to answer would have not favored plaintiff or changed the outcome of the hearing. [30]

Plaintiff's request to call his wife and a number of people involved in the prior case that resulted in the order of protection, was premised on his claim that these witnesses would put the order in "context" and clarify that plaintiff was, in fact, allowed to speak with his wife by telephone. (Disc. Hrg. Tr. at 6–7, 22, 23, 39, 57–58, 61). Although due process includes a right to call witnesses, this right is not unfettered. *Alicea v. Howell,* 387 F.Supp.2d 227, 234 (W.D.N.Y.2005) (citing *Ponte v. Real,* 471 U.S. 491, 495 (1985)). This right may be limited for security reasons, to keep a hearing within reasonable limits, or on the basis of irrelevance or lack of necessity. *Id.* (citing, inter alia, *Kingsley v. Bureau of Prisons,* 937 F.2d 26, 30 (2d Cir.1991) (a hearing officer does not violate due process by excluding irrelevant or unnecessary testimony or evidence). An inmate's due process rights are violated when a prison hearing officer refuses to interview

witnesses without assigning a reason "logically related to preventing undue hazards to 'institutional safety or correctional goals.' " *Ponte v. Real,* 471 U.S. at 497.

**\*29** Hearing Officer Gutwein denied plaintiff's request to call his wife as a witness, because to do so would violate the order of protection. Defendant Gutwein also declined to call the other witnesses involved with the prior order of protection because their testimony would not be relevant. (Disc. Hrg. Tr. at 61–63; Dkt. No. 42–15 at 95–96). [31] As noted above, the order of protection explicitly precluded plaintiff from having telephonic or other communications with his wife, and created an exception that allowed only prison visits and "correspondence." (Dkt. No. 42–15 at 3). Given the clarity of the order of protection, and the prior order of a DOCCS official that plaintiff refrain from telephone contact with his wife, calling other witnesses to "explain" or put into "context" the order of protection would have been unnecessary and irrelevant. Accordingly, Hearing Officer Gutwein did not violate plaintiff's due process rights by refusing to call these witnesses. [32]

Plaintiff requested that his medical and mental health records be produced at the hearing, claiming they would indicate that his wife was listed as his emergency contact and that, therefore, he had permission from DOCCS staff at Clinton to call his wife. [33] (Disc. Hrg. Tr. at 7, 59). In fact, plaintiff's position that his emergency contact information contained the address and phone number where his wife could be reached was repeatedly placed on the record during the hearing, and was accepted by the witnesses and the hearing officer. (Disc. Hrg. Tr. at 9, 12, 18–19, 29, 36, 37, 56–57, 60, 72–73). However, the DOCCS witnesses and hearing officer documented that the name plaintiff associated with that emergency contact information was that of his aunt, not his wife, and viewed this as evidence that plaintiff was misleading DOCCS staff so he could make calls to his wife, despite orders to the contrary. (*Id.*)

Plaintiff, while apparently conceding that he used his wife's address and phone number, but not her name, in his emergency contact information (Disc. Hrg. Tr. at 7; Dkt. No. 36 at 35), argued that he disclosed, to Counselor Paquette–Monthie at Coxsackie, that his aunt subsequently moved from that residence and his wife moved in. (Disc. Hrg. at 12–13, 37, 56–57, 60). However, plaintiff was charged, not with misleading defendant

Paquette–Monthie at Coxsackie, but with misleading staff at other DOCCS facilities by listing his wife's contact information under his aunt's name. (Disc. Hrg. Tr. at 2; Inmate Misbehavior Report, Dkt. No. 48–15 at 2). Plaintiff's position on this point is a variation on his frivolous defense that he could not be charged at Coxsackie for misconduct he previously committed at a prior institution. (Disc. Hrg. Tr. at 37). Accordingly, when Hearing Officer Gutwein ruled that documentary or testimonial evidence from DOCCS health units about plaintiff's emergency contact information was not relevant (Disc. Hrg. Tr. at 10; Dkt. No. 42–15 at 94–95), he was pursuing a legitimate correctional goal of avoiding redundant and irrelevant evidence, and did not violate plaintiff's due process rights. *See, e.g., Clyde v. Bellnier,* 9:08–CV–909 (JKS), 2010 WL 1489897, at *6 (N.D.N.Y. April 13, 2010) (no due process violation arose when the hearing officer failed to provide documents that did not exist or that were not relevant to the defense). [34]

### 3. Sufficiency of the Evidence

**\*30** As discussed in section IV B 4. above, plaintiff essentially admitted all of the conduct which formed the basis of the disciplinary charges against him, and his "defenses" were frivolous. The testimony of Counselor Paquette–Monthie (*see, e.g.,* Disc. Hrg. Tr. at 9, 18–19, 21–22) and Supervising Counselor Chenel (*see, e.g.,* Disc. Hrg. Tr. at 46, 49, 56–57, 59–60), along with the supporting documents (Dkt. No. 42–15 at 2–14), provided far more support for defendant Gutwein's guilty finding than the "some" "reliable evidence" standard requires to satisfy due process. (Disc. Hrg. Tr. at 72–73; Dkt. No. 42–15 at 98–99). [35]

### 4. Hearing Officer Bias

"An inmate subject to a disciplinary proceeding is entitled to an impartial hearing officer." *Allen v. Cuomo,* 100 F.3d at 253, 259 (2d Cir.1996). An impartial hearing officer is "one who, *inter alia,* does not prejudge the evidence and who cannot say ... how he would assess the evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 569–70 (2d Cir.1990); *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard").

It is well settled, however, "that prison disciplinary officers are not held to the same standard of neutrality as

adjudicators in other contexts." *Allen v. Cuomo,* 100 F.3d at 259. "The degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Id.* An inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact. *Francis v.. Coughlin,* 891 F.2d 43, 47 (2d Cir.1989); *Clyde v. Schoellkopf,* 714 F.Supp.2d 432, 437–38 (W.D.N.Y.2010).

The unsupported allegations that defendant Gutwein conspired with the other defendants to retaliate against plaintiff in connection with the disciplinary proceedings at Coxsackie (discussed above) are insufficient to establish that he was a biased hearing officer. *See, e.g., Bunting v. Nagy,* 452 F.Supp.2d 447, 460–61 (S.D.N.Y.2006) (in order to defeat a motion for summary judgment, a plaintiff-inmate must "be armed with [something] more than conclusory allegations of bias and prejudgment" of the disciplinary hearing officer) (quoting *Francis v. Coughlin,* 891 F.2d at 47). The transcript of the disciplinary hearing demonstrates that Hearing Officer Gutwein displayed great patience in dealing with plaintiff's argumentative demeanor and his persistence in pursuing frivolous lines of witness questioning. Given the weight of the evidence supporting plaintiff's guilt and the fact that defendant Gutwein's various rulings regarding witnesses and documentary evidence clearly comported with due process, no reasonable fact finder could conclude that he was an unconstitutionally biased hearing officer.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 42) be **GRANTED** on the grounds stated herein, and that plaintiff's complaint be **DISMISSED** in its entirety; and it is further

**\*31 RECOMMENDED,** that plaintiff's motions for preliminary injunctions (Dkt. Nos.54, 58) be **DENIED AS MOOT;** and it is further

**ORDERED,** that plaintiff's motion for appointment of counsel (Dkt. No. 58) be **DENIED.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN**

**DAYS WILL PRECLUDE APPELLATE REVIEW.**
*Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing
*Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d
Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e),
72.

Filed Jan. 17, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1292232

Footnotes

| | |
|---|---|
| 1 | Brooks named "P. Chaste" in his complaint, (Compl. at 1, 2), but it is apparent that the proper spelling of that individual's name is Chase, (Dkt. No. 42, Attach.3). |
| 2 | While the complaint names "R. Paquette" and "Monthie" as separate defendants, (Compl. at 1, 2), they are one in the same: Roberta PaquetteMonth ie. (Dkt. No. 42, Attach.12.) |
| 3 | Brooks named "Eric Mutuein" as a defendant in his complaint. (Compl. at 1, 2.) It is clear, however, that he intended to name Eric Gutwein as a party defendant. (Dkt. No. 42, Attach.14.) |
| 4 | Notably, Judge Baxter considered new facts that were first submitted by Brooks in his motion seeking leave to amend even though they were "not technically part of the complaint." (Dkt. No. 60 at 51–60.) |
| 5 | "[A] report is clearly erroneous if the court determines that there is a mistake of fact or law which is obvious and affects substantial rights." *Almonte,* 2006 W L 149049, at *6. |
| 6 | Brooks writes "I'am adding deffendant to my existing prior civil suit," yet he seems to assert new wrongdoing only on the part of DOCCS for "fail[ing] to protect and refus[ing] to put [him] in midstate A.P.P.U. under federal [p]rotection." (Dkt. No. 62 at 3.) Elsewhere, Brooks refers to "new defendants added." (*Id.* at 5 .) |
| 7 | Buried within his submission, Brooks "request[s] to fill Amendent Complaint have discovery In new defendants added." (Dkt. No. 62 at 5.) Construing this statement liberally, as the court must, *see Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006), it can safely be assumed that Brooks seeks leave to amend. |
| 1 | Because plaintiff's complaint does not have consecutive pagination or consistent paragraph numbering, the court will refer to the page numbers assigned by the CM–ECF system in the document header. |
| 2 | Plaintiff incorrectly refers to defendant Peter **Chase** as "P. **Chaste**." The court will use this defendant's correct name. |
| 3 | The complaint lists the hearing officer as Eric Mutuein (Compl., Dkt. No. 1 at 2), but this court will use his correct name herein. |
| 4 | The complaint names as defendants R. Paquette, Counselor and Monthie, "Councelor [sic] Supervisor." As noted, the counselor who initiated the disciplinary charges against plaintiff is named Roberta Paquette–Monthie. Ms. Paquette–Monthie's supervisor, who testified at plaintiff's disciplinary hearing, but was not at work the day the misbehavior report was issued, is Supervising Correction Counselor Chenel. (Disc. Hrg. Tr. at 8, 52). Supervising Correction Counselor Chenel has not been served in this action. |
| 5 | To avoid dismissal of his due process claims under *Heck v. Humphrey,* 512 U.S. 477 (1994), plaintiff filed a *Peralta* waiver relinquishing any due process claims with respect to his loss of good time. (Dkt.Nos.7, 9, 12, 13, 15–17). *See Peralta v. Vasquez,* 467 F.3d 98, 105–106 (2d Cir.2006). |

| | |
|---|---|
| 6 | *See Hemphill v. State of New York,* 380 F.3d 680 (2d Cir.2004) (remanding case to determine if defendant's alleged threats constituted "special circumstances" justifying plaintiff's failure to exhaust); *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004) (whether failure to exhaust may be justified because plaintiff obtained favorable rulings on his grievances, but the relief that he was supposed to obtain was never forthcoming); *Johnson v. Testman,* 380 F.3d 691 (2d Cir.2004) (whether including claims in a disciplinary appeal may suffice for the exhaustion requirement); *Ortiz v. McBride,* 380 F.3d 649 (2d Cir.2004) (complete dismissal is not required when plaintiff brings both exhausted and unexhausted civil rights claims). |
| 7 | *See, e.g., Newman v. Duncan,* 04–CV–395 (TJM/DRH), 2007 WL 2847304, at * 2 n. 4 (N.D.N.Y. Sept. 26, 2007); *Shariff v. Coombe,* 655 F.Supp.2d 274, 285–86 n. 7 (S.D.N.Y.2009). |
| 8 | According to DOCCS records, plaintiff was moved from Clinton Annex to Downstate Correctional Facility on June 24, 2011; then to Coxsackie on June 27, 2011; and on to Upstate Correctional Facility on July 22, 2011. (LaValley Decl. ¶ 11 & Ex. B, Dkt. No. 42–5 at 4; Brousseau Decl. ¶ 8). |
| 9 | As plaintiff appears to acknowledge, a letter of complaint to the facility superintendent would not qualify as a formal grievance required to exhaust administrative remedies, unless the informal complaint produced a resolution favoring the inmate. *See, e.g., Goodson v. Silver,* 9:09–CV–494 (GTS/DRH), 2012 WL 4449937 at *9 & n. 20 (N.D.N.Y. Sept. 25, 2012) (district courts have interpreted *Marvin v. Goord,* 255 F.3d 40, 43 (2d Cir.2001), to mean that an inmate's efforts to resolve a matter through informal channels satisfies the exhaustion requirement only if the efforts resulted in the matter being concluded in the inmate's favor) (collecting cases); *Shomo v. Goord,* 9:04–CV–707 (LEK/DEP), 2007 WL 2693526, at *9 (N.D.N.Y. Sept. 11, 2007) (courts have repeatedly held that complaint letters to the DOCCS Commissioner or the facility Superintendent do not satisfy the PLRA's exhaustion requirements) (collecting cases). |
| 10 | The copy of the July 14th Affidavit of Service has two receipt stamps from DOCCS-one dated 9/1/2011 and the other of which has the date obscured. It appears that a copy of the Affidavit of Service was sent to other DOCCS officials in Albany in September 2011. In the absence of a reply from defendants questioning the authenticity of the document, and construing the facts in favor of the non-movant, as I must, the court will assume that N. Ratliff at Clinton received a copy of the Affidavit of Service at some time between July 14, when the affidavit was notarized, and July 18, 2011, when N. Ratliff sent the confirming memorandum to plaintiff. |
| 11 | Nothing on the face of plaintiff's June 15, 2011 letter to Supt. LaValley indicates that a copy was submitted to grievance officials. (Dkt. No. 52–11 at 5). |
| 12 | *See* N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.5(a) ("[a]n inmate must submit a complaint to the clerk within 21 calendar days of an alleged occurrence"), 701.6(g)(1)(b) ("[t]he IGP supervisor may grant an exception to the time limit for filing a grievance based on mitigating circumstances[;] ... [a]n exception to the time limit may not be granted if the request was made more than 45 days after an alleged occurrence). |
| 13 | The New York regulations specifically state that if a grievance is not decided within the time limits provided, the inmate may appeal to the next step. N.Y. Comp.Codes R. & Regs. tit. 7, § 701.6(g)(1)(ii)(2). In *Pacheco v. Drown,* 9:06–CV–20 (GTS/GHL), 2010 WL 144400, at *19 & n. 21 (N.D.N.Y. Jan. 11, 2010), U.S. District Judge Glenn Suddaby held that the failure by the IGRC or the |

Superintendent to timely respond to a grievance or first level appeal may be appealed to the next level(s), including the CORC, in order to properly complete the grievance process. *Accord, Murray v. Palmer,* 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, *2 & nn. 4, 6 (N.D.N.Y. Mar. 31, 2010). N.Y. Comp. Codes R. & Regs. tit. 7, §§ 701.6(h)(2) provides:

> An inmate transferred to another facility may continue an appeal of any grievance. If the grievant wishes to appeal, **he or she must mail the signed appeal form back to the IGP supervisor at the facility where the grievance was originally filed** within seven calendar days after receipt. The IGP supervisor will refer it to the facility grievance clerk for processing.

(emphasis supplied).

Absent an extension, which would require the written consent of the grievant, N.Y. Comp. Codes R. & Regs. tit. 7, §§ 701.6(g)(1) (b)(ii)(2), the IGRC is required, during the first step of the grievance process, to schedule a hearing within 16 calendar days after receipt of the grievance. N.Y. Comp. Codes R. & Regs. tit. 7, §§ 701.5(b)(2)(ii). At the second step of the process, the Superintendent is supposed to render a decision within 20 calendar days from the receipt of an appeal. N.Y. Comp. Codes R. & Regs. tit. 7, §§ 701.5(c)(3) (I), (ii). Arguably, if an inmate has not consented to an extension and the IGRC has not scheduled a hearing within 16 days, or a superintendent has not rendered a decision within 20 days, the inmate would then have only seven days to appeal to the next level, unless he requested an extension supported by mitigating circumstances. *See, e.g., Goodson v. Silver,* 2012 WL 4449937, at *6 (discussing how to calculate the deadline for filing an appeal to CORC in a case where the Superintendent failed to respond to a harassment grievance). However, a number of contingencies, other than an inmate-approved extension, could alter such deadlines. In this case, the plaintiff was transferred from Clinton less than 16 days after the "occurrence" which was the subject of the alleged grievance. When an inmate's confinement status precludes his timely appearance at an IGRC hearing, an unspecified delay in the resolution of the first stage of the grievance process is contemplated- to determine whether the inmate wants to postpone his hearing or have it proceed in his absence. N.Y. Comp. Codes R. & Regs. tit. 7, §§ 701.5(b) (2)(ii)(a). If a grievance against a DOCCS employee is determined by a superintendent to be a "harassment" grievance, the process and the deadlines change. *See* N.Y. Comp. Codes R. & Regs. tit. 7, §§ 701.8. Given the uncertainty of the deadlines for filing appeals when an inmate, particularly one who is transferred to another facility, receives no response to a grievance, this court cannot conclude, in the context of a summary judgment motion, that plaintiff's appeals were untimely for exhaustion purposes or that any untimeliness should not be excused under *Hemphill* and its progeny.

In support of the summary judgment motion, defendants document that plaintiff could have sought and obtained medical attention prior to June 17th by taking advantage of sick call procedures from his cell. (Devlin–Varin Decl., Dkt. No. 42–10). Plaintiff responded, in conclusory fashion, that prior efforts to get medical attention were thwarted by the Clinton staff. (Pl.'s Reply to Devlin–Varin Decl. ¶¶ 5, 6, Dkt. No. 52–5; Pl.'s Reply to Michalek Decl. ¶ 4, Dkt. No. 52–4). In any event, because plaintiff could seek prompt, necessary medical treatment once he returned to his cell, C.O. Rock would not have been subjectively aware that her failure to send plaintiff for immediate medical attention would subject him to a risk of serious harm from a prolonged delay in care, even if she had known that the bathroom door had struck plaintiff in

the head. *Farmer v. Brennan,* 511 U .S. at 844; *Salahuddin v. Goord,* 467 F.3d at 281. Thus, no reasonable fact finder would conclude that plaintiff could establish the subjective prong of the deliberate indifference standard.

17    Plaintiff has also filed copies of sick call requests that he purportedly submitted in August and September 2011, complaining of ongoing symptoms relating to the alleged blow to his head on June 15, 2011 at Clinton and a 2009 assault in Sing Sing. (Dkt. No. 52–11 at 45–51).

18    Plaintiff has filed documents relating to complaints and grievances regarding his medical care between September and November 2011. (Dkt. No. 52–11 at 52–54).

19    *See also Brown v. White,* 9:08–CV–200, 2010 WL 985184, at *8 (N.D.N.Y. Mar. 15, 2010) (plaintiff's conclusory suggestion that defendant nurse completely refused to provide any medical attention on a particular date is insufficient to create a dispute of fact in the face of the sworn declaration and supporting documentary evidence in the record); *Benitez v. Pecenco,* 92 Civ. 7670, 1995 WL 444352 at n. 5, (S.D.N.Y. July 27, 1995) (conclusory claim that plaintiff was never issued medication was directly contradicted by medical records and was insufficient to create a factual dispute on that issue) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case")).

20    *See also Brown v. White,* 2010 WL 985184, at *9–10 (inmate who suffered from chronic, but not acute, lower back pain and occasional headaches and dizziness during a three-month delay in requested medication and other treatment did not suffer a serious deprivation of medical care); *Evans v. Manos,* 336 F.Supp.2d at 260 (W.D.N.Y.2004) (subjective claims of pain, unaccompanied by substantial medical complications are not sufficient to create a factual issue as to whether he was suffering from a "serious," unmet medical need); *Hanrahan v. Menon,* 9:07–CV–610 (FJS/ATB), 2010 WL 6427650, at *8–9 (N.D.N.Y. Dec. 15, 2010) (plaintiff's complaints of primarily subjective mental health symptoms do not rise to the level that would make the two-month delay in plaintiff's medication a serious deprivation) (ReportRecommendation), *adopted,* 2011 WL 1213171 (N.D.N.Y. Mar. 31, 2011), *aff'd,* 470 F. App'x 32 (2d Cir. May 18, 2012).

21    Conclusory allegations, lacking any factual foundation, are also insufficient to support a claimed conspiracy to violate another's civil rights. *See, e.g., Jackson v. County of Rockland,* 450 F. App'x 15, 19 (2d Cir.2011) (citing *Gallop v. Cheney,* 642 F.3d 364, 369 (2d Cir.2011) (finding allegations of conspiracy "baseless" where the plaintiff "offer[ed] not a single fact to corroborate her allegation of a 'meeting of the minds' among the conspirators")); *Ciambriello v. County of Nassau,* 292 F.3d 307, 325 (2d Cir.2002). Plaintiffs alleging a civil rights conspiracy must "make an effort to provide some details of time and place and the alleged effects of the conspiracy ... [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Warren v. Fischl,* 33 F.Supp.2d 171, 177 (E.D.N.Y.1999) (citations omitted).

22    *See, e.g., Hare v. Hayden,* 09 Civ. 3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant.") (citing *Wright v. Goord,* 554 F.3d 255, 274 (2d Cir.2009) (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was complaint about an incident involving another corrections officer); *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 369 (S.D.N.Y.2011) (plaintiff has failed to provide any basis

to believe that a corrections counselor would retaliate for a grievance that she was not personally named in).

23     *See Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) and other cases cited below with respect to the due process standards applying to disciplinary proceedings.

24     The district court in *Allah v. Greiner* found that plaintiff's allegations were sufficient to create issues of fact with regard to the prisoner's claim of retaliation against one defendant because the defendant (Totten) had a plausible motive to retaliate against the plaintiff for a grievance specifically naming Totten and because Totten's explanation for the allegedly retaliatory act was internally inconsistent and in conflict with other evidence. *Id.* at *4.

25     Plaintiff speculated that Counselor Paquette–Monthie previously worked in the sex offender program at Clinton Annex, and presumably met C.O. Rock while at Clinton. (Dkt. No. 36 at 36, 37).

26     Plaintiff attached, to his response to the Rule 12(b)(6) motion, documents purportedly submitted in state court proceedings in October 2011, one of which referenced Counselor Paquette–Monthie's alleged statement that she filed the misbehavior report against plaintiff because he filed a complaint against a friend of hers. (Dkt. No. 36 at 19). Even if this document is authentic and was not backdated, as some of plaintiff's submissions clearly are, it is apparent from the record that plaintiff belatedly claimed that Counselor Paquette–Monthie made this admission in furtherance of self-serving legal tactics, well after the disciplinary hearing at Coxsackie and after plaintiff filed his complaint in this action.

27     Defendant Paquette–Monthie and her supervisor testified at the disciplinary hearing that DOCCS phone records confirmed that plaintiff had, indeed, made calls to the number at which plaintiff admitted his wife could be reached. (Disc. Hrg. Tr. at 19, 59–60; Dkt. No. 42–15 at 6–13). Plaintiff was allowed to inspect those phone records during the hearing. (Disc. Hrg. Tr. at 67, 69).

28     The Order of Protection was apparently modified, on October 28, 2011, after the disciplinary hearing, to allow telephonic contact. (Dkt. No. 36 at 66). However, this reinforces that the Order of Protection in place at the time of the telephonic contact that resulted in the misbehavior report against plaintiff clearly did not authorize contact by phone.

29     Plaintiff asked Supervising Counselor Chenel, with respect to the misbehavior report against him, "was there any complaint initially by any outside services ... or was there anything written from another facility, uh,—retaliate or anything like that?" Hearing Officer rephrased the questions: "to you knowledge was there any outside contact with regard to the Order of Protection being violated?" and Supervising Counselor Chenel answered "No." (Disc. Hrg. Tr. at 54).

30     *See Clark v. Dannheim,* 590 F.Supp.2d at 429–31 (to establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural errors, in the sense that the errors affected the outcome of the hearing) (collecting cases). Toward the end of the hearing, plaintiff requested that witnesses Paquette–Monthie and Chenel be recalled for further questioning; but he would not explain what new questions he wanted to ask these witnesses. (Disc. Hrg. Tr. at 63–66). Hearing Officer Gutwein denied plaintiff's request to recall these witnesses because plaintiff failed to articulate any additional information that they could provide that would not be redundant of their lengthy, prior testimony. (Disc. Hrg. Tr. at 66, 71–72; Dkt. No. 42–15 at 93). Defendant Gutwein's stated reasons for not recalling these witnesses were reasonably

related to a correctional goal and did not, based on the authority cited below, violate due process. In any event, because plaintiff never articulated how recalling these two witnesses would have helped him or changed the outcome of the disciplinary hearing, he cannot establish that he was prejudiced by the hearing officer's ruling.

31    On July 20, 2011, Hearing Officer Gutwein provided plaintiff with copies of form 2176 explaining, in writing, the reasons for his refusal to call each witness. Plaintiff demanded that the hearing officer state on the record his reasons for refusing to call the District Attorney involved with the prior order of protection, and defendant Gutwein did not due so. (Disc. Hrg. Tr. at 62–63). On July 21, 2011, when the hearing resumed, plaintiff complained that he could not read script, and the hearing officer orally explained his reasons to deny plaintiff's new request to recall witnesses Paquette–Monthie and Chenel on the record, apparently because the 2176 forms prepared that morning were handwritten in script. (Disc. Hrg. Tr. at 70–72). Once he announced his problems with reading script, plaintiff did not renew his request that the hearing officer orally explain the reasons for not calling the District Attorney, which were written in script on form 2176 the day before. (*Id.*). In his prior rulings on various questions plaintiff posed to the witnesses, the hearing officer made clear that the various persons involved in the prior order of protection had nothing relevant to offer with respect to the pending charges. (*See, e.g.,* Disc. Hrg. Tr. at 23, 40, 49). In any event, as long as a hearing officer articulates a reason for not calling a witness that is logically related to correctional goals, due process does not require that he do so during the hearing, even if state law requires a contemporaneous finding. *Duffy v. Selsky,* 95 CIV. 0474, 1996 WL 407225, at * 10 (S.D.N.Y. Jul. 18, 1996) (the Supreme Court has held that the proffer of the explanation for not calling a witness need not be contemporaneous with the hearing) (citing *Ponte v. Real,* 471 U.S. at 497).

32    Given that these witnesses had no relevant information to offer, plaintiff's complaint that his assistant was not allowed to interview these witnesses also fails to support a due process claim.

33    Plaintiff initially requested witnesses from the health units, but he did not persist in that request after Counselor Paquette–Monthie and Supervising Counselor Chenel testified. (Disc. Hrg. Tr. at 7, 61). Hearing Officer Gutwein nonetheless prepared copies of form 2176 explaining that these witnesses would not be called because the proposed testimony would not be relevant. (Dkt. No. 42–15 at 94–95).

34    The court notes that Hearing Officer Gutwein provided plaintiff with copies of requested documents discussed during the hearing, and once adjourned the hearing so plaintiff could get a copy of a document he claimed he needed to continue questioning a witness. (Disc. Hrg. Tr. at 31, 66–71).

35    The hearing office stated the basis for his finding on the disciplinary charges both in writing and on the record at the hearing. (*Id.*).

**End of Document**      © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Jonathan HENRY, Plaintiff,
v.
James F. DINELLE, Corrections Officer; Russell E. Duckett, Corrections Officer; Alfred J. Deluca, Corrections Officer; Donald L. Broekema, Sergeant; and Jean Norton, Nurse, Defendants.
No. 9:10–CV–0456 (GTS/DEP).

Nov. 29, 2011.

Sivin & Miller, LLP, Edward Sivin, Esq., of Counsel, New York, NY, for Plaintiff.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Timothy P. Mulvey, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

### MEMORANDUM–DECISION and ORDER

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this prisoner civil rights action filed by Jonathan Henry ("Plaintiff") against the five above-captioned employees of the New York State Department of Corrections and Community Supervision ("Defendants"), is Defendants' motion for partial summary judgment. (Dkt. No. 24.) For the reasons set forth below, Defendants' motion is granted in part and denied in part.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Claims

Generally, liberally construed, Plaintiff's Complaint alleges that, between approximately January 29, 2009, and January 31, 2009, at Ulster Correctional Facility in Napanoch, New York, Defendants violated Plaintiff's following rights in the following manner: (1) Defendants

Nurse Jean Norton, Corrections Officer James F. Dinelle, Corrections Officer Russell E. Duckett and Corrections Officer Alfred J. DeLuca violated Plaintiff's rights under the First Amendment by filing retaliatory false misbehavior reports against him, and subsequently providing false testimony against him at administrative disciplinary hearings, which resulted in his spending time in the Special Housing Unit ("SHU"); (2) Defendant Dinelle violated Plaintiff's rights under the Eighth Amendment by assaulting him on two occasions, and Defendants DeLuca and Duckett violated Plaintiff's rights under the Eighth Amendment by assaulting him once; (3) Defendant Sergeant Donald L. Broekema violated Plaintiff's rights under the Eighth Amendment by failing to intervene to prevent one of these assaults from occurring; (4) Defendant Norton violated Plaintiff's rights under the Eighth Amendment by harassing him almost immediately before he was subjected to the above-described assaults; and (5) Defendants Norton, Dinelle, Duckett and DeLuca violated Plaintiff's rights under the Fourteenth Amendment by performing the aforementioned acts, which constituted atypical and significant hardships in relation to the ordinary incidents of prison life. (*See generally* Dkt. No. 1 [Plf.'s Compl.].) Familiarity with the factual allegations supporting these claims in Plaintiff's Complaint is assumed in this Decision and Order, which is intended primarily for review by the parties. (*Id.*)

### B. Undisputed Material Facts

At all times relevant to Plaintiff's Complaint, Plaintiff was an inmate and Defendants were employees of the New York State Department of Corrections and Community Supervision at Ulster Correctional Facility. On January 30, 2009, Defendant Dinelle took Plaintiff to the medical ward, because Plaintiff was experiencing a foul odor and oozing from a wound on his leg. After Defendant Norton treated Plaintiff, she filed an inmate misbehavior report against Plaintiff based on (1) Plaintiff's harassing behavior toward Defendant Norton and Defendant Dinelle, and (2) Plaintiff's disobedience of a direct order to be quiet. The misbehavior report was signed by Defendant Dinelle as an employee witness.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

At his deposition, Plaintiff testified, while leaving the infirmary, he was punched and kicked by Defendant Dinelle and two unknown prison officials. Plaintiff was then taken to the SHU, where he waited with Defendants Dinelle and Duckett, and up to three more individuals, for a sergeant to arrive. When Defendant Broekema (a sergeant) arrived at the SHU, Plaintiff was taken to a frisk room, where a frisk was conducted. During the frisk, Defendants Dinelle, Duckett and (Plaintiff suspected) DeLuca used force to bring Plaintiff to the ground. Plaintiff testified that, during the use of force, he was simultaneously punched in the nose by two officers while their supervisor watched.

**\*2** After the use of force, Plaintiff stated to Defendants Dinelle, Broekema and Duckette, "I will be contacting my attorney," or "I will be calling a lawyer." [FN1] Plaintiff never used the term "grievance" when addressing Defendants Dinelle, Broekema and Duckette (or Defendant Norton).[FN2] Subsequently, Defendant Duckett filed an inmate misbehavior report against Plaintiff based on his disobedience of frisk procedures and a direct order. Defendant DeLuca signed this report as a witness to the events.

> [FN1.] (*Compare* Dkt. No. 24, Attach. 9, at ¶ 17 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 27, Attach. 3, at ¶ 17 [Plf.'s Rule 7 .1 Response]; *see also* Dkt. No. 24, Attach. 4, at 100, 102–03 [attaching pages 216, 218 and 219 of Trans. of Plf.'s Depo.]; Dkt. No. 33, at 2–3 [attaching pages 228 and 229 of Trans. of Plf.'s Depo .].)

> [FN2.] (*Compare* Dkt. No. 24, Attach. 9, at ¶ 17 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 27, Attach. 3, at ¶ 17 [Plf.'s Rule 7 .1 Response]; *see also* Dkt. No. 24, Attach. 4, at 59–60, 100, 102–03 [attaching pages 175, 176, 216, 218 and 219 of Trans. of Plf.'s Depo.]; Dkt. No. 33, at 2–3 [attaching pages 228 and 229 of Trans. of Plf.'s Depo.].)

Familiarity with the remaining undisputed material facts of this action, as well as the disputed material facts, as set forth in the parties' Rule 7.1 Statement and Rule 7.1 Response, is assumed in this Decision and Order, which

(again) is intended primarily for review by the parties. (*Id.*)

## C. Defendants' Motion

Generally, in support of their motion for partial summary judgment, Defendants argue as follows: (1) Plaintiff's claim that Defendants issued false misbehavior reports should be dismissed because Plaintiff has no constitutional right to be free of false misbehavior reports; (2) Plaintiff's First Amendment retaliation claim should be dismissed because he has failed to adduce admissible record evidence from which a rational factfinder could conclude that he (a) engaged in protected activity, or (b) suffered adverse action as a result of engaging in protected activity; (3) Plaintiff's Fourteenth Amendment substantive due process claim should be dismissed because he has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendants deprived Plaintiff of his liberty rights; (4) Plaintiff's Eighth Amendment excessive-force claim against Defendant Norton should be dismissed because Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that she (a) used force against Plaintiff, or (b) was in a position to prevent the use of force from occurring, yet failed to do so; (5) Plaintiff's Eighth Amendment excessive-force claim against Defendant DeLuca should be dismissed because Plaintiff's identification of Defendant DeLuca is "very tentative"; (6) Plaintiff's Eighth Amendment failure-to-intervene claim against Defendant Broekema should be dismissed because Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant Broekema had a realistic opportunity to intervene to prevent or stop the assault, yet failed to do so; and (7) Defendants are protected from liability, as a matter of law, by the doctrine of qualified immunity, under the circumstances. (*See generally* Dkt. No. 24, Attach. 10 [Defs.' Memo. of Law].).[FN3]

> [FN3.] In their motion, Defendants do not challenge the evidentiary sufficiency of Plaintiff's Eighth Amendment excessive-force claim against Defendants Dinelle or Duckett. (*See generally* Dkt. No. 24, Attach. 10 [Defs.' Memo. of Law].)

In Plaintiff's response to Defendants' motion for partial summary judgment, he argues as follows: (1) his

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

retaliation claims should not be dismissed because there are triable issues of fact as to whether Defendants retaliated against him for stating that he would be contacting an attorney; (2) his failure-to-intervene claim against Defendant Broekema should not be dismissed because there are triable issues of fact as to whether Defendant Broekema failed to prevent excessive force from being used against him; (3) his excessive-force claim against Defendant DeLuca should not be dismissed because there are triable issues of fact as to whether Defendant DeLuca used excessive force against him; and (4) Defendants are not protected from liability, as a matter of law, by the doctrine of qualified immunity, under the circumstances. (*See generally* Dkt. No. 27, Attach. 5 [Plf.'s Response Memo. of Law].) [FN4]

> FN4. Plaintiff does not oppose Defendants' arguments that (1) Plaintiff's excessive-force claim against Defendant Norton should be dismissed, and (2) Plaintiff's substantive due process claim should be dismissed. (*See generally* Dkt. No. 27, Attach. 5 [Plf.'s Response Memo. of Law].)

**\*3** In their reply, Defendants essentially reiterate their previously advanced arguments. (*See generally* Dkt. No. 29, Attach. 1 [Defs .' Reply Memo. of Law].)

## II. RELEVANT LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the legal standard governing motions for summary judgment, the Court will not recite that well-known legal standard in this Decision and Order, but will direct the reader to the Court's decision in *Pitts v. Onondaga Cnty. Sheriff's Dep't,* 04–CV–0828, 2009 WL 3165551, at *2–3 (N.D.N.Y. Sept.29, 2009) (Suddaby, J.), which accurately recites that legal standard.

### B. Legal Standards Governing Plaintiff's Claims

### 1. First Amendment Retaliation Claim

Claims of retaliation like those asserted by Plaintiff find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380–81 (2d Cir.2004). Central to such claims is the notion that, in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of his First Amendment rights. *See Gill,* 389 F.3d at 381–383. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.

> *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

To prevail on a First Amendment claim under 42 U.S.C. § 1983, a plaintiff must prove by the preponderance of the evidence that (1) the speech or conduct at issue was "protected", (2) the defendants took "adverse action" against the plaintiff—namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights, and (3) there was a causal connection between the protected speech and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d Cir.2001] ). Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996).

**\*4** In determining whether an inmate has established a prima facie case of a causal connection between his protected activity and a prison official's adverse action, a number of factors may be considered, including the following: (1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation. *Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1178 (2d Cir.1996); *Baskerville v. Blot,* 224 F.Supp.2d 723, 732 (S.D.N.Y.2002). Even where the inmate has established such a prima facie case, the prison official may be entitled to judgment as a matter of law on the inmate's retaliation claim where the prison official has satisfied his burden of establishing that the adverse action would have been taken on proper grounds alone. *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994); *Jordan v. Garvin,* 01–CV–4393, 2004 WL 302361, at \*6 (S.D.N.Y. Feb.17, 2004).

## 2. Eighth Amendment Claims of Excessive–Force and Failure–to–Intervene

To establish a claim of excessive-force under the Eighth Amendment, a plaintiff must satisfy two components: "one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009). In consideration of the subjective element, a plaintiff must allege facts which, if true, would establish that the defendant's actions were wanton " 'in light of the particular circumstances surrounding the challenged conduct.' " *Id.* (quoting *Blyden v. Mancusi,* 186 F.3d 252, 262 [2d Cir.1999] ). The objective component asks whether the punishment was sufficiently harmful to establish a violation "in light of 'contemporary standards of decency.' " *Wright,* 554 F.3d at 268 (quoting *Hudson v. McMillian,* 503 U.S. 1, 8 [1992] ).

Generally, officers have a duty to intervene and prevent such cruel and unusual punishment from occurring or continuing. *Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001); *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). "It is well-established that a law enforcement official has an affirmative duty to intervene

on behalf of an individual whose constitutional rights are being violated in his presence by other officers." *Cicio v. Lamora,* 08–CV–0431, 2010 WL 1063875, at \*8 (N.D.N.Y. Feb.24, 2010) (Peebles, M.J.). A corrections officer who does not participate in, but is present when an assault on an inmate occurs may still be liable for any resulting constitutional deprivation. *Id.* at \*8. To establish a claim of failure-to-intervene, the plaintiff must adduce evidence establishing that the officer had (1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene. *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008). Generally, officers cannot be held liable for failure to intervene in incidents that happen in a "matter of seconds." *Parker v. Fogg,* 85–CV–177, 1994 WL 49696 at \*8 (N.D.N.Y. Feb.17, 1994) (McCurn, J.).

## 3. Fourteenth Amendment Substantive Due Process Claims

**\*5** The Due Process Clause of the Fourteenth Amendment contains both a substantive component and a procedural component. *Zinernon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). The substantive component "bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Zinernon,* 494 U.S. at 125 [internal quotations marks omitted]. The procedural component bars "the deprivation by state action of a constitutionally protected interest in life, liberty, or property ... *without due process of law." Id.* at 125–126 [internal quotations marks and citations omitted; emphasis in original]. One of the differences between the two claims is that a substantive due process violation "is complete when the wrongful action is taken," while a procedural due process violation "is not complete unless and until the State fails to provide due process" (which may occur *after* the wrongful action in question). *Id.*

"Substantive due process protects individuals against government action that is arbitrary, ... conscience-shocking, ... or oppressive in a constitutional sense, ... but not against constitutional action that is incorrect or ill-advised." *Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994) [internal quotations marks and citations omitted], *aff'g,* 91–CV–1196, Memorandum–Decision and

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

Order (N.D.N.Y. filed Jan. 26, 1993) (DiBianco, M.J.) (granting summary judgment to defendants in inmate's civil rights action).

"An inmate has a liberty interest in remaining free from a confinement or restraint where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes 'an atypical and significant hardship on the ordinary incidents of prison life.' " *Whitaker v. Super,* 08–CV–0449, 2009 WL 5033939, at *5 (N.D.N.Y. Dec. 14, 2009) (Kahn, J. adopting Report–Recommendation by Lowe, M.J.) (quoting *Sandin v. Conner,* 515 U.S. 472, 484 [1995] ). Regarding the first prong of this test, "[i]t is undisputed ... that New York state law creates a liberty interest in not being confined to the SHU. *Palmer v. Richards,* 364 F.3d 60, 64 n. 2 (2d Cir.2004). When evaluating whether an inmate's confinement in SHU violates his substantive due process rights, the issue, then, is whether his keeplock confinement imposed "an atypical and significant hardship on [him] in relation to the ordinary incidents of prison life." *Id.* at 64.

"In the Second Circuit, determining whether a disciplinary confinement constituted an 'atypical and significant hardship' requires examining 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation compared to discretionary confinement.' " *Whitaker,* 2009 WL 5033939, at *5 (quoting *Palmer,* 364 F.3d at 64). "Where a prisoner has served less than 101 days in disciplinary segregation, the confinement constitutes an 'atypical and significant hardship' only if 'the conditions were more severe than the normal SHU conditions.' " *Id.* (quoting *Palmer,* 364 F.3d at 65).[FN5]

> FN5. Generally, " '[n]ormal' SHU conditions include being kept in solitary confinement for 23 hours per day, provided one hour of exercise in the prison yard per day, and permitted two showers per week." *Whitaker,* 2009 WL 5033939, at *5 n. 27 (citing *Ortiz v. McBride,* 380 F.3d 649, 655 [2d Cir.2004] ).

**4. Qualified Immunity Defenses**

**\*6** The qualified immunity defense is available to only those government officials performing discretionary functions, as opposed to ministerial functions. *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991). "Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams v. Smith,* 781 F.2d 319, 322 (2d Cir.1986) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ). As a result, a qualified immunity inquiry in a civil rights case generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff establish a constitutional violation"; and (2) "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Sira v. Morton,* 380 F.3d 57, 68–69 (2d Cir.2004), *accord, Higazy v. Templeton,* 505 F.3d 161, 169, n. 8 (2d Cir.2007).

In determining the second issue (i.e., whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted), courts in this circuit consider three factors:

(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992).[FN6] "As the third part of the test provides, even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton,* 505 F.3d 161, 169–70 (2d Cir.2007).[FN7] This "objective reasonableness" part of the test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

*v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).[FN8] As the Supreme Court has explained,

> **FN6.** *See also Pena v. DePrisco,* 432 F.3d 98, 115 (2d Cir.2005); *Clue v. Johnson,* 179 F.3d 57, 61 (2d Cir.1999); *McEvoy v. Spencer,* 124 F.3d 92, 97 (2d Cir.1997); *Shechter v. Comptroller of City of New York,* 79 F.3d 265, 271 (2d Cir.1996); *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995); *Prue v. City of Syracuse,* 26 F.3d 14, 17–18 (2d Cir.1994); *Calhoun v. New York State Div. of Parole,* 999 F.2d 647, 654 (2d Cir.1993).

> **FN7.** *See also Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' "); *Davis v. Scherer,* 468 U.S. 183, 190, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984) ("Even defendants who violate [clearly established] constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard."); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

> **FN8.** *See also Malsh v. Corr. Oficer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) [citing cases]; *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996).

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

*Malley,* 475 U.S. at 341.[FN9]

> **FN9.** *See also Hunter v. Bryant,* 502 U.S. 224, 299, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) ("The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.") [internal quotation marks omitted].

## III. ANALYSIS

### A. Plaintiff's Retaliation Claim Under the First Amendment

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of this claim because Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that he (1) engaged in protected activity, or (2) suffered adverse action as a result of engaging in protected activity. More specifically, Defendants argue that the claim should be dismissed because (1) the statement of an inmate's intent to contact an attorney is not protected conduct, (2) Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant Norton knew of Plaintiff's intention to contact an attorney, and (3) Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendants' actions were retaliatory. (Dkt. No. 24, Attach.10.) [FN10]

> **FN10.** Defendants also argue that Plaintiff's First Amendment claim should be dismissed to the extent that it is based solely on the fact that misbehavior reports against him were *false* (as opposed to being false *and retaliatory* ). The Court agrees that Plaintiff has no general constitutional right to be free from false misbehavior reports. *See Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir.1997). As a result, to the extent that the Plaintiff's Complaint may be construed as asserting a claim based solely on the issuance of false behavior reports, that claim is dismissed.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

**\*7** After carefully considering the admissible record evidence adduced in this case, and carefully reviewing the relevant case law, the Court has trouble finding that an inmate's one-time making of an oral statement (immediately after the use of force against him) that he would be "contacting [his] attorney," or "calling a lawyer" at some unidentified point in the future constitutes engagement in activity that is protected by the First Amendment—especially where, as here, the inmate did not reference the prison grievance process in his statement.

Representation by a lawyer is certainly not necessary to file an inmate grievance in the New York State Department of Corrections and Community Supervision, nor does such representation necessarily result in the filing of a grievance. Rather, such representation is most typically associated with the filing of a civil rights action in federal court (as is clear from the motions for appointment of counsel typically filed in federal court actions). As a result, the statement in question does not reasonably imply that Plaintiff would be filing a grievance as much as it implies that he was going to consult an attorney as to whether or not to file a civil rights action in federal court.

Here, such a statement is problematic. This is because, generally, the filing of the prisoner civil rights action in federal court in New York State must be preceded by the prisoner's exhaustion of his available administrative remedies (or his acquisition of a valid excuse for failing to exhaust those remedies). Any filing without such prior exhaustion (or acquisition of a valid excuse), under the circumstances, would be so wholly without merit as to be frivolous. Of course, filing a court action that is frivolous is not constitutionally protected activity.[FN11]

> [FN11](). See *Wade–Bey v. Fluery,* 07–CV–117, 2008 WL 2714450 at \*6 (W.D.Mich. July 8, 2010) ("Although it is well established that prisoners have a constitutional right of access to the courts ..., the filing of a frivolous lawsuit would not be protected activity.") [citation omitted].

Moreover, to the extent that Plaintiff's statement could be construed as reasonably implying that he was going to consult an attorney as to whether or not to file a grievance, the Court has trouble finding that such a vague statement is constitutionally protected.[FN12] As one district court has stated, "[h]oping to engage in constitutionally protected activity is not itself constitutionally protected activity."[FN13] The Court notes that a contrary rule would enable a prisoner who has committed conduct giving rise to a misbehavior report to create a genuine issue of material fact (and thus reach a jury) on a retaliation claim (alleging adverse action based on the issuance of that misbehavior report) simply by uttering the words, "I'm calling a lawyer," after he commits the conduct in question but before the misbehavior report is issued.

> [FN12](). The Court notes that numerous cases exist for the point of law that even *expressly threatening* to file a *grievance* does not constitutes protected activity. *See, e.g., Bridges v. Gilbert,* 557 F.3d 541, 554–55 (7th Cir.2009) ("[I]t seems implausible that a *threat* to file a grievance would itself constitute a First Amendment-protected grievance.") [emphasis in original]; *Brown v. Darnold,* 09–CV–0240, 2011 WL 4336724, at \*4 (S.D.Ill. Sept.14, 2011) ("Plaintiff cannot establish that his threat to file a grievance against Defendant Darnold is a constitutionally protected activity."); *Koster v. Jelinek,* 10–CV–3003, 2011 WL 3349831, at \*3, n. 2 (C.D.Ill. Aug.3, 2011) ("The plaintiff does not seem to be asserting that he had a First Amendment right to threaten the facilitators with lawsuits and grievances, nor does the Court believe that he has such a right."); *Ingram v. SCI Camp Hill,* 08–CV–0023, 2010 WL 4973302, at \*15 (M.D.Pa. Dec.1, 2010) ("Stating an intention to file a grievance is not a constitutionally protected activity."), *aff'd,* No. 11–1025, 2011 WL 4907821 (3d Cir. Oct.17, 2011); *Lamon v. Junious,* 09–CV–0484, 2009 WL 3248173, at \*3 (E.D.Cal. Oct.8, 2009) ("A mere threat to file suit does not rise to the level of a protected activity...."); *Miller v. Blanchard,* 04–CV–0235, 2004 WL 1354368, at \*6 (W.D.Wis. June 14, 2004) ("Plaintiff alleges that

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

defendants retaliated against him after he threatened to file a lawsuit against them. Inmates do not have a First Amendment right to make threats.").

FN13. *McKinnie v. Heisz,* 09–CV–0188, 2009 WL 1455489, at *11 (W.D.Wis. May 7, 2009) ("Hoping to engage in constitutionally protected activity is not itself constitutionally protected activity. At most, petitioner's actions could be construed as a 'threat' to assert his rights but that is not enough.").

In any event, even assuming, for the sake of argument, that Plaintiff's statement was constitutionally protected, the Court finds, based on the current record, that Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that his statement to Defendants Dinelle, Duckett, and Broekema that he would be contacting an attorney was a substantial or motivating factor for the issuance of the misbehavior report by Defendant Norton (which was signed by Defendant Dinelle as a witness), and the misbehavior report by Defendant Duckett (which was signed by Defendant DeLuca as a witness). The Court makes this finding for two alternate reasons.

**\*8** First, with regard to the misbehavior report issued by Defendant Norton, Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that she was aware Plaintiff would be contacting an attorney. In addition, with regard to the report made by Defendant Duckett (which was signed by Defendant DeLuca as a witness), although there is record evidence that Defendant Duckett had knowledge of Plaintiff's statement that he would contact an attorney, Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant Duckett had reason to believe, at the time the misbehavior report was issued, Plaintiff would actually follow through with his one-time oral statement, made on the heals of a heated incident.

Second, even assuming that Defendant Duckett or Defendant Norton had reason to believe Plaintiff would contact an attorney, Plaintiff has failed to adduce

admissible record evidence from which a rational factfinder could conclude that Defendant Duckett or Defendant Norton would not have issued the misbehavior report anyway, based on Plaintiff's actions. Indeed, at Plaintiff's disciplinary hearings, evidence was adduced that he in fact committed most of the misconduct alleged in the misbehavior reports, which resulted in the hearing officer finding multiple violations and sentencing Plaintiff to SHU.[FN14] Furthermore, those convictions were never subsequently reversed on administrative appeal.[FN15] As a result, no admissible record evidence exists from which a rational factfinder could conclude that Plaintiff has established the third element of a retaliation claim—the existence of a causal connection between the protected speech and the adverse action.

FN14. *See Hynes v. Squillance,* 143 F.3d 653, 657 (2d Cir.1998) (holding that defendants met their burden of showing that they would have taken disciplinary action on valid basis alone where the evidence demonstrated that plaintiff had committed "the most serious, if not all, of the prohibited conduct"); *Jermosen v. Coughlin,* 86–CV–0208, 2002 WL 73804, at *2 (N.D.N.Y. Jan.11, 2002) (Munson, J.) (concluding, as a matter of law, that defendants showed by a preponderance of the evidence that they would have issued a misbehavior report against plaintiff even in the absence of his complaints against correctional department personnel, because they established that the misbehavior report resulted in a disciplinary conviction, "demonstrat[ing] that plaintiff in fact committed the prohibited conduct charged in the misbehavior report.").

FN15. For these reasons, the Court finds to be inapposite the case that Plaintiff cites for the proposition that the Court must accept as true his sworn denial that he committed any of the violations alleged in the misbehavior reports issued against him. *See Samuels v. Mockry,* 142 F.3d 134, 135–36 (2d Cir.1998) (addressing a situation in which a prisoner was placed in a prison's "Limited Privileges Program," upon a finding rendered by the prison's Program Committee, that he had refused to accept a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

mandatory work assignment, *"without a hearing or a misbehavior report"* ) [emphasis added]. The Court would add only that, even if it were to accept Plaintiff's sworn denial as true, the Court would still find that he has failed to establish that Defendants Duckett and Norton would not have issued the misbehavior reports against him anyway, based on their subjective belief that he was acting in a disturbing, interfering, harassing and disobedient manner at the time in question (as evident from, *inter alia,* their misbehavior reports, the disciplinary hearing testimony of three of the Defendants, and admissions made by Plaintiff during his deposition regarding the "confusion" and "misunderstanding" that occurred during his examination by Defendant Norton, his persistent assertions about his prescribed frequency of visits, and his unsolicited comments about his proper course of treatment).

For each of these alternative reasons, Plaintiff's retaliation claim under the First Amendment is dismissed.

**B. Plaintiff's Claims Under the Eighth Amendment**

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of Plaintiff's Eighth Amendment claims because (1) Plaintiff has failed to adduce any admissible evidence from which a rational factfinder could conclude that Defendant Norton used any force against Plaintiff, or was in a position to intervene to prevent the use of force against Plaintiff, yet failed to do so, (2) Plaintiff has failed to adduce any admissible evidence from which a rational factfinder could conclude that Defendant Broekema had a reasonable opportunity to intervene and prevent the alleged assault by Defendants Dinelle, DeLuca and Duckett, yet failed to do so, and (3) Plaintiff's identification of Defendant DeLuca is "very tentative."

As an initial matter, because Plaintiff did not oppose Defendants' argument that his excessive-force claim against Defendant Norton should be dismissed, Defendants' burden with regard to this claim "is lightened such that, in order to succeed, they need only show the facial merit of their request, which has appropriately been characterized as a 'modest' burden." *Xu–Shen Zhou v.*

*S.U.N.Y. Inst. of Tech.,* 08–CV–0444, 2011 WL 4344025, at *11 (N.D.N.Y. Sept.14, 2011)* (Suddaby, J.). After carefully considering the matter, the Court finds that Defendants have met this modest burden, for the reasons stated by them in their memoranda of law. The Court would add only that, based on its own independent review of the record, the Court can find no record evidence to support the claim that Defendant Norton used force against Plaintiff, or was in a position to intervene to prevent the use of force against Plaintiff, yet failed to do so. As a result, Plaintiff's Eighth Amendment claim against Defendant Norton is dismissed.

**\*9** Turning to Plaintiff's failure-to-intervene claim against Defendant Broekema, it is undisputed that it was Defendants Duckett, Dinelle and DeLuca who used force against Plaintiff. Plaintiff testified that, while Defendant Broekema was in the room at the time, Defendant Broekema was standing behind Defendant Dinelle on his "immediate right." In addition, Plaintiff testified that Defendant Duckett's threat of physical force against Plaintiff was conditioned on Plaintiff's continued failure to comply with (what Plaintiff perceived to be) conflicting instructions by Defendants Duckett and Dinelle during the frisk. (Dkt. No. 24, Attach. 4, at 97–99.) Furthermore, Plaintiff testified that it was only after he failed to put his hands in his pockets (rather soon after being warned by Defendant Duckett) that either Defendant Duckett or Defendant Dinelle punched him *one time* with a "closed fist" in the side of his nose, causing him to immediately fall to the ground. (*Id.* at 98–99.) Finally, Plaintiff testified that the kicks that he suffered soon after falling to the ground were limited in nature, having occurred only "a couple of times," and indeed having only *possibly* occurred. (*Id.* at 99.)

While the Court in no way condones the conduct alleged in this action, the Court is simply unable to find, based on the current record, that Plaintiff has adduced sufficient admissible record evidence to reach a jury on his Eighth Amendment claim against Defendant Broekema. Rather, based on the evidence presented, a rational factfinder could only conclude that the use of force was simply too uncertain for a reasonable person in Defendant Broekema's position to expect; and it was too brief in nature to give Defendant Broekema a realistic opportunity

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

to intervene in it, so as prevent the one punch and possibly few kicks that Plaintiff presumably experienced.[FN16]

> FN16. *See* *O'Neill v. Krzeminski,* 839 F.2d 9, 11–12 (2d Cir.1988) (noting that "three blows [that occurred] in such rapid succession ... [is] not an episode of sufficient duration to support a conclusion that an officer who stood by without trying to assist the victim became a tacit collaborator"); *Blake v. Base,* 90–CV–0008, 1998 WL 642621, at *13 (N.D.N.Y. Sept.14, 1998) (McCurn, J.) (dismissing failure-to-intervene claim against police officer based on finding that the punch to the face and few body blows that plaintiff allegedly suffered "transpired so quickly ... that even if defendant ... should have intervened, he simply did not have enough time to prevent plaintiff from being struck"); *Parker v. Fogg,* 85–CV–0177, 1994 WL 49696, at *8 (N.D.N.Y. Feb.17, 1994) (McCurn, J.) (holding that an officer is not liable for failure-to-intervene if there "was no 'realistic opportunity' to prevent [an] attack [that ends] in a matter of seconds"); *see also* *Murray–Ruhl v. Passinault,* 246 F. App'x 338, 347 (6th Cir.2007) (holding that there was no reasonable opportunity for an officer to intervene when one officer stood by while another fired twelve shots in rapid succession); *Ontha v. Rutherford Cnty., Tennessee,* 222 F. App'x 498, 506 (6th Cir.2007) ("[C]ourts have been unwilling to impose a duty to intervene where ... an entire incident unfolds 'in a matter of seconds.' "); *Miller v. Smith,* 220 F.3d 491, 295 (7th Cir.2000) (noting that a prisoner may only recover for a correction's officer's failure to intervene when that officer "ignored a realistic opportunity to intervene").

Finally, based on the current record, the Court rejects Defendants' third argument (i.e., that Plaintiff's excessive-force claim against Defendant DeLuca should be dismissed because Plaintiff's identification of Defendant DeLuca is "very tentative"). Defendants argue that Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant DeLuca was present during the use of force

against Plaintiff (let alone that Defendant DeLuca used force against Plaintiff). This is because Plaintiff's basis for bringing his excessive-force claim against Defendant DeLuca is that he remembered being assaulted by three individuals, including Defendants Dinelle and Duckett, whose last names began with the letter "D." While this fact is undisputed, it is also undisputed that Defendant DeLuca was interviewed by the Inspector General's Office regarding his involvement in the incidents giving rise to Plaintiff's claims,[FN17] and that both Defendant Broekema's use-of-force report, and Defendant Broekema's Facility Memorandum, state that Defendant DeLuca participated in the use of force against Plaintiff.[FN18] Based on this evidence, a rational factfinder could conclude that Defendant DeLuca violated Plaintiff's Eighth Amendment rights. As a result, Plaintiff's Eighth Amendment excessive-force claim against Defendant DeLuca survives Defendants' motion for summary judgment. The Court would add only that, although it does not construe Plaintiff's Complaint as alleging that Defendant DeLuca failed to intervene in the use of force against Plaintiff, assuming, (based on Plaintiff's motion papers) that Plaintiff has sufficiently alleged this claim, the claim is dismissed because the entirety of the record evidence as it pertains to Defendant DeLuca establishes that he used force against Plaintiff.

> FN17. (Dkt. No. 27, Attach. 2, at 19–20.)

> FN18. (Dkt. No. 27, Attach. 2, at 10, 14.)

**C. Plaintiff's Claim Under the Fourteenth Amendment**

**\*10** As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of this claim because Defendants did not deprive Plaintiff of his liberty rights. As stated above in note 2 of this Decision and Order, Plaintiff failed to address Defendants' argument that his substantive due process claim should be dismissed. As a result, as stated above in Part III.B. of this Decision and Order, Defendants' burden with regard to this claim "is lightened such that, in order to succeed, they need only show the facial merit of their request, which has appropriately been characterized as a 'modest' burden." *Xu–Shen Zhou,* 2011 WL 4344025, at *11.

After carefully considering the matter, the Court finds

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

that Defendants have met this modest burden, for the reasons stated by them in their memoranda of law. The Court would add only that, based on its own independent review of the record, although the record evidence establishes that Plaintiff was confined in SHU for 150 days as a result of the misbehavior reports issued by Defendants Norton and Duckett, Plaintiff has failed to adduced admissible record evidence from which a rational factfinder could conclude that the conditions of his confinement during this 150–day period were more severe than normal SHU conditions.[FN19] As a result, Plaintiff's substantive due process claim is dismissed.

> FN19. *See* *Spence v. Senkowski,* 91–CV–0955, 1998 WL 214719, at \*3 (N.D.N.Y. Apr.17, 1998) (McCurn, J.) (finding that 180 days that plaintiff spent in SHU, where he was subjected to numerous conditions of confinement that were more restrictive than those in general population, did not constitute atypical and significant hardship in relation to ordinary incidents of prison life); *accord, Husbands v. McClellan,* 990 F.Supp. 214, 217–19 (W.D.N.Y.1998) (180 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Warren v. Irvin,* 985 F.Supp. 350, 353–56 (W.D.N.Y.1997) (161 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Ruiz v. Selsky,* 96–CV–2003, 1997 WL 137448, at \*4–6 (S.D.N.Y.1997) (192 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Horne v. Coughlin,* 949 F.Supp. 112, 116–17 (N.D.N.Y.1996) (Smith, M.J.) (180 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Nogueras v. Coughlin,* 94–CV–4094, 1996 WL 487951, at \*4–5 (S.D.N.Y. Aug.27, 1996) (210 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Carter v. Carriero,* 905 F.Supp. 99, 103–04 (W.D.N.Y.1995) (270 days in SHU under numerous conditions of confinement that

were more restrictive than those in general population).

**D. Defendants' Defense of Qualified Immunity**

As stated above in Part I.C. of this Decision and Order, Defendants seek dismissal of Plaintiff's claims on the alternative ground that they are protected from liability, as a matter of law, by the doctrine of qualified immunity, under the circumstances.

**1. Retaliation**

The doctrine of qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 [1982] ). Here, even assuming that Plaintiff's statement that he would contact an attorney regarding the use of force he experienced constitutes engagement in protected activity, and even also assuming that the only reason Defendant Norton and/or Duckett issued Plaintiff a misbehavior report was because he made this statement, these Defendants are, under the circumstances, entitled to qualified immunity. This is because the Court finds that the right to make this statement (without experiencing any resulting adverse action) was not a clearly established during the time in question (January 2009), based on a review of the relevant case law. *See, supra,* notes 12 and 13 of this Decision and Order.

As a result, Plaintiff's retaliation claim is dismissed on the alternate ground of qualified immunity.

**2. Excessive Force**

There is no doubt that the right to be free from the use of excessive force was "clearly established" at the time of the incidents giving rise to Plaintiff's claims. *See, e.g., Hudson v. McMillian,* 503 U.S. 1, 9–10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). Moreover, with regard to whether it was objectively reasonable for Defendants to use the alleged amount of force that they used, the Second Circuit has made clear that, "[w]here the circumstances are in dispute, and contrasting accounts present factual issues as to the degree of force actually employed and its

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

reasonableness, a defendant is not entitled to judgment as a matter of law on a defense of qualified immunity." *Mickle v. Morin,* 297 F.3d 114, 122 (2d Cir.2002) [internal quotation marks omitted].

**\*11** Here, after carefully reviewing the record, and construing it in the light most favorable to Plaintiff, the Court finds that, even if Defendants Dinelle, DeLuca and Duckett genuinely feared being assaulted by Plaintiff, and even if those three Defendants genuinely perceived Plaintiff's words and movements to constitute an attempt to resist a frisk, admissible record evidence exists from which a rational jury could conclude that those perceptions were not objectively reasonable under the circumstances. As the Second Circuit has observed, it is impossible to "determine whether [Defendants] reasonably believed that [their] force was not excessive when several material facts [are] still in dispute, [and therefore,] summary judgment on the basis of qualified immunity [is] precluded." *Thomas v. Roach,* 165 F.3d 137, 144 (2d Cir.1999).[FN20] For these reasons, the Court rejects Defendants' argument that Plaintiff's excessive-force claim should be dismissed on the ground of qualified immunity as it relates to Defendants Dinelle, DeLuca and Duckett.

> FN20. *See also Robison v. Via,* 821 F.2d 913, 924 (2d Cir.1987) ( "[T]he parties have provided conflicting accounts as to [who] initiated the use of force, how much force was used by each, and whether [the arrestee] was reaching toward [a weapon]. Resolution of credibility conflicts and the choice between these conflicting versions are matters for the jury and [should not be] decided by the district court on summary judgment.").

However, the Court reaches a different conclusion with regard to Plaintiff's failure-to-intervene claim against Defendant Broekema: the Court finds that, at the very least, officers of reasonable competence could disagree on the legality of Defendant Broekema's actions, based on the current record. As a result, Plaintiff's failure-to-intervene claim against Defendant Broekema is dismissed on this alternative ground.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion for partial summary judgment (Dkt. No. 24) is ***GRANTED*** in part and ***DENIED*** in part in the following respects:

(1) Defendants' motion for summary judgment on Plaintiff's First Amendment claim is ***GRANTED;***

(2) Defendants' motion for summary judgment on Plaintiff's Fourteenth Amendment substantive due process claim is ***GRANTED;***

(3) Defendants' motion for summary judgment on Plaintiff's Eighth Amendment excessive-force claim against Defendant Norton is ***GRANTED;***

(4) Defendants' motion for summary judgment on Plaintiff's Eighth Amendment failure-to-intervene claim against Defendant Broekema is ***GRANTED;*** and

(5) Defendants' motion for summary judgment on Plaintiff's Eighth Amendment excessive-force claim against Defendant DeLuca is ***DENIED;*** and it is further

**ORDERED** that the following claims are ***DISMISSED*** **with prejudice** from this action:

(1) Plaintiff's First Amendment claim;

(2) Plaintiff's Fourteenth Amendment substantive due process claim;

(3) Plaintiff's Eighth Amendment excessive-force claim against Defendant Norton; and

(4) Plaintiff's Eighth Amendment failure-to-intervene claim against Defendant Broekema; and it is further

**ORDERED** that Defendants Norton and Broekema are ***DISMISSED*** from this action; and it is further

**ORDERED** that, following this Decision and Order, the following claims remain pending in this action: Plaintiff's Eighth Amendment excessive-force claim against Defendants DeLuca, Dinnelle and Duckett; and it is further

**\*12 ORDERED** that counsel are directed to appear

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

on **JANUARY 4, 2012 at 2:00 p.m.** in chambers in Syracuse, N.Y. for a pretrial conference, at which counsel are directed to appear with settlement authority, and in the event that the case does not settle, trial will be scheduled at that time. Plaintiff is further directed to forward a written settlement demand to defendants no later than **DECEMBER 16, 2011,** and the parties are directed to engage in meaningful settlement negotiations prior to the 1/4/12 conference.

N.D.N.Y.,2011.

Henry v. Dinelle
Slip Copy, 2011 WL 5975027 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York
State Department of Correctional Services; Peter J.
Lacy, Superintendent at Bare Hill Corr. Facility;
Wendell Babbie, Acting Superintendent at Altona Corr.
Facility; and John Doe, Corrections Officer at Bare Hill
Corr. Facility, Defendants.
**No. 97-CV-1385 LEK DRH.**

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst.
Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on August 21, 1998 by the
Honorable David R. Homer, Magistrate Judge, pursuant to
28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern
District of New York.

No objections to the Report-Recommendation have been
raised. Furthermore, after examining the record, the Court
has determined that the Report-Recommendation is not
clearly erroneous. See Fed.R.Civ.P. 72(b), Advisory

Committee Notes. Accordingly, the Court adopts the
Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without
prejudice as to the unserved John Doe defendant pursuant
to Fed.R.Civ.P. 4(m), and the action is therefore dismissed
in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER [FN1]

FN1. This matter was referred to the undersigned
pursuant to 28 U.S.C. § 636(b) and
N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of
Correctional Services ("DOCS"), brought this pro se
action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that
while incarcerated in Bare Hill Correctional Facility
("Bare Hill") and Altona Correctional Facility ("Altona"),
defendants violated his rights under the Eighth and
Fourteenth Amendments.[FN2] In particular, plaintiff alleges
that prison officials maintained overcrowded facilities
resulting in physical and emotional injury to the plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

and failed to provide adequate medical treatment for his injuries and drug problem. Plaintiff seeks declaratory relief and monetary damages. Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. *Id.* at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. *Id.* at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. *Id.* at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. *Id.* at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. *Id.* at ¶¶ 22, 27-28.

II. Motion to Dismiss

**\*2** When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from these facts in favor of the plaintiff. *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Staron v. McDonald's Corp.,* 51 F.3d 353, 355 (2d Cir.1995) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

III. Discussion

A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Rhodes v. Chapman,* 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. *Farmer,* 511 U.S. at 837.

1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl.,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes,* 452 U.S. at 347-48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver,* 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord,* 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn,* 110 F.3d 520, 524 (7th Cir.1997)).

**\*3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare Ingalls v. Florio,* 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and Zolnowski v. County of Erie,* 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with Harris v. Murray,* 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare

Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer,* 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer,* 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,* 524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

**\*4** Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

### B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware* that there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d

Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at \*3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at \*3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

### IV. Failure to Complete Service

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

### V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v.*

*Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

2016 WL 1253684
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jesse J. Miller, Plaintiff,

v.

Dr. Subbarao Ramineni; et al., Defendants.

No. 9:14-CV-1351 (DNH/CFH)
|
Signed 02/29/2016

**Attorneys and Law Firms**

JESSE J. MILLER, 12–B–0543, Fishkill Correctional
Facility, P.O. Box 12508, Beacon, N.Y. 12508–0307,
Plaintiff Pro Se.

HON. ERIC T. SCHNEIDERMAN, Attorney General
for the State of New York, The Capitol, OF COUNSEL:
NICOLE HAIMSON, ESQ, Assistant Attorney General,
Albany, New York 12224–0341, Attorney for Defendants.

**REPORT–RECOMMENDATION AND ORDER** [1]

CHRISTIAN F. HUMMEL, U.S. MAGISTRATE
JUDGE

**\*1** Plaintiff *pro se* Jesse J. Miller ("Miller"), an
inmate currently in the custody of the New York State
Department of Corrections and Community Supervision
("DOCCS"), brings this action pursuant to 42 U.S.C. §
1983 alleging that defendants Dr. Ramineni, R.N. Wayne
Visallr, Correction Officers Wiggins and Barker, and
John Doe(s) # 1–13, Correction Officers at Mid–State
Correctional Facility (collectively "defendants," where
appropriate), violated his constitutional rights under the
Eighth Amendment. Am. Compl. (Dkt. No. 13) at 1–
5. Presently pending is defendants' motion to dismiss
pursuant to Federal Rule of Civil Procedure ("Fed. R.
Civ.P.") 12(b)(6). Dkt. No. 24–1. Miller did not oppose. [2]
For the reasons that follow, it is recommended that
defendants' motion be granted.

### I. Background

The facts are reviewed in the light most favorable to
the non-moving party. At all relevant times, Miller was
incarcerated at Mid–State. Miller claims that defendants
violated the Eighth Amendment by denying him access to
proper medical care. Am. Compl. at Dk. No. 13 at 20–21.

### A. Facts [3]

The events giving rise to Miller's claim occurred between
March and April of an unspecified year [4] during his
incarceration at Mid–State Correctional Facility ("Mid–
State"). *See generally* Am. Compl. Sometime on March
17, Miller noticed that his acne had become sore, and he
submitted a request for sick call that evening. Am. Compl.
at ¶ 1. On March 18, at approximately 6:30 AM, Miller
went on sick call and was provided with cream. *Id.* at ¶ 2.

**\*2** One week later, on March 25, Miller developed a
"bump" under his right arm pit, causing "a little pain,
but not too serious." Am. Compl. at ¶ 3. On March 26,
Miller informed Officer Wiggins that the "bump" under
his arm was causing severe pain and numbness in his arm
and requested emergency sick call, which Wiggins denied.
*Id.* at ¶ 4. Later that day, Miller made two similar requests
to John Doe # 1 and John Doe # 2, correction officers,
which were also denied. *Id.*

On March 27, Miller explained to John Doe # 3, a
correction officer, that he was experiencing severe pain
and numbness in his arm resulting from the "bump" and
requested emergency sick call, which was denied. Am.
Compl. at ¶ 5. Later that morning, while attending his
masonry vocational class, Miller's teacher noticed the
bump and that Miller was unable to perform his work
due to the pain that he was experiencing. *Id.* Miller's
teacher arranged for him to be seen at emergency sick call.
*Id.* R.N. Visallr examined Miller at emergency sick call
later that day and documented that Miller had impaired
mobility, swelling, and redness on his right arm and that
his bicep had swollen three (3) to four (4) inches into
his right arm pit. *Id.* R.N. Visallr diagnosed Miller with
cellulitis, prescribed him 500mg of the antibiotic Keflex,
and instructed him to return to sick call if the symptoms
worsened. *Id.* Between March 28 to April 3 the bump
remained relatively unchanged and Miller's diminished
ability to engage in physical activity continued. *Id.* at ¶ 6.

On March 29, while working at his cleaning job at the infirmary, Miller explained to Officer Barker that he was unable to work due to the pain that he was experiencing and requested consultation with one of the nurses. Am. Compl. at ¶ 7. Officer Barker denied Miller's request and told him to sit down rather than work. *Id.* On April 3, Miller's bump became more painful, rendering him unable to eat or sleep and impairing his mobility. *Id.* at. ¶ 8. Miller described his symptoms to John Doe # 5 and requested emergency sick call, which was denied. On April 4, Miller explained his symptoms to John Does # 6, # 7, and # 8, and made requests for emergency sick call, which we're all denied. *Id.* at ¶ 9. The bump "popped" over night. *Id.* at ¶ 10. By the next morning, April 5, the bump "started to feel better," and by that night the bump "went down in size and started to feel better." By the morning of April 6, the bump was "going away." *Id.* at ¶ 11.

While showering on April 6, Miller "pressed on [his] left upper chest while washing" and experienced "a pain." Am. Compl. at ¶ 11. Miller noticed a "little bump" on his chest that was slightly larger than a pimple, which he "paid no attention to," since he "normally" ... get[s] acne on [his] chest. *Id.* Over the course of the day, the "bump" became red and swollen. *Id.* Miller requested emergency sick call, which was denied by John Does # 9 and # 10. *Id.* On April 7, the bump became "even worse" and Miller requested emergency sick call from the "am, pm and evening officers," which was again denied. *Id.* at ¶ 12.

On April 8, Miller went to emergency sick call where he was seen by Nurse P. Reese [5] at 7:45 AM, and then by Dr. Ramineni at 10:00 AM. Am. Compl. at ¶ 13. Dr. Ramineni increased Miller's antibiotic dosage, noted that Miller had no drainage or fever, and instructed him to return if the bump became worse. *Id.* Dr. Ramineni examined the bump by looking at it, but did not perform any additional "tests," and told Miller to return if it worsened. *Id.* On April 9, the bump swelled, his pain increased, and Miller felt sick, feverish, and had difficulty moving. *Id.* at ¶ 14. Miller explained his condition and requested emergency sick call from correction officers John Does # 11, 12, and 13; all requests were denied. *Id.* Miller asserts that "one officer told me [the] only way to emergency sick call was if I was dying or bleeding to death." *Id.* Miller does not specify which officer made this statement.

**\*3** On April 10, Miller went to emergency sick call and saw Nurse Santamour. [6] Am. Compl. at ¶ 15. Miller was

then brought to St. Elizabeth's hospital in Utica, where he was seen by a physician and admitted for observation. *Id.* On April 13, Miller was diagnosed with Methicillin-resistant staphylococcus aureus ("MRSA") and moved into an isolation room at the hospital. *Id.* at ¶ 18. Miller returned to Mid–State on April 15, where he was admitted to the infirmary and continued on his antibiotic treatment. *Id.* at ¶ 19. On April 23, Miller was placed on a nasal ointment. *Id.* at ¶ 20. On April 26, Miller was discharged from the infirmary into general population and remained on antibiotics and nasal ointment treatment. *Id.* at ¶ 21. On April 24, Dr. Mannava, a Mid–State physician, cleared Miller of MRSA. *Id.* at ¶ 22. [7]

## II. Discussion

### A. Legal Standard [8]

A plaintiff's claim can be dismissed for failure to state a claim under FED. R. CIV. P. 12(b)(6) if the court finds that " 'it appears beyond doubt that the plaintiff can prove no set off acts in support of his claim which would entitle him to relief.' " *Davis v. Goord,* 320 F.3d 346, 350 (2d Cir. 2003) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957)). To defeat a motion to dismiss, a claim must include "facial plausibility ... that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556 (2007) (explaining that the plausibility test "does not impose a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]."); *see also Arar v. Ashcroft,* 585 F.3d 559, 569 (2d Cir. 2009) (holding that, "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible ....") (citations omitted)).

Still, "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Twombly,* 550 U.S. at 555 (citations omitted). Although a complaint attacked under the standard set forth in Rule 12(b)(6) does not require detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires

more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* These factual allegations must raise the possibility of relief above a "speculative level" and are based on "the assumption that all of the complaint's allegations are true." *Id.*

When, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated

> [t]here are many cases in which we have said that a *pro se* litigant is entitled to special solicitude, ... that a *pro se* litigant's submissions must be construed liberally, ... and that such submissions must be read to raise the strongest arguments that they suggest..... At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not consistent with the *pro se* litigant's allegations, ... or arguments that the submissions themselves do not suggest, ... that we should not excuse frivolous or vexatious filings by *pro se* litigants ... and that *pro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law

> **\*4** ....

*Id.* (citations, internal quotation marks, and footnote omitted) (internal quotations omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, ... a court is obliged to construe his pleadings liberally.' ") (citation omitted).

### B. Eighth Amendment Medical Indifference

The Eighth Amendment proscribes the infliction of "cruel and unusual punishments" upon those convicted of crimes, "which includes punishments that involve the unnecessary and wanton infliction of pain." U.S. CONST. amend. VIII; *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir. 1994) (citing *Gregg v. Georgia,* 428 U.S. 153, 173 (1976)). The unnecessary and wanton infliction of pain includes deliberate indifference to a prisoner's serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). "In order to establish an Eighth Amendment claim arising

out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Estelle,* (429 U.S. at 104)). The deliberate indifference standard consists of both an objective and subjective component. *Hathaway,* 37 F.3d at 66. The objective component requires that the plaintiff's alleged medical need be "sufficiently serious." *Id.* The subjective component requires the plaintiff to demonstrate that the defendant has acted with a "sufficiently culpable state of mind." Id.

### 1. Objective Prong

As a threshold matter, in order for a prisoner to state a cognizable claim of deliberate indifference, he must make a showing of serious illness or injury. *Smith v. Carpenter,* 316 F.3d 178, 184 (citation omitted). A "sufficiently serious" medical need is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway,* 37 F.3d at 66 (quoting *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J., dissenting)). As there is no bright-line rule to determine whether a condition is sufficiently serious, the Second Circuit has identified several factors that are highly relevant to the inquiry, including: "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.' " *Brock v. Wright,* 315 F.3d 158, 163–63 (2d Cir. 2003) (citing *Chance,* 143 F.3d at 702 (internal citation omitted)).

Here, construing Miller's complaint liberally to raise the strongest arguments that it suggests, it can be inferred that Miller alleges that he experienced severe pain and that his daily activities were affected as a result of his skin condition. *Triestman,* 470 F.3d at 477; Am. Compl. at ¶ 20–22.

Miller alleges that he experienced increased irritation stemming from recurring acne, which apparently developed into cellulitis and eventually MRSA. *See* Am Compl. at ¶ 1, 5, 18. The record demonstrates that Miller tested positive for MRSA. *Id.* at ¶ 18. Several courts have concluded that MRSA constitutes a sufficiently serious medical condition. *See Washington v. Westchester County Dep't of Corr.,* No. 13–CV–5322, 2014 WL 1778410,

at *5 (S.D.N.Y. Apr. 25, 2014) (holding that MRSA constitutes a serious medical condition since it is capable of causing death, degeneration, or extreme pain); *Gaines v. Armor Health Care, Inc.,* No. 12–CV–5663, 2013 WL 6410311, at *5 (E.D.N.Y. Dec. 9, 2013) (indicating that the plaintiff's MRSA infection constituted a sufficiently serious medical condition); *Wargula v. Erie County Sheriff Dept.,* No. 08–CV–00280, 2010 WL 376402, at *4–5 (W.D.N.Y. Jan. 25, 2010) (assuming that the plaintiff's MRSA infection constituted a sufficiently serious medical condition). Accordingly, Miller has plausibly pleaded the objective requirement for establishing a claim of deliberate medical indifference. *Hathaway,* 37 F.3d at 66.

## 2. Subjective Prong

**\*5** A prison official acts with a sufficiently culpable state of mind when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837 (N.D.N.Y 1999). Non-medical prison personnel engage in deliberate indifference where they "intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problem known to the attendant prison personnel." *See Baumann v. Walsh,* 36 F.Supp.2d 508, 512 (N.D.N.Y. 1999); *see also Estelle,* 428 U.S. at 104–05 (noting that deliberate indifference may be manifested when prison guards intentionally deny or delay access to medical care).

However, "[a] difference of opinion between an inmate and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference." *Adams v. Rock,* 12–CV–1400 (GLS/ATB), 2015 WL 1312738, at *7 (N.D.N.Y. Mar. 24, 2015) (citing *Chance,* 143 F.3d at 703). "Thus, disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a Section 1983 claim." *Baumann,* 36 F.Supp.2d at 512. Courts have held that, where a plaintiff receives appropriate treatment for a skin infection, which later develops into MRSA, a plaintiff will not be able to establish deliberate indifference to serious medical needs where the plaintiff offers no allegations of the acts or omissions in his care and treatment that resulted in him contracting MRSA. *See*

*Maldonado v. Wells,* 9:12–CV–1290 (LEK/CFH), 2015 WL 3455215, at *8 (N.D.N.Y. May 28, 2015); *Wargula,* 2010 WL 376402, at *5.

### a. Corrections Officer Wiggins [9]

Miller visited sick call on March 18 and was placed on cream after his acne became sore. Am. Compl. at ¶ 1–2. On March 25, Miller discovered a "lump" that was developing under his right arm pit. *Id.* at ¶ 3. Then, on March 26, Miller explained to Wiggins the details of his March 18 sick call visit, that a "lump" had developed under his arm pit, that he was in "severe pain," that his arm was numb, and requested emergency sick call. *Id.* at ¶ 4. Miller alleges that, despite "knowing all this," Wiggins denied his request for emergency sick call. *Id.*

First, even assuming that Wiggins was fully informed of this information, Miller does not state a plausible claim that Wiggins knew of and disregarded an "excessive risk" to Miller's health. *Farmer,* 511 U.S. at 837. Miller's request to Wiggins for emergency sick call on March 26 pre-dates Miller's diagnosis of cellulitis and MRSA. *See* Am. Compl. at ¶ 4, 5, 18. Thus, at the time of the request, Miller could have only relayed to Wiggins that he had acne and a sore lump. Am Compl. at ¶ 1–4, 5, 18. Courts have generally held that skin conditions similar to acne are not considered "serious medical conditions." *See,* e.g., *Reid v. Nassau Cnty. Sherif's Dep't,* No. 13–CV–1192, 2014 WL, 4185195, at *20 (E.D.N.Y. Aug. 20, 2014) (holding that an inmate's persistent skin rash and infection did not constitute a "serious medical need."); *Samuels v. Jackson,* No. 97–CV–2420, 1999 WL 92617, at *2–3 (S.D.N.Y. Feb. 22, 1999) (holding that scabies, causing open sores and scarring, did not constitute a "serious medical condition." Thus, as Miller was not yet diagnosed with anything beyond acne at the time he asked Wiggins for sick call, Wiggins would not have reasonably inferred that denying Miller's request would result in a "substantial risk of harm" to Miller's health or safety. *Farmer,* 511 U.S. at 837; Am Compl. at ¶ 2.

**\*6** Moreover, Miller was seen at sick call the following day, diagnosed with cellulitis, and was given an antibiotic. Am. Compl. at ¶ 5. Causing a one-day wait for medical treatment does not constitute deliberate indifference. *See Allen v. Ford,* 880 F.Supp.2d 407, 411 (W.D.N.Y.2012) (finding no medical indifference where the inmate's

request for emergency sick call was denied but the inmate was seen at sick call, pursuant to an appointment, the following day). Further, plaintiff does not demonstrate that this delay was intentional. *Estelle,* 429 U.S. at 104–05 (holding that, to demonstrate deliberate indifference, a plaintiff must show that defendant intentionally delayed medical care or infringed access to prescribed treatment). Accordingly, Miller fails to state a plausible claim for relief against Wiggins, as he does not plausibly allege that Wiggins had knowledge of a serious risk of that could result in denying such request

### b. Corrections Officer Barker [10]

On March 29, while working on his cleaning job, Miller explained to Barker, his supervising officer, that he was unable to work due to the pain caused by his cellulitis. Am. Compl. at ¶ 7. Miller asked Barker to see one of the nurses at the infirmary. *Id.* Barker denied this request and instead told Miller to sit down and rest. *Id.*

Miller fails to plausibly allege that Barker was deliberately indifferent to his serious medical needs. Miller explicitly concedes in his amended complaint that, between March 28 and April 3, the pain and redness resulting from the bump remained unchanged. Am. Compl. at ¶ 6. Therefore, even assuming that Barker was fully informed of Miller's diagnosis of cellulitis from the March 27 sick call visit, Miller admits that his condition did not worsen due to this denial. *Allen,* 880 F.Supp.2d at 411; *Id.* at ¶ 6, 7. Additionally, other than his March 29 request to Barker, Miller made no further requests for medical attention until April 3. *Id.* at ¶ 7–8. Although a delay in medical care can demonstrate deliberate indifference, the plaintiff "must show that substantial harm resulted from the delay itself." *Colon v. Plescia,* No. 07–CV–727 (DNH/DEP), 2009 WL 2882944, at *4 (N.D.N.Y. July 27, 2009). However, plaintiff provides that the bump on his arm improved – by April 5, "the lump popped and started to feel better that morning." *Id.* at ¶ 10. Thus, Miller fails to plausibly allege that Barker's denial of his request to see nurse amounts to deliberate indifference.

### c. Medical Professionals: Visallr and Ramineni [11]

Miller alleges that R.N. Visallr and Dr. Ramineni's provision of medical care constitutes deliberate indifference, causing his condition to escalate into MRSA, a more threatening illness. Am. Compl. at 5, 13, 20–21.

#### i. Visallr

On March 27, R.N. Visallr examined Miller at sick call, diagnosed him with cellulitis, and placed him on the antibiotic Keflex. Am. Compl. at ¶ 5. Miller's bump remained unchanged between March 28 and April 3. *Id.* at ¶¶ 6–8. Miller made one request to see a nurse on March 29, but made no other requests until April 3. *Id.* Miller's condition improved when the bump popped on the night of April 4, and began to "go[ ] away." *Id.* at ¶ 11. Miller did not request medical attention until the afternoon of April 6, which was for a different bump. *Id.* On April 8, Miller went back to sick call, where he was seen by R.N. Reese at 7:45 AM, and again by Dr. Ramineni at 10:00 AM, who examined Miller's bump and increased the antibiotic R.N. Vass.ir had initially prescribed. *Id.* at % 5, 13. According to Miller, Dr. Ramineni increased the antibiotic "obviously knowing it was not working." Am. Compl. at. Additionally, Miller alleges that Dr. Ramineni only looked at his bump, without performing any "tests," and that the doctor reported that Miller had "no drainage or fever which was false." *Id.* Following Miller's return to Mid–State after his visit to St. Elizabeth's hospital, Dr. Ramineni ordered a nasal culture. *Id.* at % 21.

**\*7** Construing Miller's amended complaint liberally to raise the strongest arguments that it suggests, the only viable allegation that can be construed against R.N. Vissalr is that his diagnosis of cellulitis on May 28 was erroneous. *Triestman,* 470 F.3d at 477; Am. Compl. at % 5. However, even if R.N. Visallr's diagnosis were incorrect, it would constitute, at most, negligence or malpractice, which, without culpable recklessness – acts or omissions that evidence conscious disregard for a substantial risk of harm –does not establish an Eighth Amendment violation. *Wargula,* 2010 WL 376402, at *5; *Chance,* 143 F.3d at 703. R.N. Visallr's course of action in treating Miller at sick call and prescribing antibiotics for his skin condition fails to demonstrate culpable recklessness, as Visallr promptly addressed Miller's condition and provided appropriate medication for the illness he believed to be present. *Chance,* 143 F.3d at 703; THE MERCK MANUAL OF DIAGNOSIS AND THERAPY 694–95 (Robert S.

Porter, MD, et al. eds., 19th ed. 2011) (noting that antibiotic treatment is appropriate for cellulitis); *See Wargula,* 2010 WL 376402, at *5); Am. Compl. at ¶ 5. Thus, Miller fails to plausibly allege that R.N. Visallr's treatment amounts to deliberate indifference.

### ii. Dr. Ramineni

Miller's allegations against Dr. Ramineni fare no better. Miller's amended complaint seemingly alleges that Dr. Ramineni did not adequately examine the bump, incorrectly documented his condition, and improperly continued and raised his prescription of Keflax. Am. Compl. Am. Compl. at 13. Similar to his allegations against R.N. Visallr, Miller alleges, at most, negligence or malpractice, but fails to allege culpable recklessness. *Wargula,* 2010 WL 376402, at *5; *Chance,* 143 F.3d at 703; Am Compl. at ¶ 13. Miller demonstrates only that Dr. Ramineni adequately examined his cellulitis and made the discretionary, medical judgment to increase his antibiotic dose. *See Church v. Hegstrom,* 416 F.2d 449, 450–51 (2d Cir. 1969) (noting that medical professionals have discretion when treating prisoners); *Mendoza v. McGinnis,* No. 05–CV–1124T(JM/DEP), 2008 WL 4239760, at *11 (N.D.N.Y. Sept. 11, 2008) (concluding that determinations made by medical professionals exercising their discretion are presumptively correct when they concern the care of patients); THE MERCK MANUAL OF DIAGNOSIS AND THERAPY 694–95 (stating that the proper diagnostic technique for cellulits is examination; cultures are generally not indicated as they rarely identify the infecting organism.). Thus, the fact that Miller believes that Dr. Ramineni should have performed different or alternative treatments or examined him differently, does not amount to an Eighth Amendment violation. *Chance,* 143 F.3d at 703 ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim.").

The same general analysis applies to Miller's allegation that Dr. Ramineni either erroneously documented that Miller had no drainage or fever or erroneously failed to check whether Miller had drainage or fever. *See* Am. Compl. at ¶ 13. Even assuming Dr. Ramineni incorrectly documented Miller's condition, Dr. Ramineni's discretionary approach enjoys the presumption of validity, and Miller's mere disagreement does not amount to a claim of deliberate indifference.

*Church,* 416 F.2d at 450–51; *Mendoza,* 2008 WL 4239760, at *11; *Chance,* 143 F.3d at 703; Am. Compl. at ¶ 13.

### iii. MRSA as a result of Nurse Visallar and Dr. Ramineni's Care

Insofar as Miller alleges that he developed MRSA as a result of R.N. Visallr and Dr. Ramineni's inadequate medical care, he again fails to plausibly state a claim of deliberate indifference. Courts have held that, where an inmate is appropriately treated for a skin infection, which later develops into MRSA, deliberate indifference to serious medical needs will not be established. *See, e.g., Wargula,* 2010 WL 376042, at *4–5. In *Wargula,* an inmate who was experiencing pain from a skin infection was initially seen at sick call and prescribed an antibiotic *Id.* at *3. The inmate was reevaluated and his was medication adjusted after experiencing further symptoms approximately a week after his initial sick call and diagnosis. *Id.* at *4. Two days after his last sick call, the inmate was taken to the hospital where medical professionals diagnosed MRSA. *Id.* at *4. Based on these facts, the Court held that, "rather than suggesting indifference, the record demonstrates that plaintiff's complaints were addressed" and that the "infection was timely treated and diagnosed." *Id.* at *5.

**\*8** Here, Miller was seen at sick call and prescribed an antibiotic after experiencing pain resulting from his skin infection. Am. Compl. at ¶ 5. He was reevaluated and his medication was adjusted after experiencing further symptoms approximately a week after his initial visit and diagnosis. Am. Compl. at ¶ 13. Finally, three days after his last sick call visit at Mid–State, Miller was taken to St. Elizabeth's Hospital, where his MRSA infection was diagnosed and treated. Am. Compl. at ¶¶ 13–16. Miller's amended complaint demonstrates that his medical situation was addressed and that his MRSA infection was timely diagnosed and treated. *Wargula,* 2010 WL 376042, at *5; Am. Compl. at 5, 13–16. Therefore, Miller fails to plausibly allege a claim of deliberate indifference to his serious medical needs. *See Maldonao,* 2015 W L 3455215, at *8 (holding that the plaintiff failed to establish deliberate indifference where he defendants prescribed antibacterial and pain medication, scheduled him for follow up visits, and changed the dressings on his wound, as the defendants "took sufficient measures to avoid the risk of harm posed by the presence of MRSA in [the

plaintiff's] incisional wound."); *Sheils v. Flynn,* No. 9:06–CV–407, 2009 WL 2868215, at *18 (N.D.N.Y. Sept. 2, 2009) (holding that the defendants' failure to immediately diagnose the plaintiff's lesion, although it may amount to medical malpractice, did not amount to deliberate indifference where the plaintiff received frequent medical care and was prescribed various medications).

### d. John Doe Defendants

### i. John Does # 1, 2, and 3

On March 26 – the same day that Officer Wiggins denied Miller's emergency sick call request – John Does # 1 and # 2 also denied him sick call. Am. Compl. at ¶ 4. Miller allegedly informed John Does # 1 and # 2 about his March 18 sick call visit where he was provided with cream for his sore acne and explained that the bump under his arm had increased in pain and size since his earlier request to Wiggins. *Id.* at ¶ 1–4.

On March 27, the morning after Miller had been denied sick call by Wiggins and John Does # 1 and # 2, he requested sick call from John Doe # 3, which John Doe # 3 denied. Am. Compl. at ¶ 5. Miller informed John Doe # 3 of his March 18 sick call appointment, his acne, and that the lump under his arm had increased in size and pain. Am. Compl. at ¶ 1–5.

For the reasons that Miller's claim against Officer Wiggins fails to plausibly allege a claim of medical indifference, his claim against John Does # 1,# 2, and # 3 also fails. Even assuming that John Does # 1,# 2, and # 3 were completely apprised of Miller's condition, Miller does not state a plausible claim that John Does # 1, # 2, and # 3 knew of and disregarded an excessive risk' to Miller's health. *Farmer,* 511 U.S. at 837. Like Miller's request to Wiggins, his requests to John Does # 1 and # 2 on March 26 pre-date his diagnosis of cellulitis and MRSA. *See* Am. Compl. at ¶ 4, 5, 18. Therefore, Miller could only have informed John Does # 1, # 2, and # 3 that he had acne and a sore lum p. Am Compl. at ¶ 1–4, 5, 18. As mentioned, courts have generally held that skin conditions similar to acne are not considered "serious medical conditions." *See supra* II(b)(2)(a). Thus, since Miller was not yet diagnosed with any medical condition beyond acne at the time of his requests for sick calls, officers John Does # 1, # 2, and # 3 would not have reasonably inferred that denying Miller's

requests would result in a "substantial risk of harm" to Miller's health or safety. *Farmer,* 511 U.S. at 837; Am. Compl. at ¶ 2

Moreover, Miller was seen by medical staff the day after he made his request to John Does # 1 and # 2 – and just hours after his request to John Doe # 3 –was diagnosed with cellulitis, and was provided an antibiotic. Am. Compl. ¶ 5. A one-day wait for medical treatment will not constitute deliberate indifference where the inmate was not in any risk from the delay. *See Allen,* 880 F.Supp. at 411; Am. Compl. at ¶ 5. Further, Miller does not demonstrate that John Does # 1, # 2, and # 3 intentionally delayed his treatment as a form of punishment. *Estelle,* 429 U.S. at 104–105. Accordingly, Miller's claims against John Does # 1, # 2, and # 3 fail to state a plausible claim for relief.

### ii. John Does # 4, # 5, # 6, # 7, and # 8

Miller was seen at sick call on March 27, diagnosed with cellulitis, and provided with the antibiotic Keflex. Am. Compl. at ¶ 5. The pain and redness resulting from the bump under his arm remained unchanged between March 28 and April 3. *Id.* at ¶ 6. After his request on March 29, Miller made alleges no requests for medical attention until April 3. *Id.* at ¶ 7–8. On April 3, Miller allegedly explained to John Does # 4 and # 5 that he had been diagnosed with cellulitis, was prescribed an antibiotic, that he was in "lots of pain," and requested sick call, which John Does # 4 and # 5 denied. *Id.* at ¶ 5, 8. Further, on April 4, John Does # 6, # 7, and # 8 denied his requests for sick call after Miller had explained his medical situation. *Id.* at ¶ 9.

**\*9** Miller fails to plausibly allege that John Does # 4—# 8 were deliberately indifferent to his serious medical needs. A mere delay in medical care, without more, is insufficient to demonstrate deliberate medical indifference. *See Colon,* 2009 WL 2882944, at *7. Rather, a plaintiff must show that substantial harm resulted from the delay. *Id.* Here, Miller fails to show that he suffered any substantial harm resulted from any delay in treatment caused by John Does # 4–# 8. *Colon,* 2009 WL 288294, at *7; Am. Compl. at ¶ 8. In fact, Miller's amended complaint shows that his medical condition actually improved very shortly after he made his sick call requests –as early as the night of April 4, but no later than April 5 – as the bump under his arm popped and felt better. *See* Am. Compl. at ¶ 10. Additionally,

according to Miller, John Doe # 4 and # 5 knew that he was receiving antibiotic treatment for his cellulitis. *See* Am. Comlp. at ¶ 8. Thus, these defendants would not have reasonably inferred that denying Miller's request for sick call would result in any substantial risk of harm to Miller's health or safety, as Miller allegedly informed the two officers that he was already receiving treatment for his skin condition. *Farmer,* 511 U.S. at 837; Am. Compl. at ¶ 8.

Accordingly, Miller's amended complaint fails to plausibly allege that John Doe # 4, # 5, # 6, # 7, or # 8 acted with deliberate indifference toward his serious medical needs.

### iii. John Does # 9 and # 10

On April 4 or 5, the lump under Miller's arm popped, felt better, and decreased in size throughout the day on April 5. Am. Compl. at ¶ 3, 10. On April 6, while showering, Miller noticed a "little bump" on his chest. *Id.* at 11. By the afternoon of April 6, the new bump increased in size, became red and swollen, and caused Miller "a lot of pain." *Id.* Miller explained his symptoms and medical situation and requested emergency sick call from John Does # 9 and # 10, which they denied. *Id.* On April 8, Miller was seen at sick call at 7:45 AM by R.N. Reese and again at 10:00 AM by Dr. Ramineni, who increased his dosage of Keflex. *Id.* at 13.

Miller fails to plausibly allege a claim of medical indifference against John Does # 9 and # 10. Even assuming that Miller had fully explained his medical situation to John Does # 9 and # 10, as he claims, they would not have reasonably inferred that there was a substantial risk of harm to Miller's health, because if Miller had fully informed these defendants of his medical condition, as he alleges to have done, such information would necessarily include the fact that he was prescribed antibiotics for his skin condition. *Farmer,* 511 U.S. at 837; Am. Compl. at ¶ 11. Thus, John Does # 9 and # 10 would be under the impression that his condition was being actively treated. Additionally, Miller was seen at sick call at 7:45 AM on April 8, less than two days after John Does # 9 and # 10 denied his request, and there is no indication that Miller suffered substantial harm as a result of this wait. *See Colon,* 2009 WL 288294, at *7; Am. Compl. at ¶ 11, 13. Thus, Miller fails to plausibly allege

a claim of deliberate indifference against John Does # 9 and # 10.

### vi. John Does # 11, # 12, and # 13

On April 8, Miller visited sick call and his antibiotic was increased. Am. Compl. at ¶ 13. On April 9, Miller alleges that the bump became more swollen and painful, resulting in decreased mobility and causing him to feel feverish. *Id.* at 14. Miller alleges that he requested emergency sick call from John Does # 11, # 12, and # 13, and his requests were denied. *Id.* Again, Miller alleges that these officers denied emergency sick call "knowing" all of the details of his medical condition. *Id.* Further, Miller alleges that one of these three officers told him that the only way to get an emergency sick call was if he was "dying or bleeding to death." *Id.* Miller does not identify which officer made this statement. *Id.* The following day, April 10, Miller was seen at emergency sick call and later brought to St. Elizabeth's Hospital. *Id.* at 15. On April 13, Miller was moved into isolation at St. Elizabeth's due to his MRSA diagnosis. *Id.* at 18.

**\*10** "[W]here ... a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation' " constitutes deliberate indifference." *Bilal v. White,* 494 F. App'x 143, 146 (2d Cir. 2012) (quoting *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir. 2003) (citation omitted)). Specifically, in order to establish deliberate indifference based on a temporary delay or interruption in treatment where a prisoner is receiving otherwise appropriate on-going medical treatment for an objectively serious medical condition, the prisoner must demonstrate that the temporary delay or interruption resulted in "serious consequences." *See Bilal,* 494 F. App'x at 146 (where a prisoner alleged that a temporary interruption in medical treatment occurred, but did not assert that any "consequential injurious effects" resulted from the interruption, the Second Circuit held that the plaintiff failed to establish deliberate indifference); *see also Colon,* 2009 WL 288294, at *7 (holding that a delay in medical treatment, alone, is insufficient to establish deliberate indifference and that a plaintiff must demonstrate that substantial harm resulted from the delay itself). Moreover,

"the fact that plaintiff contracted a MRSA infection, standing alone, does not support an Eighth Amendment deliberate indifference claim." *Wargula,* 2010 WL 376402, at *5.

Miller fails to plausibly allege a claim of medical indifference based on delay in treatment because he fails to allege that the one-day interruption in sick call visits caused by John Does' # 11–13 denial for emergency sick call on April 9, in itself, caused any "serious consequence" or "substantial harm." *Bilal,* 494 F. App'x at 146; *Colon,* 2009 WL 288294, at *7; Am. Compl. at ¶ 13–22. Miller visited sick call both the day before the April 9 denial and the day after. Am. Compl. at ¶ 13–15. Moreover, as the undersigned has discussed, Miller was timely diagnosed with, and adequately treated for, cellulitis. *See supra* II(B)(2)(c). Therefore, the denial of emergency sick call by John Does # 11–13 constitutes, at most, a temporary delay or interruption where a prisoner is receiving otherwise adequate medical treatment. *Bilal,* 494 F. App'x at 146.

Moreover, the fact that Miller was diagnosed with MRSA and isolated on April 13, three days after leaving Mid–State for admission at St. Elizabeth's does not demonstrate that the one-day delay or interruption in treatment allegedly caused by John Does # 11–13 constitutes deliberate indifference. *See Wargula,* 2010 WL 376402; *White v. Sears,* No. 9:10–CV–0721 (MAD/GHL), 2011 WL 2728443, at * 6 (N.D.N.Y. June 20, 2011) (holding that a two-month delay in medical care did not constitute deliberate indifference); Am. Compl. at ¶ 15. Thus, Miller does not plausibly allege that the one-day wait between sick call visits due to the denial of sick call by John Does # 11–13 caused him to suffer "serious consequences" or "substantial harm." Therefore, Miller fails to state a claim of deliberate indifference against John Does # 11–13.

Miller's allegation that one of the above unidentified officers told him that the only way to get emergency sick call is if he were "dying or bleeding to death," is of no effect to the analysis here, since Miller fails to plausibly allege that he suffered any substantial harm as a result of being denied sick call on April 9 and provides no assertion that the uttering of this phrase demonstrates that the denial was intended as punishment

Footnotes

or to cause him to suffer. *Bilal,* 494 F. App'x at 146; *Colon,* 2009 WL 288294, at *7; *Magee v. Childs,* No. 04–CV–1089 (GLS/RFT), 2006 WL 681223, at *4 (N.D.N.Y. Feb. 27, 2006) ("Although a delay in providing necessary medical care may in some cases constitute deliberate indifference, such a classification is reserved "for cases in which, for example," officials deliberately delayed care as a form of punishment....").[12] Rather, Miller alleges only that this denial led to an increase in the severity of his illness. Am. Compl. at ¶ 20–21. However, considering the adequacy and timeliness of the medical care received, Miller's amended complaint does not plausibly allege that it was the minor delay that caused such a result.

### III. Conclusion

**\*11 WHEREFORE,** for the reasons stated herein, it is hereby:

**RECOMMENDED** that defendants' motion to dismiss (Dkt. No. 24) be **GRANTED**; and it is

**ORDERED** that a copy of this Report–Recommendation and Order be served on the parties in accordance with the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.D.N.Y.L.R. 72.1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *See Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir. 1993); *Small v. Sec'y of HHS,* 892 F.2d 15, 16 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); FED R. CIV. P. 72, 6(a), 6(e).

**IT IS SO ORDERED.**

### All Citations

Slip Copy, 2016 WL 1253684

1     This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2     Miller's "failure to oppose [the] Defendant's motion to dismiss does not, by itself, require dismissal of his claims." *Leach v. City of New York,* No. 12–CV–2141, 2013 WL 1683668, at *2 (S.D.N.Y. Apr. 17, 2013). Rather, "although a party is of course to be given a reasonable opportunity to respond to an opponent's motion, the sufficiency of a complaint is a matter of law that the court is capable of determining based on its own reading of the pleading and knowledge of the law." *McCall v. Pataki,* 232 F.3d 321, 322–23 (2d Cir. 2000).

3     Miller provides that he did not exhaust his administrative remedies with regard to the alleged deliberate indifference claim. Dkt. No. 13 at 6–7. However, as exhaustion is an affirmative defense under the Prison Litigation Reform Act ("PLRA"), and one that defendants did not raise, the Court has jurisdiction to review his complaint. *See Dorsey v. Artus,* 9:09–CV–1011 (GLS/DEP), 2013 WL 5463720, at *7 (N.D.N.Y. Sept. 30, 2013).

4     The Amended Complaint does not provide the year in which these incidents occurred. As the undersigned recommends a dismissal on the merits, it is not necessary to reach defendants' statute of limitations argument regarding plaintiff's failure to specify the year of the alleged medical indifference. *See* Dkt. No. 24–1, at 6, *supra.* It is noted that, should the District Judge disagree with the undersigned's determination on the merits, it is recommended that Miller be directed to amend his complaint to afford plaintiff the opportunity to provide the year in which the alleged incidents occurred.

5     All claims against Nurse Reese were dismissed by a prior Order of this Court. *See* Dkt. No. 15, *supra.*

6     All claims against Nurse Santamour were dismissed by a prior Order of this Court. *See* Dkt. No. 15, *supra.*

7     All claims against Dr. Mannava were dismissed by a prior Order of this Court. *See* Dkt. No. 15, *supra.*

8     Any unpublished cases cited within this Report–Recommendation and Order are attached hereto.

9     To the extent Plaintiff seeks to bring an Eighth Amendment claim against Wiggins in his official capacity, such claim must be dismissed as "claims against a government employee in his official capacity are treated as a claim against the municipality," and, thus, cannot stand under the Eleventh Amendment. *Hines v. City of Albany,* 542 F.Supp.2d 218, 227 (N.D.N.Y.2008).

10     To the extent that plaintiff's amended complaint can be read as attempting to raise a claim against Barker in his official capacity, such claim must be dismissed. *See Hines,* 542 F.Supp.2d at 227.

11     To the extent that plaintiff's amended complaint can be read as attempting to raise Eighth Amendment claims against defendants Vissalr and Ramineni in their official capacity, such claims must be dismissed. *See Hines,* 542 F.Supp.2d at 227.

12     The undersigned wishes to note that, should the District Court Judge disagree with the undersigned's recommendation dismissing the claims against the John Doe defendants, Miller would still need to establish both the identify of the John Doe defendants and their personal involvement, as he does not identify which defendant made such statement.

---

**End of Document**          © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 1261125
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jesse J. Miller, Plaintiff,

v.

Dr. Subbarao Ramineni, Rn Wayne Visallr, Officer
Wiggins, Officer Barker, John Doe #1-13, Defendant.

9:14-CV-1351(DNH/CFH)
|
Signed 03/30/2016

**Attorneys and Law Firms**

JESSE J. MILLER, 12-B-0543, Fishkill Correctional
Facility, P.O. Box 1245, Beacon, NY 12508, Plaintiff, pro
se.

HON. ERIC T. SCHNEIDERMAN, New York
State Attorney General – Albany, The Capitol, OF
COUNSEL:, NICOLE E. HAIMSON, ESQ., Ass't
Attorney General, Albany, NY 12224, Attorneys for
Defendant.

**DECISION and ORDER**

DAVID N. HURD, United States District Judge

**\*1** Pro se plaintiff Jesse J. Miller brought this civil rights
action pursuant to 42 U.S.C. § 1983. On February 29,
2016, the Honorable Christian F. Hummel, United States
Magistrate Judge, advised by Report-Recommendation
that defendant's motion to dismiss the complaint for
failure to state a claim be granted, and the complaint be
dismissed in its entirety. See ECF No. 27. Neither party
timely filed objections.

Based upon a de novo review of the Report-
Recommendation, the Report-Recommendation is
accepted in whole. See 28 U.S.C. § 636(b)(1).

Therefore, it is ORDERED that:

1. Defendant's motion to dismiss is **GRANTED**, and the
   complaint is **DISMISSED IN ITS ENTIRETY**; and

2. The Clerk serve a copy of this Decision and Order
   upon plaintiff in accordance with the Local Rules.

The Clerk of the Court shall enter judgment and close this
case.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2016 WL 1261125

---

**End of Document** © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 9054936
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Nicholas ZIMMERMAN, Plaintiff,

v.

John W. BURGE, et al., Defendants.

No. 9:06–CV–0176 (GLS/GHL).
|
April 20, 2009.

**Attorneys and Law Firms**

Nicholas Zimmerman, Auburn, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Heather R. Rubinstein, Esq., of Counsel:
Syracuse, NY, for Defendants.

***REPORT–RECOMMENDATION***

GEORGE H. LOWE, United States Magistrate Judge.

 **\*1** This *pro se* prisoner civil rights action, commenced
pursuant to 42 U.S.C. § 1983, has been referred to me
for Report and Recommendation by the Honorable Gary
L. Sharpe, United States District Judge, pursuant to 28
U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Nicholas
Zimmerman alleges that Defendants Joe Wolczyk, Donald
Selsky, Captain Rourke, Harold Graham, and Thomas
Eagen [1] violated his Eighth Amendment rights by sentencing
him to ten years of solitary confinement in the Special
Housing Unit ("SITU") and refusing to allow him to
participate in the Intermediate Care Program [2]. Currently
pending before the Court is Defendants' partial motion
for summary judgment pursuant to Federal Rule of Civil
Procedure 56. (Dkt. No. 42.)Defendants seek dismissal of
(1) Plaintiff's claims against Defendants in their official
capacities; and (2) Plaintiff's Eighth Amendment medical
claim. Defendants do not seek dismissal of Plaintiff's Eighth
Amendment claim regarding his ten-year SITU confinement.
For the reasons that follow, I recommend that Defendants'
motion be granted.

**I. BACKGROUND**

**A. Summary of Plaintiff's Complaint**

Plaintiff's complaint is quite cursory. Regarding his Eighth
Amendment medical care claim, Plaintiff alleges that:

> On October 25, 2005, Defendant[ ] Captain Rourke
> violated Plaintiff's Eighth Amendment rights to adequate
> medical care by refusing to allow Plaintiff to seek mental
> health by participating in the Intermediate Care Program.

> On November 10, 2005, Defendant Superintendent
> Graham violated Plaintiff's Eighth Amendment rights to
> adequate medical care by affirming Captain Rourke's
> decision to deny Plaintiff's admittance to the Intermediate
> Care Program.

> On December 14, 2005, Defendant Thomas Eagen violated
> Plaintiff's rights to adequate medical care by affirming
> Superintendent Graham's decision to deny Plaintiff's
> admittance to the Intermediate Care Program.

(Dkt. No. 1 at 5, ¶¶ 16–18.)

Plaintiff sues Defendants "in their individual capacities and
in their official capacities as officials of the New York State
Department of Corrections."(Dkt. No. 1 at 2.)

In his prayer for relief Plaintiff requests (1) a declaration
that Defendants violated Plaintiff's constitutional rights; (2)
an injunction requiring Defendants to place Plaintiff in the
Intermediate Care Program; (3) the reversal and expungement
or reduction of Plaintiff's ten-year SITU sentence; (4) $1
million in compensatory damages; (5) $200,000 in punitive
damages from each Defendant; and (6) costs and attorney
fees. (Dkt. No. 1 at 8.)

**B. Summary of Grounds in Support of Defendants'
Motion**

Defendants argue that (1) the Eleventh Amendment bars
Plaintiff's claims against Defendants in their official
capacities; (2) Plaintiff does not allege sufficient personal
involvement on the part of Defendants Rourke, Graham, or
Eagen; (3) Plaintiff cannot prevail on his Eighth Amendment
medical care claim because Defendants were not deliberately
indifferent to a serious medical need; and (4) Defendants are
entitled to qualified immunity. (Dkt. No. 42–4.)

**C. Summary of Plaintiff's Response to Defendants'
Arguments**

**\*2** In response, Plaintiff argues that (1) even if the Eleventh Amendment bars his claims against Defendant in their official capacities, he has also sued them in their individual capacities; (2) Defendants were personally involved because they failed to remedy a wrong after learning of it; (3) Plaintiff suffered from depression and suicidal tendencies and Defendants' refusal to allow him to participate in the Intermediate Care Program constituted deliberate indifference; and (4) Defendants are not entitled to qualified immunity. (Dkt. No. 43.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under *Federal Rule of Civil Procedure 56*, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."*Fed.R.Civ.P. 56(c).* The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Major League Baseball Properties, Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008). Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist.*Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [3] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [4] In determining whether a genuine issue of material [5] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. [6]

### B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim

To the extent that a defendant's motion for summary judgment under *Federal Rule of Civil Procedure 56* is based entirely on the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under *Federal Rule of Civil Procedure 12(b)(6).* As a result, "[w]here appropriate, a trial judge may

dismiss for failure to state a cause of action upon motion for summary judgment."*Schwartz v. Compagnie General Transatlantique,* 405 F.2d 270, 273–74 (2d Cir.1968) [citations omitted]; *accord, Katz v. Molic,* 128 F.R.D. 35, 37–38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a *Rule 56* summary judgment motion to a *Rule 12(b)(6)* motion to dismiss the complaint] is proper with or without notice to the parties."). Moreover, even where a defendant has not advanced such a failure-to-state-a-claim argument on a motion for summary judgment, a district court may, *sua sponte,* address whether a *pro se* prisoner has failed to state a claim upon which relief may be granted. [7] For these reasons, it is appropriate to briefly summarize the recently clarified legal standard governing *Federal Rule of Civil Procedure 12(b)(6)* motions to dismiss.

**\*3** Under *Federal Rule of Civil Procedure 12(b)(6),* a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted."*Fed.R.Civ.P. 12(b)(6).* It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under *Federal Rule of Civil Procedure 8(a)(2);* [8] or (2) a challenge to the legal cognizability of the claim. [9]

*Rule 8(a)(2)* requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief."*Fed.R.Civ.P. 8(a)*(2) [emphasis added]. By requiring this "showing," *Rule 8(a)(2)* requires that the pleading contain a short and plain statement that "give[s] the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." [10] The main purpose of this rule is to "facilitate a proper decision on the merits." [11] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [12]

The Supreme Court has long characterized this pleading requirement under *Rule 8(a)(2)* as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement. [13] However, it is well established that even this liberal notice pleading standard "has its limits." [14] As a result, several Supreme Court and Second Circuit decisions exist, holding that a pleading has failed to meet this liberal notice pleading standard. [15]

Most notably, in *Bell Atlantic Corporation v. Twombly,* the Supreme Court, in reversing an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1, "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."127 S.Ct. 1955, 1968–69 [16] (2007). [17] Rather than turning on the *conceivability* of an actionable claim, the Court clarified, the Rule 8 "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74.

More specifically, the Court reasoned that, by requiring that a pleading "show [ ] that the pleader is entitled to relief,"Rule 8(a)(2) requires that the pleading give the defendant "fair notice" of (1) the nature of the claim and (2) the "grounds" on which the claim rests. *Id.* at 1965, n. 3 [citation omitted]. While this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id* .[citations omitted]. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.* at 1965 [citations omitted]. What this means, on a practical level, is that there must be "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]."*Id* .

**\*4** As have other Circuits, the Second Circuit has repeatedly recognized that the clarified plausibility standard that was articulated by the Supreme Court in *Bell Atlantic* governs *all* claims, not merely antitrust claims brought under 15 U.S.C. § 1 (as were the claims in *Bell Atlantic* ). [18] The Second Circuit has also recognized that this *plausibility* standard governs claims brought even by *pro se* litigants (although the plausibility of those claims is be assessed generously, in light of the special solicitude normally afforded *pro se* litigants). [19]

It should be emphasized that Rule 8's plausibly standard, explained in *Bell Atlantic,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which the Court stated, "Specific facts are not necessary" to successfully state a claim under Rule 8(a) (2).*Erickson v. Pardus,* 127 S.Ct. 2197, 2200 (2007) [citation omitted]. That statement was merely an abbreviation

of the often-repeated point of law-first offered in *Conley* and repeated in *Bell Atlantic*-that a pleading need not "set out in detail the facts upon which [the claim is based]" in order to successfully state a claim. *Bell Atlantic,* 127 S.Ct. 1965, n. 3 (citing *Conley v. Gibson,* 355 U.S. 41, 47 [1957] ). That statement in no way meant that all pleadings may achieve the requirement of giving a defendant "fair notice" of the nature of the claim and the "grounds" on which the claim rests without ever having to allege any facts whatsoever. [20] There must still be enough facts alleged to raise a right to relief above the speculative level to a plausible level, so that the defendant may know what the claims are and the grounds on which they rest (in order to shape a defense).

Having said all of that, it should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor."? [21] "This standard is applied with even greater force when the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.* [22] In other words, while all pleadings are to be construed liberally under Rule 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality.

For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint. [23] Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." [24] Furthermore, when addressing a *pro se* complaint, *generally* a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [25] Of course, an opportunity to amend is not required where the plaintiff has already amended his complaint. [26] In addition, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." [27]

**\*5** However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit has observed), [28] it does not

completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Rules 8, 10 and 12. [29] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Rules 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow. [30] Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." [31]

## III. ANALYSIS

### A. Claims Against Defendants in Their Official Capacities

Plaintiff's complaint names Defendants "in their individual capacities and in their official capacities as officials of the New York State Department of Corrections."(Dkt. No. 1 at 2.) Defendants argue that Plaintiff's claims against them in their official capacities are barred by the Eleventh Amendment. (Dkt. No. 42–4 at 3.) Defendants are correct.

The Eleventh Amendment has long been construed as barring a citizen from bringing a suit against his or her own state in federal court, under the fundamental principle of "sovereign immunity." *See* U.S. Const. amend XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); *Hans v. Louisiana,* 134 U.S. 1, 10–21 (1890); *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 267 (1997); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984). State immunity extends not only to the states, but to state agencies and to state officers who act on behalf of the state. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf,* 506 U.S. 139, 142–47 (1993); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101–06 (1984). DOCS employees are state officials for the purposes of the Eleventh Amendment. *See e.g. Davis v. New York,* 316 F.3d 93, 101 (2d Cir.2002); *Tolliver v. N.Y. State Correctional Officers,* No. 99 CIV 9555, 2000 WL 1154311, at *2 (S.D.N.Y. Aug. 14, 2000) ("All of the defendants in this case are state officials because they are employees of the New York State Department of Correctional Services."). Where it has been successfully demonstrated that a defendant is entitled to sovereign immunity under the Eleventh Amendment, the federal court lacks subject matter jurisdiction over the case, and "the case must be stricken from the docket." *McGinty v. State of New York,* 251 F .3d 84, 100

(2d Cir.2001) (citation omitted); *see also* Fed.R.Civ.P. 12(h)(3).

Here, the face of the complaint alleges that Defendants are each "officials of the New York State Department of Corrections."(Dkt. No. 1 at 2.) Therefore, any claims against Defendants in their officials capacities are barred by the Eleventh Amendment. Accordingly, I recommend that the Court grant Defendants' motion and dismiss all claims against Defendants in their official capacities [32].

### B. Medical Care Claims

**\*6** Plaintiff alleges that Defendants violated his Eighth Amendment right to adequate medical care by refusing to allow him to participate in the Intermediate Care Program. (Dkt. No. 1 at 5.) The Intermediate Care Program is a program for prisoners with mental health issues that provides treatment, medication, group therapy, and other counseling. (Dkt. No. 42–5, P's Depo. at 35:22–36:6.)

To prevail on an Eighth Amendment claim of inadequate medical care, a plaintiff must show two things: (1) that the plaintiff had a *sufficiently serious* medical need; and (2) that the defendant was *deliberately indifferent* to that serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

Defendants argue that Plaintiff can establish neither that he suffered from a sufficiently serious medical need nor that Defendants were deliberately indifferent. (Dkt. No. 42–4 at 5–8.)I find that Plaintiff suffered from a sufficiently serious medical need but that Defendants were not deliberately indifferent to that need.

### 1. Serious Medical Need

Defendants argue that Plaintiff cannot establish that he suffered from a sufficiently serious medical need because "Plaintiff acknowledges that his allegations are only with regard to his mental health treatment and not medical treatment."(Dkt. No. 42–4 at 6–7 .)

To be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) [citations omitted], *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154 (1995); *Chance,* 143 F.3d at 702.

Neither Defendants nor Plaintiff have provided the Court with any of Plaintiff's medical records to establish the precise nature of Plaintiff's mental health diagnosis. The evidence before the Court establishes that Plaintiff was initially prescribed the medication Celexa in February 2005 and has been compliantly taking it. (Dkt. No. 42–5, P's Depo. at 33:18–34:3; Dkt. No. 42–6 at 3, Intermediate Care Program Referral form.) Celexa is prescribed to treat major depression. *The PDR Pocket Guide to Prescription Drugs* 275 (Bette LaGow, ed., 7th ed.2005). Plaintiff states that he began having suicidal thoughts sometime prior to October 25, 2005. (Dkt. No. 43 at 3.) He attempted suicide on July 5, 2008, and October 12, 2008.*Id.* I find, based on the limited information in the record before me, that Plaintiff suffered from major depression with suicidal ideation at the time he was denied entrance into the Intermediate Care Program in September 2005.

Neither party has cited any case law discussing whether depression, either with or without suicidal ideation, is a "sufficiently serious" medical condition for Eighth Amendment purposes. I have independently researched the issue and located limited published case law on the subject. The First Circuit has found that depression combined with severe anxiety attacks or suicide attempts is a serious medical need. *Mahan v. Plymouth County House of Corrections,* 64 F.3d 14, 16, 18 (1st Cir.1995); *Torraco v. Maloney,* 923 F.2d 231, 235 n. 4 (1st Cir.1991). A District Court in Delaware has presumed that a combination of depression, anxiety, and post-traumatic stress disorder is a serious medical need. *Simpson v. Penobscot County Sheriff's Dept.,* 285 F.Supp.2d 75 (D.Me.2003). A District Court in North Dakota has held that self-diagnosed depression with suicidal ideation is not a serious medical condition for Eighth Amendment purposes, but depression that actually manifests in attempted suicide is sufficiently serious. *White v. Crow Ghost,* 456 F.Supp.2d 1096, 1102–03 (D.N.D.2006).

**\*7** Here, Plaintiff was not merely self-diagnosed: prison officials prescribed Celexa to treat his depression. Although he did not attempt suicide until three years after he was denied admission to the Intermediate Care Program, these later attempts illustrate that his suicidal thoughts in 2005 were not ephemeral. In light of these facts, and because the summary judgment standard requires the Court to resolve all ambiguities and draw all reasonable inferences against the moving party, I will assume that Plaintiff suffered from a sufficiently serious medical need.

**2.** *Deliberate Indifference*

Defendants argue that even if Plaintiff had a serious medical need, they were not deliberately indifferent to it. (Dkt. No. 42–4 at 7–8.)Defendants are correct.

Defendants Rourke, Eagen, and Graham are not medical personnel. (Dkt. No. 42–5, P's Depo. at 45:25–46:7.) "Non-medical personnel engage in deliberate indifference where they intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problem known to attendant prison personnel."*Baumann v. Walsh,* 36 F.Supp.2d 508, 512 (N.D.N.Y.1999) (Scullin, J., adopting Report–Recommendation of Sharpe, M.J.). Here, Plaintiff was not denied access to mental health care. Beginning in February 2005, Plaintiff was seen by mental health providers once a month. (Dkt. No. 42–5, P's Depo. at 18:7–20:14.) As discussed above, he was also prescribed Celexa, an anti-depressant. While Plaintiff may have preferred to receive his mental health treatment through the Intermediate Care Program, he was not constitutionally entitled to his preferred care. "It is well established that mere disagreement over the proper treatment does not create a constitutional claim."*Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998). Therefore, I find that there is no genuine issue of material fact showing that Defendants Rourke, Eagen, or Graham were deliberately indifferent to Plaintiff's serious medical need. Accordingly, I recommend that Defendants' motion for summary judgment dismissing Plaintiff's Eighth Amendment medical care claim be granted.

In light of my finding that Defendants are entitled to summary judgment dismissing Plaintiff's Eighth Amendment medical care claim on the constitutional merits, I decline to address Defendants' arguments regarding personal involvement and qualified immunity.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for partial summary judgment (Dkt. No. 42) be ***GRANTED.***It is recommended that the Court (1) dismiss Plaintiff's claims against all Defendants in their official capacities; and (2) dismiss Plaintiff's Eighth Amendment medical care claim against Defendants Rourke, Eagen, and Graham, thus terminating those Defendants from this litigation; and it is further

**RECOMMENDED** that this matter be set for a pretrial conference on Plaintiff's Eighth Amendment conditions of confinement claim against Defendants Wolczyk and Selsky.

**\*8** Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE*

REVIEW.*Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Slip Copy, 2009 WL 9054936

## Footnotes

1 The caption of Defendants' moving papers refers to this Defendant as "Egan." The body of Defendants' papers refer to him as "Eagan." In light of this discrepancy, I have used the spelling provided by Plaintiff in the complaint.

2 Plaintiff's complaint contained additional claims against additional Defendants. Those claims were dismissed on March 28, 2008. (Dkt. No. 35.)

3 *Matsushita,* 475 U.S. at 585–86; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986); *see also*Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading....").

4 *Ross v. McGinnis,* 00–CV–0275, 2004 WL 1125177, at \*8 (W.D.N . Y. Mar. 29, 2004) [internal quotations omitted] [emphasis added].

5 A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

6 *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

7 The authority to conduct this *sua sponte* analysis is derived from two sources: (1) 28 U.S.C. § 1915(e)(2)(B)(ii), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S.C. § 1915A(b), which provides that, "[o]n review, the court shall ... dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ...."

8 *See*5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") [citations omitted]; *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

9 *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514 (2002) ( "These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12 [b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice; *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ("Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") [citation omitted]; *Util. Metal Research & Generac Power Sys.,* 02–CV–6205, 2004 U.S. Dist. LEXIS 23314, at \*4–5 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101–102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01–CV–4430, 2002 U.S. Dist. LEXIS 1658, at \*6–7 (S.D.N.Y. Jan. 30, 2002)

(identifying two sorts of arguments made on a Rule 12[b][6] motion-one aimed at the sufficiency of the pleadings under Rule 8 [a], and the other aimed at the legal sufficiency of the claims).

10 *Dura Pharm., Inc. v. Broudo,* 125 S.Ct. 1627, 1634 (2005) (holding that the complaint failed to meet this test) [citation omitted; emphasis added]; *see also Swierkiewicz,* 534 U.S. at 512 [citation omitted]; *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168 (1993) [citation omitted].

11 *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") [citation omitted]; *Salahuddin v. Cuomo,* 861 F .2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") [citations omitted].

12 *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,*113 F.3d 1229 (2d Cir.1997) (unpublished table opinion); *accord, Hudson v. Artuz,* 95–CV–4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov. 30, 1998), *Flores v. Bessereau,* 98–CV–0293, 1998 WL 315087, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J .). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

13 *See, e.g., Swierkiewicz,* 534 U.S. at 513–514 (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake.").

14 2 *Moore's Federal Practice* § 12.34[1][b] at 12–61 (3d ed.2003).

15 *See, e.g., Bell Atlantic Corp. v. Twombly,* 127 S.Ct. 1955, 1964–1974 (2007) (pleading did not meet Rule 8[a][2]'s liberal requirement); *accord, Dura Pharm.,* 125 S.Ct. at 1634–1635, *Christopher v. Harbury,* 536 U.S. 403, 416–422 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234–235 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208– 209 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after *Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N.Y.,* No. 01–7539, 2002 WL 741835, at *5 (2d Cir. Apr. 26, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, *see*Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit interpreting Rule 8(a)(2).*See Khan v. Ashcroft,* 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

16 All references to *Bell Atlantic* will cite the Supreme Court Reporter rather than the United States Reports. The United States Reports version of the case does not include page numbers at this time.

17 The Court in *Bell Atlantic* further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint....*Conley,* then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival."*Bell Atlantic,* 127 S.Ct. at 1969.

18 *See, e.g., Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (in civil rights action, stating that "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'") [citation omitted]; *Goldstein v. Pataki,* 07–CV–2537, 2008 U.S.App. LEXIS 2241, at *14 (2d Cir. Feb. 1, 2008) (in civil rights action, stating that "*Twombly* requires ... that the complaint's '[f]actual allegations be enough to raise a right to relief above the speculative level ....'") [internal citation omitted]; *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98, n. 2 (2d Cir.2007) ( "We have declined to read Twombly's flexible 'plausibility standard' as relating only to antitrust cases.") [citation omitted]; *Iqbal v. Hasty,* 490 F.3d 143, 157–58 (2d Cir.2007) (in prisoner civil rights action, stating, "[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly* ] is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible.*") [emphasis in original].

19 *See, e.g., Jacobs v. Mostow,* 281 F. App'x 85, 87 (2d Cir. March 27, 2008) (in pro se action, stating, "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'") [citation omitted] (summary order, cited in accordance with Local Rule 32.1[c][1] ) ; *Boykin v. KeyCorp.,* 521 F.3d 202, 215–16 (2d Cir.2008) (finding that borrower's *pro se* complaint sufficiently presented a *"plausible* claim of disparate treatment,"

under Fair Housing Act, to give lenders fair notice of her discrimination claim based on lenders' denial of her home equity loan application) [emphasis added].

20 For example, in *Erickson,* a district court had dismissed a *pro se* prisoner's civil rights complaint because, although the complaint was otherwise factually specific as to how the prisoner's hepatis C medication had been wrongfully terminated by prison officials for a period of approximately 18 months, the complaint (according to the district court) failed to allege facts plausibly suggesting that the termination caused the prisoner "substantial harm." *127 S.Ct. at 2199.* The Supreme Court vacated and remanded the case because (1) under *Fed.R.Civ.P. 8* and *Bell Atlantic,* all that is required is "a short and plain statement of the claim" sufficient to "give the defendant fair notice" of the claim and "the grounds upon which it rests," and (2) the plaintiff had alleged that the termination of his hepatitis C medication for 18 months was "endangering [his] life" and that he was still in need of treatment for [the] disease." *Id. at 2200.*While *Erickson* does not elaborate much further on its rationale, a careful reading of the decision (and the dissent by Justice Thomas) reveals a point that is perhaps so obvious that it did not need mentioning in the short decision: a claim of deliberate indifference to a serious medical need under the Eighth Amendment involves two elements, i.e., the existence of a sufficiently serious medical need possessed by the plaintiff, and the existence of a deliberately indifferent mental state possessed by prison officials with regard to that sufficiently serious medical need. The *Erickson* decision had to do with only the first element, not the second element. *Id.* at 2199–2200.In particular, the decision was merely recognizing that an allegation by a plaintiff that, during the relevant time period, he suffered from hepatis C is, in and of itself, a factual allegation plausibly suggesting that he possessed a sufficiently serious medical need; the plaintiff need not *also* allege that he suffered an independent and "substantial injury" as a result of the termination of his hepatis C medication. *Id.* This point of law is hardly a novel one. For example, numerous decisions, from district courts within the Second Circuit alone, have found that suffering from hepatitis C constitutes having a serious medical need for purposes of the Eighth Amendment. *See, e.g., Rose v. Alvees,* 01–CV–0648, 2004 WL 2026481, at *6 (W.D.N.Y. Sept. 9, 2004); *Verley v. Goord,* 02–CV–1182, 2004 WL 526740, at *10 n. 11 (S.D.N.Y. Jan. 23, 2004); *Johnson v. Wright,* 234 F.Supp.2d 352, 360 (S.D.N.Y.2002); *McKenna v. Wright,* 01–CV–6571, 2002 WL 338375, at *6 (S.D.N.Y. March 4, 2002); *Carbonell v. Goord,* 99–CV–3208, 2000 WL 760751, at *9 (S.D.N.Y. June 13, 2000).

21 *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

22 *Hernandez,* 18 F.3d at 136 [citation omitted]; *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) [citations omitted]; *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) [citation omitted].

23 "Generally, a court may not look outside the pleadings when reviewing a *Rule 12(b)(6)* motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum."*Gadson v. Goord,* 96–CV–7544, 1997 WL 714878, at *1, n. 2 (S.D.N.Y. Nov. 17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) [citations omitted], *vacated in part on other grounds,*317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on *Rule 15 of the Federal Rules of Civil Procedure,* which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138–39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) [citations omitted].

24 *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) [internal quotation and citation omitted].

25 *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) [internal quotation and citation omitted]; *see also*Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

26 *Yang v. New York City Trans. Auth.,* 01–CV–3933, 2002 WL 31399119, at *2 (E.D.N.Y. Oct. 24, 2002) (denying leave to amend where plaintiff had already amended complaint once); *Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once).

27 *Cuoco,* 222 F.3d at 112 (finding that replanding would be futile) [citation omitted]; *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted]; *see, e.g., See Rhodes v. Hoy,* 05–CV–0836, 2007 WL 1343649, at *3, 7 (N.D.N.Y. May 5, 2007) (Scullin, J., adopting Report–Recommendation of Peebles, M.J.) (denying *pro se* plaintiff opportunity to amend before dismissing

his complaint because the error in his complaint-the fact that plaintiff enjoyed no constitutional right of access to DOCS' established grievance process-was substantive and not formal in nature, rendering repleading futile); *Thabault v. Sorrell,* 07–CV–0166, 2008 WL 3582743, at *2 (D.Vt. Aug. 13, 2008) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the errors in his complaint-lack of subject-matter jurisdiction and lack of standing-were substantive and not formal in nature, rendering repleading futile); *Hylton v. All Island Cob Co.,* 05–CV– 2355, 2005 WL 1541049, at *2 (E.D.N.Y. June 29, 2005) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the errors in his complaint-which included the fact that plaintiff alleged no violation of either the Constitution or laws of the United States, but only negligence-were substantive and not formal in nature, rendering repleading futile); *Sundwall v. Leuba,* 00–CV–1309, 2001 WL 58834, at *11 (D.Conn. Jan. 23, 2001) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the error in his complaint-the fact that the defendants were protected from liability by Eleventh Amendment immunity-was substantive and not formal in nature, rendering repleading futile).

28   *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06–1590, 2008 WL 3294864, at *5 (2d Cir. Aug. 12, 2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") [internal quotation marks and citation omitted]; *see also Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") [citation omitted].

29   *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519 [1972], did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8] ); *accord, Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691) [unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit]; *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

30   *See McNeil v. U.S.,* 508 U.S. 106, 113 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

31   *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980).

32   It is not clear from Defendants' papers whether they intended to move for summary judgment dismissing the claims against *all* of the remaining Defendants in their official capacities or whether they moved solely on behalf of Defendants Rourke, Eagen, and Graham. To the extent that Defendants neglected to explicitly move on behalf of Defendants Wolcyzk and Selsky, I recommend that the Court *sua sponte* dismiss any claims against those Defendants in their official capacities pursuant to 28 U.S.C. § 1915(e)(2)(B).

2010 WL 2039164
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Johnathan JOHNSON, Plaintiff,

v.

Robert WOODS, Superintendent, Upstate
Correctional Facility; S. Thompson, Sergeant,
Upstate Correctional Facility; D. Uhler, Captain,
Upstate Correctional Facility; J. Durgan, Lieutenant,
Upstate Correctional Facility; Jerome Snyder,
Captain, Upstate Correctional Facility; Quinn,
Captain, Upstate Correctional Facility; T. Ramsdell,
Prison Guard, Upstate Correctional Facility;
Candy Atkinson, Nurse, Upstate Correctional
Facility; Patrick Johnson, P.A., Upstate Correctional
Facility; B. Connolly, Doctor, Upstate Correctional
Facility; S. Santamore, Prison Guard, Upstate
Correctional Facility; N. Smith, Administrative
Nurse, Upstate Correctional Facility; Karen Bellamy,
Director, Inmate Grievance Program; L. Peary,
Supervisor of Inmate Grievance Program, Upstate
Correctional Facility; J. Sorrell, Prison Guard,
Upstate Correctional Facility; T. Debyah, Prison
Guard, Upstate Correctional Facility; J. White,
Prison Guard, Upstate Correctional Facility;
K. Buckley, Lieutenant, Upstate Correctional
Facility; J. Bishop, Prison Guard, Upstate
Correctional Facility; L. Marlow, Nurse, Upstate
Correctional Facility; and N. LaVigine, Defendants.

No. 07–CV–1018 (DNH/DRH).
|
March 2, 2010.

**Attorneys and Law Firms**

Johnathan Johnson, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Roger W. Kinsey, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

**REPORT–RECOMMENDATION AND ORDER** [1]

DAVID R. HOMER, United States Magistrate Judge.

**\*1** Plaintiff pro se Johnathan Johnson ("Johnson"), an
inmate in the custody of the New York State Department
of Correctional Services ("DOCS"), brings this action
pursuant to 42 U.S.C. § 1983 alleging that defendants,
twenty-one DOCS employees at Upstate Correctional
Facility ("Upstate"), violated his constitutional rights
under the First and Eighth Amendments. Compl. Dkt.
No. 1. Presently pending is defendants' motion for
summary judgment pursuant to Fed.R.Civ.P. 56. Dkt.
No. 70. Johnson opposes the motion. Dkt. No. 72. For
the following reasons, it is recommended that defendants'
motion be granted.

**I. Background** [2]

The facts are related herein in the light most favorable to
Johnson as the non-moving party. *See* subsection II(A)
*infra.* All events occurred during Johnson's incarceration
at Upstate. *See generally* Compl.

**A. Cell Extraction** [3]

On May 10, 2007, defendants Thompson and Uhler were
making rounds on the gallery when they approached
Johnson's cell. Thompson Decl. (Dkt. No. 70–18) ¶ 5;
Uhler Decl. (Dkt. No. 70–19) ¶ 5; Dkt. No. 70–7 at 6. [4]
Thompson and Uhler contend that Johnson had his cell
window covered with paper, in contravention of Special
Housing Unit ("SHU") [5] policy. Thompson Decl. ¶ 6;
Uhler Decl. ¶ 6; Dkt. No. 70–7 at 6; Dkt. No. 70–12 at 13.
Thompson ordered Johnson to remove the paper to which
Thompson contends, Johnson did not comply. Thompson
Decl. ¶ 7; Uhler Decl. ¶ 7; Dkt. No. 70–7 at 6; Dkt. No.
70–12 at 16 [6]. Thompson then ordered correctional staff
to remove Johnson from his cell and Uhler ordered that
all Johnson's paper be confiscated, with the exception of
his toilet paper, and that Johnson be placed on paper
deprivation. Dkt. No. 70–7 at 6; Dkt. No. 70–12 at 13, 15.
Johnson asserts that he never had paper on his cell window
and that defendants created this pretext to confiscate
his legal materials regarding pending litigation against
defendants. Johnson Dep. (Dkt. No. 70–3) at 14–15, 19,
20–21; Johnson Mem. of Law (Dkt. No. 72–1) at 24.

Johnson also attributes his persistent, vulgar name calling of defendants constituted a reason for their retaliatory behavior and contentious relationship. Johnson Dep. at 26–27, 32–33 (explaining that every time Johnson saw corrections staff, he called them vulgar names and shouted expletives because he did not like any of them). Video of the event shows that the two corrections officers stopped at Johnson's cell and had a conversation with him, though the vantage point does not show whether there was paper on his cell window. Video 1.

Johnson was ordered to place his hands through the slot in the cell door so that restraints could be applied. Dkt. No. 70–7 at 6. Johnson refused to put down a pen he was holding and comply, threatened to stab defendant Ellsworth, and spat on the cell door window. *Id.* Johnson "has an extensive disciplinary history ... [and] is a persistent spitter, thrower of sewer water, assaultive, harassing and defiant." Buckley Decl. (Dkt. No. 70–8) ¶¶ 3–4; Thompson Decl. ¶¶ 3–4; Uhler Decl. ¶¶ 3–4; Woods Decl. (Dkt. No. 70–21) ¶¶ 4–5; *see also* Dkt. No. 70–13 at 21–27 (Inmate Disciplinary History at Upstate). Defendant Buckley spoke to Johnson and Johnson agreed to comply with the staff's orders. Buckley Decl. ¶ 11; Thompson Decl. ¶ 11; Uhler Decl. ¶ 11; Dkt. No. 70–7 at 6. When Ellsworth opened the cell door slot to apply restraints on Johnson's wrists, Johnson pulled a pen from his waistband, attempted to stab Ellsworth, and spat out the slot. Buckley Decl. ¶¶ 12–13; Thompson Decl. ¶¶ 12–13; Uhler Decl. ¶¶ 12–13; Dkt. No. 70–7 at 6; Dkt. No. 70–12 at 13, 15, 16; Johnson Dep. at 34–36. Johnson testified that he did not have a pen in his hand during these conversations but acknowledges attempting to stab Ellsworth with a pen when he reached through the slot. Johnson Dep. at 24, 34–36. Johnson also testified that he kicked the pen out of his cell at a later point in an attempt to show compliance but that Thompson kicked the pen back into the cell. Johnson Dep. at 49.

**\*2** "A stand-off ensued with [Johnson] refusing to comply with multiple orders to exit the cell." Buckley Decl. ¶ 14; Thompson Decl. ¶ 14; Videos 2, 3. Johnson disputes this fact, alleging that he was willing to exit his cell voluntarily but was prohibited from doing so. Johnson Dep. at 20, 23–24, 44–45.[7] However, Johnson also testified that he intended to exit his cell fighting and that defendants were fully aware of his combative intentions. *Id.* at 36–37, 41–45, 54–55. The Crisis Intervention Unit, Johnson's guidance counselor, and a chaplain were all

summoned to attempt to assist in achieving Johnson's cooperation. Buckley Decl. ¶ 15; Thompson Decl. ¶ 15; Uhler Decl. ¶ 15; Dkt. No. 70–7 at 6; Dkt. No. 70–12 at 16. None were successful. Buckley Decl. ¶ 16; Thompson Decl. ¶ 16; Uhler Decl. ¶ 16; Dkt. No. 70–7 at 6; Dkt. No. 70–12 at 16.

Defendant Woods, the Upstate Superintendent, then authorized the use of chemical agents to subdue Johnson. Buckley Decl. ¶ 17; Thompson Decl. ¶ 17; Uhler Decl. ¶ 17; Woods Decl. ¶¶ 18, 20; Dkt. No. 70–7 at 6. Concurrently, defendant Atkinson, a member of the medical staff, confirmed that Johnson was healthy enough to withstand the deployment of the agents. Buckley Decl. ¶18; Thompson Decl. ¶18; Uhler Decl. ¶18; Dkt. No. 70–7 at 6. Defendants Ramsdell, Bishop, White, and Debyah, the extraction team, assembled. Bishop Decl. (Dkt. No. 70–7) ¶ 3; Debyah Decl. (Dkt. No. 70–10) ¶ 3; Ramsdell Decl. (Dkt. No. 70–14) ¶ 3; White Decl. (Dkt. No. 70–20) ¶ 3; Dkt. No. 70–7 at 6. Additionally, defendant Sorrell was called to operate the handheld video camera to document the extraction. Sorrel Decl. (Dkt. No. 70–17) ¶ 3; Dkt. No. 70–12 at 17; Video 3. While the extraction team was positioning itself, two other officers attempted to cover Johnson's cell windows from outside on the roof. Dkt. No. 70–7 at 6. Johnson began throwing liquid out the window, which the defendants stated was urine and Johnson testified was sewer water, to prevent the officers from approaching from the outside. Buckley Decl. ¶ 20; Bishop Decl. ¶ 5; Debyah Decl. ¶ 5; Ramsdell Decl. ¶ 5; Sorrell Decl. ¶ 7; White Decl. ¶ 5; Dkt. No. 70–7 at 6; Johnson Dep. at 52. As the extraction team assembled at the front of the cell, Johnson moved away from the window allowing officers to secure the window from the outside. Dkt. No. 70–7 at 6.

After repeated orders to comply over almost two hours, Buckley gave Johnson a final order to exit the cell, Johnson refused, and five canisters of chemical agents were thrown into Johnson's cell. Buckley Decl. ¶¶ 19, 21; Bishop Decl. ¶¶ 4, 6; Debyah Decl. ¶¶ 4, 6; Ramsdell Decl. ¶¶ 4, 6; Sorrell Decl. ¶¶ 6, 8; Thompson Decl. ¶¶ 19, 21; Uhler Decl. ¶¶ 19, 21; White Decl. ¶¶ 4, 6; Dkt. No. 70–7 at 6; Dkt. No. 70–12 at 16; Video 3. Each time the slot was opened to insert a canister of gas, Johnson would throw cups of toilet water out of the cell at the extraction team. Buckley Decl. ¶ 23; Bishop Decl. ¶ 8; Debyah Decl. ¶ 8; Ramsdell Decl. ¶ 8; Sorrell Decl. ¶ 10; Uhler Decl. ¶ 23; White Decl. ¶ 8; Dkt. No. 70–7 at

6; Johnson Dep. at 46–47, 50; Video 3. A plexiglass shield was used to attempt to preclude Johnson from throwing the liquid and to divert it away from the officers. Dkt. No. 70–7 at 6; Video 3. Johnson also was attempting to block the slot with a towel, but it was pushed aside by Bishop's baton. Buckley Decl. ¶ 22; Bishop Decl. ¶ 7; Debyah Decl. ¶ 7; Ramsdell Decl. ¶ 7; Sorrell Decl. ¶ 9; White Decl. ¶ 7; Dkt. No. 70–7 at 6; Video 3.

**\*3** After the last canister was thrown into Johnson's cell, the extraction team was ordered to enter. Bishop Decl. ¶ 9; Buckley Decl. ¶ 24; Debyah Decl. ¶ 9; Ramsdell Decl. ¶ 9; Sorrell Decl. ¶ 11; White Decl. ¶ 9; Dkt. No. 70–7 at 7; Dkt. No. 70–12 at 16; Video 3. Defendant Santamore mechanically opened the cell door. Santamore Decl. (Dkt. No. 70–15) ¶¶ 3, 11, 13; Dkt. No. 70–7 at 7; Johnson Dep. at 56–57. Behind the plexiglass shield, Ramsdell was the first to enter the cell. Bishop Decl. ¶ 10; Buckley Decl. ¶ 25; Debyah Decl. ¶ 10; Ramsdell Decl. ¶ 10; Sorrell Decl. ¶ 12; White Decl. ¶ 10; Dkt. No. 70–7 at 7; Dkt. No. 70–12 at 16. Johnson claims that he hit the shield with his forearm, knocking Ramsdell off-balance. Bishop Decl. ¶ 10; Debyah Decl. ¶ 10; Ramsdell Decl. ¶ 10; Sorrell Decl. ¶ 12; White Decl. ¶ 10; Dkt. No. 70–7 at 7; Johnson Dep. at 57–59. Johnson attempted to leave the cell but was pulled to the floor by Bishop. Johnson Dep. at 60.

Bishop entered the cell with a baton. Bishop Decl. ¶ 14; Debyah Decl. ¶ 14; Ramsdell Decl. ¶ 14; Sorrell Decl. ¶ 16; White Decl. ¶ 14; Dkt. No. 70–7 at 7. While the use of the baton is disputed, it was passed back out of the cell shortly after the extraction team entered. Bishop Decl. ¶ 14; Debyah Decl. ¶ 14; Ramsdell Decl. ¶ 14; Sorrell Decl. ¶ 16; White Decl. ¶ 14; Video 3. Johnson asserts that the baton was swung at him, though he deflected the blow. Johnson Dep. at 61–62. Johnson was then placed on his back and struck on the back of his head with the baton as the rest of the extraction team kicked and beat him while he attempted to hide behind the toilet. *Id.* at 62–66; Johnson Aff. (Dkt. No. 72) ¶¶ 23, 29. Johnson was unable to see who delivered what blows, but he testified that he remained silent and compliant throughout this attack. Johnson Dep. at 63–67. The video footage of the extraction fails to capture what happened in the approximately two minutes defendants were in Johnson's cell, though the audio shows that the entire event was very loud with Johnson yelling at the officers to "get off." Video 3.

Accordinglt o defendants, Ramsdell gained control over Johnson's left leg until leg irons were applied. Bishop Decl. ¶ 11; Debyah Decl. ¶ 11; Ramsdell Decl. ¶ 11; Sorrell Decl. ¶ 13; White Decl. ¶ 11; Dkt. No. 70–7 at 7. Bishop took control of Johnson's right leg, and then applied the leg restraints. Bishop Decl. ¶ 15; Debyah Decl. ¶ 15; Ramsdell Decl. ¶ 15; White Decl. ¶ 15; Dkt. No. 70–7 at 7; Dkt. No. 70–12 at 16. White and Debyah took control of Johnson's left and right wrists respectively, and then White applied restraints. Bishop Decl. ¶¶ 12–13; Debyah Decl. ¶¶ 12–13; Ramsdell Decl. ¶¶ 12–13; White Decl. ¶¶ 12–13; Dkt. No. 70–7 at 7; Dkt. No. 70–12 at 16. White and Debyah lifted Johnson to his feet and escorted him out of his cell. Dkt. No. 70–7 at 7. As Johnson entered the galley to be pat-frisked, he spit on Thompson's right arm. Bishop Decl. ¶ 18; Debyah Decl. ¶ 18; Ramsdell Decl. ¶ 18; Thompson Decl. ¶ 32; Uhler Decl. ¶ 32; White Decl. ¶ 18; Dkt. No. 70–7 at 7; Dkt. No. 70–12 at 16; Johnson Dep. at 68; Video 3. Uhler ordered that a spit net be applied. [8] Bishop Decl. ¶ 18; Debyah Decl. ¶ 18; Ramsdell Decl. ¶ 18; Thompson Decl. ¶ 32; Uhler Decl. ¶ 32; White Decl. ¶ 18; Dkt. No. 70–7 at 7; Dkt. No. 70–12 at 16; Johnson Dep. at 68–69; Video 3. After the net was secured, Ramsdell searched Johnson and found a sock tied around his waist. Bishop Decl. ¶¶ 20–21; Debyah Decl. ¶¶ 20–21; Ramsdell Decl. ¶¶ 20–21; Sorrell Decl. ¶¶ 20–21; Thompson Decl. ¶¶ 34–35; Uhler Decl. ¶¶ 34–35; White Decl. ¶¶ 20–21; Dkt. No. 70–7 at 7; Video 3. Within the sock, Ramsdell found contraband headphones. Bishop Decl. ¶¶ 20–21; Debyah Decl. ¶¶ 20–21; Ramsdell Decl. ¶¶ 20–21; Sorrell Decl. ¶¶ 20–21; Thompson Decl. ¶¶ 34–35; Uhler Decl. ¶¶ 34–35; White Decl. ¶¶ 20–21; Dkt. No. 70–7 at 7; Johnson Dep. at 78; Video 3.

**\*4** After the pat-frisk was completed, White and Debyah escorted Johnson to the showers to wash the chemical agent from his clothes and person. Bishop Decl. ¶ 22; Debyah Decl. ¶ 22; Ramsdell Decl. ¶ 22; Sorrell Decl. ¶ 22; Thompson Decl. ¶ 36; Uhler Decl. ¶ 36; White Decl. ¶ 22; Dkt. No. 70–7 at 7; Johnson Dep. 70–71; Video 3. While in the shower, Johnson resisted the officers by placing his feet on the walls and pushing away from the water, claiming that the spit net made it difficult to breathe. Bishop Decl. ¶ 23; Debyah Decl. ¶ 23; Ramsdell Decl. ¶ 23; Sorrell Decl. ¶ 23; Thompson Decl. ¶ 37; Uhler Decl. ¶ 37; White Decl. ¶ 23; Dkt. No. 70–7 at 7; Johnson Dep. at 71; Video 3. The video of the decontamination depicts Johnson screaming loudly and persistently throughout the decontamination process. Video 3. White forced Johnson to his knees

and he temporarily ceased resisting. Bishop Decl. ¶ 24; Debyah Decl. ¶ 24; Ramsdell Decl. ¶ 24; Sorrell Decl. ¶ 24; Thompson Decl. ¶ 38; Uhler Decl. ¶ 38; Dkt. No. 70–7 at 7; Video 3. Bishop entered the shower area and relieved White before Bishop and Debyah brought Johnson to a standing position as Johnson resisted. Thompson Decl. ¶ 38; Uhler Decl. ¶ 38; Dkt. No. 70–7 at 7; Video 3. Johnson was pushed against the wall to complete the decontamination process. Thompson Decl. ¶ 38; Uhler Decl. ¶ 38; Dkt. No. 70–7 at 7; Video 3. Johnson's jumpsuit was removed and discarded. Dkt. No. 70–7 at 7; Dkt. No. 70–12 at 15; Video 3.

Johnson was then moved to a holding pen, where he was examined by defendant Marlow, a nurse. Dkt. No. 70–7 at 7; Video 3. Johnson complained that his head hurt, [9] but that could not be examined due to the spit net. Marlow Decl. ¶¶ 8–9, Johnson Dep. at 72; Video 3. Otherwise, no injuries were reported or observed. Bishop Decl. ¶ 25; Debyah Decl. ¶ 25; Ramsdell Decl. ¶ 25; Sorrell Decl. ¶ 25; Thompson Decl. ¶ 39; Uhler Decl. ¶ 39; White Decl. ¶ 25; Dkt. No. 70–7 at 7; Dkt. No. 70–12 at 16. Photographs were taken by nonparty officer Dishaw. Dkt. No. 70–7 at 7; Video 3.

After Johnson's room was decontaminated, he was returned to his cell. Dkt. No. 70–7 at 7. Corrections officers removed all of Johnson's papers, as well as five cups which were used to store and propel liquid at the staff and two pens. Dkt. No. 70–7 at 7–8. Johnson contends that he only had one cup and one pen in his cell, in accordance with facility policies. Johnson Dep. at 77–78. Upon arrival, Johnson was ordered to kneel in his cell, whereupon the spit net was removed, the door was closed, and the mechanical restraints were removed. Dkt. No. 70–7 at 7; Dkt. No. 70–12 at 16; Video 3.

### B. Medical Treatment [10]

Prior to the cell extraction on May 10, 2007, Johnson was evaluated by medical staff because, as a disciplinary sanction, he was placed on a loaf diet. Atkinson Decl. ¶¶ 5–6. When Atkinson arrived that morning to examine Johnson, he yelled at Atkinson, was vulgar and obscene, and threatened to sue her. Atkinson Decl. ¶¶ 8–9; Atkinson Decl., Ex. A (health records noting Johnson's discontent with the loaf diet, general alertness, and vulgar and argumentative behavior). Later in the afternoon,

Atkinson was contacted and approved the use of chemical agents on Johnson. Atkinson Decl. ¶ 11; Atkinson Decl., Ex. B. The gas failed to affect Johnson dramatically or make him ill, and only made his eyes water. Johnson Dep. at 53; Video 3 (Johnson stating the his eyes burned from the gas).

**\*5** Following the extraction, [11] defendant Marlow attempted to examine Johnson in the holding pen. Marlow Decl. ¶ 7. Johnson reported a bump on his head, [12] but with the spit net on, Marlow was unable to see Johnson's head and face. Marlow Decl. ¶¶ 8–9; Johnson Dep. at 72. Johnson laughed at defendants' efforts because "they didn't do nothing [sic] to [him] but break [his] hand and bruise [him] up a little bit." Johnson Dep. at 70. Marlow noted no injuries, bleeding, bruises, or scratches. Atkinson Decl., Ex. B. Later that evening, when Johnson was back in his cell and not wearing the spit net, Marlow again attempted to examine him. Marlow Decl. ¶ 10; Atkinson Decl., Ex. B. Johnson became argumentative and the examination was terminated with no subjective reports or objective findings of an injury. [13] Marlow Decl. ¶ 11; Atkinson Decl., Ex. B. Johnson asserts that Marlow failed to properly document his injuries, Johnson threatened to sue him because of the failure, and Marlow affirmatively stated that he would note the exact opposite of Johnson's complaints in his medical record that he reported no injuries from the use of force. Johnson Dep. at 73–74; Johnson Aff. ¶ 74.

The following morning, Atkinson again checked on Johnson. Atkinson Decl. ¶ 13. Johnson "complained that he had hurt his knuckle when he hit the white cracker." Atkinson Decl. ¶ 13; Atkinson Decl., Ex. C (medical notes stating that Johnson's knuckle hurt from hitting another officer and that he was laughing when he informed the medical department of his injury); Marlow Decl. ¶ 12; Johnson Dep. at 106. Atkinson immediately referred Johnson to the physician's assistant, defendant P. Johnson. Atkinson Decl. ¶ 23; Johnson Dep. at 74. That same day, P. Johnson sent Johnson to the infirmary for x-rays and treatment of his finger. Atkinson Decl. ¶ 15; P. Johnson Decl. ¶¶ 12, 22–23; Johnson Dep. at 74–75.

Infirmary records indicate that Johnson was complaining of pain in his right rib area and left pinky finger, his finger was swollen, and that the x-rays of his hand showed an "impacted spiral fracture" of his finger. Atkinson Decl.,

Ex. D; *see also* Atkinson Decl., Exs. E, F (Radiology results showing a fracture of the left pinky finger and unremarkable films of the rest of the hand and his face and eyes). Johnson contends that medical staff failed to investigate his additional complaints of rib and head pain. Johnson Dep. at 75. However, while at the infirmary, Johnson's orbital area, his face and eyes, were x-rayed as well as his hand. Atkinson Decl., Exs. E, F. The finger was splinted, Johnson was instructed to keep the splint clean, dry, intact, and elevated, and Johnson was provided with Motrin for pain relief. Atkinson Decl., Ex. D.

On May 12, 2007, Johnson was examined for complaints of congestion and sore ribs, although he exhibited no signs of distress or complained of the treatment for his hand. Atkinson Decl. ¶ 16. Medical notes indicate that Johnson was yelling and laughing during the appointment, and that, upon examination, his splint was intact, he could wiggle his fingers on his left hand, there was no appreciable swelling, and there was good circulation as his nail beds remained pink. Atkinson Decl., Exs. C, G. Records from the following day also indicate that his fingers and splint were checked, his gait was steady, and his speech was clear. Atkinson Decl., Ex. G. On May 15, 2007, Johnson's left hand and right ribs were x-rayed and no abnormalities were found. *Id.* ¶ 17. The radiology reports were unremarkable for his ribs, showing no evidence of fracture ....“ *Id.,* Exs. C(1), K. On May 17, 2007, Johnson's splint was again checked, circulation was still good, there was no swelling noted, and he could easily wiggle his fingers. *Id.,* Ex. M.

 **\*6**  On May 18, 2007, Johnson was scheduled for transport to Alice Hyde Medical Center to meet with Dr. Marco, an orthopaedist. Atkinson Decl. ¶ 18 & Exs. C(1), H. Johnson was "extremely uncooperative" throughout the day, but was still called out for his appointment. *Id.* ¶ 19. While waiting in the holding pen, prior to departure, Johnson was ordered to sit down to wait, yet refused to comply with the orders, becoming argumentative and aggressive. Johnson Dep. at 91–92; Dkt. No. 72–4 at 2 (misbehavior report issued for Johnson because he refused to comply with orders to be seated and then verbally harassed corrections staff[14]. After leaving SHU, Johnson refused to receive treatment from Dr. Marco. Atkinson Decl. ¶ 20. Johnson refused treatment because his escort guards, particularly defendant LaVigine, threatened to assault him upon their arrival to a holding cell in another correctional facility.

Johnson Dep. at 90–91; Johnson Aff. ¶ 70. Dr. Marco still provided an assessment, noting that Johnson had refused treatment but, if he reconsidered, "to have a cast and treatment," Johnson could contact his staff. Atkinson Decl., Ex. H. Dr. Marco also recommended that Johnson continue the splint for at least six weeks, especially if he chose not to reschedule his appointment. *Id.* Ex. H.

On May 30, 2007, Johnson filed a grievance against the escorting officers for threatening him and precluding him from attending his specialist appointment. Dkt. No. 72–3 at 57. On June 6, 2007,, the grievance was denied, citing Johnson's actions as constituting the reason why he was given a misbehavior report and refused to attend the appointment and finding no merit to his allegations of staff harassment. *Id.* at 58. Almost immediately after the denial, on or about June 7, 2007, Johnson sought to make another appointment with the specialist and signed a consent form with Atkinson for another trip to the orthopaedist. Johnson Dep. at 93–94; Johnson Aff. ¶ 72; Dkt. No. 72–4 at 8. However, the form was never submitted and Johnson's appointment was never rescheduled. Johnson Mem. of Law (Dkt. No. 72–1) at 8. On July 18, 2007, almost a month after signing the consent form, Johnson learned that no new referral had been placed in the CORC affirmation of his previously denied grievance. Skt. No. 72–3 at 59.

Throughout the Fall, Johnson frequently refused examinations pertaining to the care of his hand and removal of his splint." Atkinson Decl. ¶ 24; Marlow Decl. ¶ 22; Smith Decl. ¶ 17; *see also* Atkinson Decl. ¶¶ 25 (refusal to have hand x-rayed on August 9th), 26 (noting general refusal of medical treatment on three days in September and three days in October), & Exs. R (refusal on September 30th to have hand and wrist examined), V, W (same refusal from October 4), Y (same refusal from October 9), Z (same refusal from October 10), BB (same refusal from October 11), CC (same refusal from October 13). Johnson disputes these allegations, testifying that he never refused any treatment or failed to attend examinations at his cell. Johnson Dep. at 84–85.

 **\*7**  It appears that Johnson's splint was removed in October. Atkinson Decl., Ex. S. Radiology reports from October 11 and December 24, 2007 both indicated normal results with no new abnormalities and no change in the position of his slightly displaced, healed, left pinky fracture. Atkinson Decl. ¶¶ 28, 30 & Exs. FF, GG; Smith

Decl. ¶¶ 21, 25. Thus, Johnson did not have any hand condition requiring further treatment. Atkinson Decl. ¶ 32.

### C. Grievances

On May 14, 2007, Johnson filed an inmate [15] grievance contending that his legal documents had been removed illegally from his cell. Quinn Decl. (Dkt. No. 70–13) [16] ¶ 7; Dkt. Nos. 70–12 at 9–10; 70–13 at 29–31; 72–2 at 33–34. Quinn was assigned to interview Johnson as a part of the grievance procedure. Quinn Decl. ¶ 8. Quinn attempted to interview Johnson on May 24, 2007, but that Johnson "was uncooperative and refused to be interviewed." Quinn Decl. ¶¶ 9–10; *see also* Dkt. No. 70–12 at 14 (memorandum to Superintendent from Quinn explaining that he unsuccessfully attempted to interview Johnson). [17] Johnson's grievance was denied on June 12, 2007, citing Quinn's inability to interview Johnson due to his argumentative and uncooperative behavior and the defendants' accounts in the Unusual Incident Report. Dkt. No. 70–12 at 12.

The following day, Johnson wrote to DOCS Commissioner Fischer, complaining that an investigation had never occurred, Quinn had never attempted to interview him, and the Superintendent's decision was based on faulty information. Dkt. Nos. 70–6 at 3; 72–3 at 40; Johnson Dep. at 95; Johnson Aff. ¶¶ 37, 40. Johnson denies the interview ever occurred because the SHU visitors logs show that Quinn was never on his gallery on May 24 when he allegedly attempted to interview Johnson. Johnson Aff. ¶¶ 43–46, 48; Dkt. No. 72–3 at 18–30. On June 19, 2007, Johnson filed another grievance, complaining that Quinn had never interviewed him. Dkt. No. 72–2 at 35. The grievance was ultimately denied, for the same reasons for which Johnson's first grievance concerning the illegal removal of his legal paperwork was demoed. *Id.* at 35. Johnson appealed this denial on July 3, 2007. *Id.* On June 28, 2007, Johnson wrote the DOCS Commissioner another letter, complaining about a delay in the mail services at Upstate. Dkt. No. 70–6 at 4–5. On July 26, 2007, defendant Bellany wrote to Johnson on the Commissioner's behalf, explaining that his Superintendent's Hearing disposition from his first grievance was never appealed and that his other two appeals about his second grievance concerning the failure

of Quinn to interview him and the mail delivery system were awaiting further disposition from the CORC. Dkt. No. 70–6 at 7, *see* note 15 *supra.*

On July 31, 2007, Johnson wrote to Bellamy's supervisor, defendant Peary, to seek an extension for his Superintendent's Hearing disposition as he claimed to have mailed the appeal on June 14 and the mail system must have lost, misplaced, or refused to process his appeal. Dkt. No. 70–12 at 21–22. On August 2, 2007, Peary denied Johnson's request for an extension citing a lack of mitigating circumstances which would justify such an extension. *Id* . at 24. Specifically, during his incarceration in 2007, Johnson had filed approximately ninety-eight grievances. Peary Decl. (Dkt. No. 70–12) ¶ 9; see *also* Dkt. Nos. 70–6 at 9–10; 70–12 at 6–7. Accordingly, "given [Johnson's] prodigious filing of grievances, the excuse proffered was inconsistent with [Johnson's] experience with the grievance procedure as evidenced by the sheer volume of grievances from [him]." Peary Decl. ¶ 17. Peary's denial of the requested extension was also a grievable action, which permitted Johnson to file a new grievance about her failure to extend his time limits for submitting his grievance. *Id.* ¶ 18; Dkt. No. 70–12 at 24. It does not appear that any appeal was taken. Johnson contends that Peary not only failed to grant him the extension to which he was entitled but received his appeal and refused to file it. Johnson Dep. at 97.

### II. Discussion

**\*8** In his complaint, Johnson alleges that his First Amendment rights were violated when (1) Quinn failed to investigate his grievance and (2) he was not given an extension to file an appeal of the denial of his grievance. Liberally construing the complaint, Johnson has also alleged that Thompson and Uhler retaliated against him on May 10, 2007 and interfered with his right of access to the courts by illegally seizing his legal paperwork. Johnson also alleges that his Eighth Amendment rights were violated when (1) he was subjected to excessive force during the cell extraction, (2) defendants failed to intervene and protect him during the cell extraction, and (3) defendants were deliberately indifferent to his broken finger, failing to reschedule a specialty medical appointment. Lastly, liberally construing the complaint, Johnson alleges a Fourteenth Amendment violation for unconstitutional seizure of his legal documents.

Defendants move for summary judgment on the grounds that (1) Johnson's constitutional claims are meritless; (2) Johnson has failed to establish the personal involvement of Bellamy, Connolly, Woods, Durgan, and Snyder; and (3) defendants are entitled to qualified immunity.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Fed.R.Civ.P. 56(c)*; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

When, as here, a party seeks dismissal or summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported

motion; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247–48.

### B. Personal Involvement

**\*9** Defendants contend that Johnson has failed to establish that Bellamy, Connolly, Woods, Durgan, or Snyder was personally involved in any of the alleged constitutional deprivations. " '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)).

### 1. Bellamy

Bellamy was named for both her alleged failure to supervise and her failure to answer Johnson's request for an extension for his grievances. While Bellamy may not have answered Johnson's request for an extension, a request which she did not appear to realize was addressed to her, Bellamy was still involved in investigating and responding to Johnson's grievances which alleged constitutional violations. Dkt. No. 70–6 at 7. This suffices

to establish personal involvement. *See e.g., Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009) (citing cases); *Boddie v. Morgenthau,* 342 F.Supp.2d 193, 203 ("While mere receipt of a letter from a prisoner is insufficient to establish individual liability ... [p]ersonal involvement will be found ... where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint.").

Accordingly, defendants' motion on this ground as to Bellamy should be denied.

### 2. Woods

In Johnson's opposition papers, he contends that the deployment and use of chemical agents in response to the events of May 16, 2007 were excessive and unconstitutional. Johnson Memorandum of Law at 32–33. As Woods ordered the use of such agents, he was directly and personally involved in the alleged constitutional violation. Accordingly, defendants' motion on this ground as to Woods should be denied.

### 3. White, Bishop, Debyah, and Ramsdell

While defendants correctly contend that Johnson has no recollection of who was specifically on the extraction team, each of these defendants' declarations establishes that they were in Johnson's cell when the alleged excessive force was applied and the assault occurred. Accordingly, defendants have established their own direct and personal involvement in the situation which gives rise to Johnson's alleged Eighth Amendment violation. Accordingly, defendants' motion on this ground as to these defendants should be denied.

### 4. Connolly, Durgan, Synder

**\*10** Connolly was a medical doctor at Upstate Correctional Facility, where Johnson was incarcerated. Connolly Decl. (Dkt. No. 70–9) ¶ 1. However, Connolly was transferred to Bare Hill Correctional Facility on March 1, 2007, months before the alleged constitutional violations occurred. Connolly Decl. ¶ 4. Accordingly, it is impossible that Connolly was directly involved with the

provision, or alleged denial, of Johnson's medical care, as he was not employed at the same institution.

Durgan, a lieutenant working at Upstate, was named as a defendant and part of the extraction team but did not participate in the extraction. Durgan Decl. (Dkt. No. 70–11) ¶¶ 1, 3–4. Durgan is not identified by the other members of the team as a participant and his name does not appear on the relevant reports. Durgan *Id.* ¶ 4. Accordingly, no reasonable person could find that he was directly involved in the constitutional violation.

Similarly, Johnson also claimed that Snyder was involved in the extraction. Snyder Decl. (Dkt. No. 70–16) ¶ 3. However, Snyder is a Captain at the Central Command Center, which is located in Albany. *Id.* ¶¶ 1, 5. Snyder was not located at Upstate on May 7, 2007 and has never been assigned to Upstate. *Id.* ¶¶ 5–6. While he received a report of the incident, the facts do not indicate, nor does Johnson allege, that Snyder was personally involved in the extraction.

The record also fails to establish that any of these defendants were in a position responsible for creating or enforcing any of the policies upon which Johnson rests his claims. Moreover, there are no allegations that any of these defendants were grossly negligent in hiring or supervising subordinates. Accordingly, defendants' motion on this ground as to Connoly, Durgan, and Snyder should be granted.

### C. Failure to State a Claim

An action commenced pursuant to 42 U.S.C. § 1983 requires proof of the "deprivation of any right[ ], privilege[ ], or immunit[y] secured by the Constitution" or laws of the federal government. 42 U.S.C. § 1983. Thus, no action lies under § 1983 unless a plaintiff has asserted the violation of a federal right. *See Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n,* 453 U.S. 1, 19, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981).

### 1. Right to an Investigation

Johnson contends that Quinn failed to interview or investigate properly his grievance into the illegal seizure of his legal materials. Even viewing the facts in the light

most favorable to Johnson, he has failed to state a claim upon which relief can be granted because he has no constitutional right to an investigation. *See Carrasquillo v. City of N.Y.,* 324 F.Supp.2d 428, 438 (S.D.N.Y.2004) (holding that prisoners have "no constitutional or federal right to an investigation into ... [an] accident, or to have his requests for an investigation answered"). Accordingly, defendants' motion as to this claim should be granted. [18]

### 2. Interference with Grievances

**\*11** Johnson contends that Bellamy, Peary, and Woods all interfered with his ability to file grievances. Johnson contends that Peary should have granted him an extension by which to file an appeal of a denial of his legal document grievance and that Peary and Bellamy knew of the appeal being lost or delayed but failed to process it on Johnson's behalf.

"Prisoners, including pretrial detainees, have a constitutional right of access to the courts ...." *Bourden v. Loughren,* 386 F.3d 88, 92 (2d Cir.2004) (internal quotation marks omitted) (citing *Bounds v. Smith,* 430 U.S. 817, 821–22, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977) (citations omitted) (holding that all prisoners have a well-established Constitutional right to "adequate, effective, and meaningful" access to courts). "[I]nmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim." *Shell v. Brzezniak,* 365 F.Supp.2d 362, 370 (W.D.N.Y.2005) (citations omitted); *see also Cancel v. Goord,* No. 00–CV–2042 (LMM), 2001 WL 303713, at \*3 (S.D.N.Y. Mar.29, 2001) ("[I]nmate grievance procedures are not required by the Constitution and therefore a violation of such procedures does not give rise to a claim under § 1983.") (citations omitted). However, "[i]f prison officials ignore a grievance that raises constitutional claims, an inmate can directly petition the government for redress of that claim." *Shell,* 365 F.Supp.2d at 370 (citations omitted).

In this case, Johnson cannot establish that he had a liberty interest which required constitutional protection. However, because the underlying facts of the grievance concerned deprivations under other constitutional amendments and established constitutional grounds, namely allegations of retaliation and excessive force,

the substance of Johnson's grievance is addressed *infra.* Accordingly, defendants' motion on this ground should be granted.

### D. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII.

### 1. Medical Care

This prohibition extends to the provision of medical care. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

" 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir.2003) (citing *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185.

**\*12** Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded

the prisoner's serious medical needs." *Chance,* 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. *Chance,* 143 F.3d at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001).

In this case, defendants' correctly assert that Johnson has failed to establish a serious medical need. At best, construing all facts in the light most favorable to Johnson, he suffered a broken pinky finger on his left hand, a slight bump on his head, and a mild head and rib pain. "[C]onditions that have failed to meet this [sufficiently serious medical needs] standard include ... a broken finger." *Henderson v. Doe,* No. 98–CV–5011, 1999 WL 37833, at *2 (S.D.N.Y. June 10, 1999). Additionally, mild headaches and tension are insufficient to demonstrate a serious medical need. *Borrelli v. Askey,* 582 F.Supp. 512, 513 (E.D.Pa.1984). Thus, even considering both injuries together, the broken finger and alleged head injury are insufficient to satisfy the objective prong of the analysis. Furthermore, transient pain is not enough to elevate the injuries into those which a reasonable individual or physician would presume treatment was necessary.

Even if Johnson's injuries constituted a serious medical need, he has failed to allege any delay or deliberate indifference on account of defendants. It is undisputed that Johnson was mean, vulgar, harassing, and contentious with medical staff. Atkinson Decl. ¶ 27; P. Johnson Decl. ¶ 27; Smith Decl. ¶ 20; Johnson Dep. at 86–89. Despite his demeanor, his medical records demonstrate that he was seen and treated, on average, every other day by medical staff. Such records controvert claims of deliberate indifference.

Furthermore, Johnson was seen immediately after the use of force. Marlow Decl. ¶¶ 7–9; Johnson Dep. at 72; Video 3. Even if Johnson's allegations against Marlow are true, Marlow did not prohibit or delay Atkinson from seeing Johnson the following day and referring him to the physician's assistant. Atkinson Decl. ¶¶ 13, 15, 23;

P. Johnson Decl. ¶¶ 12, 22–23; Atkinson Decl., Exs. C–F. Thus, Johnson received timely care for his injuries. Johnson was sent immediately to the infirmary, given x-rays for his hand [19] and face, immobilized with a finger splint, and provided with pain medication. Atkinson Decl., Exs. CF. Treatment notes from the following days indicate that Johnson's hand was not swollen, he could wiggle his fingers, and his circulation was good. Atkinson Decl., Exs. C, G, M. Despite Johnson's contentions of unbearable pain, such complaints are belied by the medical notes where he was seen alert and never complaining of pain in his wrist, hand, or ribs. When Johnson did complain of rib pain, he was taken immediately for x-rays which were unremarkable. Atkinson Decl. ¶ 17; Atkinson Decl., Exs. C(1), K. Such immediate attention to complaints and diagnostic testing also refutes claims of deliberate indifference.

**\*13** One of Johnson's primary complaints was the refusal of treatment by a hand specialist. [20] While the record indicates that Johnson's behavior was the primary cause of his inability to see the hand specialist, even viewing the facts in the light most favorable to Johnson, he has still failed to allege deliberate indifference. It is undisputed that in June, Johnson and medical personnel began making arrangements for another consultation with a specialist. Johnson Dep. at 93–94; Johnson Aff. ¶ 72; Dkt. No. 72–4 at 8. Johnson fails specifically to allege, nor does the record indicate, that any defendant's failure to file the request for a consultation was due to any malicious or wanton disregard for Johnson's health and safety. *See* Johnson Mem. of Law at 8 (failing to allege with specificity who, if anyone, from the medical staff was responsible for not turning in Johnson's request for consultation). This constituted no more than negligent behavior. *See Estelle,* 429 U.S. at 107. Negligence is insufficient to establish deliberate indifference. *Id.* at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). This conclusion is corroborated by the medical defendants' further radiology requests for Johnson's hand in October and December (Atkinson Decl. ¶¶ 28, 30; Smith Decl. ¶¶ 21, 25; Atkinson Decl., Exs. EE, GG), which showed unremarkable and unchanged results and indicated that there was no hand condition which required treatment.

Any contentions by Johnson that he required the care of a specialist, or a cast instead of a splint, are mere disagreements in treatment. Such disagreements are

insufficient to state a claim for deliberate indifference. *Sonds,* 151 F.Supp.2d at 312. The central inquiry is one of medical appropriateness. *See Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986) ("The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves. The essential test is one of medical necessity and not one simply of desirability.") (internal quotation marks and citations omitted). Johnson was appropriately immobilized with the splint, which healed his hand as is evidenced by any subsequent radiology reports. Atkinson Decl. ¶¶ 28, 30; Smith Decl. ¶¶ 21, 25; Atkinson Decl., Exs. EE, GG. The use of the splint was acknowledged and approved by the orthopaedist, who issued a medical review of Johnson's case despite his inability to examine him personally. Atkinson Decl., Ex. H.

Lastly, despite Johnson's contentions to the contrary, any delay in treatment for his hand or removal of his splint after the summer of 2007 was caused by Johnson's own behavior. The medical record is replete with instances of him refusing treatment and medication in the fall and winter of 2007. Atkinson Decl. ¶¶ 24–26; Marlow Decl. ¶ 22; Smith Decl. ¶ 17; Atkinson Decl., Exs. R, W–Z, BB–CC. Such subsequent delays had no consequence on Johnson's healing, as confirmed by the lack of change in his radiology reports, but cannot be ascribed to claims of deliberate indifference on the defendants' part. Johnson cannot refuse treatment and then allege that delays were caused by anyone other than himself.

**\*14** Accordingly, defendants' motion on this ground should be granted.

## 2. Excessive Force

Inmates enjoy an Eighth Amendment protection against the use of excessive force and may recover damages for its violation under § 1983. *Hudson v. McMillian,* 503 U.S. 1, 9–10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000). To bring a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999).

The objective element is "responsive to contemporary standards of decency" and requires a showing that "the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection." *Hudson,* 503 U.S. at 9 (internal citations omitted); *Blyden,* 186 F.3d at 262. However, "the malicious use of force to cause harm constitute[s][an] Eighth Amendment violation *per se"* regardless of the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing *Hudson,* 503 U.S. at 9); *see also Wilkins v. Gaddy,* ——U.S. – – – – , —— S.Ct. ——, —— L.Ed.2d – – – – , 2010 WL 596513 (2010) ( "The core judicial inquiry ... was not whether a certain quantum of injury was sustained, but rather whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id.* at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "the extent of the injury and the mental state of the defendant[;] ... the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) (internal quotation marks and citations omitted).

**\*15** As previously discussed, Johnson has failed to establish an injury of sufficient severity, worthy of Eighth Amendment protection. However, a serious injury is only a factor in the analysis. A *de minimus* injury may still survive summary judgment if there was a malicious use

of excessive force. *Blyden,* 186 F.3d at 263; *see also Wilkins,* —— U.S. ——, 130 S.Ct. 1175, 175 L.Ed.2d 995, 2010 WL 596513 (2010) (granting *certiorari* for an Eighth Amendment case which was dismissed based upon the inmate's *de minis* injury without discussion or regard for the fact that "injury suffered ... is one factor ... [yet] it is [force] that ultimately counts," in determining whether excessive force was used). Maliciousness is determined by the five factor test enumerated above, in *Scott.* Accordingly, after applying such a test in light of the record and videos, no reasonable person could conclude that defendants' actions were malicious or wanton rather than necessary to uphold discipline and ensure safety.

The first factor militates in favor of defendants. As previously discussed, Johnson did not suffer from sufficiently serious injuries as a result of the extraction. Moreover, his self-acknowledged violent and combative nature illustrated his unstable mental state. Johnson Dep. at 36–37, 41–45, 44–45. The defendants' declarations and video tape all show that, despite Johnson's allegations to the contrary, he was agitated and yelling every time he was approached at his cell. Videos 1–3. Moreover, Johnson testified that he intended to fight the corrections staff and taking out as many of the officers as he could, if given the opportunity. Johnson Dep. at 36–37, 41–45, 44–45.

The second and fourth factors also weigh in favor of defendants. Defendants attempted multiple times to persuade Johnson verbally to peacefully leave his cell. Buckley Decl. ¶ 14; Thompson Decl. ¶ 14; Video 3. They called for assistance upon the CIU, Johnson's counsellor, and the chaplain, all without success. Buckley Decl. ¶¶ 15–16; Thompson Decl. ¶¶ 15–16; Uhler Decl. ¶¶ 15–16; Dkt. Nos. 70–7 at 6, 70–12 at 16. When they trusted that Johnson would comply with staff orders, and Ellsworth reached through the slot in the cell door to administer restraints, Johnson attempted to stab him with a pen and spit on him. Buckley Decl. ¶¶ 12–13; Thompson ¶¶ 12–13; Uhler Decl. ¶¶ 12–13; Dkt. Nos. 70–7 at 6, 70–12 at 13, 15–16; Johnson dep. at 34–36. Johnson's deceit and violence posed a serious threat to the defendants' health and safety. Such actions, also corroborated by Johnson's testimony that he intended to fight, and that defendants were fully aware of his intent, leaving no material question of fact that force was the only option for defendants to obtain compliance. Johnson Dep. at 36–37, 41–45, 54–55.

The third factor, the amount of force used in relation to the need, also supports defendants' motion for summary judgment. After two hours of attempting to persuade Johnson to comply, defendants resorted to the introduction of gas into the cell. Buckley Decl. ¶¶ 19, 21; Bishop Decl. ¶¶ 4, 6; Debyah Decl. ¶¶ 4, 6; Ramsdell Decl. ¶¶ 4, 6; Sorrell Decl. ¶¶ 6, 8; Thompson Decl. ¶¶ 19, 21; Uhler Decl. ¶¶ 19, 21; White Decl. ¶¶ 4, 6; Dkt. Nos. 70–7 at 6, 70–12 at 16; Johnson Dep. at 50. When this was attempted, Johnson remained aggressive and assaultive, trying to block the feed-up slot with a pillow and taking every opportunity to throw various liquids on defendants. Buckley Decl. ¶¶ 22–23; Bishop Decl. ¶¶ 7–8; Debyah Decl. ¶¶ 7–8; Ramsdell Decl. ¶¶ 7–8; Sorrell Decl. ¶¶ 9–10; White Decl. ¶¶ 7–8; Dkt. Nos. 70–7 at 6; Johnson Dep. at 46–47, 50. When multiple canisters of gas failed to quell Johnson's increasing rage, the entrance and extraction of him afforded the only other option. During this extraction, Johnson still failed to cooperate. As he testified, Johnson hid in his cell, waiting for the extraction team to enter, so that he could attack them and attempt to escape the cell. Johnson Dep. at 57–59. Johnson initially hit the defendants by his own admission. *Id.* Moreover, despite Johnson's allegations of a brutal beating, he escaped relatively unscathed and still non-compliant. This is further shown by Johnson's actions of spitting on Thompson while he is escorted out of the cell. Bishop Decl. ¶ 18; Debyah Decl. ¶ 18; Ramsdell Decl. ¶ 18; Thompson Decl. ¶ 32; Uhler Decl. ¶ 32; White Decl. ¶ 18; Dkt. Nos. 70–7 at 6, 70–12 at 16; Johnson Dep. at 68–69; Video 3. Such actions required the addition of the spit net for the health and safety of the defendants.

**\*16** Lastly, as previously discussed, the record undeniably shows defendants' attempts to temper and diffuse the situation far before the suggestion of chemical agents and the introduction of an extraction team. Johnson states multiple times that he was willing to comply and leave his cell, but such contentions are contradicted by the videos and his deposition testimony which indicated that he had, and made known, his intentions to fight every defendant involved in this extraction. Defendants are charged with running a correctional facility, ensuring the health and safety of both inmate and officers alike. Johnson's deposition testimony, defendants' declarations, and the facility video tapes fail to raise any question of material fact that defendants could have pursued a different option or that their actions were not reasonably calculated to ensure safety. [21]

Accordingly, defendants' motion should be granted on this ground.

### 3. Failure to Intervene

Johnson's "failure to intervene claims premised on his excessive force claim are dismissed [because he] has failed to establish any constitutional violations based on excessive force." *Atkins v. County of Orange,* 372 F.Supp.2d 377, 407 (S.D.N.Y.2005). As the Second Circuit has mandated that a "duty to intervene exists only where a person's constitutional rights have been violated," Johnson has failed to establish a basis upon which to state his claim. Accordingly, defendants' motion should be granted as to this claim.

### E. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 Fed .Appx. 146 (2d Cir. Nov.10, 2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available ... if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990) (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, the second prong of the inquiry need not be reached because, as discussed *supra,*

it has not been shown that defendants violated Johnson's constitutional rights.

 **\*17** Therefore, it is recommended in the alternative that defendants' motion on this ground be granted.

### F. Other Claims

### 1. Interference with Access to the Courts

Liberally construing Johnson's complaint, he appears to allege interference with his First Amendment rights based upon defendants' illegal seizure of his legal material from his cell. In order to state a claim of denial of access to the courts a plaintiff must allege "that a defendant caused 'actual injury,' i.e. took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim.' " *Id.* (*citing Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997) (*quoting Lewis v. Casey,* 518 U.S. 343, 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996)).

In this case, even reading the facts in the light most favorable to Johnson, he has failed to allege a viable First Amendment claim. While Johnson claims that his legal papers were unlawfully stolen, he fails to allege or prove any sort of actual injury which occurred from their confiscation. [22] Johnson has clearly had no issues with successfully participating in motion practice in the current case. Thus, without alleging an injury, there is no issue of material fact upon which to base his claims.

Accordingly, defendants' motion as to any such claim should be granted.

### 2. Retaliation

Liberally construing Johnson's complaint, he alleges that defendants Thompson and Uhler fabricated a story to confiscate all of his legal papers in retaliation for Johnson filing of grievances and lawsuits. To state an actionable claim for retaliation, a plaintiff must first allege that the plaintiff's conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996); *see also Lipton v. County of Orange,* 315 F.Supp.2d 434, 447–48

(S.D.N.Y.2004) (applying First Amendment retaliation factors to a pretrial detainee complaint). Courts must view retaliation claims with care and skepticism to avoid judicial intrusion into matters of prison administration. *Jackson v. Onondaga County,* 549 F.Supp.2d 204, 214–15. Conclusory allegations alone are insufficient. *Id.* at 214 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) (explaining that "claim[s] supported by specific and detailed factual allegations ... ought usually be pursued with full discovery.")).

In this case, Johnson has failed to allege facts sufficient to support a retaliation claim. While filing grievances and lawsuits are actions protected by the First Amendment, Johnson has failed specifically to alleged who he filed grievances and lawsuits against and when they were filed. Johnson has failed to allege any facts to establish that Thompson's and Uhler's adverse actions were motivated by, or temporally related to, any constitutionally protected conduct. Thus, all Johnson has proffered are conclusory allegations to demonstrate that he was the victim of retaliatory conduct. These conclusory allegations, without more, are insufficient to maintain the present claims. *Id.*

 **\*18** Accordingly, defendants' motion should be granted as to these claims.

### 3. Confiscation of Property

Liberally reading Johnson's complaint, he may also allege a claim for defendants' theft of his legal papers. An inmate has a right not to be deprived of property without due process. However, federal courts do not provide redress for the deprivation of property if there is an adequate state court remedy which the plaintiff can pursue. *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). "An Article 78 proceeding permits a petitioner to submit affidavits and other written evidence, and where a material issue of fact is raised, have a trial of the disputed issue, including constitutional claims." *See Locurto v. Safir,* 264 F.3d 154, 174 (2d Cir.2001) (citations omitted); *see also* N.Y. C.P.L.R. §§ 7803, 7804; *Campo v. New York*

*City Employees' Ret. Sys.,* 843 F.2d 96, 101 (2d Cir.1988) ("Article 78 ... provides a summary proceeding which can be used to review administrative decisions."). State law also provides that "[a]ny claim for damages arising out of any act done ... within the scope of ... employment and in the discharge of the duties of any officer or employee of the department [of corrections] shall be brought and maintained in the court of claims as a claim against the state." N.Y. Corr. Law § 24(2).

In this case, Johnson contends that there was an unconstitutional deprivation when his legal documents were allegedly confiscated. Such claims fail as a matter of law for several reasons. First, the Article 78 procedure exists and affords an adequate state court remedy. Second, because Johnson is suing for damages, he must pursue his claims here against New York State in the New York Court of Claims pursuant to Corrections Law § 24. Thus, the correct venue to litigate these claims is in state court. Accordingly, defendants' motion should be granted as to this claim.

### III. Conclusion

For the reasons stated above, it is hereby

**RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 70) be **GRANTED** and that judgment be granted to all defendant on all claims.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

### All Citations

Not Reported in F.Supp.2d, 2010 WL 2039164

---

Footnotes

1        This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2      Johnson has correctly indicated that declarations must be made by those with personal knowledge of the events in question. Johnson Aff. (Dkt. No. 72) ¶¶ 60, 76. Thus, while some portions of defendants' declarations are hearsay, the citations to affidavits herein are only to those for which the affiant was personally involved or otherwise had personal knowledge.

3      Defendants have provided three video tapes which capture the events of May 10, 2007. *See* Videos 1–3. The first two, both from fixed camera locations, run, from noon to 1:00 p.m. and from 2:00 p.m. to 3:00 p.m. The third, from a handheld camera operated by defendant Sorrell, recorded during the extraction, decontamination, and medical examination. Video evidence, in conjunction with other papers, have been used as a basis to grant summary judgment in an excessive force claim. *See e.g., Stanley v. Hejirika,* 134 F.3d 629, 635–36 (4th Cir.1998) (finding videotape evidence in excessive force claim sufficient to defeat claim against officers who "used significant physical force in subduing [plaintiff], but they also had objectively reasonable grounds to believe such force was necessary.").

4      This document is a report written by Thompson and attached as an exhibit to many of the defendants' declarations. *See also* Dkt. Nos. 70–10 at 6–8; 70–14 at 6–8; 70–19 at 34–36; 70–20 at 6–8. Accordingly, for the sake of brevity, citation will only be made once to the first copy which was included in defendants' motion.

5      SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N .Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

6      This document is the "Unusual Incident Report" from May 10, 2007, which is attached as an exhibit for many of defendants' declarations. *See also* Dkt. No. 70–19 at 41–55; Dkt. No. 72–3 at 42–45. For the sake of brevity, citation will only be made once, to the first copy which was included in defendants' motion.

7      Video of the event clearly shows defendants issuing multiple orders for Johnson to stand at the back of his cell and comply with the officers' demands. While his responses are not entirely audible, the video also captures Johnson's yelling and screaming back at the officers. *See* Video Exs. 1–3.

8      "A 'spit net' is a hooded device with a screen front that when applied to an inmate, limits his ability to see and spit on staff." Bishop Decl. ¶ 19; Debyah Decl. ¶ 19; Ramsdell Decl. ¶ 19; Sorrell Decl. ¶ 19; Thompson Decl. ¶ 33.

9      Johnson contends that when he was hit in the head once with the baton, the blow did not break the skin, but left a bump on his head. Johnson Dep. at 64.

10      Defendants' filed Johnson's medical records and defendant medical staff declarations traditionally. A copy of the filings were also provided to Johnson. Thus, citations to the medical record will be made to the pagination provided in defendants' traditional filing. Additionally, while Johnson included portions of his medical records as exhibits, for the sake of convenience citations will only be made to defendants' submissions as they represent the complete record.

11      Pursuant to DOCS policies and procedures, when force is used on an inmate, he or she must be examined by medical staff. Marlow Decl. ¶ 6.

12      *See* note 9 *supra.*

13      Johnson's confrontations with prison employees are frequently documented. Medical staff indicate, without denial, that Johnson "subjected [them] ... to threats, vulgar language, profanities and a lack of cooperation as we

attempted to examine, evaluate, and treat [his] many and varied complaints." Atkinson Decl. ¶ 27; P. Johnson Decl. ¶ 27; Smith Decl. ¶ 20; *see also* Johnson Dep. at 86–89. Health records indicate at least fourteen instances where Johnson's temper, derogatory remarks, and threats were documented from September through December, 2007. Atkinson Decl., Exs. Z, AA–DD. Johnson acknowledges calling all staff derogatory names (Johnson Dep. at 86–88, 89) and suing staff for failing to treat him even after examinations were terminated for his vulgar and abrasive treatment of the medical staff. Johnson Dep. at 86.

14    Johnson was found guilty on this charge, but the finding was reversed on administrative appeal. Dkt. No. 72–4 at 3–6.

15    DOCS has established a procedure for inmates to file grievance about prison conditions and for the resolution of those grievances titled the Inmate Grievance Program (IGP). "The IGP is a three-step process that requires an inmate to: (1) file a grievance with the IGRC [Inmate Grievance Resolution Committee]; (2) appeal to the superintendent within four working days of receiving the IGRC's written response, and (3) appeal to the CORC [Central Office Review Committee] ... within four working days of receipt of the superintendent's written response." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004) (internal citations omitted).

16    Quinn has submitted two nearly identical declarations. *See* First Quinn Decl. (Dkt. No. 70–13); Second Quinn Decl. (Dkt. No. 70–19).

17    This document is a memorandum from defendant Quinn, identical copies of which are also attached in other defendants' declarations. *See* Dkt. No. 70–13 at 33.

18    To the extent that such contentions can be construed to allege that Johnson should be compensated for Johnson's failure to comply with DOCS policies and protocols for investigating grievances, such contentions are also meritless. *Bolden v. Alston,* 810 F.2d 353, 358 (2d Cir.1987) ( "State procedural requirements do not establish federal constitutional rights. At most, any violation of state procedural requirements would create liability under state law ....").

19    Radiology records indicate that Johnson's orbital area surrounding his eyes was unremarkable and that there were no fractures.

20    To the extent that Johnson attempts to allege a constitutional violation based upon LaVigine's alleged threats, such a claim is meritless. *See Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1996) ("The claim that a prison guard called Purcell names also did not allege any appreciable injury and was properly dismissed.").

21    For the same reasons articulated *infra,* Johnson's allegations that the use of chemical agents was excessive force are also denied. First, the use of chemical agents alone does not represent "malicious or sadistic" actions. *Combs v. Wilkinson,* 315 F.3d 548,557(6th Cir.2002) (citations omitted). Second, the use of such chemicals did not cause any harm or pain to Johnson, as he acknowledged in his testimony. The gas merely irritated his eyes. Third, the introduction of gas was appropriate and necessary given Johnson's anger and aggressiveness that had unfolded and increased throughout the hours as defendants attempted to obtain his compliance.

22    Johnson has also failed to allege the legal actions to which his stolen papers pertained. This too is fatal to any such First Amendment claims. *See Lewis v. Casey,* 518 U.S. 343, 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (holding that the plaintiff must show a "hinder[ance to] his efforts to pursue a legal claim ... [such as] that a complaint he prepared was dismissed...."); *Warburton*

*v. Underwood,* 2 F.Supp.2d 306, 312 (W.D.N.Y.1998) ("Plaintiff must show that he has suffered an actual injury ... that is that a nonfrivolous legal claim has been frustrated or was being impeded due to the actions of prison officials.") (citations and internal quotation marks omitted).

© 2016 Thomson Reuters. No claim to original U.S. Government Works.


Not Reported in F.Supp., 1992 WL 310792 (S.D.N.Y.)
**(Cite as: 1992 WL 310792 (S.D.N.Y.))**

**C**
Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Henry MORRIS, Plaintiff,
v.
Robert HOKE, et al., Defendants.

No. 87 Civ. 7812 (VLB).
Oct. 21, 1992.

MEMORANDUM ORDER
VINCENT L. BRODERICK, District Judge.

**\*1** This is a suit by a state prisoner against various prison and medical personnel alleging violations of federal constitutional rights. Plaintiff seeks to invoke 42 USC 1983 pursuant to this court's jurisdiction under 28 USC 1331.

Plaintiff was attacked by other inmates while in custody and hospitalized; among other things he alleges delays and shortfalls on the part of prison medical authorities in providing recommended post-hospitalization therapy. The events in question are described in detail in a thorough Report and Recommendation by Chief United States Magistrate Judge Nina Gershon.

I approve and adopt the findings, conclusions and recommendations of the Report and Recommendation of United States Chief United States Magistrate Judge Nina Gershon dated April 15, 1992 insofar as she recommends summary judgment dismissing the complaint as to defendants Robert Hoke, Wayne Duer, Corrections Officer Houston, Green Haven Correctional Facility, Charles J. Scully, and Medical Department of Eastern Correctional Facility. The Magistrate Judge's detailed analysis establishes that these defendants were not responsible for any constitutional violations.

I also grant summary judgment dismissing the complaint as to the remaining defendants Dr. Kasmar of Green Haven Correctional Facility and An-

nie Seeley Cole as Health Services Administrator of Green Haven. The claim against Kasmar and Cole is that recommended post-hospitalization occupational and physical therapy was omitted. While such inadequacies may well have constituted negligence or medical malpractice, I find no basis for asserting that deliberate disregard of plaintiff's condition or intentional violation of federal constitutional rights was involved. There is no specific evidence of intentional disregard of plaintiff's medical needs by these defendants, or of any motive for such intentional misconduct.

The Magistrate Judge treats lack of explanation of delays and lack of specificity in some of the records as sufficient to support a constitutional claim against these individual health professionals, rather than as merely a malpractice claim or as the basis for a request for injunctive relief to obtain any treatment still needed. To convert what would be malpractice if tortious in a private context into a constitutional violation in the state agency employee context requires deliberate indifference under *Estelle v. Gamble,* 429 U.S. 97, 106 (1976); such indifference can, like almost any legal conclusion, be inferred from circumstances. See *Harding v. Kuhlmann,* 588 F.Supp. 1315 (S.D.N.Y.1984), aff'd 762 F.2d 990 (2d Cir.1985); and see generally *Holland v. United States,* 348 U.S. 2112 (1954); *Direct Sales Co. v. United States,* 319 U.S. 703 (1943); *Interstate Circuit v. United States,* 306 U.S. 208, 226 (1939).

The need for direct or inferential evidence of deliberate wrongdoing or deliberate indifference at the summary judgment stage in personal suits against governmental employees is emphasized by their right to interlocutory appeal from denial of such summary judgment on grounds of qualified immunity, based on the right of such employees to avoid the risk of trial where the suit is not well grounded. See *Mitchell v. Forsyth,* 472 U.S. 511 (1985); see also Schroeder, "Rights Against Risks," 86 Colum.L.Rev. 495 (1986).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1992 WL 310792 (S.D.N.Y.)
**(Cite as: 1992 WL 310792 (S.D.N.Y.))**

**\*2** It is not permissible (*Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 554, 587 [1986] ) to infer, absent some specific basis for drawing such an inference, that medical personnel failing to perform recommended procedures have done so deliberately or with deliberate indifference. If there is no evidentiary basis for drawing such an inference, the failure to perform the recommended procedures would underlie, at best, a state claim of negligence or medical malpractice, not cognizable under 42 USC 1983.[FN1]

The clerk is directed to close this case.

SO ORDERED.

> FN1. Although not directly relevant to the present case, it is important in evaluating the consequences of translation of negligence into a basis for 42 U.S.C. 1983 liability, to recognize that § 1983 liability also carries liability for attorney's fees because of the fact that deliberate violations of federal rights must be shown.

S.D.N.Y.,1992.
Morris v. Hoke
Not Reported in F.Supp., 1992 WL 310792 (S.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

2012 WL 3104884
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Forest L. FATE, Plaintiff,

v.

Glenn GOORD, et. al., Defendants.

No. 11 Civ. 7493(RWS).
|
July 31, 2012.

**Attorneys and Law Firms**

Forest L. Fate, Romulus, NY, pro se.

Eric T. Schneiderman, Attorney General of the State of
New York, by: Jeb Harben, Esq., New York, NY, for
Defendants.

OPINION

SWEET, District Judge.

**\*1** Defendants Glenn Goord, the former Commissioner
of what is now the New York State Department of
Correction and Community Supervision ("DOCCS")
("Goord" or the "Former Commissioner"), Brian Fischer,
current Commissioner of DOCCS ("Fischer" or the
"Commissioner"), and John Lempke, Superintendent
of the DOCCS Five Points Correctional Facility
("Five Points") ("Lempke" or the "Superintendent"),
(collectively, the "Defendants"), have moved to dismiss
*pro se* inmate Forest Fate's ("Fate" or the "Plaintiff")
complaint (the "Complaint") pursuant to Rules 12(b) (1),
(3), and (6) of the Federal Rules of Civil Procedure and
28 U.S .C. § 1406. Brought pursuant to the Rehabilitation
Act, the Americans with Disabilities Act (the "ADA") and
42 U.S.C. § 1983, the Complaint has alleged violations
of the Eighth, Ninth and Fourteenth Amendments of the
U.S. Constitution for alleged delays in receiving a hearing
aid by the Plaintiff while he was incarcerated at Five
Points.

Based on the conclusions set forth below, the motion to
dismiss is granted and the Complaint is dismissed.

*Prior Proceedings & Facts*

On October 16, 2011, Fate, *pro se,* filed the Complaint
in the Southern District of New York and was granted
in forma pauperis status. The facts are set forth in the
Complaint and the declarations submitted by the parties
and are not in dispute except as noted below.

In July 2010, while incarcerated at Downstate correctional
facility, Fate was scheduled for audiological testing.
(Complaint at Attached Page 1). The results indicated that
he suffered from a HL30 "non-significant hearing loss."
According to Fate, the facility's medical staff offered a
hearing aid and stated that he would be moved to a facility
with other inmates with hearing loss for future follow-ups.
(*Id.*).

Fate was transferred to Five Points on August 2011. (*Id.*).
Upon his arrival, Fate informed the facility's medical
staff that he had hearing loss and requested reasonable
accommodations. (*Id.*). Fate sought a hearing aid and
"shake awake" alarm. (*Id.*). According to Fate, he could
not hear the meal or line up calls over the loudspeaker and
missed meals and count because of the lack of reasonable
accommodations for his hearing loss. (*Id.*).

On August 8, 2011, Fate "tried to talk to the officer's (sp)
about my problem and they said they don't have anything
medically concerning hearing loss." (*Id.*). Thereafter, Fate
contacted his wife and counselor about his grievances.
(*Id.*). His counselor informed him that he had been
scheduled to see the doctor at Five Points for audiology
testing. (*Id.*).

According to the Complaint, on September 23, 2011,
Fate saw a doctor at Five Points who "said he didn't
need to test me, because I've already been tested and
will be getting a hearing aid, the next time he comes in
about 30 days." (*Id.* at Attached Page 2). The next day,
Fate's counselor came to his cell and asked him to sign a
"reasonable accommodation" request. (*Id.*). According to
Fate, he signed the document but would not have done
so had he known that the "shake awake" alarm was not
included in his request. (*Id.*).

**\*2** On August 8, 2011, Fate contacted DOCCS
ombudsperson Robert Raymond concerning his request.
(*Id.* at Attached Page 3). On September 16, 2011, DOCCS
responded, indicating that a follow-up audiological
appointment was scheduled to get a better assessment of

Fate's level of hearing loss as the initial testing indicated "non-significant hearing loss." (*Id.*).

According to Fate, because of the lack of accommodations, he is depressed, scared, losing weight and "suffer[s] daily in fear of what might happen when I leave my cell and not hear an order by officers and they attack me thinking that I'm trying to be a wise guy and I just don't hear them." (Complaint at IV). The Complaint alleges that Sing Sing prison is the more appropriate prison for Fate because it is "the facility that most inmates were sent to with a hearing problem like mines (sp)." (*Id.* at Attached Page 1).

According to the Defendants, "Five Points is staffed and equipped to accommodate hearing impaired inmates and currently houses numerous hearing impaired inmates in addition to plaintiff." (Heywood Decl. ¶ 3). In addition, "DOCCS currently houses 1697 offenders who have non-significant hearing loss ... [and][m]ost offenders with non-significant do not require a shake awake alarm as reasonable accommodation." (*Id.* ¶ 4). If DOCCS provided all hearing impaired inmates, including those with non-significant hearing loss, with the shake awake alarms, "it would cost DOCCS almost $42,425 the first year." (*Id.*).

The instant motion was marked fully submitted on April 18, 2012.

### The Applicable Rule 12 Standards

In considering a motion to dismiss pursuant to Rule 12, the Court construes the complaint liberally, accepting all factual allegations as true and drawing all reasonable inferences in the plaintiff's favor. *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993). The issue "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 235–36, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

In addressing the present motion, the Court is mindful that Fate is proceeding *pro se* and that his submissions are held to "less stringent standards than formal pleadings drafted by lawyers." *Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (quoting *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)). Courts "construe the pleadings of a *pro*

*se* plaintiff liberally and interpret them to raise the strongest arguments they suggest." *Fuller v. Armstrong,* 204 Fed. Appx. 987, 988 (2d Cir.2006); *see also Lerman v. Bd. of Elections in City of N.Y.,* 232 F.3d 135, 139–40 (2d Cir.2000) ("Since most *pro se* plaintiffs lack familiarity with the formalities of pleading requirements, we must construe *pro se* complaints liberally, applying a more flexible standard to evaluate their sufficiency than we would when reviewing a complaint submitted by counsel."). However, dismissal of a *pro se* complaint is still appropriate where the plaintiff fails to allege facts supporting his claim to relief. *Rodriguez v. Wepin,* 116 F.3d 62, 65 (2d Cir.1997).

**\*3** Rule 12(b)(3) provides that a defendant may move to dismiss a complaint on the grounds of improper venue. *See* Fed.R.Civ.P. 12(b)(3). "[T]he burden of showing that venue in the forum district is proper falls on the plaintiff." *E.P.A ex rel. McKeown v. Port Auth. of N.Y. & N.J.,* 162 F.Supp.2d 173, 183 (S.D.N.Y.2001). However, absent an evidentiary hearing, " 'the plaintiff need only make a *prima facie* showing of [venue].' " *Gulf Ins. Co. v. Glasbrenner,* 417 F.3d 353, 355 (2d Cir.2005) (quoting *CutCo Indus., Inc. v. Naughton,* 806 F.2d 361, 364–65 (2d Cir.1986)).

In addition, a case may be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) "when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000). A facially sufficient complaint may be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) if the asserted basis for jurisdiction is not sufficient. *See TM Patents, L.P. v. Int'l Bus. Machs. Corp.,* 121 F.Supp.2d 349, 367–68 (S.D.N.Y.2000); *Peterson v. Continental Airlines, Inc.,* 970 F.Supp. 246, 249 (S .D.N.Y.1997). A plaintiff bears the burden of proving by a preponderance of the evidence that subject matter jurisdiction exists. *Makarova,* 201 F.3d at 113.

To survive a motion to dismiss pursuant to Rule 12(b)(6)," "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A plaintiff must allege sufficient facts to "nudge[ ] their claims across the line from conceivable

to plausible." *Twombly,* 550 U.S. at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Cohen v. Stevanovich,* 772 F.Supp.2d 416, 423 (S.D.N.Y.2010). Though the court must accept the factual allegations of a complaint as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal,* 556 U.S. at 678. (quoting *Twombly,* 550 U.S. at 555).

### *Venue is Improper in this District*

The instant action was filed in the Southern District of New York by the Plaintiff as "related" to *Clarkson v. Goord,* No. 91–1792(RWS). There are no allegations, however, regarding any violation of the *Clarkson* Consent Decree made in the pleadings. Thus, because the Plaintiff alleges that the events in question arose at Five Point, which is located in the Western District of New York, this action need not be deemed "related" to *Clarkson.*

For venue purposes, it is well-settled under 28 U.S.C. § 1391 that public officials reside in the district in which they perform their official duties.[1] *See, e.g., Berry v. New York State Dep't of Correctional Servs.,* 808 F.Supp. 1106, 1108 (S.D.N.Y.1992). Here, not only did all of the relevant events occurred in Seneca County, New York, within the Western District of New York, but all of the Defendants work outside of the Southern District of New York. Lempke currently works in Seneca County and both Goord and Fischer work or worked in the Northern District of New York.

**\*4** A complaint fails for venue purposes where no material connections exist between the venue and the underlying events and parties. *See id.* at 1109. The Plaintiff has not made a prima facie showing of proper venue and accordingly venue is improper in the Southern District. Where proper venue is not established pursuant to 28 U.S.C. § 1391(b), the remedy is dismissal or transfer. *See* 18 U.S.C. § 1406(a). The decision of whether to dismiss or transfer an action for improper venue is within the discretion of the trial court. *See Friedman v. Revenue Mgmt. of New York,* 38 F.3d 668, 672 (2d Cir.1994). Because the Complaint fails to state a claim as set forth below, dismissal, rather than transfer, is appropriate.

### *The ADA and Rehabilitation Act Claims Against the Defendants In Their Individual Capacities Are Dismissed*

Monetary damages cannot generally be sought against individuals under the ADA. *See Johnson v. Goord,* No. 01–9587(PKC), 2004 WL 2199500, at *19 (S.D.N.Y. Sept. 29, 2004)* ("[P]laintiff's claims against the individual defendants in their official capacities under ... the ADA fail because those laws do not provide for money damages against the state or state officials in their official capacities ...."); *Carrasquillo v. City of New York,* 324 F.Supp.2d 428, 441 (S.D.N.Y.2004) ("Individuals cannot be named as defendants in ADA suits in either their official or representative capacities.").

Similarly, there is generally no individual liability for money damages, even in official capacity suits, under the Rehabilitation Act. *See Harris v. Mills,* 478 F.Supp.2d 544, 547–48 (S.D.N.Y.2007) ("Because claims under the Rehabilitation Act may not be brought against individuals, ... [the] Rehabilitation Act claim must also be dismissed.").

While the disability statutes do not permit claims against officials in their individual capacities, suits against individuals in their official capacities are condoned. *See Garcia v. SUNY Health Sciences Center of Brooklyn,* 280 F.3d 98, 107 (2d Cir.2001). Insofar as Fate is suing the Defendants in their individual capacities, the Second Circuit has held that "neither Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits against state officials." *Id.*

Accordingly, the ADA and Rehabilitation Act claims against the Defendants, to the extent brought against the Defendants in their individual capacities, are dismissed.

### *The Constitutional Claims Against the Defendants Are Dismissed*

The Eighth Amendment, made applicable to the states by the Fourteenth Amendment, prohibits the infliction of "cruel and unusual punishment." *See Farmer v. Brennan,* 511 U.S. 825, 828, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (holding that the Eighth Amendment is applicable to the treatment and conditions of confinement of prison inmates). In addition, the Supreme Court has recognized a state's constitutional obligation to provide inmates with adequate medical care. *See id.* at 832. In order for a plaintiff to state a cognizable claim under Section 1983 for inadequate medical care, an inmate must allege acts or omissions sufficiently harmful to evidence "deliberate indifference" to his serious medical needs. *Estelle v.*

*Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Deliberate indifference to the serious medical needs of someone in state custody is a violation of the Eighth Amendment inasmuch as it is the equivalent of "unnecessary and wanton infliction of pain." *See id.*

**\*5** In order to make out a constitutional claim under the deliberate indifference standard, Fate must meet two requirements. First, the inmate's medical need must be "serious." *See Flemming v. Velardi,* No. 02–4133(AKH), 2003 WL 21756108, at \*2 (S.D.N.Y. July 30, 2003) (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). Second, the facts must give rise to an inference that the persons charged with providing medical care knew of those serious medical needs and intentionally disregarded them. *Flemming,* 2003 WL 21756108, at \*2.

Regarding the first prong of the analysis, the inmate must show that the alleged deprivation is objectively "sufficiently serious." *Id.* This standard contemplates a "condition of urgency, one that might produce death, degeneration or extreme pain." *Hutchinson v. N.Y. State Corr. Officers,* No. 02–2407(CBM), 2003 WL 22056997, at \* \*4–5 (S.D.N.Y. Sept. 4, 2003). Only "those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment claim .... " *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992); *Liscio v. Warren,* 901 F.2d 274, 277 (2d Cir.1990) (condition must be life-threatening or fast-degenerating).

"In a typical Eighth Amendment denial of medical care case, the prisoner is challenging the defendants' failure to provide adequate medical care to treat the prisoner's medical condition." *Smith v.. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003). Because the " 'the objective component of an Eighth Amendment claim is ... necessarily contextual' and fact-specific, the serious medical need inquiry must be tailored to the specific circumstances of each case." *Id.* at 185 (quoting *Hudson,* 503 U.S. at 8). It is "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." *Id.* at 186. The alleged deprivation of care must cause "a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

Examples of conditions considered by the Second Circuit Court of Appeals to be "sufficiently serious" under the Eighth Amendment vary a great deal, but include the failure to provide prescribed medication in the face of an inmate's extreme weight loss and deteriorating condition, *see Kaminsky v. Rosenblum,* 929 F.2d 922, 924 (2d Cir.1992), a delay in removing broken pins from a prisoner's hip for more than two years despite nearly fifty complaints of pain, *see Hathaway v. Coughlin,* 37 F.3d 63, 65–66 (2d Cir.1994), and chronic tooth pain lasting at least six months, rendering the prisoner unable to chew, and resulting in as many as three teeth degenerating to the point of requiring extraction, *see Chance,* 143 F.3d at 702.

**\*6** While loss of hearing may be sufficiently serious, Fate has only alleged HL30 non-significant hearing loss and a relatively modest delay in providing him with a hearing aid. (Complaint at Attached Page 1). As noted in the Complaint, on September 16, 2011, DOCCS had advised Fate that he was scheduled for a follow-up appointment to further evaluate his hearing loss. (*Id.* at Attached Page 3). At no time did DOCCS deny Fate a hearing aid or other appropriate accommodations, instead it took steps that were necessary to review Fate's condition and provide him with the appropriate type of hearing aid for his needs.

In addition, Fate has not alleged any facts to support an inference that, with the use of hearing aids, his hearing would still have been impaired to the point that a major life activity was impaired. Measures to correct or mitigate a condition are relevant to whether a condition substantially limits a major life activity. *See Fall v. N.Y. State United Teachers,* 289 Fed. Appx. 419, 421 (2d Cir.2008) (finding that plaintiff did not assert, or support with credible evidence, the proposition that her hearing loss was substantial when the corrective measures were employed).

Accordingly, the Complaint fails to allege facts necessary to satisfy the objective component of the Eighth Amendment analysis.

Even assuming that Fate's hearing loss was sufficiently serious, to satisfy the second prong of the analysis, an inmate must show that the prison official had a "sufficiently culpable state of mind" and must subjectively know of and disregard an excessive risk to inmate health and safety. *See Seiter,* 501 U.S. at 297; *Hathaway,* 37 F.3d

at 66. "Deliberate indifference is 'a state of mind that is the equivalent of criminal recklessness.' " *Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2003) (quotation omitted).

A plaintiff must show that the acts or omissions of defendants "involved more than lack of due care, but rather involved obduracy and wantonness in placing his health in danger." *LaBounty v. Coughlin,* 137 F.3d 68, 72 (2d Cir.1998). Even if plaintiff claims he suffered pain, it would not in itself satisfy the state of mind requirement. *See Seiter,* 501 U.S. at 298–303. It is well-settled that "disagreements over medications, diagnostic techniques, forms of treatment or the need for specialists or the timing of their intervention" are insufficient under § 1983. *Estelle,* 429 U.S. at 106. Additionally, unsuccessful medical treatment alone does not give rise to § 1983 liability. *Id.*

Indifference to serious medical needs is said to occur at the institutional, as opposed to the individual level, when a prison's system of medical care is so inadequate as to cause unwarranted suffering. *See Cruz v. Ward,* 558 F.2d 658, 662 (2d Cir.1977). In keeping with this principle, it has been held by that "deliberate indifference" is "a standard for measuring the adequacy of prison officials' response to the known medical needs of inmates and their system for allowing inmates to make their needs known." *Dean v. Coughlin,* 623 F.Supp. 392, 402 (S.D.N.Y.1985), vacated and remanded on other grounds, 804 F.2d 207 (2d Cir.1986).

**\*7** Under certain circumstances, delay or denial of inmates' access to medical care amounts to deliberate indifference. *See Estelle,* 429 U.S. at 104–05; *Liscio,* 901 F.2d at 276–77 (failure to examine inmate going through "life-threatening" and "fast-degenerating" condition for three days could constitute deliberate indifference); *Hathaway,* 841 F.2d at 50–51 (delay of two years in arranging surgery to correct pins in inmate's hip raises question of fact as to deliberate indifference of prison officials' conduct); *Gill v. Mooney,* 824 F.2d 192, 195–96 (2d Cir.1987) (denial of access to exercise program and failure to provide necessary medical treatment as punishment for misconduct states colorable constitutional claim of deliberate indifference).

Upon his arrival, Fate met with the medical staff at Five Points, who responded to Fate's request by stating that he would get a hearing aid. (Complaint at Attached Page 2).

On September 23, 2011, the doctor informed Fate that he "will be getting a hearing aid, the next time he comes in about 30 days." (*Id.*). The relatively short waiting period that Fate endured before receiving his hearing aid cannot be considered "deliberate indifference."

Moreover, Fate appears to have received his hearing aid and is no longer experiencing problems with waking up on time, which moots this issue. *See* Harblen Decl., Ex. A. While the Court is sympathetic that Fate missed meals as a result of not hearing meal times being called out over the loudspeaker, which caused him to lose weight and become depressed and scared, there are no facts alleged in the Complaint sufficient to show an Eighth Amendment injury.

With respect to any claims for injunctive relief such as transferring Fate from Five Points to Sing Sing Correctional Facility, the Complaint similarly alleges no facts to support such a transfer, other than allegations that Sing Sing is where hearing impaired inmates are normally sent. (Complaint at Attached Page 1). As the U.S. Constitution and federal law do not guarantee a prisoner the right to be placed in any particular prison, even if the degree of confinement or the living conditions in one institution are more disagreeable than in another. *See Meachum v. Fano,* 427 U.S. 215, 224–25 (1976). Accordingly, "prison officials have broad discretion to transfer prisoners to another facility." *Odom v. Poirier,* 2004 WL 2884408, at \*13 (S.D.N.Y. Dec. 10, 2004). The placement and transfer of inmates are examples of "inordinately difficult" undertakings as to which the courts "accord deference to the appropriate prison authorities." *Turner v. Safley,* 482 U.S. 78, 84–5 (1987).

In addition, the Complaint fails to make any allegations specific to the named Defendants that could serve as the basis for liability under Section 1983. *See Monell v. N.Y.C. Dep't of Social Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). To state a Section 1983 claim for damages against an individual defendant, a plaintiff must allege specific facts to show that each defendant was directly or personally involved in the alleged violation of the Constitution or laws; "that is, that there was 'personal participation by one who ha[d] knowledge of the facts that rendered the conduct illegal.' " *McCoy v. Goord,* 255 F.Supp.2d 233, 245 (S.D.N.Y.2003) (quoting *Provost v. City of Newburgh,* 262 F.3d 146, 155 (2d Cir.2001)).

**\*8** The personal involvement of an individual may be established by showing (1) direct participation in the violation, (2) failure to remedy a known wrong, (3) creation of an unconstitutional or illegal practice or custom, (4) gross negligence in managing subordinates who have caused the violation, or (5) failure to act on information indicating that a violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). Liability cannot be based on a theory of respondeat superior, *see Monell,* 436 U.S. at 694, and Fate has not shown how any of the named Defendants were involved in any of the alleged Constitutional violations or why he has sued these particular Defendants.

Even assuming for the purposes of this motion that Fate has sufficiently pled claims against the Defendants, dismissal would be granted to all Defendants based upon qualified immunity. State officials "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Wilson v. Layne,* 526 U.S. 603, 614, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). "A right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful." *Anderson v. Recore,* 317 F.3d 194, 197 (2d Cir.2003). "[T]he objective legal reasonableness of an official's actions must be viewed in light of the action's relationship to the clearly established law at the time." *Walentas v. Lipper,* 862 F.2d 414, 423 (2d Cir.1988), cert. den ., 490 U.S. 1021 (1989). "Conduct that does not violate any constitutional right certainly does not violate a constitutional right that is 'clearly established' " *Mozzochi v. Borden,* 959 F.2d 1174, 1179 (2d Cir.1992).

The Complaint does not allege any facts demonstrating that there was any basis to infer that any of the Defendants would have reasonably believed that any law existed that prohibited their conduct or that they were violating any constitutional rights of Fate. There is no clearly established right to the immediate receipt of a hearing aid. Moreover, the Complaint pleads facts demonstrating that the DOCCS was in the process of providing Fate with a functional and appropriate hearing aid prior to his filing of the instant motion.

Taken together, the Complaint has not pled sufficient facts to show that any of the Defendants violated any of Fate's constitutional rights, and those claims are dismissed.

### *Conclusion*

Based upon the conclusions set forth above, the Defendants' motion to dismiss is granted.

When an amended complaint would be futile, a court need not grant leave to replead. *See Van Buskirk v. The New York Times Co.,* 325 F.3d 87, 92 (2d Cir.2003). Because even a liberal reading of the Complaint suggests that no valid claim could be stated against the named Defendants, Fate's claims against as to these Defendants will be dismissed with prejudice *See Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991).

**\*9** It is so ordered.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 3104884

Footnotes

1     Section 1391(b) reads as follows: A civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claims occurred, or a substantial part of the property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought. 28 U.S.C. § 1391(b).

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 3047110
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Angelo SAVAGE, Plaintiff,
v.
BRUE, Nurse and D.C. Peppin, Nurse, Defendants.

Civil Action No. 9:05-cv-857 (GLS/GHL).
|
Oct. 18, 2007.

**Attorneys and Law Firms**

Angelo Savage, Comstock, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Maria Moran, Esq., Assistant Attorney General, of Counsel, Syracuse, NY, for Defendant.

## *ORDER*

GARY L. SHARPE, U.S. District Judge.

**\*1** The above-captioned matter comes to this court following a Report-Recommendation by Magistrate Judge George H. Lowe, duly filed September 19, 2007. Following ten days from the service thereof, the Clerk has sent the file, including any and all objections filed by the parties herein.

No objections having been filed, and the court having reviewed the Magistrate Judge's Report-Recommendation for clear error, it is hereby

ORDERED, that the Report-Recommendation of Magistrate Judge George H. Lowe filed September 19, 2007 is ACCEPTED in its entirety for the reasons stated therein, and it is further

ORDERED, that the defendants motion for summary judgment (Dkt. No. 46) is GRANTED, and it is further

ORDERED, that the Clerk of the Court is to enter judgment in favor of the Defendants and close this case.

IT IS SO ORDERED.

## *REPORT-RECOMMENDATION*

GEORGE H. LOWE, United States Magistrate Judge.

This matter has been referred to me for Report and Recommendation by the Honorable Gary L. Sharpe, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule N.D.N.Y. 72.3(c). Generally, in this *pro se* civil rights complaint brought under 42 U.S.C. § 1983, Inmate Angelo Savage ("Plaintiff") alleges that two employees of the New York State Department of Correctional Services' Franklin Correctional Facility-Nurses R. Brue and D.C. Pepin ("Defendants")-violated his rights under the Eighth Amendment when, on May 4, 2005, they were deliberately indifferent to his serious medical needs. (*See generally* Dkt. No. 1.)[1] Currently before the Court is Defendants' motion for summary judgment. (Dkt. No. 46) For the reasons discussed below, I recommend that Defendants' motion for summary judgment be granted.

## I. BACKGROUND

### A. Plaintiff's Complaint

Liberally construed, Plaintiff's Complaint asserts the following factual allegations.

On May 3, 2005, while sleeping at Franklin Correctional Facility ("Franklin C.F."), Plaintiff fell out of his bunk bed, injuring his back and neck. (Dkt. No. 1, ¶ 6, Attachment, at 2 [Plf.'s Compl.].) On May 4, 2005, at approximately 2:05 p.m., Corrections Officer Dutell informed Plaintiff that a nurse wanted to see him in the facility's infirmary. (Dkt. No. 1, ¶ 6, Attachment, at 1.) When Plaintiff arrived at the infirmary, he found various nurses and corrections officers gathered together, laughing. (*Id.*) Defendant Pepin stated, "So the paralyzed man [can] walk." (*Id*.) She then instructed Plaintiff to go into a room, and started writing something down. (*Id.*)

After about ten minutes, a corrections sergeant and a corrections officer (both unidentified in the Complaint) entered the room. (*Id.*) The sergeant ordered Plaintiff to stand against a wall, where the corrections officer placed handcuffs on Plaintiff. (*Id.*) When Plaintiff asked the corrections officer where he was going, the corrections officer replied that Plaintiff was going to "C.S.U." (*Id.*)[2]

Immediately thereafter, Plaintiff was searched, stripped of his clothing, given a yellow-paper gown with which to cover himself, and placed on suicide watch. (Dkt. No. 1, ¶ 6, Attachment, at 2.) When Plaintiff asked the corrections officer responsible for monitoring him (who was also not identified in the Complaint) why he was on suicide watch, the corrections officer responded that Defendant Pepin had reported that she had witnessed Plaintiff harming himself and that Plaintiff had informed her he wanted to commit suicide. (*Id.*)

**\*2** Plaintiff's suicide watch lasted forty-eight (48) hours. (*Id.*) During that time, the cell in which he was incarcerated contained no mattress on which Plaintiff could sleep. (*Id.*) Plaintiff was forced to sleep on the metal frame of a bed, which was covered with only two extremely thin blankets. (*Id.*) He was not provided a pillow to support his head and neck. (*Id.*) Because he had injured his neck and back when falling out of his bunk bed the day before, he was in what he characterizes as "extreme[ ] ... pain." (*Id.*)

When Defendant Brue came to check up on Plaintiff, Plaintiff informed her about the lack of bedding and his extreme pain. (Dkt. No. 1, ¶ 6, Attachment, at 2-3.) Plaintiff also informed Defendant Brue that he needed pain medication. (Dkt. No. 1, ¶ 6, Attachment, at 3.) Defendant Brue responded that Plaintiff would just have to adjust to the pain. (*Id.*)

In addition, while Plaintiff was in C.S.U., he asked one or more corrections officers (again, not identified in the Complaint) for (1) supplies to use to clean the toilet, which was smeared with "watery feces," and (2) toilet paper, since the cell had none. (*Id.*) The corrections officer(s) denied both requests. (*Id.*) As a result, after each of the three times that Plaintiff defecated in the cell during the aforementioned forty-eight hour period, he was unable to wipe himself and he was subjected to the strong smell of feces. (*Id.*)

Plaintiff was finally released from C.S.U. when he was evaluated by a psychologist and found to be not suicidal and not a harm to himself. (Dkt. No. 1, ¶ 6, Attachment, at 4.) As compensation for the pain and suffering that he experienced during his forty-eight hour placement on suicide watch, Plaintiff demands the sum of ten million dollars ($10,000,000). *Id.* at ¶ 9.

**B. Defendants' Motion for Summary Judgment**

In their motion for summary judgment, Defendants argue that Plaintiff's Eighth Amendment claim against Defendants Brue and Pepin should be dismissed for essentially two reasons: (1) he has failed to allege facts plausibly suggesting, or adduce evidence establishing, that Defendant Pepin was personally involved in the alleged constitutional deprivation since it was not she but someone else who determined that Plaintiff should be placed on suicide watch; and (2) Plaintiff has failed to allege facts plausibly suggesting, or adduce evidence establishing, that he suffered a medical need that was sufficiently serious for purposes of the Eighth Amendment, or that Defendant Brue was deliberately indifferent to any such medical need. (*See generally* Dkt. No. 46, Part 2, at 5-9 [Defs.' Mem. of Law].)

**II. APPLICABLE LEGAL STANDARDS**

**A. Motion for Summary Judgment Under Rule 56**

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [3] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. [4]

**\*3** However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." [5] The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [6] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [7]

What this somewhat complex burden-shifting standard means is that, where a plaintiff has failed to respond to a defendant's motion for summary judgment, "[t]he fact that there has been no response to a summary judgment

motion does not ... [by itself] mean that the motion is to be granted automatically." [8] Rather, practically speaking, the Court must (1) determine what material facts, if any, are undisputed in the record, and (2) assure itself that, based on those undisputed material facts, the law indeed warrants judgment for the defendants. [9] However, where a plaintiff has failed to respond to a defendant's statements of material fact contained in its Statement of Material Facts (a/k/a its "Rule 7.1 Statement"), the facts as set forth in that Statement will be accepted as true [10] to the extent that (1) those facts are supported by the evidence in the record, [11] and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment. [12] (Here, I note that Plaintiffs were so advised by Defendants.) [13]

Implied in the above-stated standard is the fact that, where a non-movant fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute, even if that non-movant is proceeding *pro se.* [14] In the event the district court chooses to conduct such an independent review of the record, any verified complaint filed by the plaintiff should be treated as an affidavit. [15] (Here, I note that Plaintiffs' Complaint contains a verification pursuant to 28 U.S.C. § 1746. [16] ) In any event, to be sufficient to create a factual issue for purposes of a summary judgment motion, an affidavit must, among other things, not be conclusory. [17] An affidavit is conclusory if, for example, its assertions lack any supporting evidence or are too general. [18] Finally, even where an affidavit (or verified complaint) is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." [19]

### B. Motion to Dismiss for Failure to State a Claim Under Rule 12(b)(6)

**\*4** To the extent that a defendant's motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure is based entirely on the plaintiff's complaint, [20]

such a motion is functionally the same as a motion to dismiss for failure to state a claim under Rule 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie General Transatlantique,* 405 F.2d 270, 273-74 (2d Cir.1968) [citations omitted], *accord, Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties.").

Moreover, even where a defendant has not advanced such a failure-to-state-a-claim argument on a motion for summary judgment, a district court may, *sua sponte,* address whether a *pro se* prisoner has failed to state a claim upon which relief may be granted. [21]

For these reasons, it is appropriate to briefly summarize the recently revised legal standard governing Rule 12(b)(6) motions to dismiss. Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Rule 8(a)(2); [22] or (2) a challenge to the legal cognizability of the claim. [23]

Rule 8(a)(2) requires that a pleading include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Such a statement must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." [24] The purpose of this rule is to "facilitate a proper decision on the merits." [25] A complaint that fails to comply with this rule "presents far too a heavy burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [26]

The Supreme Court has long characterized this pleading requirement under Rule 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement. [27] However, it is well established that even this liberal notice pleading standard "has its limits." [28]

As a result, several Supreme Court and Second Circuit decisions exist, holding that a pleading has failed to meet this liberal notice pleading standard. [29]

Most notably, in the recent decision of *Bell Atl. Corp. v. Twombly,* the Supreme Court, in reversing an appellate decision holding that a complaint had stated a claim upon which relief could be granted, "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 127 S.Ct. 1955, 1968-69 (2007). [30] Rather than turning on the conceivability of an actionable claim, the Court clarified, the Rule 8 standard turns on the "plausibility" of an actionable claim. *Id.* at 1965-74. More specifically, the Court held that, for a plaintiff's complaint to state a claim, his "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]" assuming, of course, that all the allegations in the complaint are true. *Id.* at 1965 [citations omitted]. What this means, on a practical level, is that there must be "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Id.*

**\*5** Having said that, it should be emphasized that, "[i]n reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [31] Moreover, "[t]his standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*" [32] In other words, while all pleadings are to be construed liberally, *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality. Indeed, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." [33] Moreover, when addressing a *pro se* complaint, generally a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [34] Of course, granting a *pro se* plaintiff an opportunity to amend is not required where the plaintiff has already been given a chance to amend his pleading. [35] Moreover, an opportunity to amend should be denied to a *pro se* plaintiff where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." [36] This is because, even when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." [37]

## III. ANALYSIS

Generally, to prevail on a claim of deliberate indifference to a serious medical need under the Eighth Amendment, a plaintiff must show two things: (1) that the plaintiff had a sufficiently serious medical need; and (2) that the defendant was deliberately indifferent to that serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

### A. Plaintiff's Claim Against Defendant Pepin

I must begin by saying that I have real difficulty even liberally construing Plaintiff's allegations against Defendant Pepin as stating an Eighth Amendment claim for deliberate indifference to a serious medical need. I acknowledge that Plaintiff has alleged facts plausibly suggesting (barely) that, on May 4, 2005, when he reported to the infirmary at Franklin C.F., Defendant Pepin, through her laughter, indicated a certain callousness. [38] However, an allegation of callous laughter does not, in and of itself, appear to plausibly suggest deliberate indifference, [39] which is a state of mind akin to criminal recklessness. [40] In any event, even assuming that Defendant Pepin was acting with deliberate indifference when Plaintiff was in the Franklin C.F. infirmary on May 4, 2005, I cannot discern what Plaintiff's alleged serious medical need was at that time. [41] While he alleges that he sustained a back injury on May 3, 2005, [42] he does not allege facts plausibly suggesting that he was in extreme pain when he was in Defendant Pepin's presence in the Franklin C.F. infirmary on May 4, 2005. [43] Rather, he alleges that he was in extreme pain *after* he left Defendant Pepin's presence, and he was subjected to the harsh living conditions while on suicide watch at Franklin C.F. [44] Indeed, he expressly alleges that, when he reported to the Franklin C.F. infirmary on May 4, 2005, Defendant Pepin commented on his apparent *lack of injury.* [45] As a result, I find that, as an initial matter, Plaintiff has not even stated

a claim upon which relief may be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

**\*6** However, even assuming that Plaintiff had stated a viable claim, he has adduced absolutely no evidence in support of that claim for purposes of Rule 56. To the contrary, the uncontroverted record evidence indicates that (1) it was not Defendant Pepin but someone else who ordered, on May 4, 2005, that Plaintiff be placed on suicide watch, (2) to the extent that Defendant Pepin played any role whatsoever in requesting or suggesting that Plaintiff to be placed on suicide watch, her efforts were, under the circumstances, reasonably justified, and (3) even if those efforts were not reasonably justified, they were not in reckless disregard of some sort of serious medical need actually possessed by Plaintiff.

Taking this last finding (regarding the absence of a serious medical need) first, the record evidence before the Court simply does not contain any evidence that, when Defendant Pepin recommended Plaintiff for suicide watch on May 4, 2005, Plaintiff's back and neck injury was of such a nature as to constitute a serious medical need under the Eighth Amendment, for the reasons discussed below in Part III.B. of this Report-Recommendation. Because there is no record evidence of a sufficiently serious medical need of which Defendant Pepin could have been deliberately indifferent when she recommended Plaintiff for suicide watch on May 4, 2005, there is no need to proceed to an analysis of whether there is any record evidence of deliberate indifference by Defendant Pepin with regard to any such medical need when she made the aforementioned recommendation. However, in the interest of thoroughness, I will proceed to such an analysis.

In their Rule 7.1 Statement, Defendants asserted, *inter alia,* the following material facts with respect to Plaintiff's claim against Defendant Pepin, supporting each of the assertions with accurate record citations:

1. At approximately 7:15 a.m. on May 3, 2005, Defendant Pepin and Nurse Charlene Volpe responded to Plaintiff's cell for an emergency sick call, because Plaintiff had apparently fallen off a top bunk bed, which was approximately four feet high. [46] When they arrived, Plaintiff told them that he had had a nightmare and had hit the back of his head on a locker. [47] Although Plaintiff complained that he was unable to move, the nurses assessed Plaintiff's condition and noted that he had sensation in his lower extremities and could, in fact, move his lower extremities. [48]

2. Later that day, Plaintiff was transferred to Albany Medical Center for further evaluation because he still claimed that he could not move his legs. [49] However, the results of multiple spine and brain x-rays and scans of Plaintiff at Albany Medical Center were normal. [50]

3. At approximately 12:45 a.m. on May 4, 2005, Plaintiff was returned to Franklin C.F., where he was admitted to the infirmary so that he could be assessed by a facility doctor. [51] Later that morning, at approximately 8:25 a.m., Plaintiff was discharged from the infirmary and returned to his dorm room with various special permits and restrictions. [52]

**\*7** 4. Later that day, at some point between 12:00 p.m. and 3:00 p.m., a lieutenant at Franklin C.F. requested that Defendant Pepin interview Plaintiff regarding the requests that he had recently made to see a psychiatrist about his nightmares. [53] After interviewing Plaintiff, Defendant Pepin became concerned that he might be a danger to himself [54] As a result, she called the New York State Office of Mental Health ("O.M.H.") Satellite Unit at Clinton Correctional Facility ("C.S.U."). [55] O.M.H. staff at C.S.U. determined that Plaintiff needed to be placed on suicide watch. [56] Because C.S.U. did not have a bed available, C.S.U. directed that Plaintiff be placed on special watch in a strip cell at Franklin C.F. [57] A "strip cell" is a cell in which an inmate is permitted to have only two matts in the cell. [58] At approximately 3:30 p.m., Plaintiff was admitted to Franklin C.F.'s Special Housing Unit ("S.H.U."). [59] After her shift ended at 3:00 p.m., Defendant Pepin had no further interaction with Plaintiff until he was discharged from S.H.U. on May 6, 2005. [60]

For whatever reason, Plaintiff chose not to respond to the aforementioned factual assertions through the filing of a Rule 7.1 Response, despite being advised of the consequences of failing to so respond, [61] being granted a thirty (30) day extension of time in which to respond, [62] and being provided a copy of the Local Rules of Practice for this Court and two copies of the Northern

District's *Pro Se* Manual. [63] The closest Plaintiff comes to submitting such a response is when he submits an affidavit asserting several facts. [64] However, this affidavit contains no citations to the record, nor does it even respond to Defendants' factual assertions in matching numbered paragraphs. As a result, it does not constitute a Rule 7.1 Response. [65]

By failing to respond to the aforementioned factual assertions (which, again, are supported by the record evidence), Plaintiff has *admitted* those factual assertions under the Local Rules of Practice for this Court. [66] As explained above in Part II.A. of this Report-Recommendation, a district court has no duty to perform an independent review of the record to find proof of a factual dispute. [67] Under the circumstances, I decline to perform an independent review of the record to find proof of a factual dispute.

Having said that, I cannot help note several pieces of evidence that I came across during my consideration of Plaintiff's Opposition to Defendants' Motion. Specifically, I note that several of the pieces of evidence adduced by Plaintiff, as part of the four-page affidavit and 15-page stack of exhibits submitted with his Opposition Memorandum of Law, do not controvert the above-stated factual assertions, but actually support those factual assertions. [68] For example, the aforementioned pieces of evidence adduced by Plaintiff indicate that (1) between April 25, 2005, and May 2, 2005, he wrote twice to a psychologist, requesting to speak to him because of nightmares, [69] (2) on May 3, 2005, when he fell out of his bed and injured himself, the fall was caused by a nightmare, [70] (3) on May 4, 2005, Defendant Pepin's interview of Plaintiff (which led to her telephone call to C.S.U., suggesting that Plaintiff might hurt himself) was requested by a lieutenant at Franklin C.F., [71] and (4) at that interview, Defendant Pepin believed that Plaintiff was acting "bizarre." [72]

**\*8** At its core, Plaintiff's argument, with regard to his claim against Defendant Pepin, is that she *knew* she was wrong when, on May 4, 2005, she telephoned C.S.U., suggesting that Plaintiff might hurt himself. [73] The problem is that Plaintiff has offered no evidence (only allegations) in support of this allegation that Defendant

Pepin made a recommendation to C.S.U. that she *knew* was wrong. The closest he comes is when he attaches to his Opposition a copy of a grievance he filed on May 6, 2005, in which he alleges that Defendant Pepin (1) chastised Plaintiff for needlessly costing the State of New York "millions of dollars" in CAT scans and x-rays by claiming he could not move his legs when, in fact, he could, (2) asked him if he was homosexual, and (3) referred to him by use of a racial epithet. [74] However, these unsworn allegations (deplorable as the alleged conduct may be) are not *admissible evidence,* [75] much less admissible evidence of a *knowingly false* recommendation by her that he might be a danger to himself. Similarly, Plaintiff's brief assertion, in his sworn Complaint, that Defendant Pepin laughed at him when he walked into the infirmary (after claiming he could not move) is not evidence of a *knowingly false* recommendation by her that he might be a danger to himself. [76] Nor is his vague assertion, in the affidavit that he attaches to his Opposition, that Defendant Pepin "antagonised" [sic] Plaintiff during their meeting on May 4, 2005, evidence of a *knowingly false* recommendation by her that he might be a danger to himself. [77]

What Plaintiff is left with is merely a few shreds of evidence indicating that what he acknowledges was Defendant Pepin's "diagnostic impression" of him on May 4, 2005, [78] may have been mistaken. However, a mere disagreement with a medical diagnosis is not actionable under the Eighth Amendment. [79] Plaintiff appears to acknowledge that this is the nature of his claim when he alleges in a grievance that Defendant Peppin is liable for negligence. [80] Negligence, like a mere disagreement with a medical diagnosis, is not actionable under the Eighth Amendment. [81]

Finally, it is important to note that Plaintiff appears to fundamentally misconstrue Defendants' burden on their motion for summary judgment, which is not to adduce evidence of a material fact, as he argues, but to demonstrate the *absence* of a question of material fact. [82] It is *he* who has to adduce evidence in support of his claim of deliberate indifference to a serious medical need, and he has not done so.

As a result, I recommend that the Court dismiss Plaintiff's Eighth Amendment claim against Defendant Pepin for failure to state a claim under Rule 12(b)(6) and, in the

alternative, for failure to adduce evidence sufficient to create a question of fact under Rule 56.

**B. Plaintiff's Claim Against Defendant Brue**

I must again begin my analysis by saying that I have difficulty even liberally construing Plaintiff's allegations against Defendant Brue as stating an Eighth Amendment claim for deliberate indifference to a serious medical need. For the sake of argument, I will assume that the "extreme[ ] ... pain" that Plaintiff allegedly experienced, as a result of his being forced to stay in a cell with no mattress or pillow even though he had a back and neck injury, [83] constituted (barely) a sufficiently serious medical need for purposes of the Eighth Amendment- although this fact is far from certain. [84] This uncertainty is particularly magnified when one considers the relatively brief duration of the pain (i.e., forty-eight hours), and the rather vague and conclusory nature of the alleged "extreme[ ] ... pain" (which was not alleged to be "constant," "shooting," "throbbing," "spasmodic," "debilitating," "muscular," "spinal," "lower," "upper," or any other adjectives commonly used by prisoner-plaintiffs to describe back pain). [85]

**\*9** In any event, the more serious problem is that it appears extremely doubtful that Plaintiff has alleged facts plausibly suggesting that Defendant Brue possessed a sufficiently culpable state of mine-which, again, is akin to criminal reckless-with regard to that medical condition. Rather, Plaintiff has alleged facts plausibly suggesting that (1) he stayed in that cell for only forty-eight (48) hours, (2) during that stay, he was provided two thin blankets (which could have been balled up into a pillow), (3) during that stay, he was closely supervised by corrections officers, and he was, in fact, visited at least once by a nurse (i.e., Defendant Brue), (4) when he told Defendant Brue that he was "extremely in pain" (due to his recently sustained back and neck injury and the inadequate sleeping conditions in C.S.U.) and he requested pain medication, Defendant Brue told Plaintiff that he would simply have to "adjust to it," and (5) indeed, when Defendant Brue made that statement to Plaintiff, Plaintiff had been placed, by corrections employees other than Defendant Brue, in C.S.U ., a housing arrangement that involved the living conditions that Plaintiff described. [86] At *most*, Plaintiff has alleged facts plausibly suggesting a hint of negligence by Defendant Brue, which is insufficient to render a

defendant liable under the Eighth Amendment. As the Second Circuit has explained,

> It must be remembered that the State is not constitutionally obligated, much as it may be desired by inmates, to construct a perfect plan for [medical] care that exceeds what the average reasonable person would expect or avail herself of in life outside the prison walls. [A] correctional facility is not a health spa, but a prison in which convicted felons are incarcerated. Common experience indicates that the great majority of prisoners would not in freedom or on parole enjoy the excellence in [medical] care which plaintiff[ ] understandably seeks .... We are governed by the principle that the objective is not to impose upon a state prison a model system of [medical] care beyond average needs but to provide the minimum level of [medical] care required by the Constitution.... The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves .... The essential test is one of medical necessity and not one simply of desirability.

*Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986) [internal quotations and citations omitted].

However, even assuming that Plaintiff had stated a viable claim of deliberate indifference to a serious medical need, he has adduced absolutely no evidence, for purposes of Rule 56, in support of that claim. To the contrary, in their Rule 7.1 Statement, Defendants asserted, *inter alia,* the following material facts with respect to Plaintiff's claim against Defendant Brue, supporting each of the assertions with accurate record citations:

1. At approximately 7:15 a.m. on May 3, 2005, two nurses (other than Defendant Brue) responded to Plaintiff's cell for an emergency sick call, because Plaintiff had apparently fallen off a top bunk bed, which was approximately four feet high. [87] When they arrived, Plaintiff told them that he had fallen out of his bed and had hit the back of his head on a locker. [88] Although Plaintiff complained that he was unable to move and had lower back pain, the nurses assessed Plaintiff's condition and noted the following, in pertinent part: (1) he had positive pedal pulses; (2) he had good circulation, movement, sensation and temperature in his lower extremities; (3) he had no contusions to the back of his head; (4) he was alert and oriented as to person, place and time; (5) he showed no signs of a concussion; (6) his pupils were round and

reactive to light; (7) he had no vision changes; and (8) he denied nausea or vomiting. [89]

**\*10** 2. Later that day, Plaintiff was transferred to the Albany Medical Center for further evaluation because he still claimed that he could not move his legs. [90] However, the results of multiple spine and brain x-rays and scans of Plaintiff at Albany Medical Center were normal. [91]

3. At approximately 12:45 a.m. on May 4, 2005, Plaintiff was returned to Franklin C.F., where he was admitted to the infirmary so that he could be assessed by a facility doctor. [92] At that time, Plaintiff denied any back pain, had a full range of motion in all his extremities, and was able to ambulate unassisted. [93] Later that morning, at approximately 8:25 a.m., Plaintiff was discharged from the infirmary and returned to his dorm room with various special permits and restrictions. [94]

4. Later that day, at approximately 3:30 p.m., Plaintiff was admitted to the Franklin C.F. S.H.U. [95] During his admission, Plaintiff was interviewed by Defendant Brue. [96] During that interview, Plaintiff informed Defendant Brue that, in pertinent part, he had "old" back and pinky finger injuries, but denied having any "new" injuries. [97] Moreover, Defendant Brue observed no injuries to Plaintiff [98] Finally, Plaintiff denied that he was on any medication. [99]

5. A little more than an hour later, at approximately 4:45 p.m., it was noted by a corrections officer that Plaintiff was "alert" and eating dinner. [100]

6. A little less than three hours later, at approximately 7:30 p.m., Plaintiff requested to speak with someone from the facility's medical department, and Defendant Brue responded to the request. [101] During the conversation that ensued, Plaintiff stated, in pertinent part, that his bed was too hard and hurt his back. [102] Defendant Brue responded that he was on suicide watch and would be seeing someone from the psychiatric department the following day. [103]

7. At 8:00 a.m. on May 5, 2005, Plaintiff was seen by a nurse (other than Defendant Brue), who noted that he

had stated to her, "I feel better-I have felt better since yesterday." [104]

8. Defendant Brue worked the 2:00 p.m. to 10:00 p.m. shift at Franklin C.F. on May 5, 2005. [105] She did not personally observe Plaintiff on that date. [106] However, that evening, she made an entry in Plaintiff's Ambulatory Health Records that a Dr. Whalen (fromt Clinton C.F.) would like Plaintiff evaluated at "CSU"-referring to a satellite unit of the New York State Office of Mental Health, located at Clinton C.F. [107] At 7:15 p.m., Defendant Brue called Dr. Whalen's office to make an appointment, and a nurse in Dr. Whalen's office asked Defendant Brue if someone in the infirmary could call back the next morning to make the arrangements for the evaluation. [108]

9. At approximately 11:48 a.m. the next morning (May 6, 2005), Plaintiff was taken to C.S.U. for a mental health evaluation. [109] At approximately 12:30 p.m., he was returned to the Franklin C.F. S .H.U. for special watch. [110] At approximately 12:38 p.m., Plaintiff was escorted to the Franklin C.F. infirmary, where he spoke to Defendant Brue. [111] During that conversation, he told Defendant Brue that he loved himself too much to hurt himself, and he denied any intent to harm others. [112] Finally, at approximately 1:00 p.m., Plaintiff was cleared from special watch by a mental health professional (Sarah Hicks) at C.S.U., and he was returned to his dormitory. [113]

**\*11** As stated above in Part III.A. of this Report-Recommendation, Plaintiff chose not to respond to the aforementioned factual assertions through the filing of a Rule 7.1 Response, despite being advised of the consequences of failing to so respond, being granted a thirty (30) day extension of time in which to respond, and being provided a copy of the Local Rules of Practice for this Court and two copies of the Northern District's *Pro Se* Manual. The closest Plaintiff comes to submitting such a response is when he submits an affidavit asserting several facts. However, this affidavit contains no citations to the record, nor does it even respond to Defendants' factual assertions in matching numbered paragraphs. As a result, it does not constitute a Rule 7.1 Response.

By failing to respond to the aforementioned factual assertions (which, again, are supported by the record evidence), Plaintiff has *admitted* those factual assertions under the Local Rules of Practice for this Court. As explained above in Part II.A. of this Report-Recommendation, a district court has no duty to perform an independent review of the record to find proof of a factual dispute. Under the circumstances, I decline to perform an independent review of the record to find proof of a factual dispute.

Based on the above-stated undisputed facts, I find that a rational fact finder could not conclude that Plaintiff was suffering from a sufficiently serious medical condition, when, at approximately 7:30 p.m. on May 4, 2005, Plaintiff complained to Defendant Brue, that his bed was too hard and hurt his back. The sort of medical need contemplated by the first prong of the above-stated two-pronged test governing claims under the Eighth Amendment is "a condition of urgency, one that may produce death, degeneration or *extreme* pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) [citation omitted; emphasis added]. The condition that Plaintiff experienced while under suicide watch at Franklin C.F. was (again, based on the above-stated undisputed facts) simply none of these things.

Nor could a rational fact finder conclude, based on the above-stated undisputed facts, that Defendant Brue possessed a mental state akin to criminal recklessness when she responded to Plaintiff's aforementioned complaint. She simply had no reason to believe that he was actually in the sort of *extreme* pain contemplated by the Eighth Amendment. Moreover, she promptly responded to his request to speak to a nurse on May 4, 2005, and she diligently communicated with Dr. Whalen's office on May 5, 2005, to facilitate a determination of whether or not Plaintiff should remain under suicide watch. [114] Indeed, based on the above-stated undisputed facts, I have trouble divining even any evidence of *negligence* by her with respect to Plaintiff's medical care.

While my findings need no further support, I note that they are in fact further supported by several facts: (1) none of the several Ambulatory Health Records included in the record contain any notations by nurses that Plaintiff complained to them of any pain while he was under suicide watch in the Franklin C.F. S.H.U. (from May 4, 2005, to May 6, 2005) other than his statement to Defendant

Brue at approximately 7:30 p.m. on May 4, 2005, that the bed was so hard that it hurt his back; [115] (2) the record indicates that, at approximately 4:50 p.m. on May 5, 2005, Plaintiff was observed lying on his bunk, in which position he was able to shake his head in response to a question; [116] and (3) the record indicates that, during the early morning hours of May 6, 2005, Plaintiff was observed by a nurse to be sleeping. [117]

**\*12** Finally, I note that Plaintiff's allegations about the lack of toilet supplies while under suicide watch at Franklin C.F. are, while dismaying, wholly immaterial to his inadequate-medical-care claim against Defendant Brue since (1) the Complaint contains no allegation plausibly suggesting, and the record contains no evidence establishing, that the lack of toilet supplies in any way contributed to his alleged serious medical condition, (2) in any event, the Complaint contains no allegation plausibly suggesting, and the record contains no evidence establishing, that he ever communicated such complaints to her, and (3) in any event, the Complaint contains no allegation plausibly suggesting, and the record contains no evidence establishing, that she, as a nurse, had the authority to provide toilet-cleaning supplies to Plaintiff while he was under suicide watch at Franklin C.F. (a housing arrangement in which prisoners are, among other things, deprived of various materials that they might use to harm themselves).

As a result, I recommend that the Court dismiss Plaintiff's Eighth Amendment claim against Defendant Brue for failure to state a claim under Rule 12(b)(6) and, in the alternative, for failure to adduce evidence sufficient to create a question of fact under Rule 56.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 46) be *GRANTED.*

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y*

*of Health and Human Servs.,* 892 F.2d 15 [2d Cir.1989] );
28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 3047110

Footnotes

1    Defendants point out that, although Plaintiff's Complaint identifies the second Defendant as "D.C. Peppin," that individual's last name is correctly spelled "Pepin." (Dkt. No. 46, Part 2, at 1, n.1 [Defs.' Mem. of Law].)

2    In his Complaint, Plaintiff does not indicate to what entity or housing arrangement the acronym "C.S.U." refers. In his opposition papers (which may be considered when liberally construing the allegations of a *pro se* pleading during a Rule 12[b][6] analysis), Plaintiff attaches two documents suggesting that "C.S.U." stands for "Clinton [C.F.] Satellite [Mental Health] Unit." (*See* Dkt. No. 48, at 41 [Ex. E to Plf.'s Opp., attaching grievance dated 5/6/05 from Plaintiff, using term "Clinton Satellite Unit"]; Dkt. No. 48, at 46 [Ex. J to Plf.'s Opp ., attaching memorandum dated 5/6/05 from Lori Montroy, Nurse Administrator at Clinton C.F.'s Satellite Mental Health Unit, regarding screening of Plaintiff on same date].) However, I notice that several reported decisions from courts within the Second Circuit use the term "C.S.U." to refer to a "Close Supervision Unit," which is a housing area for prisoners identified as requiring more careful monitoring than the general prison population. *See, e.g.,* Hameed v. Mann, 57 F.3d 217, 218 (2d Cir.1995) (affirming judgment entered in N.D.N.Y., following jury trial before McAvoy, C.J.). In any event, the issue of exactly what Plaintiff intended to mean when he used the term "C.S.U." in his Complaint is immaterial to the outcome of Defendants' motion for summary judgment (and my analysis of the sufficiency of Plaintiff's claims).

3    A fact is "material" only if it would have some effect on the outcome of the suit. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

4    Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

5    Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff].");*see also* Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986).

6    Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ...."); Matsushita, 475 U.S. at 585-86; *see also* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

7    Ross v. McGinnis, 00-CV-0275, 2004 WL 1125177, at *8 (W.D.N . Y. March 29, 2004) [internal quotations omitted] [emphasis added].

8    Champion v. Artuz, 76 F.3d 483, 486 (2d Cir.1996).

9    *See* Champion, 76 F.3d at 486 ("Such a motion may properly be granted only if the facts as to which there is no genuine dispute show that ... the moving party is entitled to a judgment as a matter of law.") [internal quotation marks and citation omitted]; Allen v. Comprehensive Analytical Group, Inc., 140 F.Supp.2d 229, 232 (N.D.N.Y.2001) (Scullin, C.J.) (stating that, where a plaintiff has failed to respond to a defendant's motion for summary judgment,

"[t]he Court must review the merits of Plaintiff's claims"). This requirement (that the Court determine, as a threshold matter, that the movant's motion has merit) is also recognized by Local Rule 7.1(b)(3) of the Local Rules of Practice for this Court, which provides that "the non-moving party's failure to file or serve ... [opposition] papers ... shall be deemed as consent to the granting ... of the motion ... unless good cause is shown," *only where the motion has been "properly filed" and "the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein."* N.D.N.Y. L.R. 7.1(b)(3) [emphasis added].

10  *See* N.D.N.Y. L.R. 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."* ).

11  *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243 (2d Cir.2004) ("[W]here the non-movant party chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.... If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.... [I]n determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [internal quotation marks and citations omitted]; *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2003) (Sharpe, M.J.) ("In this case, [the plaintiff] did not file a statement of undisputed facts in compliance with Local Rule 7.1(a)(3). Consequently, the court will accept the *properly supported* facts contained in the defendants' 7.1 statement.") [emphasis added]; *Adirondack Cycle & Marine, Inc. v. Am. Honda Motor Co., Inc.,* 00-CV-1619, 2002 U.S. Dist. LEXIS 4386, at *2-3 (N.D.N.Y. Mar. 18, 2002) (McAvoy, J.) ("Local Rule 7.1 requires a party opposing summary judgment to respond to the statement of undisputed material facts submitted by the movant. To the extent such facts are not controverted, *the properly supported facts* will be taken as true.") [emphasis added; citation omitted]; *cf.* Fed.R.Civ.P. 83(a)(1) ( "A local rule shall be consistent with ... Acts of Congress and rules adopted under 28 U.S.C. §§ 2072 and 2075 [which include the Federal Rules of Civil Procedure] ...."); Fed.R.Civ.P. 56(e) (requiring that, "if the non-movant does not ... respond [to a summary judgment motion], summary judgment, *if appropriate,* shall be entered against the non-movant," and requiring that, as a threshold matter, the motion for summary judgment must be "made *and supported* as provided in this rule") [emphasis added].

12  *See Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996); *cf.* N.D.N.Y. L.R. 56.2 (imposing on movant duty to provide such notice to *pro se* opponent).

13  (Dkt. No. 46, Part 1.) Furthermore, clearly Plaintiff understood these consequences since he subsequently requested (and was granted) an extension of time in which to respond to Defendants' motion. (Dkt. No. 47.)

14  *See Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432 (2d Cir. Oct. 14, 2004),

*aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at \*12-13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at \*1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

15   *See Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted].

16   (Dkt. No. 1.)

17   *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate v. Top Assoc.,* 425 F.2d 92, 97 (2d Cir.1970) (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

18   *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829 (1985); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

19   *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-55 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at \*3-4 & n.7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint,

which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliatory act against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd,* 136 F. App'x 383 (2d Cir.2005) (unreported decision, cited not as precedential authority but merely to show the case's subsequent history, in accordance with Second Circuit Local Rule § 0.23).

20    (*See, e.g.,* Dkt. No. 46, Part 2, at 8-9 [Defs.' Mem. of Law, arguing, *inter alia,* that Plaintiff's Complaint fails to contain sufficient factual allegations against Defendant Brue, and that the Complaint's conclusory allegations fail to "state a claim"].)

21    The authority to conduct this *sua sponte* analysis is derived from two sources: (1) 28 U.S.C. § 1915(e)(2)(B)(ii), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S.C. § 1915A(b), which provides that, "[o]n review, the court shall ... dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ...."

22    *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a) (2).") [citations omitted]; *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

23    *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514 (2002) ( "These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12 [b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370

(S.D.N.Y.2005) ("Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") [citation omitted]; *Util. Metal Research & Generac Power Sys.,* 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-02 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01-C∨-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b] [6] motion-one aimed at the sufficiency of the pleadings under Rule 8 [a], and the other aimed at the legal sufficiency of the claims).

24    *Dura Pharm., Inc. v. Broudo,* 125 S.Ct. 1627, 1634 (2005) (holding that the complaint failed to meet this test) (quoting *Conley v. Gibson,* 355 U.S. 41, 47 [1957] ); *see also Swierkiewicz,* 534 U.S. at 512 (quoting *Conley,* 355 U.S. at 47); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168 (1993) (quoting *Conley,* 355 U.S. at 47).

25    *See Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48).

26    *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d cir.1997) (unpublished table opinion). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Tech., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

27    *See, e.g., Swierkiewicz,* 534 U.S. at 513-514 (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake.").

28    2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed.2003).

29    *See, e.g., Bell Atl. Corp. v. Twombly,* 127 S.Ct. 1955, 1964-74 (2007) (pleading did not meet Rule 8[a][2]'s liberal requirement), *accord, Dura Pharm.,* 125 S.Ct. at 1634-35, *Christopher v. Harbury,* 536 U.S. 403, 416-22 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234-35 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208-09 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after *Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N.Y.,* No. 01-7539, 2002 WL 741835, at *5 (2d Cir. Apr. 26, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, *see* Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit interpreting Rule 8(a)(2). *See Khan v. Ashcroft,* 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

30    The Court in *Twombly* further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint.... *Conley,* then, described the breadth of opportunity to prove what an adequate complaint claims, not the

minimum standard of adequate pleading to govern a complaint's survival." *Twombly,* 127 S.Ct. at 1969.

31    *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

32    *Hernandez,* 18 F.3d at 136 [citation omitted]; *see also Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) [citations omitted]; *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) [citation omitted].

33    *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) (internal quotation and citation omitted).

34    *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

35    *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *2, n.14 (N.D.N.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5, n.34 (N.D.N.Y. Jan. 23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n.13 (N.D.N.Y. Jan. 10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.; *Collins v. Fed. Bureau of Prisons,* 05-CV-0904, 2007 WL 37404, at *4, n.30 (N.D.N.Y. Jan. 4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Goros v. Cent. Office Review Comm.,* 03-CV-0407, 2006 WL 2794415, at *5, n.18 (N.D.N.Y. Sept. 26, 2006) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Williams v. Weaver,* 03-CV-0912, 2006 WL 2799417, at *4, n .16 (N.D.N.Y. Sept. 26, 2006) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

36    *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) [citation omitted]; *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted].

37    *Stinson v. Sheriff's Dep't of Sullivan County,* 499 F.Supp. 259, 262 & n.9 (S.D.N.Y.1980); *accord, Standley v. Dennison,* 05-CV-1033, 2007 WL 2406909, at *6, n.27 (N.D.N.Y. Aug. 21, 2007) (Sharpe, J., adopting report-recommendation of Lowe, M.J.; *Muniz,* 2007 WL 2027912, at *2 (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *DiProjetto v. Morris Protective Serv.,* 489 F.Supp.2d 305, 307 (W.D.N.Y.2007); *Cosby v. City of White Plains,* 04-CV-5829, 2007 WL 853203, at *3 (S.D.N.Y. Feb. 9, 2007); *Lopez v. Wright,* 05-CV-1568, 2007 WL 388919, at *3, n.11 (N.D.N.Y. Jan. 31, 2007) (Mordue, C.J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5 (N.D.N.Y. Jan. 23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n.13 (N.D.N.Y. Jan. 10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins,* 2007 WL 37404, at *4 (Kahn, J., adopting report-recommendation of Lowe, M.J.).

38    (Dkt. No. 1, ¶ 6, Attachment at 1 [Plf.'s Compl.].)

39    *See Luttrell v. Nickel,* 129 F.3d 933, 936 (7th Cir.1997) ( "[Correctional Sergeant's] failure personally to investigate [the plaintiff's] cellmate's mental state and her response to [the plaintiff's] request with laughter did not amount to deliberate indifference."); *Sampay v. Griffin,* 06-CV-0360, 2007 U.S. Dist. LEXIS 44111, at *3 (M.D.La. May 8, 2007) (prison doctor's laughter at

prisoner who stated he was in pain "from his head to his toes" after his unsuccessful suicide attempt was not, in and of itself, deliberate indifference), *adopted by* 2007 U.S. Dist. LEXIS 40401 (M.D. La. June 4, 2007); *Owens v. Cuyter,* 81-CV-1722, 1989 U.S. Dist. LEXIS 8071, at \*12 (E.D.Pa. July 14, 1989) ("While Dr. Dincer's alleged laughter when the plaintiff showed him his medical ailment would seem inapproprate 'bedside manner' on his part, this shortcoming does not rise to the level of deliberate indifference which could constitute a constitutional deprivation."); *cf. Barad v. Comstock,* 03-CV-0736, 2005 U.S. Dist. LEXIS 38418, at \*30 (W.D.N.Y. June 30, 2005) ("[Plaintiff] alleges that defendant laughed at him and told the guards that it was a 'false alarm' [when plaintiff complained he was going to die from a kidney-stone attack] but plaintiff has not established that defendant wantonly intended to cause plaintiff to suffer [in order] to establish the subjective element of the deliberate indifference claim.").

40 " 'The required state of mind [for a deliberate indifference claim under the Eighth Amendment], equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and he must also draw the inference.' " *Evering v. Rielly,* 98-CV-6718, 2001 U.S. Dist. LEXIS 15549, at \*30 (S.D.N.Y. Sept. 28, 2001) (quoting *Hemmings v. Gorczyk,* 134 F.3d 104, 108 [2d Cir.1998] ).

41 It bears noting that this is not a case in which a prisoner claims he was refused suicide watch when he needed it; it is a case in which a prisoner claims that (1) he was provided suicide watch when he did not need it and that (2) the conditions of confinement in that suicide watch (for a period of forty-eight hours) ended up causing him further harm to an existing back injury.

42 (Dkt. No. 1, ¶ 6, Attachment at 2 [Plf.'s Compl.].)

43 (Dkt. No. 1, ¶ 6, Attachment at 1 [Plf.'s Compl.].)

44 (Dkt. No. 1, ¶ 6, Attachment at 2-3 [Plf.'s Compl.].)

45 (Dkt. No. 1, ¶ 6, Attachment at 1 [Plf.'s Compl., alleging that Def. Pepin stated, "So the paralyzed man [can] walk."].)

46 (Dkt. No. 46, Part 5, ¶ 4 [Defs.' Statement of Material Facts, asserting referenced fact and providing record citations in support thereof].)

47 (*Id.*)

48 (*Id.*)

49 (Dkt. No. 46, Part 5, ¶ 6 [Defs.' Statement of Material Facts, asserting referenced fact and providing record citations in support thereof].)

50 (*Id.*)

51 (Dkt. No. 46, Part 5, ¶ 7 [Defs.' Statement of Material Facts, asserting referenced fact and providing record citations in support thereof].)

52 (*Id.*)

53 (Dkt. No. 46, Part 5, ¶ 10 [Defs.' Statement of Material Facts, asserting referenced fact and providing record citations in support thereof]; *see also* Dkt. No. 46, Part 7, ¶ 7 [Pepin Affid., asserting that her shift ended at 3:00 p.m. on 5/4/05, and that, towards the end of that shift, she interviewed Plaintiff].)

54 (Dkt. No. 46, Part 5, ¶ 10 [Defs.' Statement of Material Facts, asserting referenced fact and not expressly providing record citations immediately following this assertion but providing such record citations elsewhere in paragraph]; *see* Dkt. No. 46, Part 7, ¶ 7 [Pepin Affid.]; Dkt. No. 46, Part 4, at 14 [Ex. A to Moran Affid., attaching, at page "13," Plf.'s Ambulatory Health Records from 5/4/05, authored by Def. Pepin].)

| | |
|---|---|
| 55 | (Dkt. No. 46, Part 5, ¶ 10 [Defs.' Statement of Material Facts, asserting referenced fact and providing record citations in support thereof].) |
| 56 | (Dkt. No. 46, Part 5, ¶ 10 [Defs.' Statement of Material Facts, asserting referenced fact and not expressly providing record citations immediately following this assertion but providing such record citations elsewhere in paragraph]; *see* Dkt. No. 46, Part 7, ¶ 7 [Pepin Affid.]; Dkt. No. 46, Part 6, ¶ 5 [Brue Affid.]; Dkt. No. 46, Part 4, at 14 [Ex. A to Moran Affid., attaching, at page "14," Plf.'s Ambulatory Health Records from 5/4/05, authored by Defs. Pepin and Brue].) |
| 57 | (Dkt. No. 46, Part 5, ¶ 10 [Defs.' Statement of Material Facts, asserting referenced fact and not expressly providing record citations immediately following this assertion but providing such record citations elsewhere in paragraph]; *see* Dkt. No. 46, Part 7, ¶ 7 [Pepin Affid.]; Dkt. No. 46, Part 6, ¶ 5 [Brue Affid.]; Dkt. No. 46, Part 4, at 14 [Ex. A to Moran Affid., attaching, at page "13," Plf.'s Ambulatory Health Records from 5/4/05, authored by Defs. Pepin and Brue].) |
| 58 | (Dkt. No. 46, Part 5, ¶ 10 [Defs.' Statement of Material Facts, asserting referenced fact and providing record citation in support thereof].) |
| 59 | (Dkt. No. 46, Part 5, ¶ 12 [Defs.' Statement of Material Facts, asserting referenced fact and providing record citations in support thereof].) |
| 60 | (Dkt. No. 46, Part 5, ¶ 25 [Defs.' Statement of Material Facts, asserting referenced fact and providing record citations in support thereof].) |
| 61 | (Dkt. No. 46, Part 1.) Furthermore, clearly Plaintiff understood these consequences since he subsequently requested (and was granted) an extension of time in which to respond to Defendants' motion. (Dkt. No. 47.) |
| 62 | (Dkt. No. 47.) |
| 63 | The Clerk of Court for the Northern District of New York has provided to all correctional facilities in New York State (including Franklin C.F.) copies of the Northern District's *Pro Se* Manual and Local Rules of Practice. As Plaintiff was advised by the Court on or about August 31, 2006, if he wanted an additional copy of the *Pro Se* Manual or Local Rules of Practice, he could obtain them from the Clerk upon request. (Dkt. No. 36, at 1-2, n. 1 [Order of Magistrate Judge Lowe, dated 8/31/06].) Plaintiff was mailed an additional copy of the *Pro Se* Manual on January 30, 2006. (*See* Dkt. Entry dated 1/30/06.) |
| 64 | (Dkt. No. 48, at 2-5 [Plf.'s Response to Defs.' Motion, attaching Plf.'s Affid.].) |
| 65 | *See* N.D.N.Y. L.R. 7.1(a)(3) ("The non-movant's [Rule 7.1] response shall mirror the movant's [Rule 7.1] Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises."). |
| 66 | *Id.* ("*Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.*") [emphasis in original]. |
| 67 | *See Amnesty Am. v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N.Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) (granting |

motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

**68** (*See* Dkt. No. 48, at 2-5, 33-48 [Plf.'s Response to Defs.' Motion].)

**69** (Dkt. No. 48, at 3-4 [Plf.'s Affid., ¶¶ 4-6]; *see also* Dkt. No. 48, at 48 [Ex. L to Plf.'s Opp., attaching letter dated 5/2/05 from Plaintiff to the Psychiatric Department at Franklin C.F., requesting, for the second time, a consultation due to his nightmares].)

**70** (Dkt. No. 48, at 3 [Plf.'s Affid., ¶ 7].)

**71** (Dkt. No. 48, at 44 [Ex. H to Plf.'s Opp., attaching Response to Grievance No. FKN 6503-05].)

**72** (Dkt. No. 48, at 45 [Ex. I to Plf.'s Opp., attaching Screening / Admission Note dated 5/6/05, stating, "referral states pt was acting bizarre."].)

**73** (Dkt. No. 38, at 11-12, 16, 18-27 [Plf.'s Mem. of Law at pages "7," "8," "11," "13-22"].)

**74** (Dkt. No. 48, at 38-40 [Ex. E to Plf.'s Opp., attaching grievance].)

**75** As an initial matter, such unsworn claims are not *evidence* of the events giving rise to the claims at all but mere *allegations,* which are always insufficient to create a question of fact for purposes of summary judgment. *See* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ...."); *Applegate v. Top Assoc.,* 425 F.2d 92, 97 (2d Cir.1970) (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings"); *see, e.g., Mays v. Rhodes,* 255 F.3d 644, 648 (8th Cir.2001) ("unsworn accounts [of events] found in grievances forms filed by [prison] inmates" did not constitute evidence for purposes of motion for summary judgment) [citations omitted]; *Boyd v. Pork,* 01-CV-7957, 2003 U.S. Dist. LEXIS 7485, at *19 (N.D.Ill. Apr. 30, 2003) ("[The prisoner's] statement in the grievance is unsworn and of no evidentiary value [for purposes of the defendant's motion for summary judgment]."); *cf. David v. Lester,* 156 F.Supp.2d 588, 592, n.6 ("These unsworn grievance responses cannot be considered evidence from either party as to what actually happened or why. At the most, they are evidence as to the answers that [the prisoner] received to his grievances."). In any event, even if such unsworn claims did somehow constitute evidence, they could not be used for purposes of summary judgment because they are *inadmissible* at trial as hearsay. *See* Fed.R.Civ.P. 56(e) (requiring summary judgment decisions to be based on matters that would be "admissible in evidence"); Fed.R.Evid. 801(c) (" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."); Fed.R.Evid. 802 ("Hearsay is not admissible except as provided by these rules or by other rules prescribed by the Supreme Court pursuant to statutory authority or by Act of Congress."); *see, e.g., Jordan v. Van Winkle,* 04-CV-0647, 2006 U.S. Dist. LEXIS 76733, at *7-8 (N.D.Ind. Oct. 6, 2006) (prisoner's "unsworn grievances" were not able to create question of fact for purposes of summary judgment since they were not admissible to prove truth of statements contained in those grievances).

**76** (Dkt. No. 1, ¶ 6, Attachment, at 1 [Plf.'s Verified Compl.].)

**77** (Dkt. No. 48, at 3 [Plf.'s Affid., ¶ 7].)

**78** (*See* Dkt. No. 38, at 18 [Plf.'s Mem. of Law at page "13"].)

**79** *See Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) ( "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that

a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation.").

80    (Dkt. No. 48, at 40 [Ex. E to Plf.'s Opp., attaching grievance, the end of which alleges that the "Nurse Administration," including Defendant Pepin, acted with "neglegence" [sic], with regard to what they told a psychologist].)

81    See Estelle v. Gamble, 429 U.S. 97, 106 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.").

82    (Dkt. No. 38, Plf.'s Mem. of Law at 16.)

83    (Dkt. No. 1, ¶ 6, Attachment, at 2-3.)

84    See Cain v. Jackson, 05-CV-3914, 2007 WL 2193997, at *1, 6 (S.D.N.Y. July 27, 2007) (prisoner's degenerate disc disease in her cervical spine, which was compounded when she fell from her cell bunk and injured her back, was not "sufficiently serious" to implicate Eighth Amendment; Salaam v. Adams, 03-CV-0517, 2006 WL 2827687, at *10 (N.D.N.Y. Sept. 29, 2006) (Decision and Order of Kahn, J., adopting Report-Recommendation of Lowe, M.J.) (prisoner's sporadic and moderate complaints of lower back pain, even when considered in conjunction with prisoner's sporadic complaints of gastrointestinal problem, were not sufficiently serious for purposes of Eighth Amendment, as a matter of law); Rodriguez v. Mercado, 00-CV-8588, 2002 WL 1997885, at *2-3, 8 (S.D.N.Y. Aug. 28, 2002) (prisoner's back pain and migraines not "sufficiently serious" to implicate Eighth Amendment); Gomez v. Zwillinger, 94-CV-8739, 1998 U.S. Dist. LEXIS 17713, at *16-17 (S.D.N.Y. Nov. 6, 1998) (prisoner's back pain and discomfort not sufficiently serious).

85    See Hayes v. N.Y.S. D.O.C. Officers, 97-CV-7383, 1998 WL 901730, at *8 (S.D.N.Y. Dec. 28, 1998) (Mukasey, J.) (granting defendants' motion to dismiss, in part because prisoner's eye condition was "conclusory" in that he alleged merely that his "eye was in pain, tearing, and [his] vision was becoming worse," but not that his condition significantly affected his daily activities, or that he experienced "chronic and substantial pain").

86    (Dkt. No. 1, ¶ 6, Attachment, at 2-3.)

87    (Dkt. No. 46, Part 5, ¶ 4 [Defs.' Statement of Material Facts, asserting referenced fact and providing record citations in support thereof].)

88    (Id.)

89    (Id.)

90    (Dkt. No. 46, Part 5, ¶ 6 [Defs.' Statement of Material Facts, asserting referenced fact and providing record citations in support thereof].)

91    (Id.)

92    (Dkt. No. 46, Part 5, ¶ 7 [Defs.' Statement of Material Facts, asserting referenced fact and providing record citations in support thereof].)

93    (Id.)

94    (Id.)

95    (Dkt. No. 46, Part 5, ¶ 12 [Defs.' Statement of Material Facts, asserting referenced fact and providing record citations in support thereof].)

96    (Dkt. No. 46, Part 5, ¶ 13 [Defs.' Statement of Material Facts, asserting referenced fact and providing record citations in support thereof].)

97    (Dkt. No. 46, Part 5, ¶ 13 [Defs.' Statement of Material Facts, asserting referenced fact and not expressly providing record citations immediately following this assertion but providing such record citations elsewhere in paragraph]; see Dkt. No. 46, Part 6, ¶¶ 5, 6 [Brue Affid.]; Dkt. No. 46, Part 4,

at 15 [Ex. A to Moran Affid., attaching, at page "14," Plf.'s Ambulatory Health Record on S.H.U. Admission on 5/4/05, authored by Def. Brue].)

98     (*Id.*)

99     (*Id.*)

100     (Dkt. No. 46, Part 5, ¶ 14 [Defs.' Statement of Material Facts, asserting referenced fact and providing record citations in support thereof].)

101     (Dkt. No. 46, Part 5, ¶ 14 [Defs.' Statement of Material Facts, asserting referenced facts and providing record citations in support thereof]; *see also* Dkt. No. 46, Part 4, at 21 [Ex. B to Moran Affid., attaching page "383" of handwritten log of notes and observations made by corrections officer on 5/4/05, indicating that, at approximately 7:20 p.m., Plaintiff requested to see someone from the facility's medical department, which was promptly notified of that fact].)

102     (Dkt. No. 46, Part 5, ¶ 15 [Defs.' Statement of Material Facts, asserting referenced fact and not expressly providing record citations immediately following this assertion but providing such record citations elsewhere in paragraph]; *see* Dkt. No. 46, Part 6, ¶ 7 [Brue Affid.]; Dkt. No. 46, Part 4, at 16 [Ex. A to Moran Affid., attaching, at page "15," Plf.'s Ambulatory Health Record from 5/4/05, authored by Def. Brue].)

103     (Dkt. No. 46, Part 5, ¶ 15 [Defs.' Statement of Material Facts, asserting referenced fact and providing record citations in support thereof].)

104     (Dkt. No. 46, Part 5, ¶ 17 [Defs.' Statement of Material Facts, asserting referenced fact and providing record citation in support thereof].)

105     (Dkt. No. 46, Part 5, ¶ 19 [Defs.' Statement of Material Facts, asserting referenced fact and providing record citation in support thereof].)

106     (Dkt. No. 46, Part 5, ¶ 21 [Defs.' Statement of Material Facts, asserting referenced fact and providing record citation in support thereof].)

107     (Dkt. No. 46, Part 5, ¶¶ 10, 20 [Defs.' Statement of Material Facts, asserting referenced fact and providing record citations in support thereof]; *see also* Dkt. No. 46, Part 4, at 17 [Ex. A to Moran Affid., attaching, at page "16," Plf.'s Ambulatory Health Record from 5/5/05, authored by Def. Bru, indicating that Dr. Whalen worked at Clinton C.F.)

108     (Dkt. No. 46, Part 5, ¶ 20 [Defs.' Statement of Material Facts, asserting referenced fact and providing record citations in support thereof].)

109     (Dkt. No. 46, Part 5, ¶ 22 [Defs.' Statement of Material Facts, asserting referenced fact and providing record citation in support thereof].)

110     (Dkt. No. 46, Part 5, ¶ 22 [Defs.' Statement of Material Facts, asserting referenced fact and providing record citation in support thereof].)

111     (Dkt. No. 46, Part 5, ¶ 23 [Defs.' Statement of Material Facts, asserting referenced fact and providing record citation in support thereof].)

112     (Dkt. No. 46, Part 5, ¶ 23 [Defs.' Statement of Material Facts, asserting referenced fact and not expressly providing record citations immediately following this assertion but providing such record citations elsewhere in paragraph]; *see* Dkt. No. 46, Part 6, ¶ 10 [Brue Affid.]; Dkt. No. 46, Part 4, at 18 [Ex. A to Moran Affid., attaching, at page "17," Plf.'s Ambulatory Health Record from 5/6/05, authored by Def. Brue].)

113     (Dkt. No. 46, Part 5, ¶ 24 [Defs.' Statement of Material Facts, asserting referenced fact and providing record citations in support thereof].)

114     I note that, as recognized by the Supreme Court, " 'the Constitution does not mandate comfortable prisons,' ... and conditions that are 'restrictive and even harsh ... are part of the penalty that criminal offenders pay for their offenses against society.' " *Davidson v. Murray,* 371 F.Supp.2d 361,

370 (W.D.N.Y.2005) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347, 349 [1981] ).

115          (*See generally* Dkt. No. 46, Part 4, at 14-18 [Ex. A to Moran Affid., attaching, at pages "14" through "17," Plf.'s Ambulatory Health Record from 5/4/05 to 5/6/05, authored by various nurses, including Def. Brue].)

116          (Dkt. No. 46, Part 4, at 17 [Ex. A to Moran Affid., attaching, at page "16," Plf.'s Ambulatory Health Record from 5/5/05, authored by an unidentifiable nurse].)

117          (Dkt. No. 46, Part 4, at 18 [Ex. A to Moran Affid., attaching, at page "17," Plf.'s Ambulatory Health Record from 5/6/05, authored by an unidentifiable nurse].)

---

**End of Document**                                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW      © 2016 Thomson Reuters. No claim to original U.S. Government Works.      21


Slip Copy, 2009 WL 3111711 (N.D.N.Y.)
(Cite as: 2009 WL 3111711 (N.D.N.Y.))

**C**
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
MORTIMER EXCELL, Plaintiff,
v.
Brian FISCHER, Commissioner, DOCS, et al.,[FN1]
Defendants.

FN1. It is noted that the plaintiff has named a total of forty-three (43) defendants in the eighty-eight (88) page complaint.

Civ. No. 9:08-CV-945 (DNH/RFT).

Sept. 24, 2009.

West KeySummary
Prisons 310 &#8272;&#8658; 126

310 Prisons
   310II Prisoners and Inmates
     310II(B) Care, Custody, Confinement, and Control
      310k126 k. Protection from Violence, Assault, or Abuse. Most Cited Cases

Sentencing and Punishment 350H &#8272;&#8658; 1537

350H Sentencing and Punishment
   350HVII Cruel and Unusual Punishment in General
     350HVII(H) Conditions of Confinement
      350Hk1537 k. Protection from Violence. Most Cited Cases
Inmate's claim of failure to protect was facially adequate to sustain an action for violation of Eighth Amendment rights. Inmate's complaint alleged that he put prison officials on notice of a threat to his safety by sending three complaint letters days before he was allegedly assaulted. He also claimed that a prison nurse falsified his medical records so as to cover up the alleged assault, and another prison official participated in the conspiracy by instructing that no photographs be taken of inmate's injuries after the alleged assault. U.S.C.A. Const.Amend. 8.

Mortimer Excell, Elmira, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Adam Silverman, Esq., David L. Cochran, Esq., Assts. Attorney General, of Counsel, Albany, NY, for State Defendants.

***DECISION and ORDER***

DAVID N. HURD, District Judge.

**\*16** Plaintiff, Mortimer Excell, brought this civil rights action pursuant to 42 U.S.C. § 1983. By Report-Recommendation dated August 25, 2009, the Honorable Randolph F. Treece, United States Magistrate Judge, specifically recommended that the defendants' motion to dismiss (Docket No. 59) be granted in part and denied in part; that the following defendants be dismissed: T. Ramsdell, C. Crossman, Fearchild, D. Uhler, M. Patnode, Lucien LeClaire, Jr., Vonda Johnson, Frenyea, R. Lawrence, S. Tyrell, Lt. Miller, Lashway, Benthley, Knapp, Lucia, Loomis, Ferguson, Poltlos, Brousseau, J.T. Rice, D. Waldron, Quinn, Travers, Pedro Diaz, Robert Woods, Richard Roy, Brian Bengmann, N. Bezio, Steven Racette, Sgt. Rokece, C.O. Green, Ortloff (spelled "Oltloff" on the docket), and Karen Bellamy; and that plaintiff's motion for a preliminary injunction (Docket No. 57) be denied. To clarify his recommendations, the Magistrate Judge specifically stated that his recommendations leave the following claims viable: (1) Excessive force and retaliation against defendants Tamer, M. Orzech, T. Carter, Moak, and Labetz; (2) conspiracy against defendant Tamer, M. Orzech, T. Carter, Moak, Labetz, R. Rock, and H. Warner; (3) violation of plaintiff's First Amendment right to practice religion against M. Orzech; and (4) supervisory liability against Dale Artus

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)
(Cite as: 2009 WL 3111711 (N.D.N.Y.))

and Brian Fischer. The Magistrate Judge further stated that his recommendations leave defendants T. Carter, Tamer, Moak, M. Orzech, Labetz, R. Rock, H. Warner, Dale Artus, and Brian Fischer as remaining defendants should the Report-Recommendation be adopted. In a Clarification Order dated September 9, 2009, Magaistrate Judge Treece clarified that it is his recommendation that all of plaintiff's claims against defendant Lester Wright, M.D., be dismissed. The plaintiff has timely filed objections to the Report-Recommendation.

**\*17** It is noted that the defendant "Labetz, Lt., Clinton Correctional Facility," has never been served. The Magistrate Judge ordered that said defendant not be dismissed from the action as the other unserved defendants will be. The Magistrate Judge directed the Clerk to issue a summons and forward it, along with a copy of the complaint, to the United States Marshal for service upon defendant Labetz within thirty days of the date of the Report-Recommendation. It appears that the summons and complaint were never issued for service. Therefore, the plaintiff will be granted thirty days from the date of this order within which to serve defendant Labetz. The plaintiff is again warned, that if this defendant is not served within thirty days, the claims against defendant Labetz will be dismissed without further order of this court.

Based upon a careful review of the entire file, including the recommendations of Magistrate Judge Treece, the Clarification Order, and the objections by plaintiff, the Report-Recommendation is accepted and adopted in all respects. *See* 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendants' motion to dismiss is GRANTED, in part, and DENIED, in part;

2. Defendants T. Ramsdell, C. Crossman, Fearchild, D. Uhler, M. Patnode, Lucien LeClaire, Jr., Vonda Johnson Fenyea, R. Lawrence, S. Tyrell, Lt. Miller, Lashway,

Benthley, Paul Knapp, Lucia, Loomis, Ferguson, Poltlos, Brousseau, J.T. Rice, D. Waldron, Quinn, Travers, Pedro Diaz, Robert Woods, Richard Roy, Brian Bengmann, N. Bezio, Steven Racette, Sgt. Rokece, C.O. Green, Ortloff (spelled "Oltloff" on the docket), Karen Bellamy, and Lester Wright, M.D., are DISMISSED from this action;

3. Defendants T. Carter, Tamer, Moak, M. Orzech, Labetz, R. Rock, H. Warner, Dale Artus, and Brian Fischer will remain as defendants;

4. Plaintiff's motion for a Preliminary Injunction is DENIED;

5. The following claims remain in this action:

   a. Excessive force and retaliation against defendants Tamer, M. Orzech, T. Carter, Moak, and Labetz;

   b. Conspiracy against defendant Tamer, M. Orzech, T. Carter, Moak, Labetz, R. Rock, and H. Warner;

   c. Violation of plaintiff's First Amendment right to practice religion against M. Orzech; and

   d. Supervisory liability against Dale Artus and Brian Fischer.

6. The defendant Labetz is not dismissed from this action at this time. The Clerk is directed to issue a summons and forward it, along with a copy of the complaint, to the United States Marshal for service upon defendant Labetz within thirty days of the date of this Order adopting the Report-Recommendation.

7. If defendant Labetz is not served within thirty days of the date of the order, he will then be DISMISSED without further order of the court.

8. The Clerk is directed to enter judgment against the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

dismissed defendants, and to make the necessary changes on the docket to reflect the remaining defendants; and

9. The above action is referred to the Honorable Victor Bianchini, Recalled United States Magistrate Judge, for the purposes of mediation. Any further proceedings are stayed pending the completion of mediation.

**\*18** IT IS SO ORDERED.

### REPORT-RECOMMENDATION and ORDER

RANDOLPH F. TREECE, United States Magistrate Judge.

**\*1** *Pro se* Plaintiff Mortimer Excell brings this civil rights action, pursuant to 42 U.S.C. § 1983, alleging that he suffered the following constitutional violations: (1) conspiracy to violate his First, Eighth, and Fourteenth Amendment rights; (2) excessive force; (3) deliberate indifference to his serious medical needs; (4) retaliation; (5) due process violations stemming from both Disciplinary and Parole Board Hearings; (6) violation of his First Amendment rights of religious affiliation and expression; and (7) interference with his personal and legal mail.

Presently before the Court are Plaintiff's Motion for a Preliminary Injunction and Temporary Restraining Order and Defendants' Motion to Dismiss. Dkt. Nos. 57, 59, & 62.[FN2] In support of his Opposition to Defendants' Motion, Plaintiff has submitted two Supplemental Briefs, both of which have Exhibits attached. Dkt. Nos. 79, 82, & 84. The Court has not considered these Exhibits in considering the instant Motion to Dismiss. For the reasons that follow, it is recommended that the Defendants' Motion to Dismiss be **GRANTED in part** and **DENIED in part,** and the Plaintiff's Motion for a Preliminary Injunction be **DENIED.**

> FN2. Defendants Tamer, Urzech, T. Carter, and Moak filed an Answer to the Complaint and do not join in the Motion to Dismiss. Dkt. No. 61,

Ans.; Dkt. No. 62, Defs.' Mem. of Law at p. 1 n. 2. The causes of action asserted against these Defendants for excessive force, conspiracy, retaliation, and interference with his religious practices survive this Motion. Also, Defendants C.O. Green, Labetz, Oltloff, and Karen Bellamy have not been served with process. Dkt. Nos. 17, 54, & 66 (no summons has been returned for Defendant Bellamy).

### I. SUMMARY OF PLAINTIFF'S CLAIMS

Plaintiff's Complaint is eighty-eight (88) pages in length and contains eighty-one (81) numbered paragraphs and five (5) "Causes of Action" which are in sum and substance summaries of the claims alleged in the preceding 81 paragraphs. *See generally* Dkt. No. 1, Compl. Given the length of the Complaint and the amount of claims stated therein, we shall provide in this section a summary of Plaintiff's claims and delve into the finer points of his allegations within our discussion of the Defendants' bases for dismissal. This summary is derived from the facts alleged in Plaintiff's Complaint, which must be accepted as true for the purposes of addressing Defendants' Motion to Dismiss brought pursuant to FED. R. CIV. P. 12(b)(6). *See infra* Part II.A.[FN3]

From July through September 4, 2007, Plaintiff was incarcerated at Upstate Correctional Facility ("Upstate"), where he was allegedly denied medication for various physical ailments by Defendant Nurse Fearchild, denied recreation for a period of three days by Defendant N. Bezio, threatened and harassed by Defendant Brian Bengmann, and had his due process rights violated during a Disciplinary Hearing. Dkt. No. 1, Compl. at ¶¶ 1-7.[FN3] In September 2007, Plaintiff was sent to Great Meadow Correctional Facility ("Great Meadow") in order to attend a medical appointment at Albany Medical Hospital. *Id.* at ¶ 7. During his stay at Great Meadow, Plaintiff was denied his "medical draft bag" and therefore forced to wear the same clothes from September 2-18, denied drinking water for one twenty-four (24) hour period, threatened, and issued a false misbehavior report by Defendant Correctional Officer ("C.O") Green. *Id.* at ¶¶ 7-10.

> FN3. All citations to the Plaintiff's Complaint

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)
(Cite as: 2009 WL 3111711 (N.D.N.Y.))

refer to the paragraphs contained in the *"Statement of Facts"* section, starting on page twelve (12) of the Complaint.

Plaintiff alleges that on October 18, 2007, after his transfer back to Upstate, Defendant T. Ramsdell sexually assaulted him by grabbing and squeezing his penis during a body search and that Ramsdell and Defendant Rokece pushed his face against an iron rail, causing injuries to his face and forehead. *Id.* at ¶¶ 11-12 & 14. In the days that followed Plaintiff was threatened, harassed, issued a false Misbehavior Report accusing him of possessing contraband, and for a two-day period denied a bed pan and personal hygiene products. *Id.* at ¶¶ 13-19. In November 2007, Plaintiff was transferred to Clinton Correctional Facility ("Clinton"), where in December of that year, several Defendants, including S. Tyrell, R. Lawrence, Poltlos, and Frenyea, conspired to take his identification card, put him in keeplock, and improperly opened his legal mail. *Id.* at ¶¶ 22-27. During a Disciplinary Hearing held on December 24, 2007, before Hearing Officer Defendant Lieutenant ("Lt.") Miller, Plaintiff was denied the opportunity to present evidence or testimony and was not given a written disposition of the proceeding. *Id.* at ¶ 32.

**\*2** On January 15, 2008, Plaintiff had a Parole Hearing before Defendants Loomis, Ferguson, and Ortloff,[FN4] during which Plaintiff articulated his complaints about the aforementioned alleged constitutional violations. These Defendants denied Plaintiff parole. *Id.* at ¶¶ 61-62.

FN4. Defendant Ortloff's name is spelled "Oltloff" on the Docket Report. Because both parties refer to this Defendant as "Ortloff," we presume his name to be spelled as such.

On May 13, 1008, Defendant C.O. M. Orzech told Plaintiff to cut his beard by May 17th or he would issue Plaintiff a misbehavior report. *Id.* at ¶ 36. That same day, Plaintiff filed a request to Department of Correctional Services ("DOCS") officials for a beard permit based on his Rastafarian religious beliefs and, on May 14th, received a receipt for said request stating that Plaintiff did not have to cut his beard during the pendency of the decision on his request. *Id.* at ¶¶ 37-39. On May 15th, Plaintiff explained to Orzech that he had submitted a

request for a beard exemption and could not be forced to cut his beard until that request was decided, however, on May 17th, Orzech denied Plaintiff recreation time and placed him in keeplock because he had not cut his beard. *Id.* at ¶¶ 3 6-43. Also, Plaintiff alleges that on May 17th, Orzech allegedly threatened to beat him up if he filed any more complaints to Defendants Commissioner Fischer and Superintendent Artus. *Id.* at ¶ 43.

On May 18, 2008, Plaintiff filed a medical services request to address his heart pain and weakness. *Id.* at ¶ 45. On May 19, 2008, Defendant C.O.'s T. Carter and Orzech arrived at Plaintiff's cell to take him to the medical unit and proceeded to cuff Plaintiff's hands behind his back, then pushed him to the floor as he was being escorted out of his cell block and punched, kicked, and beat him, as did Defendant C.O.'s Tamer and Moak. *Id.* at ¶¶ 46-47. Plaintiff was escorted to the hospital where he was punched by Moak and Defendant Lieutenant ("Lt.") Labetz, and Defendant Nurse R. Rock allegedly refused to treat him for the injuries he sustained. *Id.* at ¶¶ 48 & 63(1).[FN5] Afterwards, Plaintiff was sent to the Special Housing Unit ("SHU"), where he was denied medical care, allegedly in order to prevent evidence of the incident in his medical records. *Id.* at ¶¶ 49-50.

FN5. There are two consecutive paragraphs in the Complaint numbered 63. To avoid confusion, we will refer to them as paragraphs 63(1) and 63(2), respectively.

On May 20, 2008, Orzech and Carter issued Plaintiff Misbehavior Reports alleging that Plaintiff had attacked Orzech while being escorted to the medical unit; on May 27, 2008, a Disciplinary Hearing was convened on those charges before Hearing Officer Defendant Captain D. Uhler. At the Disciplinary Hearing, Plaintiff was denied the opportunity to call witnesses and present evidence, and was improperly removed from the proceedings; in addition the Hearing was allegedly improperly extended through June 19, 2008. *Id.* at ¶¶ 52-54, 58, & 63(2)-64.

From July 2005 through July 2008, Plaintiff did not receive any mail from family or friends, and his family members did not receive outgoing mail he sent. *Id.* at ¶¶ 63(1) & 65. In addition, letters of complaint Plaintiff sent

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)
(Cite as: 2009 WL 3111711 (N.D.N.Y.))

to various New York State Officials and Officers were not received. Plaintiff alleges that his incoming and outgoing mail was stolen by Defendants J. Rice, Quinn, and D. Waldron, who are mail clerks at Auburn, Upstate, and Clinton Correctional Facilities, respectively. *Id.* at ¶¶ 65, & 75-80.

**\*3** Finally, on July 16, 2008, Plaintiff was transferred back to Upstate, where he was allegedly denied medical care from July 17 through August 14, 2008. *Id.* at ¶ 81.

## II. DISCUSSION

### A. Standard of Review

On a motion to dismiss, the allegations of the complaint must be accepted as true. *See Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). The trial court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). "[T]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

"Generally, in determining a 12(b)(6) motion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, and matters to which the court may take judicial notice." *Spence v. Senkowski,* 1997 WL 394667, at \*2 (N.D.N.Y. July 3, 1997) (citing *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir.1991)). Moreover, "even if not attached or incorporated by reference, a document 'upon which [the complaint] *solely* relies and which is *integral to the complaint*' may be considered by the court in ruling on such a motion." *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991)) (emphasis added).

The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *See Retail Clerks Intern.*

*Ass'n, Local 1625, AFL-CIO v. Schermerhorn,* 373 U.S. 746, 753 n. 6, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963); *see also Arar v. Ashcroft,* 532 F.3d 157, 168 (2d Cir.2008). Nevertheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice." *Id.* (citation omitted).

A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as the plaintiff's complaint includes "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *Ashcroft v. Iqbal,* --- U.S. ---- 129 S.Ct. at 1950 (citing *Twombly* ).[FN6] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* --- U.S. ---- 129 S.Ct. at 1949. This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Thus, in spite of the deference the court is bound to give to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts which [he or she] has not alleged, or that the defendants have violated the ... laws in ways that have not been alleged." *Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). The process of determining whether a plaintiff has "nudged [his] claims ... across the line from conceivable to plausible," entails a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal,* --- U.S. ---- 129 S.Ct. at 1950-51.

> FN6. By its opinion in *Bell Atlantic Corp. v. Twombly* and then again in *Ashcroft v. Iqbal,* the Supreme Court abrogated the often-cited language of *Conley v. Gibson* "that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 562-63 (2007) (quoting *Conley,* 355 U.S. 41, 45-46, 78

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)
(Cite as: 2009 WL 3111711 (N.D.N.Y.))

S.Ct. 99, 2 L.Ed.2d 80 (1957)). In so doing, the Court found that *Conley* "described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Id.* at 563.

**B. Eighth Amendment Claims**

1. *Medical Treatment*

**\*4** The Eighth Amendment to the United States Constitution prohibits cruel and unusual punishment. Prohibited punishment includes that which "involve[s] the unnecessary and wanton infliction of pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove deliberate indifference to [his] serious medical needs." *Smith v. Carpenter,* 316 F.3d 178, 183 (2d Cir.2003) (internal quotation marks and citations omitted) (alteration in original). This standard contains both objective and subjective elements. *Id.* "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberative indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Id.* at 183-84 (citing *Chance v. Armstrong,* 143 F.3d at 702 & *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)). The subjective element "entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Hathaway v. Coughlin,* 99 F.3d at 553 (quoting *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

In this case, Plaintiff's medical indifference claims are as follows: (1) in mid-July 2007, he suffered from heart and chest pain for a period of five days, but received only non-aspirin medication and, on July 12, 2007, was denied a blood pressure test by Defendant Nurse Fearchild; (2) in November 2002, he was prescribed "Omeprazole 20 mg caps" for his "belly pains," but was denied refills of that medication by Defendant Nurses Travers and Fearchild at

Upstate, and by Defendant Nurses Lashway, Rock, and Benthley at Clinton; and (3) Defendants Rock, Benthley, Lashway, Fearchild, and Travers failed to treat him for the injuries he sustained during the alleged use of excessive force against him on May 19, 2008, and falsified his medical records to cover-up the injuries he allegedly sustained on that date.[FN7] Compl. at ¶¶ 1, 48, 74 & 81.

> FN7. Plaintiff also alleges that at a Disciplinary Hearing held on June 16, 2008, he told the presiding hearing officer, Defendant Uhler, about his medical problems, and that Uhler denied his requests for medical care. Compl. at ¶ 60. To the extent Plaintiff intended to raise an Eighth Amendment claim against Uhler, that claim must fail because Uhler was not responsible for Plaintiff's medical treatment.

In Plaintiff's first and second medical indifference claims, there is no allegation that he suffered from a serious medical condition. Plaintiff claims that he suffered from heart and chest pains for a period of five (5) days, and that he was denied refills for medication used to treat stomach pain. Compl. at ¶¶ 1 & 74. Such conclusory allegations of heart, chest, and stomach pain, without more, do not satisfy the objective prong of the Eighth Amendment test. *See Bell. Atl. Corp. v. Twombly,* 550 U.S. at 545 (stating that a valid claim must have enough factual allegations "to raise a right to relief above the speculative level"); *see also Hutchinson v. New York State Corr. Officers,* 2003 WL 22056997, at *5 (S.D.N.Y. Sept.4, 2003) (holding that a general allegation of chest pain is not sufficiently serious under the Eight Amendment) (citations omitted); *Pender v. McClellan,* 1996 WL 343253, at *4 (W.D.N.Y. Feb.5, 1996) (dismissing plaintiff's Eighth Amendment claims based on stomach pain when there was no allegation that his condition was urgent or otherwise serious). Therefore, it is recommended that those claims be **dismissed.**

**\*5** Likewise, in his third medical indifference claim alleging Defendants Rock, Benthley, Lashway, Fearchild, and Travers failed to treat him for the injuries he sustained during the alleged use of excessive force against him on May 19, 2008, Plaintiff fails to allege that he suffered from a constitutionally significant injury or medical condition. Plaintiff merely alleges in general terms that his

head and neck were hurt, he experienced head and heart pain, and that he requested x-rays for unspecified injuries to his head and body. Compl. at ¶¶ 48-49 & 81. These statements of general pain cannot sustain an Eighth Amendment claim because they do not allege that Plaintiff suffered from "a condition of urgency that may result in degeneration or extreme pain." *Chance v. Armstrong,* 143 F.3d at 702. Therefore, these claims should be **dismissed.**[FN8]

> **FN8.** Plaintiff's other claims surrounding the alleged excessive use of force on May 19th remain. *See infra* Parts II.F & IV.

2. *Conditions of Confinement*

In order to state a valid conditions of confinement claim under the Eighth Amendment, a plaintiff must allege: (1) the conditions were so serious that they constituted a denial of the "minimal civilized measure of life's necessities," and (2) the prison officials acted with "deliberate indifference." *Wilson v. Seiter,* 501 U.S. 294, 297-99, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (citation omitted) (cited in *Branham v. Meachum,* 77 F.3d 626, 630-31 (2d Cir.1996)).

Plaintiff alleges the following conditions of confinement claims: (1) he was denied recreation on July 12, 13, and 15, 2007, Compl. at ¶ 2; (2) while on a multi-day visit to Albany Medical Hospital he was forced to wear the same clothes from September 2 through September 18, 2007, after being denied his "medical trip draft bag," Compl. at ¶¶ 7 & 10; (3) from September 12-13, 2007, he was forced to stay in a room without drinking water, Compl. at ¶ 8; and (4) he was denied all personal hygiene items from October 19-20, 2007, Compl. at ¶ 17.

With respect to Plaintiff's claim that he did not have drinking water in his cell for a 24-hour period from September 12-13, it unclear whether he is asserting that he did not have access to running water in his cell, or that he was completely denied water for a 24-hour period. Compl. at ¶ 8. To the extent Plaintiff intended to allege the former, a lack of access to running water, without more, does not constitute an Eighth Amendment violation, *James v.*

*Monroe County Jail,* 2005 WL 2030730, at *3 (W.D.N.Y. Aug.23, 2005) (citation omitted); to extent Plaintiff intended to allege the latter, that claim is weakened by his statement that he was provided food on that date, but refused to eat it for fear that it was drugged, Compl. at ¶ 8. Thus, Plaintiff admits that he was not deprived of sustenance, even if he refused to accept it. Also, although Plaintiff alleges he was forced to wear the same clothes from September 2 through September 18, 2007, he does not allege that he was denied the opportunity to bathe or otherwise clean himself during that period.

*6 In sum, none of these deprivations are so serious as to constitute a denial of the "minimal civilized measure of life's necessities." *Wilson v. Seiter,* 501 U.S. at 297-99 (citation omitted). Plaintiff's claims amount to assertions that he was inconvenienced and perhaps discomforted for short periods of time, and are therefore *de minimis* and not cognizable under the Eighth Amendment, which only protects inmates from conditions that violate "contemporary standards of decency." *Hudson v. McMillan,* 503 U.S. 1, 8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992); *see also, e.g., Hamilton v. Conway,* 2008 WL 234216, at *9 (W.D.N.Y. Jan.28, 2008) (stating that "briefly denying hygienic materials does not violate contemporary standards of decency"), *Ochoa v. Connell,* 2007 WL 3049889, at * 12 (N.D.N.Y. Oct.18, 2007) (citing cases for the proposition that the denial of recreation for a few days does not implicate the Eighth Amendment). Therefore, it is recommended that these claims be **dismissed.**

3. *Threats, Harassment, Excessive Force, and Sexual Abuse*

Plaintiff makes numerous allegations that various Defendants threatened, harassed, and subjected him to verbal abuse. Specifically, Plaintiff alleges that (1) on July 12, 2007, Fearchild threatened to issue a misbehavior report against him, Compl. at ¶ 1; (2) Defendant Bengmann threatened him on August 8, 2007, Compl. at ¶ 3; (3) on September 12, 2007, Defendant Green threatened to assault him, Compl. at ¶ 8; (4) on October 19, 2007, Defendant Crossman threatened to beat him up if he did not stop talking and then verbally abused Plaintiff with profane language and gestures, Compl. at ¶ 18; (6) on December 21, 2007, Defendants Tyrell, Lawrence,

Poltlos, Frenyea, and other unnamed officers conspired to harass and provoke Plaintiff when they took his identification card, put him on keeplock, and improperly opened his legal mail, Compl. at ¶¶ 24-27; and (7) Defendant Poltlos threatened his life, pushed his face up against a wall, and made racial epithets against Plaintiff while escorting him to the mental health unit, Compl. at ¶¶ 28-29.

It is well settled law in this Circuit that "42 U.S.C. § 1983 is not designed to rectify harassment or verbal abuse." *Gill v. Hoadley,* 261 F.Supp.2d 113, 129 (N.D.N.Y.2003) (citing *Alnutt v. Cleary,* 913 F.Supp. 160, 165-66 (W.D.N.Y.1996)); *Petway v. City of New York,* 2005 WL 2137805, at *3 (E.D.N.Y. Sept.2, 2005); *Larocco v. N.Y. City Dep't of Corr.,* 2001 WL 1029044, at *5 (S.D.N.Y. Aug.31, 2001). Thus, "verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Moncrieffe v. Witbeck,* 2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000) (quoting *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998)). Additionally, "threats do not amount to violations of constitutional rights." *Id.* (quoting *Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995)). Therefore, the aforementioned claims of threats and harassment should be **dismissed.**

**\*7** To the extent Plaintiff intends to assert a claim of excessive force against Defendant Poltlos for allegedly pushing his face up against a wall, that action does not rise to the level of an Eighth Amendment violation, especially when, as here, Plaintiff has not alleged he was in any way injured by the Defendant's actions. *See Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.") (internal citations omitted); *see also Govan v. Campbell,* 289 F.Supp.2d 289, 300 (N.D.N.Y.2003) (prisoner's claim that he was pushed up against a wall, even if true, did not amount to a constitutional violation).

Plaintiff has also brought claims of sexual and physical abuse against Defendants Ramsdell and Rokece. Compl.

at ¶¶ 11-14. Specifically, Plaintiff alleges that during a search of his person for contraband, Defendant Ramsdell grabbed and squeezed his penis,[FN9] and that Rokece pushed his face up against an iron rail. *Id.* at ¶¶ 11-12 & 14. Like Plaintiff's claim against Poltlos, his claim that Rokece pushed him against a rail, even if true, is *de minimis* and therefore fails to state a claim. *See Govan v. Campbell,* 289 F.Supp.2d at 300. As per Plaintiff's claim against Ramsdell, in some cases, "[s]exual abuse may violate contemporary standards of decency" so as to implicate the Eighth Amendment. *Boddie v. Schnieder,* 105 F.3d 857, 861 (2d Cir.1997). However, the Second Circuit has made clear that allegations of minor, isolated incidents, even if inappropriate, will not normally state a valid cause of action under the Eighth Amendment. *Id.* In this case, Plaintiff has alleged a quick, isolated incident of inappropriate touching that occurred during a search of his person for contraband. Such an incident, even if true, does not constitute an Eighth Amendment violation. *Id.* (prisoner's allegation that a corrections officer inappropriately touched his penis on one occasion did not state a valid claim), *see also Davis v. Castleberry,* 364 F.Supp.2d 319, 321 (W.D.N.Y.2005) (prisoner's allegation that a corrections officer grabbed his penis during a pat frisk did not state a valid constitutional claim); *Montero v. Crusie,* 153 F.Supp.2d 368, 373 & 375 (S.D.N.Y.2001) (squeezing an inmate's genitalia on several occasions during pat frisks did not constitute an Eighth Amendment violation).

FN9. Plaintiff does not allege that he was in any way injured when Ramsdell allegedly squeezed his penis.

Therefore, it is recommended that Plaintiff's allegations of sexual abuse, threats, excessive force, and harassment be **dismissed** for failure to state a claim.

### C. Due Process Claims

Plaintiff alleges that he suffered due process violations during a Parole Hearing held on January 15, 2008, and Disciplinary Hearings held in 2007 and 2008.

#### 1. *Parole Hearing*

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)
(Cite as: 2009 WL 3111711 (N.D.N.Y.))

Plaintiff alleges that on January 15, 2008, he had a Parole Hearing before Defendants Loomis, Ferguson, and Ortloff, all Commissioners of the New York State Division of Parole. Compl. at ¶ 61. Plaintiff states that he informed those Defendants about all of the constitutional violations he had suffered during his incarceration, but that Defendants Loomis and Ferguson prevented Plaintiff from pleading his side of the case and disregarded his suffering. *Id.* On January 16, 2008, Plaintiff was denied parole by Loomis, Ferguson, and Ortloff; Plaintiff alleges that but for such denial, he would not have been assaulted on May 19, 2008. *Id.* at ¶ 62.

**\*8** As Defendants point out, the Second Circuit has held that "parole board officials, like judges, are entitled to absolute immunity from suit for damages when they serve a quasi-adjudicative function in deciding whether to grant, deny or revoke parole." *Montero v. Travis,* 171 F.3d 757, 761 (2d Cir.1999) (citations omitted). Therefore, because Defendants Loomis, Ferguson, and Ortloff were acting as quasi-judicial officers when they allegedly improperly denied Plaintiff's parole, they are entitled to absolute immunity and the claims for damages [FN10] against them should be **dismissed** pursuant to 28 U.S.C. § 1915(e)(2)(B)(I), which gives the Court authority to dismiss a claim brought by a plaintiff proceeding *in forma pauperis* "at any time" if it determines such claim to be frivolous.

> FN10. Plaintiff does not ask for any other non-pecuniary form of relief against Defendants Loomis, Ferguson, and Ortloff. *See* Compl. at pp. 77-80.

### 2. *Disciplinary Hearings*

Plaintiff makes several due process claims concerning Disciplinary Hearings held on (1) November 21, 2007; (2) December 24, 2007; and (3) May 27 through June 19, 2008. Compl. at ¶¶ 21, 32, 58-60, 63(2), & 64. Plaintiff alleges that at the Disciplinary Hearing presided over by Defendant D. Kemp on November 21, 2007, Kemp prevented Plaintiff from presenting a defense by threatening him and stating that if Plaintiff did "it her

way[,] she [would] not give [him] any time and [would] dismiss the charges against [him]." *Id.* at ¶ 21. Plaintiff alleges Kemp found him guilty of smuggling and issued him a sentence of "counsel and release." *Id.*

Plaintiff alleges that on December 24, 2007, Defendant Lieutenant Miller presided as Hearing Officer over a Disciplinary Hearing during which Plaintiff was denied the opportunity to present evidence and testimony and that he was not given a written disposition of the Hearing. [FN11] *Id.* at ¶ 32. Plaintiff alleges that he was found guilty at the Hearing and sentenced to thirty (30) days keeplock. Plaintiff states that he filed a complaint with Defendant Racette requesting a new hearing, which was denied. *Id.*

> FN11. Plaintiff also alleges that he did not receive a written disposition after a Disciplinary Hearing held in November 2007. Compl. at ¶ 20. However, that claim is alleged only against Superintendent Bukeco, who is not a named Defendant in this action, and therefore, should be **dismissed** as Plaintiff has alleged no personal involvement on the part of any Defendant.

Finally, Plaintiff alleges that on May 27, 2008, Defendant Uhler presided over a Disciplinary Hearing on charges brought by Defendants Orzech and T. Carter stemming from the May 19, 2008 incident, at which Plaintiff was denied the opportunity to present witnesses and other evidence. *Id.* at ¶ 54. Plaintiff also alleges that such Hearing was adjourned to June 3, 2008, and then again to June 9, 2008, but he did not receive a copy of an extension form in either instance and was made to wait in SHU during those adjournments. *Id.* Plaintiff alleges that the Hearing reconvened on June 16, 17, and 19, 2008 before Defendant Uhler, during which time Plaintiff was again precluded from presenting evidence and Uhler allegedly improperly led the witnesses. *Id.* at ¶¶ 58, 63(2), & 64. Plaintiff also avers that he was improperly removed from the proceedings on June 16, 2008. *Id.* at ¶ 63(2). Plaintiff does not state what the outcome of the May 27-June 19, 2008 Disciplinary Hearing was, nor if he received any form of punishment after its disposition. *Id.* at ¶¶ 54 & 58-60.

**\*9** In order to state a procedural due process claim

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

pursuant to the Fourteenth Amendment, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)). The Supreme Court held in *Sandin v. Conner* that state created liberty interests shall be limited to those deprivations which subject a prisoner to "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

In this case, Plaintiff has alleged that he was sentenced to thirty (30) days keeplock after his conviction in the Disciplinary Hearing conducted on December 24, 2007. Courts in this Circuit have held that a 30 day period of keeplock, absent additional egregious circumstances, is not "atypical and significant" so as to create a liberty interest and thereby trigger the protections of the Due Process Clause. *See Rivera v. Goord,* 2008 WL 5378372, at *2-3 (N.D.N.Y. Dec.22, 2008) (holding that 40 days of room restriction "did not constitute a constitutionally cognizable liberty deprivation"); *Uzzell v. Scully,* 893 F.Supp. 259, 263 (S.D.N.Y.1995) (45 days of keeplock is not atypical and significant); *Rivera v. Coughlin,* 1996 WL 22342, at *5 (S.D.N.Y. Jan.22, 1996) (89 days in keeplock does not create a liberty interest). Indeed, courts have roundly rejected the notion that such a short period of confinement, without additional hardships, creates a liberty interest even when that confinement is completely segregated, such as when an inmate is sent to the Special Housing Unit ("SHU"). *See Sealey v. Giltner,* 197 F.3d 578, 589-90 (2d Cir.1999) (101 days in normal SHU conditional was not atypical or significant); cited in *Ochoa v. DeSimone,* 2008 WL 4517806, at *4 (N.D.N.Y. Sept.30, 2008) (30 days in SHU, without more, did not create a liberty interest); *Thompson v. LaClair,* 2008 WL 191212, at *3 (N.D.N.Y. Jan.22, 2008) (30 days in SHU does not create a liberty interest).

With respect to Plaintiff's allegations regarding the Disciplinary Hearings held on November 21, 2007 and from May 27, 2008, through June 19, 2008, Plaintiff does not allege that he suffered any atypical or significant hardship as a consequence of those alleged due process violations. To the extent Plaintiff intended to allege that his confinement in SHU during the pendency of his Hearing that went from May 27 through June 19, 2008,

was a due process violation, such a short period of confinement is not atypical and significant for the reasons mentioned above. Therefore, it is recommended that his due process claims be **dismissed** because he had failed to implicate a liberty interest with respect to any of the due process violations alleged.

**D. First Amendment Claims**

1. *Interference with Personal Mail*

Plaintiff alleges that the Defendants interfered with his outgoing and incoming mail. Plaintiff states that his family members sent him numerous letters, but that he did not receive any mail from family or friends from September 2005 through July 2008. Compl. at ¶¶ 63(1) & 65. Plaintiff also states that on January 15, 2008, his mother informed Deacon Debiec [FN12] that she had not received any of Plaintiff's letters. *Id.* at ¶ 63(1). Plaintiff alleges that he sent his daughter and her mother a certified letter while in Auburn in 2005, but that he never received the return receipt; he called his daughter's mother who informed him that she never received the letter. *Id.* at ¶¶ 75-76. Plaintiff accuses the Senior Mail Clerk at Auburn, Defendant J. Rice, of stealing his mail. *Id.* Also in 2005, Plaintiff allegedly sent complaint letters to the New York Department of State Ethics Commission and, having heard no response, sent another letter to the Ethics Commission asking if they received his complaints, to which they responded they had not. *Id.* at ¶ 77. Plaintiff accuses Defendant Rice of stealing those complaints. *Id.*

> FN12. Deacon Debiec is not a named Defendant in this action.

**\*10** Plaintiff alleges that from 2005 through March 24, 2007, he sent over two hundred (200) letters to his daughter and her mother, all of which were allegedly stolen by Defendant Quinn, a mail clerk at Upstate. *Id.* at ¶ 76. In addition, Plaintiff accuses Quinn of stealing letters he sent to DOCS' Rastafarian Priest Abuna A. Foxe in 2006, as well as a complaint of criminal misconduct sent to various government officers. *Id.* at ¶ 78.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)
(Cite as: 2009 WL 3111711 (N.D.N.Y.))

In March 2008, Plaintiff spoke with his father who advised him that he had not received any correspondence from Plaintiff for over three years, though Plaintiff alleges he sent his parents over sixty (60) letters between 2005 and 2008. *Id.* at ¶ 79. Plaintiff accuses Defendants Rice, Quinn, and Defendant Waldron, who is a Senior Mail Supply Clerk at Clinton, of obstructing his written communications to his family. *Id.*

As Plaintiff correctly contends, the First Amendment protects an inmate's right to send and receive both legal and non-legal mail, though that right may be limited by restrictions that are " 'reasonably related to legitimate penological interests.' " *Thornburgh v. Abbott,* 490 U.S. 401, 409, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989) (quoting *Turner v. Safley,* 482 U.S. 78, 79, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)). However, Plaintiff's sweeping accusations that his incoming and outgoing mail was obstructed for a period of over three years does not assert a plausible claim under § 1983. *See Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868. Plaintiff's conclusory accusations that Defendants Rice, Quinn, and Waldron stole his incoming and outgoing mail appears to be based on nothing more than the fact that those Defendants were DOCS employees who worked in the mailrooms at Auburn, Upstate, and Clinton, respectively. Indeed, beyond his own suspicions, Plaintiff offers no factual allegations that link these Defendants to the alleged obstruction of his mail from 2005 through 2008. Therefore, we recommend that these claims be **dismissed** as conclusory.

### 2. False Misbehavior Reports

Plaintiff alleges that several Defendants filed false misbehavior reports against him. Some of those allegations include the additional claim that the false reports were filed in retaliation for the exercise of his First Amendment rights, some do not. We address first the claims that do not have the retaliation rider attached.

Plaintiff alleges that on October 19, 2007, Defendant Ramsdell, in an effort to cover-up staff misconduct, issued him a false Misbehavior Report accusing Plaintiff of carrying contraband in his crotch. Compl. at ¶ 15. Plaintiff also alleges that on December 22, 2007, Defendant Tyrell

filed a false Misbehavior Report accusing Plaintiff of threats in order to cover-up Tyrell's improper opening of Plaintiff's legal mail. *Id.* at ¶ 31. However, there is "no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d at 862 (citing *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)); *see also Gill v. Riddick,* 2005 WL 755745, at *7 (N.D.N.Y. Mar.31, 2005). While an inmate may have a valid cause of action where a false misbehavior report is filed *in retaliation* for the exercise of a constitutional right, *see, e.g., Gill v. Riddick,* 2005 WL 755745 at *7,* Plaintiff has not established that he was engaged in constitutionally protected conduct with respect to these claims. Therefore, it is recommended that these claims be **dismissed** for failure to state a claim and pursuant to 42 U.S.C. § 1915(g). *See supra* Part II.C.1.

**\*11** We now consider Plaintiff's claims that false misbehavior reports were filed against him with retaliatory animus. The Second Circuit has stated that courts must approach prisoner retaliation claims "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) & *Franco v. Kelly,* 854 F.2d 584, 590 (2d Cir.1988)), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

In order to prevail on a retaliation claim, a plaintiff bears the burden to prove that (1) he engaged in constitutionally protected conduct; (2) prison officials took an adverse action against him; and (3) a causal connection exists between the protected speech and the adverse action. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted); *see also Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citation omitted).

In this case, Plaintiff alleges that (1) at some point prior to August 8, 2007, Defendant Bezio submitted a letter of complaint Plaintiff had written to Defendant Bengmann of the DOCS Inspector General's Office in retaliation for a civil rights action Plaintiff had previously initiated against several DOCS officials, Compl. at ¶ 3; (2) on August 11,

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)
(Cite as: 2009 WL 3111711 (N.D.N.Y.))

2007, Defendant Bengmann issued Plaintiff a false Misbehavior Report in retaliation for complaints Plaintiff had filed against several DOCS and New York State officials, Compl. at ¶ 3; (3) on October 21, 2007, Defendant Crossman filed a false Misbehavior Report against Plaintiff in retaliation for his filing a civil lawsuit against numerous DOCS officials, Compl. at ¶ 19; and (4) on December 22, 2007, Defendant Lawrence filed a false Misbehavior Report against Plaintiff in retaliation and in order to cover-up staff misconduct, Compl. at ¶ 30.

With respect to the first two claims listed above, Plaintiff alleges that on August 8, 2007, he spoke with Defendant Brian Bengmann, who told Plaintiff that Bezio had forwarded him a letter written by Plaintiff that allegedly included threats against the Upstate staff. *Id.* at ¶ 3. Plaintiff states that Bengmann produced a letter of complaint Plaintiff wrote to Defendant Woods about his medical issues, assaults he had endured, and his allegedly improper SHU confinement. *Id.* Plaintiff alleges that he received a Misbehavior Report on May 21, 2008, for sending that letter to Woods, and was eventually assessed ninety (90) days in SHU on that charge. Plaintiff states that notwithstanding the punishment he had already been assessed, Defendant Bezio sent his letter to Defendant Bengmann on August 8, 2007, in retaliation for a civil rights action he filed in federal court that Plaintiff has identified as 9:07-CV-0305.[FN13] Plaintiff alleges that he received a Misbehavior Report from Bengmann on August 21, 2007, in retaliation for a complaint Plaintiff filed against Defendant Richard Roy, former-Governor Eliot Spitzer, State Commission Chairman Daniel Stewart, DOCS Commissioner Defendant Brian Fischer, and Bezio. *Id.*

> FN13. The Court takes judicial notice that Plaintiff has currently pending in the Northern District of New York another § 1983 action, *Excell v. Woods et al.,* civil action number 9:07-CV-305(GTS/GHL), in which he has brought claims against many of the same Defendants listed in this action, including Bezio.

*12 With respect to Bengmann, Plaintiff's claim that he wrote a false Misbehavior Report against Plaintiff because of complaints and lawsuits Plaintiff filed against other individuals is conclusory because Plaintiff fails to allege

a plausible causal connection between his protected conduct and Bengmann's allegedly false Misbehavior Report. Plaintiff himself alleges that Bengmann was acting on Plaintiff's letter of complaint that was forwarded to him by Bezio, a letter that was alleged to contain threats against DOCS officials. As per Bezio, the only retaliatory act Plaintiff has alleged is that he submitted Plaintiff's letter of complaint to Bengmann, who then authored a Misbehavior Report against Plaintiff. Thus, Plaintiff does not allege that Bezio took any adverse action directly against him. Therefore, it is recommended that these claims be **dismissed.**

Plaintiff's third and fourth retaliation claims listed above against Defendants Crossman and Lawrence, respectively, both suffer from the same deficiency: neither describes with any degree of specificity the constitutionally protected conduct that was the basis for the alleged retaliatory acts. *See id.* at ¶¶ 19 (alleging that Crossman filed a false Misbehavior Report against him "as retaliation against the Plaintiff for his inmate civil complaints against numerous fellow [DOCS] employees") & 30 (asserting no constitutionally protected conduct whatsoever). Therefore, it is recommended that these claims be **dismissed** as conclusory and pursuant to 42 U.S.C. § 1915(g).

### 3. *Access to the Courts*

In paragraph thirty-five (35) of his Complaint, Plaintiff appears to allege that he was denied access to the law library on May 8, 2008, but he does not state that any Defendant was personally involved in that alleged constitutional deprivation. *Id.* at ¶ 35. In paragraph sixty-six (66) of his Complaint, Plaintiff alleges in conclusory fashion that Brousseau destroyed several grievances he filed. Once again, this claim appears to be based on nothing more than Plaintiff's own supposition and speculation. Therefore, it is recommended that these claims be **dismissed.**

### E. Conspiracy Claims

Plaintiff brings several conspiracy claims that are difficult to decipher and to the extent they can be logically

interpreted, are wholly conclusory. Plaintiff alleges that Defendant Bezio (and perhaps Uhler and Boyea as well) was involved in a conspiracy to send Plaintiff to Upstate and to have him placed in a cell next to an inmate with whom Plaintiff would likely have fights. Compl. at ¶ 22. In another conspiracy claim, Plaintiff states his belief that Bezio was the mastermind behind the alleged May 19, 2008, attack against him because Plaintiff knew Bezio from Upstate and Defendants Bezio and Uhler had a history of working together against Plaintiff. *Id.* at ¶ 5 8. Finally, Plaintiff alleges that Defendants Fischer, LeClaire, Bezio, Artus, and Uhler conspired to subject Plaintiff to "religious harassment and discrimination and physical assault and the prison disciplinary proceeding[s] and [to] transfer [him] back to upstate." *Id.* at ¶ 81.

**\*13** All of the aforementioned conspiracy claims appear to be based solely on Plaintiff's own beliefs and conjecture and, in the absence of factual allegations, should therefore be **dismissed** as frivolous pursuant to 42 U.S.C. § 1915(g).

### F. Personal Involvement

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz,* 1997 WL 576038, at *2 (S.D.N.Y. Sept.15, 1997) (citing *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted). Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. at 1948, 173 L.Ed.2d 868.

If a plaintiff seeks to bring a § 1983 action for supervisory liability, liability on the part of the supervisor may exist in one or more of the following ways: 1) actual direct participation in the constitutional violation, 2) failure to remedy a wrong after being informed through a report or appeal, 3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, 4) grossly negligent supervision of subordinates who committed a violation, or 5) failure to act on information indicating that unconstitutional acts were occurring.

*Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2003) (citing *Colon v. Coughlin,* 58 F.3d at 873) (further citations omitted).

Aside from naming them as Defendants, Plaintiff has failed to make any factual allegations whatsoever against Defendants Roy, Knapp, Lucia, and Diaz. Also, Plaintiff's only mention of Defendant LeClaire is the conclusory claim that LeClaire was somehow involved in his alleged First and Eighth Amendment violations. Compl. at ¶ 81. Therefore, it is recommended that the Complaint be **dismissed** as against those Defendants.

Furthermore, because we have recommended dismissal of Plaintiff's underlying constitutional claims concerning mail theft, retaliation, medical indifference, conditions of confinement, and due process, his claims of supervisory liability against Defendants Woods, Bezio, Racette, Uhler, Wright, Johnson, Brousseau, Patnode, and Bellamy, for failure to remedy those alleged violations should also be **dismissed.** *See* Compl. at ¶¶ 10, 21-22, 32-34, 51, 58-59, 66-67, 72-73, & 79.

Defendants have not moved to dismiss Plaintiff's claims stemming from the alleged events of May 19, 2008, however, they argue that Defendants Artus and Fischer should be dismissed for lack of personal involvement. Defs.' Mot. at pp. 16-17. Plaintiff has alleged that prior to the alleged use of excessive force that occurred on May 19, 2008, he sent complaints to Artus and Fischer about his problems with Orzech and Orzech's alleged threat to assault him, and that such complaints were either ignored or not responded to, and therefore, Artus and Fischer failed to protect him. Compl. at ¶¶ 41, 44, 57, & 68.

**\*14** In order to state a valid failure to protect claim, a prisoner must demonstrate that the prison officials "acted

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)
(Cite as: 2009 WL 3111711 (N.D.N.Y.))

with deliberate indifference with respect to his safety or with an intent to cause harm to him." *Hendricks v. Coughlin,* 942 F.2d at 113. The key element of a failure to protect claim is the existence or potential existence of a substantial risk of serious harm and not the actual harm which may or may not ensue. *Farmer v. Brennan,* 511 U.S. 825, 836, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). To prove deliberate indifference, the plaintiff must show that the "official knew of and disregarded an excessive risk to the plaintiff's health or safety." *Id.* at 837 (cited in *Ramirez v. Mantello,* 1998 WL 146246, at *2 (N.D.N.Y. Mar.24, 1998).* "The official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists *and* he must also draw the inference." *Id.* at 836.

In this case, Plaintiff alleges that Artus and Fischer were put on notice of the threat to his safety by his letters of complaint dated May 15, 17, and 18, 2008. Based on these allegations, we find that Plaintiff has stated a facially adequate claim for failure to protect. Therefore, we recommend against dismissal of these claims against Artus and Fischer. Similarly, Plaintiff has alleged that Defendants Warner and Rock were involved in a conspiracy to cover-up the alleged May 19th assault. Although we recommended dismissal of Plaintiff's medical indifference claims against Rock in Part II.B.1, *supra,* Plaintiff also alleges that Rock falsified his medical records in furtherance of the alleged conspiracy to violate his Eighth Amendment rights. Compl. at ¶¶ 48 & 70. Warner is alleged to have participated in the conspiracy by directing Defendant Tamer not to take any close-up pictures of Plaintiff's injuries after the assault. *Id.* at ¶ 48. Considering that Plaintiff's underlying excessive force claim has not been challenged, dismissal of his conjoining conspiracy claims would be premature at this stage. Therefore, it is recommended that these claims against Warner and Rock not be dismissed.

### G. Unserved Defendants

Under Federal Rule of Civil Procedure 4(c)(1), the plaintiff is responsible for service of the summons and complaint for each defendant within a specified time period. Specifically, the plaintiff must effectuate service of process within 120 days of the filing of the complaint. FED. R. CIV. P. 4(m). [FN14] Failure to properly serve any

defendant in accordance with the Federal Rules will result in the court, upon motion or on its own initiative, to dismiss the case without prejudice as to that defendant. *Id.*

> FN14. Under the Local Rules for the Northern District of New York, a plaintiff must effectuate service within sixty (60) days. N.D.N.Y.L.R. 4.1(b).

In this case, there is no indication that the Defendants C.O. Green, Labetz, Ortloff, or Karen Bellamy have been served. *See* Dkt. Nos. 17, 54, & 66. Although courts must afford plaintiffs notice before they may dismiss a claim for failure to serve a defendant, FED. R. CIV. P. 4(m), in this case, because Plaintiff's claims against Defendants Green, Ortloff, and Bellamy lack merit, granting Plaintiff the opportunity to properly serve these unnamed Defendants would be futile. Thus, it is recommended that Plaintiff's claims against Green, Ortloff, and Karen Bellamy be **dismissed.** With respect to Labetz, Plaintiff has alleged that he used excessive force against Plaintiff during the May 19, 2008 incident. Compl. at ¶ 63(1). Because Defendants have not moved to dismiss Labetz for failure to state a claim, we will afford Plaintiff *one final opportunity to effectuate service of process on Defendant Labetz. Plaintiff is forewarned that a failure to do so will result in the Court's recommendation of dismissal of his claims against Labetz.* The Court will afford Plaintiff *thirty (30) days from the date this Report-Recommendation is issued* to effectuate service upon Labetz.

### III. Plaintiff's Motion for a Preliminary Injunction

**\*15** On February 23, 2009, Plaintiff submitted a Motion for a Preliminary Injunction and Temporary Restraining Order seeking an order enjoining the Defendants from: interfering with his Rastafarian religious practices, physically assaulting him, confining him in SHU under the pretext of false misbehavior reports, denying him medical care, stealing his mail, and denying him access to the law library. Dkt. No. 57 at pp. 1-6.

In the Second Circuit, the standard for granting a temporary restraining order and a preliminary injunction

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)
(Cite as: 2009 WL 3111711 (N.D.N.Y.))

is the same. *See* FED. R. CIV. P. 65; *see also Local 1814 Int'l Longshoremen's Ass'n, AFL-CIO v. New York Shipping Ass'n Inc.,* 965 F.2d 1224, 1228 (2d Cir.1992).

> In general, to secure a preliminary injunction, the moving party must demonstrate: (1) irreparable harm, and (2) either: (a) a likelihood of success on the merits of [the case], or (b) sufficiently serious questions going to the merits of the case to make it a fair ground for litigation, and a balance of hardships tipping decidedly in [favor of the moving party].

*D.D. v. New York City Bd. of Educ.,* 465 F.3d 503, 510 (2d Cir.2006) (internal quotation marks and citation omitted).

Irreparable harm "means an injury for which a monetary award cannot bring adequate compensation." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979). The Second Circuit has held that the alleged violation of a constitutional right triggers a finding of irreparable injury. *See Jolly v. Coughlin,* 76 F.3d 468, 482 (2d Cir.1996). Therefore, in cases involving alleged constitutional violations, the issue of irreparable harm merges with the question of success on the merits. *See Metropolitan Council, Inc. v. Safir,* 99 F.Supp.2d 438, 443 (S.D.N.Y.2000) (citation omitted).

Finally, when the injunction sought "will alter, rather than maintain the *status quo,"* or will "provide the movant with ... relief [that] cannot be undone even if the defendant prevails at a trial on the merits," the moving party must show a "clear" or "substantial" likelihood of success. *Beal v. Stern,* 184 F.3d 117, 122-23 (2d Cir.1999) (citation omitted).

In this case, Plaintiff has failed to demonstrate either irreparable harm or a likelihood of success on the merits of his claims. Indeed, we have already recommended for dismissal the majority of Plaintiff's claims. In addition, Plaintiff's Motion for Preliminary Injunction is presented in conclusory fashion and, for the most part, simply repeats the accusations brought in his Complaint. Therefore, it is recommended that Plaintiff's Motion be **denied.**

## IV. CONCLUSION

For the reasons stated above, it is recommended that the majority of the aforementioned claims be dismissed. To clarify, should the district court adopt this Report-Recommendation, the following claims will remain: (1) excessive force and retaliation against Defendants Tamer, Orzech, T. Carter, Moak, and Labetz; (2) conspiracy against Defendants Tamer, Orzech, T. Carter, Moak, Labetz, R. Rock, and Warner; (3) violation of Plaintiff's First Amendment right to practice religion against Orzech; and (4) supervisory liability against Artus and Fischer.

Therefore, it is hereby

**RECOMMENDED,** that the Defendants' Motion to Dismiss (Dkt. No. 59) be **GRANTED in part** and **DENIED in part** in accordance with the above opinion; and it is further

**RECOMMENDED,** that the following Defendants be **DISMISSED** from this action: T. Ramsdell, C. Crossman, Fearchild, D. Uhler, M. Patnode, Lucien LeClair, Jr., Vonda Johnson, Fenyea, R. Lawrence, S. Tyrell, Lt. Miller, Lashway, Benthley, Knapp, Lucia, Loomis, Ferguson, Poltlos, Brousseau, J.T. Rice, D. Waldron, Quinn, Travers, Pedro Diaz, Robert Woods, Richard Roy, Brian Bengmann, N. Bezio, Steven Racette, Sgt. Rokece, Green, Ortloff (spelled "Oltloff" on the Docket), Karen Bellamy; [FN15] and it is further

> FN15. To clarify further, should the District Court adopt this Report-Recommendation, the following Defendants shall remain as parties in this action: T. Carter, Tamer, Moak, M. Orzech, Labetz, R. Rock, H. Warner, Artus, and Fischer.

**RECOMMENDED,** that Plaintiff's Motion for a Preliminary Injunction (Dkt. No. 57) be **DENIED;** and it is further

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)
(Cite as: 2009 WL 3111711 (N.D.N.Y.))

**ORDERED,** that should the District Court adopt this Court's recommendation that Defendant Labetz not be dismissed from the action, the Clerk shall issue a Summons and forward it, along with a copy of the Complaint, to the United States Marshal for service upon Defendant Labetz. Plaintiff is warned that failure to effectuate service upon Labetz within **_thirty (30) days of the date this Report-Recommendation is issued_** will result in this Court recommending dismissal of his claims against Labetz; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **_FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW._** _Roldan v. Racette,_ 984 F.2d 85, 89 (2d Cir.1993) (citing _Small v. Sec'y of Health and Human Servs.,_ 892 F.2d 15 (2d Cir.1989)); _see also_ 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

N.D.N.Y.,2009.
Mortimer Excell v. Fischer
Slip Copy, 2009 WL 3111711 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2628720 (N.D.N.Y.)
(Cite as: 2010 WL 2628720 (N.D.N.Y.))



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Johnathan JOHNSON, Plaintiff,
v.
B. CONNOLLY, Doctor et al., Defendants.
**Civil Action No. 9:07-CV-1237 (TJM/DEP).**

March 15, 2010.

Johnathan Johnson, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Office of Attorney General, State of New York, The Capitol, Christopher Hall, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendant.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff Johnathan Johnson, a New York prison inmate and a prodigious litigant, has commenced this suit pursuant to 42 U.S.C. § 1983 alleging deprivation of his civil rights.[FN1] In his complaint, plaintiff asserts that prison officials at the Upstate Correctional Facility ("Upstate") were deliberately indifferent to his medical needs following his transfer into that facility, including by not providing him with medication previously prescribed for him at other prison facilities, and that his transfer into Upstate was in retaliation for his having engaged in protected activity. Plaintiff's complaint seeks both equitable relief, in the form of an unspecified permanent injunction, and recovery of compensatory and punitive damages.

FN1. In response to a request in the form complaint utilized by the plaintiff seeking information about prior lawsuits, Johnson identifies a single action brought in the New York Court of Claims in November of 2006 but states that he has not commenced any suits in federal court relating to his imprisonment. *See* Amended Complaint (Dkt. No 7) § 4. Despite this statement, which was given under penalty of perjury, the record discloses otherwise. In fact, in this district alone plaintiff has commenced some thirty other actions addressing various aspects of prison life while incarcerated.

Currently pending before the court is defendants' motion for summary judgment seeking dismissal of plaintiff's complaint in its entirety. In their motion, defendants assert that the record does not support either of plaintiff's substantive claims and that they are, therefore, entitled to judgment dismissing those claims as a matter of law. Having carefully considered the record now before the court in light of defendants' motion and plaintiff's arguments in response, I recommend that the motion be granted with respect to all claims except plaintiff's retaliation cause of action against defendant Burge, as to which genuine issues of fact exist precluding summary judgment.

I. *BACKGROUND*[FN2]

FN2. In light of the procedural posture of the case the following recitation is derived from the record now before the court with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003). It should be noted, however, that many if not most of plaintiff's allegations are sharply contested by the defendants.

The plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Correctional Services ("DOCS"). *See generally* Amended Complaint (Dkt. No. 7). At the times relevant to his claims in this action plaintiff was designated first to the Elmira

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Correctional Facility, located in Elmira, New York, and later following his transfer out of that prison on November 16, 2006, to Upstate, situated in Malone, New York.[FN3] It appears that at all relevant times plaintiff was designated to special housing unit ("SHU") disciplinary confinement.[FN4] *Id.*

> FN3. Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined, generally though not always for disciplinary reasons, for twenty-three hours each day. *See Samuels v. Selsky,* No. 01 CIV. 8235, 2002 WL 31040370, at *4 n. 11 (S.D.N.Y. Sept. 12, 2002).

> FN4. The record reflects that plaintiff has been in SHU confinement since 1997 and is currently scheduled to remain there until 2028, a date extending beyond his current maximum prison release date. *See* Hall Aff. (Dkt. No. 68-5) Exh. A. (Transcript of Plaintiff's Deposition, held on January 22, 2009, hereainfter "Johnson Dep. Tr.") at pp. 20-21.

While confined at Elmira, on November 13, 2006 plaintiff apparently was the target of human feces thrown by another inmate in the SHU during plaintiff's scheduled shower period. Complaint (Dkt. No. 7) p. 5-B. That incident prompted the sending by plaintiff of a letter to defendant John Burge, the Superintendent at Elmira, requesting that the videotape footage of the incident be preserved for use in a future lawsuit.[FN5] *Id.*

> FN5. In response to his later requests for copies of the videotape, plaintiff was informed that due to a "recorder malfunction" it does not exist. *See* Johnson Aff. (Dkt. No. 69) Exh. A at p. 3.

Two days later, on November 15, 2006, the DOCS Classification and Movement Office, which as a general matter controls inmate facility assignments, received an electronic request that Johnson be transferred out of Elmira. Carvill Aff. (Dkt. No. 68-4) ¶¶ 4, 6, 11 and Exh. A; *see also* Burge Aff. (Dkt. No. 68-3) ¶¶ 9-10. The stated reason for the transfer request was that plaintiff had a

"severe problem at Elmira CF SHU." Carvill Aff. (Dkt. No. 68-4) ¶ 12 and Exh. A. As an explanation for that observation, the statement noted that plaintiff "ha[d] created a management problem in the SHU ... he is disruptive to other [inmates] in the unit ..." and made reference to the November 13, 2006 incident. *Id.* at ¶ 14 and Exh. A. The transfer request was processed by John Carvill, a Classification Analyst with the DOCS. Carvill Aff. (Dkt. No. 68-4) ¶¶ 1, 6, 11 and Exh. A. On recommendation of the SHU unit of the Classification and Movement Office, it was determined by defendant Carvill that the plaintiff should be transferred into Upstate. *Id.* at ¶¶ 9-14. When making that decision Carvill was unaware of plaintiff's contemplation of a lawsuit concerning the feces throwing incident at Elmira on November 13, 2006. *Id.* at ¶ 16.

**\*2** According to the plaintiff, Superintendent Burge, though not present for the throwing incident, spoke with the plaintiff about the transfer on November 15, 2006 from the catwalk adjacent to plaintiff's cell and stated "I'm getting rid of you." Amended Complaint (Dkt. No. 7) p. 5-C; Johnson Dep. Tr. pp. 82-86; Johnson Aff. (Dkt. No. 69) ¶ 12. Other than that statement, during his deposition plaintiff admitted that he has no evidence to support his allegation that Superintendent Burge initiated the transfer request or was otherwise a participant in the decision to place him in Upstate. *Id.* at pp. 89-90.

According to Superintendent Burge, the transfer of a prisoner is typically initiated by the inmate's guidance counselor, who sends a transfer request directly to the DOCS Classification and Movement Office in Albany. Burge Aff. (Dkt. No. 68-3) ¶ 9. Superintendent Burge denies any role in the transfer of Johnson to Upstate and specifically states that he did not ask plaintiff's guidance counselor at Elmira to initiate the transfer request. *Id.* at ¶¶ 11-14. While having no recollection of any conversation with plaintiff regarding the transfer, Superintendent Burge states that it is his practice never to discuss transfers with any inmates. *Id.* at ¶ 5.

Plaintiff was transferred into Upstate on November 16, 2006. *See* Smith Aff. (Dkt. No. 68-2) ¶ 11 and Exh. B. According to plaintiff's medical records, prior to his transfer he had been prescribed various medications including Lactase, a drug prescribed for lactose

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2628720 (N.D.N.Y.)
(Cite as: 2010 WL 2628720 (N.D.N.Y.))

intolerance; Nasacort, for nasal congestion; Naprosyn, a pain medication; Prilosec for a gastroenterlogical disorder; and Vitamin E lotion for a dry, irritated skin condition. *Id.* at ¶¶ 15-16. As an SHU prisoner at both Elmira and Upstate, by regulation plaintiff was allowed only a twenty-four hour supply of non-prescription items and a seven day supply of prescription medications. FN6 *Id.* at ¶ 18 and Exh. B, 11/18/06 entry.

> FN6. As an SHU inmate, plaintiff similarly was not allowed to possess creams, lotions, or spray bottles. Smith Aff. (Dkt. No. 68-2) ¶ 19.

Under established protocol, upon his transfer plaintiff's prescription medications should have been packed in a white medication bag and transferred to the medical staff at Upstate. Smith Aff. (Dkt. No. 68-2) ¶ 12. This, unfortunately, did not occur upon plaintiff's transfer. *Id.* at ¶ 13 and Exh. A at p. 3. Instead, plaintiff's medications were packed along with his personal property, and consequently those medications were not received by medical staff at Upstate until December 5, 2006. *Id.* at ¶ 13 and Exhs. A, B.

Plaintiff's medical records reveal that on November 20, 2006, four days after his transfer into Upstate, a physician at the facility ordered a seven day supply of Lactase, Naprosyn, and Prilosec for the plaintiff. Smith Aff. (Dkt. No. 68-2) ¶ 20 and Exh. B, 11/18/06 entry. Plaintiff received those medications on November 21, 2006 and November 24, 2006. *Id.* at ¶ 21 and Exh. C. In the interim, over-the-counter medications were made available to the plaintiff, upon request, to substitute for any lacking prescription medications. *Id.* at ¶ 22. Plaintiff's medical records reveal that, in fact, he did request such non-prescription medication on November 17, 18, and 26, 2006, including Medicidin D for nasal congestion and Ibuprofen for pain. *Id.* at ¶ 22 and Exh. B, 11/18/60 and 11/26/06 entries. The records also reflect that nasal spray was ordered for the plaintiff on December 5, 2006, at the request of a facility nurse, upon her review of plaintiff's records and that on that same date a prison physician, Dr. Connolly, reordered Nasacort to be restarted for the plaintiff. *Id.* at ¶¶ 23-24, and Exh. B, 12/5/06 entry. Plaintiff's medical records also reveal that he was provided Lactaid tablets for his lactose intolerance and that he had daily access to Vitamin E lotion. *Id.* at ¶¶ 27-28 and Exh.

B, 11/18/06 and 11/26/06 entry.

## II. *PROCEDURAL HISTORY*

**\*3** Plaintiff commenced this action on February 15, 2007 and later filed an amended complaint on April 12, 2007, with approval of the court. FN7 *See* Dkt. Nos. 1, 7. Named as defendants in plaintiff's complaint are B. Connolly, a prison physician at Upstate; C. Atkinson and K. Mulverhill, identified as nurses at that facility; M. Smith, a nurse administrator at Upstate; Elmira Superintendent Burge; Theresa Knapp-David, the DOCS Director of Classification and Movement; Lucien LeClaire, Jr., the acting DOCS Commissioner; N. Bezio, the Deputy Superintendent at Upstate; and Brian Fischer, the acting DOCS Commissioner. *Id.* Plaintiff's complaint asserts two causes of action, alleging that his transfer out of Elmira was in retaliation for his having engaged in protected activity in violation of his rights under the First Amendment and also that the defendants at Upstate were deliberately indifferent to his serious medical needs in violation of his right under the Eighth Amendment to be free from cruel and unusual punishment. *Id.*

> FN7. This action was initiated in the Western District of New York but was transferred to this district as a result of the issuance of an order by District Judge David Larrimer on October 17, 2007. *See* Dkt. No. 16.

Since commencement of the action plaintiff has twice sought preliminary injunctive relief, in both instances requesting that the defendants be directed to transfer him out of Upstate and into another facility for the safety of both Johnson and his family. Dkt. Nos. 21, 41. Those motions were denied by Senior District Judge Thomas J. McAvoy by decisions issued on January 30, 2008 and August 21, 2008, respectively. Dkt. Nos. 30, 48. Plaintiff appealed those denials to the United States Court of Appeals for the Second Circuit. By summary order issued on October 16, 2009, and reissued as a mandate on November 12, 2009, that court affirmed Judge McAvoy's first preliminary injunction denial and ordered the issuance of a briefing schedule with regard to the second. FN8 *See* Dkt. No. 70.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2628720 (N.D.N.Y.)
(Cite as: 2010 WL 2628720 (N.D.N.Y.))

FN8. According to publically available information, that appeal remains pending, and was deemed ready as of the week of March 1, 2010. The pendency of that appeal, which addresses only plaintiff's request for interim injunctive relief, does not divest this court of jurisdiction to entertain and decide defendants' pending summary judgment motion. *Webb v. GAF Corp.,* 78 F.3d 53, 55 (2d Cir.1996)

On April 27, 2009, following joinder of issue and the close of discovery, defendants filed a motion for summary judgment seeking dismissal of both of plaintiff's causes of action. Dkt. No. 68. In their motion defendants argue that no reasonable factfinder could conclude either that the plaintiff's transfer out of Elmira was provoked by his contemplation of a suit regarding the November 13, 2006 incident, or that once at Upstate the medical personnel there were deliberately indifferent to his serious medical needs. *Id.* Plaintiff has since responded in opposition to defendants' motion, Dkt. No. 69, which is now fully briefed and ripe for determination and has been referred to me for the issuance of report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

III. *DISCUSSION*

A. *Plaintiff's Failure To File A Local Rule 7.1(a)(3) Responsive Statement*

In support of their motion defendants properly filed with the court a statement of material facts alleged not to be in dispute, as required by Northern District of New York Local Rule 7.1(a)(3). That rule imposes a corresponding requirement upon a party who, like the plaintiff, opposes a summary judgment motion, providing that

**\*4** [t]he opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record

where the factual issue arises. The nonmovant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs. *The Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.*

N.D.N.Y.L.R. 7.1(a)(3) (emphasis in original).

In opposing defendants' motion plaintiff did not submit the responding statement contemplated under Local Rule 7.1(a)(3). The consequences of this failure are potentially significant. By its terms, Local Rule 7.1(a)(3) provides that "[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y.L.R. 7.1(a)(3). Courts in this district have routinely enforced Rule 7.1(a)(3) and its predecessor, Rule 7.1(f), by deeming facts admitted upon an opposing party's failure to properly respond. *See, e.g.,* *Elgamil v. Syracuse Univ.,* No. 99-CV-611, 2000 WL 1264122, at *1 (Aug. 22, 2000) (McCurn, S.J.) (listing cases) FN9; *see also* *Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).FN10

FN9. Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [*Editor's Note: Attachments of Westlaw case copies deleted for online display.]

FN10. As to those facts not contained in the defendants' Local Rule 7.1(a)(3) statements, I assume for purposes of this motion that plaintiff's version of those facts is true, as plaintiff is entitled to the benefit of all inferences at this stage. *Wright v. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998).

As a counterbalance to this often fatal deficiency, a court has broad discretion to overlook a party's failure to comply with its local rules. *The* *Travelers Indemnity Co. of Ill. v. Hunter Fan Co.,* No. 99 CIV 4863, 2002 WL

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2628720 (N.D.N.Y.)
(Cite as: 2010 WL 2628720 (N.D.N.Y.))

109567, at *7 (S.D.N.Y. Jan. 28, 2002) (citing *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir.2001)). In deference to his *pro se* status, and given that he has actively opposed defendants' motion and that it is fairly clear from his submission which facts are disputed, though without minimizing the importance of Local Rule 7.1(a)(3), I recommend against deeming plaintiff to have admitted the facts set forth in defendants' statement of facts not in dispute.

B. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

**5** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material

facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507-08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

C. *Retaliatory Transfer Claim*

In their motion defendants contend no reasonable factfinder could conclude that plaintiff's transfer out of Elmira and into Upstate was motivated by his contemplation of a lawsuit regarding the November 13, 2006 incident. Defendants further maintain that even if his protected activity were a motivating factor in the decision, the defendants have shown, as a matter of law, that regardless of the influence of that motive they would have taken the same action toward the plaintiff in any event, thereby establishing a complete affirmative defense to plaintiff's retaliation claim.

When adverse action is taken by prison officials against an inmate and is motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. *See Franco v. Kelly,* 854 F.2d 584, 588-90 (2d Cir.1988). As the Second Circuit has repeatedly cautioned, however, such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular

Slip Copy, 2010 WL 2628720 (N.D.N.Y.)
(Cite as: 2010 WL 2628720 (N.D.N.Y.))

care." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (same).

**\*6** In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes,* 239 F.3d at 492 (2d Cir.2001). If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

Analysis of retaliation claims thus requires careful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two. When such claims, which are exceedingly case specific, are alleged in only conclusory fashion and not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, a defendant is entitled to summary judgment dismissing plaintiff's retaliation claims. *Flaherty,* 713 F.2d at 13.

In this instance, drawing all inferences in plaintiff's favor, the record now before the court sufficiently establishes the first two elements to avoid the entry of summary judgment dismissing this claim. Plaintiff's letter to Superintendent Burge on November 15, 2006, revealing his contemplation of a lawsuit regarding the feces throwing incident, could be viewed as activity protected under the First Amendment. *See Espinal v. Goord,* 558 F.3d 119, 128-29

(2d Cir.2009); *Benitez v. Locastro,* No. 9:04-CV0423, 2010 WL 419999, at \*13 (N.D.N.Y. Jan. 29, 2010) (Mordue, C.J.). Similarly, given his allegation that at Upstate he was allegedly exposed to danger at the hands of known enemy inmates, plaintiff's transfer from one facility into another, even though he was placed in disciplinary SHU confinement at both facilities, could be found by a reasonable factfinder to represent an adverse action sufficient to support a retaliation cause of action. *Davis v. Kelly,* 160 F.3d 917, 920 (2d Cir.1998).

Consideration of the evidence related to the third prong of the retaliation test, addressing the question of motivation, brings squarely into focus a controverted fact. At the outset it should be noted that the fact the transfer occurred one day after plaintiff's letter threatening suit was sent gives rise to an inference of retaliatory motivation. *See Bennett v. Goord,* 343 F.3d 133, 138 (2d Cir.2003) (noting that temporal proximity of protected conduct and alleged retaliatory conduct may serve as circumstantial evidence of retaliation). In this instance, however, there is more. According to the plaintiff Superintendent Burge appeared outside of his SHU cell on November 15, 2006 and told him that he was "getting rid of" the plaintiff. Amended Complaint (Dkt. No. 7) at pp. 5-7; Johnson Aff. (Dkt. No. 69) ¶ 12. Notwithstanding defendant Burge's denial of having had that conversation, plaintiff's allegations raise a disputed issue of fact which must be resolved before the third element of the retaliation claim can be determined. *See id.* at 138-39.

**\*7** In their motion, defendants contend that even if plaintiff could establish a *prima facie* case of retaliation, they have successfully established, as a matter of law, that they would have taken the same steps irrespective of the retaliatory animus, thereby establishing a complete defense to plaintiff's retaliation claim. When construed in a light most favorable to the plaintiff, however, the facts reveal that there is a significant question as to whether the motivation offered by the defendants as having prompted the decision was pretextual. *See Gill v. Calescibetta,* No. 9:00-CV-1553, 2009 WL 890661, at \* 3 (N.D.N.Y. mar. 31, 2009) (Suddaby, J. and Peebles, M.J.).

Given the existence of the disputed facts which must be resolved before plaintiff's retaliation claim and defendants' *Mount Healthy* defense can be analyzed, I recommend that

defendants' motion for dismissal of plaintiff's retaliation claim be denied.[FN11]

> FN11. As will be seen, several of the defendants named by plaintiff in connection with his retaliation cause of action, including Acting Commissioners LeClaire and Fischer, Director Theresa A. Knapp-David, and Deputy Superintendent Bezio, are nonetheless entitled to dismissal of plaintiff's retaliation claim against them based upon their lack of personal involvement in the alleged violation, *see* pp. 25-27, *post*, while others, including Dr. Connolly, Nurses Atkinson, Miles and Mulverhill and Nurse Administrator Smith, do not appear from the record to be linked to plaintiff's retaliation claim.

### D. *Deliberate Medical Indifference Claim*

Defendants' motion also challenges plaintiff's claim that upon his arrival at Upstate medical officials there were deliberately indifferent to his serious medical needs. In support of that motion defendants assert both that the record fails to establish that plaintiff suffers from a medical need of constitutional significance, and, in any event, medical officials at Upstate were not subjectively indifferent to any such need.

Claims that prison officials have intentionally disregarded an inmate's medical needs fall under the umbrella of the protected afforded by the Eighth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976). The Eighth Amendment prohibits the imposition of punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Id.; see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-that is, the conditions alleged must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference." *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 297 & 298, 111 S.Ct. 2321, 2323-2324 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. & Homer, M.J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1970); *Waldo,* 1998 WL 713809, at *2 (citing *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1970).

### 1. *Serious Medical Need*

**\*8** In order to meet the objective prong of the governing Eighth Amendment test in a medical indifference case, a plaintiff must first allege a deprivation involving a medical need which is, in objective terms, " 'sufficiently serious.' " *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (quoting *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108 (1995). A medical need is serious for constitutional purposes if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain'." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations omitted). A serious medical need can also arise where " 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain' "; since medical conditions vary in severity, a decision to leave a condition untreated may or may not raise constitutional concerns, depending on the facts. *Harrison v. Barkley,* 219 F.3d 132, 136-37 (2d Cir.2000) (quoting, *inter alia, Chance,* 143 F.3d at 702). Relevant factors informing this determination include whether the plaintiff suffers from an injury that a " 'reasonable doctor or patient would find important and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2628720 (N.D.N.Y.)
(Cite as: 2010 WL 2628720 (N.D.N.Y.))

worthy of comment or treatment' ", a condition that " 'significantly affects' " a prisoner's daily activities, or " 'the existence of chronic and substantial pain.' " *Chance,* 143 F.3d at 702 (citation omitted); *Lafave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *3 (N.D.N .Y. Apr. 3, 2002) (Sharpe, M.J.) (citation omitted).

From the record in this case no reasonable factfinder could conclude that any of the conditions giving rise to the prescription medications of which plaintiff was deprived over an exceedingly brief period while at Upstate qualifies as serious for constitutional purposes. The medications involved were directed toward such modest conditions as lactose intolerance, nasal congestion, ankle pain, a gastrointestinal condition, and dry or irritated skin. The record is devoid of any indication that these conditions presented situations of urgency or resulted in degeneration or extreme pain over the brief period involved. Indeed, according to his medical records, plaintiff was seen by medical staff seven times over a four week period following his transfer into Upstate, including on November 16, 17, 18, 26, and 28, 2006 as well as December 5 and December 18 of that year. Smith Aff. (Dkt. No. 68-2) ¶ 33 and Exh. B. None of the medical record entries associated with those examinations reveal evidence that would support a finding of the existence of a serious medical condition. Accordingly, I recommend dismissal of plaintiff's medical indifference claim based upon his failure to establish the existence of a serious medical condition.

2. *Deliberate Indifference*

In addition to establishing the existence of a serious medical need, to prevail on an Eighth Amendment medical indifference cause of an action a plaintiff must also establish indifference to that condition on the part of one or more of the defendants. *Leach,* 103 F.Supp.2d at 546. Deliberate indifference, in a constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979); *Waldo,* 1998

WL 713809, at *2 (same).

**\*9** A physician's mere negligence in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a § 1983 action. *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at 292; *Chance,* 143 F.3d at 703. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle,* 429 U.S. at 106, 97 S.Ct. at 292. Thus, a physician who "delay [s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison,* 219 F.3d at 139. Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under § 1983 if the treatment provided is "adequate." *Chance,* 143 F.3d at 703. If prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," however, such conduct constitutes deliberate indifference. *Harrison,* 219 F.3d at 138; *Kearsey v. Williams,* 2005 WL 2125874, at *5 (S.D.N.Y. Sep. 1, 2005).

The record now before the court also fails to substantiate plaintiff's claims of subjective, deliberate indifference on the part of the defendants The failure of prison officials to provide him with his prescription drugs immediately upon his arrival at Upstate appears to have been the result of a mistake on the part of DOCS medical personnel at Elmira, who are not named in this complaint, in packing and forwarding those prescriptions along with plaintiff's personal belongings rather than following the established protocol of separately conveying them to the medical staff at Upstate. The record also reveals that at Upstate plaintiff was offered alternatives to the medications and that his prescriptions for most drugs were renewed shortly after his transfer into the facility. Neither plaintiff's complaint nor the record now before the court establishes a level of indifference on the part of any of the named defendants sufficient to support the subjective element of the deliberate indifference test. Accordingly, I recommend dismissal of that cause of action on this additional, independent basis.

E. *Personal Involvement*

Slip Copy, 2010 WL 2628720 (N.D.N.Y.)
(Cite as: 2010 WL 2628720 (N.D.N.Y.))

In their motion defendants also seek dismissal of plaintiff's claims against acting Commissioner's Fischer and LeClaire, defendant Knapp-David, and Superintendent Bezio on the basis that they lacked any personal involvement in the conduct giving rise to plaintiff's constitutional claims.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

**\*10** The four defendants who are the subject of this portion of defendants' summary judgment motion occupy supervisory positions with the DOCS. A supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. Culpability on the part of a supervisory official for a civil rights violation can, however, be established in one of several ways, including when that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152-53 (2d Cir.2007), *rev'd on other grounds sub nom., Ashcroft v. Iqbal,* 129 S.Ct. 1937 (2009); *see also Richardson,* 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright,* 21 F.3d at 501.

In this instance plaintiff has adduced no evidence to show any permissible basis to find liability on the part of the four defendants in question. Accordingly, I recommend dismissal of plaintiff's claims against defendants Fischer,

LeClaire, Knapp-David and Bezio on this separate, independent ground.

F. *Qualified Immunity*

In their motion, defendants argue that even if plaintiff can establish a *prima facie* claim of medical indifference or retaliation, defendants should be shielded from liability based upon qualified immunity. Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982) (citations omitted). "In assessing an officer's eligibility for the shield, 'the appropriate question is the objective inquiry whether a reasonable officer could have believed that [his or her actions were] lawful, in light of clearly established law and the information the officer[ ] possessed." *Kelsey v. County of Schoharie,* 567 F.3d 54, 61 (2d Cir.2009) (quoting *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692 (1999)). The law of qualified immunity seeks to strike a balance between the need to hold government officials accountable for irresponsible conduct and the need to protect them from "harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. ----, 129 S.Ct. 808, 815 (2009).

In *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151 (2001), the Supreme Court "mandated a two-step sequence for resolving government official's qualified immunity claims." *Pearson,* 555 U.S. at ----, 129 S.Ct. at 816. The first step required the court to consider whether, taken in the light most favorable to the party asserting immunity, the facts alleged show that the conduct at issue violated a constitutional right,[FN12] *Kelsey,* 567 F.3d at 61, with "the second step being whether the right is clearly established", *Okin v. Village of Cornwall-On-Hudson Police Dept.,* 577 F.3d 415, 430 n. 9 (citing *Saucier* ).[FN13] Expressly recognizing that the purpose of the qualified immunity doctrine is to ensure that insubstantial claims are resolved prior to discovery, the Supreme Court recently retreated from the prior *Saucier* two-step mandate, concluding in *Pearson* that because "[t]he judges of the district courts and courts of appeals are in the best position to determine

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

the order of decisionmaking [that] will best facilitate the fair and efficient disposition of each case", those decision makers "should be permitted to exercise their sound discretion in deciding which of the ... prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." [FN14] *Pearson,* 555 U.S. at ----, 129 S.Ct. at 818, 821. In other words, as recently emphasized by the Second Circuit, the courts "are no longer *required* to make a 'threshold inquiry' as to the violation of a constitutional right in a qualified immunity context, but we are free to do so." *Kelsey,* 567 F.3d at 61 (citing *Pearson,* 129 S.Ct. at 821) (emphasis in original).

> FN12. In making the threshold inquiry, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151.

> FN13. In *Okin,* the Second Circuit clarified that the " 'objectively reasonable' inquiry is part of the 'clearly established' inquiry", also noting that "once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for the [government] officer who violated the clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful." *Okin,* 577 F.3d at 433, n. 11 (citation omitted).

> FN14. Indeed, because qualified immunity is "an immunity from suit rather than a mere defense to liability ...", *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806 (1985), the Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Pearson,* --- U.S. at ----, 129 S.Ct. at 815 (quoting *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 524 (1991) (per curiam)).

*11 For courts engaging in a qualified immunity analysis, "the question after *Pearson* is 'which of the two prongs ...

should be addressed in light of the circumstances in the particular case at hand.' " *Okin,* 577 F.3d 430 n. 9 (quoting *Pearson* ). "The [*Saucier* two-step] inquiry is said to be appropriate in those cases where 'discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all .' " *Kelsey,* 567 F.3d at 61 (quoting *Pearson,* 129 S.Ct. at 818).

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202, 121 S.Ct. at 2156 (citation omitted). When deciding whether a right was clearly established at the relevant time, a court should consider

> (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the [Second Circuit] support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Wright v. Smith,* 21 F.3d at 500 (quoting *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993)). The objective reasonableness test will be met, and qualified immunity enjoyed, where government officers of reasonable competence could disagree as to whether by his or her alleged conduct the defendant would be violating the plaintiff's rights. *Okin,* 577 F.3d at 433 (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092 (1986)). "If, on the other hand, no officer of reasonable competence would conclude that the conduct in question is lawful, there is no immunity." *Okin,* 577 F.3d at 433 (citing *Lennon v. Miller,* 66 F.3d 416, 420-21 (2d Cir.1995)).

In this instance the surviving claim of retaliation implicates legal principles that were firmly established in 2006, the time of the relevant events. Because there are disputed issues as to whether or not defendant Burge ordered a transfer of the plaintiff out of Elmira in retaliation for his protected activity, an action which could not be said to be objectively reasonable for a superintendent in his position, I recommend denial of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2628720 (N.D.N.Y.)
(Cite as: 2010 WL 2628720 (N.D.N.Y.))

defendants' motion for summary judgment based on qualified immunity, without prejudice.

IV. *SUMMARY AND RECOMMENDATION*

Plaintiff's complaint in this action alleges two discreet causes of action. The first, alleging that plaintiff was transferred out of Elmira and into Upstate at the direction pf defendant Burge in retaliation for his having threatened to commence a lawsuit regarding an incident at Elmira, gives rise to disputed issues of material fact that must be resolved before the questions of whether plaintiff has established the requisite nexus between his protected activity and the transfer, and whether defendants have carried their burden in establishing that they would have taken the same action regardless of the plaintiff's protected activity, can be decided. Turning to plaintiff's cause of action for deliberate medical indifference, because the record fails to establish that he suffers from a serious medical condition of constitutional proportions or that any of the defendants were deliberately indifferent to any such condition, summary judgment dismissing that claim is warranted.

**\*12** Addressing defendants' remaining arguments, I find that the record further fails to disclose any basis for finding that defendants LeClaire, Fischer, Knapp-David, or Bezio were personally involved in the constitutional violations alleged, and that plaintiff has not alleged participation on the part of Dr. Connolly, Nurses Atkinson, Miles and Mulverhill, and Nurse Administrator Smith in the conduct giving rise to plaintiff's surviving retaliation cause of action. Additionally, I conclude that at this juncture, it cannot be said that defendant Burge is protected by qualified immunity from plaintiff's retaliation claim. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 68) be GRANTED, in part, and that plaintiff's deliberate medical indifference cause of action and all claims against defendants Fischer, LeClaire, Knapp-David, Smith, Bezio, Connolly, Atkinson, Miles, and Mulverhill be DISMISSED, leaving only plaintiff's cause of action against defendant Burge for retaliation to be tried in this action.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2010.
Johnson v. Connolly
Slip Copy, 2010 WL 2628720 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Mark LABOUNTY, Plaintiff,
v.
Philip COOMBE, Jr., Wayne Strack, and Donald
Selsky, Defendants.
No. 95 CIV 2617(DLC).

Dec. 26, 2001.
Mark LaBounty, Pro Se, Marcy Correctional Facility,
Marcy, for Plaintiff.

Michael J. Keane, Assistant Attorney General, Office of
the Attorney General of the State of New York, New
York, for Defendants.

OPINION AND ORDER

COTE, District J.

**\*1** On April 17, 1995, Mark LaBounty ("LaBounty"),
who is presently incarcerated at Marcy Correctional
Facility, brought this action *pro se* pursuant to 42 U.S.C.
§ 1983 ("Section 1983"), alleging that the defendants
violated his constitutional rights while he was an inmate at
Fishkill Correctional Facility ("Fishkill"). On November
25, 1996, the Court granted in part the defendants' motion
to dismiss. On February 5, 2001, the Court of Appeals for
the Second Circuit vacated in part the November 25, 1996
decision, and remanded LaBounty's procedural due
process claim for further development.[FN1] This claim stems
from LaBounty's wrongful confinement in "SHU" for 30
days, a claim that this Court had dismissed for failure to
identify a violation of a liberty interest. After discovery,
defendants now move for summary judgment. For the
reasons set forth below, the motion is denied.

    FN1. The claims brought by the plaintiff that
survived summary judgment were tried before a
jury on October 4, 1998. On October 6, 1998,
the jury returned a verdict for LaBounty on his
claim that Nurse Millie Rivera had been

deliberately indifferent to his serious medical
needs and awarded him $1 in nominal damages.
The Second Circuit denied the appeals from the
trial and the summary judgment opinion, but
reversed the dismissal of the due process claim at
issue here. *LaBounty v. Kinkhabwala,* No.
99-0329, 2001 WL 99819 (2d Cir. Feb. 5, 2001).

BACKGROUND

    LaBounty's allegations against the defendants are
fully described in the Court's November 25, 1996 Opinion,
familiarity with which is presumed. *LaBounty v.
Coombe, et al.,* No. 95 Civ. 2616, 1996 WL 684168
(S.D.N.Y. Nov. 25, 1996). Here, the Court only describes
those facts necessary for the purposes of this motion.[FN2]

    FN2. To the extent that the plaintiff reiterates in
his opposition claims that have been previously
dismissed or makes new claims unrelated to the
issues which have been remanded, those claims
are not properly before this Court and the Court
does not consider them here.

    By Order dated February 13, 2001, the Court
described the issues remanded by the Court of Appeals for
further development as follows:

1. The plaintiff's procedural due process claim that the
disciplinary hearing held on January 23 and 27, 1995
was delayed, that witnesses at that hearing were
examined outside his presence, and that Vuturo
prejudged the merits of the hearing.

2. Whether plaintiff's due process rights were violated
while he was in SHU during the period beginning on
January 27, 1995, by

(a) a denial of medication for his ear infection;

(b) the prescription of Flexeril for a back condition;

(c) Nurse Rivera substituting his back pain medication
with an unknown drug which caused him dizziness and

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

head and stomach aches;

(d) a denial of paper and pencils;

(e) a denial of out-of-cell exercise;

(f) a denial of access to library books;

(g) not being permitted to mail letters in the evening; and

(h) the censorship or destruction of his mail, legal documents, and personal papers.

3. Whether, under *Sandin v. Conner,* 515 U.S. 472 (1995) and its progeny, the plaintiff has a liberty interest sufficient to bring the due process claims described in items 1 and 2.

The parties were ordered to inform the Court if they had any other understanding of the Court of Appeals' Order of remand.

By letter dated February 27, 2001, the defendants agreed that the February 13, 2001 Order correctly described the remanded issues. By letter dated February 17, 2001, the plaintiff also agreed with the description of the issues, but indicated a wish to add three additional issues. By Order dated February 28, 2001, the Court found that the issues remanded for further development were those described in the February 13, 2001 Order.

**\*2** The following facts are undisputed or as shown by the plaintiff unless otherwise noted. On January 12, 1995, LaBounty went to the clinic at Fishkill to renew his prescriptions for hypertension medication, and to complain of an ear infection. On that day, Nurse Ronald Waller issued an "Inmate Misbehavior Report" against him, which included the charge of refusing a direct order. Also on that day, Robert L. Macomber issued a "Inmate Misbehavior Report" against LaBounty, which included the charge of possessing outdated medications in his cell.

*Tier III Hearing*

On January 23 and 27, 1995, hearing officer Joseph

Vuturo ("Vuturo") conducted a "Tier III" disciplinary hearing to address the charges against plaintiff. [FN3] On January 27, Vuturo found LaBounty guilty of violating a direct order and possessing outdated medications. Vuturo sentenced LaBounty to 90 days of segregated confinement in the Special Housing Unit ("SHU"), of which 60 days were suspended. LaBounty served 30 days in SHU, beginning on January 27, 1995.

> FN3. Tier III hearings are held for " 'the most serious violations of institutional rules." ' *Colon v. Howard,* 215 F.2d 227, 230 n. 1 (2d Cir.2000) (citation omitted).

On January 27, 1995, LaBounty appealed his conviction to the Commissioner of the Department of Correctional Services ("DOCS"). On March 22, 1995, the DOCS Director of the Special Housing / Inmate Disciplinary Program, defendant Donald Selsky ("Selsky"), reversed LaBounty's conviction on the charge of possessing outdated medication because the "[m]isbehavior report fail[ed] to support [the] charge." On February 6, 1996, Selsky "administratively reversed" plaintiff's conviction on the only remaining charge-disobeying a direct order-"due to off-the-record communication used as evidence in hearing." Selsky directed that any records containing references to the January 27, 1995 hearing be expunged.

*SHU Conditions*

The SHU regulations provide that, while in SHU, inmates are confined to their cells for 23 hours a day, and are permitted to leave their cells for recreation, visits to the medical department, legal visits, guidance or counselor interviews, and for showers two times per week. SHU may be imposed for disciplinary and non-disciplinary, or administrative, reasons. Between January 1, 1991 and December 31, 1996, 162,601 of the 215,701 inmates in the New York correction system received "confinement sanctions." 106,265 inmates were penalized by "keeplock" confinement. In 1993, 4.2% of the inmates in DOCS' confinement were sentenced to SHU, and in 1994, 4.8% were sentenced to SHU.

*Plaintiff's Experience in SHU*

While in SHU, LaBounty was deprived of all of the

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

pain medication which had been prescribed for "constant severe pain related to his spinal condition," [FN4] as well as medication for an ear infection. LaBounty complained to defendant Nurse Rivera and to other medical staff that he was not receiving his pain medication and that he was suffering from an ear infection, but he received no response from them. On February 13, 1995, LaBounty was prescribed "Flexeril" by a physician's assistant, but LaBounty claims the medicine was merely prescribed as a "pretext" and that it did not help his severe pain or his ear infection. LaBounty was in "constant severe pain for the duration of his 30-days in SHU." LaBounty was not treated for his ear infection until he was released from SHU and given a CAT Scan. The CAT Scan revealed that the ear infection had become "Mastoiditis." As a result of the untreated ear infection, LaBounty lost the hearing in his right ear.

> FN4. Plaintiff asserts that his spinal condition was, at all relevant times, well-documented and diagnosed.

**\*3** While he was in SHU, LaBounty was prescribed one refill of his hypertension medication. A nurse gave the refill to officers, but the officers refused to give plaintiff his medication. After LaBounty repeatedly threw his bed against the cell door, the SHU evening supervisor came to his cell and later ordered the SHU officer to give LaBounty his medication.

While he was in SHU, LaBounty was deprived of any "out-of-the-cell exercise," which he requested each day. He was given only two showers during his 30 days in SHU, and each shower was only one to two minutes long. He requested a pen from the SHU officer in order to write his appeal to the Commissioner, and the officer refused. Plaintiff later received a pen from the "porter." [FN5] Plaintiff requested other writing materials from the officers, but they did not give him any. LaBounty received all of his writing materials from the porter and other inmates when they were let out for exercise. Before he was released from SHU, the officers opened LaBounty's "property bags" and "removed legal material relevant to this case and other pending cases." LaBounty was refused books and newspapers while he was in SHU despite requesting them.

> FN5. A porter is an inmate who is also serving a sentence in SHU.

DISCUSSION

Summary judgment may not be granted unless the submissions of the parties, taken together, "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The substantive law governing the case will identify those issues that are material, and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1987). The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the Court must view all facts in the light most favorable to the nonmoving party. See Azrielli v. Cohen Law Offices, 21 F.3d 512, 517 (2d Cir.1994). When the moving party has asserted facts showing that the nonmovant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" of his pleadings. Rule 56(e), Fed.R.Civ.P. See also Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir.1995). In deciding whether to grant summary judgment, this Court must, therefore, determine (1) whether a genuine factual dispute exists based on the evidence in the record, and (2) whether the facts in dispute are material based on the substantive law at issue.

Where, as here, a party is proceeding *pro se,* this Court has an obligation to "read [the pro se party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir.1994). Nonetheless, a *pro se* party's "bald assertion," completely unsupported by evidence, is insufficient to overcome a motion for summary judgment. Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir.1991).

A. *Protected Liberty Interest*

**\*4** A claim for procedural due process violations requires a determination of "(1) whether the plaintiff had a protected liberty interest in not being confined and, if so,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

(2) whether the deprivation of that liberty interest occurred without due process of law." *Tellier v. Fields,*-F.3d-, 2001 WL 457767, at *7 (2d Cir. Nov. 1, 2000) (errata filed Apr. 26, 2001) (citation omitted). After the Supreme Court's decision in *Sandin v. Connor,* 515 U.S. 472 (1995), a determination that there is a liberty interest also requires a two-part analysis. *Tellier,*-F.3d-, 2001 WL 457767, at *7. " 'As a result of *Sandin,* a prisoner has a liberty interest only if the deprivation is atypical and significant and the state has created the liberty interest by statute or regulation." ' *Id.* (citation omitted).

*Atypical and Significant Hardship*

The defendants argue that LaBounty does not have a protected liberty interest because his confinement in SHU was not atypical or significant. To determine whether the conditions of a particular confinement impose an "atypical and significant hardship" one must undertake a factual analysis. *Id.* "The circumstances that the court must examine include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions....' " *Sims v. Artuz,* 230 F.3d 14, 22 (2d Cir.2000) (citation omitted). It is clear that "[c]onfinement in SHU may impose hardships that are atypical or significantly different from the burdens of ordinary prison confinement." *Id.* " 'The content of the *Sandin* standard of 'atypical and significant hardship' is an issue of law, but if the facts concerning the conditions or the duration of confinement are reasonably in dispute, the jury (where one is claimed) must resolve those disputes and then apply the law of atypicality, as instructed by the Court." ' *Colon v. Howard,* 215 F.3d 227, 230 (2d Cir.2000) (citation omitted).

Material issues of fact exist as to whether LaBounty's confinement in SHU was "atypical" as compared to the conditions of other inmates in both administrative confinement and in the general population. As noted above, LaBounty asserts that while he was in SHU, he was denied medication and medical treatment, writing materials, books, and exercise.[FN6] If proven true, these conditions would appear to be atypical when compared to the conditions of confinement not only of inmates in administrative confinement and in the general population, but also of other inmates in punitive segregation. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 304.1 *et seq.; Colon,* 215 F.3d at 230 (stating that "normal conditions of SHU confinement in New York" include one hour of exercise per day, two showers a week, and a limited number of books). LaBounty further asserts that the conditions in SHU caused him significant hardship in a number of ways, including severe physical pain and the loss of hearing.

> FN6. Although not included in the list of issues from the February 13, 2001 Order, LaBounty also presents evidence that he was allowed only two showers in one month.

**\*5** The defendants rely on the length of LaBounty's sentence of confinement for their argument that his punishment was not atypical and significant. While it has been found in at least one other case that as much as 101 days in SHU did not run afoul of *Sandin, Sims,* 230 F.3d at 23, there is no litmus test based on the length of confinement alone-as the remand here demonstrates. *See also Colon,* 215 F.3d at 232 n. 5. Even a relatively brief term in segregated confinement may violate the law. *Taylor v. Rodriguez,* 238 F.3d 188, 196 (2d Cir.2001).

The defendants have also submitted evidence regarding the percentage of inmates in disciplinary confinement. These statistics do not address the specific conditions experienced by LaBounty during his confinement in SHU. *See Welch v. Bartlett,* 196 F.3d 389, 393-94 (2d Cir.1999) (vacating summary judgment where plaintiff alleged that SHU hygiene conditions were far inferior to those in general population). "[M]erely calculating the percentage of prisoners sentenced to SHU confinement" says nothing about the qualitative experience of prisoners in confinement and the relative degree to which they are deprived of the care and facilities at issue here. *Kalwasinski v. Morse,* 201 F.3d 103, 107 (2d Cir.1999).

The defendants make several additional arguments which can swiftly be rejected. They argue that only those deprivations experienced by LaBounty that independently constitute a constitutional violation-such as deliberate indifference to his serious medical needs in violation of the Eighth Amendment or an interference with his ability to pursue litigation in violation of the First Amendment-should be considered in judging whether LaBounty suffered atypical and significant hardships.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

There is no authority within either *Sandin* or its progeny in this Circuit for such a heightened showing. The defendants also argue that the issue of whether LaBounty suffered atypical and significant hardships should be tested not by his personal experience in SHU but by what the prison regulations prescribe as the standard for treatment of SHU prisoners. They contend, for instance, that what is relevant is that SHU prisoners are supposed to receive one hour per day of out of cell exercise and either two or three showers a week (depending on the level of prison) and not that LaBounty contends he received no opportunity to exercise and two brief showers in one month. The individualized inquiry required by the law is of the actual experience of the inmate, not what the experience should have been. *Sims,* 230 F.3d at 22-23. Finally, the defendants contend that they are entitled to summary judgment because while LaBounty's description of his deprivations is sufficient to create issues of fact regarding his own experience, he has not presented evidence that inmates in general population or in administrative confinement were not subjected routinely to those same deprivations. LaBounty has, until this point in the litigation, proceeded *pro se.* He was entitled to rely on the prison's regulations, well established law, and the basic standards of decency, to make the point that the deprivations of medical care, exercise, showers, books, and writing material that he alleges he experienced for one month cannot be the general experience of inmates incarcerated in New York state.

*Liberty Interest Created by State Law*

**\*6** The defendants argue that New York State has not granted inmates a protected liberty interest in remaining free from disciplinary confinement. In *Hewitt v. Helms,* 459 U.S. 460, 471-72 (1983), the Supreme Court held that a state-created "liberty interest arises when state statutes or regulations require, in 'language of an unmistakably mandatory character,' that a prisoner not suffer a particular deprivation absent specified predicates." *Welch v. Bartlett,* 196 F.3d 389, 392 (2d Cir.1999). *Sandin* did not replace *Hewitt*'s description of the process that creates a cognizable "liberty interest." *Tellier,*-F.3d-, 2001 WL 457767, at *7; *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir.1999); *Welch,* 196 F.3d at 394 n. 4. Where a regulation requires "in language of an unmistakably

mandatory character, that a prisoner not suffer a particular deprivation absent specified predicates," *Tellier,*-F.3d-, 2001 WL 457767, at *8 (citation omitted), then the regulation creates a protectable liberty interest.

New York regulates the process through which SHU disciplinary confinement may be imposed. Regulations allow such confinement only upon "[d]isposition of superintendent's Tier III hearing for a designated period of time as specified by the hearing officer." N.Y. Comp.Codes R. & Regs. tit. 7, § 301.2 (McKinney 1999). The regulations further explain the manner in which the Tier III hearings must be conducted.

> Upon receipt of a misbehavior report from the review officer, the hearing officer *shall* commence the superintendent's hearing as follows:
>
> (a) The misbehavior report *shall* be served on the inmate at least 24 hours before the superintendent's hearing. If the inmate is confined and requests an assistant, the hearing *may not* start until 24 hours after the assistant's initial meeting with the inmate.
>
> (b) The inmate *shall* be present at the hearing unless he refuses to attend, or is excluded for reason of institutional safety or correctional goals. The entire hearing *must* be electronically recorded.
>
> (c) The inmate when present may reply orally to the charge and/or evidence and *shall* be allowed to submit relevant documentary evidence or written statements on his behalf.

N.Y. Comp.Codes R. & Regs. tit. 7, § 254.6 (McKinney 2000) (emphasis supplied). The regulations provide that "where the hearing officer affirms the charges on the basis of the evidence, the hearing officer may impose ... confinement to a cell or room continuously or to a special housing unit continuously or on certain days during certain hours for a specified period." *Id.* § 254.7.

It has long been recognized that New York's regulations authorizing restrictive confinement in SHU "provide sufficient limitation on the discretion of prison officials to create a liberty interest." *Sher v. Coughlin,* 739 F.2d 77, 81 (2d Cir.1984). *See also Sealey,* 197 F.3d at

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

585 (construing New York regulation regarding administrative confinement in SHU). New York has therefore created a liberty interest protected by the Due Process Clause.

B. *Qualified Immunity*

**\*7** The defendants contend that they are entitled to qualified immunity. Qualified immunity protects a state actor sued in his individual capacity from a suit for damages. *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 250 (2d Cir.2001). A state actor is qualifiedly immune if either "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Id.* (citation omitted).

LaBounty claims that he was deprived of his procedural due process rights during the 1995 disciplinary hearing because he was denied, among other things, the right to call witnesses and to introduce documentary evidence.[FN7] The law was clearly established in January 1995 that inmates have the right to call witnesses and submit documentary evidence at disciplinary hearings.[FN8] *Wolff v.. McDonnell,* 418 U.S. 539, 566 (1974); *Walker v. Bates,* 23 F.3d 652, 656 (2d Cir.1994). Since the contours of LaBounty's due process rights were well defined by both Supreme Court and Second Circuit precedent by the time Vuturo conducted LaBounty's disciplinary hearing in January 1995, the defendants have not demonstrated that they are entitled to qualified immunity as a matter of summary judgment.

> **FN7.** The parties agreed in February 2001 that the procedural irregularities at issue here were the delay in the hearing, the examination of witnesses outside of LaBounty's presence, and a prejudgment of the merits by a hearing officer. The defendants do not object to LaBounty's emphasis in this motion on the interference with his right to offer evidence.

> **FN8.** The defendants characterize the pertinent inquiry as whether the law was clearly established in January 1995, that inmates have a liberty interest in remaining free from SHU confinement. Defendants argue that the Second

Circuit law since *Sandin* has been "ambiguous at best." The extent to which *Sandin* may have unsettled the law on this issue is irrelevant since *Sandin* was handed down after LaBounty's hearing. The law was "clearly established" as of January 1995, that inmates have a liberty interest in remaining free from segregated confinement such as SHU. *See, e.g., Walker v. Bates,* 23 F.3d 652, 655-56 (2d Cir.1994); *Sher v. Coughlin,* 739 F.2d 77, 81 (2d Cir.1984).

C. *Personal Involvement*

Defendants contend that they are not liable for the alleged due process violations because none of the remaining defendants was personally involved in the January 1995 disciplinary hearing. The defendants argue that hearing officer Vuturo is the only proper defendant and that no action may proceed against him because he was never served in this case. As LaBounty will be appointed counsel in this case, counsel for all parties will be able to explore this issue further.[FN9]

> **FN9.** The defendants argue that LaBounty failed to exhaust his administrative remedies by not filing grievances regarding the conditions in SHU. Because the defendants raised this argument for the first time in their reply brief and it has not been developed, it will not be considered. *See Strom v. Goldman, Sachs & Co.,* 202 F.3d 138, 142 (2d Cir.1999) (holding that it would not consider arguments raised in a reply brief because "[w]e repeatedly have said that we will not consider contentions first advanced at such a late stage").

D. *Appointment of Counsel*

Plaintiff has submitted an application requesting counsel. In determining whether to grant a request for counsel, the Court must consider
the merits of plaintiff's case, the plaintiff's ability to pay for private counsel, his efforts to obtain a lawyer, the availability of counsel, and the plaintiff's ability to gather the facts and deal with the issues if unassisted by counsel.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

*Cooper v. A. Sargenti Co., Inc.,* 877 F.2d 170, 172 (2d Cir.1989). As a threshold matter, plaintiff must demonstrate that his claim has substance or a likelihood of success in order for the Court to grant plaintiff's request for counsel. *See Hodge v. Police Officers,* 802 F.2d 58, 61 (2d Cir.1986). Based on the Court's familiarity with this case and the legal issues presented, LaBounty's claim has substance and LaBounty has shown a need for representation. Accordingly, plaintiff's request for counsel is granted.

## CONCLUSION

For the reasons stated, defendants' motion for summary judgment is denied. Plaintiff's request for counsel is granted. The Pro Se Office of this Court shall seek Pro Bono counsel for this plaintiff.

**8** SO ORDERED:

S.D.N.Y.,2001.

LaBounty v. Coombe
Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ramon ALVAREZ, Plaintiff,
v.
Thomas A. COUGHLIN, III, Commissioner NYS
DOCS; William Brunet, Seargent; SGT. Davis; SGT.
Emery; J. Baker, C.O.; W. Smith, C.O.; M. Hamilton,
C.O.; Mushen, C.O.; Supt. Barkley; Nurse L. Lipscum;
Thomas Farns, C.O.; Walter Lincoln, C.O., Defendants.
No. 94–CV–985(LEK)(DRH).

Feb. 6, 2001.
*MEMORANDUM–DECISION AND ORDER*

KAHN, J.

**\*1** Presently before the Court are Plaintiff's motions for relief from judgment and for recusal of the undersigned. For the reasons set forth below, Plaintiff's motions are denied.

I. BACKGROUND

Plaintiff, an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), commenced the present 42 U.S.C. § 1983 action alleging violations of his Constitutional Rights on August 5, 1994. On July 18, 1993, while Plaintiff was incarcerated at Riverview Correctional Facility, defendant Baker alleges that she witnessed Plaintiff exposing himself to her in the recreation yard. Plaintiff was then taken from the yard to the infirmary by defendants Baker, Smith, and Hamilton. In his Amended Complaint, Defendant alleges, in relevant part, that he was repeatedly assaulted by defendants Davis, Smith, Mushen, and Hamilton while defendants Liscum, Baker, and Emery stood by and watched in violation of his Eighth Amendment rights. Plaintiff then alleges that he was escorted to the prison's special housing unit ("S.H.U.") and received further physical mistreatment from defendants Emery, Mushen, Hamilton, Smith, Farns, and Lincoln.

Plaintiff also alleges that his due process rights under

the Fourteenth Amendment were violated by the disciplinary proceeding resulting from the incident, which was conducted by defendant Brunet. Finally, Plaintiff alleges that defendant Barkley participated in the violation of these rights by failing to address Plaintiff's grievances and by designating a biased hearing officer, defendant Brunet, to preside over Plaintiff's Tier III hearing.

On June 14, 1999, defendants Brunet, Baker and Barkley ("Defendants") filed a motion for summary judgment pursuant to Fed.R.Civ.P. 56. Plaintiff filed an affirmation in opposition to Defendants' motion on June 23, 1999 and a letter response on July 6, 1999. By an Order dated October 25, 1999, this Court granted Defendants' motion for summary judgment and dismissed Plaintiff's case against them in its entirety.[FN1] Plaintiff's current motions for relief from judgment and recusal were filed on November 12, 1999 and March 23, 1999, respectively.

> FN1. Also still pending before the Court is a motion for summary judgment filed by Plaintiff September 1, 1998. The motion was originally dismissed by the Court's Order adopting the Report–Recommendation of United States Magistrate Judge David R. Homer, which held that the motion was untimely and, in the alternative, that it failed on the merits. Then, by an Order dated June 1, 1999, the Court vacated its previous order and held that Plaintiff's motion would be addressed on the merits, along with Defendants' motion for summary judgment. However, Judge Homer's Report–Recommendation did address the merits of Plaintiff's motion. The Court has undertaken a de novo review of the record and has determined that Plaintiff's motion should be dismissed for the reasons discussed in the Report–Recommendation.

II. ANALYSIS

A. Relief from Judgment

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

Plaintiff's motion, although termed a "motion for relief from judgment," is brought pursuant to Local Rule 7.1(g). Accordingly, it will be treated by the Court as a motion for reconsideration.

Motions for reconsideration proceed in the Northern District of New York under Local Rule 7.1(g), unless otherwise governed by Fed.R.Civ.P. 60. The "clearly erroneous" standard of review applies to motions for reconsideration. The moving party must "point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir.1995).

Generally, the prevailing rule in the Northern District "recognizes only three possible grounds upon which motions for reconsideration may be granted; they are (1) an intervening change in controlling law, (2) the availability of new evidence not previously available, or (3) the need to correct a clear error of law or prevent manifest injustice." *In re C–TC 9th Ave. P'ship,* 182 B.R. 1, 3 (N.D.N.Y.1995). Defendant does not argue that there has been an intervening change in controlling law or the availability of new evidence. Therefore, the basis for this motion must be that the Court made a clear error of law or needs to correct a manifest injustice. Although this Court enjoys broad discretion when making a determination to reconsider on this ground, *Von Ritter v. Heald,* 876 F.Supp. 18, 19 (N.D.N.Y.1995), it will not disregard the law of the prior case unless "the Court has a 'clear conviction of error' with respect to a point of law on which its previous decision was predicated." *Fogel v. Chestnutt,* 668 F.2d 100, 109 (2d Cir.1981).

1. *Discovery Matters*

**\*2** Plaintiff, in part, objected to Defendants' motion for summary judgment on the ground that Defendants have yet to comply with several orders by this Court compelling production. Ordinarily, Defendants' failure to comply with discovery orders would make a motion for summary judgment premature. However, in this case, the outstanding items sought by Plaintiff do not relate to the claims against the three defendants who have brought the present action.

Plaintiff points to two orders compelling Defendants to comply with his discovery requests. The first, signed on June 26, 1997, orders Defendants to provide Plaintiff with: (1) the names, identification numbers, and cell locations of all inmates that were confined in the Special Housing Unit the evening of the event; (2) copies of any witness refusal forms; (3) copies of Plaintiff's medical records from July 18, 1993 to September 27, 1993; (4) copies of medical refusal forms indicating that Plaintiff refused his medication on the day of the incident; (5) copies of any reports prepared by prison staff regarding Plaintiff's refusal to take his medication between July 18, 1993 and September 27, 1993; and (6) copies of psychiatric reports regarding Plaintiff dated July 18, 1993 to September 27, 1993. The second order, signed on January 29, 1998, requires Defendants to provide Plaintiff with clearer copies of photographs taken of Plaintiff on the day of the incident.

To the extent any of these items exist, they are not relevant to the summary judgment motion before the Court. Accordingly, the Court is free to address the summary judgment motion of these three defendants. However, if Defendants still have not produced the complained of documents and photographs, Plaintiff is free to file another motion to compel or a motion for sanctions.

2. *Defendant Baker*

In their motion for summary judgment, Defendants argue that Plaintiff's claims against defendant Baker are conclusory and insufficient because they do not contain specific allegations of fact indicating a deprivation of rights. *See Barr v. Abrams,* 912 F.2d 52, 56 (2d Cir.1986). Plaintiff's Amended Complaint makes mention of defendant Baker only once. Plaintiff's first cause of action alleges that:

[t]he willful acts and omissions of defendant J. Baker constituted gross deprivation of the plaintiff's Civil Rights when J. Baker subject[ed] or caused plaintiff to be subjected to cruel and unusual punishment and failed to intervene to secure the plaintiff's health and safety.

However, Plaintiff's statement of facts does not allege that defendant Baker was present at the time of the beating

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

or that Baker had any knowledge whatsoever of the beating.

In fact, Plaintiff's statement of facts does not mention defendant Baker at all. The statement of facts does, on the other hand, describe with specificity the involvement of a number of prison staff members, including defendant Liscum who allegedly observed the assault without taking any action to intervene, suggesting that Baker was not present at the time of the beating. Accordingly, Plaintiff's claims against defendant Baker do not contain any specific allegations of fact regarding her alleged failure to intervene and this Court was not in error when it dismissed them.

### 3. *Defendant Barkley*

**\*3** Defendants argue that Plaintiff has not alleged sufficient personal involvement on the part of defendant Barkley. In order to maintain a Section 1983 action, a plaintiff must allege direct personal involvement by the defendant in the alleged constitutional deprivation. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright v. Smith,* 21 F.3d 496, 501 (1994). Liability may not be based on respondeat superior or vicarious liability. *See Al– Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989).
Supervisors may be held liable for personal involvement when they: (1) are directly involved in the alleged events; (2) fail to rectify a constitutional violation after being notified of the situation; (3) create or allow to continue a policy of unconstitutional practices; or (4) commit gross negligence in supervising the individuals responsible for the constitutional violations. *See Wright,* 21 F.3d at 501.

Here, Plaintiff's complaint baldly alleges that defendant Barkley failed to address Plaintiff's grievance complaint and appointed a biased hearing officer to conduct Plaintiff's disciplinary hearing. Plaintiff does not make any specific factual allegations regarding defendant Barkley's involvement in his case. Plaintiff's statement of facts fails to allege facts establishing that Barkley ever reviewed his grievance. Indeed, Plaintiff's own exhibit reveals that Harlan W. Jarvis, Jr., Acting Superintendent, rather than defendant Barkley, reviewed Plaintiff's

grievance. Moreover, an exhibit introduced by Defendants, and not contradicted by Plaintiff, shows that Mr. Jarvis also appointed the hearing officer for Plaintiff's disciplinary hearing.

"It is not enough to allege that officials failed to carry out the duties of their office without defining these duties or how each individual failed to meet them." *Thomas v. Coombe,* No. 95 Civ. 10342, 1998 WL 391143, at \*5– \*6 (S.D.N.Y. July 13, 1998) (citing *Beaman v. Coombe,* No. 96 Civ. 3622, 1997 WL 538833, at \*3 (S.D.N.Y. Aug. 29, 1997), *aff'd in relevant part* No. 97–2683, 1998 WL 382751, at \*\*1 (2d Cir. May 13, 1998)). Because Plaintiff's claim against defendant Barkley fails to allege with sufficient specificity his personal involvement in the alleged constitutional violations, it was properly dismissed by the Court.

### 4. *Defendant Brunet*

Plaintiff alleges that defendant Brunet violated his Due Process rights under the Fourteenth Amendment in the conduct of his disciplinary hearing. Defendants argue that (1) Plaintiff's claim is barred by the Supreme Court decision in *Sandin v. Conner,* 515 U.S. 472 (1995), because Plaintiff has not alleged that he had a protected liberty interest; (2) Plaintiff was nevertheless accorded all of the process due under *Wolff v. McDowell,* 418 U.S. 539 (1974); and (3) defendant Brunet is protected by qualified immunity in any event.[FN2] In order to establish a due process violation, a defendant must "prove that the state has created a protected liberty interest and that the process due was denied." *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)).

> FN2. Defendants also argue in their brief that Plaintiff's claim is barred by the Supreme Court decisions in *Heck v. Humphrey,* 512 U.S. 477 (1994), and *Edwards v. Balisok,* 520 U.S. 641 (1997). Following the filing of Defendants' brief, however, the Second Circuit held that a Section 1983 suit "challenging the validity of a disciplinary or administrative sanction that does not affect the overall length of the prisoner's confinement is not barred by *Heck* and *Edwards." Jenkins v. Haubert,* 179 F.3d 19, 27

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

(2d Cir.1999). Because Plaintiff's complaint challenges the conditions of, as opposed to the fact or duration of his confinement, the *Heck* and *Edwards* decisions are not applicable.

a. *Protected liberty interest*

**\*4** In *Sandin,* the Supreme Court considered whether prisoners have a protected liberty interest entitling them to due process in disciplinary proceedings and held that such interests "will be generally limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prisoner life." *Sandin,* 515 U.S. at 483–84. Following the *Sandin* decision, the Second Circuit held that, in order for a liberty interest to be protectable, a plaintiff "must establish both that the confinement or restraint creates an 'atypical and significant hardship' under *Sandin,* and that the state has granted inmates, by regulation or statute, a protected liberty interest in remaining free from that confinement or restraint." *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

 i. Atypical and significant hardship

The Second Circuit has repeatedly held that, in determining whether a liberty interest has been affected, a district court is required to undertake extensive fact-finding regarding both the length and conditions of confinement and make specific findings in support of its conclusions. *See, e.g., Brooks v. DiFasi,* 112 F.3d 46, 48–49 (2d Cir.1997); *Miller v. Selsky,* 111 F.3d 7, 9 (2d Cir.1997); *Sealey v. Giltner,* 116 F.3d 47, 51–52 (2d Cir.1997); *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998). The Second Circuit makes clear that it is not enough to look at the length of time a prisoner has been confined to SHU in determining whether he has a liberty interest. *Brooks,* 112 F.3d at 49. Instead, courts must also make a factual finding as to the conditions of the prisoner's confinement in SHU relative to the conditions of the general prison population. *Id.* (citing *Miller,* 111 F.3d at 8–9).

However, in *Hynes v. Squillance,* 143 F.3d 653 (2d Cir.1998), the Second Circuit held that, "in cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, the district court need not provide such detailed explanation

of its reasoning." *Id.* at 658. There, the plaintiff offered no evidence in support of his argument that his 21–day confinement was atypical or significant to contradict the defendants' submission showing that the conditions of confinement were typical. *See id.* The ruling was explicitly limited, however, to cases involving shorter periods of segregated confinement. *See id.* The Court held that the decisions in *Miller, Brooks,* and *Wright* all required specific factual findings because they "involved relatively long periods of confinement." *Id.; see also Spaight v. Cichon,* No. 98–2537, 1998 WL 852553, at *2 (2d Cir. Dec 8, 1998) (holding that a 39–day confinement was not so short as to be subject to dismissal under *Hynes* without further analysis); *Colon v. Howard,* 215 F.3d 227, 232 (2d Cir.2000) (advising district courts to develop a detailed factual record for cases involving segregated confinement of between 101 and 305 days in lenght). The plaintiff in *Miller,* for example, was subject to disciplinary segregation for 125 days. *See Miller,* 11 F.3d at 7.

**\*5** In this case, Plaintiff was subject to 120 days in disciplinary segregation, much closer to the period of confinement in *Miller* than that in *Hynes.* Accordingly, the Court may not rely on the length of Plaintiff's confinement alone and must undertake a detailed factual finding regarding the conditions of Plaintiff's confinement as compared to other forms of segregated confinement and to the general population of inmates.

To establish that Plaintiff's confinement was not atypical and significant, Defendants put forth the affidavit of Mr. Donald Selsky, Director of the Special Housing/Inmate Disciplinary Program. However, Selsky's affidavit discusses the special housing program on a statewide basis in comparison to general population policies statewide, but acknowledges that conditions differ from facility to facility. The affidavit also includes a variety of statistics regarding SHU confinement establish, including the fact that 19,983 of the 215,701 inmates (9.26%) in the prison system between 1991 and 1996 were penalized with SHU confinement and that 17,302 of those received terms up to one year (85.17%). It does not, however, provide any evidence regarding the specific conditions of Plaintiff's confinement.

This leaves the Court with insufficient evidence with

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

which to compare Plaintiff's conditions of confinement to other forms of segregated confinement and to the general population. If such a generalized showing by the government regarding the typicality of segregated confinement was satisfactory, then there would be no need for the specific factual findings required in each case by the Second Circuit.

Indeed, in *Welch v. Bartlett,* 196 F.3d 389 (2d Cir.1994), the Second Circuit held that a district court's reliance on the percentage of the prison population receiving punitive terms of segregated confinement and the percentage of that group receiving terms similar in length to that of the plaintiff was inappropriate. *See id.* at 394. The Court held that

> [t]he theory of *Sandin* is that, notwithstanding a mandatory entitlement, a deprivation is not of sufficient gravity to support a claim of violation of the Due Process Clause if similar deprivations are typically endured by other prisoners, not as a penalty for misbehavior, but simply as the result of ordinary prison administration.

> *Id.*

A comparison between the duration of a plaintiff's SHU confinement and the SHU terms received by other inmates who were convicted of misbehavior "does not tell whether [the plaintiff's] deprivation was more serious than typically endured by prisoners as an ordinary incident of prison life." *Id.* Likewise, the court held that punitive terms in SHU

> are not a 'normal incident' for a prisoner whose wrongdoing must be established according to due process standards if the consequence of an adverse finding is confinement in atypical conditions of severe hardship. How many prisoners receive such terms as punishment for misbehavior does not measure how likely a prisoner is to suffer comparable deprivation in the ordinary administration of the prison.

**\*6** *Id.* Moreover, the Court expressed doubt that, even if such a statistic was held to be relevant, the fact that 10% of prisoner were subject to terms in SHU made such

confinement typical. *See id.* at 394 n.2.

As the record before the Court is not sufficient to determine whether Plaintiff's confinement was an atypical and significant hardship, summary judgment at this time is inappropriate.

### ii. State created liberty interest

Defendants also argue the second prong of the *Frazier* test, requiring Plaintiff to establish the existence of a state-created liberty interest in remaining free from segregated confinement, has not been satisfied. Defendants contend that no New York law grants prisoners the right to be free from segregated confinement.

Defendants argue that previous Second Circuit precedent establishing the existence of such a state-created interest, *see, e.g., Sher v. Coughlin,* 739 F.2d 77, 81 (2d Cir.1984), does not survive the Supreme Court's decision in *Sandin.* However, *Sandin* does not effect the validity of these decisions. *See Ramirez v. McGinnis,* 75 F.Supp.2d 147, 153 (S.D.N.Y.1999) (holding that *Sandin* "simply limits due process protection to hardships that are also 'atypical and significant' ") (citing *Gonzalez v. Coughlin,* 969 F.Supp. 256, 257 (S.D.N.Y.1997); *Wright v. Miller,* 973 F.Supp. 390, 395 (S.D.N.Y.1997); *Lee v. Coughlin,* 26 F.Supp.2d 615, 632–33 (S.D.N.Y.1998)). Accordingly, New York State regulations do create a protected liberty interest in remaining free from disciplinary segregation.

### b. *Process Due*

Defendants next urge the Court to find that, even if Plaintiff was entitled to due process protections, he was afforded the necessary procedural protections at his hearing. In a conclusory fashion, Defendants argue that Plaintiff "received advance notice of the charges, called witnesses at the hearing, and testified on his own behalf."

When charged with a disciplinary infraction that could lead to loss of good-time credits or to confinement in SHU, a prisoner is entitled to "at least the minimum requirements of procedural due process appropriate for the circumstances." *Wolff v. McDonnell,* 418 U.S. 539, 558 (1974); *see Benitez v. Wolff,* 985 F.2d 662, 665 (2d Cir.1993) (citing *McCann v. Coughlin,* 698 F.2d 112, 121 (2d Cir.1983)). This requires, among things, that the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

prisoner be given advance notice of the charges against him and a meaningful opportunity to marshall and present evidence in his defense, which includes the right to "call witnesses and present evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Wolff,* 418 U.S. at 563, 566.

Plaintiff specifically argues that defendant Brunet denied him due process by, among other things, disregarding his complaints regarding the confiscation of his trial materials and refusing to allow him to present an eye witness who would testify that Plaintiff was beaten by several of the defendants. The requirement that a prisoner be given advance notice of the charges against him is "no mere formality." *Benitez,* 985 F.2d at 665. Such "notice must be 'written ... in order to inform [the inmate] of the charges and to enable him to marshall the facts and prepare a defense.' ' *Id.* (quoting *Wolff,* 418 U.S. at 564). Moreover, the prisoner must be given the notice no less than 24 hours before the hearing and be permitted to retain the notice for at least 24 hours. *See Benitez,* 985 F.2d at 665–66.

**\*7** Here, Plaintiff alleges that his litigation papers were all confiscated from him by the guards in the SHU and that, when he complained of these actions to defendant Brunet, his concerns were ignored. Confiscation of a prisoner's papers made in preparation for a hearing, particularly the notice of charges, significantly hampers the prisoner's ability to prepare his defense. Defendants do not address Plaintiff's allegation in their papers. Accordingly, summary judgment is not appropriate on this ground.

A prisoner is also given the right to call and present witnesses in his defense at a disciplinary hearing. *See Ponte v. Real,* 471 U.S. 491, 495 (1985) (citing *Wolff,* 418 U.S. at 566)). This right is not absolute, however, as prison officials must be allowed "discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority." *Wolff,* 418 U.S. at 566; *see also Ponte,* 471 U.S. at 496 (suggesting that prison officials may also deny a witness request on grounds of irrelevance or lack of necessity). However, "a hearing official has a duty to

articulate an explanation for the decision to exclude a witness." *Rivera v. Coughlin,* No. 92 Civ. 3404, 1994 WL 263417, at *6 (S.D.N.Y. June 13, 1994).

In this case, Plaintiff alleges that he requested the presence of an eye-witness to the events in question but that defendant Brunet did not allow it. The transcript to the hearing reveals that Brunet informed Plaintiff that he could not contact the witness because he could not contact the witness and the hearing had to be finished that day.

Defendants have not argued, much less established, that these were reasonable limits placed on the hearing by Brunet. Moreover, Defendants have not presented any evidence or argued that allowing the witness' testimony would have been "unduly hazardous to institutional safety" or create a "risk of reprisal or undermine authority." Defendants do not even argue the validity or importance of those reasons set forth by defendant Brunet at the hearing. Finally, it is clear that the proposed evidence in this case was not irrelevant or unnecessary. Accordingly, genuine issues of material fact exist which prevent a finding of summary judgment at this time.

c. *Qualified Immunity*

Finally, relying solely on their prior arguments, Defendants contend that defendant Brunet is protected by qualified immunity. The doctrine of qualified immunity protects a Section 1983 defendant from liability for damages if his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Defendants are further protected from liability where the rights are clearly established if it was objectively reasonable to believe that their actions did not violate those rights. *See Anderson v. Creighton,* 483 U.S. 635, 638 (1987).

**\*8** The officials do not have such immunity, however, where the "contours of the right" were "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640. In determining whether a particular right was clearly established at the time of the alleged violation, courts should consider:

(1) whether the right in question was defined with

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

"reasonable specificity;" (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991).

In this case, Plaintiff's right to notice and to present witnesses were clearly established and well defined at the time of the hearing, July 22, 1993. Although, prior to 1993, it was not entirely clear whether a prisoner was entitled to keep his notice for at least 24 hours, *Benitez* clarified that this was so on February 3, 1993. Therefore, it was not objectively reasonable for defendant Brunet to leave unanswered Plaintiff's complaint that his litigation papers were confiscated.

Also, the right to present witnesses at a disciplinary hearing and the limitations on that right were well defined prior to the time of the hearing. Whether the rationale offered by defendant Brunet for excluding the witness, the difficulty in locating the witness and the need to complete the hearing that day, are sufficient justification to support his qualified immunity defense are material issues of fact which cannot be resolved on a motion for summary judgment. *See Rivera,* 1994 WL 263417, at [*]6. Accordingly, summary judgment may not be granted on this ground.

In light of these holdings, it is evident that this Court made a clear error of law and that reconsideration is appropriate as to Plaintiff's claims against defendant Brunet.

B. Recusal

Plaintiff's motion for recusal is based on 28 U.S.C. § 455(a), which states that "[a]ny justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." *Id.* Importantly, it does not matter whether the judge is in fact subjectively impartial, only whether the objective facts create the appearance of impartiality. *United States v. Bayless,* 201 F.3d 116, 126 (2d Cir.2000);

*Hughes v. City of Albany,* No. 98–2665, 1999 WL 709290, at [**]2 (2d Cir. July 1, 1999). "The ultimate inquiry is whether 'a reasonable person, knowing all the facts, would conclude that the trial judge's impartiality could reasonably be questioned." ' *Hughes v. City of Albany,* 33 F.Supp.2d 152, 153 (N.D.N.Y.1999) (quoting *United States v. Lovaglia,* 954 F.2d 811, 815 (2d Cir.1992)); *see Bayless,* 201 F.3d at 126.

In this case, Plaintiff's claim is based on the congregation of a number of the Court's rulings and the overall handling of his case. The Supreme Court has held, however, that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States,* 510 U.S. 540, 555 (1994); *see Hughes,* 1999 WL 709290, at [**]2. Indeed, the Second Circuit has held that "opinions formed by a judge on the basis of facts introduced or events occurring in the course of judicial proceedings do not constitute a basis for recusal unless they indicate that the judge has a 'deep-seated favoritism or antagonism that would make fair judgment impossible." ' *United States v. Diaz,* 176 F.3d 52, 112 (2d Cir.1999) (quoting *Liteky,* 510 U.S. at 555). Plaintiff has put forth nothing, and a review of the record reveals nothing, which would suggest to an objective observer that the Court has a deep-seated favoritism for Defendants or any antagonism against Plaintiff. Therefore, his motion is denied.

III. CONCLUSION

**9** ORDERED that Plaintiff's motion to vacate is GRANTED in part and DENIED in part consistent with the terms of this opinion;

ORDERED that Plaintiff's claim against defendant Brunet be REINSTATED and the judgment dismissing the case in defendant Brunet's favor be VACATED;

ORDERED that Plaintiff's motion for recusal is DENIED; and it is further

ORDERED that the clerk serve a copy of this order on all parties by regular mail.

IT IS SO ORDERED.

N.D.N.Y.,2001.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

Alvarez v. Coughlin
Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

2014 WL 1292232
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Emanuel M. BROOKS Jr., Plaintiff,

v.

P. ROCK et al., Defendants.

No. 9:11–cv–1171 (GLS/ATB).
|
Signed March 28, 2014.

**Attorneys and Law Firms**

Emanuel M. Brooks Jr., Marcy, NY, pro se.

Hon. Eric T. Schneiderman, Stephen M. Kerwin, Assistant Attorney General, of Counsel, Albany, NY, for the Defendants.

### *MEMORANDUM–DECISION AND ORDER*

GARY L. SHARPE, Chief Judge.

### I. *Introduction*

**\*1** Plaintiff *pro se* Emanuel M. Brooks Jr. commenced this action against defendants P. Rock, P. Chase, [1] T. LaValley, R. Paquette–Monthie, [2] and Eric Gutwein [3] alleging a host of civil rights violations pursuant to 42 U.S.C. § 1983. (*See generally* Compl., Dkt. No. 1.) Following the dismissal of some claims, (Dkt. No. 17), defendants moved for summary judgment dismissing the complaint in its entirety. (Dkt. No. 42). Brooks also moved for preliminary injunctions and the appointment of counsel. (Dkt.Nos.54, 58.) In a Report–Recommendation (R & R) dated January 17, 2014, Magistrate Judge Andrew T. Baxter recommended that defendants' motion be granted, and that Brooks' motions be denied. (Dkt. No. 60.) Pending is Brooks' "Motion of Appeal and Objection to [Decision]," which, as explained below, is liberally construed as both an objection to the R & R and request for leave to amend. (Dkt. No. 62.) For the reasons that follow, the R & R is adopted in its entirety, and leave to amend is denied.

### II. *Background*

Brooks, an inmate in the custody of the New York Department of Corrections and Community Supervision (DOCCS), was housed at Clinton Correctional Facility for the first time period relevant to his complaint. (Dkt. No. 42, Attach. 5 at 4; Compl. at 5.) While at Clinton, Brooks contends that Rock opened a door, which hit him extremely hard in the forehead, refused him speedy medical attention for his head injury, and falsely charged him with misbehavior. (Compl. at 5.) Chase, who found Brooks not guilty of the charges lodged by Rock, (Defs.' Statement of Material Facts (SMF) ¶ 39, Dkt. No. 42, Attach. 16), allegedly threatened Brooks that he was "going to get [him] at the next [correctional facility]," (Compl. at 5).

Thereafter, Brooks was transferred to Coxsackie Correctional Facility. (Dkt. No. 42, Attach. 5 at 4.) Brooks claims that LaValley arranged for his transfer to Coxsackie, despite his request to be transferred to Sing Sing Correctional Facility, in retaliation for filing a grievance regarding Rock. (Compl. at 6.) While at Coxsackie, Brooks was cited for misbehavior by Paquette–Monthie, (Dkt. No. 42, Attach. 13 at 8); Brooks claims that the misbehavior report was filed in retaliation for his complaint about Rock while at Clinton, (Compl. at 7). According to Brooks, Gutwein, who presided at Brooks' disciplinary hearing on the Coxsackie misbehavior report, (Dkt. No. 42, Attach. 14 ¶ 5), improperly denied Brooks' requests to produce certain witnesses and evidence, found him guilty of the charged conduct, and sentenced him to six months in the special housing unit along with six months loss of good time, (Compl. at 7–8).

This action was filed on September 30, 2011. (*See generally* Compl.) In October 2012, following several delays attributable to Brooks before service of process occurred, (Dkt No. 7 at 7–10; Dkt. Nos. 9, 12, 13, 15, 16, 17), defendants moved to dismiss pursuant to Rule 12(b)(6), (Dkt. No. 31). In response, Brooks sought leave to amend. (Dkt. No. 36.) The court converted defendants' motion to dismiss to a motion seeking summary judgment and denied Brooks' motion for leave to amend for failure to comply with the Local Rules of Practice, but explained that "[i]f, after resolution of the summary judgment motion, [he] still wish[ed] to amend his complaint, he

[could do so] in the proper form." (Dkt. No. 38 at 9–10.) In May 2013, defendants filed their motion for summary judgment consistent with the court's conversion of their earlier-filed motion to dismiss. (Dkt. No. 42.) Before that motion for summary judgment was considered by the court, Brooks filed the aforementioned motions for appointment of counsel and preliminary injunctions. (Dkt.Nos.54, 58.)

**\*2** In a January 17, 2014 R & R, Judge Baxter recommended that defendants' motion for summary judgment be granted.[4] (Dkt. No. 60 at 60.) As pertinent here, Judge Baxter determined that: (1) issues of fact precluded summary judgment regarding Brooks' exhaustion of administrative remedies with respect to his claims against Rock; (2) Brooks failed to exhaust his administrative remedies with respect to his claims against Chase and LaValley; and (3) despite his failure to exhaust with respect to Chase and LaValley, all claims, against all defendants, were subject to dismissal on the merits. (*Id.* at 7.)

### III. *Standard of Review*

Before entering final judgment, this court routinely reviews all report and recommendation orders in cases it has referred to a magistrate judge. If a party has objected to specific elements of the magistrate judge's findings and recommendations, this court reviews those findings and recommendations *de novo. See Almonte v. N.Y. State Div. of Parole,* No. 04–cv–484, 2006 WL 149049, at \*6– 7 (N.D.N.Y. Jan. 18, 2006). In those cases where no party has filed an objection, or only a vague or general objection has been filed, this court reviews the findings and recommendations of the magistrate judge for clear error.[5] *See id.*

### IV. *Discussion*

As an initial matter, the court must make sense of Brooks' submission, which he has titled "Motion of Appeal and Objection to [Decision]." (Dkt. No. 62.) The only references made to the R & R in that filing concern Brooks' contention that defendants "[l]ied in the summary [j]udg[ ]ment [when] they all testified and stated that ... plaintiff never file[d] a grievance or at[tempted] to

exhaus[t] his [administrative remedies]." (*Id.* at 1–2, 10.) The balance of Brooks' submission contains allegations, made for the first time, that defendants, DOCCS, and potentially other unnamed individuals,[6] failed and/or refused to protect him from a conspiracy-related to an incident that occurred on December 2, 2013 at Clinton- to murder him "in further [retaliation]." (*Id.* at 2–13.) In light of the new allegations, Brooks requests a "Motion of discover," "Motion for permanent order of restrain," "Motion for chain of custody," and a "Tellephone an commer emergency Confrence." (*Id.* at 8, 9.) Bearing in mind Brooks' *pro se* status, the court treats his assertion that defendants were dishonest regarding his exhaustion of administrative remedies as an objection to the R & R, and it considers the remainder of Brooks' submission as a motion seeking leave to amend his complaint.[7]

#### A. *Objection*

While it appears that Brooks' objection is specific, and, thus, is deserving of *de novo* review, *see Almonte,* 2006 WL 149049, at \*6–7, even if the court accepts as true his allegation that defendants "lied" in support of their argument that he failed to exhaust his administrative remedies, (Dkt. No. 62 at 1–2, 10), that fact would not impact Judge Baxter's ultimate recommendation of dismissal. Indeed, despite the finding that Brooks failed to exhaust with respect to some of his claims, the R & R recommends dismissal of all claims on the merits, (Dkt. No. 60 at 7, 60), a reality that Brooks overlooks entirely. Nonetheless, the court has carefully reviewed the R & R for clear error and finds none. As such, the R & R is adopted in its entirety.

#### B. *Leave to Amend*

**\*3** Defendants argue that leave to amend should be denied because: (1) the new allegations "have absolutely nothing to do with the incidents in [Brooks' c]omplaint, or the named defendants"; (2) Brooks failed to submit a proposed amended pleading in compliance with Local Rule 7.1(a)(4); and (3) a late amendment "would prejudice the right of the current defendants to a speedy conclusion of this action." (Dkt. No. 63 at 2.) The court agrees that Brooks should not be granted leave to amend.

At the outset, the court is cognizant of the fact that Brooks has had no prior opportunity to file an amended pleading. This is so despite the fact that this action has

been pending for well over two years. Indeed, the posture of this case is somewhat peculiar in that the summons and complaint were not served upon defendants until nearly one year after commencement. (Dkt.Nos.17–20, 23–25.) The wheels of justice have churned at an admirable pace since; nonetheless, given the natural progression of this litigation, a significant amount of time has elapsed. Before filing an answer, defendants moved to dismiss, and later, after the court's conversion of that motion, augmented the record and filed a summary judgment motion. (Dkt.Nos.31, 38, 42.) The court is also mindful that discovery has not commenced.

Brooks was previously informed that if, after resolution of the summary judgment motion, he still wished to amend his complaint, he had to do so by making "a motion to amend in the proper form." (Dkt. No. 38 at 10.) Despite the explicit nature of the court's prior order, Brooks' latest request, which is based on facts that did not occur until December 2013, (Dkt. No. 62 at 5, 6), is not in proper form. *See* N.D.N.Y. L.R. 7.1(a)(4) (requiring, among other things, that a party seeking leave to amend "must attach an unsigned copy of the proposed amended pleading to its motion papers").

More fundamentally, however, Brooks' latest allegations are not sufficiently related to his underlying claims to warrant amendment under Fed.R.Civ.P. 15. *See Jolley v. Meachum,* 210 F.3d 354, 2000 WL 427276, at *1 (2d Cir.2000) ( "As for the claims that were unknown to [the plaintiff] at the time he filed his original complaint, we agree with the district court's determination that these claims were not sufficiently related to [the plaintiff]'s original claim, and therefore they could not be added to his original complaint."); *Smith v. Yonkers Police Dep't,* 152 F.3d 920, 1998 WL 433005, at *1 (2d Cir.1998) (holding that the district court did not abuse its discretion in denying a motion to amend made five years after commencement of the action that sought to allege "a claim wholly unrelated to [the original pleading]"); *Jones v. Fischer,* No. 9:11–cv–774, 2013 WL 4039377, at *2 n. 6 (N.D.N.Y. Aug. 7, 2013) (explaining that new factual allegations, raised for the first time along with objections, would be disregarded where those "allegations have nothing whatsoever to do with claims that were asserted in the [operative pleading]"). Indeed, the only link between the new allegations that DOCCS has failed to protect Brooks from a murder conspiracy and defendants is his wispy assertion that defendants are participating

in that failure or refusal to protect Brooks "in *further* [retaliation]." (Dkt. No. 62 at 3 (emphasis added).) Liberally read, this suggests that defendants' new alleged failure to protect Brooks is because of the same grievances that were at the center of his original retaliation claims. The highly tenuous relationship between the new and original allegations is insufficient to serve as a basis for leave to amend, particularly when coupled with the significant lapse of time between the facts alleged in the complaint, which occurred in 2011, (Compl. at 5, 12–20), and Brooks' claim about an incident that occurred in December 2013, (Dkt. No. 62 at 5–6). *See Robles v. Khahaifa,* No. 09CV718, 2012 WL 2401574, at *10 (W.D.N.Y. June 25, 2012). Accordingly, leave to amend is denied.

## V. *Conclusion*

**\*4 WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge Andrew T. Baxter's ReportRecommendation (Dkt. No. 60) is **ADOPTED** in its entirety; and it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 42) is **GRANTED;** and it is further

**ORDERED** that Brooks' complaint (Dkt. No. 1) is **DISMISSED;** and it is further

**ORDERED** that Brooks' motion for the appointment of counsel (Dkt. No. 58) is **DENIED;** and it is further

**ORDERED** that Brooks' motions for preliminary injunctions (Dkt.Nos.54, 58) are **DENIED** as moot; and it is further

**ORDERED** that Brooks' motion for leave to amend his complaint (Dkt. No. 62) is **DENIED;** and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this MemorandumDecision and Order to the parties.

**IT IS SO ORDERED.**

## REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

Presently before the court is the defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 42). This matter was referred for Report and Recommendation on May 22, 2013 by Chief U.S. District Judge Gary L. Sharpe, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

On October 31, 2012, defendants filed a motion to dismiss plaintiff's civil rights action for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No. 31). Plaintiff responded (Dkt. No. 36) and defendants filed a reply (Dkt. No. 37). By Decision and Order dated March 29, 2013, this court converted the Rule 12(b)(6) motion to one for summary judgment, and provided the parties with an opportunity to file supplemental papers. (Dkt. No 38). On May 20, 2013, defendants filed a complete motion for summary judgment (Dkt.Nos.42, 43), but also continued to rely on papers submitted in connection with the prior Rule 12(b)(6) motion. Plaintiff has opposed the motion for summary judgment (Dkt. No. 52); he has also filed two motions for preliminary injunctions, one of which included a motion for appointment of counsel (Dkt.Nos.54, 58), to which defendants have responded (Dkt.Nos.57, 59).

For the reasons set forth below, this court recommends that defendants' motion for summary judgment be granted on most of the grounds raised therein, and that plaintiff's complaint be dismissed in its entirety. In light of this recommendation, this court also recommends that plaintiff's motion for appointment of counsel be denied and his motions for preliminary injunctions be found moot.

### *BACKGROUND*

On and before June 15, 2011, plaintiff was confined by the New York Department of Corrections and Community Supervision ("DOCCS") at the Clinton Correctional Facility ("Clinton") in Danemora, in the northeastern corner of New York. Plaintiff alleges that, on that date, Correction Officer ("C.O.") P. Rock "bust open" the door to the bathroom that plaintiff was using, causing the door

to hit him extremely hard in the forehead. (Compl., Dkt. No. 1 at 5). [1] Although plaintiff was injured, defendant Rock refused to take plaintiff for immediate medical attention; and plaintiff did not receive any medical care until two days later. (*Id.*).

**\*5** C.O. Rock prepared a misbehavior report, charging plaintiff with smoking in the bathroom, a copy of which was served on plaintiff at 7:00 a.m. on June 16th. (*Id.*; Dkt. No. 36 at 67). Plaintiff attached to his complaint a letter, dated June 15th, addressed to Superintendent LaValley, complaining about C.O. Rock's conduct earlier that day. (Dkt. No. 1 at 12). Plaintiff claims that he also filed a formal grievance with respect to the incident involving defendant Rock and later submitted appeals when he received no response to his initial grievance. (Compl., Dkt. No. 1 at 3–4, 13–20).

Lt. Chase [2] conducted a disciplinary hearing and found plaintiff not guilty on the misbehavior report filed by C.O. Rock. Plaintiff alleges that defendant Chase stated that, although he could not "get me at this facility [,] ... he was going to get me at the next one." (Compl., Dkt. No. 1 at 5). Plaintiff further alleges that, although he had requested a transfer to the Sing Sing Correctional Facility ("Sing Sing"), Supt. LaValley had plaintiff promptly transferred to Coxsackie Correctional Facility (Coxsackie), in retaliation for the complaint against C.O. Rock, which plaintiff submitted to defendant LaValley. (Compl., Dkt. No. 1 at 6, 7; Dkt. No. 36 at 40).

On July 7, 2011, shortly after his arrival at Coxsackie, Counselor PaquetteMonthie issued plaintiff a misbehavior report for placing telephone calls to his wife from other facilities, in violation of an order of protection issued in connection with an earlier prosecution of plaintiff. (Compl., Dkt. No. 1 at 7; Dkt. No. 31–2 at 2). Plaintiff alleges that defendant Paquette–Monthie wrote the misbehavior report in retaliation for plaintiff's complaint about C.O. Rock at Clinton. (Compl., Dkt. No. 1 at 7). In exhibits attached to his response to the Rule 12(b)(6) motion, plaintiff claimed that Counselor Paquette–Monthie told him that she initiated the disciplinary charges against him at Coxsackie because he filed a complaint against a friend of hers at Clinton Annex. (Dkt. No. 36 at 31, 37, 40).

Defendant Eric Gutwein[3] presided over plaintiff's disciplinary hearing at Coxsackie. (Disc. Hrg. Tr. at 1, Dkt. No. 42–15). Plaintiff alleges that Hearing Officer Gutwein, participating in the retaliatory conspiracy against plaintiff because of his complaints at Clinton, denied plaintiff's many requests for witnesses and additional evidence, found plaintiff guilty of the charges, and sentenced him to six months in the Special Housing Unit ("SHU") and a six-month loss of good time. (Compl., Dkt. No. 1 at 7–8).

Liberally construed, plaintiff's complaint alleges that his constitutional rights under the First, Eighth, and Fourteenth Amendments were violated because (1) he was subjected to cruel and unusual punishment by defendant Rock when she allegedly hit him in the head with the bathroom door; (2) he was improperly denied prompt medical care by defendant Rock; (3) he was retaliated against for filing complaints and grievances by defendants Rock, Chase, LaValley, Paquette–Monthie,[4] and Gutwein in connection with the initiation and adjudication of disciplinary charges at Clinton, his transfer to Coxsackie, and the initiation and adjudication of disciplinary charges at Coxsackie; and (4) he was denied due process in connection with the adjudication of the disciplinary charges at Coxsackie.[5] Plaintiff demands damages, as well as injunctive relief, including the termination of the defendants by DOCCS, a formal apology from the defendants, a transfer to the prison of his choice, and protection from further retaliation at DOCCS. (Compl., Dkt. No. 1 at 10–11).

**\*6** Defendants have challenged each of plaintiff's claims and have filed numerous declarations contesting many of plaintiff's factual allegations. In moving for summary judgment with respect to the claims against defendants Rock, Chase, and LaValley, defendants contend that plaintiff failed to exhaust his administrative remedies because, *inter alia,* he never filed a formal grievance with respect to any of these defendants at Clinton. (Defs.' Mem. of Law at 14–16, Dkt. No. 42–17).

Defendant Rock denies that she hit the plaintiff with a bathroom door on June 15, 2011, and she alleges that plaintiff did not request medical attention on that date, nor did he appear to require medical attention. (Rock Decl. ¶¶ 8–12, Dkt. No. 42–2). Plaintiff was seen by the medical staff at Clinton on June 17th and complained of

a headache relating to being hit on the head by a mess hall door two days earlier. There was no evidence of a bump, swelling, or bruising, and plaintiff was treated with Ibuprofen and given a bag of ice. (Michalek Decl. ¶ 5, Dkt. No. 42–9). C.O. Rock was unaware of any complaint or grievance filed against her by plaintiff, and denies knowing defendant Paquette–Monthie or causing her to issue a misbehavior report against plaintiff at Coxsackie. (Rock Decl. ¶¶ 14–17).

Defendant Chase, who found plaintiff not guilty on the disciplinary charges filed by C.O. Rock, denies ever threatening plaintiff, and had no knowledge that he filed any complaint or grievance against defendant Rock. Lt. Chase asserts that he did nothing to cause defendant Paquette–Monthie–whom he does not know–or anyone else, to retaliate against plaintiff. (Chase Decl. ¶¶ 7–14, Dkt. No. 42–3). Clinton Supt. LaValley also denies knowing defendant Paquette–Monthie or doing anything to induce her to file a misbehavior report against plaintiff at Coxsackie. Defendant LaValley asserts that he had no involvement in plaintiff's transfer to Coxsackie; that transfer was handled by the DOCCS Deputy Superintendent for Programs pursuant to a prior request by plaintiff for an "area of preference" transfer. (LaValley Decl. ¶¶ 7–15, Dkt. No. 42–4).

DOCCS Counselor Paquette–Monthie filed a misbehavior report against plaintiff at Coxsackie after learning, through her intake interview of plaintiff and information in his file, that he had been contacting his wife by telephone. Such contact violated an order-of-protection issued against plaintiff and contravened prior direct orders from the staff at Sing Sing that plaintiff should stop calling his wife. Defendant Paquette–Monthie denies knowing defendants Rock, Chase, or LaValley at Clinton, and states that she did not file the misbehavior report for retaliatory purposes. (Paquette–Monthie Decl. ¶¶ 6–15, Dkt. No. 42–12).

Defendant Gutwein, who presided over the disciplinary hearing at Coxsackie also denied knowing defendant Rock, or knowing that she had been the target of a prior complaint by plaintiff. Defendant Gutwein claims that he made his documented decisions regarding the evidence allowed at the hearing, the ultimate determination of plaintiff's guilt, and the punishment imposed, based on the merits, and not because of any retaliatory motive. (Gutwein Decl. ¶¶ 5–34, Dkt. No. 42–14).

**\*7** The court concludes that there are material issues of fact as to whether plaintiff exhausted his administrative remedies relating to his claims against defendant Rock, but no issues of fact as to whether he failed to properly exhaust claims with respect to defendants Chase and LaValley. However, this court recommends dismissal of all of plaintiff's claims on the merits, because no rational fact finder could conclude that the defendants violated plaintiff's various constitutional rights, as he alleges.

### DISCUSSION

### I. Summary Judgment

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P. 56; Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc .,* 369 U.S. 654, 655 (1962); *Salahuddin v. Goord,* 467 F.3d at 272.

### II. Exhaustion of Administrative Remedies

Defendants contend that, notwithstanding plaintiff's claims to the contrary, he failed to initiate the grievance process, in a timely and proper manner, with respect to his complaints against defendants Rock, Chase, and LaValley of Clinton Correctional Facility. Defense counsel argues that, even if plaintiff had filed a timely grievance with respect to these defendants, he failed to exhaust his administrative remedies by not pursuing an appeal to the Central Office Review Committee (CORC). (Defs.' Mem. of Law at 14–16).

The court concludes that there are issues of fact material to whether plaintiff has exhausted his administrative remedies with respect to the claims against defendant Rock, which may not be resolved on summary judgment. However, no reasonable fact finder could conclude that the plaintiff filed timely grievances relating to his claims against defendants Chase regarding the disciplinary charges initiated at Clinton, or against defendant LaValley with respect to plaintiff's transfer from Clinton to Coxsackie. Accordingly I will recommend that those claims be dismissed on summary judgment based, *inter alia,* on plaintiff's failure to exhaust administrative remedies.

### A. Applicable Law

**\*8** The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord,* 380 F.3d 670, 675–76 (2d Cir.2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock,* 549 U.S. 199, 216 (2007); *Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g, Key v. Toussaint,* 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) (citations omitted).

The Supreme Court held that, in order to properly exhaust an inmate's administrative remedies, he must complete

the administrative review process in accordance with the applicable state rules. *Jones v. Bock,* 549 U.S. at 218–19 (citing *Woodford v. Ngo,* 548 U.S. 81 (2006)). In *Woodford,* the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90–103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee (IGRC). N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee (CORC). *Id.* § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility).

At the same time that the Second Circuit decided *Giano,* it also decided four related cases, clarifying the law in the Second Circuit regarding the PLRA's exhaustion requirement, and specifying various instances in which the requirement could be waived or excused. [6] Based on these cases, the Second Circuit developed a "three part inquiry" to determine whether an inmate has fulfilled the PLRA exhaustion requirement. *See Brownell v. Krom,* 446 F.3d 305, 311–12 (2d Cir.2006) (citing *Hemphill,* 380 F.3d at 686). The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.* Whether the *Hemphill* test survives following the Supreme Court's decision in *Woodford,* has been a matter of some speculation. [7] Although the Second Circuit has not explicitly held that *Hemphill* remains good law, it has applied the three-part inquiry in post-*Woodford* cases. *See, e.g., Messa v. Goord,* 652 F.3d 305, 309 (2d Cir.2011); *Davis v. State of New York,* 311 F. App'x 397, 399 (2d Cir.2009).

## B. Analysis

**\*9** Defense counsel attempts to rebut plaintiff's allegation that he filed a timely initial grievance with respect to his claims against defendants Rock, Chase, and LaValley, purported copies of which are attached to the complaint. (Defs.' Mem. of Law at 14–16). Clinton Superintendent LaValley declared that his office had no record of receiving any letter from plaintiff raising the allegations contained in the complaint in this action, and had no recollection of receiving any such letter, including those attached to the complaint. (LaValley Decl. ¶ 5–6). Tara Brousseau, the Inmate Grievance Program ("IGP") Supervisor at Clinton, found no documentation in her files indicating that plaintiff ever submitted a formal grievance at Clinton regarding plaintiff's allegations against defendants Rock, Chase, and LaValley. (Brousseau Decl. ¶¶ 8–11, Dkt. No. 42–6). Defense counsel contends that the documentation provided by plaintiff in his complaint contained no "acknowledg[ ]ment from any recipient that his document was received in a timely manner so as to comply with DOCCS grievance procedures." (Defs.' Mem. of Law at 14). Counsel also points out inconsistencies in plaintiff's claims regarding the submission of his initial grievance, including the fact that the "Affidavit of Service," attached to his complaint (Dkt. No. 1 at 18) swears that he placed a grievance regarding defendant Rock in a mailbox at Clinton on June 26, 2011–two days after plaintiff was transferred out of that facility, according to DOCCS transfer records. (Defs.' Mem. of Law at 16). [8]

In his response to defendants' summary judgment motion, plaintiff has filed additional documentation regarding some of his complaints to DOCCS about the alleged violations of his constitutional rights by defendant Rock at Clinton. (Dkt. No. 52–11 at 4, 7, 13, 21). The newly-disclosed records include a memorandum, purportedly signed by Supt. LaValley, acknowledging receipt of a communication from plaintiff on June 17, 2011–two days after plaintiff claims he submitted his original letter of complaint about defendant Rock to the Clinton Superintendent (Dkt. No. 52–11 at 4–5). In the absence of any reply from defendants questioning the authenticity of the memorandum, this would seem to confirm plaintiff's allegation that he sent the letter dated June 15th to defendant LaValley, even if that complaint about defendant Rock would not qualify as a formal grievance for exhaustion purposes. [9]

Plaintiff also filed a July 18, 2011 memorandum from N. Ratliff, then the IGP Supervisor at Clinton, acknowledging receipt, from plaintiff, of a "complaint dated 7/14/11/6/24/11," which would appear to refer, in part, to plaintiff's "Affidavit of Service," notarized July 14, 2011 and addressed, *inter alia*, to Ratliff, regarding a grievance about defendant Rock. (Dkt. No. 52–11 at 7, 14). [10] Plaintiff's papers in opposition to the summary judgment motions include two slightly different complaints directed to N. Ratliff and the Inmate Grievance Committee regarding defendant Rock, each dated June 26, 2011. (Dkt. No. 52–11 at 8–9, 15–16). Given that N. Ratliff's memorandum reference a "complaint" dated, *inter alia*, June 24–the day plaintiff was th moved out of Clinton-it is not entirely clear which version of plaintiff's "complaint" Ratliff received or how and when she received it. However, a rational fact finder could conclude that, contrary to the assertion by Tara Brousseau, a complaint against defendant Rock from plaintiff was received at Clinton, notwithstanding the uncertainty regarding the dates. The memorandum from N. Ratliff returned plaintiff's "complaint" because he was no longer housed at Clinton and because an inmate is supposed to file grievances in the facility where he is confined, even if it relates to conduct at another institution. Neither party has submitted any information as to whether plaintiff thereafter submitted a grievance regarding the earlier events at Clinton to officials at the DOCCS institutions to which he was transferred or that he sought an extension of the deadline for submitting an initial grievance.

**\*10** There are some discrepancies in plaintiff's various claims about his submission(s), to DOCCS, of a grievance about the alleged violations of his rights at Clinton. In some statements, including his recent response to the declaration of Tara Brousseau, plaintiff claims that he submitted a grievance about defendant Rock to the IGP supervisor at Clinton on June 15, 2011, and that the letter that he sent to Supt. LaValley on the same date was a copy of the grievance. (Dkt. No. 52–9 at 2). [11] In other statements, including his "Affidavit of Service," plaintiff asserts that he filed an initial grievance at Clinton on or about June 26, 2011, which is also the date on several versions of the complaints against defendant Rock that plaintiff filed with his complaint and his response to the summary judgment motion. (Dkt. No. 52–11 at 8–9, 14–18). However, there are also discrepancies between

the documents recently filed by plaintiff and some of the statements of DOCCS witnesses regarding plaintiff's submission of complaints-*i.e.,* Supt. LaValley's claim that his office never received any of the letters attached to plaintiff's complaint and Tara Brousseau's declaration that Clinton IGP never received a grievance from plaintiff about defendant Rock.

Under applicable regulations, [12] an inmate must file a formal grievance within 21 days of an alleged occurrence, although he may make a request for additional time within 45 days of the occurrence, which may be granted in the discretion of the IGP supervisor upon a showing of mitigating circumstances. If the plaintiff properly submitted an initial grievance on June 15, June 24, or June 26, 2011, it would have timely-*i.e.,* within 21 days of the alleged incident involving defendant Rock. If the first grievance was submitted around July 14, 2011, it would have been beyond the 21–day deadline, but within the 45–day period during which the plaintiff could have requested additional time to file, based upon mitigating circumstances. Even if, after his transfer from Clinton, plaintiff filed his initial grievance with the wrong facility, and he did not explicitly ask for additional time to file it properly, the failure of the IGP Supervisor to advise plaintiff of his ability to ask for an extension suggests the possibility that the grievance procedures were not made reasonably available to plaintiff. *See, e.g., Mandell v. Goord,* 9:06–CV–1478 (GTS/DEP), 2009 WL 3123029, at \*10–11 (N.D.N.Y. Sept. 29, 2009) (where DOCCS officials tersely rejected plaintiff's grievance as untimely, without advising the plaintiff that he should request an exception to the time limit from the IGP supervisor based on mitigating circumstances, or that additional information regarding his delay in filing the grievance was needed, it is arguable that material questions of fact exist as to whether administrative remedies were available to the plaintiff or whether the defendants should be estopped by their conduct from relying on the non-exhaustion defense).

**\*11** It is entirely possible that a finder of fact tasked with weighing the relative credibility of plaintiff and the DOCCS witnesses might conclude, in the face of the inconclusive documentary evidence, that plaintiff did not properly submit a timely initial grievance regarding defendant Rock's alleged violation of plaintiff's rights at Clinton. However, given that the court should not make credibility determinations in connection with a

summary judgment motion, and that the defendants have the ultimate burden of proving that plaintiff did not exhaust his administrative remedies, there appears to be a material issue of fact as to whether plaintiff filed a timely initial grievance about defendant Rock or whether his failure to do so should be excused under *Hemphill* standards.

Defendants contend that, even if plaintiff properly filed a timely initial grievance against defendant Rock that was ignored by DOCCS officials, he failed to exhaust his administrative remedies because he never filed an appeal with CORC. (Defs.' Mem. of Law at 15). The Assistant Director of the DOCCS IGP program states, in his declaration, that he found no evidence in the CORC files indicating that plaintiff ever filed a grievance appeal with CORC concerning the alleged events at Clinton Annex. (Hale Decl. ¶¶ 8–11, Dkt. No. 42–7).

Courts have consistently held that an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement. *See e.g. Veloz v. New York,* 339 F.Supp.2d 505, 516 (S.D.N.Y.2004) (plaintiff's allegations that his grievances were misplaced or destroyed by corrections officers ultimately does not relieve him of the requirement to appeal those claims to the next level once it became clear that no response was forthcoming) (citing *Martinez v. Williams,* 186 F.Supp.2d 353, 357 (S.D.N.Y.2002) (same). "If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA." *Croswell v. McCoy,* 01–CV–547, 2003 WL 962534, at \*4 (N.D.N.Y. Mar. 11, 2003) (Sharpe, M.J.). [13]

Plaintiff, however, has submitted documentation indicating that, after receiving no response to the initial grievance he claimed to have filed, he submitted "appeals" to the Superintendent at Clinton and to the IGP Supervisor and the Director of the IGP in Albany. A copy of plaintiff's purported "appeal" to Supt. LaValley, dated July 26, 2011, was attached to his complaint (Dkt. No. 1 at 13), although he has filed no additional documents acknowledging receipt of this "appeal." Copies of a further "appeal" addressed to the Director of the IGP in Albany and an IGP supervisor, part of which is dated "6–26–11" and part of which was dated 8–26–11," were also appended to the complaint (Dkt. No. 1 at 14–17), along with the "Affidavit of Service" notarized on July

14, 2011 (Dkt. No. 1 at 18). Plaintiff submitted, with his response to the summary judgment motion, a letter dated September 6, 2011, from the offices of the Director of IGP in Albany (Karen Bellamy), acknowledging receipt of correspondence from plaintiff dated July 14, 2011. (Dkt. No. 52–11 at 13). As noted earlier, plaintiff's "Affidavit of Service" notarized on July 14th has receipt stamps indicating that DOCCS received a copy of it on September 1, 2011. The letter from Karen Bellamy's office returns plaintiff's correspondence, advising him that "you must submit your grievance or appeal directly to IGRC at the facility." (Dkt. No. 52–11 at 13).

**\*12** Plaintiff's response to the summary judgment motion also attaches a memorandum from the IGP Supervisor at Upstate dated September 14, 2011, acknowledging receipt of "complaints/letters of appeal ... with written dates of 6/26/2011 and 7/27/2011." (Dkt. No. 52–11 at 21). As noted above, one of plaintiff's alleged grievance appeals is dated June 26, 2011; there does not appear to be any submission from plaintiff dated July 27, 2011 in the record. The letter from Upstate, where plaintiff was confined at the time, returned plaintiff's documents as "untimely" because they related to alleged occurrences on "6/14/11 [and] 6/15/11"-the dates of the incident with defendant Rock at Clinton. (*Id.*). The Upstate IGP Supervisor relied on the regulations summarized in note 12 above, which require an initial complaint to be filed within 21 days of the alleged occurrence unless an extension request is made within 45 days of the occurrence and is granted by the IGP supervisor. (*Id.*).

While the documentation with respect to plaintiff's alleged "appeals" is far from conclusive, it supports his claim that, when he received no response to his purported initial grievance, he properly mailed an "appeal" to the Superintendent of the facility where the grievance was allegedly ignored. [14] When his appeal to the Superintendent was also allegedly ignored, plaintiff attempted to file an appeal with CORC by sending it to the Director of IGP in Albany. When the Director's Office advised plaintiff that his complaint or appeal needed to be filed with the IGRC at the facility where he was confined, plaintiff apparently did so. However, the IGP supervisor at Upstate treated his submission as an original complaint-not an appeal that should be forwarded to CORC-and found that it was untimely based on the deadlines applicable to initial complaints.

While the applicable regulations set time limits for filing appeals based on receipt of the written decision at an earlier stage, they do not set definitive deadlines for filing appeals when no response is ever received. See N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.5(c)(1) (an appeal to the Superintendent must be filed within seven calendar days **after the receipt of the IGRC's written response")** (emphasis added); 701.5(d)(1)(I) (an appeal to CORC must be submitted, through the grievance clerk, **"within seven calendar days after receipt of the superintendent's written response")** (emphasis added); 701.6(h)(2) (quoted in note 14 above). Plaintiff's "appeals" could not, as a matter of law, be deemed untimely; or at least, the uncertainty with respect to the deadlines might excuse a late appeal under the *Hemphill* standards.[15] The court concludes that there are issues of fact that are material to the question of whether plaintiff properly pursued the administrative appeals necessary to exhaust his claims with respect to defendant Rock.

The various documents filed by plaintiff do not reflect that he made any written complaints about retaliation in connection with the adjudication of his disciplinary charges at Clinton by defendant Chase, or his transfer to Coxsackie, for which plaintiff blames defendant LaValley, until his submission to IGP in Albany—part of which was dated "6–26–11" and part of which was dated "8–26–2011." (Dkt. No. 52–11 at 17–20). It is clear that the portion of the submission dated June 26th is backdated because it purports to be an appeal of the grievance plaintiff states that he filed on approximately the same date and it references events, including plaintiff's misconduct charge at Coxsackie on July 7, 2013 (Paquette–Monthie Decl. ¶¶ 6–7, 11–12), which occurred well after June 26th. As noted above, the documents submitted by plaintiff indicate that his submission was not received in the office of the IGP Director in Albany until early September 2011. The court concludes that no reasonable fact finder could conclude that plaintiff filed an initial grievance with respect to the conduct of defendants Chase and LaValley until August 26, 2011, which is considerably longer than 21 or 45 days after the relevant "occurrences"-the adjudication of the misbehavior report at Clinton on June 22, 2011 (Chase Decl. ¶ 5) or plaintiff's transfer out of Clinton, which occurred on or about June 24, 2011 (LaValley Decl. ¶ 7 & Ex. B). Accordingly, the court concludes that these claims against defendants Carr and LaValley may be dismissed, on summary judgment, because of plaintiff's failure to

exhaust his administrative remedies by filing a timely initial grievance.

### III. Eighth Amendment Claims

**\*13** Plaintiff alleges that defendant Rock violated his Eighth Amendment rights in two ways on June 15, 2011, by inflicting cruel and unusual punishment when she hit him in the head with the bathroom door, and by refusing to allow him to get immediate medical treatment for his purported injuries. As discussed above, C.O. Rock denies that she opened the bathroom door or caused it to hit plaintiff in the head, and she alleges that plaintiff did not request medical care or appear to require it. Plaintiff was seen, at his request, two days later by the Clinton medical staff, who found no evidence of bruising or swelling on plaintiff's head and treated him with Ibuprofen and a bag of ice.

Notwithstanding these factual disputes, the court concludes that, even accepting plaintiff's version of the relevant events, no reasonable fact finder could conclude that his Eighth Amendment rights were violated by defendant Rock. Accordingly, for the following reasons, this court recommends dismissal of those claims.

### A. Excessive Force

#### 1. Applicable Law

Inmates enjoy Eighth Amendment protection against the use of excessive force, and may recover damages under 42 U.S.C. § 1983 for a violation of those rights. *Hudson v. McMillian,* 503 U.S. 1, 9–10 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *Sims v.. Artuz,* 230 F.3d 14, 20 (2d Cir.2000). To sustain a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999).

In order to satisfy the objective element of the constitutional standard for excessive force, the defendants' conduct must be " 'inconsistent with the contemporary standards of decency.' " *Whitley v. Albers,* 475 U.S. 312, 327 (1986) (citation omitted); *Hudson,* 503 U.S. at 9. "[T]he malicious use of force to cause harm constitute[s] [an] Eighth Amendment violation per se [,]" regardless of

the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing *Hudson,* 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id.* at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: the extent of the injury and the mental state of the defendant; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003).

### 2. Analysis

**\*14** In connection with defendants' summary judgment motion, plaintiff and C.O. Rock present very different versions of the events of June 15th. Plaintiff alleges that, on the day before the incident, C.O. Rock threatened to "put her size 7 shoe up my Muslim ass." (Compl ., Dkt. No. 1 at 5; Pl.'s Reply to Rock Decl. ¶ 7, Dkt. No. 52–6). Defendant Rock denies ever threatening plaintiff. (Rock Decl. ¶ 13). Defendant Rock alleges that, on June 15th, plaintiff had been in the bathroom for approximately 15 minutes, and that other inmates needed to use the bathroom. (Rock Decl. ¶ 6). Plaintiff states that he obtained permission from C.O. Rock to use the bathroom and had been in the room for only five minutes. (Pl.'s Reply to Rock Decl. ¶ 9). Plaintiff claims that C.O. Rock "bust open" the door to the single male bathroom in the mess hall, hitting him extremely hard in the forehead. (Compl., Dkt. No 1 at 5; Pl.'s Reply to Rock Decl. ¶ 7). C.O. Rock states that she knocked on the door and directed plaintiff to come out; she denies that she opened the door or hit plaintiff with the door. (Rock Decl. ¶¶ 6, 8–9).

In support of defendants' initial Rule 12(b)(6) motion, counsel contended that plaintiff's allegations regarding the June 15, 2011 incident in the Clinton mess hall established, at worst, that defendant Rock was negligent in causing a bathroom door to strike plaintiff in the head. (Defs.' Mem. in Support of Rule 12(b)(6) Mot. at 13, Dkt. No. 31–4). A correction officer who negligently causes an unintended injury to an inmate has not engaged in the type of wanton or malicious conduct necessary to support an Eighth Amendment excessive force claim. (*Id.,* citing *Daniels v. Williams,* 474 U.S. 327 (1986) (a state official's negligent act causing unintended loss of or injury to life, liberty, or property does not support a Section 1983 claim)). *See also Epps v. City of Schenectady,* 1:10–CV–1101 (MAD/CFH), 2013 WL 717915, at *6 (N.D.N.Y. Feb. 27, 2013) (negligence cannot be a basis for liability for constitutional torts); *Cicio v. Graham,* 9:08–CV–534 (NAM/DEP), 2010 WL 980272, at * 13 (N.D.N.Y. Mar. 15, 2010) (citing *Schultz v. Amick,* 955 F.Supp. 1087, 1096 (N.D.Iowa 1997) (liability in a § 1983 excessive force action cannot be founded on mere negligence) (collecting cases)).

The court concludes that, even under plaintiff's version of the relevant events, a reasonable fact finder could not conclude that defendant Rock used force against plaintiff maliciously and sadistically, to cause harm. Whether plaintiff was in the bathroom for five minutes or 15 minutes, C.O. Rock had a good-faith penological basis to investigate why plaintiff had stayed in the bathroom long enough to deny access to other inmates who needed to use the facilities. Because plaintiff was on the other side of the bathroom door, defendant Rock could not have known that he was positioned in such a way that the door would hurt plaintiff if she opened it forcefully. While "busting open" the door may have created some risk that the person inside might be hit by the door, this is, at most, negligence that clearly does not rise to the level of wanton or malicious conduct. *See, e.g., White v. Drake,* 9:10–CV–1034 (GTS/DRH), 2011 WL 4478921, at *1, 9 (N.D.N.Y. Sept. 26, 2011) (the allegation that defendant kicked plaintiff's cell door from the outside while plaintiff was inside his cell, causing injury to plaintiff nose and jaw, are insufficient to establish an intentional or malicious effort to injure plaintiff, as necessary to state an excessive force claim under the Eighth Amendment); *Bilan v. Davis,* 11 Civ. 5509, 2013 WL 3940562, at *6

(S.D.N.Y. July 31, 2013) (an officer struck plaintiff only after the conflict between the officers and a non-party inmate spilled over to where plaintiff was standing; in the absence of allegations that the force used against him was intentional and wanton, plaintiff's excessive force claim must fail) (Rept. & Recommendation), *adopted,* 2013 WL 4455408 (S.D.N.Y. Aug 20, 2013).

### B. Denial of Medical Care

#### 1. Applicable Law

**\*15** In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing, *inter alia, Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

The objective prong of the standard is satisfied "when (a) the prisoner was 'actually deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.' *Bellotto v. County of Orange,* 248 F. App'x 232, 236 (2d Cir.2007) (quoting *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006)). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). When a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," the court must focus on the seriousness of the particular risk of harm that resulted from the challenged delay or interruption, rather than the prisoner's underlying medical condition alone." *Id.* at 185. The standard for determining when a deprivation or delay in a prisoner's medical need is sufficiently serious contemplates a condition of urgency that may result in degeneration of the patient's condition or extreme pain. *Bellotto v. County of Orange,* 248 F. App'x at 236 (citing, *inter alia, Chance v. Armstrong,* 143 F.3d at 702).

The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan,* 511 U.S. 825, 847 (1994). A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Id.* at 835, 837. The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer v. Brennan,* 511 U.S. at 844. Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin v. Goord,* 467 F.3d at 281.

**\*16** A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference. *Chance v. Armstrong,* 143 F.3d at 703. Nor does the fact that an inmate feels that he did not get the level of medical attention he deserved, or that he might prefer an alternative treatment, support a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001) (citing *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986)). Even negligence in diagnosing or treating an inmate's medical condition does not constitute deliberate indifference. *Farmer v. Brennan,* 511 U.S. at 835. Thus, any claims of medical malpractice, or disagreement with treatment are not actionable under Section 1983. *Ross v. Kelly,* 784 F.Supp. 35, 44–45 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (table).

#### 2. Analysis

While plaintiff claims that defendant Rock violated his Eighth Amendment rights by failing to allow him to obtain immediate medical care after the incident on June 15th, he acknowledges that he was seen by the prison medical staff two days later. (Compl., Dkt. No. 1 at 5). [16] In connection with defendants' initial Rule 12(b)

(6) motion, counsel argued, *inter alia,* that plaintiff failed to allege that the brief delay in his treatment caused any significant harm to him, thus failing to satisfy the objective prong of the deliberate indifference standard. (Mem. in Support of Rule 12(b) (6) Mot. at 22–23). It is clear from the parties' submissions relating to defendants' summary judgment motion that C.O. Rock and plaintiff disagree as to whether he requested and/or required medical attention on June 15th. However, no reasonable fact finder could conclude, based on the irrefutable facts, that the brief delay in plaintiff's treatment significantly increased the risk of serious adverse health consequences to him, as required to establish a deliberate indifference claim.

*Evans v. Manos* cogently summarizes how a prison inmate's claim for a delay in medical treatment should be evaluated under the Eighth Amendment:

"Although a delay in medical care can demonstrate deliberate indifference to a prisoner's medical needs, a prisoner's Eighth Amendment rights are violated only where 'the delay reflects deliberate indifference to a serious risk of health or safety, to a life-threatening or fast-degenerating condition or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment.' "

*Evans v. Manos,* 336 F.Supp.2d 255, 262 (W.D.N.Y.2004) (citations omitted). The Second Circuit has not resolved whether actual adverse medical effects are required, as a threshold matter, to state a viable Eighth Amendment claim relating to delayed medical care; but has indicated that a plaintiff must at least show that the delay significantly increased the risk for medical injury or similar serious adverse consequences. *Smith v. Carpenter,* 316 F.3d at 188–89, n. 14, n. 15. The Court in Smith also observed, in the post-trial context, that, "although demonstrable adverse medical effects may not be required under the Eighth Amendment, the absence of present physical injury will often be probative in assessing the risk of future harm." *Smith v. Carpenter,* 316 F.3d at 188.

**\*17** As noted, when plaintiff was examined by the Clinton medical staff on June 17th, they observed no visible bump, swelling, or bruising on his head, and he was treated with only Ibuprofen and a bag of ice. (Michalek Decl. ¶ 5; 6/17/11 Ambulatory Health Record ("AHR"), Dkt. No. 43 at 4). Plaintiff claims he did have a visible bruise and swelling, which is why the medical staff gave him ice. (Pl.'s Reply to Michalek Decl. ¶ 5). Subsequent

medical records document only a few complaints by plaintiff of the lingering headaches, dizziness, shaking, and smelling odors, which he attributed to the blow to the head he allegedly received at Clinton on June 15, 2011. (Michalek Decl. ¶¶ 6, 11; 7/18/11 AHR, Dkt. No. 43 at 6; 8/16/11 AHR, Dkt. No. 43 at 9). The medical staff found no follow-up treatment was necessary with respect to his complaints about a head injury, other than dispensing Tylenol to plaintiff on August 16, 2011. (*Id.*).

Plaintiff apparently contests the accuracy of subsequent medical records at several DOCCS facilities, which reflect no evidence of any significant long-term effects of the alleged incident on June 15th, claiming that "he has expressed to medical staff in each facility of all the ongoing pain and suffering he has been force [sic] to live with due to all of the injuries he sustained from past and present incident...." (Pl.'s Reply to Michalek Decl. ¶ 6) . [17] He also challenges the quality of his medical care after leaving Clinton. [18] As noted above, differences of opinion between a prisoner and prison officials regarding appropriate medical treatment do not, as a matter of law, constitute deliberate indifference. Moreover, Plaintiff's conclusory claims of serious ongoing health problems that he attributes to the June 15th incident at Clinton do not create an issue of fact in the face of the overwhelming documentary medical evidence to the contrary. [19]

In any event, plaintiff still has offered no evidence to rebut defendants' well—documented position that the two-day delay before plaintiff saw the medical staff at Clinton about his very subjective and relatively minor medical complaints did not involve a significant risk of degeneration of his medical condition or require him to endure extreme pain. *Bellotto v. County of Orange,* 248 F. App'x at 236. Thus, the court concludes that no reasonable fact finder could conclude that plaintiff can establish the objective element of a deliberate indifference claim. *See, e.g., Vansertima v. Department of Corrections,* 10 CV 3214, 2012 WL 4503412, at *2, 6 (E.D.N.Y. Sept. 28, 2012) (plaintiff allegedly suffered a nose bleed and an injury to his head "causing sever[e] pain" as a result of hitting his face on the seat in front of him when the prison bus in which he was riding stopped suddenly; given that plaintiff was seen by the medical staff within one or two days after the incident and his subsequent complaints involved relatively infrequent nose bleeds and intermittent headaches, plaintiff cannot show any "adverse medical

effects or demonstrable physical injury" that resulted from what was in any case-at most—a two delay in treatment). [20]

### IV. Retaliation

**\*18** Plaintiff's theory is that, in response to plaintiff's complaint against defendant Rock for hitting plaintiff with a bathroom door and then denying him medical care, five DOCCS employees from two separate and geographically distant prisons conspired to retaliate against him in various ways. This court recommends the dismissal of plaintiff's retaliation/conspiracy claims against each defendant, based on the lack of a causal connection between plaintiff's protected conduct and any "adverse action" taken against him, the absence of "personal involvement," and/or, as previously discussed, plaintiff's failure to exhaust his administrative remedies.

### A. Applicable Law

#### 1. Retaliation

In order to establish a claim of retaliation for the exercise of a First Amendment right, plaintiff must show that he engaged in constitutionally protected speech or conduct, and that the protected activity was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *see also Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997). The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (citation omitted). This objective test applies whether or not the plaintiff was himself subjectively deterred from exercising his rights. *Id.*

To establish retaliation, the plaintiff must also establish a causal connection between the protected speech or conduct and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004). Although a " 'plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action[,]' "[s]uch circumstantial evidence of retaliation, ... without more, is insufficient to survive summary judgment." *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 370 (S.D.N.Y.2011) (citations omitted).

Even if plaintiff makes the appropriate showing of retaliation, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.* at 371. "Regardless of the presence of retaliatory motive, ... a defendant may be entitled to summary judgment if he can show ... that even without the improper motivation the alleged retaliatory action would have occurred." *Scott v. Coughlin,* 344 F.3d 282, 287–88 (2d Cir.2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977)).

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Accordingly, plaintiff must set forth non-conclusory allegations to sustain a retaliation claim. [21] *Bennett,* 343 F.3d at 137. Even where a complaint or affidavit contains specific assertions, the allegations "may still be deemed conclusory if [they are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.' " *Smith v. Woods,* 9:03–CV–480 (DNH/GHL), 2006 WL 1133247, at *3 & n. 11 (N.D.N.Y. Apr. 24, 2006) (quoting *Jeffreys v. City of New York,* 426 F.3d 549, 554–55 (2d Cir.2005)). To be sufficient to create a "factual issue," in the context of a summary judgment motion, an allegation in an affidavit or verified complaint "must, among other things, be based 'on personal knowledge.' " *Id.,* 2006 WL 1133247, at *3 & n. 7 (collecting cases); Fed.R.Civ.P. 56(c)(4).

**\*19** A prison inmate has no constitutionally-guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest, as long as the prisoner is provided with procedural due process. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). However, if a defendant initiated disciplinary proceedings against plaintiff in retaliation for his exercise of a constitutionally protected right, substantive due process rights may be implicated even if the plaintiff did receive full procedural due process. *Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988). Any adverse action taken by defendant in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself, states a viable constitutional claim. *Id.*

### 2. Personal Involvement

For retaliation claims, as for other section 1983 claims, a plaintiff "must show some tangible connection between the constitutional violation alleged and [a] particular defendant." *Toole v. Connell,* 9:04–CV–724 (LEK/DEP), 2008 WL 4186334, at *6 (N.D.N.Y. Sept. 10, 2008). Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003).

In *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability. A supervisory official is personally involved if the supervisor directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she was grossly negligent in managing subordinates who caused the unlawful condition. *Id. See also Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007) (citing *Colon v. Coughlin,* 58 F.3d 865, 873) (2d Cir.1995)), *rev'd on other grounds,* 556 U.S. 662 (2009).

### B. Analysis

Defense counsel argues that the retaliation claims should be dismissed because there was no causal connection between plaintiff's protected conduct and the alleged adverse actions against him, and because some defendants were not personally involved in any adverse action against plaintiff. Those arguments require a close examination of the record regarding each defendant. *Toole v. Connell,* 2008 WL 4186334, at *6 (analysis of retaliation claims requires careful, case-specific, consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two).

### 1. Defendant Rock

**\*20** To the extent plaintiff alleges that defendant Rock retaliated against him by filing a false misbehavior report because he submitted a complaint to Supt. LaValley about the June 15, 2011 incident in the Clinton mess hall, plaintiff clearly cannot establish the required causal connection between his protected conduct and C.O. Rock's alleged adverse action. Plaintiff's initial complaint to Supt. LaValley (Dkt. No. 52–11 at 5), explicitly refers to the misbehavior report written by defendant Rock, and so was clearly written after the correction officer made clear to plaintiff that she intended to initiate disciplinary action against him. The letter which purportedly confirms that Supt. LaValley's office received plaintiff's letter of complaint states that the communication was not received until June 17, 2011 (Dkt. No. 52–11 at 4), after plaintiff was served with the misbehavior report, on June 16th at 7:00 a.m. (Dkt. No. 36 at 67). Clearly, plaintiff's complaint to the Superintendent about C.O. Rock could not have been "a substantial or motivating factor" that caused her to issue the misbehavior report, as would be necessary to support a retaliation claim. *Bennett v. Goord,* 343 F.3d at 137.

Plaintiff also alleges that, because of the complaint he wrote against defendant Rock, she caused others to retaliate against him-defendant Chase, in connection with the June 22, 2011 adjudication of the disciplinary charges she filed at Clinton; Supt. LaValley, in connection with plaintiff's transfer to Coxsackie on June 24th; defendant Paquette–Monthie, in connection with the misbehavior report she filed against plaintiff at Coxsackie on July 7, 2011; and defendant Gutwein, in connection with the adjudication of the disciplinary charges at Coxsackie later in July 2011. As discussed elsewhere herein, plaintiff's retaliation claims with respect to the adjudication of the misbehavior report at Clinton (on which plaintiff was acquitted), and his transfer from Clinton (which plaintiff initiated), clearly lack merit and should also be dismissed because plaintiff did not exhaust his administrative remedies.

Plaintiff's retaliation claim with respect to the misbehavior report at Coxsackie are also not viable. Although he did not make this allegation in his original complaint, plaintiff claimed, in response to the defendants' initial Rule 12(b)(6) motion and their later summary judgment motion, that C.O. Rock bragged to him, on June 14, 2011, that she would not suffer any consequences if plaintiff 'wr[o]te her up" because she had "family" in

Clinton and at DOCCS—presumably in the central office in Albany. (Dkt. No. 36 at 29; Dkt. No. 52 at 6). However, plaintiff does not otherwise counter defendant Rock's sworn declaration that she was not aware of any complaint plaintiff wrote about her conduct on June 15th, which plaintiff admits was never investigated by DOCCS (Dkt. No. 52–11 at 6, 19). (Rock Decl. ¶¶ 13–14). And, for the reasons set forth below, no reasonable fact finder could conclude that plaintiff can overcome C.O. Rock's sworn statements that she did not know, or communicate with, defendant Paquette–Monthie, or otherwise direct anyone at Coxsackie to pursue a false misbehavior report against plaintiff. (Rock Decl. ¶¶ 14–17).

### 2. Defendant Chase

**\*21** As noted above, plaintiff failed to exhaust his administrative remedies with respect to any retaliation claims relating to Lt. Chase's adjudication of the disciplinary charges at Clinton or plaintiff's transfer from Clinton. In any event, defendant Chase's acquittal of defendant on the misbehavior report clearly is not an "adverse action" which could support a retaliation charge.

The complaint alleges that, when he could not "get" plaintiff at Clinton, C.O. Chase threatened to "get," *i.e.,* retaliate against, plaintiff at the next facility. In response to the defendants' Rule 12(b)(6) motion and/or the instant summary judgment motion, plaintiff attributed further damaging admissions to Lt. Chase: first, that he talked about the order of protection against plaintiff, which was the impetus for the later disciplinary charges at Coxsackie (Dkt. No. 36 at 30; Pl.'s Reply to Chase Decl. ¶¶ 6–7, 9–10, Dkt. No. 52–7); and second, that he threatened to block plaintiff's transfer to Coxsackie (Pl.'s Reply to Defs.' Rule 7.1(a)(3) Stmt. ¶ 113, Dkt. No. 52 at 9; Pl.'s Reply to Chase Decl. ¶ 12).

Plaintiff's claims about Lt. Chase's admissions, which became more selfserving from the time plaintiff filed the initial complaint to the times he was defending his complaint against substantive defense motions, are, in the court's view, inherently implausible. It seems unlikely that defendant Chase would retaliate against an inmate based on a complaint against another officer in which he was not implicated. [22] Lt. Chase acquitted plaintiff of disciplinary charges that he was smoking in the bathroom at Clinton because C.O. Rock did not actually see plaintiff smoking; she only smelled cigarette smoke on his person

and in the room as he was leaving. (Chase Decl. ¶ 7; Dkt. No. 52–11 at 1–3). Given that the circumstantial evidence presented by C.O. Rock probably constituted "some" "reliable evidence" sufficient to uphold a conviction on a prison disciplinary charge, [23] it seems highly likely that defendant Chase would have convicted plaintiff had he truly wanted to retaliate against him for his complaints against defendant Rock. Moreover, if, as plaintiff suggests in response to the Rule 12(b)(6) motion, Lt. Chase knew about plaintiff's violations of the order of protection and intended to extract revenge against plaintiff, he could have initiated additional disciplinary charges before plaintiff was transferred. If Lt. Chase had the power and the retaliatory motivation to block plaintiff's transfer from Clinton to Coxsackie, then why did that transfer actually take place?

In his sworn declaration, Lt. Chase states that he never threatened plaintiff; he had no knowledge of any complaints by plaintiff against C.O. Rock; and he had no knowledge as to why or when plaintiff was to be transferred out of Clinton (where Lt. Chase worked). Defendant Chase further alleges that he did not personally know, or have any contact with defendant Paquette–Monthie; he never gave any direction to anyone else regarding a misbehavior report issued to plaintiff at Coxsackie; and he did not otherwise take any action to retaliate against plaintiff. (Chase Decl. ¶¶ 8–14).

**\*22** The only support for plaintiff's allegation that Lt. Chase harbored a retaliatory motive because of plaintiff's complaints against C.O. Rock and played some role in the later filing of disciplinary charges against plaintiff in a different prison are the purported admissions which plaintiff attributes to defendant Chase. As noted, those supposed admissions are inherently implausible and have become increasingly elaborate and self serving as this case has progressed. Plaintiff's unsupported and highly improbable claims about Lt. Chase's admissions are not sufficient to overcome defendant Chase's sworn declaration, and no reasonable fact finder could conclude that he retaliated against the plaintiff. *See, e.g ., Allah v. Greiner,* 03 Civ. 3789, 2006 WL 357824, at \* 1, 3, 5–6, 7, 9 (S.D.N.Y. Feb. 15, 2006) (prisoner's allegations that virtually all of the defendants made specific admissions that they retaliated against him, were implausible and discredited by the defendants' sworn affidavits, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims) [24]; *Jeffreys v. City*

*of New York,* 426 F.3d at 554 ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably for the plaintiff,' ... and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account.") (citation omitted)).

### 3. Defendant LaValley

The complaint alleges that plaintiff sent Clinton Superintendent LaValley an initial complaint about defendant Rock; but that, rather than investigate, defendant LaValley worked with C.O. Rock and Lt. Chase to retaliate against plaintiff. Plaintiff also appears to allege that defendant LaValley caused him to be transferred to Coxsackie, where he would be subjected to further retaliation by Counselor PaquetteMonthie. (Dkt. No. 1 at 6). In response to the defendants' summary judgment motion, plaintiff filed a letter apparently acknowledging receipt, by Supt. LaValley's office, of plaintiff's initial complaint, which, according to the letter, was "referred to Captain D. Holdridge for review and appropriate action ." (Dkt. No. 52–11 at 4).

As discussed above, plaintiff failed to administratively exhaust any retaliation claim involving the adjudication of the disciplinary charges at Clinton or his transfer from Clinton. Furthermore, plaintiff's claims that defendants Rock and Chase retaliated against him in connection with the misbehavior report at Clinton are devoid of merit for the reasons set forth above. In any event, if defendant LaValley failed to follow up on plaintiff's complaint about C.O. Rock or he delegated responsibility for addressing the complaint to a subordinate, he would not have been "personally involved" in any violation of plaintiff's rights by defendant Rock. *See, e.g., Smart v. Goord,* 441 F.Supp.2d 631, 642–643 (S.D.N.Y .2006) (the failure of a supervisory official to respond to a letter of complaint is insufficient to create personal responsibility); *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (a supervisor's referral of a prisoner's letter of complaint to a subordinate for review, and a later response to the prisoners to advise him of the subordinate's decision did not demonstrate the requisite personal involvement on the part of the supervisory prison official).

**\*23** With respect to plaintiff's transfer out of Clinton, plaintiff admittedly initiated the process by requesting an "area of preference" transfer. (LaValley Decl. ¶ 7 & Ex. A, Dkt. No. 42–5 at 2; Pl.'s Reply to Defs.' Rule 7.1(a)(3) Stmt. ¶ 115). Plaintiff complains, however, that he should have been transferred from Clinton, in far Northern New York, to Sing Sing, near plaintiff's family in Westchester County, rather than to Coxsackie, which is south of Albany-much closer to Westchester County than Clinton, but not as close as Sing Sing. (Pl.'s Reply to Defs.' Rule 7.1(a)(3) Stmt. ¶¶ 115–16). While "prison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights[,]" "[a] prisoner has no liberty interest in remaining at a particular correctional facility...." *Davis v. Kelly,* 160 F.3d 917, 920 (2d Cir.1998). In any event, Supt. LaValley's declaration states, and plaintiff has not rebutted, that he had no personal involvement in plaintiff's transfer to Coxsackie, because transfers of prisoners from Clinton were overseen, in the normal course of business, by the Deputy Superintendent for Programs. (LaValley Decl. ¶¶ 8–13; Pl.'s Reply to LaValley Decl., Dkt. No. 52–8).

Finally, to the extent the complaint suggests that defendant LaValley conspired with others at Coxsackie to retaliate against him, plaintiff provides no evidence whatsoever to counter Supt. LaValley's declaration that he did not know Counselor Paquette–Monthie, and that he did nothing to retaliate against plaintiff in connection with the filing of disciplinary charges against him at that separate facility. (LaValley Decl. ¶¶ 13–15; Pl.'s Reply to LaValley Decl., Dkt. No. 52–8). Based on the authority cited above, it is clear that a claim of retaliation based on mere speculation by an inmate that a particular defendant was somehow involved in allegedly retaliatory action by others at a separate facility cannot survive summary judgment. In any event, as discussed below, plaintiff's claims of retaliation against the Coxsackie defendants are subject to dismissal on other grounds.

### 4. Defendants Paquette–Monthie and Gutwein

Defendants' initial Rule 12(b)(6) motion plaintiff's retaliation claims against Counselor Paquette–Monthie and Hearing Officer Gutwein argued that plaintiff did not plead any specific facts to support his bald speculation that the Clinton defendants enlisted the Coxsackie defendants to pursue retaliatory disciplinary charges against him. (Defs.' Mem. in Support of Rule 12(b)(6) Mot. at 12). Plaintiff responded to this motion with the

self-serving claim that defendant Paquette–Monthie told him that she issued the misbehavior report against him because he "filed a complaint against her friend at Clinton Annex." (Dkt. No. 36 at 31, 37, 40). [25] During the July 2011 disciplinary hearing, plaintiff tried to cross-examine defendant Paquette–Monthie about her allegedly biased and vengeful motivation for filing the misbehavior report against him, and asked questions about statements she supposedly made during prior interviews of plaintiff; but, he never made any reference to the counselor's alleged statement that she initiated the charges because plaintiff had filed a complaint against a friend of hers. (Disc. Hrg. Tr. at 15, 27, 28, 33–34, 38, 40, 42–43, Dkt. No. 42–15). Nor did plaintiff claim that Counselor Paquette–Monthie made this admission in the various complaints and grievance "appeals" he purportedly submitted in August 2011 (Dkt. No. 52–11 at 6, 17–20, 22–23, 27–28), or in his original complaint filed in this action in September 2011 (Dkt. No. 1). [26]

**\*24** In her sworn declaration, defendant Paquette–Monthie states that she did not personally know, and never had any contact with, defendants Rock and Chase at Clinton. She insists that she issued the misbehavior report against plaintiff, not to retaliate against him, but in good faith, based on the evidence. (Paquette–Monthie Decl. ¶¶ 11–15). Defendant Gutwein similarly denies any effort to retaliate against plaintiff, and swears that he was not directed by anyone to find plaintiff guilty of the disciplinary charges against him at Coxsackie. Hearing Officer Gutwein also states that he did not know C.O. Rock from Clinton, and was unaware of any complaint or grievance plaintiff may have filed against her. (Gutwein Decl. ¶¶ 24–33).

Based on the authority cited in note 22 above, it is unlikely that defendants Paquette–Monthie and Gutwein would be motivated to retaliate against plaintiff for a complaint or grievance in which they were not implicated, particularly when the target of the complaint worked at a separate and geographically distant correctional facility. The sworn declarations establishing that the Clinton and Coxsackie defendants did not know each other or have any contact, utterly refute plaintiff's speculation that they colluded to initiate false disciplinary charges against him. The only support plaintiff offers for the implausible conspiracy theory underlying the retaliation claim against the Coxsackie defendants is the alleged admission of Counselor Paquette–Monthie that she issued

the misbehavior report because plaintiff had complained about a friend of hers at Clinton Annex. Given that plaintiff did not offer this self-serving alleged admission while confronting Counselor Paquette–Monthie at the disciplinary hearing, or in his grievance appeals which referenced the Coxsackie defendants, or even in his initial complaint in this action, the court finds that the purported admission does not create an issue of fact that could lead any reasonable fact finder to conclude that defendants Paquette–Monthie and Gutwein conspired to retaliate against plaintiff. *See, e.g., Allah v. Greiner,* 2006 WL 357824, at \* 1, 3, 5–6, 7, 9; *Jeffreys v. City of New York,* 426 F.3d at 554.

In any event, the court concludes that plaintiff's retaliation claims against defendants Paquette–Monthie and Gutwein would be subject to dismissal because they would have taken the same actions with respect to the misbehavior report against plaintiff even if they had known of complaints or grievances filed by plaintiff against defendant Rock. See, e.g., *Lowrance v. Achtyl,* 20 F.3d 529, 534–35 (2d Cir.1994) (defendants met their burden of showing that they would have disciplined the plaintiff even in the absence of the protected conduct because the plaintiff had admitted to engaging in the misconduct that formed the basis of the misbehavior report; plaintiff's retaliation claim was properly dismissed under *Mt. Healthy* and its progeny); *Smith v. Woods,* 2006 WL 1133247, at \* 10 (the record evidence establishes that the hearing officer could, and indeed would, have reached the same disciplinary hearing decision (and imposed the same penalties) despite any such complaints or grievances by plaintiff-*i.e.,* based upon the evidence as presented to him at plaintiff's disciplinary hearing decision).

**\*25** The basis of the disciplinary charge against plaintiff was that he violated an order of protection that precluded him from, *inter alia,* all communications and contact, including by "telephone[,]" with his wife and daughters, "except for visits to state correctional facility and correspondence." (Gutwein Decl. ¶ 6 & Ex. A, Dkt. No. 14–15 at 3). Based on the order of protection, plaintiff had been directed to stop calling his wife by DOCCS staff at Sing Sing, and was not allowed to add his wife to his authorized call list (Dkt. No. 42–15 at 4–5); but plaintiff apparently circumvented that limitation by listing, under the name of an aunt, the telephone number at the home where his wife came to reside. (Disc. Hrg. Tr. at 2, 7, 9, 21–22, 56–58).

During his initial interview with Counselor Paquette–
Monthie at Coxsackie, and during the disciplinary
hearing, plaintiff acknowledged that he had telephonic
contact with his wife from other DOCCS facilities before
he was transferred to Coxsackie, at the number listed
under his aunt's name on his emergency contact list.[27]
(Disc. Hrg. Tr. at 7, 9, 12, 18, 19–20). He disputed the
disciplinary charges because he believed that he should
not be charged with misconduct by Coxsackie officials for
calls he made to his wife from other institutions. (Disc.
Hrg. Tr. at 14, 19–20, 26, 35, 44, 46, 52–53, 56). Plaintiff
also asserted that the exception for "correspondence"
in the order of protection should be interpreted to
include telephonic contact, notwithstanding the explicit,
prior prohibition in the order against communications
by telephone. (Disc. Hrg. Tr. at 17, 18, 20, 23, 44–45,
49). Plaintiff claimed that his wife, who was willing to
speak with him by phone, and the District Attorney and
Judge who caused the order of protection to be entered,
would agree that telephonic contact was permissible,
notwithstanding the clear language of the order of
protection.[28] (Disc. Hrg. Tr. at 6–7, 23, 39, 57–58, 61).

The court finds that, although plaintiff made several
frivolous arguments that he should be found not guilty,
"he admitted to engaging in the conduct that formed the
basis of the misbehavior report." *Lowrance v. Achtyl,* 20
*F.3d at 534–35.* Accordingly, I would recommend that
summary judgment be granted in favor of the Coxsackie
defendants on plaintiff's retaliation claim, based, *inter
alia,* on *Mt. Healthy* and its progeny.

### V. Due Process

#### A. Legal Standards
To begin a due process analysis, the court must determine
whether plaintiff had a protected liberty interest in
remaining free from the confinement that he challenges,
and then determine whether the defendants deprived
plaintiff of that liberty interest without due process. *Giano
v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001); *Bedoya v.
Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). In *Sandin v.
Conner,* 515 U.S. 472, 484 (1995), the Supreme Court
held that although states may create liberty interests for
inmates that are protected by due process, "these interests
will be generally limited to freedom from restraint which,
while not exceeding the sentence in such an unexpected

manner as to give rise to protection by the Due Process
Clause of its own force ..., nonetheless imposes atypical
and significant hardship on the inmate in relation to the
ordinary incidents of prison life."

**\*26** The due process protections afforded inmates
facing disciplinary hearings that affect a liberty interest
include advance written notice of the charges, a fair
and impartial hearing officer, a hearing that affords the
inmate the opportunity to call witnesses and present
documentary evidence, and a written statement of the
evidence upon which the hearing officer relied in making
his determination. *Sira v. Morton,* 380 F.3d 57, 69 (2d
Cir.2004) (citing, *inter alia, Wolff v. McDonnell,* 418 U.S.
539, 563–67 (1974)). The hearing officer's findings must be
supported by "some" "reliable evidence." *Id.* (citing, *inter
alia, Superintendent v. Hill,* 472 U.S. 445, 455 (1985)).

Violations of state regulations with respect to disciplinary
hearings do not, by themselves, necessarily rise to the
level of constitutional violations. *See, e.g., Soto v. Walker,*
44 F.3d 169, 173 (2d Cir.1995) (state law violation
does not necessarily rise to the level of a constitutional
violation); *Young v. County of Fulton,* 160 F.3d 899,
902 (2d Cir.1998) (violation of state law is not the
"benchmark" for determining whether a constitutional
violation has occurred). To establish a procedural due
process claim in connection with a prison disciplinary
hearing, an inmate must show that he was prejudiced by
the alleged procedural deficiencies, in the sense that the
errors affected the outcome of the hearing. *See, e.g., Clark
v. Dannheim,* 590 F.Supp.2d 426, 429 (W.D.N.Y.2008)
(citing, *inter alia, Powell v. Coughlin,* 953 F.2d 744, 750
(2d Cir.1991) ("it is entirely inappropriate to overturn the
outcome of a prison disciplinary proceeding because of
a procedural error without making the normal appellate
assessment as to whether the error was harmless or
prejudicial").

#### B. Analysis
The complaint alleges that, in conducting the disciplinary
hearing at Coxsackie and finding plaintiff guilty,
defendant Gutwein was motivated by a desire to retaliate
against plaintiff for his complaint against defendant Rock
at Clinton. Plaintiff also alleges that Hearing Officer
Gutwein also improperly denied plaintiff's requests to
call key witnesses or obtain documents that would
have established his innocence. (Dkt. No. 1 at 7). In
plaintiff's prior motion to amend his complaint, which this

court denied (Dkt. No. 38 at 7, 9–10), he attempted to supplement his due process claim by alleging that (1) the misbehavior report was deficient because it did not specify the institution from which plaintiff made the offending phone calls to his wife (Dkt. No. 36 at 34); (2) defendant Gutwein improperly disallowed certain questions plaintiff wanted hearing witnesses to answer (Dkt. No. 36 at 33); and (3) plaintiff's assistant was not allowed to contact certain witnesses on his behalf (Dkt. No. 36 at 36). Although not technically part of the complaint, the court will address these allegations.

Defendants, apparently conceding that the disciplinary sanctions imposed on plaintiff at Coxsackie implicated a liberty interest, argue that the plaintiff was afforded all of the process to which he was due at the hearing conducted by defendant Gutwein. (Defs.' Mem. in Support of Rule 12(b)(6) Mot. at 16–20). The court agrees that, based on the record of the disciplinary hearing, no reasonable fact finder could conclude that plaintiff's due process rights were violated or that the outcome of the proceeding would have been any different if he had been allowed to call and question the witnesses and present the documents that he requested.

### 1. Misbehavior Report

**\*27** The July 7, 2011 misbehavior report charged plaintiff with violating prison rules 107.20 (False Statements or Information); 106 .10 (Refusing Direct Order); and 121.12 (Phone Program Violation) for making telephone calls to his wife in violation of an order of protection and contrary to direct orders from an officer at Sing Sing, which he managed to do by misleadingly listing his aunt's name as an emergency contact, but at an address and phone number where his wife resided. (Dkt. No. 42–15 at 2). Plaintiff alleges that defendant Paquette–Monthie's misbehavior report provided inadequate notice of the charges because it did not specify the facility from which he made telephone calls to his wife.

The notice required by due process serves to "compel 'the charging officer to be [sufficiently] specific as to the misconduct with which the inmate is charged' to inform the inmate of what he is accused of doing so that he can prepare a defense to those charges and not be made to explain away vague charges set out in a misbehavior report." *Taylor v. Rodriguez,* 238 F.3d 188, 192–93 (2d Cir.2001)) (citation omitted)). However, the Constitution does not demand notice that painstakingly details all facts

relevant to the date, place, and manner of charged inmate misconduct. *Sira v. Morton,* 380 F.3d at 72.

Counselor Paquette–Monthie's misbehavior report was based on plaintiff's admissions that he had previously been calling his wife, and the report noted the date in 2009 when plaintiff changed his emergency contact information so he could reach his wife by phone, despite prior orders that he not do so. (Dkt. No. 42–15 at 2). The misbehavior report includes considerable factual detail, and the charges contained therein could certainly not be considered impermissibly vague or conclusory. *Taylor v. Rodriguez,* 238 F.3d at 193 (due process requires more than a conclusory charge). The fact that the misbehavior report did not specify the institution(s) from which plaintiff impermissibly called his wife did not impede him from establishing that he made no such calls from Coxsackie and pursuing the defense, albeit a frivolous one, that he could not be charged at Coxsackie for conduct committed at prior facilities. (Disc. Hrg. Tr. at 14, 19–20, 26, 35, 44, 46, 53, 56).

### 2. Witnesses and Exhibits

During the hearing, plaintiff requested the following witnesses on his behalf: defendant Paquette–Monthie; her supervisor; plaintiff's wife; the District Attorney and the judge who were involved with the Order of Protection; plaintiff's wife's lawyer; plaintiff's criminal defense lawyer; and a staff member from the Office of Mental Health. (Gutwein Decl. ¶ 8; Disc. Hrg. Tr. at 4–8). The hearing officer called only Counselor Paquette–Monthie and Supervising Counselor Chenel to testify, and both were questioned extensively by plaintiff, although defendant Gutwein screened many of plaintiff's questions. (Gutwein Decl. ¶¶ 9–10; Disc. Hrg. at 8–43, 43–61).

**\*28** Plaintiff, in his motion to amend the complaint, alleged that Hearing Officer Gutwein "would not allow me to question witnesses with questions that proved I was being ret[a]liated for no reasons but for[ ] filing a complaint against the coun[s]elor['s] friend C.O. P. Rock." (Dkt. No. 36 at 33). Hearing Officer Gutwein allowed the witnesses to answer some, but not all questions by which plaintiff tried to establish that Counselor Paquette–Monthie filed the misbehavior report against him because of her "bias" and motive for "revenge." But, plaintiff never sought to ask any question as to whether the counselor initiated the charges because plaintiff had filed a prior complaint against C.O. Rock or

any other friend at Clinton. (Disc. Hrg. Tr. at 15, 27, 28, 33–34, 38, 40, 42–43, 54, 55). [29]

The mere fact that plaintiff's questions for witnesses had to be filtered through the hearing officer did not violate due process. *See Baxter v. Palmigiano,* 425 U.S. 308, 322–23 & n. 5 (1976) (inmates are not entitled to the right to confront and crossexamine witnesses at a disciplinary hearing). The plaintiff's tone during the entire disciplinary hearing was argumentative, and many of his proposed questions reflected a dogged, but unfocused effort to induce Counselor Paquette–Monthie to admit she was, for whatever reason, biased against the plaintiff. During the disciplinary hearing, defendant Paquette–Monthie clearly testified that she initiated the charges against plaintiff because of the perceived seriousness of his misconduct, and "was not playing any dirty politics ... behind the scenes." (Disc. Hrg. Tr. at 26, 28). The hearing officer reasonably denied many of the plaintiff's other questions about the counselor's alleged bias because they were repetitive and bordered on harassment. In any event, it is clear from defendant Paquette–Monthie's declaration (¶¶ 12–17, Dkt. No. 42–12), that if plaintiff had actually tried to ask her at the hearing whether she was retaliating against him at the behest of C.O. Rock or others from Clinton, she would have flatly denied it. Thus, plaintiff cannot establish prejudice, because even if defendant Gutwein had disallowed such questions (which, again, plaintiff never asked), allowing Counselor Paquette–Monthie to answer would have not favored plaintiff or changed the outcome of the hearing. [30]

Plaintiff's request to call his wife and a number of people involved in the prior case that resulted in the order of protection, was premised on his claim that these witnesses would put the order in "context" and clarify that plaintiff was, in fact, allowed to speak with his wife by telephone. (Disc. Hrg. Tr. at 6–7, 22, 23, 39, 57–58, 61). Although due process includes a right to call witnesses, this right is not unfettered. *Alicea v. Howell,* 387 F.Supp.2d 227, 234 (W.D.N.Y.2005) (citing *Ponte v. Real,* 471 U.S. 491, 495 (1985)). This right may be limited for security reasons, to keep a hearing within reasonable limits, or on the basis of irrelevance or lack of necessity. *Id.* (citing, *inter alia, Kingsley v. Bureau of Prisons,* 937 F.2d 26, 30 (2d Cir.1991) (a hearing officer does not violate due process by excluding irrelevant or unnecessary testimony or evidence). An inmate's due process rights are violated when a prison hearing officer refuses to interview

witnesses without assigning a reason "logically related to preventing undue hazards to 'institutional safety or correctional goals.' " *Ponte v. Real,* 471 U.S. at 497.

**\*29** Hearing Officer Gutwein denied plaintiff's request to call his wife as a witness, because to do so would violate the order of protection. Defendant Gutwein also declined to call the other witnesses involved with the prior order of protection because their testimony would not be relevant. (Disc. Hrg. Tr. at 61–63; Dkt. No. 42–15 at 95–96). [31] As noted above, the order of protection explicitly precluded plaintiff from having telephonic or other communications with his wife, and created an exception that allowed only prison visits and "correspondence." (Dkt. No. 42–15 at 3). Given the clarity of the order of protection, and the prior order of a DOCCS official that plaintiff refrain from telephone contact with his wife, calling other witnesses to "explain" or put into "context" the order of protection would have been unnecessary and irrelevant. Accordingly, Hearing Officer Gutwein did not violate plaintiff's due process rights by refusing to call these witnesses. [32]

Plaintiff requested that his medical and mental health records be produced at the hearing, claiming they would indicate that his wife was listed as his emergency contact and that, therefore, he had permission from DOCCS staff at Clinton to call his wife. [33] (Disc. Hrg. Tr. at 7, 59). In fact, plaintiff's position that his emergency contact information contained the address and phone number where his wife could be reached was repeatedly placed on the record during the hearing, and was accepted by the witnesses and the hearing officer. (Disc. Hrg. Tr. at 9, 12, 18–19, 29, 36, 37, 56–57, 60, 72–73). However, the DOCCS witnesses and hearing officer documented that the name plaintiff associated with that emergency contact information was that of his aunt, not his wife, and viewed this as evidence that plaintiff was misleading DOCCS staff so he could make calls to his wife, despite orders to the contrary. (*Id .*)

Plaintiff, while apparently conceding that he used his wife's address and phone number, but not her name, in his emergency contact information (Disc. Hrg. Tr. at 7; Dkt. No. 36 at 35), argued that he disclosed, to Counselor Paquette–Monthie at Coxsackie, that his aunt subsequently moved from that residence and his wife moved in. (Disc. Hrg. at 12–13, 37, 56–57, 60). However, plaintiff was charged, not with misleading defendant

Paquette–Monthie at Coxsackie, but with misleading staff at other DOCCS facilities by listing his wife's contact information under his aunt's name. (Disc. Hrg. Tr. at 2; Inmate Misbehavior Report, Dkt. No. 48–15 at 2). Plaintiff's position on this point is a variation on his frivolous defense that he could not be charged at Coxsackie for misconduct he previously committed at a prior institution. (Disc. Hrg. Tr. at 37). Accordingly, when Hearing Officer Gutwein ruled that documentary or testimonial evidence from DOCCS health units about plaintiff's emergency contact information was not relevant (Disc. Hrg. Tr. at 10; Dkt. No. 42–15 at 94–95), he was pursuing a legitimate correctional goal of avoiding redundant and irrelevant evidence, and did not violate plaintiff's due process rights. *See, e.g., Clyde v. Bellnier,* 9:08–CV–909 (JKS), 2010 WL 1489897, at *6 (N.D.N.Y. April 13, 2010) (no due process violation arose when the hearing officer failed to provide documents that did not exist or that were not relevant to the defense). [34]

### 3. Sufficiency of the Evidence

**\*30** As discussed in section IV B 4. above, plaintiff essentially admitted all of the conduct which formed the basis of the disciplinary charges against him, and his "defenses" were frivolous. The testimony of Counselor Paquette–Monthie (*see, e.g.,* Disc. Hrg. Tr. at 9, 18–19, 21–22) and Supervising Counselor Chenel (*see, e.g.,* Disc. Hrg. Tr. at 46, 49, 56–57, 59–60), along with the supporting documents (Dkt. No. 42–15 at 2–14), provided far more support for defendant Gutwein's guilty finding than the "some" "reliable evidence" standard requires to satisfy due process. (Disc. Hrg. Tr. at 72–73; Dkt. No. 42–15 at 98–99). [35]

### 4. Hearing Officer Bias

"An inmate subject to a disciplinary proceeding is entitled to an impartial hearing officer." *Allen v. Cuomo,* 100 F.3d at 253, 259 (2d Cir.1996). An impartial hearing officer is "one who, *inter alia,* does not prejudge the evidence and who cannot say ... how he would assess the evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 569–70 (2d Cir.1990); *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard").

It is well settled, however, "that prison disciplinary officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen v. Cuomo,* 100 F.3d at 259. "The degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Id.* An inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact. *Francis v.. Coughlin,* 891 F.2d 43, 47 (2d Cir.1989); *Clyde v. Schoellkopf,* 714 F.Supp.2d 432, 437–38 (W.D.N.Y.2010).

The unsupported allegations that defendant Gutwein conspired with the other defendants to retaliate against plaintiff in connection with the disciplinary proceedings at Coxsackie (discussed above) are insufficient to establish that he was a biased hearing officer. *See, e.g., Bunting v. Nagy,* 452 F.Supp.2d 447, 460–61 (S.D.N.Y.2006) (in order to defeat a motion for summary judgment, a plaintiff-inmate must "be armed with [something] more than conclusory allegations of bias and prejudgment" of the disciplinary hearing officer) (quoting *Francis v. Coughlin,* 891 F.2d at 47). The transcript of the disciplinary hearing demonstrates that Hearing Officer Gutwein displayed great patience in dealing with plaintiff's argumentative demeanor and his persistence in pursuing frivolous lines of witness questioning. Given the weight of the evidence supporting plaintiff's guilt and the fact that defendant Gutwein's various rulings regarding witnesses and documentary evidence clearly comported with due process, no reasonable fact finder could conclude that he was an unconstitutionally biased hearing officer.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 42) be **GRANTED** on the grounds stated herein, and that plaintiff's complaint be **DISMISSED** in its entirety; and it is further

**\*31 RECOMMENDED,** that plaintiff's motions for preliminary injunctions (Dkt. Nos.54, 58) be **DENIED AS MOOT;** and it is further

**ORDERED,** that plaintiff's motion for appointment of counsel (Dkt. No. 58) be **DENIED.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN**

**DAYS WILL PRECLUDE APPELLATE REVIEW.**
*Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

Filed Jan. 17, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1292232

**Footnotes**

| | |
|---|---|
| 1 | Brooks named "P. Chaste" in his complaint, (Compl. at 1, 2), but it is apparent that the proper spelling of that individual's name is Chase, (Dkt. No. 42, Attach.3). |
| 2 | While the complaint names "R. Paquette" and "Monthie" as separate defendants, (Compl. at 1, 2), they are one in the same: Roberta PaquetteMonth ie. (Dkt. No. 42, Attach.12.) |
| 3 | Brooks named "Eric Mutuein" as a defendant in his complaint. (Compl. at 1, 2.) It is clear, however, that he intended to name Eric Gutwein as a party defendant. (Dkt. No. 42, Attach.14.) |
| 4 | Notably, Judge Baxter considered new facts that were first submitted by Brooks in his motion seeking leave to amend even though they were "not technically part of the complaint." (Dkt. No. 60 at 51–60.) |
| 5 | "[A] report is clearly erroneous if the court determines that there is a mistake of fact or law which is obvious and affects substantial rights." *Almonte,* 2006 W L 149049, at *6. |
| 6 | Brooks writes "I'am adding deffendant to my existing prior civil suit," yet he seems to assert new wrongdoing only on the part of DOCCS for "fail[ing] to protect and refus[ing] to put [him] in midstate A.P.P.U. under federal [p]rotection." (Dkt. No. 62 at 3.) Elsewhere, Brooks refers to "new defendants added." (*Id.* at 5 .) |
| 7 | Buried within his submission, Brooks "request[s] to fill Amendent Complaint have discovery In new defendants added." (Dkt. No. 62 at 5.) Construing this statement liberally, as the court must, *see Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006), it can safely be assumed that Brooks seeks leave to amend. |
| 1 | Because plaintiff's complaint does not have consecutive pagination or consistent paragraph numbering, the court will refer to the page numbers assigned by the CM–ECF system in the document header. |
| 2 | Plaintiff incorrectly refers to defendant Peter **Chase** as "P. **Chaste.**" The court will use this defendant's correct name. |
| 3 | The complaint lists the hearing officer as Eric Mutuein (Compl., Dkt. No. 1 at 2), but this court will use his correct name herein. |
| 4 | The complaint names as defendants R. Paquette, Counselor and Monthie, "Councelor [sic] Supervisor." As noted, the counselor who initiated the disciplinary charges against plaintiff is named Roberta Paquette–Monthie. Ms. Paquette–Monthie's supervisor, who testified at plaintiff's disciplinary hearing, but was not at work the day the misbehavior report was issued, is Supervising Correction Counselor Chenel. (Disc. Hrg. Tr. at 8, 52). Supervising Correction Counselor Chenel has not been served in this action. |
| 5 | To avoid dismissal of his due process claims under *Heck v. Humphrey,* 512 U.S. 477 (1994), plaintiff filed a *Peralta* waiver relinquishing any due process claims with respect to his loss of good time. (Dkt.Nos.7, 9, 12, 13, 15–17). *See Peralta v. Vasquez,* 467 F.3d 98, 105–106 (2d Cir.2006). |

| 6 | *See Hemphill v. State of New York,* 380 F.3d 680 (2d Cir.2004) (remanding case to determine if defendant's alleged threats constituted "special circumstances" justifying plaintiff's failure to exhaust); *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004) (whether failure to exhaust may be justified because plaintiff obtained favorable rulings on his grievances, but the relief that he was supposed to obtain was never forthcoming); *Johnson v. Testman,* 380 F.3d 691 (2d Cir.2004) (whether including claims in a disciplinary appeal may suffice for the exhaustion requirement); *Ortiz v. McBride,* 380 F.3d 649 (2d Cir.2004) (complete dismissal is not required when plaintiff brings both exhausted and unexhausted civil rights claims). |
|---|---|
| 7 | *See, e.g., Newman v. Duncan,* 04–CV–395 (TJM/DRH), 2007 WL 2847304, at * 2 n. 4 (N.D.N.Y. Sept. 26, 2007); *Shariff v. Coombe,* 655 F.Supp.2d 274, 285–86 n. 7 (S.D.N.Y.2009). |
| 8 | According to DOCCS records, plaintiff was moved from Clinton Annex to Downstate Correctional Facility on June 24, 2011; then to Coxsackie on June 27, 2011; and on to Upstate Correctional Facility on July 22, 2011. (LaValley Decl. ¶ 11 & Ex. B, Dkt. No. 42–5 at 4; Brousseau Decl. ¶ 8). |
| 9 | As plaintiff appears to acknowledge, a letter of complaint to the facility superintendent would not qualify as a formal grievance required to exhaust administrative remedies, unless the informal complaint produced a resolution favoring the inmate. *See, e.g., Goodson v. Silver,* 9:09–CV–494 (GTS/DRH), 2012 WL 4449937 at *9 & n. 20 (N.D.N.Y. Sept. 25, 2012) (district courts have interpreted *Marvin v. Goord,* 255 F.3d 40, 43 (2d Cir.2001), to mean that an inmate's efforts to resolve a matter through informal channels satisfies the exhaustion requirement only if the efforts resulted in the matter being concluded in the inmate's favor) (collecting cases); *Shomo v. Goord,* 9:04–CV–707 (LEK/DEP), 2007 WL 2693526, at *9 (N.D.N.Y. Sept. 11, 2007) (courts have repeatedly held that complaint letters to the DOCCS Commissioner or the facility Superintendent do not satisfy the PLRA's exhaustion requirements) (collecting cases). |
| 10 | The copy of the July 14th Affidavit of Service has two receipt stamps from DOCCS-one dated 9/1/2011 and the other of which has the date obscured. It appears that a copy of the Affidavit of Service was sent to other DOCCS officials in Albany in September 2011. In the absence of a reply from defendants questioning the authenticity of the document, and construing the facts in favor of the non-movant, as I must, the court will assume that N. Ratliff at Clinton received a copy of the Affidavit of Service at some time between July 14, when the affidavit was notarized, and July 18, 2011, when N. Ratliff sent the confirming memorandum to plaintiff. |
| 11 | Nothing on the face of plaintiff's June 15, 2011 letter to Supt. LaValley indicates that a copy was submitted to grievance officials. (Dkt. No. 52–11 at 5). |
| 12 | *See* N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.5(a) ("[a]n inmate must submit a complaint to the clerk within 21 calendar days of an alleged occurrence"), 701.6(g)(1)(b) ("[t]he IGP supervisor may grant an exception to the time limit for filing a grievance based on mitigating circumstances[;] ... [a]n exception to the time limit may not be granted if the request was made more than 45 days after an alleged occurrence). |
| 13 | The New York regulations specifically state that if a grievance is not decided within the time limits provided, the inmate may appeal to the next step. N.Y. Comp.Codes R. & Regs. tit. 7, § 701.6(g)(1)(ii)(2). In *Pacheco v. Drown,* 9:06–CV–20 (GTS/GHL), 2010 WL 144400, at *19 & n. 21 (N.D.N.Y. Jan. 11, 2010), U.S. District Judge Glenn Suddaby held that the failure by the IGRC or the |

Superintendent to timely respond to a grievance or first level appeal may be appealed to the next level(s), including the CORC, in order to properly complete the grievance process. *Accord, Murray v. Palmer,* 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, *2 & nn. 4, 6 (N.D.N.Y. Mar. 31, 2010).

**14**　N.Y. Comp. Codes R. & Regs. tit. 7, §§ 701.6(h)(2) provides:

> An inmate transferred to another facility may continue an appeal of any grievance. If the grievant wishes to appeal, **he or she must mail the signed appeal form back to the IGP supervisor at the facility where the grievance was originally filed** within seven calendar days after receipt. The IGP supervisor will refer it to the facility grievance clerk for processing.

(emphasis supplied).

**15**　Absent an extension, which would require the written consent of the grievant, N.Y. Comp. Codes R. & Regs. tit. 7, §§ 701.6(g)(1) (b)(ii)(2), the IGRC is required, during the first step of the grievance process, to schedule a hearing within 16 calendar days after receipt of the grievance. N.Y. Comp. Codes R. & Regs. tit. 7, §§ 701.5(b)(2)(ii). At the second step of the process, the Superintendent is supposed to render a decision within 20 calendar days from the receipt of an appeal. N.Y. Comp. Codes R. & Regs. tit. 7, §§ 701.5(c)(3) (I), (ii). Arguably, if an inmate has not consented to an extension and the IGRC has not scheduled a hearing within 16 days, or a superintendent has not rendered a decision within 20 days, the inmate would then have only seven days to appeal to the next level, unless he requested an extension supported by mitigating circumstances. *See, e.g., Goodson v. Silver,* 2012 WL 4449937, at *6 (discussing how to calculate the deadline for filing an appeal to CORC in a case where the Superintendent failed to respond to a harassment grievance). However, a number of contingencies, other than an inmate-approved extension, could alter such deadlines. In this case, the plaintiff was transferred from Clinton less than 16 days after the "occurrence" which was the subject of the alleged grievance. When an inmate's confinement status precludes his timely appearance at an IGRC hearing, an unspecified delay in the resolution of the first stage of the grievance process is contemplated-to determine whether the inmate wants to postpone his hearing or have it proceed in his absence. N.Y. Comp. Codes R. & Regs. tit. 7, §§ 701.5(b) (2)(ii)(a). If a grievance against a DOCCS employee is determined by a superintendent to be a "harassment" grievance, the process and the deadlines change. *See* N.Y. Comp. Codes R. & Regs. tit. 7, §§ 701.8. Given the uncertainty of the deadlines for filing appeals when an inmate, particularly one who is transferred to another facility, receives no response to a grievance, this court cannot conclude, in the context of a summary judgment motion, that plaintiff's appeals were untimely for exhaustion purposes or that any untimeliness should not be excused under *Hemphill* and its progeny.

**16**　In support of the summary judgment motion, defendants document that plaintiff could have sought and obtained medical attention prior to June 17th by taking advantage of sick call procedures from his cell. (Devlin–Varin Decl., Dkt. No. 42–10). Plaintiff responded, in conclusory fashion, that prior efforts to get medical attention were thwarted by the Clinton staff. (Pl.'s Reply to Devlin–Varin Decl. ¶¶ 5, 6, Dkt. No. 52–5; Pl.'s Reply to Michalek Decl. ¶ 4, Dkt. No. 52–4). In any event, because plaintiff could seek prompt, necessary medical treatment once he returned to his cell, C.O. Rock would not have been subjectively aware that her failure to send plaintiff for immediate medical attention would subject him to a risk of serious harm from a prolonged delay in care, even if she had known that the bathroom door had struck plaintiff in

the head. *Farmer v. Brennan*, 511 U .S. at 844; *Salahuddin v. Goord*, 467 F.3d at 281. Thus, no reasonable fact finder would conclude that plaintiff could establish the subjective prong of the deliberate indifference standard.

17    Plaintiff has also filed copies of sick call requests that he purportedly submitted in August and September 2011, complaining of ongoing symptoms relating to the alleged blow to his head on June 15, 2011 at Clinton and a 2009 assault in Sing Sing. (Dkt. No. 52–11 at 45–51).

18    Plaintiff has filed documents relating to complaints and grievances regarding his medical care between September and November 2011. (Dkt. No. 52–11 at 52–54).

19    *See also Brown v. White*, 9:08–CV–200, 2010 WL 985184, at *8 (N.D.N.Y. Mar. 15, 2010) (plaintiff's conclusory suggestion that defendant nurse completely refused to provide any medical attention on a particular date is insufficient to create a dispute of fact in the face of the sworn declaration and supporting documentary evidence in the record); *Benitez v. Pecenco*, 92 Civ. 7670, 1995 WL 444352 at n. 5, (S.D.N.Y. July 27, 1995) (conclusory claim that plaintiff was never issued medication was directly contradicted by medical records and was insufficient to create a factual dispute on that issue) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir.1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case")).

20    *See also Brown v. White*, 2010 WL 985184, at *9–10 (inmate who suffered from chronic, but not acute, lower back pain and occasional headaches and dizziness during a three-month delay in requested medication and other treatment did not suffer a serious deprivation of medical care); *Evans v. Manos*, 336 F.Supp.2d at 260 (W.D.N.Y.2004) (subjective claims of pain, unaccompanied by substantial medical complications are not sufficient to create a factual issue as to whether he was suffering from a "serious," unmet medical need); *Hanrahan v. Menon*, 9:07–CV–610 (FJS/ATB), 2010 WL 6427650, at *8–9 (N.D.N.Y. Dec. 15, 2010) (plaintiff's complaints of primarily subjective mental health symptoms do not rise to the level that would make the two-month delay in plaintiff's medication a serious deprivation) (ReportRecommendation), *adopted,* 2011 WL 1213171 (N.D.N.Y. Mar. 31, 2011), *aff'd,* 470 F. App'x 32 (2d Cir. May 18, 2012).

21    Conclusory allegations, lacking any factual foundation, are also insufficient to support a claimed conspiracy to violate another's civil rights. *See, e.g., Jackson v. County of Rockland*, 450 F. App'x 15, 19 (2d Cir.2011) (citing *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir.2011) (finding allegations of conspiracy "baseless" where the plaintiff "offer[ed] not a single fact to corroborate her allegation of a 'meeting of the minds' among the conspirators")); *Ciambriello v. County of Nassau*, 292 F.3d 307, 325 (2d Cir.2002). Plaintiffs alleging a civil rights conspiracy must "make an effort to provide some details of time and place and the alleged effects of the conspiracy ... [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Warren v. Fischl*, 33 F.Supp.2d 171, 177 (E.D.N.Y.1999) (citations omitted).

22    *See, e.g., Hare v. Hayden*, 09 Civ. 3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant.") (citing *Wright v. Goord*, 554 F.3d 255, 274 (2d Cir.2009) (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was complaint about an incident involving another corrections officer); *Roseboro v. Gillespie*, 791 F.Supp.2d 353, 369 (S.D.N.Y.2011) (plaintiff has failed to provide any basis

to believe that a corrections counselor would retaliate for a grievance that she was not personally named in).

23  See *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) and other cases cited below with respect to the due process standards applying to disciplinary proceedings.

24  The district court in *Allah v. Greiner* found that plaintiff's allegations were sufficient to create issues of fact with regard to the prisoner's claim of retaliation against one defendant because the defendant (Totten) had a plausible motive to retaliate against the plaintiff for a grievance specifically naming Totten and because Totten's explanation for the allegedly retaliatory act was internally inconsistent and in conflict with other evidence. *Id.* at *4.

25  Plaintiff speculated that Counselor Paquette–Monthie previously worked in the sex offender program at Clinton Annex, and presumably met C.O. Rock while at Clinton. (Dkt. No. 36 at 36, 37).

26  Plaintiff attached, to his response to the Rule 12(b)(6) motion, documents purportedly submitted in state court proceedings in October 2011, one of which referenced Counselor Paquette–Monthie's alleged statement that she filed the misbehavior report against plaintiff because he filed a complaint against a friend of hers. (Dkt. No. 36 at 19). Even if this document is authentic and was not backdated, as some of plaintiff's submissions clearly are, it is apparent from the record that plaintiff belatedly claimed that Counselor Paquette–Monthie made this admission in furtherance of self-serving legal tactics, well after the disciplinary hearing at Coxsackie and after plaintiff filed his complaint in this action.

27  Defendant Paquette–Monthie and her supervisor testified at the disciplinary hearing that DOCCS phone records confirmed that plaintiff had, indeed, made calls to the number at which plaintiff admitted his wife could be reached. (Disc. Hrg. Tr. at 19, 59–60; Dkt. No. 42–15 at 6–13). Plaintiff was allowed to inspect those phone records during the hearing. (Disc. Hrg. Tr. at 67, 69).

28  The Order of Protection was apparently modified, on October 28, 2011, after the disciplinary hearing, to allow telephonic contact. (Dkt. No. 36 at 66). However, this reinforces that the Order of Protection in place at the time of the telephonic contact that resulted in the misbehavior report against plaintiff clearly did not authorize contact by phone.

29  Plaintiff asked Supervising Counselor Chenel, with respect to the misbehavior report against him, "was there any complaint initially by any outside services ... or was there anything written from another facility, uh,—retaliate or anything like that?" Hearing Officer rephrased the questions: "to you knowledge was there any outside contact with regard to the Order of Protection being violated?" and Supervising Counselor Chenel answered "No." (Disc. Hrg. Tr. at 54).

30  See *Clark v. Dannheim,* 590 F.Supp.2d at 429–31 (to establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural errors, in the sense that the errors affected the outcome of the hearing) (collecting cases). Toward the end of the hearing, plaintiff requested that witnesses Paquette–Monthie and Chenel be recalled for further questioning; but he would not explain what new questions he wanted to ask these witnesses. (Disc. Hrg. Tr. at 63–66). Hearing Officer Gutwein denied plaintiff's request to recall these witnesses because plaintiff failed to articulate any additional information that they could provide that would not be redundant of their lengthy, prior testimony. (Disc. Hrg. Tr. at 66, 71–72; Dkt. No. 42–15 at 93). Defendant Gutwein's stated reasons for not recalling these witnesses were reasonably

related to a correctional goal and did not, based on the authority cited below, violate due process. In any event, because plaintiff never articulated how recalling these two witnesses would have helped him or changed the outcome of the disciplinary hearing, he cannot establish that he was prejudiced by the hearing officer's ruling.

31    On July 20, 2011, Hearing Officer Gutwein provided plaintiff with copies of form 2176 explaining, in writing, the reasons for his refusal to call each witness. Plaintiff demanded that the hearing officer state on the record his reasons for refusing to call the District Attorney involved with the prior order of protection, and defendant Gutwein did not due so. (Disc. Hrg. Tr. at 62–63). On July 21, 2011, when the hearing resumed, plaintiff complained that he could not read script, and the hearing officer orally explained his reasons to deny plaintiff's new request to recall witnesses Paquette–Monthie and Chenel on the record, apparently because the 2176 forms prepared that morning were handwritten in script. (Disc. Hrg. Tr. at 70–72). Once he announced his problems with reading script, plaintiff did not renew his request that the hearing officer orally explain the reasons for not calling the District Attorney, which were written in script on form 2176 the day before. (*Id.*). In his prior rulings on various questions plaintiff posed to the witnesses, the hearing officer made clear that the various persons involved in the prior order of protection had nothing relevant to offer with respect to the pending charges. (*See, e.g.,* Disc. Hrg. Tr. at 23, 40, 49). In any event, as long as a hearing officer articulates a reason for not calling a witness that is logically related to correctional goals, due process does not require that he do so during the hearing, even if state law requires a contemporaneous finding. *Duffy v. Selsky,* 95 CIV. 0474, 1996 WL 407225, at * 10 (S.D.N.Y. Jul. 18, 1996) (the Supreme Court has held that the proffer of the explanation for not calling a witness need not be contemporaneous with the hearing) (citing *Ponte v. Real,* 471 U.S. at 497).

32    Given that these witnesses had no relevant information to offer, plaintiff's complaint that his assistant was not allowed to interview these witnesses also fails to support a due process claim.

33    Plaintiff initially requested witnesses from the health units, but he did not persist in that request after Counselor Paquette–Monthie and Supervising Counselor Chenel testified. (Disc. Hrg. Tr. at 7, 61). Hearing Officer Gutwein nonetheless prepared copies of form 2176 explaining that these witnesses would not be called because the proposed testimony would not be relevant. (Dkt. No. 42–15 at 94–95).

34    The court notes that Hearing Officer Gutwein provided plaintiff with copies of requested documents discussed during the hearing, and once adjourned the hearing so plaintiff could get a copy of a document he claimed he needed to continue questioning a witness. (Disc. Hrg. Tr. at 31, 66–71).

35    The hearing office stated the basis for his finding on the disciplinary charges both in writing and on the record at the hearing. (*Id.*).

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 3729362
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Marc LEWIS, Plaintiff,

v.

MURPHY, Captain, Coxsackie Correctional
Facility; J. Lewis, Corrections Counselor,
Coxsackie Correctional Facility; Matthews, Deputy
Superintendent for Administration, Coxsackie
Correctional Facility; Christopher Miller, Deputy
Superintendent for Security, Coxsackie Correctional
Facility; Eric G. Gutwein, Commissioner
Hearing Officer, N.Y.S., D.O.C.C.S., Defendants.

No. 9:12–CV–00268 (NAM/CFH).
|
Signed July 24, 2014.
|
Filed July 25, 2014.

**Attorneys and Law Firms**

Marc Lewis, Attica, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State
of New York, Joshua E. McMahon, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

### *ORDER*

NORMAN A. MORDUE, Senior District Judge.

**\*1** The above matter comes to me following a Report–
Recommendation by Magistrate Judge Christian F. Hummel,
duly filed on the 27th day of June 2014. Following fourteen
(14) days from the service thereof, the Clerk has sent me
the file, including any and all objections filed by the parties
herein.

After careful review of all of the papers herein, including
the Magistrate Judge's Report–Recommendation, and no
objections submitted thereto, it is

ORDERED that:

1. The Report–Recommendation is hereby adopted in its
entirety.

2. The defendants' motion for summary judgment (Dkt. No.
46) is granted and the Clerk shall enter judgment accordingly.

3. The Clerk of the Court shall serve a copy of this Order upon
all parties and the Magistrate Judge assigned to this case.

**IT IS SO ORDERED.**

**REPORT–RECOMMENDATION AND ORDER** [1]

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

Plaintiff *pro se* Marc Lewis ("Lewis"), an inmate currently
in the custody of the New York State Department of
Correctional and Community Supervision ("DOCCS"),
brings this action pursuant to 42 U.S.C. § 1983 alleging
that defendants, five DOCCS employees, violated his
rights under the Fourteenth Amendment. Compl. (Dkt. No.
1). Presently pending is defendants' motion for summary
judgment pursuant to Fed.R.Civ.P. 56. Dkt. No. 46. Lewis
opposes and defendants replied. Dkt. Nos. 57, 61. For the
following reasons, it is recommended that defendants' motion
be granted.

### I. Background

The specific facts of the case are set forth in the Report–
Recommendation and Order filed February 28, 2012,
familiarity with which is assumed. *See* Dkt. No. 39 (Report–
Recommendation); Dkt. No. 43 (Memorandum–Decision and
Order). The facts are related herein in the light most favorable
to Lewis as the non-moving party. At all relevant times,
Lewis was an inmate at Coxsackie Correctional Facility
("Coxsackie").

### A. November 5, 2011 Letter

On November 5, 2011, Lewis was watching television when
non-party Correctional Officer Whit ("Whit") changed the
channel on the television that Lewis was watching. Dkt. No.
46–9 at 2. Lewis wrote a letter to non-party Superintendent
Martuscello ("Martuscello") complaining about the incident
and stated that Whit harassed and intimidated him. Compl. ¶

1. Lewis indicated that he would "blow the whistle on a lot of other wrong doings in this facility if need be." Dkt. No. 46–9 at 4. Lewis further indicated that he feared correctional officers would retaliate against him because he filed this complaint. *Id.* at 3. Lewis sent a copy of this letter to non-party Commissioner Fisher. Lewis Dep. # 1 (Dkt. No. 46–6) at 43:8–14. On November 7, 2011, Lewis was taken from his cell and told by non-party Sergeant Martin that he was being placed under keeplock [2] status for threats Lewis made against someone in the administration building. *Id.* at 27:14–22. At that time, Lewis had yet to receive a copy of the misbehavior report. *Id.* at 28:11–15. Based on the content of the November 5, 2011 letter, Lewis was charged with making threats and attempting to bribe and extort personnel. Dkt. No. 46–9 at 1.

## B. Tier III Disciplinary Hearing

**\*2** On November 10, 2011, Lewis was escorted by non-party Correctional Officer Stevenson ("Stevenson") to attend his disciplinary hearing before defendant Captain Murphy ("Murphy"). Lewis Dep. # 1 at 34:8–12, 35:12–13. Murphy started the recording, explained the hearing process, and took Lewis's plea. *Id.* at 35:17–22. Lewis advised Murphy that he had not been served with a copy of the misbehavior report and had not yet been provided inmate assistance. Compl. ¶ 4; Murphy Decl. (Dkt. No. 46–22) ¶ 8. Murphy attested that he immediately stopped the hearing and directed Stevenson to provide Lewis with a copy of the misbehavior report and to arrange for the plaintiff to receive inmate assistance. Murphy Decl. ¶¶ 8, 11. Lewis also objected to Murphy being the officer who reviewed the misbehavior report and authorized Lewis to be placed in keeplock pending a disciplinary hearing, and the hearing officer. *Id.* ¶ 9. According to DOCCS Directive 4932, 251–2.2(f) Murphy could not serve as both the reviewing and hearing officer on the same misbehavior report. Dkt. No. 46–12 at 4. Lewis was then brought back to his cell to review the misbehavior report and receive inmate assistance. Compl. ¶ 5.

### 1. Inmate Assistance

Defendant Corrections Counselor Jackie Lewis ("Counselor Lewis") was assigned as Lewis's employee assistant. Lewis Decl. (Dkt. No. 46–14) ¶ 4. On November 10, 2011, Counselor Lewis arrived at Lewis's cell to help prepare a defense for his hearing. *Id.* ¶ 7. During the meeting, Lewis requested that Martuscello and Fischer be called as witnesses

and asked for the name of the review officer who authorized his keeplock confinement. *Id.* ¶ 8; Lewis Dep. # 1 at 40:8–16. Counselor Lewis indicated that Murphy was the reviewing officer and took note of the witnesses whom Lewis wanted to question. Lewis Dep. # 1 at 40:15–17; Dkt. No. 46–15. Lewis also stated that he requested an explanation of the charges but Counselor Lewis said she was not going to do that because she was trying to go home. Compl. ¶¶ 7–8. Since Counselor Lewis did not meet Lewis's standards for assistance, Lewis did not sign the inmate assistance form and Counselor Lewis left the cell at that time. *Id.* ¶ 8. Counselor Lewis maintains that Lewis never asked her for definitions or an explanation of the charges. Lewis Decl. ¶ 9.

### 2. Hearing Extension

On November 10, 2011, a request for an extension of the Tier III disciplinary hearing was filed because Lewis was going to be in court from November 14, 2011 to November 18, 2011 and no staff was available to conduct the hearing before that time. Dkt. No. 46–17; Compl. ¶ 10. The request indicated that defendant Commissioner's Hearing Officer Gutwein ("Gutwein") was the hearing officer and that the hearing had not commenced. Dkt. No. 46–17. Lewis contends that defendant Deputy Superintendent for Administration Matthews ("Matthews") had filed the request. Compl. ¶ 10. Lewis believes that the request contained false information because Murphy began the hearing on November 10, 2011 and Lewis was only in court from November 14, 2011 to November 16, 2011. *Id.* Matthews attested that Lewis is mistaken about who wrote the report. Matthews Decl. (Dkt. No. 46–16) ¶¶ 8–10. Matthews explained that although the request indicates "Matthew" as the contact person, extension requests are filed by clerical staff in Coxsackie's Discipline Office; thus the reference to "Matthew" refers to someone in that office, and not Matthews. *Id.*

**\*3** Later on November 10, 2011, Lewis wrote a letter to Martuscello explaining his November 5, 2011 letter and objecting to Murphy being the hearing officer. Dkt. No. 46–19. Martuscello directed defendant Deputy Superintendent Miller ("Miller") to respond to the letter. Miller Decl. (Dkt. No. 46–18) ¶ 7. By letter dated November 15, 2011, Miller informed Lewis that Gutwein was assigned as the hearing officer. *Id.;* Dkt. No. 46–20.

### 3. Hearing on November 21, 2011

On November 17, 2011, a second request to extend the date of the disciplinary hearing to November 21, 2011 was filed because no hearing officer was available to conduct the hearing before that time. Dkt. No. 46–13. On November 21, 2011, Gutwein conducted the disciplinary hearing for Lewis. Hr'g Tr. (Dkt. No. 46–10) at 2. [3] Lewis pleaded not guilty to the charges against him. *Id.* at 3. Lewis objected to: (1) Murphy commencing a disciplinary hearing concerning the same misbehavior report on November 10, 2011; (2) Murphy being both the reviewing and hearing officer; (3) Gutwein commencing the hearing more than seven days after placement in keeplock; and (4) Counselor Lewis providing inadequate assistance because she did not fulfill his requests. *Id.* at 4.

Lewis requested that Counselor Lewis, Murphy, Stevenson, Fischer, Martin, and Martuscello be called as witnesses. Hr'g Tr. at 8. Lewis also requested that the November 5, 2011 letter be produced as evidence. *Id.* Gutwein noted for the record that the November 5, 2011, letter was placed in the hearing packet and denied Lewis's request to have the log books produced as evidence. *Id.* at 8, 19. Gutwein denied Lewis's request to call Murphy, Stevenson, and Counselor Lewis as witnesses on relevance grounds as Lewis wanted them to testify to the defects of the disciplinary hearing. Gutwein Decl. (Dkt. No. 46–8) ¶ 28; Hr'g Tr. at 19, 20. Since Gutwein called Martin to testify to the misbehavior report, Gutwein declined to call Martuscello and Fischer as witnesses for their testimonies would be duplicative. Hr'g Tr. at 8, 19, 20.

Gutwein produced Martin and asked him questions concerning the grounds for authoring the misbehavior report. Hr'g Tr. at 9. Martin explained that Lewis's November 5, 2011 letter contained statements threatening actions if certain demands were not met and Lewis would "blow the whistle if need be." *Id.* Lewis was afforded an opportunity to direct questions at Martin through Gutwein. *Id.* Gutwein denied Lewis's request to have the definitions of bribery, extortion, and threats because the definitions would be irrelevant to the incident in the report. *Id* . at 19.

Gutwein then made a written disposition and found Lewis guilty of the charges based on: (1) the misbehavior report, which stated that Lewis would retaliate if his demands were not met; (2) review of the November 5, 2011 letter stating that Lewis will retaliate by "blowing the whistle on the wrong

doings by staff"; (3) Martin's testimony stating that the letters contained an ultimatum; (4) Lewis's Testimony stating that the hearing was commenced previously in an improper and untimely manner; and (5) Lewis's disciplinary history. Hr'g Tr. at 20. Gutwein sentenced Lewis to seven months in the Special Housing Unit ("SHU"), [4] along with seven months without packages, commissary privileges, phone privileges, and loss of good time credits. *Id.* Gutwein's determination and sentence was made to impress upon Lewis that it is a serious violation to threaten employees, which would not be tolerated at the correctional facility and that Lewis should modify his behavior in the future. Gutwein Decl. ¶ 12.

### C. SHU conditions

**\*4** On November 30, 2011, Lewis received a letter indicating that he had been unsatisfactorily discharged from the Aggression Replacement Training ("ART") Program because he was going to be in SHU for seven months. Compl. ¶ 39. Nevertheless, Lewis was able to complete this program after his release from SHU. Lewis Dep. # 1 (Dkt. No. 46–6) at 69:7–14.

Since Lewis had his telephone privileges taken away, he was unable to call his sister who was in need of a kidney transplant. Lewis Dep. # 2 (Dkt. No. 46–7) at 12:6–11. Lewis also stated he was in the process of filing paperwork to donate a kidney to his sister but being in SHU prevented him from finishing it. *Id.* at 12:3–5, 13:2–3. By the time Lewis was released from SHU, his sister had received a transplant. *Id.* at 13:4–7.

Lewis was also unable to interact with other inmates by attending group activities such as congregational prayer or group chow during his time in SHU. Compl. ¶ 46. Lewis contends that he was "restrained from practicing the prerequisite [rituals] associated with performing his [religious] prayers" while in SHU because the cells were unsanitary, he had to share a cell, the correctional officers gave him showers whenever they wanted, and he was not given a shower three times a week. Dkt. No. 57 at 15–16. Lewis claims he was prevented from practicing Islam because Muslims must be "in a state of purification in order to pray" and Islamic law states that men must not expose their body from the navel to the knee. Therefore he was restrained from doing "wudu," a ritual where one must wash their whole body in preparation for prayer. *Id.* at 16.

### D. Appeal of the Hearing Disposition

Lewis filed an appeal of the hearing disposition. Compl. ¶ 34. Miller reviewed the appeal and found "the hearing to be without procedural error and the resulting sanctions appropriate." Dkt. No. 46–21. Lewis appealed to non-party Albert Prack, the director of the Special Housing/Inmate disciplinary program, who reversed the guilty determination on the ground that "the evidence uncle fails to provide enough information to support the charges." Dkt. No. 57 at 49. Therefore, after sixty-nine days, Lewis was released from the SHU. Compl. ¶ 45.

### II. Discussion

Lewis contends that (1) all defendants deprived him of his Fourteenth Amendment rights by denying him procedural due process in connection with the disciplinary hearings at issue and (2) defendants Miller, Matthews, Murphy, and Gutwein conspired against him to cover up Murphy's improper commencement of the hearing.

Defendants seek summary judgment dismissing the complaint in its entirety. Defs.' Mem. of Law (Dkt. No. 46–2) at 3. Defendants specifically move for summary judgment on the grounds that: (1) Lewis failed to establish a due process claim; (2) Lewis failed to establish an actionable conspiracy claim; and (3) defendants are entitled to qualified immunity. *Id.* Additionally, Matthews moves for summary judgment for lack of personal involvement. *Id.*

### A. Legal Standard

**\*5** A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

When, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude," ... that a *pro se* litigant's submissions must be construed "liberally,"... and that such submissions must be read to raise the strongest arguments that they "suggest,".... At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not "consistent" with the *pro se* litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by *pro se* litigants," ... and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law...."

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247–48.

### B. Personal Involvement

**\*6** "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position

of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)).[5] Assertions of personal involvement that are merely speculative are insufficient to establish a triable issue of fact. *See e.g., Brown v. Artus,* 647 F.Supp.2d 190, 200 (N.D.N.Y.2009).

Lewis has failed to establish the personal involvement of defendant Matthews in allegedly depriving him of his Fourteenth Amendment due process rights by filing a Tier III hearing extension request. Lewis contends that Matthews filed a Tier III hearing extension form that falsely indicated Gutwein as the hearing officer, the hearing had not yet commenced, and the dates for which Lewis would be out of the facility for an unrelated trial. Compl. ¶ 10. Matthews attested that the notation "Contact: Matthew" on the extension request did not refer to him. Rather, the extension requests are submitted by members of Coxsackie's Discipline Office; hence, it can be inferred that the notation refers to a clerical staff member in the Discipline Office. Therefore, Matthews did not participate directly in the alleged constitutional violation. Matthews Decl. (Dkt. No. 46–16) ¶ 10; Dkt. No. 46–17. Furthermore, Matthews attested that he was not even aware of Lewis's disciplinary hearing or the extension request until after the lawsuit was filed. Matthews Decl. (Dkt. No. 46–16) ¶ 11. Accordingly, Matthews could not have failed to remedy any wrong after he was informed of the violation through a report or appeal, since he was never informed of any violation.

In addition, Matthews did not exhibit deliberate indifference to Lewis's rights by failing to act on information indicating that unconstitutional acts were occurring because Matthews had no information indicating that any wrong was occurring. Matthews also attested that he had no supervisory role over Coxsackie's inmate disciplinary program; consequently, Matthews could not have created or allowed the continuation of a policy or custom under which unconstitutional practices occurred. Matthews Decl. ¶ 2. Lastly, since Matthews held no supervisory authority over the inmate disciplinary program, he could not have been grossly negligent in supervising subordinates who committed the allegedly wrongful acts. *Id.* Lewis points to no evidence in the record to substantiate his assertions that Matthews created the extension request. Moreover, Lewis testified in his deposition and indicated in his response papers that he voluntarily withdraws his claims against Matthews. Lewis Dep. # 2 (Dkt. No. 46–7) at 28; Resp. (Dkt. No. 57) at 9. It is fair to conclude that a rational finder of fact would determine that these assertions are merely speculative and therefore, Lewis cannot establish the personal involvement of Matthews in the alleged unconstitutional actions.

**\*7** Accordingly, defendants' motion on this ground should be granted.

## C. Fourteenth Amendment

The Due Process Clause of the Fourteenth Amendment states that "[n]o State shall ... deprive any person of life, liberty, or property without due process of law." U.S. CONST. amend. XIV § 1. It is important to emphasize that due process "does not protect against all deprivations of liberty. It protects only against deprivations of liberty accomplished without due process of law." *Baker v. McCollan,* 443 U.S. 137, 145 (1979) (internal quotation and citations omitted). "A liberty interest may arise from the Constitution itself, ... or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin,* 545 U.S. 209, 221 (2005) (citations omitted). An inmate retains a protected liberty interest in remaining free from segregated confinement if the prisoner can satisfy the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 483–84 (1995).

### 1. Liberty Interest

To state a claim for procedural due process, there must first be a liberty interest which requires protection. *See generally Valmonte v. Bane,* 18 F.3d 992, 998 (2d Cir.1994) ("[Procedural] due process questions [are analyzed] in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.") (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)). The Second Circuit has articulated a two-part test whereby the length of time a prisoner was placed in segregation as well as "the conditions of the prisoner's segregated confinement relative to the conditions of the general prison population" are to be considered. *Vasquez v. Coughlin,* 2 F.Supp.2d 255, 259 (N.D.N.Y.1998). This standard requires a prisoner to establish that the confinement or condition was atypical and significant in relation to ordinary prison life. *See Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

While not a dispositive factor, the duration of a disciplinary confinement is a significant factor in determining atypicality. *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000) (citations omitted). The Second Circuit has not established "a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights." *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (citations omitted). Instead, the Second Circuit has provided guidelines that "[w]here the plaintiff was confined for an intermediate duration—between 101 and 305 days—development of a detailed record of the conditions of confinement relative to ordinary prison conditions is required." *Id.* at 64–65 (citing *Colon,* 215 F.3d at 232). In the absence of a dispute about the conditions of confinement, summary judgment may be issued "as a matter of law." *Id.* at 65 (citations omitted). Conversely, where an inmate is confined under normal SHU conditions for a duration in excess of an intermediate disposition, the length of the confinement itself is sufficient to establish atypicality. *Id.* (citing *Colon,* 215 F.3d at 231–32). Also, "[i]n the absence of a detailed factual record, cases in this Circuit typically affirm dismissal of due process claims where the period of time spent in SHU was short—e.g. 30 days—and there was no indication [of] ... unusual conditions." *Harvey v. Harder,* No. 09–CV–154 (TJM/ATB), 2012 WL 4093792, at *6 (N.D.N.Y. July 31, 2012) (citing *inter alia Palmer,* 364 F.3d at 65–66).[6]

**\*8** Defendants contend that Lewis has failed to demonstrate that he suffered from atypical and significant confinement and therefore cannot establish a protected liberty interest. The Court considers factors such as the length of time the prisoner was placed in segregation as well as "the conditions of the prisoner's segregated confinement relative to the conditions of the general prison population" to determine whether the prisoner can establish a liberty interest in remaining free from segregated confinement. *Palmer,* 364 F.3d at 64–65. The length of time in which Lewis spent in confinement was sixty-nine days, which is less than an intermediate amount of time. As such, the length of time itself cannot determine that the confinement is atypical and significant. Therefore, the Court determines if the confinement is atypical and significant by looking at the conditions of the segregated confinement compared to ordinary prison conditions.

Lewis contends that his confinement was atypical and significant because he was deprived of: (1) communications with the outside world; (2) an opportunity to possibly donate a kidney to his sister; (3) religious practices due to the unsanitary conditions of his confinement; (4) participation in the ART program; and (5) interaction with other inmates during activities like group chow and congressional prayer.[7] Dkt. No. 57 at 12–14. In New York, under "normal SHU conditions" an inmate is:

> placed in a solitary confinement cell, kept in his cell for twenty-three hours a day, permitted to exercise in the prison yard for one hour a day, limited to two showers a week, and denied various privileges available to general population prisoners, such as the opportunity to work and obtain out-of-cell schooling. Visitors were permitted but the frequency and duration was less than in general population. The number of books allowed in the cell was also limited.

*Colon,* 215 F.3d at 230; *see also* N.Y. COMP.CODES R. & REGS. tit. 7, §§ 304.1–.14, 305.1–.6 (setting forth minimum conditions of SHU confinement). Lewis's confinement was of a similar kind, with twenty-three hours a day of isolation, an hour of recreation, and denial of telephone and commissary privileges. Such a claim falls short of establishing a liberty interest as Lewis fails to allege any particular condition or further deprivation outside of those generally applicable to the incidents of prison life in SHU confinement. *Vasquez,* 2 F.Supp.2d at 259; *Frazier,* 81 F.3d at 317 (explaining that while prisoners in SHU may be deprived of "certain privileges that prisoners in the general population enjoy," there exists no liberty interest in remaining a part of the general prison

population); *see also Alvarado v. Halle Hous. Assoc.,* 152 F.Supp.2d 355, 355 (S.D.N.Y.2001) (finding restrictions such as loss of phone privileges, one hour of exercise a day, and three showers per week, fail to meet *Sandin* requirements).

**\*9** Lewis's inability to communicate with the outside world through phone or post for the purpose of transplanting his kidney to his sister or otherwise is not considered atypical because loss of telephone privileges is an aspect of SHU confinement in New York and courts have held that this would not violate an inmate's constitutional rights. *See Long v. Crowley,* No. 09–CV–456(F), 2012 WL 1202181, at \*11 (W.D.N.Y. March 22, 2012) (sixty days in keeplock with loss of telephone and commissary privileges is not a protected liberty interest); *Borsock v. Early,* No. 03–CV–395 (GLS/RFT), 2007 WL 2454196, at \*9 (N.D.N.Y. Aug. 22, 2007) (GLS/RFT) (finding that a ninety-day confinement in SHU with a ninety-day loss of packages, commissary and telephone privileges is insufficient to raise a liberty interest).

Lewis has failed to show that his unsatisfactory discharge from his ART programming due to his placement in SHU posed an atypical and significant hardship. Compl. ¶ 46; *Thompson v. LaClair,* No. 08–CV–37 (FJS/DEP), 2009 WL 2762164, at \*8 (N.D.N.Y. Jan. 30, 2009) (plaintiff's inability to participate in ASAT, ART, and MAWP programs not atypical and significant hardship); *Deutsch v. U.S.,* 943 F.Supp. 276, 280 (W.D.N.Y.1996) (holding that prisoners do not have a protected liberty interest in rehabilitative programs). Moreover, Lewis was able to complete this program after his release from SHU. Lewis Dep. # 1 at 69:7–14.

Lewis's claim that his exclusion from group activities posed an atypical and significant hardship is also unfounded because SHU confinement usually segregates the inmate from the rest of the prison and therefore, the inmate would be unable to participate in group activities. *Sealey v. Coughlin,* 997 F.Supp. 316, 321 (N.D.N.Y.1998) ("plaintiff's administrative segregation in SHU was not an atypical and significant hardship"); *Edmonson v. Coughlin,* 21 F.Supp.2d 242, 249, 250 (W.D.N.Y.1998) (plaintiff's inability to participate in congregate activities such as group counseling, and religious services during his eight months of administrative segregation is not a protected liberty interest).

Lastly, in his opposition papers to the instant motion, Lewis claims that the unsanitary conditions of his cell posed an atypical and significant hardship. Lewis contends that he was "restrained from practicing the prerequisite [rituals] associated with performing his prayers" while in SHU because the cells were unsanitary, he had to share a cell, the correctional officers gave him showers at their choosing, and he was not given a shower three times a week. Dkt. No. 57 at 15–16. Lewis contends that his cell always accumulated dirt and dust, was cleaned once a week with a dirty sponge without any germicidal cleaning agents, and the water used was "black from prior use of 20 or more cells." *Id.*

Courts have found that the denial of a clean cell and personal hygiene items, as well as double-celling in SHU, do not constitute an atypical and significant hardship. *See Davidson v. Murray,* 371 F.Supp.2d 361, 364, 369 (W.D.N.Y.2005) (concluding that the denial of hygiene items and cleaning materials is not an atypical and significant hardship); *McNatt v. Unit Manager Parker,* No. 99–CV–1397 (AHN), 2000 WL 307000, at \*4, \*8 (D.Conn. Jan. 18, 2000) (finding stained, smelly mattresses, unclean cell, no cleaning supplies for toiletries for six days, no shower shoes, and dirty showers during SHU confinement do not constitute a constitutional violation of due process); *Bolton v. Goord,* 922 F.Supp. 604, 630 (S.D.N.Y.1998) (finding double-celling of inmates is not considered an atypical and substantial hardship). Nevertheless, a finder of fact may conclude that Lewis's cell conditions in conjunction with the denial of three showers a week to constitute an atypical and significant hardship that amount to a protected liberty interest. *See, e.g., Welch v. Bartlett,* 196 F.3d 389, 393 (2d Cir.1999) (stating that allegations of "inadequate amounts of toilet paper, soap and cleaning materials, a filthy mattress, and infrequent changes of clothes" may be a constitutional violation). Drawing every inference in Lewis's favor, these conditions were present during the entirety of Lewis's SHU confinement. Moreover, defendants do not specifically address these allegations with argument or evidence. Therefore the Court will proceed as though Lewis has established a protected liberty interest.

## 2. Procedural Due Process

**\*10** Defendants argue that Lewis was afforded ample due process. While inmates are not given "the full panoply of [due process] rights," they are still afforded procedural due process. *Wolff v.. McDonnell,* 418 U.S. 539, 556 (1974). A prisoner is "entitled to advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the

disposition including the evidence relied upon and the reasons for the disciplinary actions taken." *Sira v.. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citations omitted).

### a. Written Notice

In this case, Lewis received proper written notice. An inmate must be provided advance written notice of the charges against him at least twenty-four hours before the disciplinary hearing commences. *Wolff,* 418 U.S. at 563–64. Notice must be written "in order to inform [the inmate] of the charges and to enable him to marshal the facts and prepare a defense." *Id.* at 564. When Lewis was brought to the hearing before Murphy on November 10, 2011, Lewis had not yet received written notice of the charges. Murphy attested that once Lewis stated he did not receive a copy of the misbehavior report or inmate assistance, Murphy stopped the hearing immediately. Murphy attested that no testimony was taken, he did not review any documentary evidence other than the misbehavior report, and did not discuss the statements in the misbehavior report with Lewis. Murphy Decl. ¶ 16. Lewis was then provided a copy of the misbehavior report and inmate assistance on the same day. On November 21, 2011, Gutwein took over Lewis's Tier III disciplinary hearing. Even assuming Murphy had commenced the hearing, the ultimate penalty imposed on Lewis was by Gutwein based on the evidence presented on November 21, 2011. Lewis received a copy of the misbehavior report on November 10, 2011, well in advance of the November 21, 2011 hearing date. As such, Lewis received advanced written notice of the charges against him.

Accordingly, defendants' motion on this ground should be granted.

### b. Opportunity to Call Witnesses and Present Documentary Evidence

Lewis contends that he was deprived of an opportunity to call all his requested witnesses and present some documentary evidence. However, "[i]t is well settled that an official may refuse to call witnesses as long as the refusal is justifiable [such as] ... on the basis of irrelevance or lack of necessity." *Scott v. Kelly,* 962 F.2d 145, 146–47 (2d Cir.1992). With respect to documentary evidence, Lewis requested the admission of the logbooks as evidence to show that he had already been taken for a disciplinary

hearing regarding the same misbehavior report. Hr'g Tr. at 19. Gutwein correctly denied this request because they were irrelevant to the charges in the misbehavior report and would not have aided in Lewis's defense to such charges. Gutwein Decl. ¶¶ 33–34. As for the November 5, 2011 letter, Gutwein allowed for a copy of it to be placed in the hearing packet as evidence. Hr'g Tr. at 8.

**\*11** As for witnesses, Gutwein permitted Martin to testify at Lewis's disciplinary hearing but denied the request for Murphy, Stevenson, and J. Lewis on relevance grounds because their testimonies would have concerned the alleged defects in the disciplinary hearing rather than the charges giving rise to the hearing. Gutwein Decl. ¶ 28. Furthermore, since Martin was to testify to the content of the November 5, 2011 letter, Gutwein denied testimonies from Martuscello and Fischer on the grounds that they would be unnecessary and duplicative. *Id.* ¶ 32.

Lewis was provided with an opportunity to question Martin through Gutwein. "While inmates do have the right to question witnesses at their disciplinary hearings, that right is not unlimited and its contours are under the discretion of prison officials." *Rivera v.. Wohlrab,* 232 F.Supp.2d 117, 125 (S.D.N.Y.2002). Thus, Gutwein retained the authority to administer the questioning in a manner he saw fit. Gutwein did not permit Lewis to ask every question, but Gutwein offered reasoning for the denial of certain questions that Lewis wanted to ask. Hr'g Tr. at 9–18. A review of the hearing transcript shows that Lewis was permitted to question Martin rather extensively until Lewis was finished. *Id.* As such, Lewis was provided an opportunity to call witnesses and present documentary evidence. *Sira,* 380 F.3d at 69.

Accordingly, defendants' motion on this ground should be granted.

### c. Fair and Impartial Hearing Officer

Lewis contends that Gutwein was not an impartial hearing officer because Gutwein had not allowed Lewis to call his requested witnesses and denied him the standard and legal definitions of bribery, extortion, and threats. Prisoners have a constitutional right to a fair and impartial hearing officer. *See, e.g., Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004). However, "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges ... [as i]t is well recognized that prison disciplinary hearing officers are

not held to the same standard of neutrality as adjudicators in other contexts." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996) (citations omitted). The Supreme Court held "that the requirements of due process are satisfied if some evidence supports the decision by the [hearing officer] .." and the Second Circuit has held that the test is whether there was " 'reliable evidence' of the inmate's guilt." *Luna v. Pico,* 356 F.3d 481, 487–88 (2d Cir.2004); *see also Superintendent, Mass. Corr. Inst. v. Hill,* 472 U.S. 445, 455 (1985).

As discussed *supra,* "[i]t is well settled that an official may refuse to call witnesses as long as the refusal is justifiable [such as] ... on the basis of irrelevance or lack of necessity." *Scott v. Kelly,* 962 F.2d 145, 146–47 (2d Cir.1992). Therefore, Gutwein was within his discretion to deny the calling of certain witnesses and the admission of certain evidence.

 **\*12** Even though Lewis's guilty determination was reversed, it is not clear evidence that Gutwein was not a fair and impartial hearing officer. The determination was reversed on the grounds that there was insufficient evidence to support the charges, not on any procedural defects. Dkt. No. 57 at 49. The record shows no indication that Gutwein was biased and failed to serve a fair and impartial hearing officer. It is unclear to the Court how the denial of the requested definitions served as evidence of bias on Gutwein's part. Rather, it is clear from the hearing transcript that Gutwein allowed Lewis to state all of his objections for the record and question Martin as much as he needed to. *See generally* Hr'g Tr.

Gutwein had reliable evidence of Lewis's guilt, which is presented in his statement of the evidence relied upon. Gutwein relied on the statements in the November 5, 2011 letter that stated Lewis would 'blow the whistle' on wrongdoings in the facility and Martin's testimony regarding the ultimatums made by Lewis. Hr'g Tr. at 20–21. Lewis had admitted to writing the November 5, 2011 letter. *Id.* at 6. Gutwein's determination was made to impress upon Lewis that it is a serious violation to threaten employees, which would not be tolerated at the correctional facility and that he should modify his behavior in the future. Lewis points to no evidence in the record to show that Gutwein came to his determination improperly. As such, despite Lewis's contentions of bias, the record is clear that there is no question of material fact regarding the process that Lewis was provided.

Accordingly, defendants' motion on this ground should be granted.

### d. Written Statement of Disposition

It is undisputed that Lewis received a written statement of the hearing disposition. On November 21, 2011, Lewis was present when Gutwein rendered his decision on the misbehavior report. Hr'g Tr. at 20–21. The record indicates that Lewis received a written statement of the evidence relied upon and the reasons for the disciplinary action. *Id.;* Dkt. No. 46–11 at 9. Thus, Lewis was provided with a written statement of the Tier III disciplinary hearing disposition. *Sira,* 380 F.3d at 69.

Accordingly, defendants' motion on this ground should be granted.

### e. Inmate Assistance

"An inmate's right to assistance with his disciplinary hearing is limited." *Neree v. O'Hara,* No. 09–CV–802 (MAD/ATB), 2011 WL 3841551, at \*13 (N.D.N.Y. July 20, 2011) (*Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993)). This Circuit has held that an assistant is constitutionally necessary when the plaintiff is confined in SHU and unable to marshal evidence and present a defense. *Id.* (citation omitted). In such a case, the assistant need only perform what the plaintiff would have done but need not go beyond the inmate's instructions. *Lewis v. Johnson,* No. 08–CV–482 (TJM/ATB), 2010 WL 3785771, at \*10 (N.D.N.Y. Aug. 5.2010) (citing *Silva,* 992 F.2d at 22). Furthermore, "any violations of this qualified right are reviewed for 'harmless error.' " *Clyde v. Schoellkopf,* 714 F.Supp.2d 432, 437 (W.D.N.Y.2010) (citing *Pilgrim v. Luther,* 571 F.3d 201, 206 (2d Cir.2009)). Lewis was confined in SHU from November 7, 2011, onward and thus was entitled to an inmate assistant. Dkt. No. 46–12 at 5; N.Y. COMP.CODES R. & REGS. tit. 7 § 251–4.1(a)(4).

 **\*13** Lewis alleges that he was deprived of adequate inmate assistance. Lewis first met with his inmate assistant, Counselor Lewis, on November 10, 2011. According to Lewis, Counselor Lewis refused to give him definitions of the charges against him and interview potential witnesses. Counselor Lewis denies that she was asked to give explanations of the charges and notes that the alleged request is not indicated on the assistant form. Lewis Decl. ¶ 9; Dkt. No. 46–17. Gutwein had also denied Lewis's request for

the definitions of threats, bribery, and extortion during the hearing on relevance grounds.

Taking Lewis's version of events as true, even if Counselor Lewis failed to provide such definitions of the charges, Lewis does not demonstrate that he was somehow prejudiced as a result of this error, and does not show that he was unable to present a defense or that the outcome of the hearing would have been different had Counselor Lewis provided such definitions. *Clark v. Dannheim,* 590 F.Supp.2d 426, 429–31 (W.D.N.Y.2008) ("To establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural errors, in the sense that the errors affected the outcome of the hearing." (citation omitted)).

Furthermore, Lewis was able to present a defense and pose questions to Martin that evinced an understanding of the charges. *See generally* Hr'g Tr. at 5–18. For example, Lewis asked Martin whether the November 5, 2011 letter contained any threats of harm, which suggests that Lewis had some understanding of what constitutes "threat." *Id.* at 9. Lewis then asked "did I—anything of value to or from— Martuscello, yourself or anyone," which shows that Lewis understood the nature of the extortion charge. *Id.* at 10. Lastly, Lewis asked "did I give or attempt to give—money, gifts,— or anything worth—value ... to ... Superintendent Martuscello and—or—administrator ...." This demonstrates that Lewis had an understanding of what bribery meant. *Id.* at 11.

Lewis also alleged that Counselor Lewis failed to interview Martuscello or Fischer but does not show how this would have changed the outcome of the hearing or how this failure prejudiced him as a result. Therefore, any shortcomings in the assistance rendered by Counselor Lewis was harmless error and does not rise to the level of a due process violation. *Hernandez v. Selsky,* 572 F.Supp.2d 446, 455 (S.D.N.Y.2008) (plaintiff failed to show how outcome of hearing would have been different had employee assistant interviewed witnesses, and thus any alleged inadequate assistance was harmless error not warranting denial of summary judgment). Additionally, even though Gutwein failed to provide an explanation of the charges, Lewis was not prejudiced as a result because Gutwein described in his hearing disposition the evidence he relied upon to determine that Lewis was guilty. An explanation of these charges to Lewis would not have changed the evidence which Gutwein had relied upon. As such, Lewis's due process claim based on inadequate inmate assistance must fail.

*14 Accordingly, defendants' motion for on this ground should be granted.

### f. Timeliness

Lewis contends that the Tier III disciplinary hearing concerning the November 7, 2011 misbehavior report was not commenced in a timely manner because his hearing did not begin until November 21, 2011. Where an inmate is confined pending a disciplinary hearing, the hearing must commence within seven days of his initial confinement and conclude within fourteen days of the writing of the misbehavior report. N.Y. COMP.CODES R. & REGS. tit. 7 § 251–5.1(a)(b); [8] Dkt. No. 46–12 at 5–6. The Commissioner of Correctional Services or his designee must authorize any delay beyond those time limits. N.Y. COMP.CODES R. & REGS. tit. 7 § 251–5.1(a)(b); Dkt. No. 46–12 at 5–6.

Lewis's Tier III hearing was timely commenced. Although Lewis's hearing was initially required to commence by November 14, 2011, an extension was granted until November 18, 2011 because Lewis was scheduled to be out of the facility from November 14, 2011 through November 18, 2011, and no staff was available to conduct the hearing before that time period. Gutwein Decl. ¶ 21; Dkt. No. 46–13. A second request was made on November 17, 2011 because no hearing officer was available to conduct plaintiff's hearing until November 21, 2011. Gutwein Decl. ¶ 22; Dkt. No. 46–13. DOCCS Central Office Special Housing Unit granted the facility permission to commence Lewis's hearing by November 21, 2011 and the hearing commenced on that date. Dkt. No. 46–13. Therefore, the hearing was commenced in a timely manner in accordance with the pertinent New York regulations.

Accordingly, defendants' motion on this ground should be granted.

### D. Conspiracy

Lewis claims that defendants Murphy, Miller, and Gutwein conspired to deny him procedural due process. To establish a claim under Section 1985(3), a plaintiff must allege that (1) an agreement existed between two or more state actors to act in concert to inflict an unconstitutional injury on plaintiff, and (2) an overt act was committed in furtherance of that

goal. *Ciambriello v. Cnty. of Nassau,* 292 F.3d 307, 324–25 (2d Cir.2002). Conclusory, vague, and general allegations are insufficient to support a conspiracy claim. *Ciambriello,* 292 F.3d at 325. Therefore, the plaintiff must provide some details of the time, place, and the alleged affects of the conspiracy, which would include facts to demonstrate that there was an agreement between the defendants to achieve some unlawful goal. *Warren v. Fischl,* 33 F.Supp.2d 171, 177 (E.D.N.Y.1999) (citations omitted).

In this case, defendants all deny conspiring to cover up the hearing that was allegedly commenced by Murphy. Lewis Dep. # 2 at 1–8; Gutwein Decl. ¶ 39; Miller Decl. ¶ 17; Matthews Decl. ¶ 12; Murphy Decl. ¶ 11. Lewis points to no evidence in the record to show that there was an agreement between the defendants to deprive him of his constitutional rights. Lewis alleges that the defendants conspired to cover up Murphy's attempt to start the Tier III disciplinary hearing because Murphy could not have served as the hearing officer. Murphy stated that he stopped the hearing once he realized that Lewis had not received a copy of the misbehavior report. Lewis was provided a copy and the hearing commenced on November 21, 2011 with Gutwein as the hearing officer. Therefore, there was no wrongdoing on Murphy's part for the defendants to cover up.

**\*15** Lewis alleges that there must have been an agreement to conspire against him because of the alleged discrepancies and false statements in the extension requests, Miller's letter ruling on the appeal, and other prison forms. These allegations are conclusory and do not provide any evidence that the defendants made an actual agreement to deprive Lewis of his constitutional rights. Furthermore, as discussed *supra,* there was no deprivation of Lewis's constitutional rights and therefore there can be no valid conspiracy claim.

Moreover, Lewis's conspiracy claim fails on the grounds that it is barred by the intra-corporate conspiracy doctrine. The doctrine states that "officers, agents and employees of a single corporate entity are legally incapable of conspiring together." *Nassau Cnty. Employee "L" v. Cnty. of Nassau,* 345 F.Supp.2d 293, 304 (E.D.N.Y.2004) (internal citations and quotation marks omitted). The doctrine applies when officers and officials are working in the scope of their official duties. *Id.* Although the doctrine began in cases involving corporations, the doctrine has been extended where there are allegations of conspiracy between a public entity and its employees. *Id.; see also Everson v. New York City Transit Auth.,* 216 F.Supp.2d 71, 76 (E.D.N.Y.2002) (collecting

cases). This doctrine would therefore exclude conspiracy claims against employees of DOCCS working within the scope of their employment. *Hartline v. Gallo,* 546 F.3d 95, 99, n. 3 (2d Cir.2008) (citations omitted); *Little v. City of New York,* 487 F.Supp. 426, 441–42 (S.D.N.Y.2007) (citations omitted). There is an exception to the doctrine when the individuals of the conspiracy are "pursuing personal interests that are separate and apart from the entity." *Nassau Cnty. Employee "L",* 345 F.Supp.2d at 304. Furthermore, personal bias is not considered a personal interest and is not within the exception to the intra-corporate conspiracy doctrine. *Everson,* 216 F.Supp.2d at 76 (citations omitted).

In this case, Lewis's allegations of conspiracy are against defendants who were all employees of DOCCS, which is one public entity, who were acting within the scope of their employment when they filed extension requests and other prison forms. Therefore, they are legally incapable of conspiring against each other. Lewis makes no allegation that the defendants were pursuing personal interest apart from their official duties. As such, Lewis's conspiracy claim fails as a matter of law.

Accordingly, defendants' motion on this ground should be granted.

### E. Qualified Immunity

Defendants contend that even if Lewis's § 1983 Fourteenth Amendment and conspiracy claims are substantiated, they are nevertheless entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 F. App'x 146 (2d Cir.2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available ... if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990) (internal citations omitted)). A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Only if there is a constitutional

violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230.

**\*16** Here, the second prong of the inquiry need not be addressed with respect to Lewis's Fourteenth Amendment and conspiracy claims against the defendants because, as discussed *supra,* it has not been shown that defendants violated Lewis's Fourteenth Amendment rights or conspired against Lewis to violate his Fourteenth Amendment rights.

Accordingly, defendants' motion on this ground should be granted.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 46) is **GRANTED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

Dated: June 27, 2014.

**All Citations**

Slip Copy, 2014 WL 3729362

### Footnotes

1 This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2 "Keeplock" is a form of disciplinary confinement where an inmate is confined in his cell for the duration of the disciplinary sanction. *Gittens v. Lefevre,* 891 F.2d 38, 39 (2d Cir.1989) (citing N.Y. COMP.CODES R. & REGS. tit. 7, § 251–1.6 (2012)).

3 The page numbers following "Hr'g Tr." refer to the pagination of the header numbers generated by CM/ECF, not the individual transcripts.

4 SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N .Y. COMP.CODES R. & REGS. tit 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

5 Various courts in the Second Circuit have postulated how, if at all, the *Iqbal* decision affected the five *Colon* factors which were traditionally used to determine personal involvement. *Pearce v. Estate of Longo,* 766 F.Supp.2d 367, 376 (N.D.N.Y.2011), *rev'd in part on other grounds sub nom., Pearce v. Labella,* 473 F. App'x 16 (2d Cir.2012) (recognizing that several district courts in the Second Circuit have debated *Iqbal* 's impact on the five *Colon* factors); *Kleehammer v. Monroe Cnty.,* 743 F.Supp.2d 175 (W.D.N.Y.2010) (holding that "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster ...."); *D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (disagreeing that *Iqbal* eliminated *Colon* 's personal involvement standard).

6 All unpublished opinions cited to by the Court in this Report–Recommendation are, unless otherwise noted, attached to this Recommendation.

7 Lewis may be attempting to raise First Amendment claims based on the denial of attendance to congregated services and sanitary conditions of his SHU cell. However, these claims were not specifically pled in the original complaint. Moreover, Lewis made no attempt to amend his complaint to include these claims. Therefore, the Court addresses these issues as arguments for establishing a liberty interest for purposes of a Fourteenth Amendment claim.

8 Section 251–5.1, states that

(a) Where an inmate is confined pending a disciplinary hearing or superintendent's hearing, the hearing must be commenced as soon as is reasonably practicable following the inmate's initial confinement pending said disciplinary

hearing or superintendent's hearing, but, in no event may it be commenced beyond seven days of said confinement without authorization of the commissioner or his designee.

(b) The disciplinary hearing or superintendent's hearing must be completed within 14 days following the writing of the misbehavior report unless otherwise authorized by the commissioner or his designee. Where a delay is authorized, the record of the hearing should reflect the reasons for any delay or adjournment, and an inmate should ordinarily be made aware of these reasons unless to do so would jeopardize institutional safety or correctional goals.

(c) Violation hearings must be completed within seven days of the writing of the misbehavior report.

N.Y. COMP.CODES R. & REGS. tit. 7 § 251–5.1.

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

---

2011 WL 2973687
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Khaliq CLARK, Plaintiff,

v.

A. DANNHEIM, Dennis Hardy, T. Breckon, # 1
John Doe, Donald Selsky, in their individual and
official capacities, David Matayas, Defendants.

No. 02–CV–6525L.
|
July 21, 2011.

**Attorneys and Law Firms**

Mark A. Young, Rochester, NY, for Plaintiff.

Gary M. Levine, New York State Office of the Attorney
General, Rochester, NY, for Defendants.

*DECISION AND ORDER*

DAVID G. LARIMER, District Judge.

**\*1** Plaintiff, Khaliq Clark, commenced this action under
42 U.S.C. § 1983. Plaintiff, an inmate in the custody of
the New York State Department of Correctional Services
("DOCS"), alleges that his constitutional rights have been
violated in a number of respects in connection with an
altercation between plaintiff and three guards on May 3,
2001, and a subsequent hearing on disciplinary charges
that were brought against plaintiff as a result of that
altercation.

In December 2008, the Court issued a Decision and
Order, 590 F.Supp.2d 426, granting summary judgment
for defendants on two of plaintiff's claims, relating to the
denial of plaintiff's request for certain documents at the
disciplinary hearing, and the refusal by the hearing officer,
defendant Thomas Breckon, to call a particular witness
requested by plaintiff.

Since defendants had not moved against plaintiff's other
claims, that decision did not address those claims.
Following the Court's December 2008 decision, then, the
following claims remained: a due process claim against

defendants Breckon and Donald Selsky, alleging that
Breckon violated plaintiff's constitutional rights by having
plaintiff removed from the hearing, and that Selsky, in his
capacity as DOCS Director of Special Housing, affirmed
Breckon's decision finding plaintiff guilty of the charges
against him; an Eighth Amendment excessive-force claim
against three correction officers; and a First Amendment
claim against the officers, alleging that they assaulted
plaintiff in retaliation for plaintiff's having complained
about certain matters.

Defendants Breckon and Selsky now move for summary
judgment on the remaining due process claim against
them. Defendants' motion is granted.

The hearing transcript shows that plaintiff became
argumentative with Breckon after Breckon denied
plaintiff's request for a copy of a certain document.
Breckon then warned plaintiff, "Now, if you interrupt me
again while I'm giving you an instruction, I'll have you
removed from the hearing." Tr. (Dkt.# 45–5) at 9. Plaintiff
then again interrupted Breckon, who again warned him,
"Do you understand that? I'm talking to you now. If
you interrupt me again, I will have you removed from
the hearing." Plaintiff immediately began to interrupt
Breckon, stating, "It's a violation of the hearing," at which
point Breckon stated, "Fine. Inmate Clark, you are done.
You can go back to your cell. If you're not gonna allow
me to conduct the hearing, you can go back and sit in your
cell." Tr. at 10.

"The Supreme Court has made clear that due to the
special nature of the prison environment, inmates are not
guaranteed the 'full panoply of rights due a [criminal]
defendant ... [and that] there must be some mutual
accommodation between institutional needs and the
objectives and the provisions of the Constitution.' " *Carter
v. Cleveland,* No. 93–CV–0254, 1995 WL 818678, at \*5
(W.D.N.Y. Feb.15, 1995) (citing *Wolff v. McDonnell,* 418
U.S. 539, 556, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)).
Thus, where an inmate disrupts a hearing, a hearing officer
has discretion to order the inmate removed, particularly
if the prisoner has been warned that continued unruly
behavior may result in his expulsion. *See, e.g., id.* (finding
that hearing officer "was well within his discretion in
ejecting plaintiff from the hearing, given his raised voice
and threatening behavior"); *see also Figueroa v. Storm,*
No. 07–CV–18, 2011 WL 1598922, at \*7 (W.D.N.Y.
Apr. 28, 2011) (defendants did not violate plaintiff's due

process rights by having him removed from hearings after plaintiff became disruptive); *Purdle v. Graham,* No. 09–CV–971, 2011 WL 941283, at *3 (N.D.N.Y. Jan.19, 2011) (dismissing claim against hearing officer where record showed that plaintiff was removed from hearing because he was irate and would not be quiet), *Report and Recommendation Adopted,* 2011 WL 940469 (N.D.N.Y. Mar.16, 2011); *Sheils v. Minogue,* No. 06–CV–482, 2010 WL 5625919, at *6 (N.D.N.Y. Nov. 1, 2010) (no due process violation arose from removal of obstreperous inmate during disciplinary hearing, where hearing officer "warn [ed] him several times that his frequent interruptions and commentary would not be tolerated"), *Report and Recommendation Adopted,* 2011 WL 210580 (N.D.N.Y. Jan.21, 2011).

**\*2** Based on the undisputed facts before me, I conclude that defendant Breckon acted well within his discretion in having plaintiff removed from the hearing. In addition, I find that plaintiff has failed to show that the outcome of the hearing would likely have been different had plaintiff not been removed, or that plaintiff was otherwise prejudiced by Breckon's actions. Finally, I conclude that even if a violation could be found here, it was objectively reasonable for Breckon to believe, in light of plaintiff's

contumacious behavior, that plaintiff's removal did not give rise to a constitutional violation, and that Breckon is therefore entitled to qualified immunity. *See Garcia v. Selsky,* 697 F.Supp.2d 442, 445 n. 3 (W.D.N.Y.2010).

Since there is no basis for a finding of liability on Breckon's part, there is likewise no basis upon which Selsky could be held liable for affirming Breckon's decision. *See Crenshaw v. Sciandra,* 766 F.Supp.2d 478, 482 (W.D.N.Y.2011). Plaintiff's claim against Selsky must therefore be dismissed as well.

## CONCLUSION

The motion for summary judgment (Dkt.# 52) filed by defendants Thomas Breckon and Donald Selsky is granted, and plaintiff's claims against those two defendants are dismissed.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 2973687

---

**End of Document** © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 2986497
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Robert MIMS, Plaintiff,
v.
Correction Officer D. UFLAND, Correction Officer
B. Stevens, Correction Officer R. Westfield,
Correction Officer M. Seaman, Correction Officer M.
Rhynders, Correction Officer R. Tilley, Correction
Officer S. Niles, Sergeant M. Scott, Sergeant S.
Rogers, Sergeant Lonzack, Director Thomas G.
Eagen, Hearing Officer Gerard Guiney, Green
Haven Superintendent Robert Ercole, Director
Donald Selsky and John Does 1-8, Defendants.

No. 07 Civ.1926(DLC).
|
Aug. 1, 2008.

**Attorneys and Law Firms**

Jason L. Lopez, New York, NY, for Plaintiff.

Christine Anne Ryan, Office of New York State Attorney
General, New York, NY, for Defendants.

*OPINION AND ORDER*

DENISE COTE, District Judge.

**\*1** Plaintiff Robert Mims ("Mims") brings this action
pursuant to 42 U.S.C. § 1983 alleging various deprivations
of his constitutional rights during his incarceration at
Green Haven Correctional Facility ("Green Haven").
Mims filed an amended complaint on August 10, 2007,
which included causes of action (1) under the Eighth
Amendment in connection with a beating he allegedly
suffered at the hands of the staff at Green Haven on
March 27, 2006 (the "March 27 attack"); (2) under the
Due Process Clause in connection with a grievance and a
disciplinary proceeding related to the March 27 attack; (3)
under the Eighth Amendment for denial of medical care;
(4) under New York State law for assault and battery;
and (5) under New York State law for general negligence.
On August 21, 2007, defendants filed a partial motion to
dismiss the state law causes of action, as well as the Eighth

Amendment claim alleging denial of medical care. In his
opposition, Mims agreed to withdraw his state law claims;
an Opinion dated November 21, 2007, denied the motion
as to the Eighth Amendment medical care claim.

Defendants now move for partial summary judgment
as to (1) the medical care claim, (2) the Due Process
claim, and (3) the Eighth Amendment claim arising out
of the March 27 attack insofar as it is alleged against
defendants Sergeants Scott and Lonzack, and Officers
Niles, Rhynders, Tilley, and Stevens, whom defendants
claim were not personally involved in the alleged attack. [1]
In his opposition, Mims withdraws the medical care
claim, and all claims against defendants Director Thomas
G. Eagen, Green Haven Superintendent Robert Ercole,
Director Donald Selsky, and Officer Niles. Mims does
defend his Eighth Amendment claim as to the sergeants
and officers noted in defendants' summary judgment
motion, as well as the due process claim against defendant
Hearing Officer Gerard Guiney regarding his conduct
of Mims's disciplinary proceeding. [2] In reply, defendants
reassert that the due process claim should be dismissed,
and that Sergeants Scott and Lonzack were not personally
involved in the March 27 attack. [3] Thus, as presently
configured, the claims to be addressed in this motion are
the Eighth Amendment claims against Sergeants Scott
and Lonzack and the due process claim against Hearing
Officer Guiney. For the following reasons, defendants'
motion for partial summary judgment is denied in part
and granted in part.

BACKGROUND

The following facts are relevant to the issues presented by
this motion, and are either undisputed or taken in the light
most favorable to Mims, unless otherwise noted. During
all relevant times, Mims was incarcerated at Green Haven.
On February 13, 2006, while traveling to the evening meal,
Mims was confronted by Officer Ufland, who cursed at
him and directed him to return to his cell. Afterward, cold
food was delivered to Mims and approximately twenty
other inmates that had not been permitted to eat at the
mess hall. Mims promptly filed a grievance regarding this
incident.

**\*2** The next day, Sergeant Lonzack indicated to Mims
that he "had no business" filing a grievance against
Officer Ufland and told Mims that he would not process
his grievance. Sergeant Lonzack also told Mims that he

should "watch [himself]," which Mims understood to be some form of threat. For these actions, Mims also filed a grievance against Sergeant Lonzack.

On the afternoon of March 27, 2006, Officer Ufland again confronted Mims while he, in the company of a group of fellow inmates, was on his way to the mess hall. Again using foul language, Officer Ufland told Mims to stand against a nearby wall so that he could be searched. He was then frisked by another officer, and again told by Officer Ufland to return to his cell. Mims verbally protested, but did return to his cell and began writing up another grievance against Officer Ufland. Upon his return, Mims was placed in "keeplock" status. [4]

At approximately 5:50 p.m. that same day, Mims's cell was opened for the apparent purpose of allowing him to take a shower. Mims was uncertain whether he was permitted to shower due to his keeplock status, but he exited the cell with his soap, towel, and wash cloth and headed toward the shower. When he arrived at the shower door, he discovered that it was locked. He then yelled to the officer in the nearby "bubble," Officer Seaman, to tell him that the shower was locked. Mims asked Officer Seaman why he was let out for a shower if the shower door was locked, at which time Officer Westfield arrived, approached Mims, and asked him, in vulgar terms, why he was out of his cell. Mims explained that his cell had been opened for him to shower; Officer Westfield did not respond, but rather closed an adjacent door, thereby preventing Mims from returning to his cell.

Thereafter, approximately four other officers arrived, including Officer Ufland. These officers told Mims to stand against the wall, at which time, Mims alleges, they began to beat him, including hitting him in the head, back, and legs with batons. Mims also alleges that he was kicked in the face by Officer Ufland and stabbed in the leg with an unknown object by Officer Stevens. Mims was handcuffed, taken downstairs into a supply room, and thereafter to the Special Housing Unit ("SHU") and the medical facility, during which time, Mims alleges, the beating and verbal abuse continued while Mims loudly protested.

Although Mims could not identify all of the prison officials who were involved with the attack-at his deposition, Mims indicated that it seemed as though as many as twenty officers were present-he testified at his

deposition that, in addition to the officers noted above (Westfield, Seaman, and Ufland), Sergeant Scott and Sergeant Rogers were involved in taking him downstairs and to the SHU, and that Sergeant Scott admitted him to the SHU. Contemporaneous inter-departmental memoranda written by Officers Rhynders and Tilley indicate that they also responded at the scene of the incident and were involved in escorting Mims to the SHU, and a "Report of Strip Frisk on Admission to SHU" further indicates that Sergeant Scott was present during Mims's admission to the SHU. Finally, Officers Ufland, Westfield, Seaman, and Sergeant Rogers completed memoranda that indicate that they were present at and involved in the incident . [5]

**\*3** Mims alleges that, when he was examined following the attack, his lip, leg, and mouth were bloody. During the subsequent disciplinary proceeding, however, medical staff who treated Mims testified that while Mims did have a small laceration on his leg, another on his lip, and some pain in his right hand, he had no notable bruises or injuries consistent with an attack of the severity described by Mims.

Later on March 27, an inmate misbehavior report was issued to Mims, authored by Officers Ufland and Niles. Mims was charged with violations of prison rules regarding violent conduct, creating a disturbance, assault on staff, and the possession of alcohol (which Officer Niles reported had been discovered in Mims's cell during a search on the evening of March 27). Defendant Guiney was assigned to conduct the Tier III disciplinary hearing on these charges, which commenced on April 2, 2006, and concluded on May 3, when Mims was found guilty on all four charges and sentenced principally to eighteen months in the SHU and loss of various privileges for twenty-four months. As discussed in greater detail below, Mims alleges that Guiney was a biased and partial hearing officer because he did not permit him to call certain witnesses, curtailed relevant witness testimony, improperly removed him from the hearing, unreasonably credited the testimony of corrections officers, and generally displayed a biased and unfair attitude toward Mims.

## DISCUSSION

Summary judgment may not be granted unless all of the submissions taken together "show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the court must view all facts in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). When the moving party has asserted facts showing that the non-movant's claims or defenses cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" of the movant's pleadings. Rule 56(e), Fed.R.Civ.P.; *accord Sista v. CDC Ixis N. Am., Inc.,* 445 F.3d 161, 169 (2d Cir.2006). Only disputes over material facts, facts that might affect the outcome of the suit under the governing law, will properly preclude the entry of summary judgment. *Anderson,* 477 U.S. at 248.

As noted, only two issues presented by defendants' partial motion for summary judgment remain to be decided here: whether a material issue of disputed fact exists regarding (1) the personal involvement of Sergeants Scott and Lonzack in the March 27 attack, and (2) the due process claim against Guiney. These issues will be addressed in turn.

## I. Personal Involvement of Sergeants Scott and Lonzack

**\*4** It is well-settled that "[p]roof of an individual defendant's personal involvement in the alleged wrong is ... a prerequisite to his liability on a claim for damages under § 1983." *Gaston v. Coughlin,* 249 F.3d 156, 164 (2d Cir.2001). First, defendants contend that Mims has not proffered evidence that Sergeant Scott was personally involved in the March 27 attack, noting particularly that Mims's deposition testimony indicates that Mims does not know who was involved in transporting him downstairs or into the supply room. Furthermore, Sergeant Scott has submitted a declaration stating that he did not respond at the scene of the alleged attack, and that his "only connection to Mr. Mims" on March 27, 2006, was related to the later search of his cell.

Based on the record submitted by the parties, a material issue of disputed fact exists as to Sergeant Scott's personal involvement in the alleged March 27 attack. Officer Seaman testified at the Tier III hearing that it was Sergeant Scott who placed restraints on Mims at the scene of the alleged attack. Defendants also overlook portions of

Mims's deposition testimony during which he indicates that, although he was disoriented due to the alleged attack, he believed that either Sergeant Scott or Sergeant Rogers was involved in escorting him downstairs. Thus, based on the current record, a reasonable jury could conclude that Sergeant Scott was "personal[ly] involve[d] in the alleged wrong." *Id.*

Second, while defendants do not dispute at this stage that Sergeant Lonzack refused to process Mims's grievance against Officer Ufland and told Mims to "watch [himself]," they argue that because Mims "does not place Sergeant Lonzack at the scene of the use of force," Mims has not proffered sufficient evidence to create a triable issue of fact as to that defendant's personal involvement in the March 27 attack. Although defendants' analysis of this point misses the mark, there is nevertheless insufficient evidence in the record to permit a reasonable jury to conclude that Sergeant Lonzack was personally involved in the March 27 attack.

Contrary to defendants' contention, personal involvement is not a concept limited to physical presence.

> The personal involvement of a supervisor may be established by showing that he (1) directly participated in the violation, (2) failed to remedy the violation after being informed of it by report or appeal, (3) created a policy or custom under which the violation occurred, (4) was grossly negligent in supervising subordinates who committed the violation, or (5) was deliberately indifferent to the rights of others by failing to act on information that constitutional rights were being violated.

*Iqbal v. Hasty,* 490 F.3d 142, 153 (2d Cir.2007) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)). Here, Mims's deposition testimony regarding Sergeant Lonzack, if credited, could lead a reasonable juror to conclude that (1) Sergeant Lonzack exercised some supervision over Officer Ufland, insofar as he was reviewing Mims's grievance regarding her conduct, and (2) Sergeant Lonzack was aware that Officer Ufland or other officers held a grudge against Mims as a result of his grievances. It would be pure conjecture to conclude

further based on this testimony, however, that Lonzack "knew or should have known that there was a high degree of risk that" Officer Ufland or others would engage in an act of physical violence against Mims, "but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable supervisor would find necessary to prevent such a risk." *Poe v. Leonard,* 282 F.3d 123, 142 (2d Cir.2002). Mims has identified no other evidence in the record in support of this theory. Thus, summary judgment will be granted to the defendants on Mims's excessive force claim insofar as it is asserted against Sergeant Lonzack.

II. Due Process and the Tier III Proceeding

**\*5** Mims claims that his due process rights were violated because Hearing Officer Guiney was biased in his conduct of the Tier III proceeding. As evidence of Guiney's bias, Mims cites the following: that Guiney (1) refused to call certain witnesses and curtailed Mims's questioning of certain witnesses; (2) unreasonably credited the testimony of prison staff and found Mims guilty on all four charges; (3) removed Mims from the hearing; and (4) generally "exhibited an attitude of bias and predisposition" regarding Mims's guilt and credibility. Notably, however, Mims's opposition to the motion for summary judgment makes clear that he does not contend that each of these actions constitutes a separate due process violation-and, indeed, the record and case law generally would not support such claims [6]-but rather that these actions collectively demonstrate that Guiney lacked the impartiality required to conduct the Tier III hearing in accordance with constitutional standards.

It is undisputed that Mims had a constitutional right to have a "fair and impartial hearing officer" preside over his Tier III disciplinary hearing. *See, e.g., Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004). "The degree of impartiality required of prison officials," however, "does not rise to the level of that required of judges generally. It is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996). Nevertheless, a hearing officer must "not prejudge the evidence" or state with certainty "how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 570 (2d Cir.1990). *See also Colon,* 58 F.3d at 871 (summary judgment not appropriate on bias allegation where statement made by hearing

officer "at least creates an issue of fact as to whether [the Hearing Officer] refused even to consider, on the evidence, the merits of [the plaintiff's] principal defense to the charges against him."); *Francis,* 891 F.2d at 46 (noting that "it would be improper for prison officials to decide the disposition of a case before it was heard"); *cf. Edwards v. Balisok,* 520 U.S. 641, 647 (1997) ("The due process requirements for a prison disciplinary hearing are in many respects less demanding than those for criminal prosecution, but they are not so lax as to let stand the decision of a biased hearing officer who dishonestly suppresses evidence of innocence.")

Mims has not cited sufficient evidence of bias to permit a reasonable jury to conclude that Hearing Officer Guiney was a biased and partial hearing officer. Although Mims has identified several decisions made by the hearing officer during the course of the proceeding that he contends were mistaken, Mims has not identified any evidence indicating that these decisions were the result of bias rather than reasoned decisionmaking with which Mims simply disagrees. Fair-minded hearing officers could have decided the issues to which Mims points in different ways. Mims has not shown that any of Guiney's rulings fall outside the range of reasonable conduct for unbiased hearing officers.

**\*6** The transcript of the Tier III proceeding, on which both parties rely and the accuracy of which is not contested, reveals that Hearing Officer Guiney permitted Mims to present his defense to the charges-*i.e.,* that he did not attack the staff on March 27, but rather the staff attacked him-and admitted testimony from several inmates who corroborated Mims's account. In addition, the transcript and hearing record demonstrates that Hearing Officer Guiney obtained several adjournments of the hearing for the purpose of obtaining witnesses requested by Mims, including the one inmate who had been transferred to another facility, who ultimately testified via telephone. No competent evidence of bias can be gleaned from these events.

Many of Mims's complaints regarding Hearing Officer Guiney's conduct of the hearing relate to Guiney's decision to focus the testimony almost exclusively on accounts of what took place at approximately 5:50 p.m. on March 27, 2006, the time of the alleged attack, [7] and not to permit questioning or testimony regarding other topics, including prior confrontations between Officer Ufland

and Mims. Mims fails to acknowledge, however, that a hearing officer may refuse to admit testimony or documents when they would be irrelevant or unnecessary to a determination of the issues in the disciplinary hearing. *Kalwasinski,* 201 F.3d at 109. Mims has not pointed to admissible evidence indicating that Hearing Officer Guiney's relevance determinations were driven by bias against Mims rather than a conclusion regarding which topics would (or would not) shed light on whether Mims was (or was not) guilty of the charges against him. A reasonable jury therefore would have no basis to conclude that these evidentiary rulings were evidence of bias.

Finally, and perhaps most importantly, Hearing Officer Guiney's decision to credit the account of the events of March 27 presented by the officers and not the inmates- and thus to find Mims guilty of the disciplinary charges- was supported by ample evidence, and is not evidence of bias. *Cf. Sira,* 380 F.3d at 76 (citing *Superintendent v. Hill,* 472 U.S. 445, 454-56 (1985)). The written disposition noted in particular that Mimis's injuries, described by prison nurses as little more than minor lacerations and pain in his right hand (or ankle, according to one witness), "were consistent with the staff's report" of the incident and not the testimony provided by the inmates, who described Mims receiving a severe beating at the hands of Officers Ufland, Westfield, and others. [8] Mims has not offered any cogent argument explaining why Hearing Officer Guiney's conclusion that the medical testimony corroborated the corrections officers' accounts of the events of March 27 was evidence of bias. [9]

In sum, Mims has not identified any evidence indicating that Hearing Officer Guiney "refused even to consider, on the evidence, the merits of [the plaintiff's] principal defense to the charges against him," *Colon,* 58 F.3d at 871, that he otherwise "prejudge[d] the evidence" in Mims's case, *Patterson,* 905 F.2d at 570, or "dishonestly suppresse[d] evidence of innocence." *Edwards,* 520 U.S. at 647. Summary judgment therefore will be granted to the defendants on this claim.

CONCLUSION

 **\*7** Defendants' partial motion for summary judgment, filed on April 15, 2008, is granted in part and denied in part. Defendants Director Thomas G. Eagen, Green Haven Superintendent Robert Ercole, Director Donald Selsky, Sergeant Lonzack, Correction Officer Niles, and Hearing Officer Gerard Guiney are dismissed from this action. The Eighth Amendment claim against defendants Sergeants Rogers and Scott and Officers Ufland, Westfield, Seaman, Rhynders, Tilley, and Stevens is the only claim remaining in this action. An Order issued in conjunction with this Opinion will set a schedule for further proceedings.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 2986497

Footnotes

| | |
|---|---|
| 1 | Defendants concede that the Eighth Amendment claim as to defendants Sergeant Rogers and Officers Ufland, Westfield, and Seaman involves disputed issues of material fact. |
| 2 | In opposition, Mims also argues that defendants' motion papers are deficient because certain exhibit pages were missing. Defendants counter that this was inadvertent, that Mims had been given these pages during discovery, and that they have now filed the missing pages. No further discussion of this issue is necessary. |
| 3 | Although the reply briefly mentions Officers Rhynders, Tilley, and Stevens, no argument is presented as to those defendants in response to the plaintiff's identification of various passages of Mims's deposition during which the involvement of these Officers was described. Defendants are therefore considered to have abandoned their argument that no issues of disputed fact remain as to the personal involvement of Officers Rhynders, Tilley, and Stevens in the March 27 attack. |

4      "Keeplock is a form of administrative segregation in which the inmate is confined to his cell, deprived of participation in normal prison routine, and denied contact with other inmates." *Peralta v. Vasquez,* 467 F.3d 98, 104 (2d Cir.2006) (citation omitted).

5      These memoranda present a different version of events, in which Mims initiated the incident by striking Officer Ufland in the face, and in which Mims was not repeatedly struck or beaten, but rather subdued using, in the words of Sergeant Rogers's memorandum, "only minimal and necessary" force, consisting principally of "body holds" and handcuffs.

6      In particular, to the extent that Mims alleges that his due process rights were violated because Hearing Officer Guiney did not permit him to call certain witnesses, Mims acknowledged at his deposition that the fifteen additional witnesses he was not allowed to call "would [have] nothing different to testify to" than the five witnesses he called. Mims stated, "[e]verybody would have testified to the same thing." While an "inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense," *Wolff v. McDonnell,* 418 U.S. 539, 566 (1974), witnesses requested by an inmate need not be called if their testimony would be "irrelevant or unnecessary." *Kalwasinski v. Morse,* 201 F.3d 103, 109 (2d Cir.1999). Guiney explained at the hearing that while Mims would only be permitted five witnesses initially, "if at any time you can demonstrate [that] one of the other ones could add something that the other [five] haven't done, then we'll call them up." Similarly, with regard to any claim that witnesses were questioned outside of Mims's presence, or that Mims was deprived of an opportunity to cross-examine those witnesses by his removal from the hearing, it must be noted that "[i]t is not a violation of due process at a disciplinary hearing to take the testimony of a witness outside the presence of an inmate. Nor does an inmate have a constitutional right of confrontation," *id.* (citing, *inter alia, Wolff,* 418 U.S. at 567-68), or cross-examination, *Wolff,* 418 U.S. at 567-68. While the case law does imply that Mims had a limited right to be present at the hearing, *compare Young v. Hoffman,* 970 F.2d 1154, 1156 (2d Cir.1992) (noting that the prisoner must be provided "the opportunity to appear at the hearing and to call witnesses"), *with Francis v. Coughlin,* 891 F.2d 43, 48 (2d Cir.1989) ("Prison inmates do not possess a constitutional right to be present during the testimony of witnesses during a disciplinary proceeding."), that right is certainly not absolute, and can be waived by engaging in disruptive conduct. *Cf. Davis v. Grant,* 532 F.3d 132, 2008 WL 2651096, at *8 (2d Cir. July 8, 2008) (noting the circumstances in which a criminal defendant may be removed from the courtroom).

7      This included, of course, medical testimony that could further illuminate that issue.

8      Inmate Gonzalez, for example, testified that the first officer to arrive on the scene (presumably Officer Westfield) was the first to punch Mims, and that when the other officers arrived, they "threw [Mims] on the floor and they held him down punching him while [Officer Ufland] continuously beat him with her stick, striking him in the head and poking him with it, nonstop, I mean, it was crazy."

9      Although Mims identifies various inconsistencies in the officers' accounts, and argues that the hearing officer should have therefore concluded that their testimony was not credible, Mims does not acknowledge the larger point, on which Hearing Officer Guiney focused-namely, that the medical testimony appeared to conclusively contradict the version of events described by Mims

and his witnesses-nor has he identified admissible evidence tending to show that Guiney's conclusion on this point was a result of bias against Mims.

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 3046701
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Andre JOHNSON, Plaintiff,

v.

Richard DOLING, Hearing Officer, Great Meadow
Correctional Facility; Robert Murphy, Acting
Director, Special Housing Unit, Defendants.

Civ. No. 9:05-CV-376 (TJM/
RFT).  |  Oct. 17, 2007.

**Attorneys and Law Firms**

Andre Johnson, Pine City, NY, pro se.

Hon. Andrew Cuomo, Attorney General for the State of New
York, Jeffrey P. Mans, Esq., Assistant Attorney General, of
Counsel, Albany, NY, for Defendants Doling and Murphy.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior United States District Judge.

**\*1** This *pro se* action brought pursuant to 42 U.S.C. §
1983 was referred to the Hon. Randolph F. Treece, United
States Magistrate Judge, for a Report and Recommendation
pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).
No objections to the Report-Recommendation and Order
dated September 17, 2007 have been filed. Furthermore, after
examining the record, this Court has determined that the
Report-Recommendation and Order is not subject to attack
for plain error or manifest injustice. Accordingly, the Court
adopts the Report-Recommendation and Order for the reasons
stated therein.

It is therefore,

**ORDERED** that Defendants' motion for summary judgment
(Docket No. 34) is **GRANTED** and the complaint is
**DISMISSED** as to all defendants.

**IT IS SO ORDERED.**

*REPORT-RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff Andre Johnson brings this civil action,
pursuant to 42 U.S.C. § 1983, alleging Defendants Doling
and Murphy denied him due process rights in a Disciplinary
Hearing in violation of the Fourteenth Amendment. Dkt. No.
1, Compl., Facts at ¶¶ 1-35 & Cause of Action at ¶¶ 36-47.
Specifically, Plaintiff alleges Defendants violated his due
process rights by denying him the right to present a defense,
call witnesses, be present, receive a written disposition and
statement of the evidence relied upon, and receive a fair and
impartial hearing. Compl. at ¶ 39. Defendants now bring
a Motion for Summary Judgment. Dkt. No. 34. Plaintiff
opposes the Motion. Dkt. No. 35. For the following reasons,
it is recommended that the Motion for Summary Judgment be
**granted.**

**I. FACTS**

During all relevant times pertaining to this action, Plaintiff
was incarcerated at Great Meadow Correctional Facility. Dkt.
No. 34, Defs' 7.1 Statement at ¶ 2. [1] Plaintiff was served
with an Inmate Misbehavior Report, dated March 17, 2002,
in which he was charged with possession of a weapon,
assault, fighting, and threat of violence. *Id.* at ¶ 3. Prior to
the Disciplinary Hearing, Plaintiff was provided an assistant
of his choice with whom he met, received all requested
documents, and requested one inmate witness, Angulo. *Id.* at
¶ 4.

Defendant Officer Doling commenced the Hearing on March
21, 2002, advising Plaintiff of the procedure and his rights. *Id.*
at ¶ 7. Doling then read the Inmate Misbehavior Report into
the record and asked Plaintiff to enter a plea, to which Plaintiff
entered a plea of not guilty. *Id.* at ¶¶ 7-8. During the Hearing,
Plaintiff objected to the evidence tag number identified in
the Misbehavior Report (# 8621), which was not the same
evidence tag number on the physical weapon (# 8629). *Id.* at ¶
9. Doling dismissed the objection, indicating that because the
weapon marked # 8629 had the same physical description as
the weapon in the Misbehavior Report, he believed the mixup
in numbers was the result of a typographical error. Dkt. No.
34, Jeffrey P. Mans, Asst. Att'y Gen., Affirm., dated Jan. 10,
2007, Ex. A-10, Hr'g Tr. at p. 2.

**\*2** Correction Officer Young authored the Misbehavior Report which formed the basis for the charges against Plaintiff. Mans Affirm., No. 34, Ex. A-3, Inmate Misbehavior Report, dated Mar. 17, 2002. In the Report, Young stated he saw Plaintiff swing at and stab another inmate, Angulo, with a weapon about eight inches long and sharpened to a point with a piece of bed sheet wrapped around it as a handle. *Id.* Young also stated he recovered the weapon after Plaintiff threw it away as he was falling to the floor. *Id.* The Misbehavior Report does not mention any other inmate besides Plaintiff and the victim, Angulo. Plaintiff objected that the Misbehavior Report should include other inmates involved in the incident pursuant to Departmental Regulation, codified at N.Y. COMP.CODES R. & REGS. (N.Y.CRR) tit. 7, § 251-3.1(c)(4), which states that "when more than one inmate was involved in an incident, the report should, to the extent practicable under the given circumstances, indicate the specific role played by each inmate." Hr'g Tr. at pp. 3-6. Because Young had not mentioned other inmates in the Report, Doling dismissed Plaintiff's objections to the Report as irrelevant. *Id.* at pp. 3-4.

An Unusual Incident Report (UIR), dated March 17, 2002, indicates that four inmates were involved in the altercation Young observed. Mans Affirm., Ex. A-6 at pp. 1-3, Unusual Incident Rep., dated Mar. 17, 2002 (stating "[O]fficer [Y]oung observed three inmates fighting with inmate Angulo"). Plaintiff attempted to introduce the UIR into evidence in order to call into question the accuracy of the Misbehavior Report, however, Doling denied said introduction for lack of relevancy because the Misbehavior Report alone constituted the formal charge against Plaintiffs under 7 NYCRR § 254.3, and because the UIR was not written by Young. Hr'g Tr. at pp. 3-5 & 10.

At Plaintiff's request, Officer Young and Inmate Ingram testified at the Hearing. Defs.' 7.1 Statement at ¶ 11. Young testified he observed Plaintiff and two other inmates attacking Inmate Angulo, that Plaintiff attempted to stab Angulo with the shank he subsequently threw away as he slipped and fell to the floor, and that after he recovered the weapon he "screwed up" the tag number, creating the aforementioned tag number discrepancy. Hr'g Tr. at pp. 6-10.

Plaintiff then called as witnesses Inmate Angulo and the other inmates named in the UIR, Temple and Ingram. Hr'g Tr. at p. 5. Angulo refused to testify in the case, stating in his refusal form that he didn't know Plaintiff. Mans Affirm., Ex. A-9 at p. 4, Requested Inmate Refusal to Testify Form, dated Mar. 21,

2002. Defendant Doling was satisfied that Angulo's refusal was fair, reasonable and not occasioned by any wrongdoing. Hr'g Tr. at p. 13. Doling called Officer Stemp in order to request Inmate Temple to testify, but Officer Stemp indicated Temple did not want to testify. *Id.* at p. 18. Officer Stemp did not know why Temple refused, nor did he know if Temple had been threatened or promised anything if he didn't testify. *Id.* Based upon that conversation, Doling found that Temple had voluntarily refused to testify. *Id.* at p. 19.

**\*3** Plaintiff also called as a witness Sergeant (Sgt.) Brown, who investigated the incident, and Lieutenant (Lt.) Armstrong, who received an interdepartmental communication from Officer Young indicating that Young recovered a different weapon from the scene of the altercation, a four-and-a-half inch long piece of sharpened metal wrapped with plastic food covering. Hr'g Tr. at pp. 13-17; Mans Affirm., Ex. A-6 at p. 4, Ex. 5, Interdepartmental Commc'n, dated Mar. 17, 2002. Doling refused to call these officers for lack of relevancy. Hr'g Tr. at pp. 13-17. In Sgt. Brown's case, Doling deemed his testimony irrelevant because he did not witness the incident nor write the Misbehavior Report. *Id.* Lt. Armstrong's testimony was deemed irrelevant because Doling saw no inconsistencies between the Interdepartmental Communication and the Misbehavior Report. *Id.*

Doling excluded Plaintiff from the Hearing after Plaintiff allegedly exhibited threatening behavior and, in Doling's opinion, attempted to prolong the Hearing by calling irrelevant witnesses. Hr'g Tr. at pp. 19-20. Officer Doling stated:

> Upon asking Mr. Johnson to step out so I could arrange for further witnesses, Mr. Johnson became threatening and I had him removed from the hearing room because of his clear refusal to um, move this hearing along and his threatening manner. Mr. Johnson has been excluded from this hearing. I have decided to complete this hearing without him. It is clear that Mr. Johnson is making requests for witnesses who are not relevant or material to the issue has become very angry with hearing officer for refusing to uh, subject himself, the hearing officer refusal to subject himself to the_____ of the inmate and have

become argumentative, threatening and otherwise uh, dangerous to the safety and security of the facility. The inmate has requested a number [of] witnesses most of whom have been dealt with by either hearing the testimony of or obtaining the refusal of the witnesses.

Hr'g Tr. at pp. 19-20.

Plaintiff denies exhibiting any threatening or obstructive behavior, and further asserts that Doling stopped the audio recorder while rudely dismissing him.[2] Pl.'s 7.1 Statement at ¶ 7. Doling continued the Hearing without Plaintiff and questioned Inmate Ingram, the final witness Plaintiff had requested prior to his removal. Hr'g Tr. at pp. 20-22. Doling found Plaintiff guilty of the charges and imposed a penalty of 730 days disciplinary confinement in the Special Housing Unit (SHU). *Id.* at p. 22. Doling made a statement of the evidence relied upon, and requested that Officer Catalfamo give copies of the Hearing Disposition along with an appeal form to Plaintiff within twenty-four hours. *Id.* at pp. 22-23. Plaintiff denies ever receiving these documents. Pl.'s 7.1 Statement at ¶ 7; Compl. at p. 2. However, Plaintiff did receive a copy of the audio tape of the Hearing and successfully requested an extension of time to appeal the disposition. Mans. Affirm., Ex. A-11, Letter from Andre Johnson to Glenn S. Goord, dated Apr. 18, 2002 (stating "I received the hearing tape in SHU"); Mans. Aff., Ex A-13, Letter from Deputy Comm'r Lucien J. Leclaire, Jr. to Andre Johnson, dated Apr. 29, 2002 (granting Johnson's request for an extension to supplement his appeal).

**\*4** Plaintiff appealed Doling's Tier III determination. Defs.' 7.1 Statement at ¶ 21. Defendant Robert Murphy, Acting Director of Special Housing and Inmate Discipline, modified the Tier III disciplinary determination by reducing the penalty imposed from 730 days to 540 days in SHU. *Id.* at ¶ 22. Subsequently, by determination dated June 23, 2002, Donald Selsky, Director of Special Housing and Inmate Discipline, administratively reversed the Tier III disciplinary determination, although Plaintiff had already served the entirety of the modified sanction. Defs.' 7.1 Statement at ¶ 26; Pl.'s 7.1 Statement at ¶ 12.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts submitted by the movant. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) and *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution."

*Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

## B. Due Process Claims Against Defendant Doling

 **\*5**  In order to state a procedural due process claim pursuant to the Fourteenth Amendment, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)). Such interests are derived from the Fourteenth Amendment Due Process Clause itself or from state statute or regulations. *Id.*

The Supreme Court has narrowly circumscribed the scope of liberty interests emanating from the Due Process Clause to protect "no more than the 'most basic liberty interests in prisoners.' " *Id.* (quoting *Hewitt v. Helms,* 459 U.S. 460, 467 (1983)). Furthermore, "changes in the conditions of confinement having a substantial adverse impact on the prisoner are not alone sufficient to invoke the protections of the Due Process Clause '[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him.' " *Vitek v. Jones,* 445 U.S. 480, 493 (1980) (quoting *Montanye v. Haymes,* 427 U.S. 236, 242 (1976)).

However, when a prisoner is subjected to conditions that are "unexpected," *Sandin v. Conner,* 515 U.S. 472, 484 (1995), and "qualitatively different from the punishment characteristically suffered by a person convicted of crime," the Due Process Clause itself confers a liberty interest. *Vitek v. Jones,* 445 U.S. at 493 (holding an involuntary transfer to a state mental hospital implicated a liberty interest protected by the Due Process Clause); *see also, Washington v. Harper,* 494 U.S. 210 (1990) (finding the Due Process Clause provides a liberty interest in being protected from the involuntary administration of psychotropic drugs).

In the case at bar, Plaintiff's disciplinary confinement in SHU does not constitute an "unexpected" change in condition, nor

did those conditions exceed the sentence imposed upon him. *See Dawes v. Dibiase,* 1997 WL 376043, at \*4 (N.D.N.Y. July 3, 1997) (citing *Washington v. Harper & Vitek v. Jones* for the proposition that the Due Process Clause will apply by its own force only for deprivations much more severe than solitary confinement for a year). Therefore, Plaintiff does not have a liberty interest in remaining free from SHU confinement emanating from the Due Process Clause itself.

State statutes and regulations may also confer liberty interests to prisoners. *Arce v. Walker,* 139 F.3d at 334 (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. at 460). The Supreme Court held in *Sandin v. Conner* that state created liberty interests shall be limited to those deprivations which subject a prisoner to "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. at 484. Thus, a prisoner asserting a denial of due process as a result of segregated confinement or loss of privileges must (1) make a threshold showing that an atypical and significant hardship was imposed upon him, and (2) establish that the "state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint." *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

 **\*6**  While the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the *Sandin* standard, *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999), it has made clear that confinement in SHU for a period of one year constitutes atypical and significant restraint on inmates, deserving due process protections, *Sims v. Artuz,* 230 F .3d 14, 23 (2d Cir.2000) (stating that confinement in SHU exceeding 305 days was atypical); *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000) (finding 305 days of SHU confinement atypical).

Thus, while Plaintiff cannot claim a liberty interest emanating from the Due Process Clause itself, he has by virtue of being confined in SHU for over a year passed the *Sandin* threshold for constitutional protection of a state-created liberty interest. Because New York State has created by statute or regulation a liberty interest in remaining free from segregated confinement, Plaintiff has stated a valid due process claim based on a constitutionally protected, state-created liberty interest. *Sher v. Coughlin,* 739 F.2d 77, 81 (2d. Cir.1984); *Alvarez v. Coughlin,* 2001 WL 118598, at \*6 (N.D.N.Y. Feb. 6, 2001) (holding *Sandin* does not affect the validity of prior decisions holding New York State

Regulations create a protected liberty interest in remaining free from disciplinary segregation).

Having made a threshold showing of atypical and significant confinement, we must consider whether Plaintiff, prior to his confinement, was afforded the minimum requirements of due process. *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974). A prisoner placed in administrative segregation must be provided (1) advanced written notice of the charges against him at least twenty-four hours prior to the hearing; (2) the opportunity to appear at the hearing, call witnesses, and present rebuttal evidence; and (3) a written statement as to the evidence relied upon and the reasons for the disciplinary action taken. *Id.* at 564-66; *see also Freeman v. Rideout,* 808 F.2d 949, 953 (2d Cir.1986); *Taylor v. Rodriguez,* 238 F.3d 188, 192 (2d Cir.2001) (quoting *Hewitt v. Helms,* 459 U.S. 460, 476 (1983).

### 1. Notice

"Notice" should be something more than a mere formality. *Benitez v. Wolff,* 985 F.2d 662, 665 (2d Cir.1993). "The effect of the notice should be to compel 'the charging officer to be [sufficiently] specific as to the misconduct with which the inmate is charged' to inform the inmate of what he is accused of doing so that he can prepare a defense to those charges and not be made to explain away vague charges set out in a misbehavior report." *Taylor v. Rodriguez,* 238 F.3d at 192-93 (quoting *McKinnon v. Patterson,* 568 F.2d 930, 940 n.11 (2d Cir.1977)) (alteration in original).

In this case, Plaintiff was served with an Inmate Misbehavior Report, dated March 17, 2002, in which he was charged by Officer Young with possession of a weapon, assault, fighting, and threat of violence. Mans Affirm., Ex. A-3, Inmate Misbehavior Rep. Johnson acknowledged receipt of the Misbehavior Report by signing the Hearing Record Sheet and does not contest receipt of such Report. Mas Affirm. Ex. A-9 at p. 2, Hr'g Record Sheet.

**\*7** We find that Plaintiff was provided sufficient notice to fulfill the requirements of due process.

### 2. Hearing

A prisoner must be afforded the opportunity to appear at the Disciplinary Hearing, to call witnesses, and to present rebuttal

evidence. *Wolff v. McDonnell,* 418 U.S. at 556. "Although the hearing requirement for placement in administrative segregation may be met by an 'informal, nonadversary' proceeding, *Hewitt [v. Helms,]* 459 U.S. at 476, it is a bedrock requirement of due process that such hearing be held 'at a meaningful time and in a meaningful manner,' *Matthews v. Eldridge,* 424 U.S. 319, 333 (1976)." *Taylor v. Rodriguez,* 238 F.3d at 193.

Plaintiff was provided an assistant of his choice, received all requested documents, and requested Inmates Angulo and Temple to testify as his only inmate witnesses. At the Hearing presided by Defendant Officer Doling on March 21, 2002, Plaintiff was advised of the procedure and of his rights and was read the charges against him as reflected in the Misbehavior Report. Hr'g Tr. at pp. 1-2. Plaintiff claims Doling violated his due process rights at various times during the course of the Hearing. Compl. at ¶ 39.

### a. Witnesses

First, Plaintiff asserts he was denied the opportunity to call witnesses as part of his defense. *Id.* An inmate's right to call witnesses is not the same as a defendant in a criminal trial, but rather, is qualified by the circumstances of prison life. *Wolff v. McDonnell,* 418 U.S. at 566-67. The Supreme Court has stated that disciplinary hearing officers must have the discretion to deny witnesses, noting that valid bases for the denial of witnesses would include irrelevance, lack of necessity, and other hazards particular to each case. *Id.* (noting that the right to call witnesses must be balanced against legitimate penological interests).

Plaintiff attempted to call as witnesses Inmates Angulo (the victim) and Temple (mentioned in the Unusual Incident Report). Angulo refused to testify, stating in his signed refusal form he didn't know Plaintiff. Mans Affirm., Ex A-9 at p. 4, Requested Inmate Witness Refusal to Testify Form, dated Mar. 21, 2002. Inmate Temple, without offering any reasons, also refused to testify as recounted by Officer Stemp. Hr'g Tr. at p. 18.

A failure to summon the testimony of a witness who has refused to testify, in the absence of evidence that the refusal was linked to intimidation on the part of prison officials, does not violate due process because calling a witness who refuses to speak upon questioning would be futile. *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993); *see also Rossi v.*

*Goord,* 2006 WL 2811505, at *14 (N.D.N.Y. Sept. 28, 2006). The hearing officer does not have to conduct an independent investigation before accepting an inmates-witness's refusal to testify. *Dumpson v. Rourke,* 1997 WL 610652, at *1 (N.D.N.Y. Sept. 28, 2006) (citing *Greene v. Coughlin,* 1995 WL 60020, at *14 (S.D.N.Y. Feb. 10, 1995). In this case, the record provides no evidence nor intimation that either refusal was made because of intimidation. The fact Temple did not sign a refusal form did not even amount to a violation of any New York State Regulation, let alone a constitutional due process violation. *See,* 7 N.Y. COMP.CODES R. & REGS. tit. 7, § 253 .5. Therefore, Officer Doling's refusal to compel these witnesses' appearance does not constitute a due process violation.

**\*8** Plaintiff also attempted to call as witnesses Sgt. Brown, who investigated the incident, and Lt. Armstrong, who received an interdepartmental communication about the incident from Officer Young. Defendant Officer Doling denied calling them for lack of relevancy. Hr'g Tr. at pp. 13-17. Doling ruled that neither Lt. Armstrong nor Sgt. Brown personally witnessed the incident, and thus could not offer any relevant information. Irrelevancy is a valid grounds for the denial of a witness. *Wolff v. McDonnell,* 418 U.S. at 566-67. Although Plaintiff correctly points out that the Misbehavior Report did not include information pertaining to other inmates who were allegedly involved in the incident, possibly in contravention of the protocol laid out in Departmental Regulation § 251-3.1, such an omission does not change the charges against him nor the evidence relevant to that charge. Violation of state law alone is generally insufficient to establish a constitutional violation. *See Soto v. Walker,* 33 F.3d 169, 173 (2d Cir.1993). Additionally, the UIR, which identified other inmate participants, is congruent with Young's Misbehavior Report in that both state that Young observed Johnson stabbing and slashing Angulo with an eight inch sharpened metal shank with a cloth handle. In determining that their testimony was irrelevant, Doling's refusal to call Brown and Armstrong did not violate due process.

Plaintiff was allowed to call and question Officer Young as a witness. Hr'g Tr. at pp. 6-10. Young affirmed the charges described in his Misbehavior Report. *Id.* Doling also called Inmate Ingram and examined him after Plaintiff was removed from the Hearing .[3] *Id.* at pp. 20-22. For the reasons stated above, it is therefore recommended that summary judgment be **granted** as to this claim.

### b. Ejection from Hearing

Second, Plaintiff asserts Doling deprived him of due process when he evicted him from the Hearing and continued it in his absence. Compl. at ¶ 39. Defendants argue due process does not entail the right to be physically present at a disciplinary hearing. Dkt. No. 34-24, Defs' Mem. of Law, at p. 17 (citing *Bogle v. Murphy,* 2003 WL 22384792 (W.D.N.Y. Sept. 9, 2003) for the proposition that violations of New York State Regulations do not necessarily constitute constitutional due process violations, and *Francis v. Coughlin,* 891 F.2d 43, 48 (2d Cir.1989) for the Second Circuit's determination that "[p]rison inmates do not possess a constitutional right to be present during the testimony of witnesses during a disciplinary proceeding"). We recently recognized in *Holloway v. Selsky* the existence of conflicting Second Circuit opinions regarding whether prisoners have a right to be present at disciplinary hearings under the Due Process Clause. 2007 WL 433375, at *7 (N.D.N.Y. Feb. 6, 2007). In that case, we noted that in *Francis v. Coughlin,* 891 F.2d 43, 48 (2d Cir.1989), the Second Circuit declared nonexistent the right of an inmate to be present at a disciplinary hearing, while in two subsequent cases, the Second Circuit affirmed a limited right to be present during disciplinary hearings: in *Young v. Hofman,* 970 F.2d 1154 (2d Cir.1992), the Second Circuit stated that "[t]he Due Process Clause provides inmates with several protective procedures that they may expect at disciplinary hearings, *including the opportunity to appear at the hearing* and to call witnesses" (emphasis added) and in *Chavis v.. Zodlow,* 2005 WL 834646, at *3-4 (2d Cir.2005), it stated that prisoners have a "limited right to be present" during disciplinary hearings. In *Holloway,* we declined to address this constitutional issue because the Plaintiff failed to make the threshold showing of a constitutionally protected liberty interest under the atypical and significant standard. *Holloway v. Selsky,* 2007 WL 433375, at *7. In the case at bar, no such roadblock prevents our consideration of this constitutional issue.

**\*9** The Second Circuit has held that the limited right to call witnesses, present evidence, and comment on the charges brought are facially valid constitutional claims. *Sims v. Artuz,* 230 F.3d 14, 24 (2d Cir.2000) (citing *Wolff v. McDonnell,* 418 U.S. at 555-72). We find implicit in the Supreme Court's decision in *Wolff* the limited right to be physically present at disciplinary hearings in order to exercise the aforementioned basic due process rights. *Chavis v. Zodlow,* 2005 WL 834646 at *3-4 (stating that the Supreme Court in *Wolff v. McDonnell*

"acknowledg[ed] an inmate's limited right to be present during his disciplinary hearing"). While this right must necessarily be limited by penological interests, the *per se* denial of such right would undermine the requirement that disciplinary hearings be held "at a meaningful time and in a meaningful manner." *Matthews v. Eldridge,* 424 U.S. 319, 333 (1976); *see also Wolff v. McDonnell,* 418 U.S. at 566 (stating "we must balance the inmate's interest ... against the needs of the prison, and some amount of flexibility and accommodation is required").

However, because we recognize that neither the Supreme Court nor the Second Circuit has clearly articulated the right of prisoners to be present at disciplinary hearings, Defendants are entitled to qualified immunity. *African Trade & Info. Ctr., Inc. v. Abromaitis,* 294 F.3d 355, 359 (2d Cir.2002). Qualified immunity will shield "government officials from liability for civil damages when their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Id.* at 359 (2d Cir.2002) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)); *see also Mollica v. Volker,* 229 F.3d 366, 370 (2d Cir.2000). Violation of a duty under state law does not defeat qualified immunity because there must be a clearly established *federal* right on which the claim for relief is based. *Elder v. Holloway,* 510 U.S. 510, 515-16 (1994) (citing *Davis v. Scherer,* 468 U.S. 183, 197 (1984)). In order for the constitutional right to be clearly established, three elements must be met: "1) ... [that] the right in question [be] defined with reasonable specificity; 2) [that] the decisional law of the Supreme Court and applicable circuit court support the existence of the right in question; and 3) [that] under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful." *Mollica v. Volker,* 229 F.3d at 371 (internal quotation marks and citations omitted) (alterations in original).

Because neither the Supreme Court nor the Second Circuit has clearly established the right of prisoners to be present at a disciplinary hearing, qualified immunity applies and it is recommended that summary judgment on this claim be **granted.**

### c. Right to Present a Defense

Plaintiff asserts Doling denied him the opportunity to present a defense. Compl. at ¶ 39. Specifically, Plaintiff objects to Doling's determination that the discrepancy of the numbered

label on the evidence bag was due to a typographical error, to his refusal to call certain witnesses, and to the Misbehavior Report, which failed to include a description of the participation of three other inmates who were named in the UIR. Pl.'s Mem. of Law at pp. 15-20. These objections are without merit. As discussed above, Doling acted within his authority when he declined to call witnesses for lack of relevancy. *See supra* Part II.B.2.a at pp. 12-14. Further, the charges brought against Plaintiff in the Misbehavior Report are not contradicted by the UIR, and are in fact affirmed by it. *Compare* Inmate Misbehavior Report (stating Plaintiff was "swinging and stabbing inmate Angulo") *with* Unusual Incident Report (stating Plaintiff was "using a metal shank stabbing and slashing at Angulo"). Finally, Doling's determination that a typographical error was the cause of the mislabeled evidence bag, affirmed by Officer Young's testimony, was not unreasonable. Hr'g Tr. at pp. 6-9. And, as previously discussed with respect to Plaintiff's dismissal from the hearing, qualified immunity applies, and it is therefore recommended that summary judgment on this claim be **granted.**

### d. Fair and Impartial Hearing

**\*10** Plaintiff claims he received an unfair and partial hearing before Hearing Officer Doling. Compl. at ¶ 39. An inmate subject to a disciplinary hearing is entitled to an impartial hearing officer who does not prejudge the evidence. *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996). But, it has been held that "prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Id.* at 259 (citing *Russell v. Selsky,* 35 F.3d 55, 60 (2d Cir.1994) and *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989).

The Hearing Transcript reveals a contentious proceeding characterized by frequent interruptions and heated exchanges between Plaintiff and Doling. *See generally* Hr'g Tr. Notwithstanding, until his dismissal from the proceeding, Plaintiff was provided the opportunity to testify, call and question witnesses, and raise objections on which Doling ruled and explained his reasoning to Plaintiff. *Id.* Disagreement with rulings made by a hearing officer does not constitute bias. *Cf. Dumpson v. Rourke,* 1997 WL 610652, at \*6 (N.D.N.Y. Sept. 26, 1997) (stating "[t]he fact that the hearing officer did not decide in the plaintiff's favor does not make him biased in the constitutional sense"). We find no genuine issues of material fact concerning Doling's

impartiality and therefore it is recommended that summary judgment be **granted** on this claim.

### 3. Written Statement of the Evidence Relied Upon

Plaintiff claims he did not receive a written disposition of the Disciplinary Hearing or statement of the evidence relied upon. Compl. at ¶ 39. Prisoners are entitled to a "written statement of the factfinders as to the evidence relied upon and the reasons for the disciplinary action taken." *Wolff v. McDonnell,* 418 U.S. at 563. Provision of a written disposition is a mechanism that ensures the inmate protection against "collateral consequences based on a misunderstanding of the nature of the original proceeding.... Without written records, the inmate will be at a severe disadvantage in propounding his own cause to or defending himself from others." *Id.* at 565.

After declaring Plaintiff guilty of the charges brought, Doling imposed a penalty of 730 days in SHU with attendant loss of privileges, annunciated a statement of the evidence which was relied upon, and directed Officer Catalfamo to deliver the Hearing Disposition together with an appeal form to Plaintiff within 24 hours. Hr'g Tr. at p. 22. Defendants provide an Interdepartmental Communication from Officer Catalfamo, dated March 29, 2002, wherein he asserts he delivered a copy of the disposition form to Plaintiff and also informed Plaintiff of his right to appeal the disposition within thirty days. Mans Affirm., Ex. A-9 at p. 6, Interdepartmental Commc'n, dated Mar. 29, 2002. Plaintiff asserts those documents were never delivered to him as Doling directed. Pl.'s Mem. of Law at pp. 20-21. However, Plaintiff did receive a copy of the disposition within a month after the Hearing, and was able to file an appeal on which he eventually prevailed. Mans Affirm ., Ex. A, Dep. of Andre Johnson, dated Sept. 12, 2006, at pp. 47-51 (stating he received them sometime in April 2002); *see also* Mans Affirm. Exs. a-11 & A-12 (letters from Plaintiff requesting extensions of time to file an appeal and noting he received an audio tape of the Hearing along with a cassette player). Any potential constitutional violation was therefore cured because the delay in no way prejudiced Plaintiff, as evidenced by the fact that he filed an appeal and was ultimately successful, and therefore it is recommended that summary judgement be **granted** on this claim.

Footnotes

### C. Due Process Claims Against Defendant Murphy

 **\*11** Plaintiff claims Murphy violated his due process rights by failing to remedy the alleged constitutional violations he suffered. Compl. at ¶¶ 40-41. Plaintiff does not allege that Defendant Murphy was personally involved in any wrongdoing, and thus his theory of liability rests solely on Murphy's supervisory status. Because we find that Defendant Doling did not violate any clearly established constitutional rights, Defendant Murphy cannot be held liable on any grounds. *See supra* Part B, Due Process Claims Against Defendant Doling. It is therefore recommended that summary judgment be **granted** as to the claims against Murphy.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Summary Judgment (Dkt. No. 34) be **GRANTED** and the Complaint (Dkt. No. 1) be **DISMISSED** against all Defendants, and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

### All Citations

Not Reported in F.Supp.2d, 2007 WL 3046701

1    When the Plaintiff has not objected to a particular statement of fact proffered in the Defendants' 7.1 Statement, we will not cite to both 7.1 Statements, only to the Defendants'. *See* N.D.N.Y.L.R. 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."*) (emphasis in original).

2    Plaintiff asserts Doling told Officer Catafalmoto to "get this piece of shit out of here." Pl.'s 7.1 Statement at ¶ 7. There does appear to be a break in the transcript before Doling announces he has expelled Plaintiff. Hr'g Tr. at p. 19.

3    We consider Plaintiff's ejection and the continuation of the Hearing in his absence below.

---

**End of Document**    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 796179
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Michael WEBB, Plaintiff,

v.

Donald SELSKY, Director of Special Housing
Program for the Department of Correctional
Services, Captain M. Kearney at Southport
Correctional Facility, and Lt. Nagy at
Greenhaven Correctional Facility, Defendants.

No. 01-CV-149S.
|
March 24, 2008.

**Attorneys and Law Firms**

Michael Webb, Comstock, NY, pro se.

**DECISION AND ORDER**

WILLIAM M. SKRETNY, District Judge.

**I. INTRODUCTION**

**\*1** In this action, pro se Plaintiff Michael Webb
alleges, pursuant to 42 U.S.C. § 1983, that Defendants
violated his due process rights by failing to properly
conduct disciplinary hearings while he was incarcerated
at Green Haven Correctional Facility and Southport
Correctional Facility in the custody of the Department
of Correctional Services. Presently before the Court is
Defendants' Motion for Summary Judgment. [1] (Docket
No. 60). For the following reasons, Defendants' Motion is
granted in its entirety.

**II. BACKGROUND**

**A. Procedural History**

Plaintiff's Complaint was filed on March 2, 2001.
Because Plaintiff was granted *in forma pauperis* status,
his Complaint was screened pursuant to 28 U.S.C. §§
1915(e)(2)(B) and 1915(a). As a result of this screening
process, it was determined that only Plaintiff's claims

against defendants Selsky, Kearney and Nagy, in their
individual capacities, were actionable. Defendants filed
the instant Motion for Summary Judgment on October
16, 2006. Plaintiff's Statement of Disputed Facts was filed
on January 3, 2007 and his Memorandum in Opposition
was filed on January 8, 2007. Defendants did not file any
reply papers. The Court (Elfvin, J.) deemed the matter
submitted on the papers on January 12, 2007. The matter
was reassigned to the undersigned on October 17, 2007.
The facts underlying Plaintiff's claims are discussed below.

**B. Facts**

1. *1997 Green Haven Hearing*

On August 11, 1997, Plaintiff was ordered to "double
bunk" in a cell at the Green Haven Correctional Facility.
(Plntf's Rule 56 Stmt. ¶ 2). Plaintiff refused to do so and
was charged with interference with an employee, threats
and refusing a direct order. (Plntf's Rule 56 Stmt. ¶ 3.)
In preparation for his hearing on the charges, Plaintiff
requested that he be provided with the medical and
mental health forms permitting him to be double bunked.
(Plntf's Rule 56 Stmt. ¶ 4; R. 122-23). [2] In a letter to his
legal assistant, Plaintiff also asked for the "mental health
professional who reviewed my records and approved me
for double bunking status." (R. 123).

On August 17, 1997, defendant Nagy commenced the
disciplinary hearing. (Plntf's Rule 56 Stmt. ¶ 6). At
the hearing, Plaintiff argued that his medical condition
precluded him from double bunking, (R. 133), and
requested that Nagy call various witnesses whose names
were unknown to Plaintiff. (Plntf's Rule 56 Stmt. ¶ 7;
R. 132-33.) Defendant Nagy adjourned the hearing and
instructed Plaintiff to go on sick call and be seen by a
doctor, physician's assistant or registered nurse to obtain
a written statement documenting his medical preclusion
from double bunking. (Plntf's Rule 56 Stmt. ¶ 8; R. 134).
Nagy also instructed Plaintiff to obtain the names of any
other witnesses he wanted to call. (R. 134).

Nagy reconvened the hearing on August 20, 1997.
Nagy called as a witness, Nurse Faour who appeared
at the hearing with Plaintiff's medical records. (Plntf's
Rule 56 Stmt. ¶ 10; R. 135). Faour testified that
based on Plaintiff's medical records, including a physical
examination conducted on August 19, 1997, Plaintiff was
not precluded from double bunking. (R. 135-36). Plaintiff
interposed an objection during Faour's testimony, but

Nagy instructed him to hold his objection and the basis of the objection was not articulated. (R. 135). When Nagy provided Plaintiff with an opportunity to speak, Plaintiff only raised an objection to Nagy presiding over the hearing because he claimed that only a Captain or the Superintendent could preside over a Superintendent's hearing. (R. 137). No other witnesses were called or requested by Plaintiff during the remainder of the hearing. [3]

**\*2** On August 20, 1997, Nagy found Plaintiff guilty of the charges and imposed a penalty of 120 days [4] confinement in his cell, loss of packages, commissary and phone and recommended the loss of six months of good time credits. (Plntf's Rule 56 Stmt. ¶ 12; R. 138). Plaintiff appealed the determination to defendant Selsky. On October 21, 1997, Selsky modified Plaintiff's sentence by dismissing the charge of interference with an employee and reducing Plaintiff's punishment to 90 days keeplock confinement and loss of privileges and recommended the loss of three months of good time credits. (Plntf's Rule 56 Stmt. ¶ 12; R. 140). [5] Plaintiff served 90 days in keeplock confinement from August 11, 1997 to November 9, 1997 at Green Haven, Wende and Attica correctional facilities. (Plntf's Rule 56 Stmt. ¶ 19; R. 93). [6] Plaintiff filed an Article 78 proceeding challenging the outcome of the hearing. While the Article 78 proceeding was pending, Plaintiff's sentence was administratively reversed, and thus the Article 78 proceeding was dismissed as moot. (Plntf's Rule 56 Stmt. ¶ 18; R. 203-04).

Plaintiff testified at his deposition concerning the conditions of his keeplock confinement. Plaintiff was confined to his cell for 23 hours per day with one hour outside of his cell for recreation. (R. 94-95). Plaintiff chose not to avail himself of the hour of recreation and instead chose to remain in his cell for 24 hours per day. (R. 95). Depending on the facility at which Plaintiff was housed, his cell was located in general population, or in a unit specifically designated for keeplock. (R. 94). Plaintiff took meals in his cell but was permitted visitors in accordance with the facility's regular schedule. (R. 95, 96). [7]

### 2. *1998 Southport Hearing*

On May 13, 1998, while incarcerated at the Attica Correctional Facility, Plaintiff was again charged with several disciplinary infractions, including assault on staff,

violent conduct, creating a disturbance and interference with an employee. (Plntf's Rule 56 Stmt. ¶ 20). A rehearing [8] commenced on August 20, 1998, by which time Plaintiff had been transferred to Southport Correctional Facility. (Plntf's Rule 56 Stmt. ¶ 24). Defendant Kearney presided over the rehearing at Southport. The rehearing was tape recorded, however, large portions of that recording were inaudible and thus were unable to be properly transcribed. [9]

Plaintiff requested that testimony from nine inmates be taken as part of his defense. (Plntf's Rule 56 Stmt. ¶ 25; R. 163). None of the inmate witnesses whose testimony was sought by Plaintiff resided at Southport. During the hearing, Kearney indicated that several of the inmates had refused to testify and Kearney reviewed the refusal forms with Plaintiff. (R. 168-170). Kearney also indicated that two inmates, Sales and Vasquez had agreed to testify, and a third inmate, McKinney had submitted a written statement. (R. 173-74). At some point during the hearing, Plaintiff was removed for being disruptive. The incident leading to Plaintiff's removal was not recorded. Shortly after the incident, however, Kearney placed the following statement on the record:

> **\*3** The time is 1:42 p.m. I was just about to reconvene the tier hearing on Webb, Michael, Webb 90 Alfa 4906. Mr. Webb came into the uh hearing room, refused to speak to the hearing officer, and then un referred to the hearing officer as another one. Stating that I was a house nigger. Uh the inmate has been removed from the hearing room. I am going to continue the hearing without inmate Webb.

(R. 186).

During the remainder of the hearing, Kearney telephoned Attica Correctional Facility and attempted to elicit testimony from inmates Sales and Vasquez. [10] (R. 186). Kearney's discussion with inmate Sales was recorded. The portions of Sales' responses to Kearney's questions reveal that Sales had no recollection of the incident. (R. 186). Other portions of Sales' responses were inaudible. The recording indicates that inmate Vasquez was also asked various questions but Vasquez's responses were

not audible on the tape. (R. 186). In a summary of the questioning of the inmates, Kearney stated that he took testimony from inmate Sales and that inmate Vasquez initially disclaimed knowledge of the incident and then claimed to be unable to speak English. (R. 155). Kearney also heard testimony from Lt. Dixon, who did not see the beginning of the incident (and hence could not testify as to whether Plaintiff had committed the assault) but who witnessed the attempts to restrain Plaintiff.

At the conclusion of the rehearing, Kearney adjudged Plaintiff guilty of assault on staff, violent conduct and interference with an employee [11] and imposed a penalty of 465 days in the Special Housing Unit ("SHU") and loss of other privileges, and recommended the loss of 12 months of good time credits. (Plntf's Rule 56 Stmt. ¶ 39; R. 190). Plaintiff appealed that determination to defendant Selsky who affirmed the determination and penalty on November 13, 1998. (R. 196). On June 4, 1999, however, Selsky reduced Plaintiff's penalty to 12 months in the SHU and loss of 12 months good time. (R. 197-98). Plaintiff filed an Article 78 proceeding challenging his August 1998 rehearing and, on December 21, 1999, the New York State Supreme Court, Chemung County, vacated the guilty determination and ordered expungement based on Kearney's failure to comply with state law requirements that he verify the inmates' refusals to testify. (R. 199-201). [12]

Plaintiff contends that his procedural due process rights were violated by Nagy's failure during the 1997 disciplinary hearing to call the facility physician rather than a nurse as a witness, and by Kearney's failures during the 1998 disciplinary hearing to (1) verify that the inmate witnesses called by Plaintiff had actually refused to testify; and (2) preserve on the record the reasons why testimony was not taken from inmate witnesses Sales and Vasquez; and (3) improperly removed Plaintiff from the hearing. Plaintiff argues that Selsky also contributed to the violation of these rights by affirming the decisions reached upon the conclusion of these allegedly faulty hearings.

### III. DISCUSSION AND ANALYSIS

#### A. Summary Judgment Standard

**\*4** Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is warranted where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); Ford v. Reynolds, 316 F.3d 351, 354 (2d Cir.2003). A fact is "material" if it "might affect the outcome of the suit under governing law." Anderson, 477 U.S. at 248. In a case where the non-moving party bears the ultimate burden of proof at trial, the movant may satisfy its burden by pointing to the absence of evidence supporting an essential element of the non-moving party's claim. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

At this stage, the function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. Thus, summary judgment is not appropriate if "there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." Ford, 316 F.3d at 354.

When deciding a motion for summary judgment, a court must view the evidence and the inferences drawn from the evidence "in the light most favorable to the party opposing the motion." Addickes v. S.H. Kress and Co., 398 U.S. 144, 158-59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970). However, the party against whom summary judgment is sought "must do more than simply show that there is some metaphysical doubt as to the material facts .... [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir.2002). "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.1991).

Where, as here, a pro se litigant is involved, the pleadings are construed liberally and interpreted to "raise the strongest arguments they suggest." McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir.1999). However, "at some point in a lawsuit even pro se litigants must make clear to the court their claims and the facts that they believe entitle them to specific relief. The summary judgment stage is an

appropriate juncture to identify the real issues in a case." *Salahuddin v. Coughlin,* 781 F.2d 24, 29 (2d Cir.1986).

### B. Due Process Standard

Plaintiff contends that Nagy violated his due process rights at the 1997 Green Haven hearing because Nagy refused Plaintiff's request to call as a witness a facility physician who examined Plaintiff. Plaintiff next contends that Kearney violated his due process rights at the 1998 Southport rehearing by failing to verify that certain inmate witnesses requested by Plaintiff had, in fact, refused to testify on his behalf, by failing to obtain the testimony of the two inmates who had agreed to testify and by improperly removing Plaintiff from the hearing. Finally, Plaintiff contends that defendant Selsky violated his due process rights by failing to remedy the violations of his rights by Nagy and Kearney. Defendants argue that Plaintiff was either not entitled to due process protections or that any process due him was provided at both of the hearings. Defendants further argue that, even if Plaintiff's due process rights were violated, they are entitled to qualified immunity because his right to due process was not clearly established at time.

**\*5** An inmate has "no right to procedural due process at his hearing unless a liberty interest" was infringed as a result. *Scott v. Albury,* 156 F.3d 283, 287 (2d Cir.1998). An inmate has a liberty interest in remaining free from disciplinary confinement that "imposes [an] atypical and significant hardship in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). In determining whether or not the confinement presents such a hardship, the Court looks to the actual punishment. *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (*citing* Scott, 156 F.3d at 287). The court considers such factors as "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions" and "the duration of the disciplinary segregation imposed compared to discretionary confinement." *Id.* (*quoting* Wright v. Coughlin, 132 F.3d 133, 136 (2d Cir.1998)). "Both the conditions and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." *Sealey v. Giltner,* 197 F.3d 578, 586 (2d Cir.1999). In *Sealey,* the Second Circuit concluded that confinement in the SHU under normal conditions for a period up to 101 days generally does not constitute an "atypical" hardship.

*Sealey,* at 589. However, the Second Circuit has also "noted that SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions of *Sealey* or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer,* 364 F.3d at 65. Courts are instructed to develop a detailed factual record when the period of confinement is "intermediate" in duration or between 101 and 305 days. *Sealey,* at 589. Confinement exceeding 305 days, without more, is sufficient to constitute an infringement of a liberty interest. *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000).

If a liberty interest has been infringed, the court must then consider whether adequate procedural due process has been provided. The Second Circuit has stated:

> [A]n inmate is entitled to advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken.

*Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citations omitted). An inmate's right to call witnesses is not unlimited and a hearing officer may exclude witness testimony where such exclusion is "justifiable." *Scott v. Kelly,* 962 F.2d 145, 146 (2d Cir.1992). Testimony or other evidence may be excluded where it is "irrelevant or unnecessary." *Kalwasinski v. Morse,* 201 F.3d 103, 109 (2d Cir.1999). A hearing officer who excludes such evidence, however, bears the burden of explaining the rationale for the exclusion either at the hearing or "later," *i.e.,* in defense of a lawsuit. *Ponte v. Real,* 471 U.S. 491, 497-98, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985); *Scott,* 962 F.2d at 147.

### 1. *1997 Green Haven Hearing*

**\*6** Defendants contend that they are entitled to summary judgment because Plaintiff's 90 day term of keeplock confinement, as a matter of law, does not implicate a liberty interest. Defendants further assert that, even

if Plaintiff's liberty interest has been burdened, he was afforded due process because the testimony of the facility physician as sought by plaintiff "would have been neither relevant nor necessary." Def's Mem. at 6. In opposition, Plaintiff discusses the factors the Court considers when determining whether a liberty interest is stated. Plaintiff notes that most of his keeplock confinement was served at Wende and Attica correctional facilities, both of which segregate their keeplocked inmates on separate companies or blocks, away from the general population. Plaintiff does not contend that he was subjected to any conditions more onerous than the normal keeplock confinement restrictions.

The Court concludes that Plaintiff's 90 day period of confinement, which was served under normal keeplock conditions, does not implicate a liberty interest and thus Plaintiff cannot state a due process claim arising from Nagy's August 1997 Green Haven hearing. Accordingly, Defendants' Motion for Summary Judgment is granted as to this claim. [13]

#### 2. *1998 Southport Rehearing*

Defendants argue that Plaintiff's August 1998 rehearing comported with due process because Kearney was not required to independently verify the refusals of various inmates to testify on Plaintiff's behalf. [14] Defendants further argue that Kearney did not violate Plaintiff's rights by removing him from the hearing and that, even if such action did violate Plaintiff's rights, Kearney is entitled to qualified immunity. [15] Plaintiff argues that Kearney should have verified that each inmate had refused to testify, that Kearney failed to obtain the testimony of the inmates who had agreed to testify and that Kearney improperly removed him from the hearing.

As previously noted, six out of the nine inmate witnesses requested by Plaintiff refused to testify on his behalf. During the rehearing, Kearney discussed those witnesses with Plaintiff and Plaintiff was provided with copies of forms documenting their refusals to testify. "A failure to summon the testimony of a witness who has refused to testify, in the absence of evidence that the refusal was linked to intimidation on the part of prison officials, does not violate due process because calling a witness who refuses to speak upon questioning would be futile." *Johnson v. Doling,* No. 9:05-CV-376, 2007 WL 3046701, at * 7 (N.D.N.Y. Oct.17, 2007) *(citing Silva v. Casey,* 992

F.2d 20, 22 (2d Cir.1983)). Plaintiff has not alleged, and the record provides no indication, that intimidation by prison officials resulted in the refusals of the witnesses. Thus, the failure to call these witnesses did not violate due process.

Plaintiff also alleges that Kearney failed to obtain testimony from two witnesses, Sales and Vasquez, who had agreed to testify. Plaintiff contends that when Kearney contacted the facility at which the inmates were housed, Kearney could not hear the inmates' responses to his questions and therefore failed to obtain their testimony.

**\*7** The following exchange appears in the transcript of the hearing:

> Kearney: Uh, the time is 1:43. I'm going to stop the tape and call Attica Correctional Facility. All right this is Captain Kearney at Southport Correctional Facility. The time is 1:53. I have via speaker phone inmate, would you state your name please?
>
> Sales: Inmate Sales.
>
> Kearney: Okay. The incident occurred on May 13th, 1998 at approximately 4:30 in B-Block at the Attica Correctional Facility. Do you remember an incident?
>
> Sales: No.
>
> Kearney: You don't remember the incident?
>
> Sales: I wasn't, I have not information on, on the ....... this.
>
> Kearney: Okay could you put Mr. Small on the phone.
>
> Sales: Who?
>
> Kearney: Oh Vez, Vasquez rather. Inmate Vasquez is there with you? Inmate Vasquez is there? Hello Mr. Vasguez this is Captain Kearney at Southport Correctional Facility. Uh do you remember an incident that occurred in B-Block in May of this year involving inmate Webb? In B-Block on 14 Company? Do you recall the incident? An inmate got in an argument and then a fight with an officer. Yes do you recall that incident? (Please note I could not hear the other end of this conversation taking place.) (End of Side B Tape 98-592).

R. 186.

Based on this Court's reading of the transcript, it appears that Kearney did, in fact, speak to both Sales and Vasquez but their responses were inaudible on the tape recording of the hearing and therefore were not transcribed. This reading is confirmed by another portion of the transcript wherein Kearney summarizes the testimony of Sales and Vasquez. (R. 155, 189). [16] Thus, Kearney did not fail to contact these witnesses.

Finally, Plaintiff alleges that Kearney erred by removing him from the hearing. Defendants, citing *Francis v. Couglin,* 891 F.2d 43, 48 (2d Cir.1989), argue that Plaintiff had no constitutional right to be present during the testimony of witnesses. More recent Second Circuit cases, however, mention an inmate's right to be present at a hearing. In *Young v. Hoffman,* 970 F.2d 1154, 1156 (2d Cir.1992), the Second Circuit referred to "the opportunity to appear at the hearing and to call witnesses." Similarly, in the unreported decision in *Chavis v. Zodlow,* 128 Fed. Appx. 800, 805, No. 04-0447, 2005 WL 834646, at *3-*4 (2d Cir.2005), the Second Circuit stated that the Supreme Court in *Wolff v. McDonnell* [17] acknowledged an inmate's limited right to be present during his disciplinary hearing. Thus, it would appear that Plaintiff may have had at least a limited right to appear at his hearing.

This Court need not decide whether Kearney's actions in excluding Plaintiff from a portion of the hearing due to Plaintiff's alleged misbehavior constitute a violation of due process because, even if Plaintiff's right to appear was violated, Kearney is entitled to qualified immunity. Qualified immunity is available to a defendant unless his or her actions violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 815, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In determining whether a particular right is clearly established, courts consider:

> **\*8** (1) whether the right in question was defined with reasonable specificity; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a

> reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991). As noted, the law of this circuit at best intimates or implies the existence of a right, or a limited right, of an inmate to be present at his disciplinary hearing. [18] The contours of that right have not been clearly established such that a reasonable person, in Kearney's position, would have known that excluding Plaintiff violated his due process rights. Thus, the Court concludes that, assuming Kearney's conduct violated Plaintiff's right to be present at the hearing, Kearney is nevertheless entitled to qualified immunity from suit. Defendants' Motion for Summary Judgment is granted as to this claim.

### 3. *Claims against Selsky*

Plaintiff seeks to hold Selsky liable for his failure to remedy the due process violations committed by the Nagy and Kearney. Defendants argue that during Plaintiff's deposition he explicitly withdrew his claims against defendant Selsky with respect to the two hearings at issue. Plaintiff did in fact make such statement, however, he changed his mind upon further questioning by defendants' counsel. During the deposition, the following exchange took place:

> Q: That's right, and I'm trying to understand, given that your complaint refers to a number of events that are no longer part of the case, I'm trying to understand whether you are attempting to sue Mr. Selsky regarding the two hearings that are left in.

> A: Yeah, I'm going to have to see according to this, according to the way I have it written here. After going over it, I would have to say yes.

(R. 16-17). Thus, Defendants' argument that Plaintiff abandoned his claims as to Selsky is belied by the record.

However, as the Court has concluded that Plaintiff's due process rights were not violated, with perhaps the exception of a right to be present at Kearney's 1998 rehearing to which qualified immunity attaches, Plaintiff's claims against Selsky likewise fail. Defendants' Motion for Summary Judgment is granted as to the claims against Selsky.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted in its entirety and the Complaint is dismissed.

## V. ORDERS

IT IS HEREBY ORDERED, that Defendants' Motion for Summary Judgment (Docket No. 60) is GRANTED in its entirety consistent with the foregoing decision.

FURTHER, that Plaintiff's Complaint is dismissed.

FURTHER, that the Clerk of the Court is directed to take all steps necessary to close the case

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 796179

Footnotes

| | |
|---|---|
| 1 | In support of their Motion for Summary Judgment, Defendants filed the following documents: a memorandum of law (Docket No. 63), a Rule 56 Statement of Undisputed Facts (Docket No. 62), and the Declaration of Peter B. Sullivan with exhibits (Docket No. 61). In opposition to Defendants' Motion, Plaintiff filed the following documents: a Statement of Disputed Facts with attachments (Docket No. 69) and a memorandum in opposition with attachments (Docket No. 70). As the Court had imposed a deadline of October 13, 2006, for the filing of dispositive motions, Defendants also filed a motion seeking a retroactive extension of the filing deadline to October 16, 2006, in light of a massive snowstorm in the Buffalo area on October 12-13, 2006, and extensive power failures thereafter. Plaintiff opposed the extension of time unless he was likewise granted an extension of time in which to respond to Defendants' Motion. The Court (Elfvin, J.) granted that extensions of time to both Plaintiff and Defendants. |
| 2 | Page references preceded by "R." indicate the page number of the exhibit attached to the Sullivan Declaration submitted in support of defendants' motion. |
| 3 | Portions of the tape recording of the hearing are inaudible and therefore were not transcribed. Plaintiff alleges that, in addition to the facility physician, Nagy failed to call a corrections officer, the inmate assigned to the cell in which Plaintiff was to double bunk, and a mental health provider. There is no indication once the hearing resumed, however, that Plaintiff had obtained the names of those individuals or again requested that they be called as witnesses. As a result, Plaintiff waived his right to call those witnesses. *See Bedoya v. Coughlin,* 91 F.3d 349, 350-51 (2d Cir.1996). |
| 4 | The transcript of the hearing indicates that a confinement period of 120 days was imposed (R. 138), while the written disposition indicates a period of 180 days with 60 days suspended. (R. 129). |
| 5 | The reason given for the modification was that the nature of the conduct did not warrant the penalty imposed. (R. 141). |
| 6 | Although Plaintiff's keeplock sentence concluded after 90 days, by that point he had been placed in the special housing unit ("SHU") for another infraction. (R. 97). |
| 7 | Plaintiff was not permitted to attend regular programs (R. 95), but no testimony was elicited concerning whether or not Plaintiff was permitted to attend religious services or the frequency with which Plaintiff was afforded showers. |

Plaintiff does not complain that his keeplock conditions were more onerous than the normal keeplock conditions.

8       The outcome of the original hearing on these charges was administratively reversed and a rehearing was ordered.

9       Additionally, it does not appear that the tapes were transcribed in the proper order, resulting in a transcript that is not in chronological order and is a piecemeal account of the proceedings.

10      The transcript indicates that Kearney spoke with inmate Vasquez, although Kearney on more than one instance indicated that he had spoken with inmate Small. In fact, in Kearney's summary of the evidence just prior to the statement of his determination, he claims to have spoken with inmate Small who stated that he did not remember the incident and did not want "to say the wrong thing and get inmate Webb in deeper trouble." (R. 189). In that same summary, Kearney indicated that it was inmate Sales who claimed to be unable to speak English. (R. 189). As the remainder of the record indicates that Sales disclaimed knowledge of the event and Vasquez claimed to be unable to speak English, it appears that Kearney misidentified the inmates in his summary of the testimony.

11      The charge of creating a disturbance was dismissed.

12      Plaintiff did not commence serving the punishment imposed by Kearney until June 29, 1999, because, at the time Kearney imposed the punishment, Plaintiff was already serving a period of SHU confinement of 545 days which had been imposed for a previous disciplinary charge. Plaintiff served 144 days in the SHU on these charges. (R. 110).

13      Therefore, the Court does not reach defendants' alternative argument that Nagy did not violate Plaintiff's due process rights when he refused to call the facility physician as a witness. The Court notes, however, that defendants failed to submit any *evidence* demonstrating Nagy's reason for excluding the witness.

14      Defendants do not argue that the period of confinement attributable to the rehearing does not implicate a liberty interest. Plaintiff served 144 days of SHU confinement due to Kearney's adjudication. That sentence was imposed, however, consecutive to another SHU sentence of 545 days. The Second Circuit has suggested that " 'separate sentences should be aggregated for purposes of the *Sandin* inquiry[ ] when they constitute a sustained period of confinement.' " *Giano v. Selsky,* 238 F.3d 223, 226 (2d Cir.2001) (citations and quotations omitted).

15      Defendants arguments supporting a grant of qualified immunity differ from the court's reasons for granting it.

16      Further complicating matters is Kearney's apparent confusion regarding the names of the inmates he was to contact. As is seen in the quoted portion of the transcript, Kearney had asked to speak with an inmate named Small, but corrected himself and instead then asked to speak with, and did speak with, inmate Vasquez. In a summary of the evidence relied on, Kearney again misspoke and attributed some testimony to inmate Small. This was simply an error on Kearney's part. Plaintiff had requested that inmate Small be called as a witness, but Small refused to testify and Kearney discussed with Plaintiff the form documenting Small's refusal to testify.

17      418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

18      Logically, it would seem obvious that an inmate has at least some right to be present through which he can exercise his limited right to call witnesses and submit documentary evidence.

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 168238
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

David DONATO, Plaintiff,

v.

Michael PHILLIPS, Commissioner Hearing
Officer, Donald Selsky, Director Inmate Grievance
Program and Floyd Bennett, Superintendent,
Elmira Correctional Facility, Defendants.

No. 9:04-cv-1160.
|
Jan. 18, 2007.

**Attorneys and Law Firms**

Anthony C. Ofodile, Office of Anthony C. Ofodile,
Brooklyn, NY, for Plaintiff.

Steven H. Schwartz, Office of Attorney General, Albany,
NY, for Defendants.

### *DECISION and ORDER*

THOMAS J. McAVOY, Senior United States District
Judge.

 **\*1** Plaintiff David Donato commenced the instant action
pursuant to 42 U.S.C. § 1983 claiming that he was denied
his procedural due process rights in connection with
discipline imposed upon him while incarcerated at the
Elmira Correctional Facility. Presently before the Court
is Defendants' motion for summary judgment pursuant to
Fed.R.Civ.P. 56 seeking dismissal of the Complaint in its
entirety.

### I. FACTS

On October 19, 2000, Plaintiff provided a urine sample
for a urinalysis. Plaintiff was selected for a urine test
based on a computer printout from the New York State
Department of Correctional Services' Central Office in
Albany that randomly selects from inmates who have had
drug-related misconduct within the past two years, twice
a year. The urinalysis tested positive for cannabinoids.
The urine sample was collected in the presence of Officer

Reisdorf. Reisdorf took the sample and placed it in
the refrigerator. Officer Brannen obtained the specimen
from the refrigerator and performed the urinalysis. A
second urinalysis was performed on October 20, 2000.
This test also came back positive for cannabinoids. As
a result of the urinalysis, Plaintiff was issued an inmate
behavior report dated October 20, 2000. The report
charged Plaintiff with a violation of rule 113.24 that
prohibits inmates from using, or being under the influence
of, any narcotics or controlled substance unless prescribed
by a health services provider. Plaintiff disputed the results
of the test because he was tested on October 13 and
October 31, both of which were negative for cannabinoids.
Plaintiff, therefore, believed that the positive test results
on the 19th and 20th were the result of a contaminated
urine sample or the result of medications he may have been
taking.

Defendants contend that a hearing was commenced on the
misbehavior report on October 26, 2000. Plaintiff denies
that the hearing began on that date, but claims that the
hearing actually commenced at a later time. Defendant
Michael Phillips acted as the hearing officer. During the
hearing, Plaintiff requested that Officer Reisdorf be called
as a witness. Plaintiff did not list Officer Residorf as
a witness on his Assistant Form. After considering the
misbehavior report and the evidence submitted at the
hearing, including evidence of Plaintiff's history of nine
prior drug/alcohol-related matters, Phillips concluded
that Plaintiff violated rule 113.24. Phillips imposed a
penalty of twenty-four months in the Special Housing
Unit ("SHU") with a corresponding loss of privileges and
recommended loss of 36 months of good time.

Plaintiff appealed the hearing to the Commissioner.
Upon considering the appeal, Defendant Donald Selsky,
Director of the Department of Correctional Services'
Special Housing/Inmate Disciplinary Program advised
Plaintiff that his penalty had been reduced to twelve
months in SHU, twenty-four months loss of privileges,
and thirty-six months of recommended loss of good time.

 **\*2** Thereafter, Plaintiff commenced an Article 78
proceeding challenging the disciplinary disposition. On
September 14, 2001, the Washington County Court issued
an order annulling the hearing officer's determination,
ordering it expunged from Plaintiff's file, and ordering
that Plaintiff be released from any penalties related to the
hearing officer's determination. The basis for the court's

determination was that "the hearing officer failed to give a reason why C.O. Reisdorf was not presented for testimony as is required by section 254.5 of Title 7 of the New York Codes, Rules and [Regulations (hereinafter, 'NYCRR')." Washington County Court concluded that Defendants' "violation of their own regulation under the circumstances here was also a violation of [Plaintiff's] constitutional right to call witnesses." [1]

On October 5, 2001, Plaintiff was transferred to general population at Elmira Correctional Facility. Neither Defendants Selsky nor Bennett were involved in deciding where, or when, Plaintiff would be transferred.

Plaintiff commenced the instant action contending that Defendants denied his due process rights by failing to allow certain documentary evidence; failing to commence the hearing within seven days; being sarcastic, condescending, and biased during the hearing process; and denying Plaintiff's right to call a witness.

## II. STANDARD OF REVIEW

It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, *see Tenenbaum v. Williams,* 193 F.3d 581, 592 (2d Cir.1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A party seeking summary judgment bears the burden of informing the Court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

If the movant is able to establish a basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). On a motion for summary judgment, the Court views the evidence in the

light most favorable to the non-moving party, and draws all reasonable inferences in his favor. *Abramson v. Pataki,* 278 F.3d 93, 101 (2d Cir.2002). However, a party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994), or on conclusory allegations or unsubstantiated speculation. *Scotto v. Almenas,* 143 F.3d 105, 114 (2d. Cir.1998).

## III. DISCUSSION

**\*3** The primary issues presented are whether Plaintiff was denied his due process rights because: (1) he was unable to have Officer Reisdorf and Inmate Harrison testify at his disciplinary hearing; and (2) the hearing did not commence within seven days.

Plaintiff first contends that he was denied his due process rights because the hearing officer failed to required Officer Reisdorf to testify. Defendants contend that Plaintiff waived the right to have Officer Reisdorf testify. For the following reasons, the Court finds that Plaintiff waived his right to have Officer Reisdorf testify and that, in the alternative, the failure to have Officer Reisdorf testify did not constitute a denial of Plaintiff's due process rights.

"An inmate charged with a violation must be given (1) advance written notice of the charges at least 24 hours before the hearing; (2) the opportunity to appear at the hearing, to call witnesses, and to present rebuttal evidence; and (3) a written statement by the factfinders as to the evidence relied on for their decision, and the reasons for the prison committee's action." *Freeman v. Rideout,* 808 F.2d 949, 953 (2d Cir.1986). "An inmate has a due process right to summon witnesses in his defense at a prison disciplinary hearing...." *Bedoya v. Coughlin,* 91 F.3d 349, 352 (2d Cir.1996). "[A]n inmate's silence can constitute a waiver of his due process right to request witness testimony at a disciplinary hearing." *Id.* Moreover, "if a prison official, presiding over a prison disciplinary hearing, reasonably concludes that it would be futile to call a witness to testify, his failure to do so will not constitute a violation of the prisoner's constitutional rights." *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993). Prison officials have the discretion to keep the hearing within reasonable limits and, as such, may refuse to call a witness for "irrelevance [or] lack of necessity." *Wolff v. McDonnell,* 418 U.S. 539, 566, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

On his Assistant Form, Plaintiff failed to request that Officer Reisdorf testify at the hearing. During the hearing, Plaintiff requested that Reisdorf testify. *See* Def.'s Ex. B at 65. Phillips attempted to contact Reisdorf by telephone, but was unable to reach him because Reisdorf was not working that day. *Id.* Upon learning of Reisdorf's unavailability, Plaintiff did not ask for an adjournment until such time as Reisdorf would be available. *Id.* [2] It, thus, may be argued that Plaintiff waived his right to call Residorf.

Assuming Plaintiff did not waive the right to call Reisdorf, Plaintiff has failed to demonstrate that he has been prejudiced by the failure to call or interview Reisdorf. In his memorandum of law, Plaintiff argues that "[t]he foremost purpose of Plaintiff Donato calling Reisdorf as a witness was (to the knowledge of Defendant Phillips) to establish that there must have been an inappropriate/sinister interference with the chain of custody of the urine sample which resulted in the false positive." Pl.'s Mem. of Law at 13. This contention is unsupported by any record evidence, and no fair-minded trier of fact could reasonably conclude otherwise. The record is clear that Plaintiff did not request Reisdorf to testify for this purpose. Rather, Plaintiff sought Reisdorf's testimony to explain *why* he was obligated to give a urine sample on October 19. *See e.g.,* Def.'s Ex. B at 63-65.[3] At page 91 of the hearing transcript, for example, Plaintiff renewed his request that Reisdorf be called to testify. The reason for this request, however, was to "conduct an investigation and, and also find out exactly why [he] was ordered to give this urine specimen." *See* Def.'s Ex. B at 91. As noted *supra* at note 2, the reason why Plaintiff gave a urine sample was, and remains, irrelevant to whether he tested positive for illegal drugs. Further, as Phillips concluded, Reisdorf's testimony as to the reason why Plaintiff was obligated to provide a urine specimen would have been cumulative because Correction Lieutenant Miller testified concerning the reason for the urine test. Def.'s Ex B at 10, 28, 64-68. Miller testified that Plaintiff was directed to provide a urine sample based on a "random prior" list sent from DOCS in Albany.[4] Even if Reisdorf would have contradicted Miller's testimony, as discussed, that factual issue was irrelevant.

**\*4** With respect to Plaintiff's chain of custody argument, he never challenged any chain of custody issues while the urine sample was in Reisdorf's possession. *Id.* at 30-31, 78. Rather, Plaintiff's allegations concerned Officer Brannan's handling of the urine once he removed the sample from the refrigerator. *Id.* Although Plaintiff contends that, at page 77 of the hearing transcript, he expressed his belief that something may have gone wrong with the chain of custody concerning his urine sample, Plaintiff never indicated that Officer Reisdorf was necessary for such a defense. To the contrary, Plaintiff's allegations concerning any mishandling of the urine sample focused on handling by Officer Brannen. Def's Ex. B at 77-79. Plaintiff fails to point to any evidence in the record suggesting that he sought to call Officer Reisdorf regarding any mishandling of the urine sample.

For the foregoing reasons, the Court finds that Phillips had a justifiable reason for refusing to have Reisdorf testify because: (1) Plaintiff did not request Reisdorf on his assistance form; (2) Reisdorf was unavailable and Plaintiff failed to request an adjournment; (3) Plaintiff never articulated to Phillips that he wanted Reisdorf to testify with respect to chain of custody issues, thereby precluding Phillips from addressing the need to call Reisdorf for that purpose, *see Scott v. Kelly,* 962 F.2d 145, 147 (2d Cir.1992) (noting that where the inmate fails to advise the hearing officer what the testimony would be, the hearing officer has "no reason to believe that the testimony would be relevant or that it would affect his decision."); (4) as Phillips found, Reisdorf's testimony concerning the reason for the test (confidential v. random) would have been cumulative to the testimony of Miller who testified that the test was in conjunction with the random testing procedures; and (5) the reason for the test was irrelevant to any chain of custody issues or the propriety of the test itself.

Plaintiff next contends that Phillips violated his due process rights by failing to call Inmate Harrison to testify at the hearing. This argument, too, must be rejected. Plaintiff sought to call Harrison to corroborate Plaintiff's claim that Officer Sears told Plaintiff that the urine sample was being collected for "confidential" purposes and that he was in "trouble." Sears testified at the hearing that he made no such statement to Plaintiff. As Phillips stated at the hearing:

> Let's presume for the sake of argument that Officer Sears ... did, in fact, tell you that ah, you had to go for a urinalysis test and that

you were in trouble. Bottom line
is, so what? Let's presume again ...
that he did write you a pass....
Presuming what you're telling me is
the truth, ... I don't care if he told you
that that was the case because you
know as well as I, that ... Lieutenant
Miller, came in here, he testified that
your name came up on a random
prior screen from Albany, and he
introduced a document which has
your name on it, which has a date of
10/17/2000 on it, which directed that
you be tested.

**\*5** Def.'s Ex. B at 75-76. Phillips reasonably was entitled
to determine that Miller's testimony, as substantiated by
the documentary evidence, was credible and that any
testimony concerning the reasons given to Plaintiff for the
test were irrelevant to whether he, in fact, tested positive
for marihuana use. Phillips also reasonably concluded
that any testimony by Harrison would be redundant to
Plaintiff's own claims about what he was told by Officer
Sears. *See Scott,* 962 F.2d at 147; *Russell v. Selsky,* 35
F.3d 55, 59 (2d Cir.1994) (a prison disciplinary hearing
officer may refuse to allow willing witnesses to testify
where their testimony would be cumulative). For reasons
previously discussed, Phillips reasonably concluded that
the reason why Plaintiff's urine was tested was irrelevant
to the misbehavior report. *See* Phillips Aff. at ¶ 13; *see
also Ponte,* 471 U.S. at 499 (the hearing officer must
provide an explanation for his rulings either at the time
of the disciplinary hearing or subsequently in court).
Accordingly, the failure to call Inmate Harrison did not
prejudice Plaintiff and did not deprive him of his right to
due process of law.

The final issue is whether Plaintiff's procedural due
process rights were violated because the disciplinary
hearing was not commenced within seven days of
Plaintiff's placement in SHU. New York State regulations
require disciplinary hearings to commence within seven
days after the inmate is placed in SHU. *See* 7 N.Y.C.R.R.
§ 251-5(a); *Tellier v. Fields,* 280 F.3d 69 (2d Cir.2000);
*Wright v. Smith,* 21 F.3d 496 (2d Cir.1994). The
misbehavior report was dated October 20, 2000. Plaintiff
was served with the report on October 21, 2000. Def.'s
Ex. B at 1. On October 26, 2000, the parties convened to
conduct a hearing on the misbehavior report. *Id.* Because
Phillips determined that Plaintiff was not provided with

certain documents, he adjourned the hearing. *Id.* at 5.
Plaintiff did not enter a plea to the charge until on or about
October 31, 2000. After various other adjournments, the
hearing concluded on November 2, 2000.

Plaintiff contends that Defendants violated the
requirement that the hearing commence within seven
days because he did not enter his plea until October
31. As an initial matter, Plaintiff waived, or failed to
exhaust this claim, because he did not raise this issue
on appeal to the Superintendent or raise it otherwise
before the instant litigation. *Khalild v. Reda,* 2003 WL
42145, at *5 (S.D.N.Y.2003). In any event, this claim
fails. The failure to provide a hearing precisely within
the time specified in the regulations does not form the
basis of a constitutional violation. This is so for several
reasons. First, confinement in SHU creates a liberty
interest only insofar as such confinement imposes an
atypical and significant hardship on the inmate in relation
to the ordinary incidents of prison life. *Sandin v. Connor,*
515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).
There is no evidence in the record that the days Plaintiff
spent in SHU pending the commencement of the hearing
imposed an atypical and significant hardship on him.
*See Sandin v. Connor,* 515 U.S. 472, 115 S.Ct. 2293, 132
L.Ed.2d 418 (1995); *Forman v. Morales,* 112 F.3d 503 (2d
Cir.1996) (unpublished decision); *Frazier v. Coughlin,* 81
F.3d 313, 317 (2d Cir.1996). It, therefore, follows that
the failure to provide a hearing within this time frame
cannot implicate due process concerns. *See Forman,* 112
F.3d at *1; *see also Williams v. Kane,* 1997 WL 527677, at
*7-8 (S.D.N.Y.1997). If there is no affront to an inmate's
rights of due process where an inmate is not provided any
hearing for placement in SHU or keeplock of periods of
30 days or less, there can be no due process violation for
a hearing that occurs within two weeks of placement in
SHU.

**\*6** Second, the seven-day rule in the New York
regulations are not constitutional requirements. As
previously noted, "[a]n inmate charged with a violation
must be given (1) advance written notice of the charges
at least 24 hours before the hearing; (2) the opportunity
to appear at the hearing, to call witnesses, and to present
rebuttal evidence; and (3) a written statement by the
factfinders as to the evidence relied on for their decision,
and the reasons for the prison committee's action." *Freeman v. Rideout,* 808 F.2d 949, 953 (2d Cir.1986).
Here, Plaintiff was provided advance written notice of the

charges and an opportunity to be heard, to call witnesses, and to present rebuttal evidence. Moreover, the hearing was held within a reasonable time. As one court has stated:

> Plaintiff's contention regarding the time frame of the hearing does not raise a constitutional claim. Plaintiff argues that the hearing did not occur until his ninth day of SHU confinement, which is in violation of New York State regulations that require hearings be held within seven days of confinement. See 7 N.Y.C.R.R. § 251-5.1(a). However, "[f]ederal constitutional standards rather than state law define the requirements of procedural due process." *Russell v. Coughlin,* 910 F.2d 75, 78 (2d Cir.1990). Those standards require only that the hearing be held within a "reasonable time" and not within any number of days. "What is considered a 'reasonable time' will depend upon the particular situation being examined." *Id.*

Plaintiff's hearing began nine days after he began SHU confinement, which is within the time period courts have held to be reasonable. *Russell v. Coughlin,* 774 F.Supp. 189, 197 (S.D.N.Y.1991) (eleven day delay not unreasonable where defendants provided reasons); *Bolanos v. Coughlin,* No. 91 Civ. 5330, 1993 WL 762112, *15 (S.D.N.Y. Oct.15, 1993) (eight day delay).... Such minor delays do not rise to the level of a constitutional violation of plaintiff's due process rights.

*Shell v. Brzezniak,* 365 F.Supp.2d 362, 376 (W.D.N.Y.2005); *see also Odom v. Keane,* 1998 WL 720671 (S.D.N.Y.1998) (hearing commenced on 8th day did not violate prisoner's due process rights); *Garcia v. Coughlin,* No. 92 Civ. 0392, 1993 WL 177819, at *2 (S.D.N.Y. May 17, 1993) ("Specific time limits imposed by state procedural requirements do not give rise to federally protected constitutional rights."), *aff'd,* 17 F.3d 391 (2d Cir.1993); *see also Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 (2d Cir.1990); *Foxworth v. Selsky,* 1998 WL 59448 (N.D.N.Y.1998); *Johnson v. Coughlin,* 1997 WL 431065 (S.D.N.Y.1997); *Kingwood v. Coombe,* 1997 WL 323913 (S.D.N.Y.1997). Here, it is evident that several adjournments were provided to allow Plaintiff a meaningful opportunity to defend himself on the misbehavior report. For example, Phillips adjourned the meeting to allow Plaintiff to review certain documents and find various witnesses to testify. Accordingly, the Court finds no due process violation with respect to the timing of the hearing.

**\*7** With respect to Plaintiff's claims that Phillips failed to allow certain documents into evidence, Plaintiff has failed to point to what evidence was not admitted and why the failure to admit such evidence was prejudicial to him. Having reviewed the hearing transcript, the Court finds that the documentary evidence excluded by Phillips was irrelevant to Plaintiff's defense. Plaintiff has similarly failed to point to sufficient evidence of sarcasm or bias on the part of Phillips such that he was denied a fair hearing.

Finally, to the extent Plaintiff challenges the length of time he remained in SHU following the order of the Washington County Court annulling the hearing officer's determination, Plaintiff has failed to demonstrate that any of the named Defendants were personally involved in the decision to continue his placement in SHU or transfer him to another non-SHU facility. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

### IV. CONCLUSION

For the foregoing reasons, the Court finds that Plaintiff has failed to demonstrate the violation of any constitutional rights. Accordingly, Defendants' motion for summary judgment is GRANTED and the Complaint is DISMISSED.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 168238

---

Footnotes

1    The state court did not indicate whether its finding was made under the state or federal constitution. For the reasons stated below, this Court finds that the violation of section 254.5 for failure to state the reasons for refusing to allow an inmate to call a witness does not necessarily implicate federal due process concerns. The United States Supreme Court has stated that the hearing officer must provide an explanation for his rulings either at the time of the disciplinary

hearing or subsequently in court. *See Ponte v. Real,* 471 U.S. 491, 499, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985).

2    Although Plaintiff did later request to call as a witness the officer who took the urine sample on October 12, the October 12 sample was, and remains, irrelevant to the positive test conducted on October 19 that was the subject of the misbehavior report.

3    Plaintiff contended that he was informed by Reisdorf that the test was "confidential" rather than a random test ordered by the Department of Correctional Services out of Albany. Def's Ex. B at 62-65. Whether the test was "confidential", conducted pursuant to a random testing program, or conducted for some other reason is irrelevant to Plaintiff' s argument as to whether there was a break in the chain of custody from the time the urine sample was collected until the time the urinalysis was performed. Plaintiff never argued that the urine sample was unlawfully collected or that Defendants were not otherwise authorized to collect the urine. Rather, it was Plaintiff' s contention that the test results were pre-determined and that he was misinformed as to the reason for the test.

4    A "random prior" means that the inmate had previously tested positive as a result of a random test.

---

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**    © 2016 Thomson Reuters. No claim to original U.S. Government Works.    6

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Phillip JEAN–LAURENT, Plaintiff,
v.
C.O. LANE; C.O. Briggs; C.O. Tyndall; John Doe # 1;
John Doe # 2; Sgt. Beard; Sgt. Pauline; Lt. Jones; DSS
McAuliffe; Dr. Mays; Dr. John Doe; Jane Doe; Supt.
Barkley; Supt. Hulihan; Dep. Comm. Linquist,
Defendants.
No. 9:11–CV–186 (NAM/TWD).

Jan. 24, 2013.
Phillip Jean–Laurent, Ozone Park, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State
of New York, Gregory J. Rodriguez, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for
Defendants.

### REPORT AND RECOMMENDATION

THÉRÈSE WILEY DANCKS, United States Magistrate
Judge.

**\*1** This *pro se* prisoner civil rights action,
commenced pursuant to 42 U.S.C. § 1983, was initially
referred to Magistrate Judge George H. Lowe for Report
and Recommendation by the Honorable Norman A.
Mordue, United States District Judge, pursuant to 28
U.S.C. § 636(b) and N.D.N.Y. L.R. 72.3(c). Upon
Magistrate Judge Lowe's retirement on February 9, 2012,
the case was reassigned to me. Plaintiff Phillip
Jean–Laurent ("Jean–Laurent") has brought this action
against Defendants Correctional Officers Patrick Lane
("Lane"), Allen Briggs ("Briggs"), and Seth Tyndall
("Tyndall"); Correctional Sergeants Matthew Beard
("Beard") and David Pawlin ("Pawlin") (sued incorrectly
as "Sgt. Pauline"); Correctional Lieutenant Norman Jones
("Jones"); Deputy Superintendent Security Brian
McAuliffe ("McAuliffe"); Superintendents Warren

Barkley ("Barkley") and William Hulihan ("Hulihan");
Appeal Review Officer Norman Bezio ("Bezio"); Deputy
Commissioner Christopher Lindquist ("Lindquist") (sued
incorrectly as "Dep. Comm. Linquist"); Dr. Charles
Moehs ("Moehs") (sued incorrectly as "Dr. Mays"); John
Does # 1 and # 2; Dr. John Doe; and Jane Doe. (Dkt. Nos.
1, ¶¶ 9–16, and 6–17.FN1)

> FN1. Page numbers in citations to filed
> documents refer to the page numbers assigned by
> the Court's electronic filing system rather than to
> the page number in the original document.

Defendants, with the exception of the four Doe
Defendants who have not yet been identified and served,
now move to dismiss Plaintiff's Complaint for failure to
state a claim under Federal Rule of Civil Procedure
12(b)(6).FN2 (Dkt. No. 23.) For the reasons set forth
below, the Court recommends that Defendants' motion be
**GRANTED** in part and **DENIED** in part.

> FN2. Because the Doe Defendants have been
> excluded from the motion, this Report and
> Recommendation does not address the legal
> sufficiency of the claims asserted against them in
> the Complaint.

## I. BACKGROUNDFN3

> FN3. The background facts set forth herein are
> taken from Plaintiff's Complaint.

### A. Facts Concerning Plaintiff's Claims Arising Out of
his Storage of Draft Bags and the Destruction of His
Legal Documents

Plaintiff is a former prisoner of the New York State
Department of Correctional and Community Supervision
("DOCCS"). (Dkt. No. 1, ¶ 8.) In January of 2008,
Plaintiff was transferred from Elmira Correctional Facility
("Elmira") to Cape Vincent Correctional Facility ("Cape
Vincent"). *Id.* at ¶ 17. Eight draft bags containing
Plaintiff's personal property were sent from Elmira to
Cape Vincent at the time of the transfer. *Id.* Plaintiff's

personal belongings did not all fit into the storage lockers provided for his use at Cape Vincent, so he stored personal legal documents and materials and books in two draft bags placed neatly under his bunk. *Id.* at ¶ 18.

Defendant Lane, who was the steady housing unit officer at the time, advised Plaintiff that he could not store belongings in draft bags and would have to purchase storage containers from the commissary for his excess belongings. *Id.* at ¶ 19. When Plaintiff informed Lane that he had no funds to purchase the containers because of his transfer and assured him that he would purchase the containers when his funds arrived from Elmira, Lane agreed to allow him to use the draft bags until he was able to comply with the storage policy. *Id.* at ¶ 20. The funds transferred from Elmira were collected by Cape Vincent, so Lane allowed Plaintiff to use the draft bags for another two weeks. *Id* . at ¶ 21. Lane agreed to continued use of the bags when funds Plaintiff subsequently received from home were also collected by Cape Vincent. *Id.*

**\*2** Lane subsequently learned that Plaintiff was litigating an action against correctional officers and issued Plaintiff a misbehavior report for possessing the two draft bags in his living quarters the same day. *Id.* at ¶ 22. Defendant Pawlin, who was the hearing officer on the claimed rule violations, directed Plaintiff to discard several hundred pages of legal materials and documents essential to pending litigations. *Id.*

After the hearing, Plaintiff learned of a state-wide policy directive that he believed permitted him to retain two draft bags to store personal belongings in his cell.[FN4] *Id.* at ¶ 23. When he informed Defendant Lane of the directive, Lane "outburst his disregards for the policy directive." *Id.* Plaintiff sought redress through the administrative grievance procedure. When Lane learned of Plaintiff's grievance, he contacted Defendant Beard, a Corrections Sergeant at Cape Vincent, and during phone conversations with Beard, Lane repeatedly referenced departmental directives, facility policy manuals, and the inmate's misbehavior handbook. *Id.* at ¶ 24. Lane directed Plaintiff to turn over the draft bags and moments later Defendants Beard and Lane, along with other corrections officers, manacled Plaintiff and took him to the Special Housing Unit ("SITU"). *Id.* Plaintiff's Complaint does not state the length of time during which he remained in the

SITU.

FN4. Plaintiff is presumably referring to Section III of DOCCS Directive # 4917 which provides in part:

Personal property possessed by an inmate assigned to double cell housing shall be limited to the amount of property that will fit in three standard draft bags (including legal materials). Inmates will be responsible for proper storage of property and the neat and orderly appearance of their cells.

A. *Storage of Property.* An inmate assigned to double occupancy cell housing will be allowed to possess in his or her cell two draft bags provided by the Department for storage of property. Any property beyond what can be stored in the individual locker may be stored in these bags.

Defendants Briggs and Tyndall subsequently packed Plaintiff's belongings, and while doing so, deliberately emptied a container of melted ice into a bag filled with legal documents, destroying several items and a significant portion of legal materials and documents essential to Plaintiff's appeal in an unidentified case pending in the Second Circuit Court of Appeals. *Id.* at ¶ 25. According to Plaintiff, the Second Circuit had granted him an enlargement of time to file a petition for a hearing or rehearing *en banc.* Because the documents were destroyed, Plaintiff was unable to file the petition within the enlargement period. *Id.*

Plaintiff thereafter had a disciplinary hearing on possession of the two draft bags and allegedly fabricated rule violations.[FN5] *Id.* at ¶ 26. Defendant Jones, the hearing officer, found Plaintiff not guilty of the fabricated rule violations. However, he found Plaintiff guilty of possessing the two draft bags, despite what Plaintiff believes to have been a clear departmental directive evidencing that no rule violation had occurred. *Id.* Plaintiff was punitively sanctioned for the draft bag violation. *Id.*

FN5. Plaintiff has not identified the nature of the

allegedly fabricated rule violations in his Complaint. (*See* Dkt. No. 1.) Although Plaintiff's Complaint does not specifically identify the person(s) responsible for filing the misbehavior report that led to the hearing, it can be inferred from other allegations that Defendants Lane and Beard were behind the report.

## B. Plaintiff's Claims of Cruel and Inhuman Treatment and Deliberate Indifference to his Serious Medical Needs Against Defendants Pawlin, Moehs, McAuliffe, and Bezio

Prior to Plaintiff's SHU confinement, he had been scheduled for oral surgery and medical treatment for chronic low back pain. *Id.* at ¶ 27. Plaintiff was not allowed to keep his appointments because he was punitively confined in the SHU and was left to endure "unbearable toothaches, extreme eating and hygienical discomfort, as well as excruciating lower back pain during and after his SHU confinement." *Id.* Once Plaintiff was released from SHU confinement, he was required to start anew the lengthy and time consuming procedure of scheduling dental and medical appointments. *Id.* According to Plaintiff, Defendants McAuliffe and Barkley were cognizant of the routine practice of denying prisoners confined in the SHU reasonable and adequate dental and medical care and/or knowingly implemented or allowed the practice. *Id.*

**\*3** When Plaintiff was released from the SITU, he was required to carry his belongings, including at least eight draft bags weighing eighty or more pounds, to an assigned housing unit over four-hundred yards away in snowy frigid weather and was not allowed to use an available pushcart or have another inmate assist him, despite informing Defendant John Doe # 1 of his medical condition and level of pain. *Id.* at ¶ 28. Plaintiff strained his lower back as a result and endured tremendous pain for at least two weeks. *Id.* According to Plaintiff, Defendant Pawlin thereafter subjected Plaintiff to a pattern of harassing inter-facility movements that required Plaintiff to move his belongings to different housing units. *Id.*

Plaintiff was punitively confined in the SITU in April of 2008 as a result of sanctions imposed by Defendant Jones.[FN6] *Id.* at ¶ 29. Plaintiff was not permitted to keep his rescheduled dental and medical appointments because of

the confinement. *Id.* at ¶ 29. When he left the SITU after serving several weeks, Plaintiff was, for a second time, required to carry all of his personal belongings without assistance or a pushcart despite informing Defendant John Doe # 2 of his medical condition and pain. *Id.* Plaintiff hurt his back transporting his belongings. *Id.* When he reported to sick call, Defendant Jane Doe told him that she was not going to do anything for him, and she would not give him a medical excuse from carrying the rest of his personal belongings to his housing unit. *Id.*

> FN6. It is not entirely clear from the Complaint whether Plaintiff was confined in the SITU by Defendant Jones as a result of Jones' finding that Plaintiff was guilty of possessing two draft bags or for some other reason. *See* Dkt. No. 1 at ¶ 26.

Approximately four months later, after filing a grievance and personally seeking redress from DOCCS' Chief Medical Officer, Plaintiff was examined by Dr. Rosner and finally had one of two troubling wisdom teeth extracted and received a few physical therapy sessions, *Id.* at ¶ 30. Upon completion of the initial therapy sessions, the therapist concluded that the course of treatment had been effective and that Plaintiff was in need of further therapy. *Id.* at ¶ 31. The therapist also recommended that Plaintiff be given a TENS unit for self-administered therapy. *Id.* However, at a follow-up appointment with Defendant Moehs, who had replaced Dr. Rosner as Plaintiff's health care provider, Moehs informed Plaintiff that he would not continue with the recommended course of treatment or provide the TENS unit and told Plaintiff to live with the pain. *Id.*

## C. Plaintiff's Claim that he was Denied a Fair and Impartial Hearing by Defendant McAuliffe

In preparation for an August 2008 disciplinary hearing, Plaintiff attempted to obtain documentary evidence he believed was relevant and necessary to his defense. *Id.* at ¶ 32. Plaintiff's request was denied by Defendant McAuliffe, who presided over the disciplinary hearing and allegedly made false representations to Plaintiff to induce him to enter into an involuntary and unintelligent plea agreement. *Id.* McAuliffe is alleged to have unfairly and unilaterally penalized Plaintiff for an altercation with another prisoner and sanctioned Plaintiff

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

to punitive segregation for six months at Mid–State Correctional Facility ("Mid–State"), with a concomitant loss of privileges and recommended loss of good time, which extended Plaintiff's term of imprisonment to the maximum. *Id.* at ¶ 33. The other prisoner was not sanctioned at all. *Id.*

**\*4** Plaintiff appealed McAuliffe's determination to Defendant Bezio on the grounds that he had been denied a fair and impartial hearing, that his guilty plea was unconstitutionally induced, and that he had been denied due process and equal protection of the law as supported by documentary evidence. *Id.* at ¶ 34. Defendant Bezio affirmed McAuliffe's determination. *Id.*

### D. Alleged Indifference to Plaintiff's Serious Medical and Dental Needs While in the SHU at Mid–State

During the period of his confinement in the SHU at Mid–State, Plaintiff continued to experience excruciating back pain and toothaches. *Id.* He requested and was denied treatment by Defendant Dr. John Doe based upon Moehs' medical entry, without any physical examination. *Id.* Plaintiff received dental care to the extent of having dental x-rays taken after grieving the matter to Defendant Hulihan. *Id.* However, his painful wisdom tooth was not extracted. *Id.* Despite making articulate, detailed complaints of being deprived necessary and adequate medical and dental care to Defendants Barkley, Hulihan, and Lindquist, Plaintiff's complaint was denied as unsubstantiated and no significant steps were taken to ensure that Plaintiff received necessary and adequate medical and dental care prior to his transfer from Mid–State to Downstate Correctional Facility. *Id.*

### II. PROCEDURAL HISTORY

Plaintiff filed his Complaint on February 17, 2011. (Dkt. No. 1.) Plaintiff's application to proceed *in forma pauperis* was granted by Judge Mordue in a June 1, 2011 Decision and Order (Dkt. No. 2) in which the District Court dismissed Plaintiff's claim for destruction of property against Defendants Briggs and Tyndall, with prejudice, and his equal protection claim against Defendants McAuliffe and Bezio, without prejudice, under 28 U.S.C. § 1915(e). Section 1915(e) directs that when a plaintiff seeks to proceed *in forma pauperis*, "(2) ... the court shall dismiss the case any time if the court determines that ... (B) the action ... (i) is frivolous or

malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2) (B). *Id.* at pp. 6–8. Judge Mordue otherwise accepted the Plaintiff's complaint for filing, specifically noting that in doing so, the District Court was expressing no opinion as to whether Plaintiff's remaining claims could withstand a properly made motion to dismiss or for summary judgment. *Id.* at p. 9. The District Court also ordered Plaintiff to take reasonable steps to ascertain the identities of the "John Doe" and "Jane Doe" defendants and cautioned him that failure to serve the unnamed defendants in a timely manner may result in the action being dismissed against them. *Id.* at pp. 8–9.

### III. ANALYSIS

### A. Legal Standard Governing Motions to Dismiss for Failure to State a Claim

**\*5** A defendant may move to dismiss a complaint "for failure to state a claim upon which relief can be granted" under Federal Rule of Civil Procedure 12(b)(6). The motion tests the formal legal sufficiency of a complaint by determining whether it conforms to Federal Rule of Civil Procedure 8(a)(2), which requires that a complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief." *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972). Satisfaction of the requirement that a plaintiff "show" that he or she is entitled to relief requires that the complaint "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). While Rule 8(a)(2) "does not require detailed factual allegations, ... it demands more than an unadorned, the-defendant-harmed-me-accusation." *Iqbal,* 556 U.S. at 678. (citation and internal quotation marks omitted). A complaint which "tenders 'naked assertion[s]' devoid of 'further factual enhancement' " does not suffice. *Id.* (citation omitted). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense .... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

(internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678.

Where a party is proceeding *pro se,* the court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *See Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994); *see also Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) (courts remain obligated to construe *pro se* complaints liberally even after *Twombly*). Furthermore, "[i]n cases where a *pro se* plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they are consistent with the allegations in the complaint." *See, e.g., Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (considering factual allegations in plaintiff's opposition papers) (citations and internal quotations marks omitted), *vacated and amended in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). *See also Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002) ("Even where a document is not incorporated by reference [in the complaint], the court may nevertheless consider it [on a Rule 12(b)(6) motion without converting the motion to one for summary judgment] where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint.") (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995)).[FN7]

FN7. Defendants have submitted DOCS Directive # 4913, entitled "Inmate Personal Property Limits" in support of their motion to dismiss. (Dkt. No. 23–2 at pp. 2–9.) Plaintiff has also relied upon the Directive in his opposition papers as support for his argument that state-wide policy allowed him to store his excess personal belongings in the two draft bags under his bunk. (Dkt. No. 27 at p. 12.) Since the Directive is integral to the Plaintiff's Complaint, the Court can consider it on Defendants' Rule 12(b)(6) motion without converting the motion to one for summary judgment. However, because the Directive, on its face, can be construed to offer some support for both Plaintiff and Defendants' position, it is of little value in determining the motion before the Court.

The Declaration of Sandra Prusak, also submitted in support of Defendants' motion to dismiss, references a disciplinary packet that was supposed to be attached to the Declaration. (Dkt. No. 23–3 at p. 2.) Inasmuch as the Disciplinary Packet is not attached to the Declaration as filed, the Court need not consider whether it, or Prusak's reference to its contents, can be considered on a Rule 12(b)(6) motion.

**\*6** Where a *pro se* complaint fails to state a cause of action, the court *generally* "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (citation and internal quotation marks omitted). An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco,* 222 F.3d at 112 (citation omitted).

## B. Plaintiff's Official Capacity Claims For Money Damages Against the Defendants

Defendants have moved for dismissal of Plaintiff's official capacity claims for money damages under 42 U.S.C. ¶ 1983. (Dkt. No. 1 at ¶¶ 9–10, 12–16.; Dkt. No. 23–1 at pp. 19–20.) The Eleventh Amendment protects states against suits brought in federal court. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978). The immunity granted the states under the Eleventh Amendment extends beyond the states themselves to state agents and instrumentalities that are

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

effectively arms of the state ( *Woods v. Rondout Valley Cent. School Dist. Bd. of Educ.,* 466 F.3d 232, 236 (2d Cir.2006)) and bars all money damages claims against state officials acting in their official capacities, including the moving Defendants herein. *Kentucky v. Graham,* 473 U.S. 159, 167–68, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *see also Davis v. New York,* 316 F.3d 93, 101 (2d Cir.2002) (an inmate plaintiff's claims for damages against individual Department of Correctional Services employees sued in their official capacities are considered claims against New York and, therefore, are barred by the state's Eleventh Amendment immunity.) Therefore, I recommend that the Plaintiff's § 1983 claims brought against the moving Defendants in their official capacities be dismissed without leave to amend.

**C. Claim Against Defendants Briggs and Tyndall for Denial of Access to Court on a Matter Before the Second Circuit Court of Appeals**

Plaintiff claims that documents essential to an appeal he had pending in the Second Circuit Court of Appeals were destroyed when Defendants Briggs and Tyndall deliberately emptied a container of melted ice into Plaintiff's bag. As a result, Plaintiff was unable to file a petition for a hearing or rehearing *en banc* in the case before the filing deadline. (Dkt. No. 1 at ¶ 25.) Plaintiff has not identified the action, nor has he described the nature of the action or the appeal on which he was seeking an *en banc* hearing or rehearing.

The Supreme Court has long held that inmates are guaranteed a right of access to the courts under the First Amendment of the Constitution. *See Lewis v. Casey,* 518 U.S. 343, 350, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); *see also Washington v. James,* 782 F.2d 1134, 1138 (2d Cir.1986) ("A prisoner has a constitutional right of access to the courts for the purpose of presenting his claims, a right that prison officials cannot unreasonably obstruct and that states have affirmative obligations to assure."). In order to state a claim for denial of access to court under § 1983, Plaintiff must assert non-conclusory allegations demonstrating that Defendants Briggs and Tyndall's alleged conduct in destroying his legal documents was deliberate and malicious. *See Lewis,* 518 U.S. at 349, 351; *Gonzales v. Carpenter* No. 9:08–CV–629 (LEK/ATB), 2011 WL 768990, at *7, 2011 U.S. Dist. LEXIS 18806, at *26 (N.D.N.Y. Jan.3, 2011)

(Baxter, M.J.). Plaintiff's Complaint, liberally construed, satisfies that requirement.

**\*7** However, Plaintiff must also assert non-conclusory allegations showing that the interference with his right of access to court resulted in actual injury. *Lewis,* 518 U.S. at 348–349. To do that, Plaintiff must describe the underlying claim allegedly frustrated by the interference well enough to establish that it is "nonfrivolous" and "arguable" in nature. *Christopher v. Harbury,* 536 U.S. 403, 415–16, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002) (underlying cause of action "is an element that must be described in the complaint."); *Arar v. Ashcroft,* 532 F.3d 157, 188–89 (2d Cir.2008), *cert. denied,* —— U.S. ——, 130 S.Ct. 3409, 177 L.Ed.2d 349 (2010) (following *Christopher* in requiring that the complaint include a description of the "nonfrivolous," "arguable" claim that the plaintiff has lost). Plaintiff must set forth sufficient facts to suggest that success on the underlying claim is found on "more than hope." *Christopher,* 536 U.S. at 416.

Plaintiff has provided no information whatsoever concerning the matter in the Second Circuit and has thus failed to state a claim for denial of his First Amendment right of access to court against Defendants Briggs and Tyndall. [FN8] For that reason, I recommend that Plaintiff's claim for denial of access to court against Defendants Briggs and Tyndall be dismissed. Inasmuch as it is possible that Plaintiff may be able to remedy the defect in his Complaint by including specific information regarding his underlying claim, I also recommend that he be granted leave to amend.

> FN8. The fact that Plaintiff was seeking a hearing or rehearing *en banc* raises the inference that he had been unsuccessful on an appeal to the Second Circuit.

**D. Retaliation Claims Against Defendants Lane, Pawlin, Beard, Briggs, Tyndall, and Moehs**

Claims of retaliation find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380–81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Pidlypchak,* 389

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

F.3d at 381–83. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983), *overruled on other grounds, Swierkewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). As the Second Circuit has noted,

[t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkewicz,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1.

**\*8** To state a retaliation claim under 42 U.S.C. § 1983, a plaintiff must allege facts plausibly suggesting that: (1) the speech or conduct at issue was "protected;" (2) the defendants took "adverse action" against the plaintiff—namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Pidlypchak,* 389 F.3d at 380 (citing *Dawes,* 239 F.3d at 492).

Several factors may be considered in determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions. *Baskerville v. Blot,* 224 F.Supp.2d 723, 732 (S.D.N.Y.2002) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)). Those factors include: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary

record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his or her motivation. *Id.* (citing *Colon,* 58 F.3d at 872–73). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.* The Second Circuit has held that the passage of "only six months" is sufficient to support an inference of a causal connection. *Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir.2009) (citing *Gorman–Bakos v. Cornell Co-op. Extension,* 252 F.3d 545, 555 (2d Cir.2001)).

### 1. *Retaliation Claim Against Defendant Lane*

According to Plaintiff, Defendant Lane, who had been allowing him to keep two draft bags of personal items under his bunk, issued a misbehavior report against Plaintiff for possessing the two bags right after learning that Plaintiff was litigating a civil action against correctional officers. (Dkt. No. 1 at ¶¶ 20–22.) When Lane learned later that Plaintiff had filed a grievance in reliance upon a state-wide directive Plaintiff believed allowed him to possess two draft bags for temporary storage of his personal belongings [FN9], Lane ordered Plaintiff to turn over the draft bags and had him manacled and taken to SITU. *Id.* at ¶¶ 23–24.

FN9. *See* Dkt. No. 23–2 at p. 7.

Plaintiff claims that he was charged with a violation for possessing the two draft bags and other fabricated rule violations. (Dkt. No. 1 at ¶ 26.) The Court has inferred that Lane was involved in Plaintiff being charged with allegedly fabricated rule violations for which he was found not guilty following a disciplinary hearing. Plaintiff was found guilty of possessing the two draft bags and punitively sanctioned. *Id.*

The filing of lawsuits and administrative grievances is constitutionally protected activity for retaliation purposes. *See Colon,* 58 F.3d at 872 ("Prisoners ... have a constitutional right of access to the courts and to petition the government for redress of grievances, and prison officials may not retaliate against prisoners for exercise of that right."); *Davis v. Goord,* 320 F.3d 346, 352–53 (2d Cir.2003) (the right of prisoners to file administrative grievances is a constitutionally protected activity for

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

retaliation purposes). Plaintiff's retaliation claim against Lane can be construed to include retaliation for his lawsuit and the grievance he filed, both constitutionally protected activity. Therefore, the Complaint satisfies the first prong of a retaliation claim for pleading purposes.

**\*9** Liberally construing Plaintiff's Complaint, it appears that Plaintiff has set forth a facially plausible claim of adverse action satisfying the second prong. Plaintiff contends that the "motivating factor" behind Lane's initial rule violation charge against him with regard to the draft bags was finding out about Plaintiff's lawsuit. (Dkt. No. 27 at p. 4.) The filing of the charge led to Plaintiff being ordered to discard documents and legal materials by hearing officer Pawlin. *Id.* Destruction of a prisoner's legal papers and personal property has been found substantial enough to qualify as an adverse action for retaliation purposes. *See Smith v. City of New York,* No. 03 Civ. 7576(NRB), 2005 WL 1026551, \*3, 2005 U.S. Dist. LEXIS 7903, at \*10 (S.D.N.Y. May 3, 2005) (Buchwald, J.) Because Plaintiff did have the two draft bags under his bunk, Lane's initial rule violation charge was arguably not a false misbehavior report. However, since Plaintiff claims that the bags were under the bunk with Lane's consent at the time he charged Plaintiff with the rule violation, the violation charge can be viewed as an adverse action for pleading purposes.

Placing Plaintiff in the SHU and filing false misbehavior claims against him after learning that he had filed a grievance based upon the directive also constitute adverse action sufficient to satisfy the second prong of a retaliation claim. *See Hamilton v. Fisher,* No. 9:10–CV1066(MAD/RFT), 2012 WL 987374, at \*14, 2012 U.S. Dist. LEXIS 39116, at \*41 (N.D.N.Y. Feb.29, 2012) (Treece, M.J.) (alleged transfer to SHU in retaliation for complaints could be considered adverse action); *Smith v. Hash,* No. 904–CV–0074 LEK/DRH, 2006 WL 2806464, at \*6, 2006 U.S. Dist. LEXIS 70362 (N.D.N.Y. Sept.28, 2006) (Kahn D.J., Homer, M.J.) (same); *Kotler v. Daby,* No. 10–CV–136 (TJM/DRH), 2011 WL 915312, \*5, 2011 U.S. Dist. LEXIS 26173, at \*14 (N.D.N.Y. Feb.10, 2011) (Homer, M.J.) (both filing false misbehavior report and sending plaintiff to SHU for filing grievances and lawsuits constitute adverse actions); *Mateo v. Fischer,* 682 F.Supp.2d 423, 433

(S.D.N.Y.2010) (filing false misbehavior report against plaintiff constituted an adverse action for purposes of retaliation claim).

Plaintiff's Complaint also satisfies the third prong of the retaliation analysis—a causal connection between Plaintiff's lawsuit and grievance and the adverse action by Lane. Although Lane was not himself the subject of Plaintiff's lawsuit, the temporal proximity between Lane's learning of the lawsuit against other correctional officers and charging Plaintiff with a rule violation makes a facially plausible showing of causation. Further, the temporal proximity between Plaintiff's grievance concerning the bags and his being placed in SITU and having an allegedly false misbehavior report filed against him supports causation for purposes of this motion. *See Baskerville,* 224 F.Supp.2d at 732. In addition, Plaintiff was found not guilty with respect to the allegedly false misbehavior reports. *Id.*

**\*10** For the foregoing reasons, I recommend that Defendant Lane's motion to dismiss Plaintiff's retaliation claim against him be denied.

### 2. *Retaliation Claim Against Defendant Pawlin*

Plaintiff has also asserted a retaliation claim against Defendant Pawlin, the hearing officer who directed him to discard documents and legal materials. (Dkt. No. 27, at p. 4.) Plaintiff's Complaint does not adequately state a claim for retaliation against Defendant Pawlin. Plaintiff has not alleged that Pawlin was aware of the lawsuit Plaintiff had filed against correctional officers, nor is there any allegation that Pawlin was a defendant in that lawsuit. As a result, Plaintiff has failed to allege plausibly that the lawsuit was causally connected to Pawlin's allegedly adverse action. *See Wilson v. Kelly,* No. 9:11–cv–00030 (MAD/RFT), 2012 WL 3704996, at \*9, 2012 U.S. Dist. LEXIS 121293, at \*24 (Aug. 27, 2012) (D'Agostino, D.J., Treece, M.J.) (claim dismissed due to failure by plaintiff to allege plausibly that protected activity was causally connected to any alleged adverse action taken by the defendant where plaintiff failed to allege that the defendant was aware of the protected activity). Therefore, I recommend that Plaintiff's retaliation claim against Defendant Pawlin be dismissed with leave to amend.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

3. *Retaliation Claim Against Defendant Beard*

The Complaint does not allege that Defendant Beard was aware of the lawsuit that Plaintiff had filed against correctional officers. However, Plaintiff has alleged that when Defendant Lane learned that Plaintiff had filed a grievance with regard to storage of the draft bags in his cell, he began phoning Defendant Beard "and reporting to him the situation." (Dkt. No. 1 at ¶ 23.) The Court can reasonably infer from that allegation that Beard was aware that the grievance had been filed when he subsequently joined Lane in escorting the manacled Plaintiff out of his housing unit and taking him to SHU. *Id.* at ¶ 24. Placing Plaintiff in SHU constitutes an adverse action for purposes of the retaliation analysis. *See Hamilton,* 2012 WL 987374, at \*14, 2012 U.S. Dist. LEXIS 39116, at \*14 (putting Plaintiff in SHU for filing a grievance constitutes an adverse action). Furthermore, the temporal proximity between Plaintiff's grievance concerning the bags and his being placed in SHU supports causation for purposes of this motion. *See Baskerville,* 224 F.Supp.2d at 732. Therefore, I recommend that Defendant Beard's motion to dismiss the Plaintiff's retaliation claim against him be denied.

4. *Retaliation Claim Against Defendants Briggs and Tyndall*

Destruction of Plaintiff's legal material and documents for his Second Circuit appeal constitutes an adverse action for purposes of the retaliation analysis. *See Smith v. City of New York,* 2005 WL 1026551, \*3, 2005 U.S. Dist. LEXIS 7903, at \*10 (destruction of prisoner's legal papers and personal property qualifies as an adverse action for retaliation purposes). However, Plaintiff has not alleged that either Briggs or Tyndall was involved in or even aware of Plaintiff's lawsuit or grievance at the time they are alleged to have emptied a container of melted ice into a bag filled with legal documents. Therefore, the Complaint does not make a facially plausible showing of causation against Briggs and Tyndall, and for that reason I recommend that Plaintiff's retaliation claim against those defendants be dismissed. Because Plaintiff may be able to correct the deficiency in an amended complaint, I recommend that he be granted leave to amend.

5. *Retaliation Claim Against Defendant Moehs*

**\*11** The only factual allegations in Plaintiff's Complaint regarding Defendant Moehs are that he replaced Dr. Rosner as Plaintiff's health care provider, informed Plaintiff that he would not continue with the recommended course of treatment necessary to improve Plaintiff's medical condition or provide him with the recommended TENS unit, and told Plaintiff to live with the pain. (Dkt. No. 1 at ¶ 31.) In his opposition to Defendants' motion to dismiss, Plaintiff has asked the Court to infer that Defendant Moehs substituted himself for Dr. Rosner in order to disapprove the recommended course of treatment because Plaintiff had complained to the Chief Medical Officer about not receiving adequate medical care. (Dkt. No. 27 at p. 5.)

The Court finds that the allegations in Plaintiff's Complaint do not permit the inference Plaintiff has asked it to make. *See Friedl v. City of New York,* 210 F.3d 79, 86 (2d Cir.2000) (retaliation claim must be "supported by specific and detailed factual allegations" and "not stated in wholly conclusory terms.") (citation and internal quotation marks omitted).

Plaintiff has failed to allege that Moehs had any knowledge of his complaint to the Chief Medical Officer when he denied Plaintiff the treatment recommended by the therapist, thus failing to satisfy the causal relationship prong of the retaliation analysis. *See Wilson,* 2012 WL 3704996, at \*9, 2012 U.S. Dist. LEXIS 12193, at \*24. Plaintiff filed the grievance and made complaints to the Chief Medical Officer prior to his examination by Dr. Rosner and to the initial therapy sessions. *See Id.* at ¶¶ 30–31. There are no allegations in the Complaint suggesting that Moehs was the subject of the grievance or complaints or that he would otherwise have any reason to retaliate against Plaintiff by denying him necessary medical care.

In light of Plaintiff's failure to make a facially plausible showing of causal connection, I recommend that his retaliation claim against Defendant Moehs be dismissed. However, because Plaintiff's grievance and complaints to the Chief Medical Officer constitute constitutionally protected activity, and the denial of necessary medical treatment in retaliation for the filing of a grievance or making a complaint is sufficient to satisfy the adverse action requirement of the retaliation claim

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

analysis, I recommend that Plaintiff be granted leave to amend should he be able to plead specific facts supporting causation.[FN10]

> FN10. *See* *Williams v. Fisher,* No. 02 Civ. 4558(LMM), 2003 WL 22170610, at *10–11, 2003 U.S. Dist. LEXIS 16442, at ——33–34 (S.D.N.Y. Sept.18, 2003) (McKenna, J) (allegation that prison doctor revoked plaintiff's necessary medical treatment because he filed a grievance is sufficient for second prong of retaliation claim analysis).

**E. Claims of Cruel and Inhuman Treatment and/or Medical Indifference Against Defendants Pawlin, Moehs, McAuliffe, Barkley, Hulihan, and Lindquist**

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishment. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble,* 429 U.S. 97, 102–03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle,* 429 U.S. at 102. Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citation omitted).

**\*12** A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement. Under the objective requirement, "the deprivation alleged must be objectively sufficiently serious [;] ... a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities." *Farmer,* 511 U.S. at 834 (citations and internal quotation marks omitted). Under the subjective requirement, a plaintiff must demonstrate that a prison official acted with deliberate indifference to an inmate's health or safety. *Id.* In *Farmer,* the Supreme court found it "fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding the risk." *Id.* at 837.

In fulfilling their duty to "provide humane conditions of confinement," prison officials must ensure, among other things, that inmates receive adequate medical care. *Id.* (citing *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). There are two elements to a prisoner's claim that prison officials violated his or her Eighth Amendment right to receive medical care. "The plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009) (citation and punctuation omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003).

A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) (citations omitted), *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). There is no bright-line test to measure the seriousness of a prisoner's medical condition. *Stevens v. Goord,* 535 F.Supp.2d 373, 383 (S.D.N.Y.2008). However, the Second Circuit has set forth factors to consider when determining whether an alleged medical condition is sufficiently serious, including but not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702. Inquiry into whether a plaintiff had a serious medical need "must be tailored to the specific circumstances of each case." *Smith,* 316 F.3d at 185.

Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance,* 143 F.3d at 703 (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)). Thus, to establish deliberate

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702–03. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *See Farmer,* 511 U.S. at 825; *Ross v. Giambruno,* 112 F.3d 505 (2d Cir.1997). An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle,* 429 U.S. at 105–6.

**\*13** Prison officials can deprive inmates of medical treatment by unnecessarily delaying adequate medical treatment. *Smith,* 316 F.3d at 185. Where a plaintiff's claim is one of a temporary delay in the provision of otherwise adequate treatment, "it is appropriate to focus on the challenged delay ... in treatment rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious to support an Eighth Amendment claim." *Id.*

### 1. *Claim of Cruel and Inhuman Treatment By Defendant Pawlin*

Plaintiff has alleged that he suffered from lower back strain after being required to carry his personal belongings from SHU to his assigned housing unit. (Dkt. No. 1 at ¶ 28.) According to Plaintiff, Defendant Pawlin thereafter subjected him "to a pattern of harassing inter-facility movements ... which required him to move his belongings to different housing units." (Dkt. No. 1 at ¶ 28.) "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837. Even if requiring Plaintiff to move his personal belongings to different housing units when he was suffering from lower back strain could pass as an "unnecessary and wanton infliction of pain ... incompatible with the evolving standards of decency that mark the progress of a maturing

society," *Estelle,* 429 U.S. at 102, Plaintiff has not alleged facts showing that Pawlin was aware of Plaintiff's back strain at the time he directed the moves, that Plaintiff complained to Pawlin about any impact the moves had on his back, or that Plaintiff suffered any further harm to his back as a result of the moves to different housing units. Therefore, Plaintiff has failed to plead a facially plausible claim of deliberate indifference to Plaintiff's health or safety, and the Court recommends that Plaintiff's Eighth Amendment claim against Defendant Pawlin for cruel and inhuman treatment be dismissed, and that Plaintiff be given leave to amend.

### 2. *Claim of Medical Indifference Against Defendant Moehs*

Plaintiff claims that the physical therapist who had worked with him had recommended that Plaintiff be given additional physical therapy sessions and a TENS unit for his lower back pain, and that Defendant Moehs refused to authorize both when he took over as Plaintiff's physician. (Dkt. No. 1 at ¶ 31.) An inmate's "mere disagreement over the proper treatment does not create a constitutional claim ... [s]o long as the treatment given is adequate." *Chance,* 143 F.3d at 703. Construing Plaintiff's complaint liberally, as is required in light of his *pro se* status, and accepting the allegations as true, Plaintiff claims that Moehs not only rejected the treatment recommended by the therapist, but that he declined to provide any treatment at all to address Plaintiff's excruciating back pain, telling him instead to learn to live with the pain. (Dkt. No. 1 at ¶ 31.)

**\*14** Plaintiff has described himself as having "excruciating lower back pain" over an extended period of time. (Dkt. No. 1 at ¶¶ 27, 35–36.) Severe back pain, especially if it lasts for an extended period of time, as Plaintiff claims, can constitute a "serious medical need" under the Eighth Amendment, there by satisfying the first element of a medical indifference claim. [FN11] *See Guarneri v. Hazzard,* No. 9:06–CV–0985, 2008 WL 552872, at \*6, 2008 U.S. Dist. LEXIS 14809 (Feb. 27, 2008) (Mordue, C.J., Homer, M.J.) (citing *Nelson v. Rodas,* No. 01 Civ. 7887(RCC)(AJP), 2002 WL 31075804, at \*14, 2002 U.S. Dist. LEXIS 17359, at \*50 (S.D.N.Y. Sept. 17, 2002) (Peck, M.J.) (collecting cases)). Given Plaintiff's alleged level of back pain and the length of time over which it lasted, Moehs' refusal to allow him to follow through with the recommended therapy and allow Plaintiff a TENS unit,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

compounded by his alleged failure to prescribe any treatment whatsoever to address Plaintiff's back condition and pain, constitutes a facially sufficient claim of deliberate indifference for purposes of Plaintiff's 12(b)(6) motion. [FN12] Therefore, the Court recommends that Defendant Moehs' motion to dismiss Plaintiff's Eighth Amendment medical indifference claim against him be denied.

> FN11. Dental conditions left untreated for a significant period of time can also constitute a serious medical need under the Eighth Amendment. *See, e.g., Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000) (tooth cavity which will degenerate with increasingly serious implications if neglected over sufficient time presents a serious medical need); *Chance,* 143 F.3d at 702 (untreated dental problems resulting in chronic tooth pain for six months resulting in tooth degeneration constitute serious medical needs); *see also Fields v. Gander,* 734 F.2d 1313, 1314–15 (8th Cir.1984) (claim based on plaintiff's inability to eat properly due to dental problems).

> FN12. If it turns out that Defendant Moehs did provide Plaintiff with some course of treatment for his back, albeit not the treatment recommended by the therapist or the treatment Plaintiff would have chosen for himself, and did not merely tell Plaintiff to live with the pain as alleged, Plaintiff's medical indifference claim is unlikely to survive a motion for summary judgment.

### 3. *Claim of Medical Indifference Against Defendants McAuliffe and Bezio Regarding Medical and Dental Care to Inmates in SHU*

Plaintiff has alleged that on two separate occasions when he in SHU he was not allowed to attend scheduled dental and medical appointments because of a routine practice denying inmates in SHU reasonable adequate dental and medical care. (Dkt. No. 1 at ¶¶ 27 and 29.) The basis for Plaintiff's Eighth Amendment medical indifference claim against Defendants McAuliffe and Bezio is that they "were cognizant of this routine practice, and/or have knowingly implemented or allowed the implementation of the practice of denying prisoners confined in the SHU reasonable adequate dental and medical care." *Id.* at ¶ 27. The dental appointment Plaintiff missed was for "troubling wisdom teeth," which were painful and one of which was ultimately extracted after Plaintiff filed a grievance. *Id.* at ¶ 30. The medical appointment was for Plaintiff's chronic lower back problem that left him with excruciating pain. *Id.* at ¶ 27.

In a § 1983 action against a defendant in his or her individual capacity, the plaintiff must establish that the defendant, acting under color of state law, caused the plaintiff to be deprived of a federal right. *Kentucky v. Graham,* 473 U.S. at 166. "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978). The United States Supreme Court has made it clear that "[b]ecause vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal,* 556 U.S. at 676 ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior.*"); *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986) ("*[R]espondeat superior* liability does not lie against corrections officers in Section 1983 actions; holding a position in a hierarchical chain of command is insufficient by itself to support personal involvement").

**\*15** However, the Second Circuit has held that personal involvement by a supervisor under § 1983 may be found where the supervisor has: "(1) participated directly in the alleged constitutional violation, (2) failed to remedy a violation after learning of it through a report or appeal,[FN13] (3) created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) was grossly negligent in managing subordinates who committed constitutional violations, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon,* 58 F.3d at 873.[FN14]

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

FN13. There are no allegations in the Complaint that McAuliffe and Bezio had direct knowledge that Plaintiff had a serious medical need while he was in SHU and nonetheless refused to allow him to keep his dentist and medical appointments. *See Farmer,* 511 U.S. at 825, 837 (deliberate indifference requires defendant's awareness of facts from which he or she could draw an inference that plaintiff had a serious medical need, that inference was actually made, and that defendant consciously and intentionally disregarded or ignored the need).

FN14. The Supreme Court's decision in *Ashcroft,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 has arguably nullified some of the categories set forth in *Colon. See Sash v. United States,* 674 F.Supp.2d 531, 543–44 (S.D.N.Y.2009). However, the Second Circuit has yet to issue a decision addressing *Iqbal's* effect on the *Colon* categories, and I will assume for purposes of these motions that *Colon* remains good law.

Under *Colon,* if McAuliffe and Bezio, acting in a supervisory capacity, either created a policy resulting in violation of an inmate's Eighth Amendment rights, or allowed the continuation of such a policy, they could be subject to liability under 42 U.S.C. § 1983. In this case, however, under even the most liberal reading of Plaintiff's Complaint, he has not alleged any facts to support such a claim. The Complaint is devoid of any factual enhancement of his conclusory assertion that McAuliffe and Bezio were aware of the allegedly routine practice, were involved in implementing it, or that they had authority to stop the practice of denying SHU prisoners "reasonable adequate dental and medical care" and allowed it to continue. *Id.* at ¶ 30. *See Iqbal,* 556 U.S. at 678 ("naked assertion[s] devoid of further factual enhancement [do] not suffice" to state a claim) (internal quotation marks omitted). Therefore, the Court recommends that Defendants McAuliffe and Bezio's motion to dismiss Plaintiff's Eight Amendment medical indifference claim against them be granted with leave granted Plaintiff to amend.

### 4. *Claim of Indifference to Serious Medical Needs Against Defendants Barkley, Hulihan, and Lindquist*

Plaintiff identifies Defendants Barkley and Hulihan as superintendents of correctional facilities and Defendant Lindquist as a grievance appeal officer. (Dkt. No. 1 at ¶¶ 14 and 16.) Plaintiff has alleged that while he was in SHU at Mid–State, he continued to experience excruciating back pains and a painful wisdom tooth and requested and was denied treatment by Defendant Dr. John Doe based upon Defendant Moehs' medical notation entry. *Id.* at ¶ 35. According to Plaintiff, the only dental or medical care he received while in SHU at Mid–State was dental x-rays. *Id.* Plaintiff has alleged in conclusory fashion that he made detailed and articulate complaints to Defendants Barkley, Hulihan, and Lindquist about being deprived of necessary and adequate medical and dental care at Mid–State, that the complaints were denied as unsubstantiated, and that no significant steps were taken to ensure that care was given during the time period he was at Mid–State prior to his transfer to Downstate. (Dkt. No. 1 at ¶ 36.)

**\*16** Supervisory personnel may be held liable under § 1983 for "fail[ure] to remedy a violation after learning of it through a report or appeal." *Colon,* 58 F.3d at 873. However, mere receipt of a report or complaint or request for an investigation by a prison official is insufficient to hold the official liable for the alleged constitutional violations. *See, e.g., Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002) (claim that official ignored prisoner's letter of protest not enough to hold official liable); *Walker v. Pataro,* No. 99 Civ. 4607(GBD)(AJP), 2002 WL 664040, at \*12, 2002 U.S. Dist. LEXIS 7067, at \*43 (S.D.N.Y. Apr. 23, 2002) (Peck, M.J.) ("[I]f mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to black-letter law that 1983 does not impose *respondeat superior* liability.").

"On the other hand, where a supervisory official receives and acts on a prisoner's grievance (or substantively reviews and responds to some other form of inmate complaint), personal involvement will be found under the second *Colon* prong: the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong." *Walker,* 2002 WL 664040, at \*13,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

2002 U.S. Dist. LEXIS 7067, at *44 (citations and internal quotation marks omitted) (in denying superintendent's motion for summary judgment the court noted that responses to grievances or other inmate complaints "which attempt to defend or explain alleged constitutional violations have been found sufficient to sustain a plaintiff's claim of personal involvement."); *see also Johnson,* 234 F.Supp.2d at 363 ("personal involvement will be found ... where a supervisory official receives and acts on a prisoner's grievances or otherwise reviews and responds to a prisoner's complaint.").

Allegations of awareness on the part of a correctional facility superintendent of an ongoing failure by prison officials to provide a plaintiff with medical treatment for injuries, coupled with failure to remedy the wrong after learning of it through a grievance procedure have been found to be sufficient to survive a Rule 12(b)(6) motion. *See Cicio v. Graham,* No. 9:08–CV–534, 2009 WL 537534, at *7, 2009 U.S. Dist. LEXIS 16675 (N.D.N.Y. Mar.3, 2009) (Mordue, C.J.) (Peebles, M.J.). However, the naked assertion in Plaintiff's Complaint that he complained to Defendants Barkley, Hulihan, and Lindquist that he was being deprived of reasonable and adequate dental care, and that his complaints were found unsubstantiated is simply too lacking in factual detail to show that Plaintiff is entitled to relief. *See Iqbal,* 556 U.S. at 678 (Rule 8(a)(2) "demands more than an unadorned, the defendant-harmed-me accusation.") Plaintiff's Complaint contains absolutely no factual enhancement regarding the manner in which complaints were conveyed to each of the defendants, the content of the complaints, the timing of the complaints, or the responses of each of those Defendants to those complaints. Therefore, I recommend that Defendants Barkley, Hulihan, and Lindquist's motion to dismiss Plaintiff's Eighth Amendment medical indifference claim against them be granted and that Plaintiff be granted leave to amend.

## G. Claims for Denial of Due Process Against Defendants Lane, Beard, Jones, McAuliffe, and Bezio

**\*17** To make out a Section 1983 claim for denial of Fourteenth Amendment due process rights, a plaintiff must demonstrate: "(1) that he possessed a liberty interest and (2) that the defendants deprived him of that interest as a result of insufficient process." *Giano v. Selsky,* 238 F.3d

223, 225 (2d Cir.2001) (internal quotation marks omitted). As to the first prong, an inmate can show deprivation of a liberty interest under the due process clause when a prison condition imposes an "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandlin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). As to the second prong, the minimal due process requirements include: "(a) written notice of the claimed violations ...; (b) disclosure [to the prisoner] of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a neutral and detached hearing body ...; and (f) a written statement by the fact finders as to the evidence relied on ...." *Wolff v. McDonald,* 418 U.S. 539, 559, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

*1. Due Process Claim Arising Out of Misbehavior Reports Involving Plaintiff's Draft Bags*

Plaintiff has asserted a claim for denial of his due process rights under the Fourteenth Amendment against Defendants Lane, Beard, McAuliffe[FN15] and Jones arising out of the institution, execution, and enforcement of a disciplinary proceeding against him based upon fabricated allegations and in violation of the state-wide directive allowing inmates to store two draft bags of personal possessions in their cells on a temporary basis. (Dkt. No. 1 at ¶¶ 47–48.) Construing Plaintiff's Complaint liberally, Defendants Lane and Beard are accused of filing fabricated charges and a draft bag possession charge against him. Defendant Jones was the hearing officer on the charges and ruled in favor of Plaintiff on the allegedly fabricated charges but found him guilty on the draft bags possession charge in violation of the state-wide directive. *Id.* at ¶ 28.

> FN15. Although Plaintiff has asserted a due process claim against Defendant McAuliffe in connection with the misbehavior report filed by Lane and Beard that resulted in the imposition of punitive sanctions by Defendant Jones, there are no factual allegations in the Complaint connecting Defendant McAuliffe to that claim.

The Court's initial inquiry is whether Plaintiff has

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

pleaded facts supporting a facially plausible claim that a liberty interest was infringed by the false charges and hearing determination since Plaintiff had no right to due process unless a liberty interest was infringed. *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004). In his Complaint, Plaintiff has alleged he was punitively confined to SITU by Jones.[FN16] (Dkt. No. 1 at ¶ 29.) Plaintiff claims that he was in SITU for a few weeks. *Id.* While he was unable to attend dental and medical appointments while he was in SITU, Plaintiff has described it as a routine practice rather than an atypical occurrence. *Id.* at ¶ 27. *See Palmer,* 364 F.3d at 64 (both duration and conditions are considered in determining whether SHU confinement rises to the level of "atypical and severe hardship"). The alleged violation of the state-wide DOCCS storage directive by Defendants Lane, Beard, and Jones help Plaintiff because failure to follow a DOCCS directive does not give rise to a Section 1983 claim. *See Cabassa v. Gummerson,* No. 9:01–CV–1039, 2008 WL 4416411, *6, n. 24, 2008 U.S. Dist. LEXIS 72975, at *6, n. 24 (N.D.N.Y. Sept.24, 2008) (Hurd, D.J.) (violation of a DOCCS directive does not give plaintiff a claim under 42 U.S.C. ¶ 1983).

> **FN16.** The Court has inferred that the SHU sanction was imposed by Jones as a result of the guilty determination on the draft bag possession charge.

**\*18** Because the Plaintiff has failed to allege a liberty interest, it is not necessary to reach the issue of whether he was provided sufficient process in the hearing on the allegedly fabricated charges.[FN17] Therefore, the Court recommends that Defendants Lane, Beard, and Jones' motion to dismiss Plaintiff's Fourteenth Amendment due process claim be granted with leave to Plaintiff to amend.

> **FN17.** The Court has recommended that Defendants Lane and Beard's motion to dismiss Plaintiff's retaliation claim arising out of the allegedly false misbehavior report be denied. *See Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir.1997) (filing of a false misbehavior report may be actionable when made in retaliation for the exercise of constitutional rights).

*2. Due Process Claim Against McAuliffe and Bezio Arising Out of Plaintiff's Alleged Denial of a Fair and Impartial Hearing*

Plaintiff has also asserted a due process claim against Defendants McAuliffe and Bezio in connection with his disciplinary hearing in front of McAuliffe. Plaintiff's due process claim against McAuliffe arises out of his denial of Plaintiff's request for access to documentary evidence needed to defend himself in a disciplinary hearing, his deliberate and purposeful misrepresentation to Plaintiff, and his denial of a fair and impartial disciplinary hearing. His claim against Bezio arises out of Bezio's affirmance of McAuliffe's determination of guilt. (Dkt. No. 1 *at* ¶ 49.) Plaintiff was placed in SHU for six months, with a concomitant loss of all privileges and good time credit, which extended his sentence to the maximum, as a result of the guilty finding. *Id.* at ¶ 33.

The Supreme Court ruled in *Sandlin* that the Constitution did not require that restrictive confinement be preceded by a hearing providing procedural due process protections unless the confinement subjected the prisoner to "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. at 484. The Second Circuit considers the duration of SHU confinement as well as the severity of the conditions. *See Palmer,* 364 F.3d at 65. Although no bright-line rule establishes a period of SHU confinement beyond which a due process right is implicated, *id. at 64,* the Second Circuit has held that a 101 day confinement does not alone meet the *Sandlin* standard of atypicality. *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir.2004), *cert. denied,* 543 U.S. 1187, 125 S.Ct. 1398, 161 L.Ed.2d 190 (2005) (citing *Sealey v. Giltner,* 197 F.3d 578, 589 (2d Cir.1999)). A liberty interest has, on the other hand, been found to be infringed by a confinement of 305 days. *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000).

SHU confinement of less than 101 days can constitute atypical and significant hardships if the conditions were more severe than normal SHU conditions or "a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer,* 364 F.3d at 65 (citing *Ortiz,* 323 F.3d at 195 & n. 1 and *Colon,* 215 F.3d at 232 & n. 1) In *Palmer,* the Second Circuit explained "[w]here the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

plaintiff was confined [in SHU] for an intermediate duration—between 101 and 305 days—development of a detailed record of the conditions of the confinement relative to ordinary prison conditions is required [to determine whether a prisoner's liberty interest has been infringed]." 364 F.3d at 64–65.

**\*19** Plaintiff's allegations of a 180 day confinement in SITU with no medical care for an excruciatingly painful back and painful wisdom tooth is sufficient to satisfy the atypical conditions requirement for a liberty interest for pleading purposes. Plaintiff has also asserted facts adequate to satisfy the pleading requirements for a denial of due process in his disciplinary hearing. "Chief among the due process minima outlined in *Wolff* [is] the right of an inmate to call and present witnesses and documentary evidence in his defense before the disciplinary board." *Ponte v. Real,* 471 U.S. 491, 496, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985). Plaintiff has alleged that McAuliffe twice denied his request for documents relevant to his defense.

Prisoners also have a constitutional right to a fair and impartial hearing officer. *See, e.g., Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004). Plaintiff claims that McAuliffe made false representations to him to induce him to enter into an involuntary plea. While Plaintiff's due process claim against McAuliffe may not survive a motion for summary judgment, the allegations in the Complaint are adequate to assert a facially plausible claim of denial of due process.

Plaintiff has also alleged facts adequate to state a claim against Defendant Bezio for denial of due process in affirming the hearing determination. According to Plaintiff, in his appeal, he informed Bezio that he had been denied a fair and impartial hearing, that his guilty plea was unconstitutionally induced, and that he was denied due process and equal protection. (Dkt. No. 1 at ¶ 34.) It appears from the Complaint that Bezio affirmed the hearing determination while Plaintiff was still in SHU, and that as a result of the affirmance, Plaintiff ended up serving the full 180 day SITU confinement and the maximum of his original sentence. *Id.* Personal involvement of a supervisory official may be shown by evidence that after learning of the violation of a prisoner's

rights through an appeal, he failed to remedy the wrong. *Colon,* 58 F.3d at 873.

The consequences of McAuliffe's alleged violation of Plaintiff's due process rights—Plaintiff's confinement in SHU and loss of good time—were ongoing at the time Bezio affirmed the hearing determination. *Id.* at 34. Bezio therefore had the opportunity to remedy the violation at least to some degree and failed to do so, thereby leaving him potentially subject to personal liability. *See Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986) (finding personal involvement where superintendent denied appeal from hearing that allegedly violated plaintiff's rights); *Delgado v. Bezio,* No. 09 Civ. 6899(LTS), 2011 WL 1842294, at \*8, 2011 U.S. Dist. LEXIS 51917, at \*25–26 (S.D.N.Y. May 9, 2011) (Swain, D.J.) (denying motion to dismiss claim against official who heard appeal from disciplinary hearing); *Johnson v. Coombe,* 156 F.Supp.2d 273, 278 (S.D.N.Y.2001) (denying appeal officer's motion to dismiss because prisoner alleged he had been denied the opportunity to call a witness at disciplinary hearing); *Moore v. Scully,* No. 90 Civ 3817(MEL), 1993 WL 22129, at \*3, 1993 U.S. Dist. LEXIS 841, at \*10–11 (S.D.N.Y. Jan. 26, 1993) Laker, D.J.) (denying summary judgment where superintendent denied affirmed disciplinary hearing result where plaintiff alleged that hearing denied due process).

**\*20** Based upon the foregoing, the Court recommends that Defendant Bezio's motion to dismiss Plaintiff's Fourteenth Amendment due process claim be denied.

## H. Plaintiff's Pendent State Claims

Plaintiff has asserted three distinct claims for relief under New York State law against Defendants for acts or omissions within the scope of their employment. (Dkt. No. 1 at ¶¶ 51–55.) They are: (1) *respondeat superior* claims against Defendants Lindquist, Barkley, and Hulihan for negligence in performing their administrative duty to supervise their subordinates' work performance as it related to Plaintiff's care and treatment, *Id.* at ¶ 51; (2) claims against Defendants Lane, Beard, Jones, McAuliffe, and Bezio for wrongful confinement and deprivation of Plaintiff's liberty interest by denying him the right to offer relevant documentary evidence for the preparation and

presentation of his defense in a disciplinary proceeding in violation of New York State Rules and Regulations and DOCCS policy directives, *Id.* at ¶¶ 52–53; and (3) negligence and malfeasance in providing Plaintiff medical and dental care. Defendants argue that Plaintiff's state law claims should be dismissed pursuant to New York Correction Law § 24. (Dkt. No. 23–1 at pp. 20–22.) Defendants are correct. Section 24 provides as follows:

1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

This statute precludes inmates from suing DOCCS employees in their personal capacity in New York State courts. *See Arteaga v. State,* 72 N.Y.2d 212, 532 N.Y.S.2d 57, 62, 527 N.E.2d 1194 (1988). The statutory bar is intended to permit correction officers to perform the task of maintaining safety and security in correctional facilities "undeterred by the fear of personal liability and vexatious suits, which could substantially impair the effective performance of a discretionary function." *Ierardi v. Sisco,* 119 F.3d 183, 187 (2d Cir.1997). The bar also applies to pendent state law claims in federal court because "[i]n applying pendent jurisdiction, federal courts are bound to apply state substantive law to the state claim." *Baker v. Coughlin,* 77 F.3d 12, 15 (2d Cir.1996) (citations omitted). "If a state would not recognize a plaintiff's right to bring a state claim in state court, a federal court exercising pendent jurisdiction ... must follow the state's jurisdictional determination and not allow that claim to be appended to a federal law claim in federal court." *Id.* at 15.

**\*21** In 2009, the United States Supreme Court held Correction Law § 24 unconstitutional to the extent it

precludes inmates from pursuing § 1983 claims. *Haywood v. Drown,* 556 U.S. 729, 129 S.Ct. 2108, 173 L.Ed.2d 920 (2009). However, the courts in this District have held that the *Haywood* decision does not affect the question of the district court's jurisdiction to hear pendent state law claims against DOCCS employees and have continued to dismiss those claims under Correction Law § 24. *See O'Diah v. Fischer,* No. 08–CV–941 (TJM/DRH), 2012 WL 987726, at \*21, 2012 U.S. Dist. LEXIS 39232, at \*60 (N.D.N.Y. Feb.28, 2012) (Homer, M.J.); *Joy v. New York,* No. 5:09–CV–841 (FJS/ATB), 2010 WL 3909694, at \*4–5, 2010 U.S. Dist. LEXIS 104641, at \*15–16 (N.D.N.Y. Sept.30, 2010) (Scullin, S.D.J.); *Gillard v. Rovelli,* No. 9:09–CV–0860 (NAM/GHL), 2010 WL 4905240, at \*16, 2010 U.S. Dist. LEXIS 124737, at \*47–48 (N.D.N.Y. Sept.29, 2010) (Lowe, M.J.); *Crump v. Ekpe,* No. 9:07–CV–1331, 2010 WL 502762, at \*18, 2010 U.S. Dist. LEXIS 10799, at \*61 (N.D.N.Y. Feb.8, 2010) (Kahn, D.J., Peebles, M.J.). For the reasons set forth in those decisions, I recommend that Defendants' motion to dismiss Plaintiff's pendent state law claims in this case be granted, without leave to amend.

**ACCORDINGLY,** it is hereby

**RECOMMENDED,** that Defendants' motion to dismiss Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) (Dkt. No. 23) be **GRANTED IN PART AND DENIED IN PART.** Specifically, the Court recommends that Defendants' motion be **GRANTED** as follows:

1. Dismissal on Eleventh Amendment grounds of all claims seeking money damages against the moving Defendants in their official capacities, without leave to amend;

2. Dismissal of all of Plaintiff's state law claims against Defendants Lindquist, Barkley, Hulihan, Lane, Beard, Jones, Moehs, McAuliffe, and Bezio (Dkt. No. 1, Counts XV–XIX), without leave to amend; and

3. Dismissal of the following claims, with leave to amend: (a) First Amendment claim against Defendants Briggs and Tyndall for denial of access to courts; (b) First Amendment retaliation claims against Defendants Pawlin,

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

Briggs, Tyndall, and Moehs; (c) Eighth Amendment claim of cruel and inhuman treatment against Defendant Pawlin; (d) Eighth Amendment claim for indifference to serious medical needs against McAuliffe, Bezio, Barkley, Hulihan, and Lindquist; and (e) Fourteenth Amendment denial of due process claims against Defendants Lane, Beard, and Jones; and it is further

**RECOMMENDED** that Defendants' motion be ***DENIED*** as to the following: (a) Plaintiff's claim for retaliation against Defendants Lane and Beard; (b) Plaintiff's Eighth Amendment medical indifference claim against Defendant Moehs; and (c) Plaintiff's Fourteenth Amendment violation of due process claim against Defendants McAuliffe and Bezio; and it is further

**RECOMMENDED** that Defendants be directed to answer those allegations in the Plaintiff's Complaint that relate to the claims on which dismissal is denied and those which relate to the Doe Defendants.

**\*22** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2013.

Jean-Laurent v. Lane
Slip Copy, 2013 WL 600213 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 599893 (N.D.N.Y.)

(Cite as: 2013 WL 599893 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Phillip JEAN–LAURENT, Plaintiff,
v.
C.O. LANE; C.O. Briggs; C.O. Tyndall; John Doe # 1;
John Doe # 2; Sgt. Beard; Sgt. Pauline; Lt. Jones; DSS
McAuliffe; Dr. Mays; Dr. John Doe; Jane Doe; Supt.
Barkley; Supt. Hulihan; Dep. Comm. Linquist,
Defendants.
No. 9:11–CV–186 (NAM/TWD).

Feb. 15, 2013.
Phillip Jean–Laurent, Ozone Park, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State
of New York, Gregory J. Rodriguez, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for
Defendants.

### ORDER

NORMAN A. MORDUE, District Judge.

**\*1** The above matter comes to me following a
Report–Recommendation by Magistrate Judge Therese
Wiley Dancks, duly filed on the 24th day of January 2013.
Following fourteen (14) days from the service thereof, the
Clerk has sent me the file, including any and all objections
filed by the parties herein.

After careful review of all of the papers herein,
including the Magistrate Judge's ReportRecommendation,
and no objections submitted thereto, it is

ORDERED that:

1. The Report–Recommendation is hereby adopted in
its entirety.

2. The Clerk of the Court shall serve a copy of this
Order upon all parties and the Magistrate Judge assigned
to this case.

**IT IS SO ORDERED.**

N.D.N.Y.,2013.

Jean-Laurent v. Lane
Slip Copy, 2013 WL 599893 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

2015 WL 5918179
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Thomas M. ROLAND III, Plaintiff,
v.
Daniel McMONAGLE, Justin Taft, Jed Saul,
Joseph Horos, and Michael McCooey, Defendants.

No. 12–CV–6331 (JPO).
|
Signed Oct. 9, 2015.

*OPINION AND ORDER*

J. PAUL OETKEN, District Judge.

**\*1** Thomas M. Roland III brings this action pursuant to 42 U.S.C. § 1983 alleging that he was forcibly medicated and physically assaulted in violation of his First, Eighth, and Fourteenth Amendment rights. Daniel McMonagle, Justin Taft, Jed Saul, Joseph Horos, and Michael McCooey (collectively "Defendants") move for partial summary judgment on Roland's First and Fourteenth Amendment claims. (Dkt. No. 99.) For the reasons set forth below, Defendants' motion is granted in part and denied in part.

### I. Background

Roland is currently incarcerated at Wende Correctional Facility in Alden, New York. (Dkt. No. 79–A at ¶ 2.) This case arises out of events that occurred when Roland was imprisoned at Sullivan Correctional Facility ("Sullivan") in Fallsburg, New York. (*Id.* at ¶ 3.) Roland alleges that Defendants coerced him to take a sedative and then physically attacked him in retaliation for grievances he filed against Sullivan staff.

### A. Roland's History of Grievances

Roland filed a number of grievances at Sullivan. (Dkt. No. 117–2, Roland Dep. 189:811.) He submitted two complaints in the summer of 2009, approximately eight weeks before the alleged beating. On July 27, 2009, Roland reported that an unnamed Correctional Officer ("CO") threatened to kill him. (Dkt. No. 110–3 at 1.) The next day,

Roland filed another grievance describing threats against his life. (*Id.* at 2.) The second grievance named "C.O. Craiter," an individual Roland now identifies as Sergeant W. Carter. (*Id.* at 2; Dkt. No. 109, Pl.'s Opp'n Summ. J. at 1.)

Sergeant Carter and another officer, Sergeant T. Aceto, investigated Roland's grievances. (Dkt. No. 110–3 at 3–4.) Sergeant Carter concluded that he was "unable to make any sense of [Roland's] written complaint." (*Id.* at 3.) Sergeant Aceto reported that Roland no longer had "any issues or problems." (*Id.* at 4.) On August 10, 2009, the State Commission of Correction wrote a letter to Sullivan's Superintendent to highlight the "seriousness" of Roland's allegations against Sullivan staff. (*Id.* at 5.)

The parties dispute whether Defendants were aware of Roland's grievances. (Dkt. No. 101, Defs.' Mot. Summ. J. at 11; Dkt. No. 109 at 2.) Roland had not filed a grievance against any of the Defendants prior to the alleged beating and one of his complaints against a Sullivan employee was never processed. (Dkt. No. 100, Defs .' R56.1 Stmt. at ¶¶ 19–20; Dkt. No. 111, Pl's R.56.1 Stmt. at ¶¶ 19–20.) However, one of the Defendants, Sergeant Daniel McMonagle, lived with the two officers involved in Roland's July 2009 complaints. (Dkt. No. 117–1, McMonagle Dep. 68:24–77:11.) Roland contends that Sergeant McMonagle "orchestrate[d][an] attack" on him in retaliation for his grievances against Sullivan employees. (Dkt. No. 109 at 2.)

### B. Alleged Forced Medication and Assault

At approximately 6:45 p.m. on September 20, 2009, Sergeant McMonagle and COs Jed Saul and Justin Taft escorted Roland from his cell to a disciplinary hearing room for urinalysis testing. (Dkt. No. 100 at ¶ 6; Dkt. No. 111 at ¶ 6.) Shortly thereafter, Nurse Diane Stefanuk entered the hearing room and offered Roland a psychotropic medication. (Dkt. No. 105, Stefanuk Decl. at ¶ 4.) The medication, Vistaril, was a sedative that nurses give to prisoners "as needed ... for anxiety or agitation." (Dkt. No. 110–1, Stefanuk Dep. 49:10–17; Dkt. No. 109 at 4.) The parties agree that Roland initially refused the medication and ultimately ingested it. (Dkt. No. 117–2 at 67:18–24; Dkt. No. 100 at ¶ 9.) They contest whether Defendants medicated Roland by force.

**\*2** Defendants claim that Roland "hesitated at first but then accepted the ... medication without incident." (*Id.*)

Roland reports that the officers "surrounded [him] and said [he] had to take th[e] medication." (Dkt. No. 117–2 at 68:2–13.) Roland concedes that the officers did not touch him, but asserts that they intimidated-and thus forced-him into swallowing the pill. (Dkt. No. 117–2 at 67:22–68:13; Dkt. No. 109 at 5.) Nurse Stefanuk reports that she did not administer medication over Roland's objection, and that if she had, she would have documented it. (Dkt. No. 105 at ¶¶ 5–7). She states that Roland ingested the sedative voluntarily. (*Id.*)

After Roland took the medication, Nurse Stefanuk and another medical provider decided to transfer him to the Residential Crisis Treatment Program ("RCTP"), a section of the prison's Mental Health Unit. (Dkt. No. 105 at ¶ 2.) Nurse Stefanuk's progress notes indicate that she initiated the transfer "due to paranoia, assaultive behavior, and for patient safety." (Dkt. No. 110–1 at 53:6–11.) At a later deposition, Nurse Stefanuk was "not sure" why she made this assessment of Roland's behavior. *Id.* Progress notes from several hours earlier describe Roland as "quiet and calm ." (*Id.* at 48:4–5.)

Three of the Defendants–Sergeant McMonagle and COs Taft and Saul-escorted Roland to the RCTP. (Dkt. No. 117–1 at 113:12–13; Dkt No. 117–8, Taft Dep. 99:4–18; Dkt. No. 117–7, Saul Dep. 39:3–23.) Two additional officers, Joseph Horos and Michael McCooey, joined the other Defendants during the transfer. (Dkt. No. 117–4, McCooey Dep. 18:3–20:21; Dkt. 117–5.) Together, the Defendants took Roland to a cell that was unmonitored by cameras. (Dkt. No. 117–4 at 76:4–5; Dkt No. 117–8 at 99:13–18.)

The parties offer conflicting descriptions of events inside the RCTP cell. Roland claims that, once he was in the cell, the five officers began to physically assault him. (Dkt. No. 106–B, Roland Dep. 82:21–85:7.) He contends that the COs punched him in the face, kicked him, taunted him with racial slurs, and told him to "crawl up under the bed" to escape the beating. (*Id.*) Roland also testifies that, during the attack, one of the COs said to him, "[O]h you like filing grievance[s]." (*Id.* at 85:9–10.) Defendants claim that Roland went into the cell without incident, but they offer varied testimony on their route through the prison and whether any officers entered the RCTP cell. (Dkt. No. 117–7 at 39:18–23; Dkt No. 117–8 at 99:4–103:22.)

It is undisputed that Roland suffered injuries on September 20, 2009. Medical records from that day state that Roland was "found ... on [the] floor unresponsive" by medical staff. (Dkt. No. 117–9 at 1.) Records from the next day list Roland's injuries as a swollen eye and a "subcong hematoma cornea," a term that likely describes a broken blood vessel. (*Id.* at 2.) Sergeant McMonagle contends that Roland injured himself by "banging his head on the walls and door, and punching the walls and door" of his cell. (Dkt. No. 117–5.) Defendants also assert that Roland "received injuries in [a] fight" with another prisoner the day before the alleged attack. (Dkt. No. 101 at 2; Dkt. No. 117–5.) Roland concedes that he had an altercation with another prisoner on September 19, 2009, but states that he suffered only "very minor" injuries during that incident. (Dkt. No. 106–B at 40:8–41:25; Dkt. No. 109 at 2.) He claims that Defendants caused the injuries documented in his medical records.

**\*3** Roland was transferred out of Sullivan on September 22, 2009, two days after the alleged attack. (Dkt. No. 117–9 at 2.) After exhausting his administrative remedies, he filed this suit.

### II. Summary Judgment Standard
Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute is genuine if, considering the record as a whole, a rational jury could find in favor of the non-moving party. *Ricci v. DeStefano,* 557 U.S. 557, 586 (2009) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986)).

The initial burden on summary judgment rests with the movant, who must provide evidence illustrating his entitlement to relief on each element of his claim or defense. *Vt. Teddy Bear Co. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004). If the movant makes this showing, the burden shifts to the non-moving party to identify specific facts demonstrating a genuine issue for trial. Fed. R. Civ. R. 56; *Anderson,* 477 U.S. at 250–51. To meet its burden, the non-moving party must "go beyond the pleadings," *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986), and may not rely on mere "conclusory statements, conjecture, or speculation," *Kulak v. City of New York,* 88 F.3d 63, 71 (2d Cir.1996) (citing *Matsushita,*

475 U.S. at 587). The court views the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in its favor." *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995) (citation omitted). "It is well established that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.' " *Curry v. City of Syracuse,* 316 F.3d 324, 333 (2d Cir.2003) (citation omitted).

### III. Discussion

Defendants argue that Roland has failed to establish triable issues of fact on his due process and retaliation claims. [1] Defendants also contend that they are entitled to qualified immunity.

### A. Due Process

The Fourteenth Amendment limits when prisoners may be forcibly medicated. Under the Due Process Clause, all prisoners possess "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs...." *Washington v. Harper,* 494 U.S. 210, 221 (1990). Forcing such drugs on a prisoner is unconstitutional "absent a finding of overriding justification and a determination of medical appropriateness" by a medical professional. *Riggins v. Nevada,* 504 U.S. 127, 135 (1992); *see Harper,* 494 U.S. at 231.

Defendants do not dispute that Roland had a liberty interest in avoiding forced medication. [2] (Dkt. No. 99 at 5–6.) Instead, they offer three arguments for why no due process violation occurred. (*Id.* at 2.) First, Defendants contend that Roland voluntarily ingested the medication. (*Id.*) Second, they argue that Defendants cannot be liable because Nurse Stefanuk, rather than an officer, actually administered the *Vistaril.* (*Id.*) Defendants' third argument is that, even if they forcibly medicated Roland, they acted in reasonable reliance on the judgment of a medical professional. (*Id.*)

**\*4** To support their first argument, Defendants emphasize that none of the officers touched Roland when he was in the hearing room. (*Id.* at 8.) While this fact is uncontested, physical contact is not required for a due process violation. *Blackburn v. Alabama,* 361 U.S. 199, 206 (1960) ("Since *Chambers v. State of Florida,*

this Court has recognized that coercion can be mental as well as physical.... A number of cases have demonstrated, if demonstration were needed, that the efficiency of the rack and the thumbscrew can be matched ... by more sophisticated modes of 'persuasion.' ") (citations omitted). The Fourteenth Amendment prohibits prison officers from using the threat of violence to compel an inmate to ingest a drug, particularly where no medical professional has authorized forced medication. [3] Roland claims that Sergeant McMonagle, CO Taft, and CO Saul made such threats; Defendants aver that they did not. Thus, there remains a genuine dispute about whether the Defendants intimidated Roland into taking *Vistaril.* The resolution of that dispute falls to the trier of fact.

Defendants' second argument also fails. In their motion for summary judgment, Defendants appear to argue that a prison official cannot violate due process when a nurse, rather than a CO, "offer[s] and administer[s]" a pill. (Dkt. No. 101 at 6.) It is true that a defendant must proximately cause a plaintiff's injuries to be liable under § 1983. *Gierlinger v. Gleason,* 160 F.3d 858, 872 (2d Cir.1998) ("[A]s in all § 1983 cases, the plaintiff must prove that the defendant's action was a proximate cause of the plaintiff's injury."). However, defendants in § 1983 suits "are responsible for the natural 'consequences of their actions,' including consequences attributable to reasonably foreseeable intervening forces, including the acts of third parties." *Richardson v. Pratcher,* 48 F.Supp.3d 651, 671 (S.D.N.Y.2014) (quoting *Kerman v. City of New York,* 374 F.3d 93, 126 (2d Cir.2004)). "[A] reasonably foreseeable independent decision that harms the victim does not break the chain of causation." *Id. at 671* (citing *Zahrey v. Coffey,* 221 F.3d 342, 351–54 (2d Cir.2000)). The fact that Nurse Stefanuk gave Roland the pill does not preclude Defendants' liability as a matter of law. Viewed in the light most favorable to the Plaintiff, the evidence permits a finding that Defendants' conduct proximately caused Roland to ingest a drug against his will. Summary judgment is inappropriate in such circumstances.

Defendants' final argument is that any force used was reasonable because the officers, as "non-medical security officials," could "rely on ... the medical judgment of the mental health nurse if she found it medically necessary to medicate [Roland]." (Dkt. No. 101 at 7.) Defendants may be entitled to rely on Nurse Stefanuk's judgment, but they stipulate that she made no medical necessity

determination in this case. (*See* Dkt. No. 100 ¶¶ 16–17 (stating that Nurse Stefanuk did not authorize medication over Roland's objection.)) Defendants' third argument is irrelevant given the uncontested facts.

**\*5** The five Defendants in this action move for summary judgment together. However, only three of those Defendants—McMonagle, Taft, and Saul—were present when Roland ingested Vistaril. The parties agree that officers Horos and McCooey joined the other Defendants during Roland's transfer to the RCTP. Because Horos and McCooey were not in the hearing room, there is no genuine dispute about whether they forced Roland to take medication against his will. Accordingly, while summary judgment on Roland's due process claim is unwarranted as to Defendants McMonagle, Saul, and Taft, it is appropriate as to Defendants Horos and McCooey. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.") (citation omitted).

### B. Retaliation

To prevail on a retaliation claim, a prisoner must show "first, that the plaintiff engaged in constitutionally protected conduct and, second, that the conduct was a substantial or motivating factor for the adverse actions taken by prison officials." *Bussey v. Phillips,* 419 F.Supp.2d 569, 585 (S.D.N.Y.2006) (citing *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003)); *see also Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir.2009). Defendants concede that "an inmate's grievance can be protected conduct" and that the use of force "can constitute a retaliatory adverse action." (Dkt. No. 101 at 9.) The question is whether Roland can connect his grievances to the alleged attack.

Defendants claim that there are "no convincing indicia" that the incident on September 20, 2009 was retaliatory. (*Id.* at 10.) They note that Roland had not filed a grievance against any of the Defendants prior to that date. (*Id.* at 11.) Accordingly, Defendants argue, none of the officers named in this suit would have had reason to retaliate against Roland, nor would they have known about complaints involving other prison employees. (*Id.*) Defendants also cite the two-month period between Roland's grievances and the alleged beating to counter Roland's retaliation claim. (*Id.*)

As a general matter, "it is difficult to establish one defendant's retaliation for complaints against [a third party]." *Hare v. Hayden,* No. 09–cv–3135 (RWS), 2011 WL 1453789, at \*4 (S .D.N.Y.2011) (citing *Wright v. Goord,* 554 F.3d 255, 274 (2d Cir.2009)). *But see Espinal,* 558 F.Supp.3d at 130 (making the "legitimate inference" that one officer could have retaliated on behalf of another). However, summary judgment is unwarranted if the evidence can support an inference of causation. Under Second Circuit precedent, plaintiffs alleging retaliation may rely on circumstantial evidence to establish a causal link between protected activity and adverse action. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995). A good disciplinary record in prison, vindication at a disciplinary hearing, "temporal proximity" between protected conduct and alleged retaliation, or "statements by the defendant concerning his motivation" can all be invoked to withstand a motion for summary judgment. *Burton v. Lynch,* 664 F.Supp.2d 349, 367 (S.D.N.Y.2009) (citing *Colon,* 58 F.3d at 872–73).

**\*6** Roland has presented circumstantial evidence of retaliation. He has offered proof of his grievances and a letter of concern from the State Commission of Correction from two months before the alleged beating. Defendants argue that the gap between Roland's grievances and the alleged retaliation is too long to permit an inference of causation. However, while the Second Circuit "has not drawn a bright line to define the outer limits" of temporal proximity in retaliation cases, courts have found support for causation in cases involving longer periods than the two months at issue here. *Gorman–Bakos v. Cornell Co-op Ext. of Schenectady Cty.,* 252 F.3d 545, 554 (2d Cir.2001); *see also Espinal,* 558 F.3d at 129 ("[T]he passage of only six months between the dismissal of [plaintiff's] lawsuit and an allegedly retaliatory beating ... is sufficient to support an inference of a causal connection."). The time between Roland's grievances and the alleged attack does not bar his claim, and is consistent with a permissible inference of causation.

Moreover, the Court need not look to temporal proximity alone. Roland has presented evidence that one of the Defendants lived with the officers involved in his July 2009 grievances. Viewed in the light most favorable to the Plaintiff, this evidence supports Roland's claim that Defendants were aware of his history of complaints. Finally, and most significantly, Roland testified that a

Defendant mocked him for filing grievances during the alleged attack. The credibility of Roland's testimony, like that of the Defendants, is a question for the factfinder. At this stage, Roland has raised a genuine and material question as to whether Defendants retaliated against him for constitutionally protected conduct.

### C. Qualified Immunity

The doctrine of qualified immunity protects prison officials from liability if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Gonzalez v. City of Schenectady,* 728 F.3d 149, 154 (2d Cir.2013) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). To resolve qualified immunity claims, courts first consider whether the plaintiff has "shown facts making out violation of a constitutional right." *Id.* at 154. Courts then assess whether the right at issue was "clearly established," and even if it was, whether it was "objectively reasonable" for the official to believe his conduct was lawful. *Id.*

For the reasons outlined above, Roland has presented enough evidence to create a genuine dispute as to whether there was in fact a violation of his First and Fourteenth Amendment rights. The remaining question is whether those rights were clearly established on September 20, 2009. A right is clearly established when its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (citing *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)). In qualified immunity analysis, courts ask if the law was "defined with reasonable clarity" by a court with binding authority at the time of the incident in question. *Id.* at 161 (citing *Young v. Cty. of Fulton,* 160 F.3d 899, 903 (2d Cir.1998)). Courts also consider whether a reasonable defendant would have known his conduct was unlawful. *Id.*

**\*7** The right to avoid forced administration of antipsychotic drugs was clearly established at the time of the alleged attack. As of 2009, the Supreme Court had recognized a liberty interest in freedom from involuntary medication. *See Sell v. United States,* 539 U.S. 166, 178–79 (2003); *Riggins,* 504 U.S. at 134–35; *Harper,* 494 U.S. at 222. The Supreme Court had also held that medical professionals may authorize forced medication in certain circumstances. *Harper,* 494 U.S. at 227, 231 ("[T]he Due Process Clause permits the State to treat

a prison inmate who has a serious mental illness with antipsychotic drugs against his will ... if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest.") At the time of the alleged beating, these precedents were reflected in Sullivan policies prohibiting non-medical staff from authorizing medication and requiring documentation of any forced medication. (*See* Dkt. No. 100 ¶¶ 13–16.) No reasonable correctional official would have believed that it was lawful to force a prisoner to take medication by threatening physical violence. The Defendants involved in the alleged forced medication are not entitled to qualified immunity on Roland's Fourteenth Amendment claims.

The right to submit grievances, and to be free from retaliation for doing so, was also clearly established in 2009. *Colon,* 58 F .3d at 872 (2d Cir.1995) ( "Prisoners ... have a constitutional right ... to petition the government for the redress of grievances, and prison officials may not retaliate against prisoners for the exercise of that right.") (citing *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988)). Defendants' sole argument for qualified immunity on Roland's First Amendment claim is that there is "no evidence that defendants ... used excessive force against the plaintiff in retaliation for the multiple grievances he filed against [prison] employees." (Dkt. No. 113 at 7). This is a contested assertion of fact, not a basis for extending immunity. On September 20, 2009, no reasonable official would have believed it lawful to physically assault an inmate for filing complaints against prison staff.

### IV. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is granted in part and denied in part. With respect to Roland's due process claim, the motion is GRANTED as to Defendants Horos and McCooey, but DENIED as to Defendants McMonagle, Saul, and Taft. With respect to Roland's retaliation claim, the motion is DENIED as to all five Defendants.

The Clerk of Court is directed to close the motion at Docket Number 99.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 5918179

Footnotes

| 1 | Defendants have not moved for summary judgment on Roland's Eighth Amendment claim. This Court has jurisdiction over the instant motion pursuant to 28 U.S.C. § 1331. |
| 2 | Defendants refer to Vistaril as a "psychotropic medication" and stipulate that forced administration of Vistaril requires a documented finding of medical necessity. (Dkt. No. 101 at 6; Dkt. No. 100 at ¶ 16.) Defendants do not argue that *Harper* and *Riggins* are inapplicable. |
| 3 | It is not necessary to address, nor does the Court decide, what modes of force are permissible upon a finding of medical necessity. |

**End of Document**                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 1007780
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Gary ETHIER, Plaintiff,
v.
CITY OF COHOES, New York, James Ward,
Patrick Abrams, and Jeffrey Guzy, Defendants.

No. 1:02-CV-1584.
|
April 18, 2006.

**Attorneys and Law Firms**

David Brickman, Office of David Brickman, Albany, NY, for Plaintiff.

Gregg T. Johnson, Jacinda Hall Conboy, Girvin, Ferlazzo Law Firm, Albany, NY, for Defendants.

### DECISION and ORDER

THOMAS J. McAVOY, Senior United States District Judge.

**\*1** Plaintiff Gary Ethier commenced the instant action against Defendants claiming violations of his civil rights in connection with his employment as a police officer for the City of Cohoes, New York. Presently before the Court is Defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56 seeking dismissal of the Complaint in its entirety.

### I. FACTS

Plaintiff was a police officer with the City of Cohoes, New York. During his first few years with the Cohoes Police Department ("CPD") (1991-1993), Plaintiff was trained and/or supervised by Defendants James Ward ("Ward") and Patrick Abrams ("Abrams"). On August 21, 1995, Plaintiff drove his police vehicle onto a curb and sidewalk, nearly striking a pedestrian with the vehicle. As a result of this incident, Plaintiff was the subject of an internal investigation by the CPD. Plaintiff ultimately pleaded guilty to violating Cohoes Police Department General Order 0012-95 entitled "Rules of Conduct" and agreed to undergo a psychological evaluation, undertake remedial

instruction on the operation of a police vehicle, and take any tests deemed necessary by the psychologist.

On February 24, 1997, Plaintiff arrested Patrick O'Donnell. After the arrest, but before Plaintiff transported O'Donnell to the police station, O'Donnell suffered injuries to his head and face. There also was damage to the rear window of a police vehicle. As a result of this incident, Plaintiff was the subject of an internal investigation.

On January 8, 1998, while Plaintiff was in pursuit of Richard Maynard, Mr. Maynard's body struck the ground and/or a retaining wall on multiple occasions before Plaintiff placed Maynard under arrest, causing Maynard to suffer injury to his face. As a result of this incident, Plaintiff was the subject of an internal investigation. This investigation resulted in Plaintiff's pleading guilty in April 1998 to violating Cohoes Police Department General Order 92-5 ("Off Duty Arrests"). As a result of this guilty plea, Plaintiff agreed that he would receive a letter of reprimand and thirty day suspension without pay, which suspension was to be held in abeyance for one year unless Plaintiff was found guilty of violating Cohoes Police Department General Order 92-5 or 0019-48 ("Physical Force") as a result of the January 8, 1998 incident involving the arrest of Maynard.

On September 25, 1998, Plaintiff placed John Gaston upon or against a police vehicle while attempting to arrest him. During the course of the arrest, Gaston suffered injury to his face and body and there was damage to the police vehicle, including a dented fender and cracked windshield. This incident resulted in an internal investigation.

In 1998, there were discussions in the CPD regarding Plaintiff's participation in the D.A.R.E. program with the Cohoes City School District. School District officials advised Defendants that if Plaintiff was permitted to participate in the D.A.R.E. program, the school would drop the program. [1]

**\*2** On February 3, 1999, Plaintiff effected a traffic stop of Eric Sawyer. Plaintiff kicked and struck Sawyer before restraining Sawyer, causing injury to Sawyer's face. This conduct resulted in another internal investigation.

On February 16, 1999, Plaintiff physically restrained Eugene Aquilina and pushed Nicole Brown while attempting to arrest Aquilina. Brown lodged a civil complaint against Plaintiff alleging excessive force and misconduct. This incident also was the subject of an internal investigation.

On March 5, 1999, Plaintiff physically restrained and maced Kyle Durocher while attempting to arrest him. Durocher filed a civil complaint against Plaintiff alleging excessive force and misconduct. This incident was the subject of an internal investigation.

On March 12, 1999, Plaintiff stopped a vehicle suspected of violating the New York State Vehicle and Traffic Law. According to Plaintiff, he smelled alcohol and believed the driver to be driving under the influence of alcohol. The driver of the vehicle was Defendant City of Cohoes Corporate Counsel, John Doherty. Plaintiff contends that he administered sobriety tests and an alco-sensor test to Doherty, all of which he failed. Plaintiff further contends that Sergeant Kubik, who was at the scene, spoke with Defendant Ward who advised that Plaintiff was to bring Doherty to the police station where he was to be released to someone who had not been drinking. When Plaintiff returned to the police station with Doherty, a taxi was called for Doherty and he was released. Plaintiff was neither reprimanded nor charged with respect to his conduct on March 12, 1999.

On March 17, 1999, Plaintiff was involved in a heated verbal exchange with CPD Detective Thomas Ross and his spouse at Mac's Tavern and Restaurant. By memorandum dated March 26, 1999, Plaintiff was advised that an internal investigation was being conducted with respect to the March 17 incident.

A meeting was conducted with CPD Chief Heslin, Defendant Ward, Lieutenant Ross, and Plaintiff concerning the March 17, 1999 incident. During the meeting, Plaintiff made a remark concerning Ross' wife, after which Ward ended the meeting and escorted Plaintiff out of the CPD.[2]

On or about March 22, 1999, Ward assigned Plaintiff to formal training. The formal training consisted of Plaintiff's being assigned to Sergeant Kubik when Kubik was working. When Kubik was not working, Plaintiff was to perform inside duties and not leave the police station without a supervisor. Plaintiff also was prohibited from assuming the duties of a tour supervisor. It was also ordered that Plaintiff would not be counted as manpower so, if the need arose, the CPD may have to call for overtime.

In April 1999, Plaintiff was directed to submit to a mental health evaluation. On April 22, 1999, Kubik prepared a memorandum indicating that Plaintiff had met the training objectives set forth on March 22, 1999. On April 28, 1999, Plaintiff was assigned to a two-man unit. Plaintiff continued to be prohibited from acting as a tour supervisor.

**\*3** On October 20, 1999, Plaintiff returned to unrestricted duty. Plaintiff consented to the withdrawal of all contractual grievances he and/or his union filed on his behalf between March 17, 1999 and October 20, 1999. On November 14, 1999, Plaintiff violated CPD Order 0057-95 by leaving his post without proper notification.

On March 24, 2000, Plaintiff entered a dwelling occupied by Hani Khalil. Plaintiff used physical force to arrest Khalil. Khalil lodged complaints against Plaintiff alleging an unlawful search, the use of excessive force, and misconduct. This resulted in an internal investigation.

On May 8, 2000, Plaintiff was issued a Notice of Discipline. Plaintiff requested an arbitration hearing concerning the Notice of Discipline. Following a full evidentiary hearing at which Plaintiff was represented by counsel, the arbitrator found Plaintiff guilty of various charges against him. Plaintiff was found guilty of violating CPD Order 12-95 (Rules of Conduct), 19-94 (Use of Force), 15-95 (Prisoners Detained in Cellblock),[3] 57-95 (Patrol Zones), and 98-95 (Constitutional Guarantees). In all, Plaintiff was found guilty of eight out of twenty-one charges. The arbitrator imposed a penalty of two months suspension without pay. There was no appeal of the arbitrator's decision.

On May 18, 2001, Plaintiff was again charged with misconduct. It was alleged that Plaintiff gave false testimony. Specifically, there was an allegation that Plaintiff was present during the arrest of a Bret Woodworth, who claimed that the CPD used excessive force against him. At Woodworth's trial, Plaintiff denied remembering arresting Woodworth. Defendant Guzy, on the other hand, testified that Plaintiff was present during the

arrest, raising a conflicting account of the incident. It was Plaintiff's position that he was outside during the arrest and, therefore, not present. At a subsequent administrative hearing, Guzy admitted that Plaintiff was not, in fact, involved in Woodworth's arrest. Defendants sought to terminate Plaintiff's employment if he was found guilty of the charges. These charges resulted in no guilty findings and Plaintiff was reinstated with all of his pay and benefits.

Plaintiff's police vehicle sustained damage on January 23, 2003. Plaintiff failed to timely report this damage. This was the subject of an internal investigation. On March 18, 2003, Plaintiff accepted the finding that he violated the CPD rules for failure to report damage to his vehicle. Plaintiff also accepted the disciplinary action of two week suspension without pay and forfeiture of two weeks accrued vacation.

Effective April 20, 2003, Plaintiff was appointed to a position of police officer with the Rennselaer Police Department. On April 21, 2003, Plaintiff voluntarily signed a letter of resignation and sent it to the CPD.

Based on the foregoing, Plaintiff commenced the instant action pursuant to 42 U.S.C. § 1983 alleging violations of his First, Fifth, and Fourteenth Amendment rights. Defendants now move to dismiss the Complaint in its entirety.

## II. STANDARD OF REVIEW

**\*4** It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, *see Tenenbaum v. Williams,* 193 F.3d 581, 592 (2d Cir.1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). A party seeking summary judgment bears the burden of informing the Court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

If the movant is able to establish a basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in his favor. *Abramson v. Pataki,* 278 F.3d 93, 101 (2d Cir.2002). However, a party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994), or on conclusory allegations or unsubstantiated speculation. *Scotto v. Almenas,* 143 F.3d 105, 114 (2d. Cir.1998). With this standard in mind, the Court will address Defendants' motion.

## III. DISCUSSION

### a. *Due Process*

Defendants move to dismiss the "stigma plus" due process claims on the grounds that: (1) Plaintiff's employment was not terminated and, thus, he was not deprived of a property interest; and (2) he was afforded due process of law with respect to the charges against him. Plaintiff has failed to respond to this portion of Defendants' motion, thereby indicating his consent to the dismissal of this claim. *See* N.D.N.Y.L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its entitlement to the relief requested therein, the non-moving party's failure to file or service any papers as this Rule requires shall be deemed as consent to the granting ... of the motion.")

With respect to the charges filed against Plaintiff, the uncontroverted evidence is that he was afforded all process due. Specifically, Plaintiff was given notice of the charges against him and was afforded the opportunity of a full pre-deprivation hearing at which time he could be represented by counsel, presented with the evidence against him, and present his own evidence. In several instances Plaintiff did not avail himself of this opportunity, *see* Def.'s Rule 7.1(a)(3) stmnt. at ¶¶ 33, 66, thereby waiving his due process claims. *Morrisroe v. Safir,* 1998 WL 709822, at \*2 (S.D.N.Y.1998). In another instance, a full hearing was held at which several charges were upheld against Plaintiff. *Id.* at ¶¶ 42, 44, 52. Plaintiff

declined to appeal the decision. *Id.* at ¶ 54. Plaintiff again invoked this procedure with respect to the perjury charges. After a full hearing, Plaintiff was acquitted of the charges. *Id.* at ¶¶ 62, 63, 64. It is, thus, evident that Plaintiff was afforded all process that was due. *See Patterson v. City of Utica,* 370 F.3d 322, 329 (2d Cir.2004).

**\*5** To the extent Plaintiff asserts a stigma-plus claim, that claim, too, must fail. "A person's interest in his or her good reputation alone, apart from a more tangible interest, is not a liberty or property interest sufficient to invoke the procedural protections of the Due Process Clause or create a cause of action under § 1983.... Loss of one's reputation can, however, invoke the protections of the Due Process Clause if that loss is coupled with the deprivation of a more tangible interest, such as government employment." *Id.* at 329.

Here, Plaintiff fails to identify any such tangible interest. Plaintiff was not terminated from his employment with the CPD. Plaintiff does not point to any other actions undertaken by Defendant that amount to a loss of a sufficient tangible interest to sustain a stigma-plus claim. Assuming Plaintiff can identify other tangible interests, he fails to point to any false statements made public by Defendants for which he was not afforded a name clearing hearing. Although Plaintiff was the subject of several charges that resulted in his being suspended without pay for sixty days, Plaintiff was afforded a full hearing after which he was found not guilty of some of the charges against him and found guilty on eight of the charges. With respect to other charges or disciplinary actions against Plaintiff, he either withdrew his grievances or consented to the findings against him. *See.* Def's Rule 7.1(a)(3) stmnt. at ¶¶ 10, 33, 66. Thus, any employment decisions (such as his suspension) were based on charges found to be true and for which he was afforded the opportunity of a hearing. With respect to the perjury allegations, Plaintiff was afforded a full administrative hearing and exonerated of the charges. No employment action was taken against him on account of any alleged perjury. Accordingly, Plaintiff's due process claims must be dismissed. *Id.*

**b. First Amendment**

Plaintiff also claims that he was retaliated against for engaging in protected speech. Plaintiff contends that his desire to arrest Corporation Counsel Doherty constituted speech on a matter of public concern and that Defendants retaliated against Plaintiff for engaging in

such protected speech. Although Plaintiff cites many cases for the proposition that speech directed at the integrity of government entities constitutes protected speech (a proposition with which this Court does not disagree), the fundamental problem with Plaintiff's claim is there is no evidence that he engaged in protected speech or that Defendants were aware of any such speech.

While the determination of whether speech is protected "may be somewhat fact-intensive, it presents a question of law for the court to resolve." *Johnson v. Ganim,* 342 F.3d 105, 112 (2d Cir.2003). Whether speech is protected depends on its context, form and content. *Connick v. Myers,* 461 U.S. 138, 147-48 (1983). Speech by a public employee is on a matter of public concern, and protected by the First Amendment, if it relates "to any matter of political, social, or other concern to the community." *Id.* at 146. "However, speech that relates primarily to matters of personal interest or internal office affairs, in which the individual speaks as an employee rather than as a citizen, will not support a First Amendment retaliation claim." *Kelly v. City of Mount Vernon,* 344 F.Supp.2d 395, 402 (S.D.N.Y.2004). Speech that arises in the usual course of a public official's duties is generally not protected. *See Cahill v. O'Donnell,* 75 F.Supp.2d 264, 273 (S.D .N.Y.1999)("A communication by an employee to an employer in the course of the employee's normal duties, in routine form, and containing standard contents, is not likely to address a matter of public concern."). Speech about individual or isolated problems within a police department, or one of its officers, are not matters of public concern. *Cahill,* 75 F.Supp.2d at 272 (internal office affairs are not matters of public concern.). As the Supreme Court has stated: "To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark-and certainly every criticism directed at a public official-would plant the seed of a constitutional case." *Connick,* 461 U.S. at 147-49. On the other hand, a claim of systemic or endemic problems in a police department might rise to the level of protected public speech. *See Collins v. Christopher,* 48 F.Supp.2d 397, 408 (S.D.N.Y.1999)(collecting cases),

**\*6** The uncontroverted evidence before the Court is that on March 12, 1999, Plaintiff pulled over a car that was being driven by Corporation Counsel Doherty. Plaintiff smelled alcohol emanating from the driver and, therefore, instructed the driver to exit the vehicle to perform sobriety tests. According to Plaintiff, Doherty failed the tests.

Based upon Sergeant Kubiks' direction (Kubik having received orders from Defendant Abrams), Plaintiff did not arrest Doherty and, instead, drove him to the police station where he was then released. There is no evidence in the record that Plaintiff expressed his desire to arrest Doherty, that he disagreed with Abrams' order not to arrest Doherty, that Plaintiff otherwise spoke out on the issue of letting Doherty go, that Plaintiff was raising concern about the covering up of the criminal acts of political figures, or was otherwise raising concern about endemic issues within the police department. The mere acts of performing his duties as a police officer by pulling Doherty over, administering sobriety tests, taking him to the police station, and letting him go were all within the course of Plaintiff's employment as a police officer and, therefore, not protected speech. *See Kelly,* 344 F.Supp.2d at 403 (finding that a police officer's investigations into illegal firearms which involved the mayor's son and the child of another police officer were not protected speech because they arose during a normal police investigation).

In support of his claim, Plaintiff cites to his Exhibit B which is a memorandum dated March 16, 1999 written from Plaintiff to Ward. That memorandum, however, does not evidence Plaintiff's having engaged in protected speech. A review of the memorandum reveals that it is Plaintiff's fact based recount to Abrams of the events of March 12, 1999. Nowhere in that memorandum does Plaintiff indicate that he wanted to arrest Doherty, that he thought Doherty should be arrested, that he disagreed with the decision to let Doherty go, that he was complaining about pervasive problems within the police department, or that he was discussing any problem within the CPD. In his memorandum of law, Plaintiff contends that he insisted that Doherty be arrested. Plaintiff points to no evidence to back this up.[4] Plaintiff does not even submit an affidavit stating that he intended his memorandum to be a report of wrongdoing within the CPD or to otherwise constitute speech on a matter of public concern. *See Morris v. Crow,* 142 F.3d 1379, 1382 (11th Cir.1998) ("Not only must the speech be related to matters of public interest, but the purpose of the expression must be to present such issues as matters of 'public' concern.") (holding that a police report prepared by a police officer concerning his investigation into a traffic accident did not constitute protected speech).[5]

Even if Plaintiff subjectively believed that he was engaging in protected speech, Abrams would not reasonably

have understood Plaintiff's memorandum as complaining about government integrity or concealing the drunk driving of a political figure. There is no indication that there was endemic problems concerning the covering up by the CPD of the criminal activities by politicians or other systemic problems in the CPD. The only reasonable conclusion is that Plaintiff was speaking as a public employee and not as a public citizen. Accordingly, the Court finds that Plaintiff did not engage in protected speech. Plaintiff's First Amendment claims must, therefore, be dismissed.

**\*7** Even assuming, *arguendo,* that Plaintiff did engage in protected speech, there is insufficient evidence of a nexus between any such speech and any alleged adverse employment action. The Court recognizes the close temporal proximity between the March 12, 1999 arrest of Doherty and Plaintiff's being subjected to a change in his work duties commencing on March 22, 1999. The Court further recognizes that a close temporal relationship between the protected activity and the adverse employment action can give rise to an inference of causation. In this case, however, to hold that the temporal relationship is sufficient would be to ignore the overwhelming uncontroverted evidence of Plaintiff's misconduct leading up to the March 26, 1999 letter changing Plaintiff's duties (the "March 26 letter") and the lack of any evidence tending to suggest that the Doherty incident had anything to do with Plaintiff's discipline. *See Simpson v. New York State Dept. of Civil Services,* 2006 WL 93011 (2d Cir. Jan. 9, 2006) ("While the temporal proximity of these events gives rise to an inference of retaliation for the purposes of appellant's prima facie case, without more, such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext.") (citing *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 770 (2d Cir.1998) for the proposition that a "strong temporal connection between the plaintiff's complaint *and* other circumstantial evidence is sufficient to raise an issue with respect to pretext.") (emphasis in original); *Colon v. Coughlin,* 58 F.3d at 872-873; *Ayers v. Stewart,* 101 F.3d 687, 1996 WL 346049, at \*1 (2d Cir.1996) (unreported decision); *Richter v. Monroe County Dept. of Social Serv.,* No. 01 Civ. 6409, 2005 WL 351052, at \*14 (W.D.N.Y. Feb. 11, 2005) ("Temporal proximity alone is insufficient to carry plaintiff's burden of proof beyond the prima facie stage, and nothing she has submitted shows that she will be able to persuade a fact-finder that the retaliation played a part in her

termination."); *Ziemba v. Thomas,* 390 F.Supp.2d 136, 157 (D.Conn.2005).

It is undisputed that Plaintiff had a lengthy history of misconduct, including the use of excessive force, going back to at least as far as 1995. In the first three months of 1999 alone, he was the subject of three complaints of the excessive use of force-one on February 3, 1999, another on February 16, 1999, and another on March 5, 1999. On March 17, 1999, after the March 12 Doherty incident involving Doherty and before the issuance of the March 26 letter, Plaintiff admits he was involved in a heated exchange with Detective Ross and his spouse. There is further evidence that, during a meeting later that day, Plaintiff insulted Detective Ross's wife, which caused Ward to end the meeting and escort Plaintiff out of the police station. On March 26, 1999, Plaintiff was ordered to undergo additional training, to be supervised by Kubik, and disqualified from being a tour supervisor.

 **\*8** This history of misconduct gave Defendants ample reason to require Plaintiff to undergo additional training and to require that Plaintiff be under the supervision of Kubik. Moreover, the terms of the March 26 letter clearly relate to Plaintiff's prior incidents of misconduct. Part of that training included reviewing with Plaintiff department policies on the rules of conduct and the use of force. Directive 1 and 3 of the March 26 letter obviously related to the incident between Plaintiff and Detective Ross. Specifically, those directives prohibited Plaintiff from entering the restaurant at which the incident occurred, prohibited Plaintiff from communicating with persons involved in the incident, and required Plaintiff to report any contact with any persons involved in the incident. Nothing about the March 26 letter tends to suggest that it was issued on account of the March 12 incident involving Doherty. Other than the previously discussed memorandum from Plaintiff to Ward, there is no evidence in the record that Plaintiff ever spoke to Ward or anybody else about the Doherty incident, or that any of the Defendants discussed the Doherty incident with Plaintiff or amongst themselves. In fact, Plaintiff specifically admitted that he never received a written reprimand concerning his conduct on March 12, 1999, nor did Plaintiff receive any disciplinary charges which referred to his conduct on March 12, 1999. Def.'s Rule 7.1(a)(3) stmnt. at ¶ 25. It, therefore, cannot be said that a fair minded trier of fact could reasonably conclude that

the March 12 Doherty incident was a motivating factor in the March 26, 1999 change in Plaintiff's duties.

On March 15, 1999, Plaintiff made a request to Abrams to switch one of his days with Abrams. Abrams is purported to have responded "start acting like a cop and I'll treat you like one." Even assuming Abrams' refusal to switch days with Plaintiff was on account of protected speech, the refusal to switch a day of work is not an adverse employment action. Moreover, the evidence before the Court is that, although Abrams initially denied Plaintiff's request, he ultimately granted it.

Further, any claim that the March 12, 1999 incident caused the March 26, 1999 change in duties is time-barred. Plaintiff's Complaint was filed on December 23, 2002, which is more than three years after Plaintiff was returned to full active duty in October 1999 and long after the issuance of the March 26, 1999 letter. The same reasoning would apply to any other claimed adverse employment actions that occurred prior to December 23, 1999, including Plaintiff's claim that he was illegally subjected to a mental health evaluation in March 1999, or that his request to switch certain days off was denied. These allegations are time-barred.

With respect to any other alleged employment actions identified by Plaintiff (a verbal counseling in March 2000, the March 2000 investigation into the Khalil incident, and any subsequent incidents), they all occurred long after the March 12, 1999 and, thus, no inferences of causation may be drawn between the timing of the March 12, 1999 Doherty incident and these other alleged adverse employment actions. Plaintiff has failed to point to sufficient other circumstantial evidence from which a fair-minded trier of fact could reasonably conclude that these other incidents in 2000 and later were on account of the March 12, 1999 Doherty incident. [6] Defendants did not take any employment actions against Plaintiff except as imposed by an independent arbitrator and/or as consented to by Plaintiff. Accordingly, no fair-minded trier of fact could reasonably conclude that Plaintiff was subjected to adverse employment action on account of the March 12, 1999 Doherty incident.

### IV. CONCLUSION

 **\*9** For the foregoing reasons, Defendants' motion for summary judgment is GRANTED IN ITS ENTIRETY.

Plaintiff's Complaint is DISMISSED. The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 1007780

Footnotes

| | |
|---|---|
| 1 | Although Plaintiff denies this allegation, he fails to point to any record evidence tending to suggest that it is not true. Accordingly, this fact is deemed admitted. N.D.N.Y.L.R. 7.1(a)(3). |
| 2 | Plaintiff denied this assertion, which is contained in Defendant's N.D.N.Y.L.R. 7.1(a)(3) statement of material facts. The denial is not supported by a citation to the record as required by that rule. Accordingly, Defendants' assertion (and all other assertions to which Plaintiff asserted a blanket denial with no citation to the record) is deemed admitted. *See* n. 1 *supra.* |
| 3 | Plaintiff required Khalil to remove his pants while in the cell block without any reason to believe that such action was necessary. |
| 4 | The Court declines to scour the record in an attempt to find triable issues of fact. *See Amnesty America v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002)("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") (citations omitted) |
| 5 | Moreover, there is evidence suggesting that Plaintiff's actions were motivated purely by his own personal self-interest. It appears that, at the time of the March 12 incident, Plaintiff was seeking to have a clause inserted into the relevant collective bargaining agreement ("CBA") whereby the municipality would indemnify officers for punitive damages awarded against them. Doherty opposed having such a clause in the CBA. There is testimony that Plaintiff had expressed a desire to "get back" at Doherty for his position on the issue. |
| 6 | Plaintiff alleges that Sergeant Meeker stated "But it's Gary Ethier, and when it comes to Gary Ethier you know that there is special circumstances that we have to follow." This statement attributed to Sergeant Meeker does not come from an affidavit of Sergeant Meeker or deposition testimony from Sergeant Meeker. In fact, Plaintiff claims this statement to have made, but provides no citation in the record to support it. This statement is hearsay and will not be considered in connection with the pending motion. |

**End of Document** © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Not Reported in F.Supp.2d, 2005 WL 3333465 (S.D.N.Y.)

(Cite as: 2005 WL 3333465 (S.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
Darryl L. FREEMAN, Plaintiff,
v.
Glenn S. GOORD, Commissioner of the Dep't of
Correctional Services of the State of New York, et al.,
Defendants.
No. 02 Civ. 9033(PKC).

Dec. 7, 2005.
*MEMORANDUM AND ORDER*

CASTEL, J.

**\*1** Plaintiff Darryl L. Freeman, an inmate in the custody of the Department of Correctional Services of the State of New York ("DOCS"), brought this action pursuant to 42 U.S.C. § 1983, alleging constitutional violations by DOCS administration and staff. He alleges, *inter alia,* that defendants retaliated against him for previously filing a Section 1983 action (which has since been dismissed), and violated his First, Eighth and Fourteenth Amendment rights. Defendants Goord, Roy, Mazzuca, Ercole and Armstrong have moved for summary judgment on plaintiff's remaining claims.

For the reasons explained below, defendants' motion is granted.

*Procedural History*

Freeman filed his Amended Complaint ("AC") on January 14, 2003, naming as defendants 16 individuals, including four John Does.[FN1] Defendants moved to dismiss the action pursuant to Fed.R.Civ.P. 12(b)(6). By Order dated September 8, 2004, I dismissed, with plaintiff's consent, all claims against defendants Block, Johnson, Smith and Travis. Plaintiff also represented that he did not seek to assert an Eighth Amendment claim based upon deliberate indifference to serious medical needs, so, to the extent the AC asserted such a claim, it was voluntarily

dismissed. *See* Freeman v. Goord, 2004 WL 2002927 at *1-*2 (S.D.N.Y. Sept. 8, 2004) (*"Freeman I"* ). I also dismissed any purported claim against defendant Beasor, as the AC did not adequately allege his personal involvement in any constitutional deprivation. *Id.* at *6. Additionally, I dismissed claims against all defendants in their official capacities as barred by the Eleventh Amendment. *Id.* at *7.

> FN1. In my prior opinion on defendants' motion to dismiss, I observed that 14 defendants, including two Does, were named. Two Does, while not appearing in the caption of the AC, were, in fact, named as defendants in the body of the complaint, but never served. Plaintiff has failed, at the summary judgment stage, to come forward with the identity of the Doe defendants or explain his failure to do so. The claims against the Doe defendants are dismissed.

Defendants moved to dismiss plaintiff's retaliatory urinalysis claim on the ground of lack of exhaustion, and premised their motion on materials outside the pleadings. I converted that branch of defendants' motion into one for summary judgment, limited to the exhaustion issue, and afforded plaintiff an opportunity to submit evidence in opposition to summary judgment. *Id.* at *2-*4. After considering plaintiff's supplemental submission, I granted defendants' motion on exhaustion grounds, and dismissed plaintiff's claim based upon a retaliatory urinalysis. *See* Freeman v. Goord, 2004 WL 2709849 (S.D.N.Y. Nov. 23, 2004) (*"Freeman II"* ).

Familiarity with the decisions in *Freeman I* and *Freeman II* is assumed. I will set forth the facts relevant to the remaining claims, accepting plaintiff's version of the facts as true together with such other facts as are undisputed, and drawing all reasonable inferences in favor of the plaintiff.

*Background*

On August 16, 1999, plaintiff filed a complaint in this district seeking damages under 42 U.S.C. § 1983 for

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3333465 (S.D.N.Y.)

(Cite as: 2005 WL 3333465 (S.D.N.Y.))

alleged violations of his Eighth Amendment right to be free from cruel and unusual punishment. The action was premised on alleged deliberate indifference to a serious medical condition. Plaintiff named as defendants several individuals who were then employed by DOCS at Fishkill Correctional Facility, where plaintiff was then housed. Defendant Goord, who was then, as he is now, DOCS Commissioner, was also named in plaintiff's prior suit, and is the only defendant here who was also a defendant in the 1999 action. Magistrate Judge Peck, to whom the case was assigned on consent, dismissed plaintiff's 1999 complaint at the summary judgment stage. *See Freeman v. Strack, No. 99 Civ. 9878(AJP), 2000 WL 1459782 (S.D.N.Y. Sept. 29, 2000).* No appeal was taken.

*2 On January 1, 2000, plaintiff was escorted from his housing unit at Fishkill to the gym area and was administered the urinalysis discussed in *Freeman II.* When he was returned to his cell, he observed the cell being searched by defendant Armstrong and another unidentified corrections officer. (Freeman Aff. ¶¶ 3-4) Later that evening, plaintiff spoke with a Sergeant Spaulding (not a defendant in this suit), and complained that the searching officers failed to leave a "cube search slip," failed to sign the unit log book indicating that they had conducted the search, and failed to leave the cell in the condition it had been in prior to the search. (*Id.* ¶ 4)

The next afternoon, January 2, 2000, while plaintiff was doing research in the law library, he was told to gather his papers and was escorted to the mess hall, where he was frisked, handcuffed and then taken to the facility's Special Housing Unit ("SHU"). He remained in the SHU until about 7:30 p.m., when he was transported from Fishkill to Downstate Correctional Facility. (*Id.* ¶¶ 5-6) Plaintiff claims to have been housed under SHU status, which is more restrictive than being housed with the general population of a correctional facility, for his entire stay at Downstate, a period of eight days. (*Id.* ¶¶ 6-7) [FN2] On January 7, 2000, plaintiff's security classification was changed from medium to maximum. (Ercole Decl. ¶ 20, Ex. B) Plaintiff was then transferred from Downstate to Attica Correctional Facility, departing Downstate on January 10 and arriving at Attica on January 11, 2000. (Freeman Decl. ¶ 7; Olmstead Decl. ¶ 5)

FN2. Although not material to the disposition of

this motion, defendants contend that plaintiff was in the SHU for only five of those days, and was thereafter treated as a general population inmate. (Olmstead Decl. ¶¶ 4-5)

On January 25, 2000, plaintiff's wife wrote a letter to defendant Goord, inquiring as to why plaintiff had been transferred to Attica. (Roy Decl. ¶ 6) Goord forwarded the letter to defendant Roy for a response. Roy wrote back to Mrs. Freeman on February 16, 2000, and informed her that plaintiff's transfer to Attica was a result of "negative behavior." [FN3] (*Id.* ¶ 6, Ex. A)

FN3. The letters also mention plaintiff's temporary housing at Sing Sing Correctional Facility for purposes of a deposition. Plaintiff has not raised any claims related to his time at Sing Sing.

On August 7, 2000, plaintiff wrote a letter to Goord, complaining of his transfer to Attica and the change in his security classification. In that letter, plaintiff asserted that the transfer was "based on unsubstantiated allegations that were arbitrarily and capriciously enforced without the customary and regulatory benefit of presenting such allegation for disciplinary determination." Specifically, plaintiff wrote that he was "never issued a misbehavior report, [he] never had a hearing, neither was [he] ever informed why [he] was transferred from a medium correctional facility back to a maximum correctional facility." He wrote that other inmates accused of taking part in the same alleged strike or demonstration in which the administration had accused him of being involved had been issued misbehavior reports and thus had been afforded hearings on the alleged misbehavior. Plaintiff asserted that his transfer was "for retaliatory purposes; retaliatory because I chose to exercise my first amendment right to be free from cruel and unusual punishment." He requested that he be redesignated as a medium security inmate and moved to a facility closer to New York City. (Roy Decl. ¶ 7; AC Ex. 12) Defendant Roy was assigned to respond to this letter as well, and, on August 29, 2000, wrote back to plaintiff, informing him that a request for reduced security placement had already been received but, based on information received from the Office of Classification and Movement, had been denied after

Not Reported in F.Supp.2d, 2005 WL 3333465 (S.D.N.Y.)

(Cite as: 2005 WL 3333465 (S.D.N.Y.))

review and consideration. Roy suggested that plaintiff seek the assistance of his assigned counselor for future transfer requests. (AC Ex. 13)

**\*3** On December 19, 2000, plaintiff again wrote to Goord, complaining that his transfer and change in classification were ordered despite the fact that he had not received a misbehavior report or been afforded a hearing. He also noted that requests for a change back to medium security had been submitted in March and June 2000, but denied. He requested a change in his security classification back to medium and a transfer to a medium security facility. (AC Ex. 15) Roy was once again assigned to respond to plaintiff's letter and, in a letter dated January 16, 2001, again suggested that plaintiff seek the assistance of his assigned counselor at his next quarterly review for matters regarding transfer requests. (Roy Decl. ¶ 12, Ex. C)

On February 8, 2001, plaintiff wrote a letter to defendant Mazzuca, with copies to defendants Goord and Ercole among others, in which he described his prior section 1983 suit and described the circumstances surrounding the January 1, 2000 urinalysis and cell search and plaintiff's subsequent transfer to Downstate and then Attica. He alleged in the letter that these actions were taken in retaliation for his prior lawsuit, and demanded that any reference to the reason for his transfer be excised from his records prior to his June 2001 parole hearing and that he be transferred back to Fishkill. (AC Ex. 17) Plaintiff received no response to this letter. (AC ¶ 41)

*Summary Judgment Standard*

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering a summary judgment motion, the Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir.1995) (citation

and quotation marks omitted); *accord* Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).

It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of its claim or defense, demonstrating that it is entitled to relief. The evidence on each material element, if unrebutted, must be sufficient to entitle the movant to relief in its favor, as a matter of law. *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir.2004). When the moving party has met this initial burden and has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial" as to a material fact. Fed.R.Civ.P. 56(e). A fact is material if it "might affect the outcome of the suit under the governing law...." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Thus, in order to survive summary judgment, plaintiffs must come forth with more than a mere scintilla of evidence in support of their position; they must come forward with evidence "on which the jury could reasonably find for the plaintiff." *Id.* at 252. "The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir.), *cert. denied*, 524 U.S. 911 (1998). In the absence of any genuine dispute over a material fact, summary judgment is appropriate.

**\*4** Courts review *pro se* pleadings carefully and liberally and interpret such pleadings "to raise the strongest arguments that they suggest." *See e.g.*, *Green v. United States*, 260 F.3d 78, 83 (2d Cir.2001) (citations omitted). This is especially true in the summary judgment context, where a *pro se* plaintiff's claims are subject to a final dismissal. *See* *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir.1988) ("[S]pecial solicitude should be afforded *pro se* litigants generally, when confronted with motions for summary judgment.") (citation omitted). Plaintiff's *pro se* status, while implicating a more liberal interpretation of his pleadings, does not excuse him from the burden of coming forward with "concrete evidence

Not Reported in F.Supp.2d, 2005 WL 3333465 (S.D.N.Y.)

(Cite as: 2005 WL 3333465 (S.D.N.Y.))

from which a reasonable juror could return a verdict" in his favor. *LaGrande v. Key Bank Nat'l Ass'n,* 393 F.Supp.2d 213, 219 (S.D.N.Y.2005) (citation and internal quotation marks omitted); *see also Miller v. New York City Health & Hosp. Corp.,* No. 00 Civ. 140(PKC), 2004 WL 1907310 at *9 (S.D.N.Y. Aug. 25, 2004). In reviewing a motion for summary judgment, the court may conduct a search of the record, and grant or deny summary judgment as the record indicates. *See* Fed.R.Civ.P. 56(c); *New England Health Care Employees Union, District 1199, SEIU AFL-CIO v. Mount Sinai Hosp.,* 65 F.3d 1024, 1030 (2d Cir.1995); *Korea Life Ins. Co. v. Morgan Guar. Trust Co. of New York,* 269 F.Supp.2d 424, 446 (S.D.N.Y.2003).

*Retaliation Claims*

In order to recover for alleged retaliation under section 1983, a plaintiff must establish the following three elements: (1) that the speech or conduct at issue is protected under the First Amendment; (2) that the defendant took adverse action against the plaintiff; and (3) that there was a causal connection between the adverse action and the protected speech or conduct. *See Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003). Even if an inmate plaintiff meets his burden under this three-pronged test, defendants are entitled to summary judgment if they can demonstrate that they would have taken the same action against the plaintiff absent any retaliatory motivation. *See Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002). "At the summary judgment stage, if the undisputed facts demonstrate that the challenged action clearly would have been taken on a valid basis alone, defendants should prevail." *Davidson v. Chestnut,* 193 F.3d 144, 149 (2d Cir.1999) (*per curiam* ). Courts employ a " 'presumption that a prison official's acts to maintain order are done for a proper purpose.' " *Hynes v. Squillace,* 143 F.3d 653, 657 (2d Cir.) (quoting *Rivera v. Senkowski,* 62 F.3d 80, 86 (2d Cir.1995)), *cert. denied,* 525 U.S. 907 (1998). Thus, " [t]he conclusion that the state action would have been taken in the absence of improper motives is readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority over the institutions they manage.' " *Hynes,* 143 F.3d at 657 (quoting *Lowrance v. Achtyl,* 20 F.3d 529,

535 (2d Cir.1994)).

*5 Courts have also taken note of the "ease with which claims of retaliation may be fabricated," and thus "examine prisoners' claims of retaliation with skepticism and particular care." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (citation omitted) (affirming in part and vacating in part grant of summary judgment); *see also Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (affirming grant of 12(b)(6) motion), *overruled in part on other grounds by Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506 (2002).

Filing lawsuits related to prison conditions is protected conduct. "Prisoners, like non-prisoners, have a constitutional right of access to the courts and to petition the government for the redress of grievances, and prison officials may not retaliate against prisoners for the exercise of that right." *Colon,* 58 F.3d at 872. Thus, plaintiff has satisfied the first prong of the retaliation inquiry. As regards adverse actions taken against him, he complains that his cell was searched, he was transferred out of Fishkill (briefly to Downstate and then to Attica), and his security classification was changed from medium to maximum. He also complains that, as a result of the allegedly false accusations that he was involved in planning the strike, he was denied parole.

It is on the third prong of the retaliation inquiry that plaintiff's claims fail. Beyond the conclusory assertions of a causal connection between plaintiff's prior lawsuit and the actions described above, plaintiff has proffered no evidence that the prior suit played any role in defendants' decisions to take the actions described above.[FN4]

> FN4. Defendants would in any event be entitled to summary judgment on the retaliatory cell search claim. The Supreme Court has held that an inmate has no legitimate expectation of privacy in his cell and thus, "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell." *Hudson v. Palmer,* 468 U.S. 517, 525-26 (1984). District courts within this circuit have interpreted *Hudson* to mean that inmates have "no constitutional right to be free from cell searches of any kind, including

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3333465 (S.D.N.Y.)

(Cite as: 2005 WL 3333465 (S.D.N.Y.))

retaliatory cell searches." *Rodriguez v. McClenning,* 399 F.Supp.2d 228, 2005 WL 937483 at *6 (S.D.N.Y. Apr. 22, 2005) (collecting cases). As the only allegations against defendant Armstrong relate to the allegedly retaliatory cell search, she too is entitled to summary judgment. Plaintiff contends that his claim against defendant Armstrong is based on her "ransack[ing]" of his cell. (Freeman Dep. at 137) However, he admits that none of his property was damaged during the search. (*Id.* at 68-69) While plaintiff contends that the conduct of the search was in violation of a DOCS directive requiring that corrections officers, to the extent possible, leave a cell in the condition it was in prior to the search, even were that true, it would not rise to the level of a Due Process violation. *See Hudson,* 468 U.S. at 539-40 (deprivation of prisoner's property does not violate Due Process if adequate post-deprivation remedies are available); *Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996) (New York provides adequate state court post-deprivation remedies for an inmate's loss of property).

Defendants, in support of their motion, have come forward with evidence of non-retaliatory motivations for the actions of which plaintiff complains. "[I]f the production of all relevant documents fails to add substance to the allegations and if the relevant officials submit affidavits explaining their reasons for the challenged actions, summary judgment dismissing the complaint may be granted...." *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). Defendant Ercole-who admittedly ordered both the search of plaintiff's cell and his temporary transfer from Fishkill to Downstate-describes in his detailed affidavit the circumstances that led to the search and the transfer out of Fishkill. Briefly, the search was ordered as part of the response to a potential inmate strike planned at Fishkill. Prison officials had learned that inmates were planning to take advantage of the anticipated "Y2K" crisis which was widely expected to occur as a result of computer malfunctions attributable to the change in date from 1999 to 2000. *See, e.g.,* 15 U.S.C. § 6601 *et. seq.* (describing "Y2K" problem and promulgating rules governing civil litigation arising from problem).

Specifically, officials learned that inmates planned to refuse to work or attend programs, and planned to "use force and/or intimidation against both staff and other inmates to accomplish these objectives." (Ercole Decl. ¶ 10)

**\*6** When prison officials heard about the planned strike, they launched an investigation under the supervision of an executive committee, of which Ercole and defendant Mazzuca were part. (Ercole Decl. ¶¶ 5-9) Based on the investigation, it was concluded that plaintiff was one of over 30 inmates who were suspected of being involved in the planned strike, and, as such, needed to be separated from other inmates. (*Id.* ¶ 15) The recommendation that plaintiff be separated from the other inmates was based on credible information, and that recommendation was approved by the executive committee after review of that information. (*Id.*) Ercole states that the search was necessary to gather potential evidence related to the strike, and to ensure safety and security at the facility, and the temporary transfer of inmates implicated in the strike was necessary to prevent the strike from taking place. (*Id.* ¶¶ 17-18) The DOCS records regarding plaintiff's transfer support the assertion that the basis for the transfer was separation from the Fishkill population to prevent the planned inmate strike. (Ercole Decl. Ex. C)

Ercole and Mazzuca have denied any motive related to plaintiff's prior lawsuit. Though plaintiff claims to have put both of these defendants on notice of his prior lawsuit, and attached to the AC typewritten memos to each of them dated "September 1999" in which he described the basis for the prior suit (AC Exs. 1 & 2), Ercole and Mazzuca have both stated that they have no recollection of receiving such memos. (*See* Ercole Decl. ¶ 22; Mazzuca Decl. ¶ 22) Mazzuca states that no evidence that such a memo was received could be found in the records kept by his office, though receipt of such a document would normally be recorded. (Mazzuca Decl. ¶ 22) Both Ercole and Mazzuca state that plaintiff's prior suit had no bearing on their decisions regarding the search of plaintiff's cell or the transfer from Fishkill to Downstate, and that such decisions were motivated solely by concerns uncovered during the investigation of the strike. (Ercole Decl. ¶¶ 24, 26; Mazzuca Decl. ¶ 24)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3333465 (S.D.N.Y.)

(Cite as: 2005 WL 3333465 (S.D.N.Y.))

Mazzuca and Ercole each state in their declarations that they played no role in the change in plaintiff's security classification from medium to maximum, nor the decision to transfer him to Attica after such change in classification, and that such decisions are made by the "Central Office in consultation with the Office of Classification and Movement." (Mazzuca Decl. ¶¶ 20-21; Ercole Decl. ¶¶ 20-21) While plaintiff named as a defendant a John Doe "Classification and Movement Analyst," he has failed, after the completion of discovery, to identify the actual individual. In any event, as with the other alleged retaliatory actions, plaintiff has failed to come forth with any evidence of a causal connection between the classification change or transfer to Attica and his prior section 1983 suit. Mazzuca and Ercole have similarly stated that they had no role in plaintiff's temporary assignment to the SHU while housed at Downstate, and plaintiff has failed to show any causal connection between his SHU assignment and his prior suit. (Mazzuca Decl. ¶ 20; Ercole Decl. ¶ 20)

**\*7** Here, plaintiff has failed entirely to come forth with any evidence that the alleged adverse actions were motivated in "substantial part" by his filing of the prior civil rights action. Scott, 344 F.3d at 287. In his affidavit opposing defendants' motion, plaintiff makes the conclusory statement that "[t]he adverse action taken against plaintiff by William Mazzuca, Fishkill's Acting Superintendent and Robert Ercole, Fishkill's Deputy Superintendent of Security was retaliatory." (Freeman Aff. ¶ 9) Conclusory allegations of retaliatory motivation are, of course, insufficient to withstand a motion for summary judgment. See, e.g., Scott, 344 F.3d at 287.

Plaintiff points as well to the period of just over four months that elapsed between the filing of his earlier action and the cell search and transfer out of Fishkill (with an attendant brief confinement in the SHU). (Freeman Aff. ¶ 15) Temporal proximity may serve as circumstantial evidence of retaliation. See Colon, 58 F.3d at 872. When the alleged retaliatory conduct takes place within a few days of the protected conduct, the temporal proximity alone may be sufficient to infer a causal connection. See, e.g., Jordan v. Garvin, No. 01 Civ. 4393(LTS)(GWG), 2004 WL 302361 at *6 (S.D.N.Y. Feb. 17, 2004) (citation

omitted) (two days). A time lapse of over four months, however, standing alone, is insufficient to justify an inference of causal connection. See, e.g., Cobian v. New York City, No. 99 Civ 10533(KMW)(AJP), 2000 WL 1782744 at *18 (S.D.N.Y. Dec. 6, 2000) (collecting cases), aff'd, 23 Fed. Appx. 82 (2d Cir.2001). Even where the time between the protected activity and the alleged retaliatory action is as short as eleven days, summary judgment may be appropriate if the plaintiff fails to come forth with any evidence of retaliatory animus. See Brown v. Coughlin, 965 F.Supp. 401, 406 (W.D.N.Y.1997). Viewed in the light most favorable to plaintiff, the four month time period, standing alone and without any evidence of retaliatory animus, would not be sufficient to permit a reasonable jury to find in plaintiff's favor.

Finally, plaintiff asserts that he was "never charged with violating any rules or regulations" such that the search and transfer could be otherwise justified. (Id. ¶¶ 10, 15) However, as discussed above, defendants submitted affidavits and documentary evidence sufficient to demonstrate the reasons for the actions they took with regard to the search and the transfer out of Fishkill. Plaintiff has failed to adduce any evidence at all to dispute those reasons.

Along with his opposition papers, plaintiff includes the affidavits of two other inmates, Abdullah Y. Salahuddin and Michael Washington. Salahuddin merely states that he considers plaintiff to be "an open, honest and helpful educator and leader," and that he has "never known [plaintiff] to advocate anything negative or subversive." Salahuddin further states his "belief that [plaintiff] was falsely accused of negative behavior by Fishkill's Administration after he sought legal redress against them for violating his civil rights." He claims that similar retaliatory action was taken against him in response to his having taken "legal action," and that it is the "unwritten policy of Fishkill to get rid of any inmate that seeks legal redress against them whenever they violate a prisoners [sic] rights." Washington similarly attests to plaintiff's good character and states that plaintiff had, in November 1999, complained that he was being harassed and "felt that he was going to be set up because of his pending legal action against certain employee's [sic] at Fishkill." Washington also states that other unidentified

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3333465 (S.D.N.Y.)

(Cite as: 2005 WL 3333465 (S.D.N.Y.))

inmates had expressed to him their beliefs that plaintiff was "set up." Neither of these declarations constitutes admissible evidence bearing on the question of the required causal connection between plaintiff's prior section 1983 suit and the alleged retaliatory actions at issue here. *Cf. Colon*, 58 F.3d at 873 (defendant's alleged admission of the existence of a retaliatory scheme may constitute direct evidence of retaliation).

**\*8** Even if plaintiff had proffered some evidence of retaliatory motivation, defendants have shown that they would have taken the same actions against plaintiff on the valid basis resulting from their investigation of the potential Y2K strike at Fishkill. *See Davidson*, 193 F.3d at 149. Plaintiff was one of over 30 inmates who were subjected to cell searches and was transferred out of Fishkill as a result of the strike investigation. (Ercole Decl. ¶¶ 15, 17-18) Both the search and the temporary transfer were justified by the information uncovered during the strike investigation, which revealed that plaintiff was suspected of involvement in a potentially dangerous disruption of the prison's administration. In the face of such undisputed evidence, no reasonable jury could find in plaintiff's favor. Defendants are entitled to summary judgment on plaintiff's retaliation claims.

*Due Process Claims*

Plaintiff claims that his temporary confinement in the SHU at Downstate violated his constitutional right to Due Process under the Fourteenth Amendment. Inmates alleging Due Process violations resulting from prison discipline must establish that they have a protected liberty interest in being free from the punishment in question. *See Sandin v. Conner*, 515 U.S. 472, 483-84 (1995). While New York state law does create a liberty interest in not being confined to the SHU, *see Palmer v. Richards*, 364 F.3d 60, 64 n. 2 (2d Cir.2004) (citing *Welch v. Bartlett*, 196 F.3d 389, 394 n. 4 (2d Cir.1999)), such an interest is only implicated in the Due Process context by a particular punishment when such punishment " 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Palmer*, 364 F.3d at 64 (quoting *Sandin*, 515 U.S. at 484) (brackets in original). "In other words, actions under the Due Process Clause are reserved for prisoners enduring a hardship that

is substantially more grave than hardships they would be likely to endure simply as a consequence of the ordinary administration of the prison." *Welch*, 196 F.3d at 392.

The Second Circuit has "explicitly avoided a bright line rule that a certain period of SHU confinement automatically fails to implicate Due Process rights." *Palmer*, 364 F.3d at 64 (citations omitted). However, the Second Circuit has affirmed grants of summary judgment where the period of confinement is "exceedingly short"-shorter than the 30 days at issue in *Sandin* itself-and there is no indication that the conditions of confinement differed significantly from those normally endured by SHU inmates. *Palmer*, 364 F.3d at 65-66 (citing *Hynes*, 143 F.3d at 658-59; *Arce v. Walker*, 139 F.3d 329, 335-36 (2d Cir.1998); and *Frazier v. Coughlin*, 81 F.3d 313, 317 (2d Cir.1996)).

Here, there is some dispute about the length of plaintiff's confinement in SHU conditions. Plaintiff claims to have been housed in SHU status for the entire period of his confinement at Downstate, a total of eight days. (Freeman Dep. 88-89, 14-45) Defendants contend that plaintiff was treated as an SHU inmate for five days, and then as a general population inmate for several days preceding his transfer to Attica. (Olmstead Decl. ¶¶ 4-5 and Ex. A)

**\*9** However, accepting plaintiff's version of the facts, as I must in the context of this motion, his eight-day confinement to SHU does not implicate a liberty interest. The Second Circuit recently observed that even a period of 101 days in "normal" SHU conditions is insufficient to constitute "atypical" treatment under *Sandin*: "To be sure, with respect to 'normal' SHU confinement, we have held that a 101-day confinement does not meet the *Sandin* standard of atypicality." *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir.2004) (citing *Sealey v. Giltner*, 197 F.3d 578, 589 (2d Cir.1999)), *cert. denied*, 125 S.Ct. 1398 (2005). Such "normal" SHU conditions include confinement to a cell for up to 23 hours daily, one hour of daily exercise and two showers per week. *Ortiz*, 380 F.3d at 655. Here, plaintiff admits that he was given his one hour of daily exercise while housed in the SHU. (AC ¶ 22) The only alleged difference between the "normal" SHU conditions described in *Ortiz* and plaintiff's SHU stay is his assertion that he was not permitted to shower at all during his stay

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3333465 (S.D.N.Y.)

(Cite as: 2005 WL 3333465 (S.D.N.Y.))

at Downstate. (*Id.*) While defendants dispute this assertion (*see* Olmstead Decl. ¶ 4 and Ex. A), I accept plaintiff's version as true on this motion; even so, that one fact would not render an eight-day stay in SHU "substantially more grave" than normal conditions of confinement. *Welch, 196 F.3d at 392; see also Frazier,* 81 F.3d at 317 (affirming dismissal of Due Process claims where plaintiff failed to show that conditions of 12-day SHU confinement were "dramatically different" from conditions in general population).

In any event, plaintiff's Due Process claims related to his brief stay in the SHU are appropriately disposed of on summary judgment because plaintiff cannot show that any of the named defendants were personally involved in the decision to confine him to the SHU at Downstate. To succeed on a section 1983 claim against state officials in their personal capacities, a plaintiff must demonstrate "personal involvement of defendants in alleged constitutional deprivations...." *Colon,* 58 F.3d at 873 (citation omitted). Here, plaintiff alleges in his complaint that defendants Mazzuca and Ercole were responsible for his being placed in SHU upon his arrival at Downstate. (AC ¶ 15) However, both defendants have denied in their respective declarations that they directed or requested that he be so placed, and stated that they had no involvement whatsoever in determining the conditions of his confinement at Downstate. (Mazzuca Decl. ¶ 20; Ercole Decl. ¶ 20) Plaintiff has failed to come forth with any evidence to the contrary, and has failed to name as defendants any Downstate personnel. Defendants are entitled to summary judgment on plaintiff's Due Process claim related to his SHU status at Downstate.[FN5]

> FN5. To the extent plaintiff asserts a Due Process claim based on his SHU confinement at Fishkill, the four hours he spent in SHU prior to his departure from Fishkill is insufficient to implicate a liberty interest under the principles discussed above.

To the extent that plaintiff claims that his transfer out of Fishkill constituted a Due Process violation, defendants are entitled to summary judgment. Prison officials are vested with broad discretion to transfer inmates, and such transfers between facilities do not generally implicate Due

Process rights. *See Meachum v. Fano,* 427 U.S. 215, 225 (1976) ("That life in one prison is much more disagreeable than in another does not in itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe rules."); *see also McKune v. Lile,* 536 U.S. 24, 39 (2002); *Matiyn v. Henderson,* 841 F.2d 31, 34 (2d Cir.), *cert. denied,* 487 U.S. 1220 (1988). This is so even when a prisoner is transferred for disciplinary reasons, unless a state law imposes restrictions or conditions on transfers. *See Montayne v. Haymes,* 427 U.S. 236, 242 (1976). New York law does not place any such restrictions on transfers, and vests the DOCS Commissioner with discretion to order such transfers. *See id.;* N.Y. CORR. LAWW § 23.1; *see also Meriwether v. Coughlin,* 879 F.2d 1037, 1047 (2d Cir.1989). Thus, plaintiff's transfer out of Fishkill does not implicate a liberty interest upon which he may base a Due Process claim.

**\*10** To the extent plaintiff's Due Process claim is based on the change in his security classification from medium to maximum, defendants are also entitled to summary judgment. Plaintiff's contentions regarding his security classification do not differ in any relevant manner from his contentions regarding transfer. Security classifications, like transfer decisions, are committed to the discretion of the DOCS commissioner. *See* N.Y. CORR. LAWW § 137.1 ("The commissioner shall establish program and classification procedures...."). Plaintiff essentially complains that he has been transferred to a less favorable and more restrictive institution. As discussed above, plaintiff has no liberty interest in being housed in the facility of his choice. *See Meachum,* 427 U.S. at 225; *Montanye,* 427 U.S. at 242. Defendants are entitled to summary judgment on plaintiff's Due Process claim to the extent it is based on his change in security classification.

Defendants would be so entitled even if a liberty interest were somehow to be implicated. As discussed above, defendants Mazzuca and Ercole stated in their declarations that they played no role whatsoever in the change in security classification (*see* Mazzuca Decl. ¶¶ 20-21; Ercole Decl. ¶¶ 20-21), and plaintiff failed to name, and thus, failed to serve, the John Doe defendant he described in the AC as a "Classification and Movement

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3333465 (S.D.N.Y.)

(Cite as: 2005 WL 3333465 (S.D.N.Y.))

Analyst." Plaintiff also alleges that defendants Goord and Roy were informed of his allegedly improper change in security classification. Defendant Goord is entitled to summary judgment based on lack of personal involvement. "Personal involvement of a supervisory official may be established 'by evidence that: (1) the [official] participated directly in the alleged constitutional violation, (2) the [official], after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the [official] created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the [official] was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the [official] exhibited deliberate indifference to the rights of [others] by failing to act on information indicating that unconstitutional acts were occurring." ' *Johnson v. Newburgh Enlarged School Dist.,* 239 F.3d 246, 254 (2d Cir.2001) (quoting *Colon,* 58 F.3d at 873) (alterations in original). Liability may not be based on a theory of *respondeat superior. See Hayut v. State University of New York,* 352 F.3d 733, 753 (2d Cir.2003). Merely occupying a high position in the prison hierarchy does not render a defendant liable for a constitutional violation without a showing of personal involvement. *See Colon,* 58 F.3d at 874.

Goord's alleged liability is tied solely to his receipt of the three letters discussed earlier, two from plaintiff and one from plaintiff's wife. Goord states in his declaration that, with regard to the thousands of letters received by his office each year from or about inmates, they are opened by his secretaries, and referred to another DOCS staff member as appropriate. (Goord Decl. ¶ 4) Goord states that there is no indication in his office files that he was ever personally made aware of plaintiff's situation, and he does not recall being made aware. (*Id.* ¶ 6) That Goord's office received the letters and referred them for an appropriate response does not constitute the requisite personal involvement. *See, e .g., Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997); *Johnson v. Wright,* 234 F.Supp.2d 352, 363-64 (S.D.N.Y.2002) (allegation that Goord received letters to which other defendants responded insufficient to show personal involvement).

**\*11** While defendant Roy did, in fact, respond to plaintiff's letters, his responses provide no evidence in support of plaintiff's claims. In response to plaintiff's August 7, 2000 letter (AC Ex. 12), Roy contacted the Office of Classification and Movement ("OCM"), which had also been forwarded a copy of the letter. Based on information provided by that office, Roy informed plaintiff in an August 29, 2000 letter (AC Ex. 13) that his request for reduced classification had been denied. This decision was made by the Office of the Inspector General and the Deputy Commissioner for Correctional Facilities, after review of a recommendation by OCM. (Roy Decl. ¶ 7) Roy informed plaintiff that the proper method for requesting transfers and changes in security classification was through his assigned corrections counselor. (AC Ex. 13) Similarly, in response to plaintiff's December 19, 2000 letter (AC Ex. 15), Roy contacted OCM to ensure that proper procedures had been followed with regard to plaintiff's requested transfer to a medium security facility, and again informed plaintiff, by letter dated January 16, 2001 (AC Ex. 16), that he should seek the assistance of his counselor in making future transfer requests. (Roy Decl. ¶ 12)

DOCS procedure for evaluating requests for reduced security classification dictates that inmates are subject to quarterly reviews. As part of the review process, an inmate's counselor may make a recommendation for change in classification to the OCM. (Roy Decl. ¶¶ 8-9) Requests that come directly from inmates are not considered. (*Id.* ¶ 10) Roy did not ignore plaintiff's letters. But neither did he act with indifference or disregard plaintiff's rights. Roy's responses to plaintiff's letters were proper and could not, in any event, be said to constitute personal involvement in a constitutional violation.

Viewed in a light most favorable to plaintiff, no reasonable jury could find in his favor on his Due Process claims. Defendants are entitled to summary judgment on these claims.

*Qualified Immunity*

Defendants have also raised the defense of qualified immunity. "[G]overnment officials performing discretionary functions generally are granted a qualified immunity and are shielded from liability for civil damages insofar as their conduct does not violate clearly

Not Reported in F.Supp.2d, 2005 WL 3333465 (S.D.N.Y.)

(Cite as: 2005 WL 3333465 (S.D.N.Y.))

established statutory or constitutional rights of which a reasonable person would have known." *Wilson v. Layne,* 526 U.S. 603, 609 (1999) (internal quotation marks and citation omitted). The doctrine applies to prison officials in civil rights actions brought by inmates. *See, e.g., Luna v. Pico,* 356 F.3d 481, 490 (2d Cir.2004). A right is clearly established if (1) the underlying law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit recognizes that right, and (3) a reasonable defendant would understand that his conduct was unlawful. *Anderson v. Recore,* 317 F.3d 194, 197 (2d Cir.2003).

**\*12** "The first step is to determine whether the alleged conduct violates any constitutionally protected right at all. Conduct that does not violate any constitutional right certainly does not violate a constitutional right that was 'clearly established' at the time the conduct occurred." *Mozzochi v. Borden,* 959 F.2d 1174, 1179 (2d Cir.1992) (citing *Siegert v. Gilley,* 500 U.S. 226 (1991)). As discussed above, plaintiff has failed to raise a disputed issue of material fact as to the existence of a violation of any constitutional right. Thus, I need not reach the remainder of the qualified immunity inquiry as to, for example, whether the right was "clearly established" or whether reasonable prison officials could have disagreed about the lawfulness of the alleged violations. *See, e.g., Malley v. Briggs,* 475 U.S. 335, 341 (1986).

*Injunctive Relief*

In addition to damages, plaintiff has also requested injunctive relief. Specifically, plaintiff seeks a judicial order requiring removal from his prison records of references to "negative behavior," a "Code 04 transfer," or "involvement in any demonstration." (AC ¶ V.3) He also seeks a new parole hearing, "minus the false information that was in his prison folders, and the stigma of going before the parole board from a disciplinary maximum security prison, and involvement in a demonstration." (AC ¶ V.4) Finally, he seeks a reduction in his security classification back to medium security, and a transfer to a medium security facility. (AC ¶ V.5)

The Prison Litigation Reform Act ("PLRA") addresses an inmate's request for prospective injunctive relief:

Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

18 U.S.C. § 3626(a)(1)(A). Under § 3626(g)(7), "prospective relief" is defined to include "all relief other than compensatory money damages." Thus, the court may only grant injunctive relief to the extent necessary to correct a violation of plaintiff's First or Fourteenth Amendment rights. However, as discussed above, plaintiff has failed to demonstrate any constitutional violation based on the cell search, transfer, or change in security classification.

To the extent plaintiff claims his Due Process rights were violated by his denial of parole, they fail as well. Plaintiff has no liberty interest in an initial release to parole. *See Barna v. Travis,* 239 F.3d 169, 171 (2d Cir.2001) ("The New York parole scheme is not one that creates in any prisoner a legitimate expectancy of release.... Accordingly, plaintiffs have no liberty interest in parole and the protections of the Due Process Clause are inapplicable."). Nor does the inclusion of allegedly false information in plaintiff's file implicate a liberty interest for Due Process purposes. *See Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *cert. denied,* 485 U.S. 982 (1988). "If there is no claim of retaliation or a constitutionally flawed disciplinary hearing, an 'inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest.' " *Flemings v. Kinney,* No. 02 Civ. 9989(DC), 2004 WL 1672448 at *4 (S.D.N.Y. July 27, 2004) (quoting *Rideout,* 808 F.2d at 951) (additional citation omitted). Here, the Court has granted defendants summary judgment on plaintiff's retaliation claims. While plaintiff contends that the allegedly false information in his file resulted in the denial of parole, he does not allege that his June 2001 or June 2003 parole hearings were marked by any lack of procedural Due Process. (AC ¶ 38 (2001); Freeman Aff.

Not Reported in F.Supp.2d, 2005 WL 3333465 (S.D.N.Y.)

(Cite as: 2005 WL 3333465 (S.D.N.Y.))

Ex. B (2003)). In short, plaintiff has demonstrated no constitutional violation on which the Court could base an injunction.

*Alleged Failure to Provide Discovery*

**\*13** In opposition to defendants' motion, plaintiff contends-for the first time-that defendants failed to adequately respond to certain of his discovery requests. (*See* Freeman Aff. ¶ 21) Fed.R.Civ.P. 56(f) provides that, when a party opposing summary judgment makes a showing that he cannot present facts essential to justify his opposition, a court may order a continuance for the purpose of allowing further discovery. In support of his assertion, plaintiff attaches a copy of his undated request for the production of documents, and defendants' response, dated May 19, 2005. (Freeman Aff. Ex. C)

Defendants' responses, on their face, appear to be appropriate. Plaintiff asserts no basis for his belief that defendants have in their possession, custody or control documents responsive to Request No. 6 (requesting documents related to "[t]he Authority that approved the Transfer Order on Sunday January 2, 2000, and based on what available evidence") which were not, in fact, produced. While defendants objected in part to Request No. 12 (requesting documents related to "[t]he evidence that was ascertained to substantiate the extreme measures taken by Fishkill's Administration under the authority of the Department of Correctional Services (D.O.C.S.)"), they also referred plaintiff to the documents produced in response to the arguably similar Request No. 6. In response to Request No. 13 (requesting documents related to "[t]he unusual incident report"), defendants objected to the request as unclear in that it did not specify what "unusual incident report" was being referenced, but also stated that they were not in possession of "any unusual incident report related to plaintiff's movement to Downstate Correctional Facility in January, 2000." Request No. 14 read as follows: "What steps did the approving Authority take to be in compliance with NYCRR Title 7 procedures that regulate how actions are conducted in conjunction with State Law." The Court agrees with defendants that the request does not make clear what documents plaintiff sought.

This case was referred to Magistrate Judge James C.

Francis IV for general pretrial supervision, including all discovery matters, on February 20, 2003. Plaintiff included in his papers in opposition to summary judgment a letter to defendants' counsel dated June 20, 2005, in which he complains about defendants' responses to his document requests, which letter purports, on its face, to have been copied to Magistrate Judge Francis. (Freeman Aff. Ex. C) There is no indication in the record that plaintiff ever sought a ruling from Magistrate Judge Francis on any of the alleged shortcomings in defendants' discovery responses. Plaintiff has failed to make the showing required under Rule 56(f) that he cannot present facts essential to justify his opposition to summary judgment because of a lack of discovery. "[A] party resisting summary judgment on the ground that it needs discovery in order to defeat the motion must submit an affidavit showing (1) what facts are sought [to resist the motion] and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." *Miller v. Wolpoff & Abramson, L.L.P.,* 321 F.3d 292, 303 (2d Cir.), *cert. denied,* 540 U.S. 823 (2003) (citations and internal quotation marks omitted). Plaintiff's argument provides no basis on which to deny summary judgment.

*Conclusion*

**\*14** For the reasons set forth above, defendants' motion for summary judgment is GRANTED.[FN6] The Clerk is directed to enter a judgment in favor of defendants.

> **FN6.** Though the motion was nominally brought only on behalf of defendants Goord, Roy, Mazzuca, Ercole and Armstrong, summary judgment is granted to all named defendants. Defendant Conklin was never served with the AC. Defendant Zehr was served, and failed to answer or otherwise appear in this action. However, the sole allegation in the complaint relating to Zehr is that, on January 2, 2000, he "escort[ed] plaintiff from the law library area to the Messhall [sic] area." (AC ¶ 11) Plaintiff does not explain how this allegation is sufficient to implicate Zehr's involvement in any alleged

constitutional violation, and the Court cannot conceive of how it might.

SO ORDERED.

S.D.N.Y.,2005.

Freeman v. Goord
Not Reported in F.Supp.2d, 2005 WL 3333465 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 23069 (S.D.N.Y.)
**(Cite as: 1994 WL 23069 (S.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Dale HENDRICKSON, Plaintiff,
v.
UNITED STATES ATTORNEY GENERAL, G.L.
Hershberger, United States Bureau of Prisons, Gary
Morgan, Pamela Ashline, Kenneth Walicki, Hulet
Keith, Otisville Medical Department, Defendants.

No. 91 CIV. 8135.
Jan. 24, 1994.

MEMORANDUM AND ORDER
McKENNA, District Judge.

**\*1** On December 4, 1991, pro se plaintiff Dale
Hendrickson ("Plaintiff" or "Hendrickson"), an in-
mate then in confinement at the Federal Correction-
al Institution in Otisville, New York ("Otisville"),
filed this action for injunctive relief and damages
based upon alleged violations of his rights under
the United States Constitution, Amendments I, IV,
V, VI, IX, and XIII, and upon violations of various
laws and/or regulations governing prison adminis-
tration.[FN1] The Complaint named as defendants
G.L. Hershberger ("Hershberger"), the United
States Attorney General ("Attorney General"), Gary
Morgan ("Morgan"), Pamela Ashline ("Ashline"),
Kenneth Walicki ("Walicki"), Hulett Keith
("Keith"), the Bureau of Prisons ("BOP"), and the
Otisville Medical Department ("OTV Medical De-
partment") (collectively "Defendants"). Defendants
moved for judgment on the pleadings pursuant to
Rule 12(c) of the Federal Rules of Civil Procedure,
or, in the alternative, for summary judgment pursu-
ant to Rule 56 of the Federal Rules of Civil Proced-
ure. For the reasons set out below, Defendants' Rule
12(c) motion is granted.

I.

Defendants move to dismiss Plaintiff's Com-
plaint, pursuant to Rule 12(c) of the Federal Rules
of Civil Procedure, for failure to state a claim upon
which relief can be granted. Rule 12(c) provides:

After the pleadings are closed but within such
time as not to delay the trial, any party may move
for judgment on the pleadings. If, on a motion for
judgment on the pleadings, matters outside the
pleadings are presented to and not excluded by
the court, the motion shall be treated as one for
summary judgment and disposed of as provided
in Rule 56, and all parties shall be given reason-
able opportunity to present all material made per-
tinent to such a motion by Rule 56.

Fed.R.Civ.P. 12(c). "[T]he same standards that
are employed for dismissing a complaint for failure
to state a claim under Fed.R.Civ.P. 12(b)(6) are ap-
plicable" to a Rule 12(c) motion to dismiss for fail-
ure to state a claim upon which relief can be gran-
ted. *See Ad–Hoc Comm. of the Baruch Black &
Hispanic Alumni Ass'n v. Bernard M. Baruch Col-
lege,* 835 F.2d 980, 982 (2d Cir.1987); *see also Vi-
acom Int'l. Inc. v. Time, Inc.,* 785 F.Supp. 371, 375
n. 11 (S.D.N.Y.1992); 5A Charles Wright and Ar-
thur R. Miller, *Federal Practice and Procedure* ¶
1367, at 515–16 (1990). Thus, the Court must read
the Complaint generously, drawing all reasonable
inferences from the complainant's allegations. *See
California Motor Transp. v. Trucking Unlimited,*
404 U.S. 508, 515 (1972). Moreover,
"consideration is limited to the factual allegations
in [the] amended complaint, which are accepted as
true, to documents attached to the complaint as an
exhibit or incorporated in it by reference, to matters
of which judicial notice may be taken, or to docu-
ments either in plaintiff['s] possession or of which
plaintiff[ ] had knowledge and relied on in bringing
suit." *Brass v. American Film Technologies, Inc.,*
987 F.2d 142 (2d Cir.1993); *accord Allen v. West-
point–Pepperell, Inc.,* 945 F.2d 40, 44 (2d
Cir.1991); *Cortec Indus., Inc. v. Sum Holding L.P.,*
949 F.2d 42, 47–48 (2d Cir.1991), *cert. denied,* 112
S.Ct. 1561 (1992); *Frazier v. General Elec. Co.,*
930 F.2d 1004, 1007 (2d Cir.1991). Defendants,
therefore, are entitled to dismissal for failure to

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 23069 (S.D.N.Y.)
**(Cite as: 1994 WL 23069 (S.D.N.Y.))**

state a claim only if the Court finds beyond a doubt that "plaintiff can prove no set of facts" to support the claim that plaintiff is entitled to relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46 (1957).

**\*2** Because the 3(g) statement and declarations submitted to this Court by Defendants have not been considered and are hereby excluded from the record, the Court renders its judgment on the pleadings pursuant to Rule 12(c).

### II.

Drawing all inferences in favor of the Plaintiff, *Miller v. Polar Molecular Corp.,* 12 F.3d 1170, 1993 WL 527434 (2d Cir.), the facts are as follows.

During Hendrickson's confinement at Otisville, certain video tapes which had been supplied to him by the government were "systematically and maliciously confiscated"; audio tapes and legal materials also were removed from Plaintiff's possession while he was a pre-trial detainee at Otisville. In retaliation for his bringing legal materials into the Otisville compound area, Plaintiff claims, he was placed in administrative detention. Compl. at 1 (presumably ¶ A.)

Hendrickson also claims at various times to have been wrongly isolated from the general prison population based on alleged and allegedly erroneous OTV Medical Department claims that he had tuberculosis. *Id.* ¶ B. During these periods of medical confinement, Hendrickson claims that the "4A unit team" denied him personal visits, his right to send mail, and telephone communications and consultations necessary to his legal representation. *Id.* ¶ C.

Hendrickson claims that as part of his medical confinement he was "subjected to ruthless and inhumane [d]isciplinary action from the D[isciplinary] H[earing] O[fficer]," and was for 15 days placed in administrative detention and for 30 days deprived of commissary, visitation, and phone privileges. *Id.* ¶ D.

Hendrickson further alleges that commissary items that he had in his possession before entering medical confinement were wrongly confiscated from him, and while in such confinement he was assaulted and searched by the "OTV Riot Squad." *Id.* ¶ E. In addition, he claims, commissary receipts, as well as legal documents and other legal materials were confiscated from him. *Id.* ¶ F.

### III.

Defendants argue that Plaintiff fails to state a claim for which relief may be granted. Of course, in considering a pro se pleading, the Court takes into consideration the special circumstances of pro se litigants. As the Second Circuit has often noted, "special solicitude should be afforded pro se litigants generally, when confronted with motions for summary judgment." *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988); *accord, e.g., Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 (2d Cir.1988); *Beacon Enters., Inc. v. Menzies,* 715 F.2d 757, 767 (2d Cir.1983). We apply the same solicitous standard to the instant motion to dismiss.

Plaintiff, however, has failed to present to this Court either a colorable theory of violation of legal duties or facts to support a claim that might be inferred from the pleadings. Even assuming the truth of Plaintiff's allegations, the Court is left without a cognizable claim before it.

**\*3** At the outset, the Court notes that to the extent that the Complaint seeks injunctive relief from conditions of Plaintiff's treatment while at Otisville as a pre-trial detainee, the claim is now moot as Plaintiff has since been transferred to the United States Penitentiary in Lompoc, California following his conviction at trial. Hendrickson's Complaint also fails to the extent that it seeks damages from the United States government or government officials in their official capacity. Because the United States government enjoys sovereign immunity, it can be sued only to the extent it so consents. *United States v. Mitchell,* 445 U.S. 535, 538 (1980) (quoting *U.S. v. Sherwood,* 312 U.S. 584, 586 (1941)). No such immunity has been waived in

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 23069 (S.D.N.Y.)
**(Cite as: 1994 WL 23069 (S.D.N.Y.))**

suits for damages arising from constitutional violations. *Keene Corp. v. United States,* 700 F.2d 836, 845 n. 13 (2d Cir.), *cert. denied,* 464 U.S. 864 (1983). Thus, the only possible redress remaining available to Plaintiff for the harms alleged is a *Bivens* action [FN2] against government officials in their personal capacities for actions taken under the color of governmental authority.

As Defendants point out, however, Plaintiff has nowhere, other than in the caption of the Complaint, mentioned by name any of the individual named Defendants. Defs.' Mem.Supp.Mot.Dismiss or Summ.Jt. at 2. It is true that Plaintiff did in the body of the Complaint name the "4A Unit Team," the "DHO," and the "OTV Riot Squad," but these designations of group actions undifferentiated as to individuals and of official titles unconnected to any individual names do not allege the actionable *individual* behavior necessary to sustain a *Bivens* claim.

In a *Bivens* action, where Defendants are sued in their personal capacities, actionable behavior must be alleged as to individuals. *See, e.g., Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir.1977); *Barbera v. Smith,* 836 F.2d 96, 99 (2d Cir.1987), *cert. denied,* 489 U.S. 1065 (1989). A complaint that fails to make any specific factual allegations of "direct and personal responsibility on the part of any of the named defendants in regard to the loss of any of [plaintiff's] property" must be dismissed. *Lee v. Carlson,* 645 F.Supp. 1430, 1436 (S.D.N.Y.1986).

More importantly, the light in which a pro se complaint may be considered does not burn so brightly as to blind the court as to the rights of defendants who are entitled to have claims against them alleged with sufficient clarity to make possible a defense. Even in a pro se complaint, claims must "specify in detail the factual basis necessary to enable [defendants] intelligently to prepare their defense ..." *Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir.1977). Otherwise, blameless parties would be subject to damages claims for free-floating innuendo. To be sufficient before the law, a complaint

must state precisely who did what and how such behavior is actionable under law. Although the Court may make special efforts to understand the underlying claim of a vague, confusing, or poorly crafted pro se complaint that it would not undertake in connection with a claim prepared by legal counsel, it cannot do so to the extent that this would work an injustice to defendants, whose rights also must be protected. A defendant who is alleged to be liable for his actions has a right to have the claims against him spelled out with a basic degree of clarity and particularity. *See supra* at 7. Although some of the harms alleged by Plaintiff might conceivably be of some substance, the Court cannot understand from the documents before it which defendants are alleged to have participated in which allegedly actionable behavior. The Court cannot on such a basis subject a party to potential liability. *See* Defs' Mot. at 9, 10.

*Summary and Order*

**\*4** For the reasons stated, Plaintiff has failed to plead a colorable case. Defendants' motion to dismiss is granted.

> FN1. The Complaint states only that "Bureau of Prison institutional Law" was violated; subsequent documents filed by Plaintiff imply the violation of specific prison policies. *See, e.g.,* Letter from Hendrickson to Judge McKenna of 10/13/93 at 2 (citing BOP Policy Statement 1315.3 purportedly concerning prisoner access to legal materials while in administrative detention).

> FN2. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971).

S.D.N.Y.,1994.
Hendrickson v. U.S. Atty. Gen.
Not Reported in F.Supp., 1994 WL 23069 (S.D.N.Y.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 23069 (S.D.N.Y.)
**(Cite as: 1994 WL 23069 (S.D.N.Y.))**

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

2015 WL 4394604
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Edgardo L. LOPEZ, Plaintiff,

v.

N. WHITMORE, et. al., Defendants.

No. 9:13–CV–952 (BKS/
ATB).    |    Signed July 16, 2015.

**Attorneys and Law Firms**

Edgardo L. Lopez, Last Known Address, Syracuse, NY, pro
se.

Hon. Eric T. Schneiderman, New York State Attorney
General, Christopher W. Hall, Assistant Attorney General,
The Capitol, Albany, NY, for Defendants.

**ORDER**

Hon. BRENDA K. SANNES, District Judge.

 *1 Plaintiff Edgardo L. Lopez, a former New York
State inmate, commenced this civil rights action under 42
U.S.C. § 1983 raising federal and state claims against New
York State Department of Correction officials arising out
of plaintiff's confinement at Marcy Correctional Facility.
Dkt. Nos. 1, 32. On October 9, 2014, defendants filed a
motion for summary judgment which was referred to United
States Magistrate Judge Andrew T. Baxter. Dkt. Nos. 69,
83. On May 20, 2015, Judge Baxter issued a Report–
Recommendation, recommending that defendants' motion
for summary judgment be granted, and that plaintiff's First
Amendment and Eighth Amendment claims be dismissed
without prejudice to refiling and that plaintiff's due process
and state law claims be dismissed with prejudice. Dkt. No.
83, p. 24. Judge Baxter advised the parties that:

> Pursuant to 28 U.S.C. § 636(b)(1) and
> Local Rule 72.1(c), the parties have
> fourteen (14) days within which to
> file written objections to the foregoing
> report. Such objections shall be filed
> with the Clerk of the Court. FAILURE
> TO OBJECT TO THIS REPORT
> WITHIN FOURTEEN DAYS WILL

PRECLUDE APPELLATE REVIEW.
Roldan v. Racette, 984 F.2d 85, 89
(2d Cir.1993) (citing Small v. Sec. of
Health & Human Servs., 892 F.2d 15
(2d Cir.1989)); 28 U.S.C. § 636(b)(1);
Fed.R.Civ.P. 6(a), 6(d), 72.

Dkt. No. 83, p. 24. A copy of the Report–Recommendation
was mailed to Lopez's last known address via certified mail.
Dkt. No. 83. Lopez's copy of the Report–Recommendation
was returned to the Court marked "Return to sender, unable
to forward." Dkt. No. 85.

On June 8, 2015, Lopez filed a notice of change of address and
a request for an extension of time to respond to the Report–
Recommendation. Dkt. Nos. 86–87. Lopez noted that he
received the Report–Recommendation that day at the public
counter in the courthouse. Dkt. No. 87. The Court granted
Lopez's request for an extension of time and, in a text order
dated June 8, 2015, extended the due date for filing objections
to June 22, 2015. The text order was mailed to Lopez's last
known address. Lopez's copy of the text order was returned
to the Court marked "Return to sender, not deliverable as
addressed, unable to forward." Dkt. No. 89.

In a Decision and Order on June 29, 2015, the Court reminded
Lopez of his obligation to notify the Court of any change in
address, see Local Rule 10.1(c)(2), and provided Lopez an
additional fourteen days to file his current address and any
objections to the Report and Recommendation. Dkt. No. 90,
pp. 2–4. The Court advised Lopez that if he failed to comply
with the Decision and Order, the Court would "consider the
Report and Recommendation as unopposed and review for
clear error only." Dkt. No. 90, p. 4. The Decision and Order
was served on Lopez via certified mail at his last known
address. Dkt. No. 90. On July 8, 2015, the Court received an
executed return receipt of delivery. Dkt. 91. Lopez has not, to
date, filed any objections to the Report–Recommendation.

 *2 Accordingly, as no objections to the Report–
Recommendation have been filed and the time for filing
objections has expired, the Court reviews the Report–
Recommendation for clear error. See Glaspie v. N.Y.C. Dep't
of Corr., No. 10 CV 00188(GBD)(JCF), 2010 WL 4967844,
at *1, 2010 U.S. Dist. LEXIS 131629, at *2–3 (S.D.N.Y.
Nov. 30, 2010) (explaining that when no objections to report
and recommendation are made, "the Court may adopt [it]
if there is 'no clear error on the face of the record.' ")
(quoting Adee Motor Cars, LLC v. Amato, 388 F.Supp.2d
250, 253 (S.D.N.Y.2005)). Having reviewed the Report and

Recommendation in its entirety and having found no clear error, it is hereby:

**ORDERED** that the Report–Recommendation (Dkt. No. 83) is **ADOPTED in its entirety** for the reasons stated therein; and it is further

**ORDERED** that the defendants' motion for summary judgment (Dkt. No. 69) is **GRANTED;** and it is further

**ORDERED** that plaintiff's due process and state law claims are **DISMISSED with prejudice;** and it is further

**ORDERED** that plaintiff's remaining claims under 42 U.S.C. § 1983 relating to assault and retaliation are **DISMISSED without prejudice to refiling;** and it is further

**ORDERED** that the Clerk of the Court shall close this case; and it is further

**ORDERED** that the Clerk of the Court shall serve a copy of this Order as well as the Report–Recommendation (Dkt. No. 83) upon all parties in accordance with the local rules.

**IT IS SO ORDERED.**

### REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

This matter has been referred to me for Report and Recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c) by the Honorable Brenda K. Sannes, United States District Judge.

In this civil rights action, plaintiff claims that in May 2013, several correctional officers assaulted him during his confinement at the Marcy Correctional Facility ("Marcy") in retaliation for filing a grievance, and then issued several false disciplinary charges against plaintiff to cover up their actions. (Amended Compl., Dkt. No. 32, ¶¶ 26–55). Plaintiff amended his complaint in November 2013 to further allege that the disciplinary hearing related to these charges violated his due process rights. (*Id.* ¶¶ 60–74). Plaintiff also raises several state law tort claims in connection with the alleged assault. (*Id.* ¶ 77, 80, 82).

Presently before the court is the defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56 (Dkt. No. 69). Plaintiff has opposed the motion. (Dkt. No. 73) [1]. Defendants did not submit a reply.

For the reasons set forth below, this court recommends that defendants' summary judgment motion be granted. Plaintiff's claims should be dismissed because no rational fact finder could conclude that he exhausted his administrative remedies as to the assault and retaliation claims as required before filing an action under 42 U.S.C. § 1983, or that plaintiff failed to receive all the process that he was due during his disciplinary hearing. Plaintiff's state law claims, raised pursuant to the court's supplemental jurisdiction, should also be dismissed.

### *DISCUSSION*

### I. Summary Judgment

**\*3** Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States*

*v. Diebold, Inc. .,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Salahuddin,* 467 F.3d at 272.

To be sufficient to create a "factual issue," in the context of a summary judgment motion, an allegation in an affidavit or verified complaint must not be conclusory or overly general. *Smith v. Woods,* 9:03–CV–480 (DNH/GHL), 2006 WL 1133247, at *3 & n. 10 (N.D.N .Y. Apr. 24, 2006). Even where a complaint or affidavit contains specific assertions, the allegations "may still be deemed conclusory if [they are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.' " *Id.,* 2006 WL 1133247, at *3 & n. 11 (quoting *Jeffreys v. City of New York,* 426 F.3d 549, 554–55 (2d Cir.2005) ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' ... and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account.")).

## II. Exhaustion of Administrative Remedies

 **\*4** Plaintiff has alleged that he was the victim of two separate assaults by Marcy Correctional Officers on the morning of May 7, 2013. (Amended. Compl., Dkt No. 32, ¶¶ 31–38, 43). Plaintiff further alleges that the assaults were in retaliation for a prior grievance which he had submitted against one or more of the defendants, and that the defendants then issued him disciplinary tickets for failing to obey orders and possessing a weapon in order to cover up their actions [2]. (*Id.* ¶ 55). Based on the record discussed below, the court concludes that no reasonable fact finder could conclude that the plaintiff had completed the administrative grievance process for these claims prior to commencing this federal proceeding. Accordingly, this court recommends that plaintiff's First Amendment retaliation claims and Eighth Amendment cruel and unusual punishment claims be dismissed for failure to exhaust administrative remedies.

## A. Legal Standards

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord,* 380 F.3d 670, 675–76 (2d Cir.2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) (exhaustion requirement applies, *inter alia,* to excessive force claims)). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g, Key v. Toussaint,* 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) (citations omitted).

The Supreme Court held that, in order to properly exhaust an inmate's administrative remedies, he must complete the administrative review process in accordance with the applicable state rules. *Jones v. Bock,* 549 U.S. at 218–19 (citing *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)). In *Woodford,* the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90–103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the superintendent of the relevant facility. *Id.* § 701.5(c). Adverse decisions at the superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id.* § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/ her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility).

 **\*5** At the same time that the Second Circuit decided *Giano,* it also decided four related cases, clarifying the

law in the Second Circuit regarding the PLRA's exhaustion requirement, and specifying various instances in which the requirement could be waived or excused. [3] Based on these cases, the Second Circuit developed a "three part inquiry" to determine whether an inmate has fulfilled the PLRA exhaustion requirement. See *Brownell v. Krom,* 446 F.3d 305, 311–12 (2d Cir.2006) (citing *Hemphill,* 380 F.3d at 686). The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.* Whether the *Hemphill* test survives following the Supreme Court's decision in *Woodford,* has been a matter of some discussion. [4] Although the Second Circuit has not explicitly held that *Hemphill* remains good law, it has applied the three-part inquiry in post-*Woodford* cases. *See, e.g., Messa v. Goord,* 652 F.3d 305, 309 (2d Cir.2011); *Davis v. State of New York,* 311 F. App'x 397, 399 (2d Cir.2009).

## B. Application

Plaintiff filed a grievance on June 17, 2013, after being transferred to Downstate Correctional Facility ("Downstate"), alleging that on May 7, 2013, certain Marcy Correctional Officers verbally and physically abused him following a pat-down frisk while plaintiff was en route from the Marcy housing unit to the facility's infirmary. (Def. Statement of Material Facts, Dkt. No. 69–1, ¶ 4; Pl's Resp. to Def. Statement of Material Facts, Dkt. No. 73, 4). This grievance was acknowledged and forwarded for investigation by IGRC on June 19, 2013. (Dkt. No. 73–2, Pl's Ex. 3(B)). On September 17, 2013, the Downstate Superintendent denied plaintiff's grievance. (Hall Aff, Dkt. No. 69–3, Ex. 3; Dkt No. 73–2, Pl's Ex. 3(C)). On September 23, 2013, Plaintiff appealed this determination to the Central Office Review Committee. *Id.* On June 11, 2014, CORC issued its decision denying the grievance, the final step in the administrative process. (Dkt. No. 73–2, Pl's Ex. 3(D)).

While the administrative grievance process was ongoing, Plaintiff commenced this litigation on August 12, 2013, alleging essentially the same facts as his grievance. (Dkt. No. 1, Compl.). Plaintiff later submitted an Amended Complaint dated November 3, 2013 which restated the assault and retaliation claims and added a due process claim arising out of the related disciplinary hearing. (Dkt. No. 32, Amended Compl.)

In their motion for summary judgment, defendants argue that plaintiff failed to exhaust his administrative remedies relating to his assault and retaliation claims prior to commencing this federal litigation [5]. Plaintiff argues that his administrative remedies were exhausted upon filing his grievance on June 17, 2013, and that "[i]t is common knowledge that one not need to wait on the CORC decision in order to file a civil action against New York State Department of Corrections and Community Supervision (N.Y.SDOCCS) employees for committing such brutally physical body harm upon plaintiff." (Pl's Mem. of Law, Dkt. No. 73–1, at 7). Plaintiff also asserts that his administrative grievance was not resolved within a reasonable time, as it took three months to receive the Downstate Superintendent's determination, and another ten months before the CORC determination was issued. (*Id.* at 8).

**\*6** "The PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532. Plaintiff did not complete the state administrative grievance process for the assault and retaliation claims before commencing this litigation, and therefore failed to exhaust his administrative remedies in accordance with the PLRA. The only excuse offered by plaintiff, that the administrative grievance process took an unreasonably long time, is unavailing. (Pl's Mem. of Law, Dkt. No. 73–1, at 8). If the superintendent failed to timely respond to plaintiff's grievance, Plaintiff needed to appeal that failure to the CORC before commencing this litigation. "If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA." *Croswell v. McCoy,* 01–CV–0547, 2003 WL 962534, at \*4 (N.D.N.Y. Mar.11, 2003) (Sharpe, M.J.). [6]

In applying the Second Circuit's three-party inquiry, plaintiff has offered no evidence to suggest that the grievance process was unavailable to him, that the defendants are estopped from asserting the defense of failure to exhaust, or that there are any other special circumstances under *Hemphill* and its progeny that would excuse plaintiff's failure to exhaust his administrative remedies.

In support of defendants' motion, Jeffrey Hale, the DOCCS Assistant Director of the Inmate Grievance Program ("IGP") and the custodian of records for CORC, which maintains files of grievance appeals by inmates, submitted a declaration based upon his review of those records. (Dkt. No. 69–2). Ass't

Dir. Hale certified that CORC records contained five separate grievances filed by plaintiff for the period between September 2012 and May 2014. (Hale Decl., Dkt. No. 69–2, ¶¶ 6–7, 10, and Ex. B.).

During his August 26, 2014 deposition, plaintiff acknowledged that he was familiar with the DOCCS grievance process and understood that CORC is the final administrative step for deciding an inmate grievance. (Hall Aff, Dkt No. 69–3, Ex. 1 at 18). While plaintiff asserts that he was discouraged from reporting the alleged assaults immediately afterwards by threats from one or more of the defendants, plaintiff not only filed a detailed administrative grievance, but also raised the assault and retaliation allegations during his disciplinary hearing. *See, e.g., Black v. Fischer,* No. 12 Civ. 2341, 2013 WL 1314940, at *8–9 (S.D.N.Y. Mar. 28, 2013) (the plaintiff's claim that he was deterred from pursuing grievances by threats from a defendant was overcome by the fact that plaintiff filed other grievances and complaints during the relevant time period).

It is true that under certain circumstances, an inmate may exhaust his administrative remedies by raising his claim during a related disciplinary proceeding. *Giano,* 380 F.3d at 678–79; *Johnson,* 380 F.3d at 697. However, such exhaustion is essentially limited to instances in which (1) the inmate reasonably believed that his "only available remedy" was to raise his claim as part of a tier disciplinary hearing, and (2) the inmate articulated and pursued his claim in the disciplinary proceeding in a manner that afforded prison officials the time and opportunity to thoroughly investigate that claim. *Murray,* No. 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, at *3 (collecting cases). Here, where plaintiff filed a grievance eleven days after the hearing, there is no indication that he reasonably believed that the disciplinary hearing was his only available remedy. In addition, the disciplinary hearing officer, defendant Cavaleri, informed plaintiff that his testimony regarding the assault was "not credible," and plaintiff declined to call any witnesses or question any witnesses. (Hall Aff., Dkt. No. 69–3, Ex. 4). No rational fact-finder could conclude that plaintiff had articulated or pursued his claim in a manner that afforded prison officials an opportunity to investigate his claim.

**\*7** During the pendency of this litigation, plaintiff received a decision by the CORC, dated June 11, 2014, upholding the Superintendent's denial of the grievance. (Dkt. No. 73–2, Pl's Ex. 3(C)). While it is true that this decision means that plaintiff has now exhausted his administrative remedies,

the Second Circuit has held that a plaintiff must exhaust his remedies *before* filing his federal action, and that the court must dismiss plaintiff's complaint notwithstanding his subsequent exhaustion. *Neal v. Goord,* 267 F.3d 116, 122–23 (2d Cir.2001).

Because plaintiff failed to exhaust his administrative remedies by failing to wait for the CORC's decision, this court is constrained to recommend dismissing this complaint without prejudice. Plaintiff may immediately re-file his action on the First and Eighth Amendment claims because he has now exhausted his remedies. As in *Neal,* plaintiff may find that requiring him to initiate a new law suit is "judicially inefficient." *Id.,* 267 F.3d at 123. However, the Second Circuit specifically rejected such an argument, finding that "if during the pendency of a suit, the administrative process were to produce results benefitting plaintiff, the federal court will have wasted its resources adjudicating claims that could have been resolved within the prison grievance system at the outset." *Id.*

## II. Due Process–Disciplinary Hearing

### A. Plaintiffs Request for Voluntary Dismissal

Plaintiff amended his complaint in November 2013 to add a due process cause of action alleging deficiencies in the disciplinary hearing arising out of the incidents at Marcy. (Dkt. No. 32). The Amended Complaint was filed after plaintiff's administrative appeal was denied, and therefore plaintiff has exhausted his administrative remedies as to the due process issue. *See Chavis v. Goord,* No. 9:00–CV–1418 (LEK/DEP), 2007 WL 2903950 (N.D.N.Y.2007) (citing *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)). Defendants seek summary judgment on the merits of this claim, arguing that plaintiff was afforded all process that was due.

In response, plaintiff has requested that the court dismiss his due process claim, in order to focus on the alleged assault. However, since plaintiff's request for dismissal comes after the defendants have answered (Dkt. No. 37) and moved for summary judgment (Dkt. No. 69), and the parties have not stipulated to dismissal, plaintiff has no right to a voluntary dismissal. Fed.R.Civ.P. 41(a)(1). Instead, dismissal lies in the discretion of the court. *See* Fed.R.Civ.P. 41(a)(2) ("Except as provided in Rule 41(a)(1), an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper."); *see also Lebewohl v. Heart Attack Grill LLC,* 890 F.Supp.2d 278, 304 (S.D.N.Y.2012) ("A trial court

has great discretion in considering whether to grant a motion for voluntary dismissal under the rule.").

The circumstances of this case weigh heavily in favor of denying plaintiff's motion for voluntary dismissal and deciding defendants' motion for summary judgment on the due process claim. These claims have been pending since 2013, and the parties have engaged in discovery, including the deposition of plaintiff. (Hall Aff., Dkt. No. 69–3, Ex. 1). Defendants filed a summary judgment motion, fully supported by numerous affidavits and exhibits, to dismiss plaintiff's claims with prejudice, in October 2014. (Dkt. No. 69). Plaintiff, who requested permission in November 2013 specifically to add the due process claims, provides no justification for withdrawing these claims, other than stating that his "complaint is not about the Tier Hearing nor Due Process regarding the tier hearing, but the factual facts that the defendants physically assaulted plaintiff...." (Pl.'s Mem. of Law, Dkt. 73–1, at 3).

**\*8** At this stage of the proceedings, it would be unfair and unduly prejudicial to the defendants to allow plaintiff to withdraw his due process claim, particularly given the potential that plaintiff may re-file this litigation in order to raise the now administratively exhausted assault claims. *See, e.g., Murray v. Fischer,* No. 9:11–CV–225 (GLS/ATB), 2015 WL 457693, at \*2–3) (denying prisoner's motion to dismiss certain claims without prejudice and granting defendants' motion for summary judgment instead); *Emory v. New York,* No. 11–CV–1774, 2013 WL 1881009, at \*3 (E.D.N.Y. May 6, 2013) (denying plaintiffs' motion to dismiss action without prejudice where plaintiffs failed to proffer reasons why their "voluntary" dismissal came so late in the litigation, and only after the defendants marshaled strong arguments in favor of dismissal in substantive motions, both because it reflects plaintiffs' lack of diligence and because it may subject defendants to the burden of relitigating these same claims); *Krivchenko v. Clintondale Aviation, Inc.,* No. 1:13–CV–820 (TJM), 2014 WL 4684808, at \*4 (N.D.N.Y. Sept.18, 2014) (denying voluntary motion to dismiss action, filed without adequate explanation after defendant filed a motion for summary judgment motion, because it indicates an "an undue vexatiousness" and could potentially subject the defendants to the burden of unnecessary relitigation). The court will now address the merits of plaintiff's due process claims.

## B. Legal Standards

In order to begin a due process analysis, the court first determines whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges and then determines whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001); *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). In *Sandin v. Conner,* the Supreme Court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ...., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 483–84.

The Second Circuit has explicitly avoided a bright line rule that a certain period of confinement in a segregated housing unit automatically gives rise to due process protection. *See Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000); *Colon v. Howard,* 215 F.3d 227, 234 (2d Cir.2000). Instead, cases in this circuit have created guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed. *Palmer v. Richards,* 364 F.3d 60, 64–66 (2d Cir.2004). A confinement longer than an intermediate one, and under "normal SHU conditions" is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin." Colon,* 215 F.3d at 231 (finding that a prisoner's liberty interest was infringed by 305–day confinement). Shorter confinements under normal SHU conditions may not implicate a prisoner's liberty interest.

**\*9** The due process protections afforded inmates facing disciplinary hearings that affect a liberty interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citing, *inter alia, Wolff v. McDonnell,* 418 U.S. 539, 563–67, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)). The hearing officer's findings must be supported by "some reliable evidence." *Id.* (citing, *inter alia, Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985)).

In certain cases, an inmate has a limited right to assistance with his disciplinary hearing. *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993). An assistant has been held to be constitutionally necessary in cases in which a plaintiff is

confined in SHU, illiterate, or unable to grasp the complexity of the issues, and therefore, unable to marshal evidence and present a defense. *Id.* (citation omitted). In those cases, the assistant must do what the plaintiff would have done if he were able, but need not go beyond the inmate's instructions. *Id.*

## C. Application

Since the disciplinary hearing resulted in a one year sentence to the special housing unit ("SHU"), plaintiff is considered to have a liberty interest subject to due process protection. Plaintiff alleges that defendants issued him fabricated disciplinary tickets to cover up the alleged retaliatory assault, leading to procedural due process and privacy violations. It is well established that fabricated or false disciplinary charges do not violate an inmate's due process rights, so long as an inmate received a proper disciplinary hearing, with a determination based upon "some evidence." *See Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). Therefore, the analysis focuses on the disciplinary hearing itself, and this court recommends that defendants' motion for summary judgment be granted.

### 1. Adequacy of Assistance at the Hearing

Because he was transferred to the SHU after disciplinary charges relating to the threatening notes were filed against him, plaintiff was entitled to assistance in preparing for his hearing. *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998) (citing *Eng v. Coughlin,* 858 F.2d 889, 898 (2d Cir.1988)). Plaintiff alleges that he requested assistance, but that the employee assistant, who is not named as a defendant, refused to help plaintiff locate relevant documents and threatened physical violence. (Amended Compl., Dkt. No. 32, ¶ 68).

At the beginning of the disciplinary hearing, defendant Cavaleri inquired about the pre-hearing assistance, and asked whether plaintiff wanted to identify any witnesses or make any other requests before the hearing commenced. (Hall Aff., Dkt. No. 69–3, Ex. 4 at 4). At the close of the hearing, plaintiff was also given an opportunity to raise any issues on the record. (*Id.* at 36). Plaintiff declined to raise any issues before or after the hearing about the quality or conduct of his pre-hearing assistant. Plaintiff's bare allegations in the Amended Complaint, which do not identify the offending officer, are not sufficient to overcome defendants' motion for summary judgment. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary

judgment once the moving party has set forth a documentary case"). Moreover, even assuming for purposes of this motion that plaintiff's allegations are accurate, plaintiff waived any objection to inadequate assistance when he failed to raise the issue during the disciplinary hearing. *Jackson v. Johnson,* 30 F.Supp.2d 613, 619 (S.D.N.Y.1998) (plaintiff waived right to object to allegedly inadequate assistance when he did not raise the issue when questioned by hearing officer); *Hailey v. Provost,* No. 94–CV–1616 (RSP/DS), 1997 WF 627547 at *2 & n. 3 (N.D.N.Y., Oct. 9, 1997) (inmate waived right to effective employee assistance by specifically answering "no sir" after hearing officer asked if he needed any additional assistance).

### 2. Use of OMH Information

**\*10** Plaintiff alleges that defendant Cavaleri's consideration of testimony from State Office of Mental Health ("OMH") staff regarding plaintiff's psychiatric and medical history violated his due process right to privacy. (Amended Compl., Dkt. No. 32, 71). Defendant Cavaleri advised plaintiff during the hearing that such testimony was admitted and would be considered, but did not disclose the contents of that evidence. Following policy, the OMH testimony was heard without the plaintiff present. (Hall Aff., Dkt. No. 69–3, Ex. 4 at 36).

In the United States Constitution, there exists a right to privacy, protecting an individual's interest in avoiding the disclosure of personal matters. *Doe v. City of New York,* 15 F.3d 264, 267 (2d Cir.1994) (citing *Whalen v. Roe,* 429 U.S. 589, 599, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977)). This right is protected by the Due Process Clause. *O'Connor v. Pierson,* 426 F.3d 187, 201 (2d Cir.2005) (citing *Whalen,* 429 U.S. at 598–600). The right to privacy has also been "characterized as a right to 'confidentiality,' which 'includes the right to protection regarding information about the state of one's health.' " *Matson v. Bd. of Ed. of City School Dist. of New York,* 631 F.3d 57, 64 (2d Cir.2011) (quoting inter alia *Doe,* 15 F.3d at 267).

With respect to the "disclosure" of medical information, an inmate's privacy right varies with the inmate's condition, with a greater interest in preventing the disclosure of highly sensitive conditions. *Id.* (citations omitted). Prison officials may impinge upon the inmate's privacy right only to the extent that their actions are "reasonably related to legitimate penological interests." *Powell v. Schriver,* 175 F.3d 107, 112 (2d Cir.1999).

The Second Circuit has concluded that the OMH policy of offering such testimony outside the patient's presence during a prison disciplinary proceeding is constitutionally valid and does not violate any due process right. *See Powell v. Coughlin,* 953 F.2d 744, 749 (2d Cir.1991). As the disclosure of unfavorable mental health evaluations in an inmate's presence will likely impair the inmate-clinician relationship, and the disclosure of favorable evaluations may encourage inmates to "act out" in order to obtain such findings, the policy of hearing mental health testimony outside the inmate's presence, followed in this case, is reasonably related to legitimate penological interests and is an appropriate measure. *Id.*

### 3. "Some" Evidence Standard

Plaintiff alleges that defendant Cavaleri was biased, that plaintiff's guilt was not based upon reliable evidence, and that Cavaleri failed to consider plaintiff's testimony, particularly about injuries following the alleged assault. (Amended Compl., Dkt. No. 32, 74). Defendants argue that the disciplinary hearing transcript shows that defendant Cavaleri explained plaintiff his rights, read him the charges and took his not guilty plea. (Def. Mem. of Law at 10–12). Plaintiff was allowed to offer testimony, and given the opportunity to call and question witnesses. (Hall Aff., Dkt. No. 69–3, Ex. 4 at 8–22). Plaintiff declined to propose questions for any witness. (*Id.*). When the witness testimony was concluded, plaintiff was given an opportunity to rebut their statements. (*Id.* at 26–30). After plaintiff raised the issue of injuries suffered in the alleged assault, defendant Cavaleri reviewed plaintiff's medical records with the assistance of a physician's assistant. (*Id.* at 35). When issuing his disposition, defendant Cavaleri noted the consistent testimony of seven witnesses, and the lack of any evidence that would support plaintiff's testimony (*Id.* at 39).

**\*11** As the hearing officer, Defendant Cavaleri was authorized to make credibility determinations. *See Lewis v. Johnson,* No. 9:08–CV–482 (TJM/ATB), 2010 WL 3785771, at \*11 n. 25 (N.D.N.Y. Aug.5, 2010) ("the Second Circuit has required that a hearing examiner make an independent assessment of the credibility of certain sources of evidence at a prison disciplinary hearing"), *Rep't. Rec. adopted,* 2010 WL 3762016, at \*1 (N.D.N.Y. Sept.20, 2010). It is well settled, however, "that prison disciplinary officers are not held to the same standard of neutrality as adjudicators in other contexts." *Alien v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996). "The degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Id.*

An inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact. *Francis v. Coughlin,* 891 F.2d 43, 47 (2d Cir.1989); *Clyde v. Schoellkopf,* 714 F.Supp.2d 432, 437–38 (W.D.N.Y.2010).

The constitutional standard for sufficiency of evidence in a prison disciplinary hearing is whether there is "some" or "a modicum" of evidence to support the hearing officer's determination. *Sira v. Morton,* 380 F.3d 57, 76 (2d Cir.2004) (citing *Superintendent v. Hill,* 472 U.S. 445, 454, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985)). In this case, there was sufficient evidence supporting the hearing officer's determination. Defendant Cavaleri specifically noted the consistent testimony of seven witnesses, and the lack of evidence to support plaintiff's testimony, which was deemed not credible.

The record evidence supports the conclusion that plaintiff's due process rights were satisfied in his disciplinary hearing. Accordingly, this court recommends that defendants' motion for summary judgment as to plaintiff's due process claims against defendant Cavaleri be granted. Because his only involvement in plaintiff's claims was to affirm the results of a disciplinary hearing that this court has found comported with due process, summary judgment should also be granted with respect to defendant Prack [7].

### III. State Law Claims

Plaintiff asserts a number of tort claims including assault and battery, invasion of privacy, sexual harassment, infliction of mental, emotional and physical distress and negligence in connection with the incidents at Marcy, all arising out of New York State statutory and common law. (Am. Compl., Dkt No. 32, 77, 79, 80, 82). Defendants have moved for summary judgment dismissing these claims, arguing that pursuit of such tort claims in this action is statutorily precluded pursuant to New York Corrections Law § 24. (Def. Mem. of Law, Dkt. No. 69–4, at 12–13). Plaintiff counters that the United States Supreme Court ruled Corrections Law § 24 unconstitutional, and that, in any case, state law immunity does not extend to excessive force claims, which fall outside the ordinary scope of a correctional officer's employment duties. (Pl.'s Mem. of Law, Dkt. No. 73–1, at 9–12).

**\*12** New York Corrections Law § 24 precludes "the assertion of claims against corrections officers in any court, including the federal courts," by designating the New York State Court of Claims as the only available venue to bring

a claim for damages arising out of the acts committed by corrections officers within the scope of their employment." *Baker v. Coughlin,* 77 F.3d 12, 15 (2d Cir.1996).

In *Haywood v. Drown,* 556 U.S. 729, 129 S.Ct. 2108, 173 L.Ed.2d 920 (2009), cited by plaintiff in his response (Pl's Mem. of Law, Dkt. No. 73–1, at 11), the Supreme Court held that New York Corrections Law § 24 was unconstitutional to the extent that it precludes inmates from pursuing § 1983 actions in state or federal court. However, plaintiff overstates the scope of *Haywood* as it pertains to this litigation.

Although the *Haywood* decision found New York Corrections Law § 24 to be in violation of the Supremacy Clause, it did so only with respect to claims brought under federal law, such as § 1983. In applying supplemental jurisdiction, federal courts are bound to apply state substantive law to claims brought pursuant to state statute or common law. *Baker,* 77 F.3d at 15. The courts of this district have unanimously held that the *Haywood* decision does not affect the question of the district court's jurisdiction to hear pendent state law claims against DOCCS officials. *See, e.g., Rucano v. Koenigsmann,* No. 9:12–CV–35 (MAD/ RFT), 2014 WL 1292281, *16 (N.D.N.Y., Mar.31, 2014); *Rounds v. Thompson,* No. 9:12–CV–953, 2013 WL 3187074 at *4 (N.D.N.Y.2013) (collecting cases). If a state would not recognize a plaintiff's right to bring a state claim in state court, a federal court must not allow that claim to be appended to a federal law claim in federal court. *Baker,* 77 F.3d at 15.

Plaintiff alleges that he was assaulted during a pat-down by correctional officers as he traversed a prison walkway, and then again while being transported and questioned about the incident. (Amended Compl. Dkt No. 32, ¶ 24–43). Transporting an inmate and subduing that individual, should a disciplinary issue arise, is 'common conduct by a DOCCS officer or sergeant.' " *Crosby v. Russell,* No. 9:10–CV–595, 2014 WL 3809129, *5 (N.D.N.Y.2014) (quoting *Johnson v. N.Y. State Dep't of Corr. Servs. & Cmty. Supervision,* No. 11–CV–0079, 2013 WL 5347468, at *3 (W.D.N.Y. Sept. 23, 2013)). Ultimately, "an employee will be considered within the scope of his employment so long as he is discharging his duties, 'no matter how irregularly, or with what disregard of

instructions.' " *Id.,* 2014 WL 3809129, *6 (quoting *Cepeda v. Coughlin,* 128 A.D.2d 995, 996, 513 N.Y.S.2d 528 (3d Dep't 1987)). Therefore, based upon the allegations in the amended complaint, this court recommends that defendants' motion for summary judgment as to plaintiff's state law claims be granted, without leave to amend.

Even if New York Corrections Law § 24 did not apply, this court would still recommend dismissal of plaintiff's state law claims in light of the recommendations of dismissal of all federal causes of action in plaintiff's amended complaint. *See* 28 U.S.C. § 1367(c)(3) (the district court may decline to exercise supplemental jurisdiction over a claim if all other claims over which the court has original jurisdiction have been dismissed); *City of Chicago v. International College of Surgeons,* 522 U.S. 156, 172, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997); *Pitchell v. Callan,* 13 F.3d 545, 549 (2d Cir.1994).

**\*13 WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 69) be **GRANTED,** and that plaintiff's First Amendment and Eighth Amendment Claims be **DISMISSED WITHOUT PREJUDICE TO REFILING,** and that plaintiff's due process and state law claims be **DISMISSED WITH PREJUDICE.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

Filed May 20, 2015

**All Citations**

Slip Copy, 2015 WL 4394604

---

Footnotes

1   Plaintiff requested oral argument on defendant's motion. That request is denied, and this court will make its report and recommendation based upon the parties' papers and the record.

2   Defendants assert that plaintiff has failed to state a claim in connection with the misbehavior reports, since plaintiff's allegations of retaliation are conclusory and defendant was found guilty based upon the evidence at his disciplinary

hearing. (Def. Mem. of Law, Dkt. No. 69–4, at 8–10). In his response, plaintiff has requested that the court dismiss the claim for retaliatory misbehavior reports in order to focus on the assault claim. (Pl.'s Mem of Law, Dkt. No. 73–1, at 9). Because I am recommending that defendants be granted summary judgment on the retaliation claim due to plaintiff's failure to exhaust administrative remedies, I do not need to address whether summary judgment should be granted on the merits on this claim.

3    *See Hemphill v. State of New York,* 380 F.3d 680 (2d Cir.2004) (remanding case to determine if defendant's alleged threats constituted "special circumstances" justifying plaintiff's failure to exhaust); *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004) (whether failure to exhaust may be justified because plaintiff obtained favorable rulings on his grievances, but the relief that he was supposed to obtain was never forthcoming); *Johnson v. Testman,* 380 F.3d 691 (2d Cir.2004) (whether including claims in a disciplinary appeal may suffice for the exhaustion requirement); *Ortiz v. McBride,* 380 F.3d 649 (2d Cir.2004) (complete dismissal is not required when plaintiff brings both exhausted and unexhausted civil rights claims).

4    See, e.g., *Newman v. Duncan,* 04–CV–395 (TJM/DRH), 2007 WL 2847304, at * 2 n. 4 (N.D.N.Y. Sept. 26, 2007); *Shariff v. Coombe,* 655 F.Supp.2d 274, 285–86 n. 7 (S.D.N.Y.2009).

5    Defendants had previously raised the failure to exhaust administrative remedies as an affirmative defense in their answer to the Amended Complaint. (Dkt. No. 37, Def.Answer, 12).

6    The New York regulations specifically state that if a grievance is not decided within the time limits provided, the inmate may appeal to the next step. 7 N.Y.C.R.R. § 701.6(g)(ii)(2). In *Pacheco v. Drown,* 9:06–CV–20, 2010 WL 144400, at *19 & n. 21 (N.D.N.Y. Jan.11, 2010), U.S. District Judge Glenn Suddaby held that the failure by the IGRC or the Superintendent to timely respond to a grievance or first level appeal may be appealed to the next level, including the CORC, in order to properly complete the grievance process. *Accord, Murray v. Palmer,* 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, *2 & nn. 4, 6 (N.D.N.Y. March 31, 2010).

7    The court notes that if plaintiff had stated a valid due process claim, the fact that defendant Prack affirmed the disciplinary finding could constitute sufficient personal involvement. *See Thomas v. Calero,* No. 09–CV–5209, at *11–18 (S .D.N.Y. Mar. 17, 2011) (Rep't.-Rec.) (lengthy discussion of personal involvement as it relates to the affirmance of a disciplinary hearing and determination that such a claim would survive a motion to dismiss); *Rodriguez v. Selsky,* No. 9:07–CV–432, 2011 WL 1086001, at *4–7 (N.D.N.Y. Jan.25, 2011) (Rep't–Rec.), *adopted,* 2011 WL 830639 (N.D.N.Y., Mar.3, 2011).

---

    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 189955
Only the Westlaw citation is currently available.
United States District Court,
E.D. California.

Shaun KANE, Plaintiff,

v.

Richard PIERCE, et al., Defendants.

No. 1:06–cv–01564–OWW–GSA–PC.
|
Jan. 26, 2009.

West KeySummary

1    **Prisons**
        👉 Solitary Confinement;Isolation

    **Sentencing and Punishment**
        👉 Segregated or Solitary Confinement

An inmate's allegation that he was confined to
solitary confinement for 24 hours a day, five
days a week, and approximately 23 hours a
day during the two days a week on which he
was permitted to exercise in an indoor room,
stated an Eighth Amendment claim against
prison officials for deliberate indifference
to the inmate's inhumane conditions of
confinement. The inmate's claim that prison
officials were aware that he had been denied
outdoor exercise for an extended period of
time was sufficient to allege that the prison
officials acted with deliberate indifference to
the inmate's basic human needs. U.S.C.A.
Const.Amend. 8.

Cases that cite this headnote

FINDINGS AND RECOMMENDATIONS
RECOMMENDING MOTION TO DISMISS
FILED BY DEFENDANT YORKE BE
GRANTED IN PART AND DENIED IN PART

**Attorneys and Law Firms**

Shaun Kane, USP Big Sandy, Inez, KY, pro se.

Justin Boyd Atkinson, Jeffrey James Lodge, US
Attorney's Office, Fresno, CA, for Defendants.

OBJECTIONS DUE WITHIN THIRTY DAYS

GARY S. AUSTIN, United States Magistrate Judge.

**I. *Procedural History***

**\*1** Plaintiff Shaun Kane ("Plaintiff") is proceeding pro se
and in forma pauperis in this civil rights action pursuant to
42 U.S.C. § 1983 and *Bivens v. Six Unknown Named Agents
of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct.
1999, 29 L.Ed.2d 619 (1971).[1] Plaintiff filed this action on
November 7, 2006, while Plaintiff was a federal prisoner
housed at the Fresno County Jail. The Court screened
Plaintiff's complaint pursuant to 28 U.S.C. § 1915A, which
applies to all civil actions in which a prisoner seeks redress
from a governmental entity or officer or employee of a
governmental entity.

On April 10, 2007, the Court issued an order directing
Plaintiff to either file an amended complaint or notify the
Court of his willingness to proceed only on the claims
found to be cognizable. Plaintiff opted to amend and filed
a first amended complaint on April 19, 2007. Plaintiff
obtained leave to amend the first amended complaint and
filed a second amended complaint on September 6,
2007. On February 27, 2008, after screening Plaintiff's
second amended complaint ("the complaint"), the Court
issued an order finding service of process appropriate for
Defendants Richard Pierce, Margaret Mims, Jose Flores,
Charlotte Tilkes, and Russell Yorke. Currently before the
Court is a Motion to Dismiss and/or For Judgment on
the Pleadings filed by Defendant Yorke ("Defendant") on
October 16, 2008.[2] On December 19, 2008, Plaintiff filed
a Reply and Opposition to Defendant Yorke's Motion
to Dismiss. Defendant submitted a Reply to Plaintiff's
opposition on December 31, 2008.

**II. *Motion to Dismiss***

"The focus of any Rule 12(b)(6) dismissal ... is the
complaint." *Schneider v. California Dept. of Corr.,* 151
F.3d 1194, 1197 n. 1 (9th Cir.1998). In considering a

motion to dismiss for failure to state a claim, the court must accept as true the allegations of the complaint in question, *Hospital Bldg. Co. v. Rex Hospital Trustees,* 425 U.S. 738, 740, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976), construe the pleading in the light most favorable to the party opposing the motion, and resolve all doubts in the pleader's favor, *Jenkins v. McKeithen,* 395 U.S. 411, 421, 89 S.Ct. 1843, 23 L.Ed.2d 404, *reh'g denied,* 396 U.S. 869, 90 S.Ct. 35, 24 L.Ed.2d 123 (1969). A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). " 'The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test.' " *Jackson v. Carey,* 353 F.3d 750, 755 (9th Cir.2003) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)); *see also Austin v. Terhune,* 367 F.3d 1167, 1171 (9th Cir.2004).

Defendant advances three arguments in the Motion to Dismiss. First, Defendant correctly asserts that Plaintiff's claims against Defendant in his official capacity as a U.S. Marshal are not cognizable. Plaintiff may not seek monetary damages against Defendant in his official capacity, as "no Bivens-like cause of action is available against federal agencies or federal agents sued in their official capacities." *Ibrahim v. Dep't of Homeland Sec.,* 538 F.3d 1250, 1257 (9th Cir.2008) (citing *FDIC v. Meyer,* 510 U.S. 471, 485–86, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994) (discussing sovereign immunity); *Nurse v. United States,* 226 F.3d 996, 1004 (9th Cir.2000)). Plaintiff's claims against Defendant in his official capacity for prospective relief are moot, as Plaintiff is no longer housed at the Fresno County Jail and has not demonstrated a reasonable expectation of returning there. *See ACLU v. Lomax,* 471 F.3d 1010, 1017 (9th Cir.2006) (request for relief is moot if there is no reasonable expectation that plaintiff will again be subject to same injury).

**\*2** Second, Defendant contends that the complaint fails to state a claim for relief because Plaintiff does not allege that Defendant was personally involved in the alleged constitutional deprivation. Alternatively, Defendant contends that even if the complaint states a claim against Defendant for violating Plaintiff's

constitutional rights, Defendant is entitled to judgment on the pleadings on the grounds of qualified immunity.

### A. *The Complaint States a Claim for Relief Against Defendant Yorke*

The Eighth Amendment protects prisoners from inhumane methods of punishment and from inhumane conditions of confinement. *Morgan v. Morgensen,* 465 F.3d 1041, 1045 (9th Cir.2006). Extreme deprivations are required to make out a conditions of confinement claim, and only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation. *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (citations and quotations omitted). "An Eighth Amendment claim that a prison official has deprived inmates of humane conditions must meet two requirements, one objective and one subjective. Under the objective requirement, the prison official's acts or omissions must deprive an inmate of the minimal civilized measure of life's necessities. The subjective requirement, relating to the defendant's state of mind, requires deliberate indifference." *Lopez v. Smith,* 203 F.3d 1122, 1132–33 (9th Cir.2000) (quoting *Allen v. Sakai,* 48 F.3d 1082, 1087 (9th Cir.1995)).

### 1) *Objective Deprivation of a Constitutional Right*

"Some form of regular outdoor exercise is extremely important to the psychological and physical well being of [prisoners]." *Spain v. Procunier,* 600 F.2d 189, 199 (9th Cir.1979). "Deprivation of outdoor exercise violates the Eighth Amendment rights of inmates confined to continuous and long-term segregation." *Keenan v. Hall,* 83 F.3d 1083, 1089 (9th Cir.1996) (citing *Spain,* 600 F.2d at 199* (term of years confined in segregated unit without outdoor exercise constitutes cruel and unusual punishment)); [3] *see also Allen,* 48 F.3d at 1087 (six-week period in which prisoner was allowed only forty-five minutes per week of outdoor exercise sufficient to state Eighth Amendment claim); *Lopez,* 203 F.3d at 1133 (allegation of indefinite and thus potentially long-term confinement without outdoor exercise sufficient to state a claim); *Toussaint v. Yockey,* 722 F.2d 1490, 1493 (9th Cir.1984) (denial of outdoor exercise to inmates assigned to administrative segregation for over one year raised "substantial constitutional question"); *Hearns v. Terhune,* 413 F.3d 1036, 1042 (9th Cir.2005) (allegation that conditions prohibited prisoner from exercising in

outdoor yard sufficient to withstand 12(b)(6) motion); *but see LeMaire v. Maass,* 12 F.3d 1444, 1458 (9th Cir.1993) (denial of outdoor exercise for forty-five day period due to disciplinary infractions held constitutional). An allegation that prison officials denied a prisoner outdoor exercise for an extended, continuous period of time is sufficient to state an objective violation of a prisoner's constitutional right to humane conditions of confinement. *See Lopez,* 203 F.3d at 133.

**\*3** According to the complaint, Plaintiff was housed in the Fresno County Jail's administrative lock-down unit ("AJ2D"), which entailed solitary confinement in a single-man cell with effectively no windows. Plaintiff alleges that the noise level in AJ2D can be intolerable, and that the unit has a cockroach problem. Plaintiff alleges that he was confined to his cell for twenty-four hours a day, five days a week, and approximately twenty-three hours a day during the two days a week on which he was permitted to exercise in an indoor room. Plaintiff alleges that he was deprived of all outdoor exercise from December of 2005 to September of 2006 and from January of 2007 to March of 2007. Plaintiff has pled sufficient facts to state an objective violation of his constitutional rights under the standard articulated by the Ninth Circuit in *Allen.* 48 F.3d at 1087.

**2)** *Subjective Requirement–Deliberate Indifference*
In order to plead deliberate indifference, a prisoner must allege that prison officials knew of and disregarded a substantial risk of serious harm to the prisoner. *E.g., Farmer v. Brennan,* 511 U.S. 825, 847, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Frost v. Agnos,* 152 F.3d 1124, 1128 (9th Cir.1998). A claim that prison officials were aware that a prisoner had been denied outdoor exercise for an extended period of time is sufficient to allege that the prison officials acted with deliberate indifference to the prisoner's basic human needs. *See Perkins v. Kansas Dep't of Corrections,* 165 F.3d 803, 810 (10th Cir.1999) (where complaint alleged that officials had knowledge plaintiff was being denied outdoor exercise, "factfinder could infer both that prison officials knew of a substantial risk of harm to plaintiff's well being ... and that they disregarded that harm"); *see also Allen,* 48 F.3d at 1088 (summary judgment on deliberate indifference issue inappropriate where prisoner produced evidence that prison officials were aware that prisoner was denied outdoor exercise); *Lopez,* 203 F.3d at 1133 (evidence showing that defendants ignored complaints about lack of outdoor exercise sufficient to defeat summary judgment

on Eighth Amendment claim). Supervisory personnel are generally not liable under section 1983 for the actions of their subordinates under a theory of respondeat superior, and therefore, when a named defendant holds a supervisory position, the causal link between her and the claimed constitutional violation must be specifically alleged. *See Fayle v. Stapley,* 607 F.2d 858, 862 (9th Cir.1979); *Mosher v. Saalfeld,* 589 F.2d 438, 441 (9th Cir.1978), *cert. denied,* 442 U.S. 941, 99 S.Ct. 2883, 61 L.Ed.2d 311 (1979).

**a. Supervisory Liability**
An individual may not be held liable in a *Bivens* action based on the theory of respondeat superior. *Terrell v. Brewer,* 935 F.2d 1015, 1017 (9th Cir.1991) (citations omitted). However, supervisory personnel may be liable for constitutional violations committed by others where the supervisor knew of ongoing constitutional violations and failed to act to prevent them. *Hansen v. Black,* 885 F.2d 642, 646 (9th Cir.1989) (internal citations omitted); *Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir.1989); *see also Jett v. Penner,* 439 F.3d 1091, 1098 (9th Cir.2006) (warden's failure to respond to prisoner's letter advising warden of medical staff's inadequate treatment sufficient to raise triable issue of fact regarding whether warden was deliberately indifferent). A supervisor may be liable if there exists a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation. *E.g., Hansen,* 885 F.2d at 646. A supervisor's failure to transfer a prisoner out of a facility may constitute deliberate indifference where the supervisor 1) knows that the conditions of confinement expose the prisoner to serious risk of harm, and 2) the supervisor has the authority to transfer the prisoner to another facility. *See Sain v. Wood,* 512 F.3d 886, 889 (7th Cir.2008) (civil detainee's allegations sufficient to state a claim against director of clinic where director failed to transfer plaintiff out of constitutionally inadequate facility);[4] *see also Redman v. County of San Diego,* 942 F.2d 1435, 1447 (9th Cir.1991) ( "requisite causal connection can be established by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury"); *Berg v. Kincheloe,* 794 F.2d 457, 462 (9th Cir.1986) (supervisor could be held liable for knowingly exposing prisoner to risk of danger by placing prisoner in unsafe work environment).

**\*4** Because Defendant did not have direct supervisory authority over the persons responsible for denying Plaintiff outdoor exercise, Plaintiff's claim is distinguishable from much of the authority concerning supervisory liability. Plaintiff seeks to impose liability on Defendant, a U.S. Marshal, for constitutional deprivations caused by persons acting under the color of state law. As a federal officer, Defendant has no direct control over the employees or the conditions of confinement at Fresno County Jail. *See e.g. Wilson v. Blankenship,* 163 F.3d 1284, 1989 n. 6 (11th Cir.1998) (commenting that even if defendant, a U.S. Marshal, knew of unconstitutional conditions of confinement at county jail, plaintiff provided no evidence that defendant had any control over the operation of the jail). Nevertheless, because the ultimate issue underlying the question of Defendant's liability is whether there is a sufficient causal connection between Defendant's act or omission and the denial of outdoor exercise to Plaintiff, if the Court finds that Defendant could have prevented Plaintiff's rights from being violated but failed to do so with deliberate indifference to Plaintiff's needs, Defendant may be held liable. *See Jordan v. Doe,* 38 F.3d 1559, 1566 (11th Cir.1994) (finding prisoner's complaint sufficient to state a claim against U.S. Marshal where complaint alleged that defendant had knowledge of unconstitutional conditions of confinement at county jail where plaintiff, a federal pretrial detainee, was housed); *Wilson,* 163 F.3d at 1288–89 (reaching qualified immunity analysis as to plaintiff's claims against U.S. Marshal); [5] *see also Loe v. Armistead,* 582 F.2d 1291, 1296 (4th Cir.1978) (complaint sufficient to state claim against U.S. Marshal where plaintiff alleged that Marshal had notice of inadequate medical treatment being afforded to plaintiff by county jail officials.)

The complaint states that Plaintiff sent a letter to Defendant in January of 2006 advising Defendant that the exercise policy at Fresno County Jail permitted denial of outdoor exercise to Plaintiff. In contrast to the defendants in *Wilson* and *Jordan,* who did not have actual knowledge that their prisoners' conditions of confinement were unconstitutional, the Court must presume that Defendant Yorke received Plaintiff's letter and had knowledge that Plaintiff was being held in unconstitutional conditions. [6] *See Jett,* 439 F.3d at1098 (where a prisoner alleges that he sent a letter to a prison administrator requesting help, the prisoner is entitled to an inference that the administrator received the letter and had knowledge of the prisoner's request). Although Defendant was not directly responsible for the denial of outdoor exercise to Plaintiff, it can be inferred that Defendant failed to cause Plaintiff to be transferred out of Fresno County Jail and thus permitted the constitutional violation to continue for an extended period of time. Under minimal federal notice pleading standards, the Court finds Plaintiff's allegations are sufficient to state a claim against Defendant for deliberate indifference to Plaintiff's inhumane conditions of confinement. Fed.R.Civ.P. 8(a); *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007); *Alvarez v. Hill,* 518 F.3d 1152, 1157–58 (9th Cir.2008).

### B. Qualified Immunity

**\*5** Qualified immunity analysis entails a three-step inquiry. *See, e.g., Saucier v. Katz,* 533 U.S. 194, 201–205, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *but see Pearson v. Callahan,* No. 07–751, slip op. 13 (U.S. Jan. 21, 2009); 2009 U.S. Lexis 591, 23, 2009 WL 128768 (holding that Saucier analysis should not be regarded as mandatory). [7] The threshold question is whether, taken in the light most favorable to the plaintiff, the facts alleged show that an official's conduct violated a constitutional right. *Id.* at 201. If a plaintiff has alleged facts sufficient to state a constitutional violation, the court must determine whether the constitutional right violated was "clearly established ... in light of the specific context of case." *Id.* Finally, where the factual allegations of the complaint set forth a violation of a clearly established constitutional right, the last inquiry is whether the official's mistake as to what the law requires is reasonable. *Id.* at 206. "If the officer's mistake as to what the law requires is reasonable ... the officer is entitled to the immunity defense." *Id.*

#### 1. The Constitutional Violation Requirement

As discussed above in section A, the complaint states a claim against Defendant for violation of Plaintiff's Eighth Amendment right to humane conditions of confinement. Accordingly, the Court must determine whether a prisoner's right to outdoor exercise was well established at the time of the alleged violation and whether Defendant's conduct was reasonable.

#### 2. The "Well Established" Requirement

In order for a constitutional right to be "well established" for the purposes of qualified immunity analysis, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing

violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.* (citations omitted). The notion that denial of outdoor exercise for extensive periods of time violates the Eighth Amendment has been well established in the Ninth Circuit since at least the 1980s. *See Allen,* 48 F.3d at 1088 ("after *Spain* and *Toussaint,* defendants cannot legitimately claim that their duty to provide regular outdoor exercise to [plaintiff] was not clearly established"); *see also Lopez,* 203 F.3d at 1133 (utilizing *Allen* as baseline standard for evaluating prisoners claim regarding six-week denial of outdoor exercise).

Plaintiff alleges he was generally confined to his cell alone for twenty-four hours a day and was denied any outdoor recreation for a period of over nine months. The unlawfulness of such conditions is apparent in light of well-settled Ninth Circuit precedent.[8] Accordingly, Plaintiff has alleged a violation of the well established constitutional right to outdoor exercise as set forth in *Spain* and its progeny. 600 F.2d at 199; *Allen,* 48 F.3d at 1088; *Lopez,* 203 F.3d at 1133; *Hearns v. Terhune,* 413 F.3d at 1042; *Keenan v. Hall,* 83 F.3d at 1089.

### 3. *Reasonableness of Defendant's Mistake*

**\*6** Defendant is entitled to qualified immunity if, despite having violated a well established constitutional right, Defendant's mistake as to what the law required of him was reasonable. *Saucier,* 533 U.S. at 205. The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular conduct and to "ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Id.*

According to the complaint, Plaintiff sent Defendant a letter informing Defendant that Plaintiff was being denied outdoor exercise for an extended period of time. Reasonable prison officials know that an inmate housed in solitary confinement may not be deprived of all outdoor exercise for extended periods of time. *See Allen v. City & County of Honolulu,* 39 F.3d 936, 940 (9th Cir.1994)

("a reasonable prison official should have known that he could not deprive Allen of [outdoor exercise]...."). The Court must presume Defendant received Plaintiff's letter and had knowledge of Plaintiff's complaint, *see Jett,* 439 F.3d at 1098, and Defendant does not contend otherwise. Further, Defendant does not identify any justification for his failure to transfer Plaintiff out of Fresno County Jail and does not contend he took *any* action in response to Plaintiff's letter. Accordingly, the Court cannot say that Defendant's conduct was reasonable as a matter of law.

### III. *Conclusion and Recommendations*

For the reasons set forth herein, the Court HEREBY RECOMMENDS that Defendant's Motion to Dismiss and/or for Judgment on the Pleadings filed on October 16, 2008, be GRANTED IN PART and DENIED IN PART as follows:

1. Defendant's motion to dismiss Plaintiff's claim against Defendant Yorke in his individual capacity, for failure to state a claim, be DENIED;

2. Defendant's motion for judgment on the pleadings on the grounds of qualified immunity be DENIED; and

3. Defendant's motion to dismiss Plaintiff's claim against Defendant Yorke in his official capacity be GRANTED.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). Within **thirty (30) days** after being served with these Findings and Recommendations, the parties may file written objections with the court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst,* 951 F.2d 1153 (9th Cir.1991).

IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2009 WL 189955

Footnotes

1       Section 1983 provides a remedy for constitutional violations committed by persons acting under the color of state law. *Bivens* establishes a similar remedy for constitutional violations committed by federal actors. Plaintiff's complaint names both federal and state officials, however, the instant motion concerns only Defendant Yorke, a federal actor.

2       Defendants Mims, Flores, and Tilkes filed a separate Motion to Dismiss on June 13, 2008. Defendant Pierce has not been served.

3       *Spain* does not stand for the proposition that denial of outdoor exercise is a per se violation of the Eighth Amendment. 600 F.2d at 199 (noting that it was not necessary to decide the issue because totality of conditions were sufficient to constitute cruel and unusual punishment). The Ninth Circuit elaborated the holding of *Spain* in *Allen:* "in *Spain* ... [w]e emphasized that the plaintiffs were in long-term incarceration where they were in continuous segregation, generally spending twenty-four hours a day in their cells. *Under those conditions deprivation of outdoor exercise constituted cruel and unusual punishment." Allen,* 48 F.3d at 1087 (emphasis added). Plaintiff's allegations parallel the allegations pled in *Spain* and discussed in *Allen,* as Plaintiff alleges that he was denied outdoor exercise for over nine months while housed in administrative segregation, which generally entailed twenty-four hour a day lock-down.

4       In *Sain,* the Seventh Circuit ultimately reversed the district court's denial of qualified immunity to the defendant, holding that the defendant's conduct was reasonable under the circumstances. The Seventh Circuit's analysis of the qualified immunity issue demonstrates approval of the district court's conclusion that the plaintiff had stated a claim against the defendant by alleging that the defendant knew of plaintiff's conditions of confinement and failed to exercise his authority to transfer plaintiff to another facility.

5       In *Jordan* and in *Wilson,* the Eleventh Circuit Court of Appeals held that the defendants were entitled to qualified immunity. The fact that the Court reached the qualified immunity inquiry necessarily implies that the allegations of the complaint were sufficient to state a claim against the U.S. Marshals involved in each case.

6       Dicta from *Wilson* suggests that even if the defendant U.S. Marshal had knowledge of the unconstitutional conditions at the jail where plaintiff was housed, the defendant would have still been entitled to qualified immunity because she did not have control over the conditions of confinement at the jail. 163 F.3d at 1989 n6. The accuracy of Footnote 6 is questionable in light of the authority discussed above, *see Jordan,* 38 F.3d at 1566 (knowledge of conditions rendered U.S. Marshal subject to liability), but Plaintiff's complaint is distinguishable from the complaint in *Wilson* in any event. In *Wilson,* the defendant U.S. Marshal was a criminal investigator and was only responsible for *transporting* the plaintiff to the jail; there was no allegation that the defendant had authority to transfer the plaintiff elsewhere. Here, however, Plaintiff alleges Defendant Yorke was responsible for the *decision* to continue housing Plaintiff at Fresno County Jail despite knowledge of the jail's unconstitutional policy.

7       Under *Pearson,* the Court has discretion to avoid the first prong of the *Saucier* inquiry if it appears that the constitutional right at issue is not clearly established. Because Plaintiff's allegations set forth a violation of a clearly established constitutional right, the Court adheres to the *Saucier* framework in deciding Defendants' motion.

**8**      The right to outdoor exercise may not be well established in other circuits. *See Hernandez v. Velasquez,* 522 F.3d 556, 561(5th Cir.2008) (denial of outdoor exercise for 13 months not unconstitutional because defendant did not demonstrate risk of "serious harm" as required by deliberate indifference standard); *Anderson v. Romero,* 72 F.3d 518, 528 (7th Cir.1995) (distinguishing *Spain* and *Allen* on the grounds that denial of outdoor exercise was only one of several factors that rendered overall conditions of confinement unconstitutional); *Rodgers v. Jabe,* 43 F.3d 1082, 1083 (6th Cir.1995) (granting officials qualified immunity on the grounds that right to outdoor exercise was not clearly established). Because the touchstone of the "well established" inquiry is whether the unlawfulness of an official's conduct is apparent, *see Anderson,* 483 U.S. at 640, the law of the circuit in which the conduct occurred necessarily frames the inquiry. In the Ninth Circuit, the unlawfulness of denying a prisoner housed in solitary confinement outdoor exercise for nine months is apparent. *See Allen,* 48 F.3d at 1088.

**End of Document**      © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 674127
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
E.D. California.

Shaun KANE, Plaintiff,
v.
Richard PIERCE, et al., Defendants.

No. 1:06-cv-01564-OWW-GSA PC.
|
March 16, 2009.

**Attorneys and Law Firms**

Shaun Kane, USP Big Sandy, Inez, KY, pro se.

Justin Boyd Atkinson, Jeffrey James Lodge, U.S. Attorney's Office, Fresno, CA, for Defendants.

ORDER ADOPTING FINDINGS AND RECOMMENDATIONS, AND GRANTING IN PART AND DENYING IN PART DEFENDANT YORKE'S MOTION TO DISMISS

ORDER REQUIRING DEFENDANT YORKE TO FILE A RESPONSE TO THE SECOND AMENDED COMPLAINT WITHIN THIRTY DAYS

OLIVER W. WANGER, District Judge.

**\*1** Plaintiff Shaun Kane ("Plaintiff") is a federal prisoner proceeding pro se and in forma pauperis in this civil rights action. The matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72-302.

On January 26, 2009, the Magistrate Judge filed Findings and Recommendations recommending Defendant Yorke's motion to dismiss be granted in part and denied in part. The parties were granted thirty days within which to file objections. Objections were due on or before March 2, 2009, and none were filed.

In accordance with the provisions of 28 U.S.C. § 636(b)(1)(C), this Court has conducted a *de novo* review of this case. Having carefully reviewed the entire file, the Court finds the Findings and Recommendations to be supported by the record and by proper analysis.

Accordingly, IT IS HEREBY ORDERED that:

1. The Findings and Recommendations, filed January 26, 2009, is adopted in full;

2. Defendant Yorke's motion to dismiss, filed October 16, 2008, is GRANTED IN PART and DENIED IN PART as follows:

    a. Defendant's motion to dismiss the claim against him in his individual capacity is DENIED;

    b. Defendant's motion for judgment on the pleadings based on qualified immunity is DENIED; and

    c. Defendant's motion to dismiss the official capacity claim against him is GRANTED; and

3. Defendant Yorke shall file a response to Plaintiff's second amended complaint within thirty days from the date of service of this order.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 674127

---

**End of Document**                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Not Reported in F.Supp.2d, 2011 WL 4055414 (N.D.N.Y.)

(Cite as: 2011 WL 4055414 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Joseph PARKS, Plaintiff,
v.
Joseph T. SMITH, et al., Defendants.
No. 9:08–CV–0586 (TJM/GHL).

Sept. 12, 2011.
Joseph Parks, Wallkill, NY, pro se.

Aaron M. Baldwin, New York State Attorney General, Albany, NY, for Defendant.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

**I. INTRODUCTION**

**\*1** This *pro se* action brought pursuant to 42 U.S.C. § 1983 was referred by this Court to the Hon. George H. Lowe, United States Magistrate Judge, for a Report and Recommendation pursuant to 28 U.S .C. § 636(b) and Local Rule N.D.N.Y. 72.3(c). In his March 29, 2011 Report–Recommendation, Magistrate Judge Lowe recommended that Defendants' motion for summary judgment (Dkt. No. 51) be granted. Plaintiff has filed objections to this recommendation.

**II. STANDARD OF REVIEW**

When objections to a magistrate judge's report and recommendation are lodged, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1)(C). General or conclusory objections, or objections which merely recite the same arguments presented to the magistrate judge, are reviewed for clear error. *Farid v. Bouey,* 554 F.Supp.2d 301, 306 n. 2 (N.D.N.Y.2008); *see Frankel v. N.Y.C.,* 2009 WL 465645 at \*2 (S.D.N.Y. Feb.25, 2009).[FN1] After reviewing the Report–Recommendation,

the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b)(1)(C).

FN1. The Southern District wrote in *Frankel:*

The Court must make a *de novo* determination to the extent that a party makes specific objections to a magistrate's findings. *United States v. Male Juvenile,* 121 F.3d 34, 38 (2d Cir.1997). When a party makes only conclusory or general objections, or simply reiterates the original arguments, the Court will review the report strictly for clear error. *See Pearson–Fraser v. Bell Atl.,* No. 01 Civ. 2343, 2003 W L 43367, at \*1 (S.D.N.Y. Jan. 6, 2003); *Camardo v. Gen. Motors Hourly–Rate Employees Pension Plan,* 806 F.Supp. 380, 382 (W.D.N.Y.1992). Similarly, "objections that are merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original [papers] will not suffice to invoke de novo review." *Vega v. Artuz,* No. 97 Civ. 3775, 2002 W L 31174466, at \*1 (S.D.N.Y. Sept.30, 2002).

2009 W L 465645, at \*2.

**III. DISCUSSION**

Having reviewed *de novo* those portions of the Report–Recommendation that Plaintiff has lodged objections to, the Court determines to adopt the recommendations for the reasons stated in Magistrate Judge Lowe's thorough report.

**IV. CONCLUSION**

Therefore, the Court **ADOPTS** the recommendations made by Magistrate Judge Lowe in their entirety. Accordingly, it is hereby **ORDERED** that Defendants' motion for summary judgment (Dkt. No. 51) is

Not Reported in F.Supp.2d, 2011 WL 4055414 (N.D.N.Y.)

(Cite as: 2011 WL 4055414 (N.D.N.Y.))

**GRANTED** and the remaining claims in this action are **DISMISSED.** The Clerk is instructed to enter judgment and close the file in this matter.

   **IT IS SO ORDERED.**

N.D.N.Y.,2011.

Parks v. Smith
Not Reported in F.Supp.2d, 2011 WL 4055414 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2012 WL 987726 (N.D.N.Y.)
**(Cite as: 2012 WL 987726 (N.D.N.Y.))**

Ⓗ
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Aror Ark O'DIAH, Plaintiff,

v.

Brian FISCHER; Michael Corcoran; Malcolm R.
Cully; Ronald W. Moscicki; Stephen Guter; C.O.
Ramsay; D. Richardson; J. Pepin; J. Hahn; Mr. &
Lt. Shaw; Scott C. Carlsen; Andrew Cuomo, Attorney General for the State of New York; K. Thomas,
Correctional Officer, Cayuga Correctional Facility;
and D. Swierk, Mail Room Clerk, Lakeview Shock
Incarceration Facility, Defendants[FN1].

> FN1. Eleven other defendants were previously terminated or had the claims against
> them transferred to other districts. *See* Dkt.
> Nos. 51, 61.

No. 08–CV–941 (TJM/DRH).
Feb. 28, 2012.

Aror Ark O'Diah, Attica, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for
the State of New York, Roger W. Kinsey, Esq., Assistant Attorney General, of Counsel, Albany, NY,
for Defendants.

**REPORT–RECOMMENDATION AND ORDER**[FN2]

> FN2. This matter was referred to the undersigned for report and recommendation
> pursuant to 28 U.S.C. § 636(b) and
> N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate
Judge.

**\*1** Plaintiff pro se Aror O'Diah ("O'Diah"), an
inmate in the custody of the New York State Department of Correctional and Community Supervi-

sion ("DOCCS"), brings this action pursuant to 42
U.S.C. § 1983 alleging that defendants, New York's
prior Attorney General and thirteen DOCCS officials and employees,[FN3] violated his constitutional rights under the First, Fourth, Fifth, Sixth,
Eighth, and Fourteenth Amendments. Am. Compl.
(Dkt. No. 55). O'Diah also asserts claims under 42
U.S.C. §§ 1985 and 1986, Title II of the Americans
with Disabilities Act ("ADA"), 42 U.S.C. § 12101
*et seq.,* and various state law provisions. Dkt. No.
70, ¶¶ 45–49. Presently pending is the moving defendants' motion to dismiss the amended complaint
pursuant to Fed.R.Civ.P. 12(b)(6). Dkt. No. 66.
O'Diah opposes the motion.[FN4] Dkt. No. 70. For
the following reasons it is recommended that defendants' motion be granted in part and denied in
part.

> FN3. *See* note 1 *supra.*

> FN4. O'Diah's opposition includes new
> claims against new defendants. Dkt. No.
> 70, ¶¶ 5–6, 26, 31, 38. These claims and
> defendants are not subjects of the present
> motion.

**I. Background**

The facts are related herein in the light most favorable to O'Diah as the non-moving party. *See*
subsection II(A) *infra.*

**A. June 2007**

On June 5 and July 27, 2007, the Queens
County Court denied O'Diah's state court motions
challenging his conviction and sentencing. Am.
Compl. ¶ 29. O'Diah appealed the denials, but the
appeals were not processed or docketed. *Id.* O'Diah
alleges that defendant Corcoran caused he appeals
not to be processed properly. *Id.*

**B. October 2007 through December 2007**[FN5]

> FN5. O'Diah claims that in May 2007, he
> was infected with bacterial and in September 2007 that while he required antibiotics

for the bacterial infection, he was instead diagnosed with cancer, epilepsy, and tuberculosis. Am. Comp. ¶¶ 7–8. However, O'Diah has failed to link these actions to any specific defendants. Thus, he has failed to allege that anyone was personally involved and claims related to these events should be dismissed.

On October 24, 2007, via defendants Ramsay and Corcoran, O'Diah applied for special access to use the law library for extended hours. Am. Compl. ¶ 43. The application was granted from October 24 through November 24, 2008 so that O'Diah could complete pending legal work. *Id.* ¶ 44. O'Diah was under the impression that he had the ability to terminate this authorization whenever he desired. *Id.* ¶ 45. In early November, O'Diah asked Ramsay to remove his name from the call out sheets as he no longer needed the special access to the library because his legal work was completed. *Id.* ¶ 46. Ramsay agreed to remove O'Diah's name from the list and also instructed him on how to renew the application if he required additional library time in the future. *Id.*

On November 11, 2007, O'Diah received a call to visit the library, which was confusing as O'Diah had previously had a conversation with Ramsay in which Ramsay indicated that he would remove O'Diah from the call out list. Am. Compl. ¶ 47. On November 12, O'Diah received a misbehavior report for failing to use the special access pass on November 11th. *Id.* ¶ 48. On or about November 21, 2007, Ramsay, who was allegedly coerced by Mawhir, testified that he did not remember having a conversation with O'Diah about him no longer needing to use the library pass. *Id.* ¶ 50. Ramsay, Mawhir, Corcoran and Carlsen allegedly conspired to have O'Diah found guilty of the disciplinary charge. *Id.* ¶ 51. Additionally, that day, Mawhir also conspired with other inmates to have them instigate an altercation with O'Diah so that he could be given additional disciplinary charges because O'Diah had filed grievances against Corcoran and

Carlsen. *Id.* ¶ 49.

**\*2** After that date, Ramsay, Mawhir and Corcoran encouraged other inmates to instigate fights with O'Diah and pour cold water on his body and personal effects. Am. Compl. ¶ 51. Due to the tension these defendants created, O'Diah refused to go into the recreation yard for fear of his personal safety. *Id.* ¶ 53. O'Diah lodged complaints with Mawhir and Ramsay, but they were ignored and he was told that he was getting what he deserved after filing grievances against the state and its employees. *Id.* ¶ 52.

### C. March 2008

On March 7, 2008, O'Diah was denied his legal mail, even though he had received prior authorization from defendant Thomas and made subsequent arrangements with an advocate to have him pick up the documents from the prison. Am. Compl. ¶ 54. Thomas had accessed O'Diah's property that day, but influenced by Mawhir, refused to deliver the legal property to O'Diah so that he could provide it to his legal advocate. *Id.* ¶ 55. The inability of O'Diah's legal advocate to receive his legal papers represented a denial of access to the courts. *Id.* ¶ 56.

Also on March 7, Thomas issued O'Diah a false misbehavior report for O'Diah's failure to obey a direct order. Am. Compl. ¶ 57. This issuance of this charge was influenced by Mawhir and Corcoran. *Id.* On March 8, O'Diah received the misbehavior report and was sent to keeplock.[FN6] *Id.* ¶ 58. While keeplocked, O'Diah was unable to file a motion to the court in one of his federal cases in the Eastern District of New York and the case was dismissed for a failure to prosecute. *Id.*

> FN6. Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." *Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995); N.Y. Comp.Codes R. & Regs. tit. 7, § 301.6.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

On March 19, 2008, defendant Guter arrived at O'Diah's cell with new medication for him to take with which O'Diah was unfamiliar. Am. Compl. ¶ 59. [FN7] O'Diah requested the information insert for the drug, which would contain the drug's name, purpose and reported side effects, but Guter refused. *Id.* ¶ 60. O'Diah refused to take the medication, so Guter summoned Thomas and the two, at the direction of Mawhir, forced O'Diah to take the unknown medication. *Id.* ¶ 61. After taking the medication O'Diah experienced serious intestinal issues including bowel movements, stomach pain, bleeding, and inflammation of his rectum. *Id.* This occurred despite the facility's directive that inmates retained the right to refuse medication. *Id.* ¶ 62. O'Diah contends that this medication was forced upon him due to his national origin. [FN8] *Id.*

> FN7. O'Diah's amended complaint contains generalized complaints that all defendants tried to provide him with the wrong medication in May, July and September of 2007 and also took away his personal food, forcing him to eat the food from the correctional facility which irritated his stomach. Am. Compl. ¶ 28. As O'Diah failed to indicate which defendants were involved in these alleged Eighth Amendment violations, they will not be further discussed. However, as O'Diah did specify dates and defendants at a later time who allegedly violated similar rights with similar actions, those actions, and only those actions, will be addressed.

> FN8. In O'Diah's opposition, he claims that he was targeted, kidnaped and had his constitutional rights violated because of his African origin. Dkt. No. 70, ¶¶ 34, 36.

On March 19, Guter also issued a misbehavior report against O'Diah for refusing to take the unknown medication. Am. Compl. ¶ 64. Sometime thereafter, non party Rocker conducted a disciplinary hearing and determined that O'Diah was within his rights to refuse to ingest the medication. *Id.* ¶ 65. While Rocker initially stated that he would have dismissed the charge, he ended up sentencing O'Diah to ninety days keeplock due to Corcoran's influence over him. *Id.* ¶ 66. Rocker then reversed himself and suspended O'Diah's sentence. *Id.*

### D. May–June 2008

**\*3** On May 9, 2008, O'Diah could not perform the work required for his work placement because the exposure to cigarette smoke, butts, and ashes aggravated his preexisting medical conditions. Am. Compl. ¶ 68. [FN9] O'Diah suffered from dizziness, headaches, shoulder and back pain, and high blood pressure. *Id.* O'Diah contends that defendants Corcoran, Carlsen, Fischer, Cuomo, and Cully were all aware of his medical conditions and disregarded them when they placed him in the work program. *Id.*

> FN9. O'Diah also contends that he was forced to work in a position exacerbating his medical conditions due to exposure to cigarettes sometime after January 26, 2007. Am. Compl. ¶ 7. Whether these refer to the same events is unclear as he did not name specific defendants, dates, or facts. Additionally, O'Diah claims that the root cause of his pre-existing medical conditions was his degenerative disc disease in his back. Dkt. No. 70, ¶ 4.

On May 10, 2008, while working at his placement, O'Diah suffered from irregular and elevated blood pressure, headaches, and increased pain as a result of having to clean up the cigarettes. Am. Compl. ¶ 69. On May 17, O'Diah received emergency treatment and was informed that his blood pressure was elevated and irregular, so he was placed on a "rest" until June 6 and advised that he should be examined by the physician when he came on duty the following week. *Id.* ¶ 71. Medical staff attended to O'Diah daily, though he still suffered from headaches and dizziness. *Id.* On May 19, 2008, O'Diah experienced a severe headache and dizziness, informed the corrections officer supervising him that he was not feeling well, and reques-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ted a change in his work placement. *Id.* ¶ 70. He was instructed to seek a medical excuse instead. *Id.* While pursuing that request, O'Diah claims to have been told by someone in the front office that Cully had placed him in that position as a sanction. *Id.*

On May 20, 2008, O'Diah was given a choice between two work programs, though he did not prefer either position because of his health conditions. Am. Compl. ¶ 72. O'Diah chose one of the placements, and was then told by an unidentified sergeant that he was going to the other per the authorization of defendants Cully, Carlsen, Corcoran, Fischer and Cuomo. *Id.* Later the sergeant was questioned about denying O'Diah's choice for work programs. *Id* . O'Diah believes his preferences were ignored because he was oppressed. *Id.* The placement results in an aggravation of O'Diah's pre-existing medical conditions of severe headaches, dizziness, and depression. *Id.*

On June 2, 2008, O'Diah was summoned by medical and told the physician that he was unable to work around excessive amounts of cigarette smoke or cigarette butts and ashes and requested a work excuse. Am. Compl. ¶ 74. Cully allegedly told the physician that supervisors prohibited him from giving work excuses. *Id.* O'Diah believes that these instructions ultimately came from Fischer and Cuomo and that he was being treated differently due to his "national origin identification." *Id.* That same day O'Diah returned to his work assignment where he again began cleaning up the cigarettes, butts, and ashes and began feeling dizzy and developing a headache. *Id.* ¶ 75. One of the corrections officers ordered O'Diah back to his cell to rest, and further advised him to file a grievance and again request a work program reassignment. *Id.*

**\*4** On June 3, 2008, O'Diah remained very ill, suffering from dizziness and headaches. Am. Compl. ¶ 76. He wrote a grievance, which was submitted to defendant Pepin in person and mailed to defendants Fischer, Cuomo, the Inmate Grievance Clerk and the Attorney General's Office. *Id.* O'Diah requested reassignment but was again ordered back

to his original work placement. *Id.* Upon returning, Pepin observed O'Diah being unable to complete his work, so Pepin sent O'Diah to return to his dorm after visiting the infirmary. *Id.* ¶ 77. While walking to the infirmary, O'Diah was stopped by an unnamed sergeant who berated him and insisted that he was O'Diah's master. *Id.* The sergeant brought O'Diah to an empty room and left him there, unattended, for hours while O'Diah believed that he was suffering from a stroke. *Id.*

On June 3, 2008, defendants Richardson and Pepin, via instructions from Cully, issued O'Diah a misbehavior report for threatening them to reassign him to a different work station. Am. Compl. ¶ 78. On June 5, 2008, Richardson conducted the hearing during which O'Diah was denied due process because Richardson allegedly made statements evidencing a bias against O'Diah. *Id.* ¶ 78, 83 (specifically, Richardson allegedly stated that he was aware that O'Diah was a difficult inmate and continually filed grievances). O'Diah was found guilty and sentenced to thirty days segregated confinement. *Id.* O'Diah also contends that the sentence which Rocker had reversed, from months prior, was reinstated. *Id.* ¶ 83. There is no evidence as to when this was reinstated or for how long, but O'Diah repeats it throughout the course of the complaint. On the same day, O'Diah was also searched, stripped naked, and paraded around while he remained shackled. *Id* . ¶¶ 33, 79. No defendants were identified as participating in that event.

On or about June 5, 2008, an Order to Show Cause was filed by the Cayuga County Court for one of the Article 78 [FN10] cases which O'Diah had filed regarding his work placement. Am. Compl. ¶ 80. O'Diah's paperwork was searched and seized which precluded his access to the courts and denied him due process. *Id.* ¶¶ 31, 80–81.

> [FN10]. N.Y.C.P.L.R. art. 78 establishes the procedure for judicial review of the actions and inactions of state and local government agencies and officials.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 987726 (N.D.N.Y.)
**(Cite as: 2012 WL 987726 (N.D.N.Y.))**

### E. June 2008

On June 10, 2008, O'Diah was transferred to Lakeview Shock Center. Am. Compl. ¶ 84. The week before, the Cayuga County Court had issued an Order to Show Cause about O'Diah's Article 78 case regarding his work placement. *Id.* ¶ 30. The return date for the order was June 26. *Id.* Prior to his transfer, he had submitted a disbursement form for postage to be attached to his legal mail in response to the Order to Show Cause previously issued by the Cayuga County Court. *Id.* ¶ 84. Also prior to his transfer, O'Diah's cell mate had provided him with postage for his legal mail, since his prior disbursement had not been processed. *Id.* ¶ 85. O'Diah then delivered four envelopes to defendant Hahn to then give to the mail room clerk, defendant Swierk. *Id.* ¶ 86.

**\*5** On June 11, 2008, defendants Hahn, Shaw, Swierk, Moscicki, Corcoran, Carlsen, Fischer and Cuomo searched and seized the stamped envelopes. Am. Compl. ¶¶ 30, 87. Hahn then issued O'Diah a misbehavior report for receiving unauthorized postage stamps from his cell mate. *Id.* ¶ 87. O'Diah also attempted to mail these responses again, on June 26, by giving them again to Hahn, but he was unsuccessful due to the conspiracy between Hahn, Shaw Swierk, Moscicki, Corcoran, Carlsen, Fischer and Cuomo. *Id.* ¶ 89. Since these responses were not mailed, it resulted in the dismissal of the Article 78 case because Cuomo, Fischer, Corcoran, and Carlsen moved for dismissal based on O'Diah's failure to respond. *Id.* ¶¶ 87–88, 90.

O'Diah then demanded the return of the funds he applied to be disbursed for his postage prior to his transfer. Am. Compl. ¶ 91. Moscicki and Cully denied that there was ever funds available with payment. *Id.* O'Diah filed a grievance which resulted in a disposition, on June 10, 2008, that he was owed a refund. *Id.* On June 17, 2008, Shaw and Hahn issued another false misbehavior report about O'Diah exchanging stamps with his cell mate. *Id.* ¶ 92. Both Shaw and Hahn, in conjunction with Moscicki, Corcoran, Carlsen, Fischer, Pepin, Richard-

son, and Cuomo engaged in a conspiracy to deny O'Diah his rights, resulting in another thirty days of segregation pursuant to the misbehavior report. *Id.* ¶ 93.

O'Diah contends that on August 8, 2008, Swierk was instructed by the above referenced defendants to charge O'Diah again with correspondence violations. Am. Compl. ¶ 94. The hearing occurred on August 13 and O'Diah was found not guilty of the charges. *Id.*

### F. Retaliatory Transfers

On May 9, 2008, Corcoran, Carlsen, Cully, Fischer, Cuomo and his subordinates, the Attorney General's office and the state all conspired to arrange for a retaliatory transfer for O'Diah to Livingston where he would be housed in keeplock for the ninety days which Rocker had previously suspended. Am. Compl. ¶ 67. After the disciplinary hearing on August 13, 2008, O'Diah was again transferred to Wyoming and the Gowanda Correctional Facilities. *Id.* ¶ 94. These facilities were further from where O'Diah's family lived, making it more difficult for them to visit him. *Id.*

### G. Conspiracies

O'Diah maintains that he was kidnaped into DOCCS custody pursuant to a conspiracy between all defendants, court and law enforcement personnel, and the state. Am. Compl. ¶ 115. O'Diah had evidenced planted against him so that he would be criminally convicted and sent to prison.[FN11] *Id.* ¶ 40. Moreover, throughout the entire time O'Diah was incarcerated he was subjected to harassment. *Id.* ¶ 36.

> FN11. In O'Diah's opposition he specifies that he was denied multiple rights such as the right to represent himself, receive alternate counsel, testify, call key eye witnesses, and introduce key evidence. Dkt. No. 70, ¶ 39. As these are not complaints about his conditions of confinement, but rather the proceedings leading to his conviction, the proper vehicle for addressing

said claims is a habeas corpus petition and not a § 1983 claim.

## II. Discussion

O'Diah contends that his First Amendment rights were violated because his access to the courts was impeded and false misbehavior reports were issued against him in retaliation. O'Diah also contends that his Eighth Amendment rights were violated when he was forced to work in a placement which exposed him to cigarettes and aggravated his prior medical condition and he was forced to take an unknown medication. O'Diah also contends that some of his disciplinary hearings did not afford due process, that he was discriminated against, and that he did not receive proper reimbursement for his stamps, all in violation of the Fourteenth Amendment. O'Diah also makes allegations that he was discriminated against based on his disability and that all defendants conspired against him. O'Diah also asserts that he was unlawfully convicted and has remained illegally detained in contravention of his constitutional rights.

**\*6** Defendants contend that O'Diah's complaint must be dismissed because it fails to meet the plausibility standards. Defendants also argue that O'Diah's retaliation and conspiracy claims are meritless, he has failed sufficiently to state numerous causes of action, certain defendants were not personally involved in his constitutional violations, and defendants are entitled to qualified immunity.

### A. Legal Standard[FN12]

FN12. O'Diah attached additional paperwork to his opposition. However, consideration of a motion to dismiss "is limited to the facts asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 191 (2d Cir.2007). As the documents were neither attached nor incorporated into the complaint, they

have not been considered on this motion.

Rule 12(b)(6) authorizes dismissal of a complaint that states no actionable claim. When considering a motion to dismiss, "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant." *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994). However, this "tenet ... is inapplicable to legal conclusions[; thus, t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 555 (2007) (holding that "entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action ... [as] courts are not bound to accept as true a legal conclusion couched as a factual allegation.")).

Accordingly, to defeat a motion to dismiss, a claim must include "facial plausibility ... that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949 (citing *Twombly,* 550 U.S. at 556 (explaining that the plausibility test "does not impose a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct].")); *see also Arar v. Ashcroft,* 585 F.3d 559, 569 (2d Cir.2009) (holding that, "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible ....") (citations omitted). Determining whether plausibility exists is "a content specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 129 S.Ct. at 1950–51.

When, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) . As the Second Circuit has stated,

[t]here are many cases in which we have said that

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

a *pro se* litigant is entitled to "special solicitude," ... that a *pro se* litigant's submissions must be construed "liberally,"... and that such submissions must be read to raise the strongest arguments that they 'suggest At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not "consistent" with the *pro se* litigant's allegations, .. or arguments that the submissions themselves do not "suggest, ..." that we should not "excuse frivolous or vexatious filings by *pro se* litigants" ... and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law ...."

**\*7** *Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)).

### B. Personal Involvement

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)).[FN13]

> [FN13]. Various courts in the Second Circuit have considered how, if at all, the *Iqbal* decision affected the five *Colon* factors which were traditionally used to determine personal involvement. *See McCarroll v. Fed. Bureau of Prisons,* No. 08–CV–1343 (DNH/GHL), 2010 WL 4609379, at \*4 (N.D.N.Y. Sept.30, 2010) (noting that although the Second Circuit has not yet addressed *Iqbal's* impact on the five *Colon* factors, several district courts have done so); *Kleehammer v. Monore County,* 743 F.Supp.2d 175 (W.D.N.Y.2010) (holding that "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster ...."); *D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (disagreeing that *Iqbal* eliminated *Colon's* personal involvement standard).

O'Diah continually claims that Fischer, Governor Cuomo, Corcoran, Carlsen, Cully, and Moscicki were persistently involved in his alleged constitutional violations. With the exceptions of Cully's involvement in O'Diah's alleged First and Eighth Amendment violations and Moscicki's involvement in O'Diah's alleged First Amendment violations, such contentions fail. The gravamen of O'Diah's complaints against these defendants is that they were in a position of power and, thus, always involved with anything occurring in conjunction with O'Diah's incarceration. However, attempts to establish personal involvement based upon the supervis-

ory role these defendants occupied is inappropriate. *Wright,* 21 F.3d at 501 (holding that a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement).

Moreover, while O'Diah does not specifically articulate to whom he sent grievances and when, receiving grievances, without more, is insufficient to establish personal involvement as there exists no allegation that the proposed defendants took any action. *See Bodie v. Morgenthau,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004) (citations omitted) (finding personal involvement only where a supervisory official received, reviewed, and responded to a prisoner's complaint); *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002) ("[I]f mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to the black-letter law that § 1983 does not impose *respondeat superior* liability.") (citations omitted). Odiah's allegations are insufficient to establish, except where otherwise noted in Section II(C)(1)-(2), (D)(1) *infra,* that these defendants were involved or aware of any alleged constitutional violations.

**\*8** Furthermore, the amended complaint does not contend that these defendants created unconstitutional policies or were grossly negligent in supervising subordinates. As such, O'Diah has failed to establish their personal involvement and defendants' motion on this ground should be granted as to these defendants.

### C. First Amendment
#### 1. Retaliation

O'Diah contends that multiple defendants retaliated against him throughout his tenure in DOCCS. To state an actionable claim for retaliation, a plaintiff must first allege that the plaintiff's conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). "Types

of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *Barclay v. New York,* 477 F.Supp.2d 546, 588 (N.D.N.Y.2007) (citations omitted).

> There is no bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship, so courts judge the permissible inferences that can be drawn from temporal proximity in the context of particular cases. However, courts have found that six and eight month gaps between the protected conduct and adverse action were sufficient, while in other circumstances three months was considered too long.

> *Burton v. Lynch,* 664 F.Supp.2d 349, 367 (S.D.N.Y.2009) (internal quotation marks and citations omitted).

However, courts must view retaliation claims with care and skepticism to avoid judicial intrusion into matters of prison administration. *Jackson v. Onondaga County,* 549 F.Supp.2d 204, 214–15 (N.D.N.Y.2008). Therefore, conclusory allegations alone are insufficient. *Id.* at 214 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) (explaining that "claim [s] supported by specific and detailed factual allegations ... ought usually be pursued with full discovery.")).

O'Diah's allegations are as follows: (1) Mawhir conspired and incited the other inmates to attack O'Diah so that he could write false misbehavior reports in retaliation for O'Diah filing grievances; (2) Mawhir and Ramsay conspired with inmates to have them throw water on O'Diah for filing grievances; (3) Pepin and Richardson issued O'Diah a false misbehavior report contending he had threatened them after O'Diah filed a grievance and sought transfer from his allegedly dangerous work placement; (4) Shaw and Hahn issued O'Diah a false misbehavior report seven days after O'Diah's

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

grievance was resolved providing him with a refund for postage he had previously paid; and (5) Swierk issued O'Diah a false misbehavior report alleging a correspondence violation. Also, liberally construing O'Diah's complaint he has alleged that Cully refused to allow him to participate in another work program, denying any requests for work program reassignments, in retaliation for his filing of grievances.

**\*9** O'Diah has failed to allege a plausible retaliation claim with respect to Mawhir and Ramsay. In order "[t]o show retaliation [in these circumstances, O'Diah] was required to present evidence that his constitutionally protected conduct in filing past grievances was a substantial or motivating factor for a prison official's adverse action." *Cole v. Fischer,* 416 Fed. Appx. 111, 113 (2d Cir.2011) (citing *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003). First, the allegations against these defendants are conclusory. Second, O'Diah does not allege when he filed grievances, who he filed them against or how long after the grievances were filed that the alleged retaliation occurred. Accordingly, even construing the facts in the light most favorable to O'Diah he has failed to demonstrate that filing grievances was a substantial factor in the alleged retaliation.

Conversely, O'Diah has sufficiently alleged retaliation claims against (1) Cully for mandating that he remain in a dangerous work condition after complaining to medical staff and filing a grievance; (2) Pepin and Richardson for writing him a false misbehavior report in retaliation for complaining about his work placement in June 2008; (3) Hahn and Shaw for issuing him a false misbehavior report in retaliation for submitting a grievance and receiving a reimbursement of money; and (5) Swierk for issuing him a false misbehavior report in retaliation for submitting a grievance about reimbursement. It is undisputed that filing grievances is a constitutionally protected activity. *See e.g. Varela v. Demmon,* 491 F.Supp.2d 442, 452 (S.D.N.Y.2007) ("[T]he making of a grievance is itself the constitutionally

protected speech. The subject matter of the grievance—including whether it alleges the violation of any constitutional right—is thus irrelevant.") (citations omitted).

While "[a]ll exposure to [environmental tobacco smoke] ETS is not unconstitutional; [unwilling] ... exposure to an unreasonably high level of ETS is cognizable as a constitutional violation." *Taylor v. Conway,* No. 06–CV–1329 (SRU), 2008 WL 4371928, at \*4 (D.Conn. Sept.23, 2008) (citing *Helling v. McKinney,* 509 U.S. 25, 35–36, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)) (attached to Report–Recommendation as Ex. A). O'Diah authored a grievance and provided it to Pepin complaining about his work placement and unconstitutional exposure to ETS just prior to receiving an allegedly false misbehavior report. O'Diah contends that Pepin and Richardson were then ordered to issue this misbehavior report at Cully's instruction, which would seem implausible except for O'Diah's earlier contentions that Cully specifically advised that O'Diah was not permitted to receive a work reassignment order from the medical staff, despite his physical ailments. O'Diah's Eighth Amendment claim regarding the ETS has been deemed sufficient to withstand the present motion. The current standing of that claim, in conjunction with the temporal proximity of the filing of the grievance with the issuance of the misbehavior report, along with the fact that the same defendant that received the grievance also authored the misbehavior report serves as a plausible set of facts to establish that the grievance was a substantial cause in Pepin taking the adverse action.

**\*10** Similarly, the circumstances surrounding the misbehavior report issued by Hahn and Shaw in June 2008 and Swirek seven weeks later in August 2008 also establish a plausible set of facts for believing that O'Diah's prior filed grievance was the reason for the adverse action. O'Diah filed a grievance seven days before receiving his misbehavior report from Hahn and Shaw and approximately two months before receiving his misbehavior report

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

from Swirek. Additionally, the grievance that O'Diah filed was resolved in his favor, so O'Diah was granted a reimbursement of funds. Lastly, at the disciplinary hearing for the misbehavior report issued by Swierk, O'Diah was found not guilty of any correspondence violations. Given both the grievance and disciplinary hearings findings in O'Diah's favor and temporal proximity between the filing of the grievance, its disposition, and the subsequent filing of the misbehavior reports, dismissal is inappropriate.

Accordingly, defendants' motion on this ground should be denied on these claims.

### 2. False Misbehavior Reports

In this case, O'Diah contends that he had multiple false misbehavior reports lodged against him throughout his incarceration. An inmate has a right not to be deprived of a liberty interest without due process. However, a "prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)). "There must be more, such as retaliation against the prisoner for exercising a constitutional right." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988)).

In this case, O'Diah contends that he received false misbehavior reports for (1) failing to use his law library pass in November 2007; (2) failing to obey a direct order in March 2008; (3) refusing to take his medication in March 2008; (4) threatening defendants to put him in a new work placement in June 2008; and (5) correspondence violations in June and August, 2008 by Shaw and Hahn and Swierk respectfully. However, O'Diah has only alleged a retaliation claim against defendants Pepin, Richardson, Swierk, Shaw, and Hahn in conjunction with the misbehavior report issued for alleged threats and a correspondence violations, authored in June and August, 2008. As previously discussed, regarding the other five alleged false misbehavior

reports, even assuming that O'Diah's grievances was the basis for his retaliation claim, he has failed to sufficiently to allege that the grievance was the motivation for the adverse action. Because O'Diah has failed to state a claim for retaliation, any allegations related to the alleged filing of false misbehavior reports is also inappropriate. However, with respect to the misbehavior report issued by Pepin, Richardson, Hahn, Swierk, and Shaw, O'Diah has sufficiently pled facts sufficient to state a plausible retaliation claim. Accordingly, defendants' motion on that ground should be denied.

### 3. Retaliatory Transfer

*11 "A prisoner has no liberty interest in remaining at a particular correctional facility, but prison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights .... " *Davis v. Kelly,* 160 F.3d 917, 920 (2d Cir.1998) (citations omitted).[FN14] In order to survive dismissal, an inmate must show "that he engaged in constitutionally protected conduct and ... that conduct was a substantial or motivating factor for the adverse actions taken by prison officials." *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted). However, "conclusory or general allegations are insufficient to state a claim for conspiracy under § 1983." *Walker v. Jastremski,* 430 F.3d 560, 564 n. 5 (2d Cir.2005) (citations omitted).

> FN14. As previously stated, an inmate has no liberty interest in being housed at the facility of his or her choice. *Davis,* 160 F.3d at 920. Therefore, to the extent that O'Diah claims that his transfers took him further away from his preferred facilities which were closer to his family, such claims are not cognizable under § 1983.

Here O'Diah has failed to allege that his transfers were retaliatory in anything more than general, conclusory terms. O'Diah claims that his transfers were retaliatory but fails to identify in what constitutionally protected conduct he was engaged which provoked the retaliatory response, when that con-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

duct occurred, and how close it was to the time of the transfers. Moreover, O'Diah has failed to present facts showing that his alleged protected conduct was known by the various supervisory defendants or that it served as a motivating factor for his transfers.

Accordingly, defendants' motion on this claim should be granted.

### 4. Access to Courts[FN15]

FN15. O'Diah also alleges that the defendants discussed *infra* were acting under the influence of Corcoran, Carlsen and Fischer. These are all supervisory defendants for whom dismissal has been recommended *supra* for a lack of personal involvement and infra for a failure to plead conspiracies. Accordingly, the contentions regarding said defendants will not be discussed further here.

"Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). In order to state a claim for denial of access to the courts, including those premised on interference with legal mail, a plaintiff must allege "that a defendant caused 'actual injury,' i.e. took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim.' " *Id.* (citing *Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997) (*quoting Lewis v. Casey,* 518 U.S. 343, 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996)). Such injury must affect "a nonfrivolous legal claim [which] had been frustrated or was being impeded due to the actions of prison officials." *Warburton v. Underwood,* 2 F.Supp.2d 306, 312 (W.D.N.Y.1998) (citations omitted); *Shine v. Hofman,* 548 F.Supp.2d 112, 117–18 (D.Vt.2008) (explaining that actual injury "is not satisfied by just any type of frustrated legal claim because the Constitution guarantees only the tools that inmates need in order to attack their sen-

tences ... and ... challenge the conditions of their confinement.") (internal quotation marks and citations omitted). Accordingly, without identification of the underlying action which was prejudiced, actual injury, and by extension a First Amendment violation, cannot be established. *See Christopher v. Harbury,* 536 U.S. 403, 415, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002) ("[T]he underlying cause of action ... is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation.").

**\*12** O'Diah first alleges that in June 2007, Corcoran impeded his access to the courts. However, O'Diah has failed to plead with any specificity what Corcoran did to preclude his access or what hindrance resulted to O'Diah's pending legal claim. Accordingly, defendants' motion as to this claim should be granted.

O'Diah next claims that in March 2008, Thomas seized his paperwork, including his legal mail, the same day he issued a false misbehavior report and sent O'Diah to keeplock. O'Diah claims that while keeplocked, he was unable to provide his legal paperwork to his legal assistant when he arrived to pick it up at the facility and also was unable to file a response to his case in the Eastern District of New York which was allegedly dismissed for a failure to prosecute. Viewing the facts in the light most favorable to O'Diah, there is nothing to indicate that the federal case pending in the Eastern District was frivolous or meritless. Accordingly, Thomas' actions in blocking delivery of O'Diah's legal papers to be the court resulted in an actual injury as his arguably meritorious case was dismissed. Therefore, defendants' motion as to this claim on this ground should be denied.

Lastly, O'Diah contends that he provided Hahn, Shaw, Swierk and Moscicki his legal mail at various times in June of 2008, but that they intentionally failed to send the mail out. Subsequently, O'Diah's Article 78 case filed in Cayuga County was dismissed. As with the Eastern District case, nothing in the record indicates that O'Diah's court

case was meritless or frivolous. Therefore, the dismissal, caused by defendants' failure to mail out O'Diah's response to the court, constituted an actual injury. Accordingly, defendants' motion as to this claim on this ground should be denied.

### D. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. "The Constitution does not mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1884). As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective ... and subjective test." *Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir.1996) (citations omitted). Thus, "a prisoner may prevail only where he proves both an objective element—that the prison officials' transgression was sufficiently serious—and a subjective element—that the officials acted, or omitted to act, with a sufficiently culpable state of mind ...." *Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d Cir.2002) (internal quotation marks and citations omitted).

The objective prong can be satisfied by

conditions of confinement ... [which] in combination [constitute an Eighth Amendment violation] when each would not do so alone ... [such as] when the conditions have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets.

**\*13** *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W.D.N.Y.2005) (citations omitted). However, "[n]othing so amorphous as overall conditions can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Id.* (citing *Wilson v. Seiter,* 501 U.S.

294, 304–05, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). The subjective prong requires "a prison official [to] have a sufficiently culpable state of mind ..., of deliberate indifference to inmate health or safety" *Farmer,* 511 U.S. at 834 (citations omitted).

### 1. Exposure to Environmental Tobacco Smoke ("ETS")

While "[a]ll exposure to ETS is not unconstitutional; [unwilling] ... exposure to an unreasonably high level of ETS is cognizable as a constitutional violation." *Taylor v. Conway,* No. 06–CV–1329 (SRU), 2008 WL 4371928, at \*4 (D.Conn. Sept.23, 2008) (citing *Helling v. McKinney,* 509 U.S. 25, 35–36, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)) (attached to Report Recommendation as Ex. A). "Courts have held that inmates were exposed to unreasonable ETS levels when they were forced to share a cell with a heavy smoker." *Id.* (citing cases). Specifically, inmates satisfy the objective prong of the Eighth Amendment test by arguing that they are personally being exposed to unreasonably high levels of ETS which is not only actually causing inmates potential harm and a serious likelihood of injury, but is seen by society as a risk so grave that it offends standards of contemporary decency. *Helling,* 509 U.S. at 35–36. Additionally, to demonstrate the subjective standard the court must assess "the prison authorities' current attitudes and conduct," towards the environment, evaluating whether "prison authorities are ignoring the possible dangers posed by exposure to ETS." *Id.* at 36–37.

In this case, it would appear that O'Diah's employment in a work area, arguably considerably larger than a cell, would expose him to a much less concentrated amount of ETS, thus making his claim meritless. However, viewing the complaint in the light most favorable to O'Diah, he has satisfied the objective prong of the analysis. O'Diah was inundated with cigarette smoke and its byproducts from having constantly to clean cigarette butts and ashes. This led to physical ailments, such as dizziness and elevated blood pressure, which required O'Diah to

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

be sent back from work on multiple occasions.
FN16 Accordingly, these circumstances caused O'Diah potential and actualized harm which was offensive to the risks society chooses to tolerate.

> FN16. To the extent that O'Diah claims an unidentified sergeant was deliberately indifferent to his care during his escort to the infirmary in June 2008, such claims are moot as O'Diah has failed to identify or name the individual as a defendant.

Moreover, O'Diah has satisfied the subjective prong by alleging that Cully specifically precluded him from receiving a work program reassignment. FN17 However, to the extent that O'Diah claims that Pepin also was deliberately indifferent to his needs, such claims are belied by O'Diah's own recitation of the facts. O'Diah contends that it was Pepin that excused him from his work placement and instructed him to report directly to the infirmary for medical treatment. Such actions do not state a plausible claim of indifference.

> FN17. O'Diah also claims that other supervisory defendants were aware of his medical condition and had some hand in requiring him to remain in his work placement. However, these vague and conclusory allegations are insufficient to establish personal involvement, as discussed *supra.*

**\*14** Accordingly, defendants' motion on this ground should be denied as to Cully and granted as to Pepin.

### 2. Other Conditions of Confinement

O'Diah claims that Ramsay, Mawhir and Corcoran encouraged inmates to pour cold water onto O'Diah and his property. These actions led him to avoid the recreation yard. These allegations, while inappropriate, do not rise to satisfy either prong of the Eighth Amendment analysis. These alleged occurrences, which were not enumerated or described in any further detail, do not result in the deprivation of a single human need. Additionally,

O'Diah's decision not to engage in certain activities cannot be imputed to other defendants. Accordingly, defendants' motion should be granted as to these clams.

O'Diah also claims that an unidentified officer paraded him around the yard shackled and naked. However, O'Diah has failed to name this individual as a defendant and further discussion about the potential constitutional violations which occurred is moot. Accordingly, defendants' motion should also be granted as to this claim.

### 3. Forced Medication

O'Diah alleges that Thomas and Guter, acting at Mawhir's direction, forced O'Diah to take an unknown medication. O'Diah was not provided with the medication's identifying information, the reason for its administration, or the anticipated side effects. The Supreme Court has recognized a constitutional right not to be medicated involuntarily, allowing it in rare instances, with respect to antipsychotic drugs "solely for trial competence purposes in certain cases." *Sell v. United States,* 539 U.S. 166, 179, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003). There is no indication in the record that the administration of the medication was for these purposes. Therefore O'Diah had a right to refuse to take such medication. After ingesting the medication, O'Diah suffered severe intestinal complications. Accordingly, such allegations suffice to satisfy the plausibility standard that O'Diah's constitutional rights were violated. Accordingly, defendants' motion on this ground should be denied.

### E. Fourteenth Amendment
### 1. Equal Protection

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law. Essential to that protection is the guarantee that similarly situated persons be treated equally. *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) ("To prove a violation of the Equal Protection Clause ... a plaintiff must demonstrate that

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

he was treated differently than others similarly situated as a result of intentional or purposeful discrimination.").

> [T]he Equal Protection Clause bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.

**\*15** *Vegas v. Artus,* 610 F.Supp.2d 185, 209 (N.D.N.Y.2009) (internal quotation marks and citations omitted).

In this case, O'Diah has offered only a few statements implicating equal protection, though they fail to establish how he was treated differently than other inmates. There are no contentions, and the record does not show, that O'Diah was treated differently by staff than other inmates. All O'Diah offers are a few, vague, conclusory allegations that he was oppressed and discriminated based upon his national origin. These allegations, without more, are insufficient. *See, e.g., John Gil Const., Inc. v. Riverso,* 99 F.Supp.2d 345, 353 (S.D.N.Y.2000) ("[A]ssertions of selective enforcement and racial animus [that] are wholly conclusory and unaccompanied by any supporting factual allegations ... are insufficient to state a claim under either the Equal Protection Clause or 42 U.S.C. § 1983.") (citations omitted). Accordingly, defendants' motion should be granted on this ground.

### 2. Confiscation of Property

O'Diah makes multiple, general complaints about unlawful confiscation of his property. An inmate has a right not to be deprived of property without due process. However, federal courts do not provide redress for the deprivation of property if there is an adequate state court remedy which the plaintiff can pursue. *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). "An Article 78 proceeding permits a petitioner to

submit affidavits and other written evidence, and where a material issue of fact is raised, have a trial of the disputed issue, including constitutional claims." *Locurto v. Safir,* 264 F.3d 154, 174 (2d Cir.2001) (citations omitted); *see also* N.Y. C.P.L.R. §§ 7803, 7804; *Campo v. New York City Employees' Ret. Sys.,* 843 F.2d 96, 101 (2d Cir.1988) ("Article 78 ... provides a summary proceeding which can be used to review administrative decisions."). State law also provides that "[a]ny claim for damages arising out of any act done ... within the scope of ... employment and in the discharge of the duties of any officer or employee of the department [of corrections] shall be brought and maintained in the court of claims as a claim against the state." N.Y. Corr. Law § 24(2).

In this case, O'Diah contends that there was an unconstitutional deprivation when his personal property was allegedly confiscated. Such claims fail as a matter of law for several reasons. First, the Article 78 procedure exists and affords an adequate state court remedy. Second, because O'Diah is suing for damages, he must pursue his claims here against New York State in the New York Court of Claims pursuant to Corrections Law § 24. Thus, the correct venue to litigate these claims is in state court.

Accordingly, defendants' motion should be granted as to this claim.

### 3. Disciplinary Dispositions

To the extent O'Diah contends he was denied due process during his disciplinary hearings, such contentions are meritless for multiple reasons. First, such claims run afoul of the "favorable termination" rule of *Heck v. Humphrey,* 512 U.S. 477, 487–87, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). That rule provides that if a determination favorable to the plaintiff in a § 1983 action "would necessarily imply the invalidity of his conviction or sentence," a plaintiff must prove that the conviction or sentence has been reversed on direct appeal or declared invalid in order to recover damages under § 1983. This rule applies to challenges to procedures

used in prison disciplinary proceedings. *Edwards v. Balisok,* 520 U.S. 641, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997). There is no evidence that O'Diah's disciplinary determinations were ever vacated. Thus, the *Heck* rule applies and any challenges to those determinations are barred.

**\*16** Additionally, as a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property. *See Perry v. McDonald,* 280 F.3d 159, 173 (2d Cir.2001). To establish a protected liberty interest, a prisoner must satisfy the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 483–84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). This standard requires a prisoner to establish that the deprivation was atypical and significant in relation to ordinary prison life. *Id.* at 484; *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). The fact that an inmate has been disciplined with a segregated confinement alone is insufficient to establish an atypical and significant deprivation. The Second Circuit has articulated a two-part test whereby the length of time a prisoner was placed in segregation as well as "the conditions of the prisoner's segregated confinement relative to the conditions of the general prison population" are to be considered. *Vasquez v. Coughlin,* 2 F.Supp.2d 255, 259 (N.D.N.Y.1998). The Second Circuit has noted that where the period of segregated confinement exceeds thirty days, "refined fact-finding" is required to resolve defendants' claims under *Sandin. Colon v. Howard,* 215 F.3d 227, 230 (2d Cir.2000).

To the extent that O'Diah claims any of his disciplinary hearings denied him due process, all of his dispositions were for thirty days. O'Diah does not complain about the conditions of his confinement while serving his sentences but only that the findings of guilt occurred. Given that no confinement exceeded thirty days, no further fact finding is required.

Therefore, defendants' as to these claims

should be granted on these grounds.

### F. Failure to State a Claim

An action commenced pursuant to 42 U.S.C. § 1983 requires proof of the "deprivation of any right[ ], privilege[ ], or immunit[y] secured by the Constitution" or laws of the federal government. 42 U.S.C. § 1983. Thus, no action lies under § 1983 unless a plaintiff has asserted the violation of a federal right. *See Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n,* 453 U.S. 1, 19, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981).

### 1. Harassment

O'Diah contends that he was constantly harassed during his incarceration at DOCCS facilities. However verbal threats and harassment, alone, are insufficient to state a constitutional claim. *See Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1996) ("The claim that a prison guard called Purcell names also did not allege any appreciable injury and was properly dismissed."); *Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998) ( "[V]erbal harassment or profanity alone, unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem does not constitute the violation of any federally protected right and therefore is not actionable under ... § 1983 ."). FN18 Accordingly, defendants' motion should be granted as to all such claims.

> FN18. To the extent that such contentions can be construed to allege that O'Diah should be compensated for defendants' failure to comply with DOCS policies and protocols for investigating grievances, such contentions are also meritless. *Bolden v. Alston,* 810 F.2d 353, 358 (2d Cir.1987) ( "State procedural requirements do not establish federal constitutional rights. At most, any violation of state procedural requirements would create liability under state law ....").

### 2. Defective Grievance Procedures

**\*17** "Prisoners, including pretrial detainees,

have a constitutional right of access to the courts ....“ *Bourden v. Loughren,* 386 F.3d 88, 92 (2d Cir.2004) (internal quotation marks omitted) (citing *Bounds v. Smith,* 430 U.S. 817, 821–22, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977) (citations omitted) (holding that all prisoners have a well-established Constitutional right to “adequate, effective, and meaningful” access to courts). “[I]nmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim.” *Shell v. Brzezniak,* 365 F.Supp.2d 362, 370 (W.D.N.Y.2005) (citations omitted). However, “[i]f prison officials ignore a grievance that raises constitutional claims, an inmate can directly petition the government for redress of that claim.” *Id.* (citations omitted).

In this case, to the extent that O'Diah has proffered generalized complaints about the grievance process as a whole, such claims are insufficient to establish a constitutional violation. Accordingly, defendants' motion on this ground should be granted as to all such claims.

### G. Qualified Immunity

Defendants claim that even if O'Diah's constitutional claims are substantiated, they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability “insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.” *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 Fed.Appx. 146 (2d Cir. Nov.10, 2003). However, even if the constitutional privileges “are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available ... if it was objectively reasonable for the public official to believe that his acts did not violate those rights.” *Kaminsky v. Rosenblum,* 929 F.2d

922, 925 (2d Cir.1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990) (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, the second prong of the inquiry must be discussed with regard to O'Diah's First Amendment access to court and retaliation claims as well as his Eighth Amendment medical indifference claims. As to all other claims, the second prong of the qualified immunity analysis need not be addressed because, as discussed above, even viewing the allegations in the light most favorable to O'Diah, he has failed sufficiently to allege constitutional violations.

**\*18** There is no question that it was well settled on June 7, 2008 that the (1) First Amendment provided inmates with access to the courts and freedom from retaliation, including in the form of a false misbehavior report ( *Bounds v. Smith,* 430 U.S. 817, 824, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977) (”[O]ur decisions have consistently required States to shoulder affirmative obligations to assure all prisoners meaningful access to the courts); *Davis v. Goord,* 320 F.3d 346, 352–53 (2d Cir.2003) (evaluating retaliation claim because “the filing of grievances is a constitutionally protected activity.”) and (2) Eighth Amendment required that inmates are to be provided “with ... reasonable safety [as i]t is cruel and unusual punishment to hold convicted criminals in unsafe conditions,” (*Helling,* 509 U .S. 33 (internal quotation marks and citations omitted)) whether that pertain to their medical care or conditions of confinement. Thus, accepting all of O'Diah's allegations as true, qualified immunity cannot be granted to (1) Thomas, Hahn, Shaw, Swierk or Moscicki for interfering with O'Diah's right

of access to the courts; (2) Cully for O'Diah's dangerous exposure to ETS at his work placement; (3) Thomas, Guter or Mawhir for forcing O'Diah to take unidentified medication; (4) Pepin, Richardson, Cully, Hahn, Shaw and Swierk for retaliating against O'Diah; and (5) Pepin, Richardson, Hahn, Shaw, and Swierk for filing false misbehavior forms. However, defendants' motion should be granted in the alternative on this ground as to all other defendants for all other claims.

**H. Conspiracy** [FN19]

> FN19. Defendants also assert that any conspiracy claims are effectively barred by the intracorporate conspiracy doctrine. However, because it is recommended herein that defendants' motion as to the conspiracy claim be granted on other grounds, the intracorporate conspiracy doctrine need not be addressed.

In order to support a claim for conspiracy pursuant to § 1985, there must be "(1) an agreement ...; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. County of Nassau,* 292 F.3d 307, 324–25 (2d Cir.2002); *Cusamano v. Sobek,* 604 F.Supp.2d 416, 468 (N.D.N.Y.2009). An agreement must be alleged with specificity as bare allegations of a conspiracy supported only by allegations of conduct easily explained as individual action is insufficient. *See Iqbal v. Hasty,* 490 F.3d 143, 177 (2d Cir.2007); *see also Gyadu v. Hartford Ins. Co.,* 197 F.3d 590, 591 (2d Cir.1999). Thus, plaintiffs must "make an effort to provide some details of time and place and the alleged effects of the conspiracy ... [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Warren v. Fischl,* 33 F.Supp.2d 171, 177 (E.D.N.Y.1999) (citations omitted). While exact specifics are not required, "the pleadings must present facts tending to show agreement and concerted action." *Anilao v. Spota,* 774 F.Supp.2d 457, 512–13 (E.D.N.Y.2011) (citations omitted). Con-

clusory, vague, and general allegations are insufficient to support a conspiracy claim. *Ciambriello,* 292 F.3d at 325.

O'Diah alleges that (1) Mawhir, Ramsay, Corcoran and Carlsen all conspired to procure his conviction on disciplinary charges, incite other inmates to assault O'Diah, and issue additional misbehavior reports subsequent to the assaults; (2) Mawhir, Corcoran and Thomas all conspired before issuing the March 2008 misbehavior report; (3) Corcoran, Carlsen, Fischer, Cuomo, and Cully all conspired to put O'Diah in a work placement program which exposed him to dangerous levels of ETS despite prior knowledge of his health conditions; and (4) Shaw, Hahn, Moscicki, Corcoran, Carlsen, Fischer, Pepin, and Cuomo conspired to deny O'Diah of his rights by assisting in the conviction on disciplinary charges he received from his misbehavior report in June 2008. However, none of these alleged conspiracy claims is sufficient to withstand the current motion.

***19** Some of O'Diah's underlying claims of constitutional violations have survived the present motion. However, it appears that in addition to the underlying conspiracy claims, O'Diah also alleges a conspiracy between the acting defendants and all of the supervisory defendants employed by DOCCS. These claims are conclusory and fail to establish how, when or why defendants from various correctional facilities and different levels of management colluded and formed these alleged schemes. While specifics are unnecessary, O'Diah fails to provide any plausible information which would lend credence to his claims of an explicit or implicit agreement between any or all of these defendants.

Accordingly, defendants' motion as to the claims of conspiracies should be granted.

**I. ADA Claims**

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of ... a public entity, or be sub-

jected to discrimination by any such entity." 42 U.S.C. § 12132. The ADA "applies to inmates in state prisons." *Beckford v. Portuondo,* 151 F.Supp.2d 204, 220 (N.D.N.Y.2001) (citations omitted). To state a claim under the ADA, an inmate must demonstrate that

> (1) he or she is a "qualified individual with a disability"; (2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) [the facility that] provides the service, program or activity is a public entity.

*Clarkson v. Coughlin,* 898 F.Supp. 1019, 1037 (S.D.N.Y.1995); 42 U.S.C. § 12132.

As to the first element, a person is an individual with a qualified disability if "(A) a physical or mental impairment ... substantially limits one or more of the major life activities of such individual, (B) [there is] a record of such an impairment, or (C) [the individual is] being regarded as having such an impairment." 42 U.S.C. § 12102(2)(A)-(C).

> To determine if an individual meets any of the above criteria, courts apply a three part test ... First, a plaintiff must show that [he or] she suffers from a physical or mental impairment. Second, the plaintiff must establish that the activity [he or] she alleges to be impaired constitutes a "major life activity." Third, the plaintiff must show that [his or] her impairment "substantially limits" the major life activity previously identified.

*Smith v. Masterson,* 538 F.Supp.2d 653, 657 (S.D.N.Y.2008) (internal citations omitted). The Second Circuit has held that it is important to distinguish[ ] between (I) making reasonable accommodations to assure access to an existing program and (ii) providing additional or different substantive benefits ... [since] the disability statutes do not require that substantively different services be provided to the disabled, no matter how great their need for services may be. They

require only that covered entities make "reasonable accommodations" to enable "meaningful access" to such services as may be provided, whether such services are adequate or not.

**\*20** *Wright v. Giuliani,* 230 F.3d 543, 548 (2d Cir.2000) (citations omitted).

In this case, O'Diah has failed sufficiently to allege that he is suffering from any sort of impairment or disability. O'Diah makes conclusory assertions that the ADA is applicable to his case, yet fails to advance from facts detailing what impairment he suffers, how it has impacted him and prevented him from engaging in major life activities, or identifying which major life activities are affected. Additionally, O'Diah has failed to indicate which reasonable accommodations, programs, or services he was denied.

Accordingly, defendants' motion as to the ADA claims on this ground should be granted.

**J. Sections 1985 & 1986**

"Section 1985 prohibits conspiracies to interfere with civil rights." *Davila v. Secure Pharmacy Plus,* 329 F.Supp.2d 311, 316 (D.Conn.2004). To state a claim for relief under § 1985(3), a plaintiff must show:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States.

*United Bd. of Carpenters & Joiners of Am., Local 610 v. Scott,* 463 U.S. 825, 828–29, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983). Additionally, a plaintiff "must demonstrate that the defendant ... acted with class-based invidiously discriminatory animus." *Webster v. Fischer,* 694 F.Supp.2d 163,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

196 (N.D.N.Y.2010) (citations omitted).

Here, O'Diah does not allege any facts giving rise to a conspiracy. First, O'Diah vaguely asserts conclusory statements relating to an alleged conspiracy among defendants. This is insufficient. *See generally Thomas v. Roach,* 165 F.3d 137, 147 (2d Cir.1999) (granting summary judgment for a § 1985(3) claim where the "assertions were conclusory and vague, and did not establish the existence of an agreement among defendants to deprive [plaintiff] of his constitutional rights."). Second, there has been alleged no facts relating to agreements, or even communications, between the defendants, the purpose of their alleged conspiracy, or an intent by defendants to deprive O'Diah of his civil rights. *See Webb v. Goord,* 340 F.3d 105, 110–11 (2d Cir.2003) ("In order to maintain an action under Section 1985, a plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end.") (internal quotation marks and citations omitted); *see also Romer v. Morgenthau,* 119 F.Supp.2d 346, 364 (S.D.N.Y.2000) (explaining that a plaintiff "cannot satisfy the conspiracy prong [if] his claims are too general and conclusory to sufficiently plead the meeting of the minds requirement.") (citations omitted). Lastly, O'Diah also fails to allege or establish discriminatory animus other than conclusory allegations that he was oppressed and discriminated against because of his national origin. Such statements are wholly insufficient.

**\*21** Additionally, if any defendant "ha[d] knowledge that any of the wrongs ... mentioned in section 1985 ... [we]re about to be committed, and ha[d] power to prevent or aid in preventing the commission of the same, [and] neglect[ed] or refuse[d] so to do ..., [he] shall be liable to the party injured." 42 U.S.C. § 1986. However, "[a] claim under section 1986 ... lies only if there is a viable conspiracy claim under section 1985." *Gagliardi v. Vill. of Pawling,* 18 F.3d 188, 194 (2d Cir.1994). No such viable claim has been alleged here.

Accordingly, defendants' motion as to this claim should be granted.

### K. Pendent State Law Claims

O'Diah's complaint also asserts that defendants violated various state laws, however these claims fail as a matter of law. New York Correction Law § 24 provides that

1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

"Section 24 thus precludes claims against corrections officers brought against them in any court in their personal capacities arising out of the discharge of their duties." *Crump v. Ekpe,* No. 07–CV–1331, 2010 WL 502762, at *18 (N.D.N.Y. Feb. 8, 2010) (citations omitted) (Attached to this Report–Recommendation as Ex. B). Because a federal court applying pendent jurisdiction is forced to apply state substantive law to a state claim, this would result in inmates being prohibited from advancing such pendent claims along with their federal claims in federal court. *Baker v. Coughlin,* 77 F.3d 12, 15 (2d Cir.1996).

In 2009, the United States Supreme Court held that § 24 is unconstitutional to the extent that it precludes inmates from pursuing § 1983 actions. However, at least two judges in this District have observed that because *Haywood's* focus is on concerns about civil rights claims and the Supremacy Clause, the decision does not affect the question of whether this Court has proper juris-

diction to hear a pendent state law claim.

*Tafari v. McCarthy,* 714 F.Supp.2d 317, 384 (N.D.N.Y.2010) (internal quotation marks and citations omitted). Accordingly, this district has continued to dismiss state law pendent claims against defendants acting in their personal capacities, discharging their duties, pursuant to the preclusive effects of § 24. *See e.g., Crumpe,* 2010 WL 502762, at *18 .

When determining whether actions fall within the scope of the defendants employment, courts have considered:

**\*22** the connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly done by any employee; the extent of the departure from normal methods of performance; and whether the specific act was one that the employer could reasonably have anticipated.

*Degrafinreid v. Ricks,* 452 F.Supp.2d 328, 333 (S.D.N.Y.2006) (citations omitted). Thus, "an employee will be considered within the scope of his employment so long as he is discharging his duties no matter how irregularly, or with what disregard of instructions." *Id.* (citations omitted). Accordingly, even in cases where alleged excessive force was used in frisking or searching a cell, or where negligence was alleged in the provision of medical care, such actions are still defined to be within an employee's duties. *Id.* (citations omitted); *see also Crump,* 2010 WL 502762, at *18 (listing DOCCS employee duties to include "determinations to administratively confine plaintiff to SHU, to issue a misbehavior report, the conduct of the disciplinary hearing, and the determination that plaintiff was guilty of the charges alleged," and explaining that while actions "exceeding the scope of the corrections officer's authority ...." may give rise to a constitutional violation, such actions are still precluded pursuant to § 24).

With respect to the defendants, all of their purported actions fell within their assigned duties. These duties include filing and adjudicating misbehavior reports, supervising inmates at their work placements, receiving grievances and handling the mail, and providing medical care. Thus, § 24 prohibits the advancement of any pendent state law claims. While these defendants actions, or inactions, may be cited as the alleged cause of a constitutional violation, their conduct was nevertheless protected by § 24.

Accordingly, defendants' motion on this ground as to such claims should be granted.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion to dismiss the amended complaint (Dkt. No. 66) be:

1. **DENIED** as to O'Diah's claims of:

A. Denial of access to courts against defendants Thomas, Hahn, Shaw, Swierk and Moscicki;

B. Medical indifference against defendants Cully, Thomas, Guter, and Mawhir;

C. Retaliation against defendants Pepin, Richardson, Cully, Hahn, Shaw and Swierk; and

D. Filing of false misbehavior reports against defendants Pepin, Richardson, Hahn, Shaw and Swierk; and

2. **GRANTED** as to all other claims and all other moving defendants.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v.*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 987726 (N.D.N.Y.)
**(Cite as: 2012 WL 987726 (N.D.N.Y.))**

*Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**\*23** [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

N.D.N.Y.,2012.
O'Diah v. Fischer
Not Reported in F.Supp.2d, 2012 WL 987726 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 976033 (N.D.N.Y.)
**(Cite as: 2012 WL 976033 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Aror Ark O'DIAH, Plaintiff,

v.

Brian FISCHER; Michael Corcoran; Malcolm R.
Cully; Ronald W. Moscicki; Stephen Guter; C.O.
Ramsay; D. Richardson; J. Pepin; J. Hahn; Mr. &
Lt. Shaw; Scott C. Carlsen; Andrew Cuomo, Attor-
ney General for the State of New York; K. Thomas,
Correctional Officer, Cayuga Correctional Facility;
and D. Swierk, Mail Room Clerk, Lakeview Shock
Incarceration Facility, Defendants.[FN1]

> FN1. Eleven other defendants were previ-
> ously terminated or had the claims against
> them transferred to other districts. *See* Dkt.
> Nos. 51, 61.

No. 08–CV–941 (TJM/DRH).
March 22, 2012.

Aror Ark O'Diah, Attica, NY, pro se.

Roger W. Kinsey, Office of Attorney General, Al-
bany, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

**I. INTRODUCTION**

　　**\*1** This *pro se* action brought pursuant to 42
U.S.C. § 1983 was referred by this Court to the
Hon. David R. Homer, United States Magistrate
Judge, for a Report–Recommendation pursuant to
28 U.S.C. § 636(b) and Local Rule N.D.N.Y.
72.3(c). In his February 28, 2012 Re-
port–Recommendation and Order, Magistrate Judge
Homer recommended that Defendants' motion to
dismiss (Dkt. No. 66) be:

　　1. DENIED as to O'Diah's claims of:

A. Denial of access to courts against Defend-
ants Thomas, Hahn, Shaw, Swierk and Mos-
cicki;

B. Medical indifference against Defendants
Cully, Thomas, Guter, and Mawhir;

C. Retaliation against Defendants Pepin,
Richardson, Cully, Hahn, Shaw and Swierk;
and

D. Filing of false misbehavior reports against
Defendants Pepin, Richardson, Hahn, Shaw
and Swierk; and

　　2. GRANTED as to all other claims and all other
moving Defendants.

　　Plaintiff has filed objections to that much of
the Report–Recommendation that recommends that
certain claims be dismissed.

**II. STANDARD OF REVIEW**

　　When objections to a magistrate judge's report
and recommendation are lodged, the district court
makes a *"de novo* determination of those portions
of the report or specified proposed findings or re-
commendations to which objection is made." *See*
28 U.S.C. § 636(b)(1)(C); *see also United States v.
Male Juvenile,* 121 F.3d 34, 38 (2d Cir.1997) (The
Court must make a *de novo* determination to the ex-
tent that a party makes specific objections to a ma-
gistrate's findings.). "[E]ven a *pro se* party's objec-
tions to a Report and Recommendation must be
specific and clearly aimed at particular findings in
the magistrate's proposal, such that no party be al-
lowed a second bite at the apple by simply relitigat-
ing a prior argument." *Machicote v. Ercole,* 2011
WL 3809920, at \*2 (S.D.N.Y., Aug.25, 2011)
(citations and interior quotation marks omitted); *Di-
Pilato v. 7–Eleven, Inc.,* 662 F.Supp.2d 333, 340
(S.D.N.Y.2009) (same). By the same reasoning, a
party may not advance new theories that were not
presented to the magistrate judge in an attempt to
obtain this second bite at the apple. *See Calderon v.*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Wheeler,* 2009 WL 2252241, at *1, n. 1 (N.D.N.Y. July 28, 2009); *Green v. City of New York,* 2010 WL 148128, at *4 (E.D.N.Y. Jan.14, 2010) ("[N]ew claims ... presented in the form of, or along with, 'objections ...' should be d ism issed.") (citations omitted).

As Judge Suddaby noted in *Calderon:*

On *de novo* review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1)(C). However, a district court will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ( "In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate").

**\*2** *Calderon,* 2009 WL 2252241, at *1, n. 1.

General or conclusory objections, or objections which merely recite the same arguments presented to the magistrate judge, are reviewed for clear error. *Farid v. Bouey,* 554 F.Supp.2d 301, 306 n. 2 (N.D.N.Y.2008); *see Frankel v. N.Y.C.,* 2009 WL 465645 at *2 (S.D.N.Y. Feb.25, 2009). After reviewing the report and recommendation, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b)(1)(C).

## III. DISCUSSION

With this standard in mind, and after having reviewed Plaintiff's objections, the Court determines to adopt the recommendations for the reasons stated in Magistrate Judge Homer's thorough report. Plaintiff has attempted to reargue the positions he took before Magistrate Judge Homer and attempted to fill the gaps in his argument, but he has not pointed to specific erroneous determinations by Judge Homer and the Court finds none. In addition, Plaintiff has attempted to assert additional facts not provided in the Amended Complaint, and some involving individuals not named as defendants in the Amended Complaint. These facts and the actions by these non-parties were properly not considered by Magistrate Judge Homer on this Rule 12(b)(6) motion.

To the extent that Plaintiff seeks leave to file a second amended complaint re-alleging the claims dismissed here, *see Cortec Industries, Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) (It is the usual practice upon granting a motion to dismiss to allow leave to replead.... [L]eave to replead is within the discretion of the district court ... [and] where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.), or assert new claims against new defendants, *see* Rep. Rec. p. 2, n. 4 ("O'Diah's opposition includes new claims against new defendants. Dkt. No. 70, ¶¶ 5–6, 26, 31, 38. These claims and defendants are not subjects of the present motion."), such an application must be made by proper motion before the magistrate judge. If such a motion is made, Plaintiff must comply with Local Rule 7.1(a)(4) that provides in pertinent part:

A party moving to amend a pleading pursuant to Fed.R.Civ.P. 14, 15, 19 – 22 must attach an unsigned copy of the proposed amended pleading to its motion papers. Except if the Court otherwise orders, the proposed amended pleading must be a complete pleading, which will supersede the original pleading in all respects. A party shall not incorporate any portion of its prior pleading into

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

the proposed amended pleading by reference.

The motion must set forth specifically the proposed amendments and identify the amendments in the proposed pleading, either through the submission of a red-lined version of the original pleading or other equivalent means.

**\*3** NDNY LR 7.1(a)(4).

If such a motion is made, Plaintiff must also be prepared to address (1) why a sought after amendment would not be futile in light of the determinations made herein adopting the Report–Recommendation and Order,[FN2] (2) why leave to amend should be allowed after this case has been pending for such a long period of time, and (3) why amendment would not prejudice the remaining Defendants.

> **FN2.** Plaintiff's continued disagreement with the Court's and Magistrate Judge Homer's legal conclusions applied to the facts as they exist in amended complaint does not constitute a meritorious basis for amendment. The assertion of some additional fact that would differentiate a claim from that considered and that would set forth a plausible claim under the law as discussed in Magistrate Judge Homer's Report–Recommendation and Order might constitute a non-frivolous basis for amendment.

## III. CONCLUSION

For the reasons discussed above, the Court adopts Magistrate Judge Homer's February 28, 2012 Report–Recommendation and Order. Therefore, Defendants' motion to dismiss (Dkt. No. 66) is:

1. **DENIED** as to O'Diah's claims of:

A. Denial of access to courts against Defendants Thomas, Hahn, Shaw, Swierk and Moscicki;

B. Medical indifference against Defendants Cully, Thomas, Guter, and Mawhir;

C. Retaliation against Defendants Pepin, Richardson, Cully, Hahn, Shaw and Swierk; and

D. Filing of false misbehavior reports against Defendants Pepin, Richardson, Hahn, Shaw and Swierk; and

2. **GRANTED** as to all other claims and all other moving Defendants.

If Plaintiff seeks to file a second amended complaint, he must make proper application by motion before the magistrate judge.

**IT IS SO ORDERED.**

N.D.N.Y.,2012.
O'Diah v. Fischer
Not Reported in F.Supp.2d, 2012 WL 976033 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2014 WL 1292281 (N.D.N.Y.)
**(Cite as: 2014 WL 1292281 (N.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Anthony RUCANO, Plaintiff,
v.
Carl J. KOENIGSMANN, et al., Defendants.

No. 9:12–cv–00035 (MAD/RFT).
Signed March 31, 2014.

Anthony Rucano, Dannemora, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of
the State of New York, Christopher W. Hall, Esq.,
Assistant Attorney General, of Counsel, Albany,
NY, for Defendants.

**ORDER**

MAE A. D'AGOSTINO, District Judge.

**\*1** Plaintiff, an inmate in the custody of the
New York State Department of Corrections and
Community Supervision ("DOCCS"), commenced
this action pursuant to 42 U.S.C. § 1983, alleging
that Defendants violated his rights under the Eighth
Amendment of the United States Constitution. *See*
Dkt. No. 60. Plaintiff's claims arise out of Defend-
ants' alleged failure to provide Plaintiff with ad-
equate dental care.

In his second amended complaint, Plaintiff
contends, among other things, that Defendant Oli-
veira violated his Eighth Amendment rights by re-
fusing to provide him with three crowns, improp-
erly performing a root planing procedure, and
delaying root planing treatments. Further, Plaintiff
alleges that Defendant Kullman failed to treat his
cavity and also delayed root planing treatments. *Id.*
Currently pending before the Court is Defendant's
motion to dismiss. *See* Dkt. No. 64.

In a March 3, 2014 Report–Recommendation
and Order, Magistrate Judge Randolph F. Treece

recommended that the Court (1) grant Defendants'
motion to dismiss as to Plaintiff's supervisory liab-
ility claims against Defendants Bellamy, LaValley,
and Fischer; (2) grant Defendants' motion to dis-
miss as to Plaintiff's state law negligence and med-
ical malpractice claims; (3) deny Defendants' mo-
tion to dismiss as to Plaintiff's Eighth Amendment
claims against Defendants Oliveira and Kullman;
and (4) deny Defendants' motion to dismiss as to
Plaintiff's supervisory liability claims against De-
fendant Koenigsmann. *See* Dkt. No. 75. None of the
parties objected to the Report–Recommendation
and Order.

When a party files specific objections to a ma-
gistrate judge's report-recommendation, the district
court makes a *"de novo* determination of those por-
tions of the report or specified proposed findings or
recommendations to which objection is made." 28
U.S.C. § 636(b)(1). However, when a party files
"[g]eneral or conclusory objections or objections
which merely recite the same arguments [that he
presented] to the magistrate judge," the court re-
views those recommendations for clear error.
*O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL
933846, \*1 (N.D.N.Y. Mar. 16, 2011) (citations and
footnote omitted). After the appropriate review,
"the court may accept, reject, or modify, in whole
or in part, the findings or recommendations made
by the magistrate judge." 28 U.S.C. § 636(b) (1).

A litigant's failure to file objections to a magis-
trate judge's report and recommendation, even
when that litigant is proceeding *pro se,* waives any
challenge to the report on appeal. *See Cephas v.
Nash,* 328 F.3d 98, 107 (2d Cir.2003) (holding that,
"[a]s a rule, a party's failure to object to any pur-
ported error or omission in a magistrate judge's re-
port waives further judicial review of the point"
(citation omitted)). A *pro se* litigant must be given
notice of this rule; notice is sufficient if it informs
the litigant that the failure to timely object will res-
ult in the waiver of further judicial review and cites
pertinent statutory and civil rules authority. *See*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Frank v. Johnson,* 968 F.2d 298, 299 (2d Cir.1992); *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989) (holding that a *pro se* party's failure to object to a report and recommendation does not waive his right to appellate review unless the report explicitly states that failure to object will preclude appellate review and specifically cites 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and former 6(e) of the Federal Rules of Civil Procedure).

**\*2** Having carefully reviewed the March 3, 2014 Report–Recommendation and Order, the parties' submissions and the applicable law, the Court finds that Magistrate Judge Treece correctly recommended that the Court (1) dismiss Plaintiff's supervisory liability claims as to Defendants Bellamy, LaValley, and Fischer; (2) dismiss Plaintiff's state law negligence and medical malpractice claims as to all Defendants; and (3) deny Defendants' motion to dismiss in all other respects. *See* Dkt. No. 75. Upon review of the thorough and well-reasoned ReportRecommendation and Order, the Court finds that Magistrate Judge Treece did not clearly err in any of his recommendations.

Wherefore, the Court hereby

**ORDERS** that Magistrate Judge Treece's March 3, 2014 Report–Recommendation and Order is **ADOPTED in its entirety** for the reasons set forth therein; and the Court further

**ORDERS** that Defendants' motion to dismiss (Dkt. No. 64) is **GRANTED in part** and **DENIED in part;** and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum–Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**ANTHONY RUCANO,** Plaintiff,

—v—

**CARL J. KOENIGSMANN,** *Deputy Commissioner and Chief Medical Officer,* **RITA GRINBERGS,** *Regional Health Services Administrator,* **MARY D'SILVA,** *Director of Correctional Dental Services,* **KAREN BELLAMY,** *Director of Inmate Grievance Program,* **TAMIR R. FAROOKI,** *Dental Director, Clinton Correctional Facility,* **ROGERIO A. OLIVEIRA,** *Facility Dentist; Clinton Correctional Facility,* **BRIAN FISCHER,** *Commissioner,* **THOMAS LAVALLEY,** *Superintendent; Clinton Correctional Facility,* **PAUL J. KULLMAN,** *Regional Dental Director at Clinton Correctional Facility,* Defendants.

### *REPORT–RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff Anthony Rucano brings this civil rights action, pursuant to 42 U.S.C. § 1983, alleging that Defendants failed to provide adequate dental care, or created and countenanced policies and procedures that led to the inadequate provision of dental care. *See generally* Dkt. No. 60, Second Am. Compl. Now before this Court is Defendants' Motion to Dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6). Dkt. No. 64. Plaintiff opposes the Motion. Dkt. No. 68. For the reasons that follow we recommend that Defendants' Motion be **GRANTED** in part and **DENIED** in part.

### I. STANDARD OF REVIEW

On a motion to dismiss, the allegations of the complaint must be accepted as true. *See Cruz v. Beto,* 405 U.S. 319, 322 (1972). The trial court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974), *overruled on other grounds by Davis v. Scherer,* 468 U.S. 183 (1984).

**\*3** "Generally, in determining a 12(b)(6) mo-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

tion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, and matters to which the court may take judicial notice." *Spence v. Senkowski,* 1997 WL 394667, at *2 (N .D.N.Y. July 3, 1997) (citing *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir.1991)). Moreover, "even if not attached or incorporated by reference, a document 'upon which [the complaint] *solely* relies and which is *integral to the complaint'* may be considered by the court in ruling on such a motion." *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007) (quoting *Cortec Indus ., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991)).

The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *See Retail Clerks Intern. Ass'n, Local 1625, AFL–CIO v. Schermerhorn,* 373 U.S. 746, 754 n. 6 (1963); *see also Arar v. Ashcroft,* 585 F.3d 559, 567 (2d Cir.2009). Nevertheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted).

A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as the plaintiff's complaint includes "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal,* 556 U.S. at 697 (citing *Twombly* ). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. at 678. This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* In this respect, to survive dismissal, a plaintiff "must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (quoting *Bell Atl. Corp. v. Twombly,* 440 U.S. at 555). Thus, in spite of the deference the court is bound to give to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts [which he or she] has not alleged, or that the defendants have violated the ... laws in ways that have not been alleged." *Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526 (1983). The process of determining whether a plaintiff has "nudged [his] claims ... across the line from conceivable to plausible," entails a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v.. Iqbal,* 556 U.S. at 679–80.

*\*4* With this standard in tow, we consider the plausibility of Plaintiff's Complaint.

## II. DISCUSSION
### A. Background

The following facts are derived from Plaintiff's Second Amended Complaint. FN1

> FN1. On June 6, 2013, this Court granted Plaintiff's Motion to Amend and directed the Clerk of the Court to file Plaintiff's Proposed Amended Pleading as his Second Amended Complaint. Dkt. No. 59. The Exhibits attached to the Proposed Amended Pleading were mistakenly not refiled by the Clerk. Nevertheless, this section includes facts derived from the Exhibits attached to Plaintiff's Proposed Amended Pleading (Dkt. No. 47–2), which are incorporated by reference as part of Plaintiff's Second Amended Complaint. *See Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007). All references to these Exhibits correspond to the Table of Contents provided by Plaintiff filed as Docket Number 47–3.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

On February 5, 2011, Plaintiff entered Downstate Correctional Facility ("DCF"). Second Am. Compl. at ¶ 13. During the week of February 8, Plaintiff requested and received a visit with DCF's Dentist.[FN2] *Id.* at ¶ 14. At that appointment, Plaintiff relayed that prior to his incarceration, his personal dentist had started work on crowns[FN3] in three of his teeth by inserting temporary fillings, which were now "past due to be replaced with crowns, and [are] affecting the way I eat. I chew slowly, carefully and am constantly nervous and afraid I will lose the fillings and the teeth." *Id.* at ¶ 15. Plaintiff also informed DCF's Dentist that his periodontist had told him that he had "advanced periodontal disease that required bone grafts to prevent continuing bone loss which would eventually result in the loss of my teeth, and work was scheduled to begin once my crowns were completed." *Id.* at ¶ 16. DCF's Dentist informed Plaintiff that "it was not within [New York State Department of Corrections and Community Supervision's ("DOCCS") ] Policy to provide crowns or bone grafts." *Id.* at ¶ 17. On February 23, 2011, Plaintiff filed a grievance regarding DCF's Dentist's refusal to provide him with crowns. *Id.* at ¶ 18.

> FN2. DCF's Dentist is not a Defendant in this action.

> FN3. According to Plaintiff, "when a tooth receives a root canal, the inside of the tooth down to the root is removed which weakens the structural integrity of the tooth; and the placement of a post, permanent filling and crown secures the tooth's integrity to prevent it from breaking apart." Second Am. Compl. at ¶ 66.

On April 19, 2011, Plaintiff was put on the draft list to be transferred to Clinton Correctional Facility ("CCF"). *Id.* at ¶ 22. On May 17, 2011, Plaintiff received a letter from Defendant Grinbergs in response to a letter he wrote, concerning his dental issues, to Defendant Koenigsmann, Deputy Commissioner and Chief Medical Officer of DOCCS. *Id.* at ¶¶ 5 & 25. On June 13, 2011,

Plaintiff wrote another letter to Defendant Grinbergs "to thank her for responding for Dr. Koenigsmann[,]" and received a response, dated June 27, informing him that "the Division of Health Services has investigated [his] concerns with the Health ervice staff at Clinton, and stated [he] was receiving treatment" and that he had been scheduled to see the Dentist. *Id.* at ¶¶ 27–29.

On September 9, 2011, Plaintiff met with Defendant Oliveira, the Dentist at CCF. Plaintiff explained to Defendant Oliveira that he had three teeth that required crowns, and stated that he was concerned he would lose his teeth if the work was not completed. Defendant Oliveira told Plaintiff that pursuant to § 7.02 of the Health Services Policy Manual ("HSPM") Plaintiff could get his own dentist to handle the crowns, but that he would not provide crowns for Plaintiff. *Id.* at ¶¶ 31–32. Plaintiff informed Defendant Oliveira that he could not afford to pay a private dentist to perform the procedure. *Id.* at ¶ 33. Defendant Oliveira's assistant, Louise Jerdo,[FN4] informed Plaintiff that if his temporary "fillings fell out they would just pull the teeth [.]" *Id.* at ¶¶ 31 & 34. On September 9, 2011, Plaintiff wrote to Defendants Grinbergs and Koenigsmann, however, neither Defendant responded. *Id.* at ¶¶ 39–40 & 42–43.

> FN4. Louise Jerdo is not a Defendant in this action.

**\*5** On October 4, November 18, and December 23 of 2011, Defendant Oliveira conducted a systematic periodontal root planing of each of the four quadrants of Plaintiff's mouth; however, he continued to refuse to provide Plaintiff with crowns. *Id.* at ¶¶ 47, 48, & 49. After his final treatment, Plaintiff inquired about a follow up treatment, but was told by Defendant Oliveira that his treatment was complete and no other work was scheduled. *Id.* at ¶ 50.

In February and March of 2012, Plaintiff made "multiple"[FN5] requests for a dental appointment to treat tooth pain and to begin bi-annual root plaining. Eventually, an appointment was made for April

5, 2012. However, Plaintiff arrived at his appointment late and consequently was told by an unidentified guard that he would have to reschedule. *Id.* at ¶¶ 51–56. On April 23, 2012, Plaintiff requested an appointment with a doctor other than Dr. Oliveira, for root planing and pain in his tooth. *Id.* at ¶ 59. Plaintiff also filed a grievance regarding the events of April 5, stating that "[he] wrote [a] letter to Mary D'Silva (Director of Corr. Dental Services) requesting my semi-anual root planing for advanced periodontal disease and appt. for tooth pain by a dentist other th[a]n Dr. Oliveira, due to issues of retaliation and substandard treatment complained of in the past. *Need appt. ASAP.* Delay will result in unnecessary infection, pain and loss of teeth that is unnecessary and serves no penological purpose, in violation of my constitutional right to adequate medical care." *Id.* at ¶ 60 & Ex. F–3, Grievance # CL–62243–12, dated Apr. 23, 2012 (emphasis in original). On May 10, 2012, Plaintiff received a response to his grievance from the Inmate Grievance Resolution Committee ("IGRC") stating "that [Plaintiff] did have a call-out on 4/5/12 for Dental but he was late. The grievant has been rescheduled." *Id.* at Ex. F–5. I.G.R.C. Response, dated May 10, 2012.

> FN5. The precise number of requests Plaintiff made is unclear from the Second Amended Complaint.

On May 11, Plaintiff was seen by Defendant Dr. Kullman, CCF's Regional Dental Director, who examined Plaintiff and discovered that he had a cavity which required treatment; Plaintiff also informed Defendant Kullman of his need to replace his temporary fillings with permanent crowns in three of his teeth. *Id.* at ¶¶ 63–64. A dental treatment form filled out by Dr. Kullman notes that root planing was needed, tooth # 5 required treatment for a cavity, and he would schedule another appointment for the treatment. *Id.* at ¶ 64A & Ex. G2, Dental Treatment Record, at entry dated May 11, 2012. When asked by Plaintiff to explain the function of crowns, Defendant Kullman

explained that when a tooth receives a root canal, the inside of the tooth down to the root is removed which weakens the structural integrity of the tooth; and the placement of a post, permanent filling and crown secures the tooths integrity to prevent it from breaking apart.... [and] that having the crown placed on my teeth was not necessary now, but in a few years if you are still here we will give you crowns."

**\*6** *Id.* at ¶ 66.

On June 12, 2012, Plaintiff was called to the dental clinic at CCF for an "emergency callout." Although his cavity was not treated, Defendant Oliveira took a full set of x-rays of Plaintiff's mouth. *Id.* at ¶ 68. On June 14, Plaintiff received a letter from Defendant Oliveira, stating in part, " 'Generalized Advanced Chronic Adult Periodontal disease is present' and 'Teeth # 04 and # 19 are poorly endodontic treated. These teeth need retreatment of root canals, post and core and crowns. Stainless steel crowns are not indicated for these teeth. DOCCS does not provide offenders with root canals in posterior teeth.... You can either follow Form HSPM–7.02 and bring a dentist into the facility to treat them or alternatively we can extract and replace them with a partial removal denture.' " *Id.* at ¶ 69 & Ex. F6, Lt. dated June 14, 2012.

On October 26, 2012, Plaintiff saw Dr. Kullman for a second time. Notwithstanding Plaintiff's protestations that he was experiencing a problem with a tooth on the left side of his mouth, Defendant Kullman refused to look at Plaintiff's x-rays and put "another filling on top of a temporary filling in tooth # 4" located on the right side of Plaintiff's mouth. *Id.* at ¶¶ 72–75. On November 26, 2012, Plaintiff submitted a sick call request form stating:

I have cavity on upper left side of mouth, diagnosed on May 11, 2012. I saw dentist on 10–26–12 who refused to look at full mouth x-rays until after he treated a temp filling on the right side of my mouth not causing pain. My cavity is worsening, causing daily pain and I have

had no treatment in it for over 6 months

*Id.* at ¶ 76.

On December 27, 2012 Plaintiff submitted an additional sick call request form stating that he had a "[c]avity on front left top of mouth untreated for over 6 months ... [and][a]dvanced Periodontal disease not treated with root scaling since Oct–Dec 2011. Please schedule appt." *Id.* at ¶ 77. Plaintiff also submitted a note to Defendant Farooki regarding his concerns. On December 31, Plaintiff received a memo from the Dental Department notifying him that he was on the list to be seen but that it was a " '[l]ong list, long wait.' " *Id.* at ¶ 78.

On April 9, 2013, Plaintiff submitted his Second Amended Complaint. As of that date, Plaintiff had not received crowns, treatment for his cavity, nor any additional root planing for treatment of his periodontal disease. *Id.* at ¶¶ 79–80 & p. 52, Wherefore Clause.FN6

> FN6. Plaintiff does not explicitly claim that as of April 9, 2013 he had still not been provided with crowns to replace three temporary fillings that were installed prior to his incarceration. However, in Plaintiff's Wherefore Clause, he requests that an injunction be granted directing Defendants to provide "treatment to complete [his] partially completed crowns[.]" Second Am. Compl. at p. 52, Wherefore Clause.

### B. Eighth Amendment

Construed liberally, Plaintiff's fifty-seven page Second Amended Complaint alleges that Defendant Oliveira (1) refused to provide him with crowns in three teeth, (2) improperly performed a root planing procedure on the lower half of his mouth, and (3) delayed root planing treatments for his advanced periodontitis. *See, e.g.,* Second Am. Compl. at ¶¶ 145–55. And, that Defendant Kullman (1) failed to treat his cavity, and (2) delayed his treatment for root planing. *See, e.g., id.* at ¶¶ 180–90E. Defendants argue that Plaintiff has failed to state a cause

of action under the Eighth Amendment. *See* Dkt. No. 64–1, Defs.' Mem. of Law, at pp. 7–12.

**\*7** To state an Eighth Amendment claim for denial of adequate medical care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105–06). To state a claim for denial of medical care, a prisoner must demonstrate (1) a serious medical condition and (2) deliberate indifference. *Farmer v. Brennan,* 511 U.S. 825, 834–35 (1994); *Hathaway v. Coughlin ("Hathaway I"),* 37 F.3d 63, 66 (2d Cir.1994).

The seriousness element is an objective test, to determine whether the deprivation of care is sufficiently serious "entails two inquiries." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006) (citations omitted). First, courts must determine "whether the prisoner was actually deprived of adequate medical care." *Id* . Medical care is "adequate" where the care provided is a "reasonable" response in light of the "health risk" the inmate faces. *Id.* at pp. 279–80. The second inquiry requires a determination of "whether the inadequacy in medical care is sufficiently serious." *Id.* at p. 280. In cases where medical care is denied, courts focus on the seriousness of the underlying medical condition. *Id.* (citing *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). Some of the factors that determine whether a prisoner's medical condition is serious include: "1) whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment, 2) whether the medical condition significantly affects daily activities, and 3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir.2003)

(internal quotation marks and citations omitted) (noting that an inmate is not required to show "that he or she experiences pain that is at the limit of human ability to bear, nor [does the court] require a showing that his or her condition will degenerate into a life threatening one").

Whereas, the "seriousness inquiry is narrower" in cases where "the prisoner is receiving ongoing treatment and the offending conduct is an unreasonable delay or interruption in that treatment." *Salahuddin v. Goord,* 467 F.3d at 280 (citing *Smith v. Carpenter,* 316 F.3d at 185)). In such cases, courts "focus [ ] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." *Id.* The question becomes whether delaying treatment subjected Plaintiff to any serious risk of harm. To that end, the Second Circuit has instructed us that "the severity of the alleged denial of medical care should be analyzed with regard to all relevant facts and circumstances." *Smith v. Carpenter,* 316 F.3d at 187. In this regard, "the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Id.* Determining whether the inadequacy/delay presents a sufficiently serious risk "requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Id.* (citing *Helling, v. McKinney,* 509 U.S. 25, 32–33 (1993)).

**\*8** The second element, deliberate indifference, is based on a subjective standard. To establish deliberate indifference a plaintiff must demonstrate that the defendant acted with a culpable mental state, similar to criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301–03 (1991); *Hathaway I,* 37 F.3d at 66. A plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *Farmer v. Brennan,* 511 U.S. at 836. This requires "something more than mere negligence ... [but] something less than acts or

omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835; *see also* *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) (citing *Farmer* ). Further, a showing of medical malpractice is insufficient to support an Eighth Amendment claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong,* 143 F.3d at 702 (quoting *Hathaway v. Coughlin ("Hathaway II"),* 99 F.3d 550, 553 (2d Cir.1996)); *see also* *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citations omitted).

### 1. Plaintiff's Crowns

According to Plaintiff, Defendants' Oliveira and Kullman were aware that he required crowns in three of his teeth. Second Am. Compl. at ¶¶ 31–32, 63–64, 66, & 69. Additionally, Plaintiff has alleged that in a letter from Defendant Oliveira, and during a conversation with Defendant Kullman, these Defendants explicitly acknowledged that one possible consequence of not receiving crowns was that Plaintiff's teeth could collapse and end up needing to be removed. Nonetheless, Defendant Oliveira told Plaintiff that DOCCS' Policy did not permit him to provide Plaintiff with crowns and he could either pay to have an outside dentist perform the procedure—which he could not afford—or wait until his temporary fillings fell out, at which time he could have his teeth pulled. *See id.* at ¶¶ 32–34, 66, 69, & Ex. F6, Lt. dated June 14, 2012. Likewise, Defendant Kullman informed Plaintiff that he would install the crowns if Plaintiff was still at CCF "in a few years." *Id.* at ¶ 66. Plaintiff claims that Defendants' refusals were based on economic rather than medical reasons. *See, e.g., id.* at ¶¶ 32–36 & 42–43; Dkt. No. 68, Pl.'s Mem. in Opp'n, at pp. 5–7.

Defendants argue that Plaintiff has not alleged a sufficiently serious injury for purposes of the Eighth Amendment because he does not claim to be "suffering any substantial, chronic pain from the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

lack of crowns," and, that his desire for crowns is nothing more than a non-actionable dispute over the proper course of treatment. Defs.' Mem. of Law at p. 9. They point out that in his Second Amended Complaint, Plaintiff does not claim that he suffered from any pain due to the lack of crowns, rather he merely alleges that he "chews slowly, carefully and [is] constantly nervous and afraid [he] will lose the fillings in his teeth." *Id.* (quoting Second Am. Compl. at ¶ 15). However, while pain is one factor to be considered in assessing the seriousness of an underlying condition, the Second Circuit has held that "dental needs—for fillings, crowns, and the like—are serious medical needs as the law defines that term." *See Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) (quoting *Dean v. Coughlin,* 623 F.Supp. 392, 404 (S.D.N.Y .), *vacated on other grounds,* 804 F.2d 207 (2d Cir.1986)).

**\*9** While upon a fuller record it may be established that Plaintiff's condition was not sufficiently serious, at this early stage, Plaintiff's allegations that Defendants acknowledged but chose to ignore the possibility that if he did not receive crowns he would lose teeth that might otherwise be saved—for economic rather than medical reasons—is sufficient to plausibly allege that Defendants acted with deliberate indifference towards Plaintiff's sufficiently serious medical need for crowns. *See Chance v. Armstrong,* 143 F .3d at 703–04 (reversing the district court's 12(b)(6) dismissal of an inmate's claim that doctors chose to pursue a less efficacious treatment based on "ulterior" economic motives).

Therefore, we recommend that Defendant's Motion to Dismiss be **DENIED** as to Plaintiff's claims that Defendants Oliveira and Kullman refused to provide him with crowns.

### 2. Plaintiff's Cavity

Plaintiff has alleged that notwithstanding multiple requests for treatment of the cavity diagnosed by Defendant Kullman, the condition went untreated for more than ten months. Second Am. Compl. at ¶¶ 63 & 76–79. Defendants argue that

Plaintiff has failed to allege that his cavity was a sufficiently serious condition for purposes of the Eighth Amendment because Plaintiff did not allege that this condition caused him substantial pain or that it affected his ability to go about his daily activities. Defs.' Mem. of Law at p. 11.

The Second Circuit has noted "that a tooth cavity is a serious medical condition, not because cavities are always painful or otherwise dangerous, but because a cavity that is not treated will probably become so." *Brock v. Wright,* 315 F.3d 158, 163 (2d Cir.2003) (citing *Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000) for the proposition that "a tooth cavity is a degenerative condition, and if it is left untreated indefinitely, it is likely to produce agony and to require more invasive and painful treatments, such as root canal therapy or extraction"). Moreover, although Plaintiff did not complain about his cavity on a daily basis, in November and December of 2012 he requested treatment for his cavity, noting that "[m]y cavity is worsening, causing daily pain and I have had no treatment in it for over 6 months." Second Am. Compl. at ¶¶ 76–79. Thus, it is plausible that Plaintiff's cavity was a sufficiently serious condition for purposes of the Eighth Amendment.

Moreover, Plaintiff's allegations that despite their awareness of the cavity, and his requests for treatment, Defendants continued to ignore his condition for approximately ten months, is sufficient at this early stage to plausibly allege that Defendants consciously disregarded his cavity.

For these reasons we recommend that Defendant's Motion be **DENIED** as to Plaintiff's Eighth Amendment claim regarding Defendants Kullman's and Oliveira's failure to treat his cavity.

### 3. Plaintiff's Periodontal Disease

Plaintiff has alleged that (1) Defendant Kullman's failure to schedule follow up appointments for routine root planing, despite acknowledging that Plaintiff required further treatment for his periodontal disease, Second Am. Compl. at ¶¶ 188–90;

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

and (2) Defendant Oliviera's substandard provision of dental planing, and his failure to schedule a follow up treatment for future planing, constituted deliberate indifference toward the treatment of his condition, *id.* at ¶¶ 150–52.

**\*10** For purposes of the instant Motion, Defendants concede that periodontal disease is a serious medical condition, and we agree. *See* Defs.' Mem. of Law. at p. 9; *see also Rashid v. McGraw,* 2006 WL 1378945,\*1 (S.D.N.Y. May 18, 2006) ("Periodontitis, like gingivitis, is a serious infection of the gum area, that, if left untreated, can lead to tooth loss. As the disease progresses, gums separate from the teeth, forming pockets (spaces between the teeth and gums) that become infected. Pockets deepen as the disease progresses and more gum tissue and bone are destroyed.") (citation omitted).

To begin with, we note that performing a procedure negligently does not amount to deliberate indifference. Here, Plaintiff alleges that Defendant Oliveira failed to properly plane the roots in the bottom quadrants of his mouth, because he performed the procedure too quickly and did not draw any blood, as is typical during such a procedure. *See, e.g.,* Second Am. Compl. at ¶¶ 150–51. Even if true, such behavior does not evince a conscious disregard to a known serious risk of harm; at most, such a claim sounds in negligence or medical malpractice, neither of which is tantamount to deliberate indifference. *See Estelle v. Gamble,* 429 U.S. 97, 106 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.").

Contrariwise, Plaintiff's remaining claims against these Defendants are sufficient to state a cause of action. Dr. Oliveira provided Plaintiff with root planing between October and December of 2011. Second Am. Compl. at ¶¶ 47, 48, & 49. On May 11, 2012, Defendant Kullman noted in a medical report that further root planing was needed, but did not schedule an appointment. *Id.* at ¶¶ 64A & 71. On June 14, 2012, Defendant Oliveira sent

Plaintiff a letter noting that advanced periodontal disease was present, and that two of his teeth needed root canals and crowns. *Id.* at ¶ 69 & Ex. F6, Lt. dated June 14, 2012. Nonetheless, as of the filing of Plaintiff's Second Amended Complaint, on April 9, 2013, Plaintiff had not received any additional treatment for his periodontal disease. Second Am. Compl. at ¶ 80. Defendants' failure to provide further periodontal care to Plaintiff, despite their explicit acknowledgments of his continuing need for such care, evinces a conscious disregard of Plaintiff's serious medical need.[FN7] While upon a fuller record, Defendants' contentions that Plaintiff received adequate care for his periodontal disease may be born out, at this early stage Plaintiff has sufficiently alleged an Eighth Amendment claim for deliberate indifference.

> FN7. In addition, we note that Plaintiff alleges that Defendants' decision not to provide further treatment for his periodontitis was based on ulterior economic concerns rather than his actual dental needs. *See* Pl.'s Mem. in Opp'n at p. 12; *see also Chance v. Armstrong,* 143 F.3d at 703–04.

Therefore, we recommend that Defendants' Motion to Dismiss be **DENIED** as to Plaintiff's claims that Defendants Oliveira and Kullman were deliberately indifferent towards the care of his periodontal disease.

### C. Personal Involvement
**\*11** An individual cannot be held liable for damages under § 1983 merely because he holds a position of authority, but he can be held liable if he was personally involved in the alleged deprivation.

The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the

continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citations omitted).

Defendants claim that Plaintiff failed to allege the personal involvement of Defendants Carl J. Koenigsmann, the Deputy Commissioner and Chief Medical Officer at DOCCS, Karen Bellamy, Director of the Inmate Grievance Program at DOCCS, Brian Fischer, the Commissioner of DOCCS, and Thomas LaValley, the Superintendent at CCF. Defs.' Mem. of Law at pp. 12–15.

### 1. Defendant Koenigsmann

Plaintiff alleges that he wrote Defendant Koenigsmann three letters describing the inadequacies of his dental care. Defendant Koenigsmann referred two of those letters to Defendant Grinbergs, who replied to Plaintiff on behalf of Defendant Koenigsmann on May 17 and June 27, 2011. *See, e.g.,* Second Am. Compl. at ¶¶ 82–87. Defendant Koenigsmann did not respond to Plaintiff's third letter, dated September 9, 2011, in which Plaintiff alleged that Defendant Kullman and Oliveira refused to provide him with crowns pursuant to an unconstitutional DOCCS' Policy. *Id.* at ¶¶ 40–43 & 83–87; *see also* Dkt. No. 1–1., Compl., Ex. B13, Lt., dated Sep. 9, 2011. It was once well accepted that neither ignoring an inmate's letter nor referring his letters to a subordinate constituted personal involvement on behalf of a supervisory official. *See Thomas v. Coombe,* 1998 WL 391143, at *6 (S.D.N.Y. July 13, 1998) (citations omitted) (ignoring letter is insufficient for personal involvement); *Silvagnoli v. Fischer,* 2010 WL 1063849, at *8 (N.D.N.Y. Mar. 1, 2010) (citing *Smart v. Goord,* 441 F.Supp.2d 631, 642–43 (S.D.N.Y.2006) for the proposition that "[i]t is now well-settled that the failure of a supervisory official to investigate a let-

ter of protest written by an inmate is not sufficient to show personal involvement"; & *Ortiz–Rodriguez v. N.Y. State Dep'f of Corr. Servs.,* 491 F.Supp.2d 342, 347 (W.D.N.Y.2007) for the proposition that "[t]he same is true if the only involvement of the supervisory official is to refer the inmate's complaint to the appropriate staff for investigation."). However, in light of the Second Circuit's recent decision in *Grullon v. City of New Haven,* it would appear that plaintiffs within the Second Circuit are "entitled to have the court draw the reasonable inference ... that the [official] in fact received the Letter, read it, and became aware of the alleged conditions of which [the inmate] complained." *See Castro v. Heath,* 2013 WL 5354241, at *8 (N.D.N.Y. Sept. 23, 2013) (MAD) (quoting *Grullon v. City of New Haven,* 720 F.3d 133, 141 (2d Cir. June 19, 2013)).

**\*12** As to the first two letters, it is clear that Defendant Koenigsmann acted upon those letters by referring them to his subordinate. *See Ortiz–Rodriguez v. N.Y. State Dep'f of Corr. Servs.,* 491 F.Supp.2d at 347. However, affording Plaintiff the benefit of this inference, it is possible that Plaintiff's third letter to Defendant Koenigsmann put him on notice of a continuing violation of Plaintiff's Eighth Amendment rights, and he failed to take any action to remedy the wrong. *See Colon v. Coughlin,* 58 F.3d at 873. Therefore, we recommend that Defendants' Motion be **DENIED** as to Defendant Koenigsmann.

### 2. Defendant Bellamy

Plaintiff claims that Defendant Bellamy is liable because of her supervisory role over the voting members of the Central Office Review Committee ("CORC"), an entity within DOCCS that reviewed and decided the final level of Plaintiff's grievance appeals. Second Am. Compl. at ¶¶ 127–129. Construed liberally, it appears that Plaintiff believes Defendant Bellamy failed to ensure that the voting members of CORC were properly trained to understand inmate medical issues. *See id.* at ¶¶ 127–129. Even if true, such a failure is not actionable under §

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

1983. See *Abdush–Shahid v. Coughlin,* 933 F.Supp. 168, 183 (N.D.N.Y.1996) (citing cases for the proposition that "supervisory officials are also generally entitled to delegate medical responsibility to facility medical staffs and are entitled to rely on the opinion of medical staff concerning the proper course of treatment."). Moreover, there is no apparent supervisory link between Defendants Kullman and Oliveira and Defendant Bellamy, therefore, Plaintiff has failed to allege her personal involvement in the alleged Eighth Amendment deprivations caused by Defendants Kullman and Oliveira. See *Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir.1999) (finding that in the absence of *respondeat superior,* supervisory liability is found only where some act or omission of the supervisory official is the proximate cause of the constitutional violation); *see also Russo v. City of Bridgeport,* 479 F.3d 196, 211 (2d Cir.2007) (a supervisory official may be held liable for "gross negligence in failing to supervise his subordinates who commit such wrongful acts, provided that the plaintiff can show an affirmative causal link between the supervisor's inaction and [his] injury") (quoting *Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002).

Alternatively, Plaintiff argues that Defendant Bellamy is "personally involved and appropriately named in this action for the purposes of discovery to ascertain the voting members present in deciding the Plaintiff's grievance, including determining the information requested by the voting members in any form that was gathered, acquired, used or consulted in reaching the final determination on the grievance." *Id.* at ¶ 130. Although courts within the Second Circuit have permitted a named defendant who lacked personal involvement in the underlying constitutional violation to remain a defendant solely for the purposes of discovery, such exceptions are typically granted only where the plaintiff was legitimately unable to identify the true identity of any other defendant named in the action without the benefit of first conducting some limited discovery. *See, e.g., Murphy v. Goord,* 445 F.Supp.2d 261, 266 (W.D.N.Y.2006) (citing *Covington v. Warden*

*of C–95,* 1996 WL 75211 at *4 (E.D.N.Y.Feb.8, 1996)); *see also Reed v. Doe No. 1,* 2013 WL 5441503, at *8 fn.5 (N.D.N.Y. Sept. 27, 2013) (citing *Davis v. Kelly,* 160 F.3d 917, 921–22 (2d Cir.1998)).

**\*13** Here, Plaintiff has not named any Doe Defendants. Moreover, to the extent that Plaintiff seeks discovery of relevant information, Plaintiff has named other supervisory officials in this action which Defendants have not moved to dismiss.[FN8] *Compare* Second Am. Compl., *with* Defs.' Mem. of Law. Therefore, it is unnecessary to allow Plaintiff to continue his action against Defendant Bellamy in the absence of some indication that she was personally involved in the deprivations allegedly caused by Defendants Oliveira and Kullman.

> FN8. By their Motion, Defendants do not seek dismissal of Defendants Grinbergs, D'Silva, nor Farooki.

Accordingly, we recommend that Defendants' Motion be **GRANTED** as to Plaintiff's claims against Defendant Bellamy.

### 3. Defendant Fischer

Plaintiff claims that Defendant Fischer is liable for actions he took (or failed to take) while acting as Commissioner of DOCCS. Specifically he alleges that Defendant Fischer (1) failed to remedy certain unconstitutional policies that he was alerted to *via* a 2009 report entitled "Healthcare in New York State Prisons, 2004–2007" written by the "Corrections Association", (2) and for his gross negligence in failing to supervise Defendant Koenigsmann. Second Am. Compl. at ¶¶ 156–68. Defendant Fischer "may be found liable for his deliberate indifference to the rights of others by his failure to act on information indicating unconstitutional acts were occurring or for his gross negligence in failing to supervise his subordinates who commit such wrongful acts, provided that the plaintiff can show an affirmative causal link between the supervisor's inaction and her injury" *Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Plaintiff does not allege that Defendant Fischer was personally involved in any aspect of his dental care. Moreover, Plaintiff has not plausibly alleged that Defendant Fischer was aware that Plaintiff's constitutional rights were being violated. Plaintiff's claim that the Correction Association's report regarding healthcare provided to prisoners in New York State between 2004 and 2007 put Defendant Fischer on notice of the care actually received by Plaintiff in 2011–2013 is patently implausible. Moreover, a review of the report offered by Plaintiff reveals that it does not directly relate to dentistry, dental care, nor the named Defendants. In fact, the word dentist does not appear at all in the report nor does the report conclude anywhere that dental care at Clinton was constitutionally inadequate. Second Am. Compl. at Ex. G11. Accordingly, it is equally implausible to suggest that Defendant Fischer's awareness of the unrelated state-wide issues presented in the report put him on notice of the potential that Plaintiff would suffer constitutional harm at the hands of Defendants Kullman and Oliveira. *See Colon v. Coughlin,* 58 F.3d at 873.

Next, Plaintiff claims that Defendant Fischer was grossly negligent in his supervision of Defendant Koenigsmann because he failed to ensure that Defendant Koenigsmann properly implemented DOCC's Quality Improvement Program and that he properly supervised Defendant D'Silva, DOCCS' Dental Director. Second Am. Compl. at ¶¶ 162–68. According to Plaintiff, it was Fischer's responsibility to ensure that Defendant Koenigsmann held Defendant D'Silva accountable for her responsibilities to (1) update HSPM § 2.01, (2) utilize the Dental Review Committee to assist in complying with policies, and to investigate health complaints, and (3) insure that Facility Dental Directors were effectively applying Dental Care Policies at CCF. *Id.* at ¶¶ 165–68.

**\*14** According to the Second Circuit:

a supervisor may be liable for failing to screen or otherwise inquire about his subordinates ... ac-

tions.... To be liable under section 1983 for his failure to inquire, he must first have been on notice that his subordinate was prone to commit some unconstitutional or unacceptable behavior. Such notice could be actual (for example, awareness of prior deprivations in a related context), or it could be constructive (for instance, notice arising from a preexisting duty)....

*Poe v. Leonard,* 282 F.3d at 141–42.

Here, Plaintiff points out several aspects which he believes could have been handled better by Defendants Koenigsmann and D'Silva, yet he fails to allege any facts from which it could plausibly be concluded that Defendant Fischer was, or should have been, aware of the allegedly deficient performance of his subordinates. "[T]he mere fact that a subordinate may have deprived an inmate of a constitutional right, without more, will not support a claim against that subordinate's supervisor." *Felix–Torres v. Graham,* 687 F.Supp.2d 38, 62 (N.D.N.Y.2009). Moreover, as mentioned above, the report Plaintiff offers is primarily focused on unrelated medical and staffing issues and does not involve dental care generally nor Defendants Koenigsmann and D'Silva. Therefore, Plaintiff has failed to plausibly allege that Defendant Fischer knew of, or should have known, that either of his subordinates required greater supervision. Consequently, Plaintiff has failed to state a plausible claim that Defendant Fischer's supervision of either Defendant was grossly negligent. *See Pettus v. Morgenthau,* 554 F.3d 293, 300 (2d Cir.2009) citing *Poe v. Leonard,* 282 F.3d at140 & *Iqbal v. Hasty,* 490 F.3d 143, 166 (2d Cir.) *cert. granted sub nom. Ashcroft v. Iqbal,* 554U.S. 902 (2008) for the proposition that "[t]o the extent that the complaint attempts to assert a failure-to-supervise claim, ... it lacks any hint that [defendant] acted with deliberate indifference to the possibility that his subordinates would violate [plaintiff's] constitutional rights."); *see also Poe v. Leonard,* 282 F.3d at 140 n. 14 ("We have often equated gross negligence with recklessness, and have defined it as the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

'kind of conduct ... where [the] defendant has reason to know of facts creating a high degree of risk of physical harm to another and deliberately acts or fails to act in conscious disregard or indifference to that risk.' " (quoting *Bryant v. Maffucci,* 923 F.2d 979, 985 (2d Cir.1991)).

Accordingly, we recommend that Defendants' Motion be **GRANTED** as to Plaintiff's claims against Defendant Fischer.[FN9]

> **FN9.** In light of this recommendation, there is no need for us to address Defendants' request to dismiss, pursuant to the Eleventh Amendment, the monetary claims asserted against Defendant Fischer in his official capacity.

*4. Defendant La Valley*

Plaintiff claims that Defendant LaValley, CCF's Superintendent, is liable in his supervisory capacity for the alleged constitutional violations of Defendants Oliveira and Kullman, because (1) "despite having actual knowledge through his administrative oversight of the FHSD, through his operation and participation of the Quality Improvement Program and in the [Quality Improvement] Committee, and through his knowledge and awareness of grievances appealed through his office, had allowed and condoned the Policies and Customs which resulted in unconstitutional practices occurring." Second Am. Compl. at ¶ ¶ 169–79.

**\*15** Construed liberally, Plaintiff has alleged that Defendant LaValley was aware of the alleged constitutional violations which Plaintiff experienced at CCF yet took no action to remedy the situation. Plaintiff's allegations that Defendant LaValley learned of the alleged constitutional deprivations *via* his administrative oversight of the FHSD, participation in the Quality Improvement Committee, or through the grievances appealed through his office, are purely speculative and conclusory. Plaintiff failed to allege with any specificity how the alleged report generated by the FHSD, complaints received by the Quality Improvement Committee, or the grievances appealed through his office related directly to Plaintiff's allegedly deficient dental care.

Moreover, although Plaintiff grieved these issues on two occasions, once while at DCF, and once while at GCF, there is nothing in the record from which it would be reasonable to infer that Defendant LaValley, the Superintendent of CCF, ever saw either grievance. *See, e.g.,* Second Am. Compl. at ¶ ¶ 18–21, 60 & Ex. F–3, Grievance # CL–62243–12. Plaintiff's first grievance was filed at DCF, and although he appealed the decision of the IGRC to the Superintendent, that grievance was handled by DCF's Superintendent, not Defendant LaValley the Superintendent of CCF. *See id.* at Ex. A–3, Superintendent's Response, dated Mar. 24, 2011. Moreover, while Plaintiff filed a grievance regarding his dental care while at CCF, he does not allege that he appealed the decision of the IGRC to the Superintendent. Second Am. Compl. at ¶ 60 & Ex. F–5, I.G.R.C. Response, dated May 5, 2012. Thus, Plaintiff has failed to plausibly allege that Defendant LaValley was aware of the alleged constitutional violations of which Plaintiff now complains, or that he had any reason to suspect that his subordinates would violate Plaintiff's constitutional rights. *See Pettus v. Morgenthau,* 554 F.3d at 300; *see also Poe v. Leonard,* 282 F.3d at 140 n. 14.

Therefore, we recommend that Defendants' Motion be **GRANTED** as to Plaintiff's claims against Defendant LaValley.

**D. Corrections Law § 24**

In addition to his federal claims, Plaintiff also raises pendent state law negligence and medical malpractice claims against each of the named Defendants. Second Am. Compl. at ¶ ¶ 191–239. A federal court exercising pendent jurisdiction must apply state law. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726 (1996). "Thus, if state law does not recognize a plaintiff's right to bring an action in state court, a federal court, exercising pendent jurisdiction, sitting as a state court, must follow the state law limitation on jurisdiction." *Livingston v.*

*Griffin,* 2007 WL 2437433, at *2 (N.D.N.Y. Aug. 22, 2007) (citing *Baker v. Coughlin,* 77 F.3d 12, 15 (2d Cir.1996)).

New York Corrections law § 24 precludes "the assertion of claims against corrections officers [in their personal capacities] in any court, including the federal courts," by designating the New York State Court of Claims as the only available venue to bring a claim for damages arising out the acts committed by corrections officers within the scope of their employment.[FN10] *Baker v. Coughlin,* 77 F.3d at 15. And, because the Court of Claims is a court of limited jurisdiction, hearing only claims against New York State and no other individual or entity, § 24 amounts to a grant of immunity for corrections officers sued in their personal capacities for claims arising out of the discharge of their duties. N.Y. CT. CLMS. LAW § 9.

> FN10. N.Y. CORR. LAWW § 24 states that:
>
> 1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.
>
> 2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

**\*16** Plaintiff contends that when used to relegate to the Court of Claims civil rights actions brought pursuant to 42 U.S.C. § 1983, § 24 is in-

consistent with the Supremacy Clause, U.S. Const. Art. VI, cl. 2, and therefore, pursuant to the Supreme Court's decision in *Haywood v. Drown,* 556 U.S. 729 (2009), unconstitutional. Pl.'s Opp'n at pp. 25–26. However, Plaintiff's reliance on *Haywood* is misplaced because claims brought pursuant to state law do not implicate the Supremacy Clause, and therefore, the *Haywood* decision does not affect the question of whether this Court has proper jurisdiction to hear pendent state law claims.[FN11] *See Rounds v. Thompson,* 2013 WL 3187074 (N.D.N.Y. June 20, 2013) (citing cases for the proposition that "courts in this District have held that the *Haywood* decision does not affect the question of the district court's jurisdiction to hear pendent state law claims against DOCCS employees and have continued to dismiss those claims under Corrections Law § 24 ."); *see also Lewis v. Turco,* 2011 WL 1044511, at *2 (W.D.N.Y. Mar. 21, 2011) ("In other words, in *Haywood,* the Supreme Court held that Correction Law section 24 was unconstitutional only insofar as it barred federal section 1983 claims in state court.").

> FN11. The *Haywood* Court held that New York State, having created courts of general jurisdiction that routinely hear § 1983 actions against all types of state actors, "is not at liberty to shut the courthouse door to federal claims [against corrections officers] that it considers at odds with its local policy." *Id.* at 2117. The Supreme Court found such selective treatment of § 1983 claims brought against corrections officers to be "contrary to Congress' judgment that *all* persons who violate federal rights while acting under color of state law shall be held liable for damages," and therefore, in violation of the Supremacy Clause. *Id.* at 2115 (emphasis in original).

Thus, pursuant to § 24, only the New York State Court of Claims has jurisdiction to hear Plaintiff's pendent claim because Plaintiff has alleged acts that clearly fall within the scope of the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Defendants' employment duties. The Second Circuit has held that § 24 bars a plaintiff from bringing state law claims against corrections employees in their individual capacities in federal as well as state court. *Baker v. Coughlin,* 77 F.3d at 15–16. In making such ruling, the Second Circuit has stated that "[i]t is of no significance that § 24(1) refers only to actions in state courts, because a federal court acts essentially as a state court in addressing pendent state law claims." *Baker v. Coughlin,* 77 F.3d at 15. Under these circumstances, the correct jurisdiction for these types of claims rests with the New York State Court of Claims. Therefore, this Court does not have jurisdiction to hear Plaintiff's pendent state law claims and we recommended that Defendants' Motion be **GRANTED** and that Plaintiff's state law claims against all Defendants be **DISMISSED.**

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion to Dismiss (Dkt. No. 64) be **GRANTED** in part and **DENIED** in part as follows:

1) **GRANTED** as to Plaintiff's supervisory liability claims against Defendants Bellamy, LaValley, and Fischer, and these Defendants should be dismissed from this action;

2) **GRANTED** as to Plaintiff's state law negligence and medical malpractice claims against all Defendants;

3) **DENIED** as to Plaintiff's Eighth Amendment deliberate indifference claims against Defendants Oliveira and Kullman; and

4) **DENIED** as to Plaintiff's supervisory liability claims against Defendant Koenigsmann;

**\*17 ORDERED,** that the Clerk of the Court attach a copy of the Exhibits that were included in Plaintiff's Motion to Amend (Dkt. No. 47), as Document Numbers 47–3 through 47–8, to Plaintiff's Second Amended Complaint (Dkt. No. 60); and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

Date: March 3, 2014.

N.D.N.Y.,2014.
Rucano v. Koenigsmann
Slip Copy, 2014 WL 1292281 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.


Slip Copy, 2013 WL 3187074 (N.D.N.Y.)
**(Cite as: 2013 WL 3187074 (N.D.N.Y.))**

H

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
William ROUNDS, Plaintiff,
v.
C.O. THOMPSON, Correction Officer; Brian Fischer, Commissioner, NYS Department of Correction and Community Service, Defendants.

Civil Action No. 9:12–cv–953 (GLS/TWD).
June 20, 2013.

William Rounds, North Syracuse, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Kevin P. Hickey, Esq., of Counsel, Albany, NY, for Defendant Fischer.

Sheehan, Greene Law Firm, Lawrence H. Schaefer, Esq., Thomas D. Latin, Esq., of Counsel, Albany, NY, for Defendant Thompson.

### *ORDER*
GARY L. SHARPE, Chief Judge.

*1 The above-captioned matter comes to this court following a ReportRecommendation by Magistrate Judge Therese W. Dancks, duly filed May 28, 2013. Following ten days from the service thereof, the Clerk has sent the file, including any and all objections filed by the parties herein.

No objections having been filed, and the court having reviewed the Magistrate Judge's Report–Recommendation for clear error, it is hereby

ORDERED that the Report–Recommendation of Magistrate Judge Therese W. Dancks filed May 28, 2013 is ACCEPTED in its entirety for the reasons state therein; and it is further

ORDERED, that Defendant Fischer's Rule 12(c) motion for judgment on the pleadings (Dkt.

No. 25) be GRANTED; and it is further

ORDERED, that Plaintiff's Complaint be dismissed as against Defendant Fisher with leave to amend within thirty (30) days of this Order; and it is further

ORDERED, that the Clerk of the Court is to mail copies of the Order to the parties in accordance with the court's local rules.

IT IS SO ORDERED.

### *ORDER AND REPORT–RECOMMENDATION*
THÉRÈSE WILEY DANCKS, United States Magistrate Judge.

This *pro se* civil rights action commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Gary L. Sharpe, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and N.D.N.Y. L.R. 72.3(c). Plaintiff William Rounds has asserted an Eighth Amendment claim for excessive force against Defendant Thompson, a Corrections Officer at the Oneida Correctional Facility ("Oneida") during the time period relevant to the claim. (Dkt. No. 1.) Plaintiff has alleged a claim for negligent hiring, training, discipline, and retention of Thompson against Brian Fischer ("Fischer"), Commissioner of the New York State Department of Corrections and Community Supervision ("DOCCS"). *Id.* Defendant Fischer filed an Answer to Plaintiff's Complaint (Dkt. No. 21) and now moves for judgment on the pleadings in his favor pursuant to Federal Rule of Civil Procedure 12(c). (Dkt. No. 25.) Plaintiff has not filed papers opposing Fischer's motion. For the reasons that follow, I recommend that Defendant Fischer's motion be granted.

### I. BACKGROUND[FN1]

> **FN1.** The background facts, taken from Plaintiff's Complaint, are accepted as true for purposes of this motion. *See Sheppard v. Beerman,* 94 F.3d 823, 827 (2d

Cir.1996) (in deciding a Rule 12(c) motion, "all allegations in the complaint must be accepted as true ....")

### A. Defendant Thompson

In March of 2011, Plaintiff was an inmate confined at Oneida. (Dkt. No. 1 at ¶ 1.) On March 28, 2011, Plaintiff was working in Cook–Chill, a food service program owned and operated by DOCCS. *Id.* at ¶ 8. Defendant Corrections Officer Thompson was assigned to supervise the area in which Plaintiff was working. *Id .* at ¶ 9.

According to Plaintiff, while he was performing his duties, Thompson began swearing at him and ordered him into a nearby bathroom. *Id.* at ¶ 10. Once in the bathroom, Thompson called Plaintiff "a piece of shit" and accused him of being a lazy worker. *Id.* at ¶ 11. When Plaintiff denied being lazy, Thompson became infuriated and pushed Plaintiff hard against a wall, causing Plaintiff to fall to the floor in pain. *Id.* at ¶¶ 12–13. Thompson then grabbed Plaintiff by the throat and began choking him, continuing as Plaintiff gasped for air and neared unconsciousness. *Id.* at ¶¶ 14–17, 19. Thompson is alleged to have told Plaintiff while he was choking him that "this is what I used to do when I was 21 [yrs. old] working at Sing Sing." *Id.* at ¶ 17. Upon releasing the choke hold, Thompson forced Plaintiff to stand, grabbed the back of his neck, and smashed his face into the wall. *Id.* at ¶¶ 22–24.

**\*2** After being taken to the Oneida infirmary where Plaintiff was treated for what he has described as injuries to his neck, face, and head, he was placed in punitive segregation pending a disciplinary proceeding on a misbehavior report filed by Thompson claiming that Plaintiff had assaulted him. *Id.* at ¶¶ 29–30, 36. According to Plaintiff, the charges in the misbehavior report were dismissed several days later on the grounds that they were unsubstantiated and not credible, and an internal investigation was conducted concerning the force used by Thompson. *Id.* at ¶¶ 31–32. Plaintiff has alleged upon information and belief that Thompson

had an extensive history of assaulting inmates but was nonetheless allowed by Defendant Fischer to remain employed during the investigation. *Id.* at ¶ 33.

In July of 2011, Plaintiff attended an arbitration hearing held for the purpose of determining whether Thompson had used excessive force. *Id.* at ¶ 33. Plaintiff believes that Thompson's employment with DOCCS was terminated following the arbitration hearing. *Id.* at ¶ 35.

### B. Defendant Fischer

Plaintiff has alleged that Defendant Fischer, as DOCCS Commissioner, is responsible for operating a number of New York correctional facilities, and through his senior officials, promulgates and implements policies, including those with respect to the use, reporting and investigation of force by uniformed staff. *Id.* at ¶ 7. Plaintiff claims that Fischer's senior officials at DOCCS are aware of and tolerate certain practices by subordinate employees in correctional facilities, including some which are inconsistent with formal policy. *Id.* Because these practices are "wide-spread, long-standing, and deeply embedded in the culture of DOCCS," they constitute unwritten policies or customs. *Id.* Plaintiff has also alleged that Fischer is responsible for the "appointment, training, supervision, and conduct of all DOCCS personnel, including Thompson. *Id.*

Plaintiff contends that Thompson was unfit and incompetent for his position, and that Fischer knew or should have known through the exercise of reasonable diligence that Thompson was potentially dangerous. *Id.* at ¶¶ 44–45. Plaintiff has alleged upon information and belief that Fischer was negligent in "screening, hiring, training, disciplining, and retaining" Thompson. *Id.* at ¶ 46.

### II. PROCEDURAL HISTORY

Plaintiff filed his Complaint in this matter on June 12, 2012, and was authorized to proceed *in forma pauperis* by this Court's Decision and Order filed on September 13, 2012. (Dkt. Nos. 1 and 9.)

Defendants Fischer and Thomson filed their respective Answers to the Complaint on January 17, 2013. (Dkt. Nos. 21 and 22.) Fischer filed his motion to dismiss on the pleadings pursuant to Rule 12(c) a day later. (Dkt. No. 25.)

On January 22, 2013, Plaintiff sent a letter to the Clerk asking for a temporary restraining order against Thompson on the grounds that he was fearful for his safety and property once he was released from incarceration. (Dkt. No. 27.) Judge Sharpe treated Plaintiff's request as a motion for a preliminary injunction and denied the motion on the grounds that Plaintiff had not made the necessary showing for issuance of a mandatory injunction. (Dkt. No. 32.)

## III. ANALYSIS

### A. Legal Standard Governing a Rule 12(c) Motion for Judgment on the Pleadings

**\*3** The standard for evaluating a Rule 12(c) motion for judgment on the pleadings is the same as that applicable to a Rule 12(b)(6) motion to dismiss for failure to state a claim. *Irish Lesbian and Gay Organization v. Giuliani,* 143 F.3d 638, 644 (2d Cir.1998). "In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

To survive a motion to dismiss, the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Id.* (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly,* 550 U.S. at 570). Facial plausibility exists "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Where a party is proceeding *pro se,* the court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *See Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994); *see also Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) (courts remain obligated to construe *pro se* complaints liberally even after *Twombly* ). Where a *pro se* complaint fails to state a cause of action, the court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (citation and internal quotation marks omitted). An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it ." *Cuoco,* 222 F.3d at 112 (citation omitted).

### B. Plaintiff's Official Capacity Claims For Money Damages Against the Defendant

Plaintiff has sued Defendant Fischer under 42 U.S.C. ¶ 1983 in both his individual and official capacity as Commissioner of DOCCS. (Dkt. No. 1 at ¶ 7.) Fischer seeks dismissal of Plaintiff's official capacity claim for money damages against him on Eleventh Amendment grounds. (Dkt. No. 25–1 at 5–6.) The Eleventh Amendment protects states against suits brought in federal court. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978). The immunity granted the states under the Eleventh Amendment extends beyond the states themselves to state agents and instrumentalities that are effectively arms of the state, *Woods v. Rondout Valley Cent. School Dist. Bd. of Educ.,* 466 F.3d

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

232, 236 (2d Cir.2006), and bars all money damage claims against state officials acting in their official capacities. *Kentucky v. Graham,* 473 U.S. 159, 167–68, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *see also Davis v. New York,* 316 F.3d 93, 101 (2d Cir.2002) (an inmate plaintiff's claims for damages against individual Department of Correctional Services employees sued in their official capacities are considered claims against New York and, therefore, are barred by the state's Eleventh Amendment immunity.) Therefore, the Court recommends that the Plaintiff's § 1983 claim for money damages brought against Fischer in his official capacity be dismissed on Eleventh Amendment grounds without leave to amend.

## C. Plaintiff's State Law Negligence Claim Against Fischer

**\*4** Plaintiff's claim for relief against Fischer sounds in state law negligence. (Dkt. No. 1 at ¶¶ 42–47.) According to Plaintiff, Fischer knew or should have known that Thompson was potentially dangerous and owed a duty of care to Plaintiff to prevent Thompson from assaulting him. *Id.* at ¶¶ 43, 45. Plaintiff contends, upon information and belief, that Fischer's negligence in screening, hiring, training, disciplining, and retaining Thompson potentially caused Plaintiff's injuries. *Id.* at ¶ 46. Fischer argues correctly that he is entitled to dismissal of Plaintiff's state law claim for negligence under New York Corrections Law § 24. (Dkt. No. 25–1 at 6–7.)

Section 24 provides as follows:

1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

2. Any claim for damages arising out of any act done or the failure to perform any act within the

scope of the employment and in the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

The statute precludes inmates from suing DOCCS employees in their personal capacity in New York State courts. *See Arteaga v. State,* 72 N.Y.2d 212, 532 N.Y.S.2d 57, 62, 527 N.E.2d 1194 (1988). The bar also applies to pendent state law claims in federal court because "[i]n applying pendent jurisdiction, federal courts are bound to apply state substantive law to the state claim." *Baker v. Coughlin,* 77 F.3d 12, 15 (2d Cir.1996) (citations omitted). "If a state would not recognize a plaintiff's right to bring a state claim in state court, a federal court exercising pendent jurisdiction ... must follow the state's jurisdictional determination and not allow that claim to be appended to a federal law claim in federal court." *Id.* at 15. *See Redd v. Wright,* No. 9:04–CV–00401 (PAM/RFT), 2006 WL 6907552, at \*8, 2006 U.S. Dist. LEXIS 100971, at \*25–26 (N.D.N.Y. Aug.9, 2006) (claim for negligent failure to train and supervise based on state law dismissed under Corrections Law § 24 which precludes pendent state law claims against DOCCS officers and employees sued in their personal capacity in federal court for employment related activities).

In 2009, the United States Supreme Court found Corrections Law § 24 unconstitutional to the extent it precludes inmates from pursuing § 1983 claims. *Haywood v. Drown,* 556 U.S. 729, 129 S.Ct. 2108, 173 L.Ed.2d 920 (2009). However, the courts in this District have held that the *Haywood* decision does not affect the question of the district court's jurisdiction to hear pendent state law claims against DOCCS employees and have continued to dismiss those claims under Corrections Law § 24. *See O'Diah v. Fischer,* No. 08–CV–941 (TJM/DRH), 2012 WL 987726, at \*21, 2012 U.S. Dist. LEXIS 39232, at \*60 (N.D.N.Y. Feb.28, 2012); *Joy v. New York,* No. 5:09–CV–841 (FJS/ATB), 2010 WL 3909694, at \*4–5, 2010 U.S.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Dist. LEXIS 104641, at *15–16 (N.D.N.Y. Sept.30, 2010); *Gillard v. Rovelli,* No. 9:09–CV–0860 (NAM/GHL), 2010 WL 4905240, at *16, 2010 U.S. Dist. LEXIS 124737, at *47–48 (N.D.N.Y. Sept.29, 2010); *Crump v. Ekpe,* No. 9:07–CV–1331, 2010 WL 502762, at *18, 2010 U.S. Dist. LEXIS 10799, at *61 (N.D.N.Y. Feb.8, 2010). For the reasons set forth in those decisions, the Court recommends that Plaintiff's state law claim against Fischer for negligence be dismissed under Corrections Law § 24 without leave to amend.

**D. Claim Against Fischer Under § 1983**

**\*5** Although Plaintiff has labeled his claim against Fischer solely as one for negligence, given Plaintiff's *pro se* status, the Court is obligated to read his Complaint liberally and interpret it to raise the "strongest arguments [it] suggest[s]." *Burgos,* 14 F.3d at 790. The Court must therefore consider whether Plaintiff has stated a claim against Fischer under § 1983 for deliberate indifference to a known risk to Plaintiff's safety in violation of the Eighth Amendment.[FN2] The Eighth Amendment proscribes "cruel and unusual" punishments, *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), and requires prison officials to "take reasonable measures to guarantee the safety of inmates." *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). In order to state a cognizable failure to protect claim under § 1983, a plaintiff must set forth facts showing that (1) "he was incarcerated under conditions posing a substantial risk of serious harm" and (2) prison officials acted with "deliberate indifference" to his safety. *Warren v. Goord,* 476 F.Supp.2d 407, 410 (S.D.N.Y.2007) (quoting *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

> FN2. Mere negligence is not actionable under § 1983. *See Daniels v. Williams,* 474 U.S. 327 (1986).

Deliberate indifference requires that the defendant official was "aware of facts from which the inference could be drawn that a substantial risk of

serious harm exist[ed]" and in fact "dr[e]w the inference." *Farmer,* 511 U.S. at 837; *see also Hayes v. New York City Dept. of Corrections,* 84 F.3d 614, 620 (2d Cir.1996) (defendant official must "ha[ve] knowledge that an inmate faces a substantial risk of serious harm and ... disregard[ ] that risk by failing to take reasonable measures to abate the harm."). Mere negligence is not enough to demonstrate deliberate indifference. *Id.*

The law is clear that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983 ." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). "Because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal,* 556 U.S. at 676. ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior.*" ). "Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement." *Groves v. Davis,* No. 9:11–CV1317 (GTS/RFT), 2012 WL 651919, at *6, 2012 U.S. Dist. LEXIS 25367, at *22–23 (N.D.N.Y. Feb.28, 2012) (citing *McKinnon,* 568 F.2d at 934); *see also Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (a "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections ... in a § 1983 claim") (quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985)). Therefore, "a plaintiff must ... allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

**\*6** The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant cre-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ated a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

The factual allegations in Plaintiff's Complaint concerning Fischer his general supervision of DOCCS facilities and promulgation and implementation, through senior officials, of policies regarding the use of force by uniformed staff, and the toleration of wide-spread and long-standing practices contrary to formal policies expose Plaintiff's claim against Fischer as one for supervisory liability. (Dkt. No. 1 at ¶ 7.) Plaintiff's only factual allegations concerning Fisher that relate specifically to Thompson's alleged use of excessive force are his conclusory assertions that: (1) upon information and belief, Fischer knew or should have known that Thompson was potentially dangerous; and (2) upon information and belief, Fischer's negligence in screening, hiring, training, disciplining, and retaining Thompson was a potential cause of Plaintiff's injuries. *Id.* at ¶¶ 45–46. The Complaint is devoid of factual allegations showing personal involvement by Fischer in Thompson's alleged use of excessive force, or that Fischer acted with deliberate indifference with respect to Thompson's safety that Fischer had knowledge that Plaintiff faced a substantial risk of serious harm from Thompson and disregarded that risk.[FN3] *Hayes,* 84 F.3d at 620.

> FN3. In order to "sufficiently allege supervisory liability based upon deliberate indifference, a plaintiff must show "(1) that the supervisor had actual or constructive notice that unconstitutional acts were occurring and deliberately failed to take corrective action and (2) that there is an affirmative causal link between the supervisor's inaction and the plaintiff's injury." *Ziemba v.*

*Thomas,* 390 F.Supp.2d 136, 144 (D.Conn.2005) (citing *Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002); *Meriwether v. Coughlin,* 879 F.2d 1037, 1048 (2d Cir.1989). The factual allegations in Plaintiff's Complaint are inadequate to make that showing with regard to Thompson's alleged use of excessive force.

Furthermore, conclusory claims that a supervisory official has failed to provide proper training and supervision or created a policy, without facts showing personal involvement, are legally insufficient to state a claim under any of the categories identified in *Colon. See Bridgewater v. Taylor,* 832 F.Supp.2d 337, 348 (S.D.N.Y.2011); *White v. Fischer,* No. 9:09–CV–240 (DNH/DEP), 2010 WL 624081, at *6, 2010 U.S. Dist. LEXIS 15492, at *19 (N.D.N.Y. Feb.18, 2010) ("Vague and conclusory allegations that a supervisor failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability."); *see also Pettus v. Morgenthau,* 554 F.3d 293, 300 (2d Cir.2009) (vague and conclusory allegations that a supervisor has failed to properly monitor the actions of subordinate employees do not suffice to establish the requisite personal involvement and support a finding of liability); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987) (dismissal of a § 1983 claim is proper where plaintiff does no more than allege defendant was in charge of the prison).

**\*7** Given the absence of factual allegations in Plaintiff's Complaint that make a facially plausible showing of personal involvement by Fischer related to Thompson's alleged use of excessive force under any of the *Colon* categories, the Court recommends that Fischer's motion for judgment on the pleadings be granted, and that Plaintiff's Complaint be dismissed as against Fischer. However, in deference to Plaintiff's *pro se* status, the Court also recommends that the dismissal be without prejudice, and that Plaintiff be granted leave to amend.

**ACCORDINGLY,** it is hereby

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**RECOMMENDED** that Defendant Fischer's Rule 12(c) motion for judgment on the pleadings (Dkt. No. 25) be **GRANTED;** and it is further

**RECOMMENDED** that Plaintiff's Complaint be dismissed as against Defendant Fisher with leave to amend; and it is further

**ORDERED** that the Clerk provide Plaintiff with copies of the unpublished decisions cited herein.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989) (per curiam)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2013.
Rounds v. Thompson
Slip Copy, 2013 WL 3187074 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 3049613 (N.D.N.Y.)

(Cite as: 2009 WL 3049613 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Charles MAY, Plaintiff,

v.

Superintendent DONNELI; Donaldson, Grievance Coordinator; Dep. Stern; Imam Ahmed; Officer Matthew; Deacon Bashaw; and James Jones, Administration Sergeant, Defendants.

Civil Action No. 9:06-cv-437 (GLS/RFT).

Sept. 18, 2009.

West KeySummary**Civil Rights 78** 🗝 1463

**78** Civil Rights

    **78III** Federal Remedies in General

        **78k1458** Monetary Relief in General

           **78k1463** k. Mental Suffering, Emotional Distress, Humiliation, or Embarrassment. Most Cited Cases

A prisoner who did not suffer a physical injury was not entitled to compensatory damages for mental or emotional suffering for his § 1983 claim under the Religious Land Use and Institutionalized Persons Act (PLRA). The prisoner's alleged loss of weight and possible increase in blood pressure was insufficient to constitute a physical injury under the PLRA. The prisoner alleged that his First Amendment rights were violated when he was denied the opportunity to eat blessed food for seven days with his fellow Nation of Islam members during the Holy Month of Ramadan. Prison Litigation Reform Act of 1995, § 101(e), 42 U.S.C.A. § 1997e(e).

Charles May, Ray Brook, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, David L. Cochran, Assistant Attorney General, of Counsel, Albany, NY, for the Defendants.

***ORDER***

GARY L. SHARPE, District Judge.

**\*1** The above-captioned matter comes to this court following a Report-Recommendation by Magistrate Judge Randolph F. Treece, duly filed August 25, 2009. Following ten days from the service thereof, the Clerk has sent the file, including any and all objections filed by the parties herein.

No objections having been filed, and the court having reviewed the Magistrate Judge's Report-Recommendation for clear error, it is hereby

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3049613 (N.D.N.Y.)

(Cite as: 2009 WL 3049613 (N.D.N.Y.))

ORDERED, that the Report-Recommendation of Magistrate Judge Randolph Treece filed August 25, 2009 is ACCEPTED in its entirety for the reasons state therein, and it is further

ORDERED, that the defendants' motion for partial summary judgment (Docket No. 57) is GRANTED in part and DENIED in part, and it is further

ORDERED, that the Clerk of the court serve a copy of this order upon the parties in accordance with this court's local rules.

IT IS SO ORDERED.

### *REPORT-RECOMMENDATION AND ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff Charles May brings this civil rights action, pursuant to 42 U.S.C. § 1983, alleging that his First Amendment rights were violated when he was denied the opportunity to eat blessed food for seven days with his fellow Nation of Islam members during the Holy Month of Ramadan. Dkt. No. 51, Am. Compl. at ¶ 1. In addition, Plaintiff asserts claims under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1, and New York State Corrections Law § 610. *Id.* at ¶ 37. Defendants move for Partial Summary Judgment, to which Plaintiff filed a Response in Opposition. Dkt. Nos. 57-58. Defendants contend that Plaintiff is (1) barred from bringing an action for mental or emotional injury under 42 U.S.C. § 1983 because he failed to allege the required showing of physical injury pursuant to 42 U.S.C. § 1997e(e); and (2) estopped from bringing a pendent state law claim pursuant to N.Y. CORR. LAWW § 24. Dkt. No. 57-5, Defs.' Mem. of Law at pp. 2-4. For the reasons that follow, it is recommended that the Defendants' Motion be

GRANTED in part and DENIED in part.

### I. BACKGROUND

The following material facts are not, for purposes of this Motion, in dispute. Plaintiff alleges that in August 2005, approximately one month prior to the Islamic celebration of Ramadan, he was signed up as a member of the Nation of Islam in order to allow him to participate in Ramadan related activities. Dkt. No. 58, Pl.'s 7.1 Statement at p. 2. According to Plaintiff, during the Holy Month of Ramadan, Muslims are unable to eat during mess hall hours because they are required to fast during that time; the fast is then broken at night by eating blessed food. Am. Compl. at ¶ 16.[FN1] On October 5, 2005, Plaintiff fasted and then ate blessed food with his fellow Nation of Islam members. *Id.* at ¶ 13. Plaintiff alleges that on October 6, 2005, he was informed by Defendant Sergeant Jones, in the presence of Defendant Corrections Officer ("C.O.") Mathew, that the administration had him listed as a Sunni Muslim and he would therefore have to eat with them until the administration straightened things out. *Id.* Though Plaintiff was willing to eat with the Sunni Muslims temporarily, he alleges that when he attempted to enter the Masjid[FN2] on October 6th, he was denied access by C.O. Mathew because he was not on the list. *Id.* at ¶ 35. Plaintiff alleges that Defendant Sergeant Jones maliciously failed to put him on the Sunni Muslim list. *Id.* at ¶ 34. Ultimately, Plaintiff was unable to eat with either Muslim sect for seven days until October 13, 2005, when he was permitted to eat with the Sunni Muslims. *Id.* at ¶ 19. During those seven days, Plaintiff observed the fasting strictures of Ramadan, but was unable to properly break his fast, thus resulting in a seven day fast. After informing Defendant Superintendent Donneli of the matter, Plaintiff was immediately placed with the Nation of Islam on October 18, 2005. *Id.* at ¶ 20.

FN1. Though Plaintiff submitted a "Material Fact" statement in accordance with N.D.N.Y.L.R. 7.1 (Dkt. No. 57), his statement is presented in an argumentative manner and does

Slip Copy, 2009 WL 3049613 (N.D.N.Y.)

(Cite as: 2009 WL 3049613 (N.D.N.Y.))

not clearly lay out all of his factual allegations. Therefore, the Court relies primarily on Plaintiff's Amended Complaint to discern his factual allegations.

FN2. A Masjid is a Muslim place of worship, commonly referred to in English as a Mosque.

**\*2** Though Plaintiff refrained from eating for seven days, he alleges no physical injury other than that he "lost a few pounds," was feeling lightheaded because of a possible increase in blood pressure, and suffered mental and emotional distress. Dkt. No. 58, Pl.'s Resp. in Opp'n to Defs.' Mot. (hereinafter "Pl.'s Resp.") at p. 2. In fact, Plaintiff stated candidly that he did not suffer any physical injury. Dkt. No. 57-4, David L. Cochran, Esq., Affirm., dated Oct. 15, 2008, Ex. A, Pl.'s Dep., dated Jan. 22, 2008 (hereinafter "Pl.'s Dep.") at p. 2.

Plaintiff alleges a second violation of his constitutional right to freely exercise his religion when Defendants denied him the opportunity to have family visits during the Muslim festival of Eid-Ul-Adha. Am. Compl. at ¶ 22.

As a result of the aforementioned factual allegations Plaintiff claims he suffered emotional, mental, and physical distress, and seeks both compensatory and punitive damages for his alleged injuries. *Id.* at ¶¶ 22, 25 & 26.

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In order for an issue of material fact to exist, it must relate to a disputed matter that "might affect the outcome of the suit," and the evidence is such that a "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

On a motion for summary judgment, the moving party bears the initial burden to demonstrate that there is no genuine issue as to any material fact, and therefore, they are entitled to a judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its burden, the non-moving party must go beyond the pleadings and allege specific facts that present a genuine issue for trial. FED. R. CIV. P. 56(e). To that end, the non-movant cannot rest on "mere allegations or denials." *Id.*

When evaluating a motion for summary judgment, the court will draw all inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Moreover, when a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (cited in *Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995)). Nevertheless, a party's "bald assertion," unsupported by evidence, is insufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

### B. Physical Injury Requirement

**\*3** The Prison Litigation Reform Act of 1995 ("PLRA"), codified in part at 42 U.S.C. § 1997e(e), states

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3049613 (N.D.N.Y.)

(Cite as: 2009 WL 3049613 (N.D.N.Y.))

that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." The purpose of this physical injury requirement is to discourage frivolous suits commenced by inmates. *See Cox v. Malone, 199 F.Supp.2d 135, 139-140 (S.D.N.Y.2002)* ("*Section 1997e(e)* [ ... ] is a *substantive* limitation on the type of actions that can be brought by prisoners. Its purpose is to weed out frivolous claims where only emotional injuries are alleged.") (emphasis in original). The Second Circuit Court of Appeals has held that the PLRA applies to alleged constitutional violations brought under 42 U.S.C. § 1983. *Thompson v. Carter,* 284 F.3d 411, 416 (2d Cir.2002).

In this case, the only physical injury that Plaintiff states he suffered was a loss of a few pounds and a possible increase in blood pressure. Pl.'s Resp. at p. 2. Furthermore, Plaintiff did not allege these injuries in his Amended Complaint, but rather, only after Defendants raised the PLRA defense in their Motion for Partial Summary Judgment. Prior to Defendants' Motion, Plaintiff stated at his deposition that he did not suffer any physical injury. Pl.'s Dep. at p. 2. Even assuming, *arguendo,* that Plaintiff had properly alleged a physical injury in his Amended Complaint, his allegations do not constitute physical injury for purposes of the PLRA.

Section 1997e(e) provides no definition of "physical injury." *Liner v. Goord,* 196 F.3d 132, 135 (2d Cir.1999). However, courts have held that in order to constitute a physical injury under 1997e(e), an injury must be more than *de minimis,* but need not be significant. *Id.* (citing *Siglar v. Hightower,* 112 F.3d 191, 193 (5th Cir.1997)); *Warren v. Westchester County Jail,* 106 F.Supp.2d 559, 570 (S.D.N.Y.2000) (citing *Siglar* ).

The issue is therefore whether Plaintiff's loss of a few pounds amounts to more than a *de minimis* injury for

purposes of the PLRA. In short, it appears this question is answered in the negative. Loss of weight is generally not considered to be a physical injury for purposes of the PLRA, especially the loss of only a few pounds. *See Dawes v. Walker,* 1998 WL 59454, at *1 n. 1 (N.D.N.Y. Feb.9, 1998)* ("It appears unlikely that lost weight is a physical injury within the meaning of Section 1997e(e)."); *see also Porter v. Coombe,* 1999 WL 587896, at *8 (S.D.N.Y. Aug.4, 1999)* (plaintiff's loss of twenty-five pounds did not constitute a physical injury); *accord Pearson v. Welborn,* 471 F.3d 732, 744 (7th Cir.2006) (plaintiff's loss of fifty pounds did not constitute a physical injury). Similarly, Plaintiff's alleged increase in blood pressure does not amount to physical injury. *See Jones v. H.H.C. Inc.,* 2003 WL 1960045, at *5 (S.D.N.Y. Apr.8, 2003)*; *accord Davis v. District of Columbia,* 158 F.3d 1342, 1349 (D.C.Cir.1998) (articulating that § 1997e(e) precludes reliance on somatic manifestations of emotional distress). Thus, Plaintiff has not alleged a sufficient physical injury pursuant to the PLRA.

**\*4** Although Plaintiff has not met his burden on the physical injury requirement of the PLRA, his failure to do so is not completely dispositive of his underlying constitutional claim. "The failure of prisoners to plead or establish a compensable actual injury in a § 1983 constitutional tort claim [ ... ] only precludes the recovery of compensatory damages, but does not lead to the dismissal of the underlying claim." *Dawes v. Walker,* 239 F.3d 489, 496 (2d Cir.2001). Plaintiff may still be entitled to injunctive or declaratory relief for a violation of his constitutional rights. *Thompson v. Carter,* 284 F.3d 411, 416-418 (2d Cir.2002). A plaintiff is not required to show physical injury in order to recover nominal damages, punitive damages, or declaratory relief. *Gill v. Hoadley,* 2007 WL 1341468, at *4 (N.D.N.Y. May 4, 2007). In fact, it is error for courts not to award nominal damages in § 1983 actions when a constitutional violation has been established. *See Robinson v. Cattaraugus,* 147 F.3d 153, 162 (2d Cir.1998).

In the instant case, Plaintiff has requested punitive

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3049613 (N.D.N.Y.)

(Cite as: 2009 WL 3049613 (N.D.N.Y.))

damages. Am. Compl. at ¶ 26. Defendants do not challenge the merits of Plaintiff's underlying constitutional claim, therefore that issue is not before this Court. Due to Plaintiff's inability to demonstrate a physical injury under 1997e(e), compensatory damages for mental or emotional suffering are barred for his § 1983 claim, but it remains to be decided if Plaintiff is entitled to nominal damages, punitive damages, or declaratory relief.

### C. Plaintiff's Pendent State Law Claim

Plaintiff also brings a pendent state law claim pursuant to N.Y. CORR. LAWW § 610, which guarantees inmates "the free exercise and enjoyment of religious profession and worship" while incarcerated. Am. Compl. at ¶ 37. A federal court exercising pendent jurisdiction must apply state law. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1996). "Thus, if state law does not recognize a plaintiff's right to bring an action in state court, a federal court, exercising pendent jurisdiction, sitting as a state court, must follow the state law limitation on jurisdiction." *Livingston v. Griffin,* 2007 WL 2437433, at *2 (N.D.N.Y. Aug.22, 2007) (citing *Baker v. Coughlin,* 77 F.3d 12, 15 (2d Cir.1996)).

Defendants argue that this claim is barred by N.Y. CORR. LAWW § 24, which reads:

1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the

employment and in the discharge of the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

**\*5** Thus, § 24 precludes "the assertion of claims against corrections officers [in their personal capacities] in any court, including the federal courts," by designating the New York State Court of Claims as the only available venue to bring a claim for damages arising out the acts committed by corrections officers within the scope of their employment. *Baker v. Coughlin,* 77 F.3d at 14-15. And, because the Court of Claims is a court of limited jurisdiction, hearing only claims against New York State and no other individual or entity, § 24 amounts to a grant of immunity for corrections officers sued in their personal capacities for claims arising out of the discharge of their duties. N.Y. CT. CLMS. LAW § 9.

After the parties submitted their respective briefs on this Motion, the Supreme Court held in *Haywood v. Drown,* --- U.S. ----, 129 S.Ct. 2108, 173 L.Ed.2d 920 (2009) that § 24, when used to relegate to the Court of Claims civil rights actions brought pursuant to 42 U.S.C. § 1983, is inconsistent with the Supremacy Clause, U.S. Const. Art. VI, cl. 2, and therefore, unconstitutional. The *Haywood* Court held that New York State, having created courts of general jurisdiction that routinely hear § 1983 actions against all types of state actors, "is not at liberty to shut the courthouse door to federal claims [against corrections officers] that it considers at odds with its local policy." *Id.* at 2117. The Supreme Court found such selective treatment of § 1983 claims brought against corrections officers to be "contrary to Congress' judgment that *all* persons who violate federal rights while acting under color of state law shall be held liable for damages," and therefore, in violation of the Supremacy Clause. *Id.* at 2115 (emphasis in original).

In this case, Plaintiff has brought a state law claim

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3049613 (N.D.N.Y.)

(Cite as: 2009 WL 3049613 (N.D.N.Y.))

pursuant to N.Y. CORR. LAWW § 610. Although the *Haywood* decision found § 24 to be in violation of the Supremacy Clause, it did so only with respect to claims brought under § 1983, a federal statute. A claim brought pursuant to a state law does not implicate the Supremacy Clause, and therefore, the *Haywood* decision does not affect the question of whether this Court has proper jurisdiction to hear this pendent state law claim.

Even after *Haywood,* a New York state court (other than the Court of Claims) would not have jurisdiction to hear Plaintiff's pendent claim pursuant to § 24 because Plaintiff has alleged acts that clearly fall within the scope of the Defendants' employment duties as corrections officers. Therefore, this Court does not have jurisdiction to hear this pendent state law claim brought pursuant to N.Y. CORR. LAWW § 610, and it is recommended that such claim be **dismissed.** *Baker v. Coughlin,* 77 F.3d at 14-16; *see also, e.g., Cancel v. Mazzuca,* 205 F.Supp.2d 128, 139 (S.D.N.Y.2002) (dismissing plaintiff's pendent state law claims pursuant to § 24).

### III. CONCLUSION

For the reasons stated therein, it is hereby

**\*6 RECOMMENDED,** that the Defendants' Motion for Partial Summary Judgment (Dkt. No. 57) be **GRANTED in part and DENIED in part;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have

ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs. .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

N.D.N.Y.,2009.

May v. Donneli

Slip Copy, 2009 WL 3049613 (N.D.N.Y.)

END OF DOCUMENT


Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

**H** Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Maurice SAMUELS, Plaintiff,
v.
Donald SELSKY, Glenn Goord, Paul Cecilia, Javier
Iurrue, G. Schwartzman, Dennis Bliden, Jeffery McCoy,
and Christopher P. Artuz, Defendants.
**No. 01CIV.8235(AGS).**

Sept. 12, 2002.

OPINION & ORDER

SCHWARTZ, District J.

I. Introduction

*1 Maurice Samuels alleges that while incarcerated at the Green Haven Correctional Facility,[FN1] prison officials searched his cell and confiscated a number of documents which were deemed to be "subversive" and contraband. Samuels claims that the materials, including theological textbook excerpts, were of a Christian nature and were used in a course he taught in the prison through the New York Theological Seminary. Samuels' alleged possession of these documents led to a misbehavior report and a subsequent disciplinary hearing, for which Samuels was sentenced to 180 days in keeplock and 180 days' loss of packages, commissary privileges, and telephone use. Samuels also alleges that instead of being punished as per his disciplinary hearing, he was sentenced to a more severe punishment, 180 days in a special housing unit which entailed Samuels' being locked in his cell for twenty-three hours per day. On the basis of the allegedly unlawful sanctions to which he was subjected, Samuels has filed the instant action pursuant to 42 U.S.C. § 1983 alleging violations of, *inter alia,* his First Amendment and due process rights, and seeks equitable relief and damages.

Defendants have filed a motion to dismiss the action pursuant to FED. R. CIV. P. 12(b)(1) and (6), and argue that they enjoy qualified immunity barring this suit. For the reasons set forth below, defendants' motion is granted in part and denied in part.

FN1. Defendants repeatedly state that the events giving rise to this action arose while Samuels was incarcerated at the Great Meadow Correctional Facility. Samuels states that the events in question happened at the Green Haven Correctional Facility. Moreover, Samuels' evidence, including the Inmate Disciplinary Report (Exhibit H), the Disciplinary Hearing Record Sheet (Exhibit O), and the Superintendent Hearing Disposition Report (Exhibit P) all note the Green Haven Correctional Facility. In light of the above, the Court determines that defendants' position that the events occurred at Great Meadow is incorrect. The Green Haven Correctional Facility is located in Dutchess County in the Southern District, while Great Meadow is located in Washington County in the Northern District. Defendants make no argument regarding the Court's jurisdiction with respect to the location of the events in question.

II. Factual Background [FN2]

FN2. Unless otherwise indicated, the facts set forth below are gleaned from Samuels' submissions, because on a FED. R. CIV. P. 12(b)(1) or (6) motion, the adjudicating court must assume as true factual allegations made in the complaint. Defendants concede this fact. *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint, at 4. It should also be noted that Samuels brings this action *pro se.* As such, it is sometimes difficult to understand fully his contentions. Accordingly, the Court reads the (sometimes confusing) factual allegations in the light most favorable to Samuels.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

Maurice Samuels is currently an inmate at the Sullivan Correctional Facility. Since being incarcerated, Samuels has taken a keen interest in religion. He identifies himself as a member of the Five Percent Nation of Gods and Earths. [FN3] While confined at Sing Sing, he received a degree of Master of Professional Studies in Prison Ministry through the New York Theological Seminary ("NYTS"). *See* Complaint Pursuant to U.S.C.A. Section 1983 ("Complaint"), at 4; Exhibit ("Ex.") A. Upon completion of his studies with the NYTS, Samuels was transferred to the Green Haven Correctional Facility. [FN4] At Green Haven, Samuels was assigned a clerk's position in therapeutic "Reality and Pain Program." He subsequently redesigned the program, creating the "Reality and Pain Therapeutic Counseling Program." *See* Complaint, at 4. During this period he also served as a volunteer inmate instructor in the Black Studies program, and was later assigned as a clerk in Green Haven's Senior Counselor's Office, where he helped create a program for sex offenders. *See id.* at 4.

FN3. The website of the University of Chicago's Divinity School provides a good summary of the beliefs of the adherents of the Five Percent Nation of Gods and Earths, commonly known as the "Five Percenters." *See* Jonathan Moore, *The Five Percenters: Racist Prison Gang or Persecuted Religion?*, SIGHTINGS, May 21, 1999, *available at* http://divinity.uchicago.edu/sightings/archive_1999/sightings-052199.html. The name of the group stems from its belief that only five percent of people are aware of and teach the truth. The term "Gods" refers to black male members; "Earths" refer to black female members. The group was founded by Clarence 13X, who left the Nation of Islam in 1964. According to Moore, "[m]any of the theological accoutrements of Black Muslim belief remain: many read the Qur'an and Elijah Muhammad's writings (especially his "Message to the Black Man"), and they hold to the exclusive divinity of black men." *Id.* (The Moore article, not part of the record, is provided for background purposes only). Samuels has included two pages outlining the differences between the Nation of Gods and Earths and similar black Muslim groups-the Nation of Islam and the Temple of Islam. *See* Exhibit B.

FN4. *See supra* note 1.

The NYTS later began a certificate program in Christian Ministry in conjunction with Marist College at Green Haven. Samuels was invited to teach several courses for the program, including a course entitled "World Views and Values" and another entitled "Introduction to Theology and Methods." *See* Complaint, at 4; Ex. E, at 12. Samuels is listed on the "Faculty and Administration" page of the Certificate in Ministry Program brochure. *See* Ex. E, at 10. In designing his theology course, Samuels, in conjunction with Professor Mar Peter-Raoul (currently the Chair of the Department of Philosophy and Religious Studies at Marist College), prepared a syllabus which included the following:

**\*2** a. This is an introductory approach to contemporary Christian Theology, there will be a broad range of material provided for the student so that they [sic] may see the evolution of Christian Theology and Contemporary Theologies, active in the world today.

b. The course is divided into different sessions (1) What is Theology; (2) Philosophy & Theology; (3) Contemporary Theology; (4) Political and Liberation Theology; (5) Feminist/Womanist Theology; and (6) Black & Third World Theology.

c. This is done so that the student can examine the evolution of Christian Theology and Contemporary Theologies, and arrive at the next step in the process, i.e. explore the [sic] how to do theology.

d. This introduction to theology course will be taught from a [sic] interdisciplinary and non-traditional approach.

Complaint, at 5. This syllabus was approved by the appropriate authorities from NYTS, Marist College, and the Department of Corrections ("DOCS"). *See id.* at 5.

The central issue in this case involves a search of Samuels' cell. On September 15, 1999, another member of the Five Percent Nation of Gods and Earths who was involved in

the NYTS program was disciplined for allegedly possessing a pamphlet entitled "Awake" or "Awaken" which addressed topics such as racism in the criminal justice system and abuses of the Rockefeller drug laws. *See* Complaint, at 6. On October 19, 1999, the assistant inmate director for the NYTS certificate program was interrogated about the program and why some of its members were also members of the Five Percent Nation of Gods and Earths. At the time, Samuels was housed in the inmate honor block housing Unit and taught a pre-G.E.D. and adult basic education class in the morning and afternoon and taught his theology class in the evening. *See* Complaint, at 6. According to defendants, Sergeant Schwartzman, a member of the prison staff, received a report from a confidential informant that Samuels was a leader of a protest planned to occur around January 1, 2000 ("Y2K protest").[FN5] On October 20, 1999, Schwartzman ordered correction officers Williams and Kelly to search Samuels' cell. Samuels states that the confiscated materials included Marist College and NYTS course handouts for the certificate program, previously published material from the NYTS and Marist College, notes from newspaper articles, a manuscript Samuels had been working on since first attending the NYTS, and Kairos statements.[FN6] *See* Complaint, at 7. According to the Cell Search Report, contraband was found which consisted of a "folder of papers containing subversive material." Ex. G. On the same day, an Inmate Misbehavior Report was completed. *See* Ex. H. The rule violations are listed as 104.12 (action detrimental to the order of the facility) and 113.23 (contraband). *See id.* The narrative section of the Inmate Behavior Report states:

> [FN5.] While denying a link to the Y2K protest, Samuels provides some background on the matter. According to Samuels, DOCS created a program at Green Haven through the Corcraft Industry Division Program known as the Recreational Cell Building Project ("Project"). The Project initially used inmate volunteers to build Inmate Recreational Cells at recently constructed S-Facilities (special housing institutions). According to Samuels, because of poor working conditions, low wages, and other factors, inmates increasingly refused to volunteer for the Project and sought other work assignments. Samuels alleges that DOCS personnel then began using the disciplinary process to systematically force inmates to work

in the Project. *See* Complaint, at 3. Samuels also alleges that prison officials specifically targeted members of the NYTS and the Five Percent Nation of Gods and Earths for compelled work participation in the Project. *See id.* at 4. The planned Y2K protest, in which Samuels claims to have played no role, was intended to protest the program as well as prison conditions generally.

> [FN6.] The Kairos Statements (referred to by Samuels as "Karios Statements") are critiques of traditional church dogma. The most famous Kairos statement originated as a critique of alleged church complicity in the white *apartheid* regime in South Africa.

On the above date [10/20/99] and time while conducting a cell search on cell D-1-21 which houses inmate Samuels, Maurice 85A0184 the following contraband was found and recovered;

**\*3** (1) Folder of papers containing subversive material These papers speak about inmate [sic] uniting together to fight against opositions [sic] such as the N.Y. parole system and other dept. of correction [sic] programs.

This material is consistant [sic] with information recieved [sic] that inmate Samuels has been active in urging others to participate in a demonstration on or about Jan. 1, 2000, which led to his cell being searched.

Ex. H. The form is signed by G. Williams, a correction officer, and G. Schwartzman. The documents are not identified, nor is there an explanation of why they were considered "subversive." Samuels repeatedly asked prison authorities to identify the "subversive" documents without success. *See, e.g.,* Exhibits ("Exs.") J, K, M, N, V, 7, 9. Defendants have not furnished the confiscated papers for the Court, and make no representation as to what documents were found in Samuels' cell or why they are considered "subversive." Samuels states that the materials seized by the prison officials is not literature pertaining to the Five Percent Nation of Gods and Earths but Christian ministry materials he used in teaching his class and which had previously been approved by the NYTS and prison

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

authorities. *See* Complaint, at 5. Samuels also states that newspaper clippings and a manuscript he had been working on since 1986 were taken. *See* Affidavit [of Maurice Samuels] in Support of Opposition Motion ("Samuels Aff."), at ¶¶ 7-9.

Samuels was immediately placed in keeplock status pending a hearing on the misbehavior report. *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint ("Motion Brief"), at 3. Under DOCS rules, Samuels was entitled to an employee assistant to assist in his defense of the charges set forth in the misbehavior report.[FN7] An Assistant Selection Form was provided to Samuels, which instructed Samuels to select three people, one of whom would be assigned to him based on availability. *See* Ex. I. Samuels selected Hanna, Lawrence, and Schwartzman as his three choices. *See id.* Instead, Paul Cecilia was assigned to Samuels. *See* Motion Brief, at 3. Samuels alleges that instead of assisting him in the preparation of his case, Cecilia proceeded to interrogate Samuels, asking him if he was in contact with Green Party candidate (formerly "Grandpa Munster") Al Lewis, whether he had any letters from him, whether he had any letters from outside organizations involved in prison reform, whether he was involved in any planned Y2K protest, and what the "Kairos" document was. *See* Complaint, at 8. Samuels further alleges that Cecilia did not explain the charges contained in the misbehavior report and failed adequately to conduct an investigation on Samuels' behalf.[FN8] Cecilia signed an Assistant Form on October 25, 1999, at 12:53 pm, indicating that he had interviewed witnesses, assisted as requested, and reported back to Samuels. *See* Ex. J. However, on October 26, Green Haven officials requested a one-day extension to hold a disciplinary hearing on the basis that the "assistant is trying to speek [sic] to with witiness [sic]." Ex. L. The extension was granted by "Alternate User 999SHURXR for 999SHU." *See id.* The name of the grantor is not listed on the computer printout.

FN7. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.1 (2002):(a) An inmate shall have the opportunity to pick an employee from an established list of persons who shall assist the inmate when a misbehavior report has been issued against the inmate if [...] (4) the inmate is confined pending a superintendent's hearing [...].

FN8. Samuels cites a number of failures on Cecilia's behalf: he failed to turn over documentary evidence relating to the charges against Samuels, he failed to provide a written record of the questions he was supposed to ask Samuels' witnesses, he failed to record the testimony of the witnesses interviewed on Samuels' behalf, he failed to explain exactly what material that was confiscated constituted contraband, and he failed to interview the confidential informant to determine his existence or credibility. *See* Complaint, at 9.

**\*4** The "Tier III" disciplinary hearing was held on October 27, 1999.[FN9] At the hearing, two inmates and Dr. George W. Webber testified on Samuels' behalf (Webber testified by telephone). Webber is the director of the Certificate Program and president emeritus of the NYTS. Sgt. Schwartzman testified against Samuels. *See* Ex. O. Samuels also submitted a written brief for the hearing. *See* Ex. M. Samuels was found guilty of "demonstration" and "contraband" on November 9, 1999. The hearing officer, Javier Irurre,[FN10] summarized his findings as follows:

FN9. Tier III hearings are held for "the most serious violations of institutional rules." *Walker v. Bates,* 23 F.3d 652, 654 (2d Cir.1994).

FN10. The name "Javier Irurre" appears on the Hearing Disposition form. *See* Ex. P. Samuels spells the name "Iurrue," *see* Complaint, at 9, while defendants in turn use two spellings for the name-"Iurre" and "Iurrue *See* Motion Brief, at 3. The Court uses the "Irurre" spelling found on the Hearing Disposition form, apparently in Javier Irurre's own handwriting, and on the Tier III assignment form signed by Superintendent Artuz. *See* Appendix 7.

Statement of Evidence Relied Upon: Papers & hand written papers retrieved from your cell show statements inciting revolt and prison unrest. Confidential tape shows similarity between statements made in papers you have written and others in your possession with statements found in written material belonging other [sic] inmates inciting the so called Y2K revolt.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

Confidential tape and testimony at the hearing establish a link between the statements in papers found in your cell and phamphlets [sic] circulating among prison population urging to strike in Y2K.

Reason for Disposition: Inciting revolt can not be tolerated in a correctional setting.

Ex. P. Samuels was punished with 180 days of keeplock, 180 days of loss of packages, 180 days of loss of commissary privileges, and 180 days of loss of phone privileges. *See* Ex. P; Complaint, at 11. The hearing officer did not impose special housing unit placement. *See* Ex. P; Complaint, at 11. The Court has not been furnished with a transcript of the hearing or of the "confidential tape" referred to by Irurre.

Samuels alleges that his due process rights were violated at the misbehavior hearing. He alleges that he failed to receive a timely hearing, that he received inadequate assistance from the employee assistant assigned to him (Cecilia), and that Dr. Mar Peter-Raoul was not permitted to testify on Samuels' behalf. *See* Complaint, at 9, 11. Samuels also protests the fact that the misbehavior report never specifies exactly what Samuels did to constitute "demonstration." *See id.* at 11. No written record was apparently made stating the reasons Dr. Peter-Raoul was not permitted to testify. Dr. Peter-Raoul later wrote a lengthy letter addressed to defendants Bliden, McCoy, and Irurre in which she explained the nature of the Kairos documents and stated her desire to serve as a witness for Samuels. *See* Complaint, at 10.

On November 8, 1999 (one day before Irurre found Samuels guilty of demonstration and contraband), Samuels submitted a detailed written brief to First Deputy Superintendent Dennis Bliden and "Jeff Macoy" [sic] on November 8, 1999, requesting that his misbehavior report be dismissed. *See* Ex. N. While waiting for a response to his letter, Samuels was transferred to the Upstate Correctional Facility, a special housing unit facility, where he was housed for 180 days.[FN11] *See* Complaint, at 11; Motion Brief, at 4; Plaintiffs' [sic] Memorandum of Law in Opposition to Defendants' Motion ("Opposition Brief"),

at 27. Neither Samuels nor defendants provides an explanation as to why Samuels was transferred to the special housing unit facility. Jeff McKoy (listed in the caption as Jeffery McCoy) wrote to Samuels on November 12, 1999, advising him that he lacked the authority to overturn a Tier III disposition. *See* Ex. R. Bliden wrote to Samuels on November 18, 1999, stating that any appeal Samuels wished to file had to be directed to the Commissioner in Albany. He stated that "[u]ntil such time as we receive a decision from [Albany], I will not modify the disposition." Ex. U.

[FN11.] Placement in a special housing unit involves confinement for twenty-three hours per day. The inmates assigned to special housing units receive virtually no programming, no congregate activities, and very little natural light. Reading materials are severely restricted, as are visits. *See* Ex. 16, at 5-6 (THE NEW YORK STATE SENATE DEMOCRATIC TASK FORCE ON CRIMINAL JUSTICE REFORM, CRIMINAL JUSTICE REFORM: A TIME THAT'S COME (2001)).

**\*5** As per Deputy Superintendent Bliden's instructions, Samuels submitted a seventeen-page letter to Donald Selsky, the Director of the Inmate Disciplinary Program, in Albany. *See* Ex. V. In the course of his letter to Selsky, Samuels voices his procedurally and substantively-based arguments for dismissing his misbehavior adjudication. Selsky affirmed the November 9, 1999 hearing on January 6, 2000 on behalf of Glenn Goord, the Commissioner.[FN12] *See* Ex. 6. Samuels filed a request for a "time-cut" from the determination of the Superintendent on February 28, 2000. *See* Ex. 6. Prisoners' Legal Services of New York ("PLS") sent a letter to Selsky on March 2, 2000, asking him to reconsider his decision. On April 27, 2000, PLS sent a supplemental request for reconsideration, this time outlining in detail the legal bases for which Samuels' disciplinary charges should be withdrawn (by this point, Samuels had already served the imposed penalty; the letter asks Selsky to reverse the disciplinary hearing and expunge the disciplinary charges). *See* Ex. 9. Selsky did not alter his January 2000 decision. Samuels then appealed to the New York State Supreme Court, apparently by means of an Article 78 proceeding. The court, Canfield J., concluded that Samuels' appeal raised a substantial evidence question that could not be resolved by "reference

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

to the objections in point of law." Decision and Order dated October 13, 2000. The court then transferred the matter to the Appellate Division, Third Judicial Department pursuant to N.Y. C.P.L.R. 7804(g).[FN13] *See id.*

> FN12. Prisoners' Legal Services of New York cite the date as January 20, 2000. *See* Ex. 7; Samuels cites the date as January 20, 1999. *See* Ex. 6.

> FN13. No Appellate Division decision on the matter is in the record. However, defendants' argument on the exhaustion of remedies focuses on administrative remedies and not on this potential deficiency.

Samuels then filed the instant action pursuant to 42 U.S.C. § 1983 based on defendants' alleged violations of his due process, First Amendment, and other constitutional rights, seeking equitable relief as well as compensatory and punitive damages.[FN14] The defendants move to dismiss the complaint pursuant to FED. R. CIV. P. 12(b)(1) (lack of subject matter jurisdiction) and (6) (failure to state a claim upon which relief can be granted). For the reasons set forth below, defendants' motion is granted in part and denied in part.

> FN14. In his complaint, Samuels also alleged an Eighth Amendment violation stemming from his treatment during a trip to and from his brother's funeral. This claim was dismissed by order of Judge Mukasey dated September 4, 2001.

III. Legal Standard

A. *Pro Se* Complaints

The Second Circuit has repeatedly held that *pro se* complaints must be read more leniently than those prepared by lawyers. Recently, for example, the Second Circuit noted that a "*pro se* complaint should not be dismissed unless 'it appears beyond doubt that the plaintiff[ ] can prove no set of facts in support of [his]

claim[s] which would entitle [him] to relief." ' *Weixel v. Board of Educ. of the City of New York,* 287 F.3d 138, 145 (2d Cir.2002) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). Moreover, when considering a motion to dismiss a *pro se* complaint, "courts must construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." *Weixel,* 287 F.3d at 146 (quoting *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (internal quotation marks omitted)). The Second Circuit has also emphasized that a liberal reading of a *pro se* complaint is especially important when the complaint alleges civil rights violations. *See Weixel,* 287 F.3d at 146; *Weinstein v. Albright,* 261 F.3d 127, 132 (2d Cir.2001). Consequently, Samuels' allegations must be read so as to "raise the strongest arguments that they suggest." *Weixel,* 287 F.3d at 146 (quoting *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (internal quotation marks omitted)).

B. Motions to Dismiss Pursuant to FED. R. CIV. P. 12(b)(1) & (6)

*6 Defendants move to dismiss the complaint pursuant to FED. R. CIV. P.12(b)(1) and (6). The standard of review for dismissal on either basis is identical. *See, e.g., Moore v. PaineWebber, Inc.,* 189 F .3d 165, 169 n. 3 (2d Cir.1999); *Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997). In either case, a court must assume as true factual allegations in the complaint and construe the complaint in the light most favorable to the plaintiff. *See, e.g., York v. Association of Bar of City of New York,* 286 F .3d 122, 125 (2d Cir.2002); *Shipping Fin. Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir.1998). While the question of subject matter jurisdiction goes to the power of the court to hear a case, the issue on a motion to dismiss is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *York,* 286 F.3d at 125 (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)).

IV. Legal Analysis

A. Exhaustion of Administrative Remedies

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

1. Legal Standards Governing Exhaustion of Administrative Remedies

Lawsuits by prisoners are governed by 42 U.S.C. § 1997e, which holds in part:

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

Under this section, where a prisoner brings an action in a district court before exhausting all available administrative remedies, the action must be dismissed. A unanimous Supreme Court has recently interpreted the term "prison conditions" expansively, requiring an exhaustion of all available administrative remedies whether the inmate suit concerns a general prison condition (i.e., quality of food) or a discrete incident specific to one prisoner (i.e., excessive force). *See* *Porter v. Nussle,* 122 S.Ct. 983 (2002). The Court also held that the exhaustion requirement applies regardless of whether the administrative remedies are "plain," "speedy," or "effective," and also applies when the prisoner "seeks relief not available in grievance proceedings" such as monetary damages. *Id.* at 988.

As a preliminary matter, defendants concede that Samuels has exhausted all administrative remedies concerning his due process violations. *See* Defendants' Supplemental Memorandum of Law and Reply Memorandum of Law in Further Support of Their Motion to Dismiss ("Reply Brief"), at 9. Defendants' concession is apparently based on DOCS Directive No. 4040, which holds that:

[T]he individual decisions or dispositions of the following are not grievable: [...] Media Review, disciplinary proceedings, inmate property claims (of any amount) and records review (Freedom of Information Requests, expunction). However, the policies, rules, and procedures of any of these programs or procedures may be the subject of a grievance.

**\*7** As noted above, Samuels unsuccessfully appealed his case within the prison facility and later to defendant Selsky in Albany, who denied it and denied reconsideration thereof.

Defendants argue, however, that "if a claim is incidental to a disciplinary determination [...] the fact that the disciplinary charge itself has been appealed does not excuse the failure to file a grievance." Reply Brief, at 9. Defendants thus seek to sever the alleged due process violations (for which Samuels has exhausted all administrative remedies) from several closely related claims-Samuels' claims protesting the confiscation of his papers, his transfer to the special housing unit, and DOCS policy regarding the Five Percent Nation of Gods and Earths (for which defendants argue Samuels has failed to exhaust all administrative remedies). *See* Reply Brief, at 9.

2. Confiscation of Documents

Defendants allege that the confiscation of the religious material is a matter separate from the underlying disciplinary hearing. While Samuels directly appealed his disciplinary adjudication, he concedes that he did not bring any complaint to the inmate grievance program. *See* Complaint, at 1. Defendants argue that Samuels' claim alleging the confiscation of religious material must therefore be dismissed because he failed to exhaust administrative remedies. *See* Reply Brief, at 9-10. Defendants represent that confiscation of religious documents from a cell is a grievable matter. The Court notes, however, that in similar cases inmates have been told that such confiscations are not grievable. *See, e.g., Allah v. Annucci,* 97 Civ. 607, 1999 U.S. Dist. LEXIS 7171, at \*2-\*3 (W.D.N.Y. Mar. 25, 1999) (plaintiff filed an inmate grievance protesting confiscation of religious material and was told such a seizure was not grievable).

As a preliminary matter, there is considerable confusion regarding exactly which documents were confiscated. Samuels has sought these documents numerous times; defendants have not made the documents available to him or to the Court. Initially, defendants stated that "Plaintiff specifically alleges in his compliant that the defendants confiscated a pamphlet called 'Awake'." Motion Brief, at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

8. Later, defendants state that it is "unclear from plaintiff's complaint and response whether the pamphlet 'Awake' was confiscated from him or another." Yet since defendants conducted the search and confiscation of the materials from Samuels' cell, they should know whether "Awake" was confiscated from Samuels' cell. Nonetheless, they claim ignorance. Samuels himself makes his position clear: "material taken from Plaintiff [sic] cell [...] was not [...] Awake." Complaint, at 2. In a later brief, he writes "Complaint NEVER POSSESSED a pamphlet entitled "Awake." Opposition Brief, at 3 (emphasis in original).

In any event, it is clear that certain religiously-oriented documents were confiscated from Samuels' cell. Samuels seeks, *inter alia,* punitive and compensatory damages he claims to have suffered through defendants' alleged violation of his rights, including his First Amendment rights. *See* Complaint, at 13. Defendants argue that Samuels "never appealed any grievance relating to the confiscation of religious material" to the Inmate Grievance Program, citing an affidavit of Thomas G. Eagen ("Eagen Aff."), the Director of DOCS's Inmate Grievance Program, dated March 13, 2002. While this may be true, Samuels did protest the confiscation of documents in his direct appeal to Bliden and McKoy and later to Selsky. *See* Exs. N, V, 9. These appeals were denied.

**\*8** As noted, it is factually unclear whether seizures of religious materials may be grieved through the Inmate Grievance Program. However, even if such seizures are grievable, Samuels' alleged failure to exhaust all administrative remedies as required by 42 U.S .C. § 1997e(a) goes only to the narrow issue of the confiscation *qua* confiscation-the damage Samuels suffered from the loss of his property (such as the property value of the books). The main confiscation issue put forward by Samuels is not the confiscation in and of itself, but the confiscation insofar as it was the basis for the misbehavior adjudication.[FN15] This issue was already effectively grieved by Samuels through his direct appeal of his misbehavior determination, which *per se* implicated the confiscation of documents. Defendants argue nonetheless that any confiscation that took place is separate from the disciplinary hearing and thus must be separately grieved. The Court does not agree.

FN15. The real damage suffered by Samuels

was, *inter alia,* his 180 days in keeplock (and later a special housing unit).

Disputes stemming from a disciplinary hearing are properly appealed directly and not through the Inmate Grievance Program. To the extent that the confiscation issue is a constituent element of the misbehavior adjudication, Samuels need not file an administrative grievance because he already sought review of the matter on his direct appeal. The recent case of *Flanagan v. Maly,* 99 Civ. 12336(GEL), 2002 WL 122921 (S.D.N.Y. Jan. 29, 2002), is instructive. In *Flanagan,* the plaintiff brought two separate claims-one stemming from inadequate access to medical and legal resources, and one stemming from an alleged due process violation in a disciplinary hearing. The court found that the plaintiff had not exhausted all administrative remedies with regard to medical and legal access because he failed to utilize the Inmate Grievance Program. With regard to the disciplinary hearing, however, the court held that utilization of the grievance procedures was unnecessary because the plaintiff had already appealed the issues directly:

To require [plaintiff] to file an administrative grievance in these circumstances would be absurd, and Congress cannot have intended such a requirement. When an inmate challenges the procedure at a disciplinary hearing that resulted in punishment, he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal. Pursuit of the appellate process that the state provides fulfills all the purposes of the exhaustion requirement of [ § 1997e(a) ][FN16], by giving the state an opportunity to correct any errors and avoiding premature federal litigation. Once the alleged deprivation of rights has been approved at the highest level of the state correctional department to which an appeal is authorized, resort to additional internal grievance mechanisms would be pointless.

FN16. The district court mistakenly cites the provision as " § 1997a(e)," a nonexistent section.

*Flanagan,* 2002 WL 122921, at \*2. While the issue referred to in *Flanagan* was a due process defect in the disciplinary hearing (not at issue here because defendants

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

concede that Samuels exhausted all available administrative remedies), the underlying point, that issues directly tied to the disciplinary hearing which have been directly appealed need not be appealed again collaterally through the Inmate Grievance Program, is applicable to the confiscation issue. Moreover, the confiscation in the instant case is part and parcel of the misbehavior adjudication-unlike the medical claim made in *Flanagan* which was divorced from the due process claim.

**\*9** Defendants rely on a single case in support of their contention that the confiscation issue and the disciplinary hearing issue are wholly separate, *Cherry v. Selsky,* 99 Civ. 4636(HB), 2000 U.S. Dist. LEXIS 9451 (S.D.N.Y. July 7, 2000). It is not completely clear which section of the opinion defendants are citing, because no pinpoint citation is given. In *Cherry,* Judge Baer held that the filing of a false misbehavior report by a corrections officer is a grievable matter. *See id.* at \*21. However, *Cherry* is readily distinguishable from the instant case because in *Cherry,* the plaintiff had "not brought a claim with respect to the due process afforded him at his disciplinary hearing [...]." *Id.* at \*15. In contrast, Samuels makes this claim. As a consequence, the due process violations, including the allegedly wrongful confiscation (to the extent it led to the misbehavior adjudication) may be appealed directly.

Consequently, while Samuels has not exhausted his administrative remedies with regard to the injuries he suffered from the confiscation *alone,* he has exhausted his administrative remedies with regard to the injuries he suffered from the confiscation inasmuch as the confiscation of the religious materials serves as the basis for the disciplinary hearing.[FN17]

> [FN17.] The confiscation of Samuels' documents is not an ancillary issue unrelated to the disciplinary hearing (as was Samuels' Eighth Amendment argument, *see supra* note 14). Instead, the allegedly improper confiscation of materials is part and parcel of the disciplinary proceeding. The primary harm suffered by Samuels of the confiscation was not the value of the documents seized (which is never mentioned by Samuels) but the fact that the confiscation of allegedly harmless materials led to his confinement in keeplock and later in a special

housing unit for 180 days.

### 3. Special Housing Unit Confinement

Defendants similarly argue that Samuels' claim of retaliatory confinement in a special housing unit is barred because he failed to exhaust all available administrative remedies.[FN18] It is not entirely clear whether Samuels is making an argument based on retaliation. On one hand, he states that "Plaintiff [sic] claim is not on issue of retaliation." Samuels Aff., at ¶ 4. Elsewhere, he argues that "Plaintiff should not need to fear imposition of [special housing unit] confinement because they [sic] have engaged in prison litigation and/or prison reform activity [...]." Opposition Brief, at 25. As noted above, after being sentenced, Samuels was apparently transferred to a special housing unit for 180 days, which involves confinement for twenty-three hours per day.

> [FN18.] There are two separate retaliation issues at play in this action. The first, discussed here, is Samuels' claim of retaliatory confinement in a special housing unit. The second, discussed below, is Samuels' claim that the misbehavior adjudication itself was a form of retaliation for the NYTS's opposition to the Cell Building Project. *See supra* note 5.

Defendants represent to the Court that confinement to a special housing unit is ordinarily grievable. *See* Reply Brief, at 11. Samuels failed to bring this grievance to the Inmate Grievance Program. However, Samuels argues, and defendants do not contest, that Samuels was transferred to the special housing unit as punishment for his misbehavior adjudication, even though he was sentenced to 180 days of keeplock. Consequently, his appeal of his misbehavior adjudication necessarily implicates his sentence-not only his *de jure* punishment of 180 days of keeplock, 180 days' loss of telephone, package, and commissary privileges, but also his *de facto* punishment of 180 days of special housing unit confinement. *See Flanagan,* 2002 WL 122921, at \*2. The transfer to a special housing unit potentially implicates due process concerns. *See, e.g., Tookes v. Artuz,* 00 Civ. 4969, 2002 WL 1484391, at \*3 (S.D.N.Y. July 11, 2002) (noting that in the Second Circuit, confinement in a special

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

housing unit for more than 101 days generally implicates a liberty interest protected by the Due Process Clause).

4. DOCS Policy Regarding the Five Percent Nation of Gods & Earths

**\*10** Samuels makes an oblique reference to the fact that DOCS has treated members of the Five Percent Nation of Gods and Earths unfairly and partially. *See* Opposition Brief, at 3. To the extent that Samuels has a claim regarding DOCS's treatment of members of the Five Percent Nation, it is not directly tied to his disciplinary hearing and has not been grieved through the Inmate Grievance Program. Moreover, he has not taken issue with DOCS policies regarding the Five Percent Nation in his appeal. Consequently, this issue is dismissed with prejudice.

5. Dismissal of Action

Defendants argue that because Samuels seeks to assert certain unexhausted claims, "the entire action should be dismissed," irrespective of the fact that some claims are (as defendants concede) exhausted. Reply Brief, at 11. Defendants point to no binding precedent in support of this contention. The only New York case cited by defendants is *Radcliffe v. McGinns,* 00 Civ. 4966 (LMM), 2001 U.S. Dist. LEXIS 15528 (S.D.N.Y. Sept. 27, 2001). However, *Radcliffe* does not support defendants assertion that dismissal of some unexhausted claims mandates the dismissal of all claims, because in that case the claims were unexhausted as to *all* defendants. On that basis, the *Radcliffe* court dismissed all claims without prejudice. This Court thus does not find that dismissal of the exhausted claims is warranted.

B. Due Process

1. Samuels Pleads a Valid Due Process Claim

Defendants argue that Samuels does not plead a valid due process claim, claiming that Samuels does not identify a liberty interest, protected by the Due Process Clause, of

which he was deprived. *See* Motion Brief, at 9. Defendants state that "[other] then [sic] allege that he was sentenced to keeplock and transferred to Upstate, plaintiff does not allege any facts that distinguishes [sic] the disciplinary sentence from general prison population conditions." [FN19] *Id.* at 9. Defendants cite *Walker v. Goord,* 98 Civ. 5217(DC), 2000 U.S. Dist. LEXIS 3501, at \*22 (S.D.N.Y. Mar. 22, 2000) for the proposition that a complaint that merely alleges that a plaintiff was housed in a special housing unit does not state a due process claim. *See* Motion Brief, at 10. In fact, *Walker* 's ruling is not so sweeping. In *Walker,* the court held that to establish a liberty interest, a prisoner "must establish that the restraint imposed creates an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' ' *Walker,* at \*21 (quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)). The court also reiterated the Second Circuit's holding that there is no "bright-line rule regarding the length or type of sanction" necessary. *Walker,* at \*21 (citation omitted). The prisoner must also establish that the state has granted its inmates a protected liberty interest in remaining free from that confinement or restraint. *Id.* at \*21.

FN19. As noted *supra,* Samuels was also sentenced to 180 days' loss of packages, telephone, and commissary privileges.

**\*11** Samuels is able to meet this burden. The deprivation of liberty Samuels suffered was onerous. He was moved from the inmate honor block housing unit to keeplock and then to a special housing unit. *See supra* note 11. Moreover, unlike the plaintiff in *Walker,* Samuels identifies the length of time he was punished (180 days). *See Walker,* at \*22. In light of these facts, and given the length of his confinement, Samuels has met the *Sandin* test cited above. *See Tookes v. Artuz,* 00 Civ. 4969, 2002 WL 1484391, at \*3 (S.D.N.Y. July 11, 2002). Additionally, the requirement of an appealable hearing, with certain procedural safeguards, *see infra,* indicates that the state has granted inmates a protected liberty interest in remaining free from keeplock and special housing unit placement.

Due process requirements for a prison disciplinary hearing are "in many respects less demanding than those for criminal prosecutions." *Espinal v. Goord,* 180 F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

532, 537 (S.D.N.Y.2002) (quoting *Edwards v. Balisok,* 520 U.S. 641, 647 (1997)). At the same time, "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Duamutef v. Hollins,* 297 F.3d 108, 112 (2d Cir.2002) (citation omitted). With respect to Tier III hearings such as the one at issue here, the Fourteenth Amendment requires that:

(1) the inmate receive at least twenty-four hours written notice of the disciplinary charges against him;

(2) the inmate be permitted to call witnesses and present evidence "when permitting him to do so would not be unduly hazardous to institutional safety or correctional goals";

(3) the inmate be judged by a fair and impartial hearing officer;

(4) the disciplinary conviction be supported by some evidence; and

(5) the inmate be provided with a written statement of fact findings that support the disposition as well as the reasons for the disciplinary action taken.

*Espinal,* 180 F.Supp.2d at 538 (citing *Wolff v. McDonnell,* 418 U.S. 539, 563-69 (1974)) (internal citations omitted)).

2. Whether Samuels Received the Process Due Him

Defendants concede that Samuels was entitled to the aforementioned rights under *Wolff. See* Reply Brief, at 13. They argue, however, that Samuels received all the procedural safeguards due him. Before analyzing defendants points in detail, the Court notes the paucity of the record before it. While Samuels has provided nearly fifty exhibits, defendants have provided only a two-page affidavit by Inmate Grievance Program Director Thomas G. Eagen dated March 13, 2002, attached to which is a nine-line computer printout of what purports to be Samuels' grievance file. Defendants have failed to submit, *inter alia,* a transcript of the disciplinary hearing, a transcript or audio recording of the confidential witness statements, a written basis for the rejection of Samuels' witnesses, or a copy of the documents that were supposedly seized from Samuels' cell. While the Court is cognizant of the fact that the instant motion is not one for summary judgment, without these and other documents, it is difficult for this Court fully to evaluate the merits of the parties' arguments. More troubling is the fact that this is apparently not the first time an inmate has been sentenced to a special housing unit on the basis of evidence which has not been preserved for judicial review. Indeed, in *Cherry v. Selsky,* 99 Civ. 4636, 2000 U.S. Dist. LEXIS 9451, at *9-*12 (S.D.N.Y. July 7, 2000), a case cited by defendants, the court noted that on more than one occasion, Selsky was forced to reverse his previous decision denying an inmate's appeal because the "record of [the disciplinary] hearing was incomplete and the 'confidential tape' was 'unavailable for judicial review.' " *Id.* at *9 (citation omitted). On the occasion cited by the *Cherry* court, the inmate's record was expunged, but only after the plaintiff had served 125 days in a special housing unit. *See id.* at *9.

a. Witnesses

**\*12** Samuels argues that his due process rights were violated because he was not permitted to call Dr. Peter-Raoul as a witness at his disciplinary hearing. *See* Complaint, at 9; Ex. V, at 2. Defendants state, without explanation, that "it is clear that the proffered testimony would have been irrelevant and redundant." Motion Brief, at 13. The Court agrees with defendants that the right of an inmate to call witnesses in his defense is not limitless. Nevertheless, prison authorities' failure to allow an inmate to call a witness may be grounds for reversal, where the authorities fail to justify their actions. *See Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998). In this case, Dr. Peter-Raoul was apparently the author of some or all of the "subversive" materials and had close ties to the theological seminary program at the prison. According to Samuels, she also "assisted plaintiff with his course syllabus and provided much of the material utilized" therein. Complaint, at 9. She was therefore in a unique position to explain the appropriateness and relevance of the materials allegedly possessed by Samuels, who had in fact argued that the materials in question were issued to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

him through the NYTS program with the authorization of prison officials. *See, e.g.,* Complaint, at 5, Ex. V, at 2. The misbehavior hearing record sheet states that, "if any witness is denied [the opportunity to testify,] form 2176 explaining the reason for that determination must be given to the inmate and included as part of the record." Ex. O. No such form was filled out, and nowhere in the record do defendants explain or justify their exclusion of Dr. Peter-Raoul. *See* Ex. Q. Due process rights may be violated where prison authorities fail "without rational explanation" to obtain a witness requested by an inmate during a disciplinary hearing. *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998). Defendants' failure to justify their exclusion of Dr. Peter-Raoul potentially gives rise to a due process violation. [FN20] Dismissal is therefore inappropriate.

> **FN20.** Samuels also appears to allege that Cecilia, his employee assistant, was not permitted to testify on Samuels' behalf, and that Schwartzman testified outside Samuels' presence. *See* Ex. V, at 4; Plaintiffs' Supplemental Memorandum of Law and Reply Memorandum of Law in Further Support of Plaintiffs' Motion to Stay Complaint, at 8.

### b. Confidential Informant

Samuels also protests the fact that he was not furnished with statements of the confidential informant, and argues that the record is insufficient to permit an assessment of the reliability of the informant's testimony. The Second Circuit has noted that "even if due process does require a hearing officer to conduct an independent assessment of the informant's credibility, that 'would not entail more than some examination of indicia relevant to credibility rather than wholesale reliance upon a third party's evaluation of that credibility.' " *Espinal v. Goord,* 180 F.Supp.2d 532, 540 (S.D.N.Y.2002) (quoting *Russell v. Scully,* 15 F.3d 219, 223 (2d Cir.1993)). In the instant case, the lack of a full record does not permit the Court to determine whether Irurre, the presiding officer at the Tier III hearing, made the required "examination of indicia relevant to the credibility of the confidential informant[ ], whether by an independent assessment or otherwise." *Espinal,* 180 F.Supp.2d at 540. Consequently, dismissal is inappropriate, because it is uncertain whether Samuels' punishment was supported by constitutionally sufficient

evidence.

### c. Assistance Provided by the Employee Assistant

**\*13** Samuels claims that his employee assistant, Cecilia, violated his due process rights by, *inter alia,* failing to explain the charges against Samuels, failing to provide Samuels with documentary evidence relating to the charges in the misbehavior report, failing to make a written record of the questions he asked the interviewees, failing to record the testimony of the witnesses he allegedly interviewed for Samuels, failing to interview the confidential informant on Samuels' behalf, and failing to interview one of the three witnesses requested by Samuels. *See* Complaint, at 9; Opposition Brief, at 22. Samuels also complains that his employee assistant did not assist in his defense but instead interrogated him about his alleged links to prison reform activists. *See* Ex. V, at 5-6.

Defendants concede that inmates have a limited right to assistance in misbehavior proceedings. *See Silva v. Casey,* 992 F .2d 20, 22 (2d Cir.1993) (per curiam). While defendants are correct in asserting that inmates do not have the right to appointed or retained counsel at a misbehavior hearing, *see Wolff v. McDonnell,* 418 U.S. 539, 570 (1974), they do have a right to assistance in "certain circumstances [in which they] will be unable to 'marshal evidence and present a defense' [...]." *Silva,* 992 F.2d at 22. Such situations include where the inmate is confined pending a superintendent's hearing. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.1(a)(4). The Green Haven Notice of Assistance form given to Samuels specifically states that an "inmate shall have the opportunity to pick an employee from established lists of persons who shall assist the inmate when a Misbehavior Report has been issued against the inmate if [...] [t]he inmate is keeplocked or confined to a special housing unit and is unable to prepare his defense." Ex. J. In the instant case, Samuels was entitled to an employee assistant because he was keeplocked immediately after the search of his cell and was unable to prepare his defense.

As noted, Samuels makes broad assertions as to the deficiency of his employee assistant. *See* Ex. V, at 3-8. Based on Samuels' factual assertions, it is possible that employee assistant Cecilia failed to provide even the

"limited" assistance to which Samuels is entitled.[FN21] Such a failure potentially implicates Samuels' due process rights. *See Ayers v. Ryan,* 152 F.3d 77, 80-81 (2d Cir.1998). Because the instant motion requires that the Court accept Samuels' allegations as true, dismissal is inappropriate.

> FN21. By statute, the "assistant's role is to speak with the inmate charged, to explain the charges to the inmate, interview witnesses and to report the results of his efforts to the inmate. He may assist the inmate in obtaining documentary evidence or written statements which may be necessary. The assistant may be required by the hearing officer to be present at the disciplinary or superintendent's hearing." N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.2. While failure to adhere to regulations does not itself give rise to a claim under 42 U.S.C. § 1983, it may constitute evidence of a constitutional deprivation. *See, e.g., Duckett v. Ward,* 458 F.Supp. 624, 627 (S.D.N.Y.1978).

**d. Actions of the Hearing Officer**

With respect to the hearing officer, Irurre, Samuels makes a variety of claims, including the fact that Irurre prohibited Samuels from calling various witnesses and that he was partial. The Court has not been furnished with a copy of the hearing transcript. Because Samuels' claims potentially implicate constitutional rights, and because any holding on this issue requires that the Court make factual determinations, dismissal is inappropriate.

**e. Timeliness of the Hearing**

***14** Samuels claims that his due process rights were violated because his misbehavior hearing was held eight days after Samuels was confined following the search of his cell. Where an inmate is confined pending a disciplinary hearing (as was the case here), the hearing must be held within seven days of the confinement unless a later date is authorized by the commissioner or his designee. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-5.1(a). In this case, Samuels' rights were not violated.

The search took place on October 20, 1999, and the hearing occurred on October 27, 1999. Under § 251-5.1, the date of the incident is generally excluded. *See, e.g., Harris v. Goord,* 702 N.Y.S.2d 676 (N.Y.App. Div.3d Dep't 2000) (holding that the fourteen-day period in § 251-5.1(b), which runs from the date of the writing of a misbehavior report, is calculated by excluding the day the report is written). Thus, Samuels' hearing was held within seven days of his detention. Moreover, as Samuels admits, prison officials sought and received permission to begin the hearing on October 27, 1999, as per the requirements of § 251-5.1(a). *See* Ex. L. For these reasons, Samuels' claim with regard to the timeliness of his hearing is dismissed.

**f. Notice**

Defendants reject Samuels' argument that he received inadequate notice of the charges against him. It is unclear from the record what notice Samuels received, either before or during the disciplinary hearing. While the Court is cognizant of the fact that inmates are entitled to fewer due process rights than other citizens, it is possible to read Samuels' allegations as presenting a valid due process claim. The Court notes, for instance, that inmate rule 104.12 provides that "[i]nmates shall not lead, organize, participate, or urge other inmates to participate in work-stoppages, sit-ins, lock-ins, or other actions which may be detrimental to the order of the facility." N.Y. Comp.Codes R. & Regs. tit. 7, § 270.2(B)(5)(iii). The Appellate Division has held that possession of threatening materials alone does not violate the rule because the inmate must actually lead, organize, participate, or urge other inmates to participate, and not merely intend to do so. *See, e.g., Abdur-Raheem v. Goord,* 665 N.Y.S.2d 152, 153 (N.Y.App. Div. 4th Dep't 1997). While Samuels may have possessed the documents, it is unclear whether he received any notice of how he allegedly led, organized, or participated in (or urged others to participate in) a prohibited activity. Because the determination hinges on a factual determination, dismissal is inappropriate.

**C. Retaliation**

Samuels alleges that his misbehavior adjudication was based on the prison authorities' perception that members

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

of the NYTS were behind the planned Y2K protest. *See* Complaint, at 3-6. Samuels alleges that the materials seized were not subversive and were of a Christian nature. Defendants move to dismiss the retaliation argument, arguing that the prison authorities' decision is entitled to deference. While this may be true, such deference is inappropriate on a motion to dismiss, particularly given the paucity of the record. Without, for example, a transcript of the hearing, a transcript of the testimony of the confidential informant, or a copy of the allegedly subversive documents, the Court cannot blindly defer to the prison authorities. Consequently, dismissal is inappropriate. Defendants also argue that "even if it was improper to discipline plaintiff for possession of contraband, the evidence of plaintiff's involvement in the unauthorized demonstration provided a valid non-retaliatory basis for the disciplinary sanction and transfer." Reply Brief, at 19. This argument is incorrect for two reasons. First, the argument ignores the fact that the contraband documents and testimony of the confidential informant provide the basis for the prison authorities' finding that Samuels was involved in the demonstration. None of these documents is in the record before the Court; thus deference is inappropriate. Second, this argument ignores the fact that Samuels' punishment was ultimately based on the fact that he had violated two rules. His prison file reflects a guilty adjudication on two counts; also, had Samuels been disciplined for violating only one rule, his penalty would likely have been less.

D. Personal Involvement

**\*15** Defendants correctly note that liability of supervisory officials under 42 U.S.C. § 1983 may not be premised on the doctrine of *respondeat superior. See, e.g., Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002); *Emblen v. Port Auth. of New York/New Jersey,* 00 Civ. 8877(AGS), 2002 WL 498634, at \*10 (S.D.N.Y., Mar. 29, 2002). Consequently, a defendant's personal involvement in the alleged constitutional violation is required. *See, e.g., Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 690-95 (1978). Such personal involvement may be proven in a number of ways:

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed

to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). The Court examines the alleged personal involvement of each defendant in turn.

1. Donald Selsky

Defendants concede Donald Selsky, Director, Special Housing/Inmate Disciplinary Program, was personally involved in the alleged due process violations cited by Samuels. The Court notes that Selsky, acting "on behalf of the commissioner," reviewed and affirmed Samuels' superintendent's hearing and denied Samuels' appeal. Ex. 6, V.

2. Glenn Goord

Defendants argue that Glenn Goord, DOCS Commissioner, has no personal involvement in this case, and that the only link to him in this action is a newspaper article. *See* Reply Brief, at 20-21. This is incorrect, however, since the denial of Samuels' appeal was written by Selsky on behalf of Goord. As noted, defendants concede Selsky's involvement. Goord had a duty to supervise his subordinate who purportedly acted in his name.[FN22] Without further evidence, the Court cannot say as a matter of law that Goord was not personally involved, since personal involvement can include gross negligence "in supervising subordinates who committed the wrongful acts." *Colon,* 58 F.3d at 873.

> FN22. Whereas the doctrine of *respondeat superior* involves the legal assignment of liability to a supervisor for the acts of a subordinate, the instant case involves a subordinate who claims to be (and legally is) acting in the name of his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

supervisor.

3. Paul Cecilia

Defendants concede Paul Cecilia's personal involvement.

4. Javier Irurre

Defendants concede Javier Irurre's personal involvement.

5. Sergeant Schwartzman

Defendants concede Sergeant Schwartzman's personal involvement.

6. Dennis Bliden

Defendants allege that Samuels never argues that Bliden had the ability to remedy the alleged constitutional violation. However, Bliden wrote to Samuels in response to his appeal of the misbehavior adjudication, stating, "You may appeal this hearing to the Commissioner in Albany. Until such time as we receive a decision from this office, *I will not modify the disposition.*" Ex. U (emphasis added). Significantly, Bliden did not state that he *could* not modify the disposition but stated that he *would* not. This provides at least *prima facie* evidence that Bliden had the authority to overturn the disposition. While further facts may reveal this to be untrue, at this stage dismissal is inappropriate.

7. Jeffery McKoy

**\*16** Samuels fails to provide any support for McKoy's personal involvement in this action. Indeed, in responding to one of Samuels' appeals, McKoy wrote that "I do not have the authority to overturn Tier 3 dispositions." Ex. R. McKoy does not appear to have been complicit in any alleged deprivation of Samuels' rights, and, in contrast to Bliden, he plainly lacked the authority to overturn the

misbehavior adjudication. Consequently McKoy was not personally involved in the matter and all claims against him are dismissed.

8. Christopher P. Artuz

Christopher P. Artuz is Green Haven's Superintendent. Samuels states that his involvement stems from his failure to respond to a note sent to him. Although the note to Artuz does not appear to be in the record before the Court, it is referenced in a note from Bliden to Samuels. *See* Ex. T ("This is in response to your memo of November 12, 1999 to Superintendent Artuz"). Samuels also alleges that Artuz failed to respond when contacted by Dr. Peter-Raoul and Dr. Webber, who sought to intervene on Samuels' behalf. *See* Opposition Brief, at 27. While it is not clear that Artuz was personally involved, the question of Artuz's involvement in this matter is a factual question. In such cases, dismissal should be denied. As the Second Circuit noted in *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986), "even if [the prison superintendent] did not actively affirm the conviction on administrative appeal, we cannot say, on this record, that as Superintendent [of the prison] he was not directly responsible for the conduct of prison disciplinary hearings [...]."

E. Qualified Immunity

Defendants move to dismiss this action based on the qualified immunity of defendants. As defendants correctly point out, government employees are generally immune from liability for civil damages "when their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known." ' *Duamutef v. Hollins,* 297 F.3d 108, 111 (2d Cir.2002) (citation omitted). As a preliminary matter, it should be noted that qualified immunity is only a defense to claims for money damages and are not a defense for equitable relief or injunctions. *See, e.g., Charles W. v. Maul,* 214 F.3d 350, 360 (2d Cir.2000). To the extent that Samuels seeks equitable relief, defendants' potential claims of qualified immunity are no bar.

The Court is unable to determine at this time whether the remaining defendants are entitled to qualified immunity in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

this case. The reason is that without having basic documentary evidence, including a transcript of the disciplinary hearing, a transcript of the testimony of the confidential informant, and the documents allegedly seized from Samuels' cell, the Court cannot determine whether these defendants violated Samuels' clearly established constitutional or statutory rights. Because it is a fact-intensive question, it cannot be disposed of at this stage.

V. Conclusion

**\*17** For the reasons set forth above, defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1) and (6) is DENIED with respect to defendants Selsky, Goord, Cecilia, Irurre, Schwartzman, Bliden, and Artuz. Defendants' motion is GRANTED with respect to Jeffery McKoy, and with respect to the issue of DOCS policy regarding the Five Percent Nation of Gods and Earths and with regard to the timeliness of Samuels' misbehavior hearing.

SO ORDERED.

S.D.N.Y.,2002.
Samuels v. Selsky
Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

2010 WL 376626
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
E.D. New York.

Simon GORIS, Plaintiff,
v.
Dennis BRESLIN, et al., Defendants.

No. 04-CV-5666 (KAM)(LB).
|
Jan. 26, 2010.

**Attorneys and Law Firms**

Mark M. Noel, Richard Owens, Aaron Mathew Singer, John Daniel Castiglione, Joseph M. Salama, Latham & Watkins LLP, New York, NY, for Plaintiff.

Maria Barous Hartofilis, Office of NYS Atty General, New York, NY, for Defendants.

*MEMORANDUM AND ORDER*

MATSUMOTO, District Judge.

**\*1** Pending before the court is a motion for summary judgment by the defendant Public Administrator of Suffolk County as the Administrator of the Estate of Francois Thebaud, M.D., ("the Public Administrator" or "defendant"). Plaintiff Simon Goris ("Goris" or "plaintiff") commenced the pending action against Dr. Francois Thebaud ("Dr.Thebaud") pursuant to 42 U.S.C. § 1983 seeking monetary relief for alleged deliberate indifference to his serious medical needs in violation of the Eighth Amendment while plaintiff was incarcerated at Arthur Kill Correctional Facility ("Arthur Kill") between February 2003 and August 2004. On August 25, 2008, Dr. Thebaud passed away and, on March 25, 2009, the Public Administrator was substituted for Dr. Thebaud.

Defendant has moved for summary judgment, arguing that: 1) Plaintiff does not suffer from an objectively serious medical condition and cannot demonstrate that Dr. Thebaud acted with deliberate indifference; and 2) Dr.

Thebaud is protected by qualified immunity. (Doc. No. 133, Def.'s Mem of Law in Supp. of Mot. for Summary Judgment at 8-18.) Plaintiff argues that the numerous issues of fact surrounding Dr. Thebaud's liability preclude summary judgment. (*See generally,* Doc. No. 135, Pl.'s Mem. of Law in Opp'n.) For the following reasons, defendant's motion for summary judgment is granted.

*BACKGROUND*

### I. *Procedural History*

Plaintiff commenced this action *pro se* on December 20, 2004, against defendants Dennis Breslin, Francois Thebaud, M.D., Gail Buswell, R.N., Syed Haider-Shah, M.D., and Lester Wright, M.D., alleging that defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. Upon defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1), (6), and (3), Judge Amon dismissed plaintiff's claim against defendant Dennis Breslin, the Superintendant of Arthur Kill Correctional Facility, in an order dated May 10, 2006. Discovery proceeded with the remaining defendants.

On October 30, 2007, plaintiff obtained *pro bono* counsel. Discovery closed on June 30, 2008. Co-defendants Buswell, Haider-Shah and Wright filed a motion for summary judgment on October 27, 2008, which the court granted on July 6, 2009.

On August 25, 2008, Dr. Thebaud passed away. On March 25, 2009, upon a motion by plaintiff, the Public Administrator was substituted for Dr. Thebaud. On June 26, 2009, the State filed a motion for summary judgment on behalf of the Public Administrator. For the following reasons, the Public Administrator's motion is granted.

### II. *Undisputed Material Facts*

**A. Plaintiff's Knee Injury and Subsequent Treatment**
Based on the plaintiff's medical records from the Department of Corrections ("DOC") submitted by plaintiff and defendants, the court finds the undisputed material facts to be as follows. [1]

Plaintiff was formerly an inmate in the custody of the New York State Department of Correctional Services. On February 9, 2003, while playing basketball at the

Arthur Kill, plaintiff sustained an injury to his right knee. (Doc. No. 110, Oct. 14, 2008 Castiglione Declaration ("10/14/08 Castiglione Decl."), Ex. 1, Ambulatory Health Records of Simon Goris (collectively, "Ambulatory Health Records") at D024.)

**\*2** Dr. Thebaud examined plaintiff on February 11, 2003 and noted swelling and tenderness of his right knee, and ordered an x-ray of plaintiff's knee. (*Id.*) The x-ray, taken on February 13, 2003, was negative and plaintiff was so informed on March 6, 2003. (*Id.;* 10/14/08 Castiglione Decl., Ex. 3, 2/13/03 Staten Island University Hospital X-Ray Examination Report at 1; Doc. No. 136, June 18, 2009 Castiglione Declaration ("6/18/09 Castiglione Decl."), Ex. 1, 3/28/08 Deposition of Dr. Thebaud ("Thebaud Dep.") at 80.) Dr. Thebaud gave plaintiff pain medication and an Ace Bandage. (Thebaud Dep. at 81.) Dr. Thebaud saw plaintiff on March 14, 2003 to discuss his cholesterol but there is no indication that plaintiff discussed his knee. (Ambulatory Health Records at D025.)

On April 7, 2003, after noting that plaintiff continued to have swelling, buckling and pain in his right knee, Dr. Thebaud ordered an orthopedic consultation for plaintiff at Staten Island University Hospital. (*Id.* at D026; 10/14/08 Castiglione Decl., Ex. 2, Requests and Reports of Consultation of Simon Goris ("Consultation Reports") at D139.) Plaintiff did not make any complaint regarding his knee during visits with a nurse on April 17 or on April 29, 2003. (Ambulatory Health Records at D026.) Plaintiff saw an orthopedic consultant on May 14, 2003, who recommended physical therapy and an MRI of the right knee. (*Id.* at D027; Consultation Reports at D139.) Based on this recommendation, on May 15, 2003, Dr. Thebaud ordered a physical therapy consultation and an MRI. (Consultation Reports at D140-D141.) On June 5, 2003, the physical therapist recommended physical therapy twice a week for an unspecified period. (*Id.* at D140.) On June 12, 2003, Dr. Thebaud ordered another physical therapy consultation. (*Id.* at D142-D143.) Plaintiff had physical therapy in June and July of 2003. (*Id.* at D140-D145.)

On June 16, 2003, an MRI was performed on plaintiff's right knee, which suggested an anterior cruciate ligament ("ACL") tear. (*Id .* at D141; 10/14/08 Castiglione Decl., Ex. 4, 6/18/03 Staten Island University Hospital MRI Report for Simon Goris ("MRI Report") at 1-2.) The

MRI also diagnosed an oblique tear of the medial meniscus involving the body and posterior horn, mild to moderate degenerative changes (arthritis) manifested by joint space narrowing and osteophyte formation, and other intact ligaments and tendons. (MRI Report at 1-2.)

On July 3, 2003, referencing the MRI results, Dr. Thebaud referred plaintiff for an orthopedic consultation. (Ambulatory Health Records at D033; Consultation Reports at D144.) On July 23, 2003, plaintiff was seen by an orthopedist who noted that plaintiff reported that his right knee pain and instability were "unimproved" since his last visit. (Consultation Reports at D144.) The orthopedist further noted that plaintiff reported pain on flexion of his right knee and prescribed continuing physical therapy and directed that plaintiff not engage in prolonged activity with the right knee. (*Id.*) The orthopedic surgeon recommended plaintiff return to an orthopedist in three weeks. (*Id.*)

**\*3** On August 5, 2003, Dr. Thebaud referred plaintiff for a follow-up consultation with an orthopedist, as recommended during the July 23, 2003 orthopedic visit. (*Id.* at D146.) Plaintiff saw an orthopedist on September 17, 2003, who again recommended physical therapy, anti-inflammatory pain medication and a return visit as needed ("prn"). (*Id.*) Thereafter, Dr. Thebaud again referred plaintiff for physical therapy on September 18, 2003, November 6, 2003 and March 16, 2004, which plaintiff received during that period through April 2004. (*Id.* at D147, D149-D155.)

Plaintiff's physical therapy records note that plaintiff occasionally complained of knee pain and also reported a reduction of knee pain and buckling to the physical therapist. (*Id.* at D140, D142-D143, D149-D155.) For example, on January 14, 2004, plaintiff reported to his physical therapist that his knee buckled less since he started physical therapy; on January 21, 2004, that his knee felt a little better and stronger and that he did not have buckling of the knee; and on January 26, 2004, that his knee felt stronger and did not buckle as much. (*Id.* at D150-D152.) On January 28 and February 2, 2004, plaintiff reported to his physical therapist that his knee pain increased with snow and cold weather but his knee was not buckling. (*Id.* at D153-D154.)

On March 16, 2004, plaintiff reported to Dr. Thebaud that he was doing better with physical therapy and was given

an ace bandage and referred for more physical therapy. (Ambulatory Health Records at D044; Consultation Reports at D155.) Dr. Thebaud's referral of March 16, 2004 noted that plaintiff had "good improvement, increase of strength, decrease of pain," and that he would improve with more therapy. (Consultation Reports at D155.) The subsequent physical therapy report dated April 14, 2004 notes that plaintiff's right knee had not buckled over the last month, but that it felt a "little unstable," with pain and tenderness on the lateral aspect, and that plaintiff was unable to run and jump. (*Id.*)

Plaintiff was seen by a registered nurse on May 14, 2004, who noted that physical therapy "be continued," provided plaintiff with a limited activity note, and recommended a follow-up medical appointment. (Ambulatory Health Records at D047.) Plaintiff returned on May 18, 2004 to have his restricted activity note verified and extended until June 1, 2004. (*Id.* at D046.) On June 7, 2004, plaintiff requested physical therapy, and the nurse scheduled a medical appointment for June 28, 2004. (*Id.*) The Ambulatory Health Records indicate that a medical doctor was not in the office on June 28, 2004, and, accordingly, plaintiff's appointment was rescheduled for July 19, 2004. (*Id.*) On July 2, 2004, plaintiff requested an appointment to see Dr. Thebaud before July 19, 2004. (*Id.* at D48.) Plaintiff was offered the option of seeing another doctor, Dr. Davis, that same day, but plaintiff refused that appointment. (*Id.*) Plaintiff saw Dr. Thebaud three days later on July 5, 2004, where the results of his cholesterol test and diet were discussed. (*Id.*)

**\*4** On July 19, 2004, plaintiff returned to see Dr. Thebaud and complained of right knee pain following two physical therapy sessions. (*Id.*) On this date, Dr. Thebaud again referred plaintiff for an orthopedic consultation and again forwarded a copy of the MRI to the consultant, stating "pt has had PT on 2 occasions but still [complains] of pain of rt knee. Please see. Sent copy of MRI." (Consultation Reports at D156; *see also* Ambulatory Health Records at D048.) The orthopedic consultation was scheduled for August 11, 2004. (Consultation Reports at D156.)

On July 31, 2004, plaintiff was examined by a nurse in the Segregated Housing Unit ("SHU") who noted no marks, abrasions or swollen areas. (Ambulatory Health Records at D48.) Plaintiff did not attend the August 11, 2004 orthopedic consultation. (Consultation Reports at D156;

Doc. No. 133, 9/10/08 Declaration of Dr. Haider-Shah ("Haider-Shah Decl.") at ¶ 9.) Plaintiff's medical chart was reviewed for transfer on August 12, 2004. (Ambulatory Health Records at D049.)

On August 13, 2004, plaintiff was transferred from Arthur Kill to Downstate Correctional Facility, then to Ulster Correctional Facility, and finally, on August 17, 2004, to Marcy Correctional Facility ("Marcy"). (Haider-Shah Decl. at ¶ 7, Ex. A at 1-2.)[2]. From the medical records, it does not appear that plaintiff saw Dr. Thebaud after July 19, 2004.

### B. Plaintiff's Expert Opinion

Plaintiff's expert, Dr. Andrew D. Pearle, concedes that plaintiff "received appropriate care from February 2003 until ... February 2004." (10/14/08 Castiglione Decl., Ex. 10, 4/14/08 Report of Pl.'s Expert Dr. Andrew Pearle (collectively, "Pearle Report") at 4.) However, Dr. Pearle opined that, "after Mr. Goris's initial improvement with physical therapy in February 2004", "orthopedic follow-up should have occurred in a more expeditious manner", and specifically that, after this point, Dr. Thebaud "did not follow the Orthopedic recommendations of following up with the Orthopedic clinic prn." (*Id.* at 4-5.) He also opined that, in his practice, "if a patient has persistent complaints of pain after physical therapy for 4 weeks in the setting of a meniscal and ACL tear, I would order more physical therapy and/ or recommend surgical intervention." (*Id.* at 4.) Dr. Pearle concluded, "[i]n the setting of defined Orthopedic pathology and a failure of physical therapy to provide relief, Orthopedic re-consultation should have occurred within a couple of weeks to one month after the persistence of symptoms." (*Id.* at 5.)

### *DISCUSSION*

#### I. *Summary Judgment Standard*

A court may grant summary judgment only "if the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party carries the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d

265 (1986). In deciding a motion for summary judgment, the court's function is not to resolve disputed issues of fact, but only to determine whether there is a genuine issue to be tried. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must construe the facts in the light most favorable to the nonmoving party and all reasonable inferences and ambiguities must be resolved against the moving party. *Flanigan v. Gen. Elec. Co.,* 242 F.3d 78, 83 (2d Cir.2001).

**\*5** Nevertheless, the nonmoving party cannot rest on "mere allegations or denials" but must instead "set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Nat'l Westminster Bank USA v. Ross,* 676 F.Supp. 48, 51 (S.D.N.Y.1987) ("Speculation, conclusory allegations, and mere denials are not enough to raise genuine issues of fact."); *Harlen Assocs. v. Incorporated Vill. of Mineola,* 273 F.3d 494, 499 (2d Cir.2001) ( "[M]ere speculation and conjecture is insufficient to preclude the granting of the motion.").

Nor can the nonmoving party rest only on the pleadings. *Celotex,* 477 U.S. at 324 (Fed.R.Civ.P. 56(e) "requires the nonmoving party to go beyond the pleadings"); *Davis v. New York,* 316 F.3d 93, 100 (2d Cir.2002). Instead, each statement of material fact by the movant or opponent must be followed by citation to evidence which would be admissible, as required by Federal Rule of Civil Procedure 56(e) and Local Civil Rule 56.1(d). Moreover, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247-48 (emphasis in original). No genuine issue of material fact exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted).

## II. *Section 1983 and Eighth Amendment Claim for Deliberate Indifference to Serious Medical Needs*

### A. *Legal Standard*

To prevail in a section 1983 action, a plaintiff must demonstrate that he has been denied a constitutional or federal statutory right and that the deprivation occurred under the color of state law. *See* 42 U.S.C. § 1983. In order to establish an Eighth Amendment violation based on a claim that a prison official provided inadequate medical treatment, a plaintiff must prove "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The deliberate indifference standard requires an inmate to meet both an objective and subjective prong. *See, e.g., Griffin v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999).

Under the objective prong, the plaintiff must establish "that an official 'denied [the patient] treatment needed to remedy a [sufficiently] serious medical condition.' " *Mills v. Fenger,* 216 Fed. Appx. 7, 10 (2d Cir.2006) (quoting *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996)). In order to demonstrate that the alleged deprivation of medical treatment is, "in objective terms, 'sufficiently serious,' " the prisoner "must prove that his medical need was 'a condition of urgency, one that may produce death, degeneration, or extreme pain.' " *Johnson v. Wright,* 412 F.3d 398, 403 (2d Cir.2005) (quoting *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998)).

**\*6** Under the subjective prong of the analysis, the plaintiff must prove that the official denied treatment with a "sufficiently culpable state of mind." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). This requires that the prison official " 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Id.* (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)); accord *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009). *See also Allen v. Wende,* ---F.Supp.2d ----, No. 09-CV-6203L, 2009 WL 4023212, at \*2 (W.D.N.Y. Nov.19, 2009) ("In other words, it is not enough that the defendant objectively *should* have perceived the risk to the inmate's health or safety; he must have *actually* been aware of, but deliberately ignored that risk." (emphasis in original) (citing *Caiozzo,* 581 F.3d at 69-70)); *Stevens v. Goord,* 535 F.Supp.2d 373, 385 (S.D.N.Y.2008) ("A plaintiff must establish a 'conscious disregard of a substantial risk of serious harm.' " (quoting *Cuoco v. Moritsugu,* 222 F.3d 99 (2d Cir.2000))). To demonstrate this prong of the deliberate indifference standard, officials must " 'intentionally deny[ ] or delay[ ] access to medical care or intentionally interfere with the treatment once prescribed.' " *Demata v. New York State Corr. Dep't of Health Servs.,* No. 99-CV-0066, 1999 U.S.App. LEXIS 22955, at \*4 (2d Cir. Sept. 17, 1999) (quoting *Estelle,* 429 U.S. at 104-05).

It is well-established that mere disagreements with the quality of medical care do not state an Eighth Amendment claim. *See, e.g., Estelle,* 429 U.S. at 106-07; *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) ("So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."); *Culp v. Koenigsmann,* No. 99-CV-9557, 2000 WL 995495, at *7 (S.D.N.Y. July 19, 2000) (collecting cases). Nor does a delay in medical treatment necessarily invoke the Eighth Amendment. *See, e .g., Morrison v. Mamis,* No. 08-CV-4302, 2008 WL 5451639, at *7 n. 19 (S.D.N.Y. Dec.18, 2008) (Report and Recommendation) (collecting cases). To the contrary, the Second Circuit has reserved classifying delays in providing necessary medical care as "deliberately indifferent" for "cases in which, for example, officials deliberately delayed care as a form of punishment, ignored a 'life-threatening and fast-degenerating' condition for three days, or delayed major surgery for over two years." *Demata,* 1999 U.S.App. LEXIS 22955, at *5 (internal citations omitted).

The Second Circuit addressed facts similar to those presented here in *Demata v. New York State Corr. Dep't of Health Servs.,* 1999 U.S.App. LEXIS 22955, at *4. [3] In that case, the plaintiff alleged that defendant prison officials failed to respond to numerous medical complaints, including injuries to both knees, an ulcer, and hemorrhoids. *Id.* at *2. Of particular significance in *Demata* is the plaintiff's allegations regarding the treatment he received for a knee injury sustained while incarcerated. *Id.* at *2-3. Demata reported his knee injury to the nurse on duty the day he sustained it in February 1994, and continued to complain of related difficulty for months thereafter. *Id.* In September 1994, an MRI was performed and the knee was examined by an orthopedist. *Id.* at *3. The orthopedist prescribed physical therapy, an injection, and knee supports. *Id.* Demata had several more orthopedic consultations. *Id.* Between the fall of 1995 and May 1996, Demata complained of knee pain and was given Tylenol. *Id.* His complaints became more frequent in May 1996 and physical therapy in the form of strengthening exercises was prescribed. *Id.* Additional consultations and MRIs followed, and in March 1997, three years after sustaining the injury, Demata had knee surgery. *Id.*

**\*7** In affirming the district court's grant of summary judgment in favor of the defendant nurse and doctors, the *Demata* court stated that "strengthening exercises are in fact a form of medical care," *id.* at *7, and the fact that the plaintiff "fe[lt] something more should have been done to treat his injuries is not a sufficient basis for a deliberate indifference claim," *id.* at *5-6. Further, the *Demata* court found that plaintiff's "mere disagreement with [strengthening exercises as a] form of treatment does not establish deliberate indifference." *Id.* at *7.

The *Demata* court, however, vacated the district court's grant of summary judgment with regard to two of Demata's Eighth Amendment claims against the Medical Director of the prison. *Id.* at *8. The *Demata* court found that the factual record was insufficient to determine whether the medical director, who defended the denial of physical therapy on the basis that the treatment was unavailable, knew of the physical therapy recommendation and any harmful consequences of failing to provide it. *Id.* at *13-15. Additionally, the court remanded to develop the record as to whether the fact that the plaintiff was recommended and scheduled for a colonoscopy that he never received while under the Director's care constituted an Eighth Amendment violation because a "[f]ailure to heed a physician's recommendation regarding treatment may in some circumstances constitute deliberate indifference." *Id.* at *16.

### B. *Application of Eighth Amendment Analysis to Dr. Thebaud*

Plaintiff alleges two theories whereby Dr. Thebaud purportedly evinced deliberate indifference to plaintiff's serious medical needs: 1) Dr. Thebaud treated plaintiff's knee injury with physical therapy instead of recommended surgery, (Doc. 29, Am. Compl. at 5); and 2) Dr. Thebaud ignored orthopedists' orders by failing to implement physical therapy prescribed for plaintiff, (Pl.'s Mem. of Law in Opp'n at 1-2; 13-16.) As defendant points out, plaintiff raises the second theory of deliberate indifference for the first time in his opposition to defendant's motion for summary judgment. (Doc. No. 134, Def.'s Reply Mem. in Supp. at 2-3.)

Plaintiff has failed to come forward with evidence from which a reasonable juror could conclude that Dr. Thebaud deliberately disregarded an excessive risk to plaintiff's health by intentionally denying or delaying medical

care to plaintiff, or interfering with treatment once prescribed to plaintiff. The undisputed material facts, as reflected in the plaintiff's medical records, establish that, during the approximately eighteen-months between plaintiff sustaining his injury and being transferred from Arthur Kill to the Marcy facility, Dr. Thebaud prescribed physical therapy, strengthening exercises, Tylenol, restricted activity when requested by plaintiff, and referred plaintiff for orthopedic and physical therapy consults and for an x-ray, MRI and other lab tests. It does not appear that Dr. Thebaud acted with a lack of due care, let alone a conscious disregard of a substantial risk of serious harm. Thus, Plaintiff has not alleged sufficient facts to meet the subjective prong of the two-part deliberate indifference test.

**\*8** Plaintiff's allegation that Dr. Thebaud treated his knee injury with physical therapy instead of surgery does not change this conclusion, particularly where the medical records during Dr. Thebaud's treatment of plaintiff do not recommend surgery and plaintiff provides only vague details as to which doctor provided the surgical recommendation and when such recommendation was given. (*See* Doc. No. 109, Aff. of Simon Goris at ¶ 13 ("At one if these [orthopaedic] consultations, the individual I spoke with indicated that I needed surgery for my knee."); Am. Compl. at 5 ("The specialist at Staten Island University Hospital requested and recommended surgery.").) As defendant argues, and the court notes, the medical records flatly contradict any assertion by plaintiff that one of the orthopedic consultants or specialists who plaintiff saw while he was at Arthur Kill recommended that plaintiff have knee surgery, (Aff. of Simon Goris at ¶ 13; Am. Compl. at 5), or that any such recommendation was conveyed to Dr. Thebaud, (Am. Compl. at 5.) Furthermore, Dr. Thebaud testified that he had to defer to the orthopedists' treatment recommendations and could not recommend treatment on his own. (*See, e.g.,* Thebaud Dep. at 67 ("[T]he orthopedist is the one who is the specialist. He's the one who has to decide what treatment to do for that patient."); *id.* at 114-115 ("I cannot recommend to the orthopedist what to do ... The orthopedist must decide.... It's for the orthopedist to recommend the course of therapy for the patient."; *id.* at 127 ("I cannot recommend. The orthopedist had to recommend the treatment of that patient.").)

Assuming for the purposes of this motion that plaintiff did receive such a recommendation, that this recommendation

was conveyed to Dr. Thebaud and that Dr. Thebaud had the power to choose which course of therapy to prescribe, Dr. Thebaud's decision to treat plaintiff with physical therapy, as undisputedly recommended by numerous orthopedic specialists, instead of with surgery, is at most "a difference in opinion as to [plaintiff's] medical treatment rather than any deliberate indifference to his medical needs." *Culp,* 2000 WL 995495, at \*9. In fact, plaintiff's own expert states that he would have recommended "more physical therapy *and/or* recommend surgical intervention" if a patient "had persistent complaints of pain after physical therapy." (Pearle Report at 4 (emphasis added).) Thus, a "mere disagreement in treatment does not amount to an Eight Amendment violation." *Culp,* 2000 WL 995495, at \*9 (rejecting deliberate indifference claim based on the fact that one doctor recommended arthroscopic surgery for knee injury, while another doctor concluded that surgery was not warranted until more conservative measures like physical therapy had been tried and failed); see also *Demata,* 1999 U.S.App. LEXIS 22955, at \*5 (rejecting deliberate indifference claim, reasoning that the fact that the plaintiff "fe[lt] something more [than physical therapy] should have been done to treat his [knee] injuries is not a sufficient basis for a deliberate indifference claim").

**\*9** Likewise, plaintiff's recently raised assertion that Dr. Thebaud ignored orthopedists' orders by failing to implement physical therapy prescribed for plaintiff does not raise facts sufficient to show that Dr. Thebaud's behavior meets the subjective prong of the deliberate indifference test. Putting aside for the moment that plaintiff improperly raised his second theory of deliberate indifference for the first time in his opposition for summary judgment, the medical records establish that Dr. Thebaud "heed[ed] a physician's recommendations regarding treatment," *Demata,* 1999 U.S.App. LEXIS 22955, at \*16, by referring plaintiff to physical therapy and additional orthopedic consultations, per the orthopedists' orders. Plaintiff's expert admits that Dr. Thebaud provided "appropriate care" from February 2003 until February 2004. (Pearle Report at 4.) Thereafter, it is undisputed from the medical records that in March 2004, plaintiff reported improvement to his knee and Dr. Thebaud referred plaintiff for more physical therapy; that plaintiff attended physical therapy in April 2004; that plaintiff requested physical therapy to a nurse in June 2004; and that Dr. Thebaud referred plaintiff for an orthopedic consultation on July 19, 2004, the first

time the plaintiff had complained of knee pain to Dr. Thebaud since March of that year. (Consultation Reports at D156; Ambulatory Health Records at D044-D048.) Even assuming for purposes of this motion that between March 1, 2004 and August 13, 2004, Dr. Thebaud failed to refer plaintiff to as many physical therapy sessions as plaintiff's expert would have scheduled per the orthopedic clinic's "prn" recommendation, any delay in Dr. Thebaud's physical therapy referrals is insufficient for a finding of subjective intent. As in *Demata,* plaintiff has not alleged, nor is there anything in the record to show, that plaintiff's knee injury was "fast-degenerating" or "life threatening," that Dr. Thebaud delayed treatment in order to punish plaintiff or that any delay in treatment rose to the egregious level identified in *Hathaway v. Coughlin,* 841 F.2d 48, 50-51 (2d Cir.1988). In fact, uncontroverted medical records show that every time plaintiff complained of knee pain to Dr. Thebaud, Dr. Thebaud promptly referred him to an orthopedist and followed the orthopedists' treatment recommendations. Plaintiff's unsupported, conclusory allegations otherwise are insufficient to avoid summary judgment.

Thus, construing the facts in the light most favorable to the plaintiff, the court finds that Dr. Thebaud was not deliberately indifferent to plaintiff's medical needs within the meaning of the Eighth Amendment, and summary judgment is appropriate. *See, e.g., Culp,* 2000 WL 995495, at *9-10; *Demata,* 1999 U.S.App. LEXIS 22955 at *4-6. As plaintiff cannot establish that the Dr. Thebaud acted with the requisite culpable mental state, the court need not address whether plaintiff's injury constitutes a "serious medical condition" for purposes of the Eighth Amendment.

### III. *Qualified Immunity*

**\*10** Furthermore, even if Dr. Thebaud's conduct rose to the level of a constitutional violation, he would be entitled to qualified immunity and defendant's motion for summary judgment is alternatively granted on this basis. "The qualified immunity doctrine protects a governmental official performing discretionary functions from liability to the extent his 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Eng v. Coughlin,* 858 F.2d 889, 895 (2d. Cir.1988) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). The inquiry turns on "the 'objective

legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.' " *Pearson v. Callahan,* --- U.S. ----, ----, 129 S.Ct. 808, 822, 172 L.Ed.2d 565 (2009) (quoting *Wilson v. Layne,* 526 U.S. 603, 614, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). When an official "reasonably believes that his or her conduct complies with the law," qualified immunity shields him or her from liability. *Id.* at 823.

The general constitutional right of a prisoner to be free from deliberate indifference to his or her serious medical needs was clearly established at the time of the events giving rise to this action. *See Estelle,* 429 U.S. at 104-05. The Supreme Court has never specifically addressed whether the conduct evidenced in the undisputed facts in this record constitutes deliberate indifference. Nevertheless, the court finds, in light of the Second Circuit's summary order in *Demata,* 1999 U.S.App. LEXIS 22955, discussed at length above, that Dr. Thebaud reasonably believed that his conduct complied with the law. *Pearson,* 129 S.Ct. at 823 (the unlawfulness of the officers' conduct in entering the plaintiff's home without a warrant was not clearly established because lower court decisions at the time held that similar conduct was constitutional). As a result, if any of Dr. Thebaud's conduct, as established in the current record, amounted to a constitutional violation, the unlawfulness of that conduct was not clearly established. Therefore, Dr. Thebaud is entitled to qualified immunity and summary judgment is granted in defendant's favor.

### *CONCLUSION*

Defendant's motion for summary judgment is granted because there exists no genuine issue of material fact as to whether Dr. Thebaud acted with deliberate indifference. Alternatively, Dr. Thebaud is entitled to qualified immunity. The Clerk of the Court is directed to enter judgment in favor of defendant Administrator of Suffolk County as Administrator of the Estate of Dr. Francis Thebaud and to close the case.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 376626

## Footnotes

1       The court notes plaintiff's objection to the admission of the declaration of defendant's now deceased expert, Dr. Edward Habermann, on which defendant relies in its Rule 56.1 Statement of Undisputed Material Facts. Because the court relies on the medical records themselves in deciding this motion, and does not rely on Dr. Habermann's declaration, the court need not reach the admissibility of Dr. Habermann's declaration. Plaintiff's DOC medical records may be admissible under the business records exception to the hearsay rule, provided that such records are "kept in the course of regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation." Fed.R.Evid. 802. Neither party has supplied an affidavit containing facts supporting admissibility of the plaintiff's medical records, nor have the records been certified in a manner compliant with Fed.R.Evid. 902(11); therefore, the records are not technically admissible. Nevertheless, the court considers the medical records because the plaintiff relies on the records in support of his claims and in his opposition to the motion for summary judgment. *See* Atkinson v. Fischer, No. 07-CV-00368, 2009 WL 3165544, at *3 n. 1 (N.D.N.Y. Sept. 25, 2009) (Report and Recommendation) (although lack of authentication rendered medical and grievance records "not technically admissible," court considered the records when granting defendants' motion for summary judgment "because Plaintiff relied on many of the same records in his complaint and in his opposition to the motion for summary judgment"); *Sheils v. Flynn,* No. 06-CV-0407, 2009 WL 2868215, at *2 n. 2 (N.D.N.Y. Sept. 2, 2009) (Report and Recommendation) (although court found that lack of authentication rendered medical records attached as exhibits to affidavits "not technically admissible," the court considered the records on defendants' motion for summary judgment "because Plaintiff also relied on the records in his opposition to the motion for summary judgment"). The parties are cautioned that medical records should be properly authenticated and accompanied by an affidavit or certification that complies with Fed.R.Evid. 803.

2       The DOC doctors do not make decisions to transfer inmates among DOC facilities. (Haider-Shah Decl. at ¶ 8.)

3       Although *Demata* is a summary order, the court finds the Second Circuit's analysis persuasive.

---

**End of Document**            © 2016 Thomson Reuters. No claim to original U.S. Government Works.